## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS

DR. JEROME CORSI, Individually
Denville, NJ, 07834

And

LARRY KLAYMAN, Individually
7050 W. Palmetto Park Rd. #15-287
Boca Raton, FL, 33433

                Plaintiffs

         v.

INFOWARS, LLC
100 Congress Ave., 22nd Floor
Austin, TX 78701

And

FREE SPEECH SYSTEMS, LLC
100 Congress Ave., 22nd Floor
Austin, TX 78701

And

ALEX E. JONES, Individually
3019 Alvin Devane Blvd., Suite 300-350
Austin, TX 78741

And

DAVID JONES, Individually
3019 Alvin Devane Blvd., Suite 300-350
Austin, TX 78741

And

OWEN SHROYER, Individually
3019 Alvin Devane Blvd., Suite 300-350
Austin, TX 78741

And

Case Number:   **1:20-cv-298-LY**

**AMENDED COMPLAINT**

1

ROGER STONE, Individually
447 Coral Way
Fort Lauderdale, FL 33301

                    Defendants.

## INTRODUCTION

Plaintiffs DR. JEROME CORSI ("Plaintiff Corsi or Dr. Corsi") and LARRY KLAYMAN ("Klayman") hereby files this action against INFOWARS, LLC ("Defendant InfoWars"), FREE SPEECH SYSTEMS, LLC ("Defendant Free Speech Systems"), ALEX E. JONES ("Defendant Alex Jones"), DAVID JONES ("Defendant David Jones"), OWEN SHROYER ("Defendant Shroyer") (collectively the "Infowars Defendants"), and ROGER STONE ("Defendant Stone") for Defamation, Intentional Infliction of Emotional Distress, and Assault, and violation of the Lanham Act.

## JURISDICTION AND VENUE

1.     This Court has federal question jurisdiction over this case pursuant to 28 U.S.C § 1331.

2.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2), (3) in that a substantial part of the events or omissions giving rise to Plaintiffs' claims arose in this district. The U.S. District Court in the Southern District of Florida transferred this action to this Court. Defendants actions were targeted to influence Special Counsel Robert Mueller's Russian collusion investigation and prosecution of Defendant Stone, a colleague of the other Defendants, which and who are centralized in this judicial district and the defamatory and other illegal acts occurred herein as well as throughout the United States and worldwide.

## THE PARTIES

3.      Plaintiff Corsi is an author and political commentator who publishes works in this judicial district and nationwide. Plaintiff Corsi is a citizen of New Jersey.

4.      Plaintiff Klayman is a public interest legal advocate, private practitioner and litigator who represented Plaintiff Corsi with regard to Special Counsel Robert Mueller's ("Mueller") Russian collusion investigation.  Plaintiff Klayman is also a media personality and author, columnist and syndicated radio talk show host. Plaintiff Klayman is a citizen of Florida.

5.      Defendant InfoWars is a Texas limited liability company with principal offices located in Austin, TX.

6.      Defendant Free Speech Systems is a Texas limited liability company with principal offices located in Austin, TX.

7.      Defendant Alex  Jones is a well-known extreme fabricator of false stories and conspiracies, who has been sued numerous times for alleged defamation. He is  media personality who creates frequently false and defamatory content that is broadcasted on the radio and posted on the internet at www.infowars.com and elsewhere on the internet and other social media sites in this district, nationally and internationally. Defendant Alex Jones is a citizen of Texas.

8.      Defendant David Jones is Defendant Alex Jones's father and holds the official title of Director of Human Relations for Defendant Free Speech Systems. On information and belief, Defendant David Jones is the owner of Defendant InfoWars and Free Speech Systems and he manages and controls the business and related activities for Defendants InfoWars and Free Speech Systems, as well as Defendant Alex Jones' other companies. Defendant David Jones is a citizen of Texas. At all material times he worked in concert with and as an agent for the other Defendants and Defendant Roger Stone and furthered, participated in  and ratified  the illegal acts set forth in this

Complaint. He profits and profited at all material times  financially and otherwise from the tortious acts of the other Defendants.

9.      Defendant Shroyer is a newscaster for Defendant InfoWars. Defendant Shroyer is a citizen of Texas.

10.      Defendant Stone is an individual and a citizen of Florida and a resident of Fort Lauderdale, Florida. Defendant Stone was indicted by Special Counsel Robert Mueller as part of the alleged "Russian Collusion' investigation and subsequently convicted on seven felony counts of perjury, witness tampering and obstruction of justice. While his 40 month sentence to serve time federal prison was commuted by President Donald J. Trump, notably he was not pardoned and his felony convictions for perjury, witness tampering and obstruction of justice stand. He is a self-proclaimed "Dirty Trickster" who admires and frequently extols the "virtues" of Mafia figures and other unsavory persons, who he professes to pattern himself after. *See* Exhibit 1 – Mueller Indictment.

## **GENERAL ALLEGATIONS**

11.      Defendant InfoWars and Defendant Free Speech Systems are both owned, controlled, and operated by Defendant Alex Jones and David Jones. Defendant Free Speech Systems owns www.infowars.com, where content created by Defendants Alex Jones, Shroyer and Stone were at all material times posted and broadcast into this district, nationally and internationally.

12.      Defendant Alex Jones hosts *The Alex Jones Show*, which is broadcast on radio and internet social media networks throughout the United States of America and internationally, including this judicial district, and online.

13.      Defendant Shroyer hosts *The War Room* at all material times along with

Defendant Stone which is broadcast on radio and internet social media networks throughout the United States of America and internationally, including this judicial district, and online.

14.    Defendants' reach and influence are enormous. On information and belief, Defendant Alex Jones and InfoWars has a radio audience of over two million people. Before it was banned from YouTube, Defendant Alex Jones' and InfoWars' channel had more than 2.4 million subscribers.[1]

15.    Defendants, each and every one of them, in concert, do substantial business and promote and sell various goods in this judicial district and nationwide, including medicine, supplements, and "tchotchkes" with InfoWars branding. The money earned from these sales funded the conspiracy and concerted acts between amongst Defendants to defame, intimidate, coerce and threaten Plaintiffs in order to first try to improperly influence the Mueller Russian collusion investigation and subsequently try to coerce false testimony from Plaintiff Corsi at Stone's criminal prosecution favorable to Defendant Stone once he had been indicted.

16.    Defendant Stone also does business promotes and sells various goods in this judicial district and nationwide, including medicine, supplements, books, and "tchotchkes" with his own branding, and he also fundraises by direct mail and the internet in this district. He claims to have raised millions of dollars with his fundraising, wherein he falsely claims to have been persecuted by a federal judge and the jury, despite not having presented one witness, including himself, at his criminal trial, obviously because he was guilty as charged. In fact, he was convicted on seven felony counts in this own words, as the undersigned pro se counsel, Mr. Klayman, who sat in on the trial for his client Plaintiff Corsi, can attest. The money earned from

---

[1] Casey Newton, *YouTube deletes Alex Jones' channel for violating its community guidelines*, The Verge, Aug. 6, 2018, available at: https://www.theverge.com/2018/8/6/17656708/youtube-alex-jones-infowars-account-deleted-facebook-apple-spotify

these sales funds Defendant Stone's legal defense fund and the conspiracy between Defendants and Stone to defame, intimidate, coerce and threaten Plaintiffs in order to first try to improperly influence the Mueller Russian collusion investigation and subsequently try to coerce false testimony from Plaintiff Corsi, Plaintiff Klayman's client, favorable to Defendant Stone once he had been indicted.

17.     The Defendants related to Infowars in particular have a long and sordid history of publishing and broadcasting defamatory material, including falsely, recklessly and baselessly accusing the families of the schoolchildren who lost their lives during the 2012 Sandy Hook Elementary School massacre of staging the massacre and faking the deaths of their children.[2]

18.     The Sandy Hook families had to endure years of abuse and torture from Defendants before finally filing suit against numerous parties involved with InfoWars, including Defendant Alex Jones and Shroyer, for defamation.

19.     As just one example, a Florida woman was arrested for making  death threats to a parent of a Sandy Hook victim.[3] According to the U.S. Department of Justice, the motivation behind the threats was the lies propagated by these Defendants that the Sandy Hook massacre was a hoax.[4]

20.     Furthermore, Defendant Alex Jones in concert with the other Defendants propagated and promoted the "Pizzagate" conspiracy on his show, accusing a restaurant called Comet Ping Pong in the Washington D.C. area of operating a child sex ring in its non-existent

[2] Aaron Katersky, *Families of Sandy Hook shooting victims win legal victory in lawsuit against InfoWars, Alex Jones*, ABC News, Jan. 11, 2019, available at:
https://abcnews.go.com/US/families-sandy-hook-shooting-victims-win-legal-victory/story?id=60314174
[3] Daniella Silva, *Conspiracy Theorist Arrested for Death Threats Against Sandy Hook Parent*, NBC News, Dec. 7, 2016, available at: https://www.nbcnews.com/news/us-news/conspiracy-theorist-arrested-death-threats-against-sandy-hook-parent-n693396
[4] *Id.*

basement that purportedly involved Hillary Clinton and John Podesta. This caused one of his listeners to shoot up the restaurant after being told by Defendant Jones to "self-investigate" the "Pizzagate" conspiracy theory.[5]

21.     Defendants, acting in concert, propagated these outrageous lies with no regard for the grief of their victims in order to gain notoriety, fame, and profit.

22.     The Defendants, acting in concert, as part of their latest scheme for notoriety, fame, and profit,  worked in concert with and on information and belief continue to work in concert with Defendant Stone, who was  at all material times an integral host on Infowars, and handsomely compensated by it,  to defame, intimidate, and threaten Plaintiffs.

23.     Defendant Stone - who was indicted on seven counts of perjury, witness tampering and obstruction of justice by Special Counsel Robert Mueller and then placed under a total gag order by the jurist, the Honorable Amy Berman Jackson,  presiding over his prosecution for, in part, even threatening her by posting, among other coercive and threatening acts, an Instagram meme of a crosshairs, that is a gun, to her head,  and subsequently convicted on all seven felony counts - has appeared numerous times on shows broadcasted by Defendant InfoWars, and hosted by Defendants Alex Jones and Shroyer, where  Defendants at the direction of Stone and Stone himself have published malicious false, misleading, and defamatory statements concerning Plaintiffs.

24.     Specifically, the seven count Mueller Indictment against Stone involved lying under oath - that is, perjury - witness tampering and obstruction of justice by threatening to kill a material witness, Randy Credico ("Credico") and his service dog, if Credico did not lie or invoke

---

[5] James Doubek, *Conspiracy Theorist Alex Jones Apologizes For Promoting 'Pizzagate'*, NPR, Mar. 26, 2017, available at: https://www.npr.org/sections/thetwo-way/2017/03/26/521545788/conspiracy-theorist-alex-jones-apologizes-for-promoting-pizzagate

the Fifth Amendment to government authorities concerning his involvement with Roger Stone. Credico is Person 2 in the Mueller Indictment of Stone. *Id.* Person 1 in this Mueller Indictment is Dr. Corsi.

25.     Even before Defendant Stone was indicted, he began a public relations campaign in this district, nationally and internationally to maliciously defame, smear, intimidate and threaten Dr. Corsi and Plaintiff Klayman, Plaintiff Corsi's lawyer and defense counsel.

26.     As just one example, in an article from The New Yorker, Defendant Stone was quoted as saying about Plaintiff Corsi, "He's certifiably insane, and he has told multiple provable lies."[6] This malicious defamatory statement, among others, was published  in concert with Defendants.

27.     Defendant Stone knew that he was going to be indicted, and therefore began this public relations campaign to maliciously defame smear, intimidate and threaten Plaintiff Corsi and Plaintiff Klayman, Corsi's legal counsel, even before his actual indictment on January 25, 2019, in order to try to influence public opinion and Special Counsel Robert Mueller – by trying to attribute guilt to Plaintiff Corsi and not him - as well as to try to raise money for his legal defense.

28.     This defamatory public relations campaign was calculated to coerce Plaintiff Corsi to testify falsely at Defendant Stone's criminal trial before Judge Jackson.

29.     Defendant Stone likes to portray himself as Mafia, and indeed on information and belief has Mafia connections, frequently making reference to Mafia figures who he admires, as well as other unsavory types who have been alleged to have engaged in unethical and/or illegal

---

[6] Jeffrey Toobin, *Roger Stone's and Jerome Corsi's Time in the Barrel*, The New Yorker, Feb. 18 & 25 Issue, available at: https://www.newyorker.com/magazine/2019/02/18/roger-stones-and-jerome-corsis-time-in-the-barrel

behavior. For example, he frequently makes reference to his heroes being Hyman Roth in the 'Godfather," who was the movie version of Meyer Lansky, and Roy Cohn, not to mention, Richard Nixon, for his role in Watergate. In this regard, after Stone was indicted he held a press conference on the courthouse steps of the federal courthouse in Ft. Lauderdale, where he was booked, with his arms defiantly in the air in the "victory' pose used by Nixon after he resigned in disgrace as a result of the Watergate scandal. At the time, Stone had been employed by a Nixon group called CREEP, or the Committee to Reelect the President. Defendant Stone even has a large tattoo of Richard Nixon affixed to his back. Thus, given his admiration for persons such as these, particularly Mafia figures, his actions as pled herein must be taken as threats, as well as being defamatory. And, Plaintiff Corsi is 72 years old and thus very vulnerable emotionally, physically and financially to these threats. Stone's intentional infliction of emotional distress and coercion and threats were intended to try even cause Plaintiff Corsi to have heart attacks and strokes, in order that Plaintiff Corsi would be unable to testify at Stone's criminal trial. Tellingly, Stone threatened kill a material witness and his service dog, Credico, Person 2 in the Mueller Indictment, "Mafia style." During his criminal trial, testimony was elicited by the government prosecutors in proving their witness and obstruction of justice felony charges, that Defendant Stone had told material witness Credico to do a Frank Pentangeli, a Mafia character in the film The Godfather, that is not testify to the truth. Stone also fashions himself and indeed has the reputation, at a minimum, as being the preeminent "dirty trickster," of which he is proud. *See* "Get Me Roger Stone" on Netflix.

30.     By defaming Plaintiffs, Defendant Stone had hoped to not only intimidate Plaintiffs to severely harm and damage their reputations, but also to coerce and threaten Plaintiff Corsi to testify falsely if subpoenaed to be called as a material witness in Stone's criminal trial.

He was also trying divert funds away from Dr. Corsi's legal defense fund, while boosting his own legal defense fund.

31.     Stone has also used and continues to employ surrogates and agents, either out in the open or secretly, to defame Plaintiffs, such as Defendants herein, and his "friend" Michael Caputo, Cassandra Fairbanks, reporter Chuck Ross of The Daily Caller, and Tom Fitton of Judicial Watch, to name just a few.

32.     Tellingly, in a video published by The Daily Caller, Defendant Shroyer appearing with Stone, admits that he will serve as a surrogate, that is an agent for Stone if Stone receives a gag order, which he did. 7  The other Defendants, like Shroyer, are also surrogates and agents of Stone, including but not limited to agent and Defendant David Jones, who controls and approves of and ratifies the conduct at all material times all of the Defendants.

33.     Defendant Stone's illegal and improper attempts to influence the Russian collusion investigation was even recognized by the presiding judge, the Honorable Amy Berman Jackson ("Judge Jackson"), who was forced to issue a complete "gag" order on Stone after Stone attempted to incite violence against Judge Jackson by putting a picture of her face and gun crosshairs up on his Instagram account.8

34.     In her minute order of February 21, 2019 imposing the total "gag" order on Stone, Judge Jackson directly cited and referenced his use of surrogates, such as all of the other Defendants herein :

> Furthermore, the defendant may not comment publicly about the case indirectly
> by having statements made publicly on his behalf by surrogates, family members,

---

7 https://www.youtube.com/watch?v=SSDkh5RYtGo
8 *Judge in Roger Stone case orders hearing after he appeared to threaten her on Instagram*,
Washington Post, Feb. 19, 2019, available at:
https://www.washingtonpost.com/politics/2019/02/18/roger-stone-deletes-photo-judge-presiding-over-his-case-says-he-didnt-mean-threaten-her/?utm_term=.2d3c5afa6326

spokespersons, representatives, or volunteers.

35.     Further evidence of Defendant Stone's collaboration and actions in concert as joint tortfeasors with the other Defendants, which other Defendants which and who were at all material times Stone's agents, as well as Stone's pattern and practice of defamatory, intimidating, coercive, threatening and defamatory conduct, is set forth in an *amicus curiae* brief filed by Plaintiff Klayman on behalf of Plaintiff Corsi in Defendant Stone's criminal case. Such evidence is attached hereto as Exhibit 2 and incorporated herein by reference, as well as civil complaint filed by Corsi and Klayman against Stone, and in a civil complaint filed by Klayman against Fitton. *See* Exhibits 3, 4, and 5, which are incorporated herein by reference.

36.     Defendants have, by working in concert with and as agents of Stone, therefore engaged in illegal witness tampering, intimidation and threats in violation of 18 U.S.C. § 1512 by virtue of the defamatory and threatening acts and practices as alleged herein. Not coincidentally, this was what largely Stone was indicted and convicted  for by Special Counsel Robert Mueller, for which he was sentenced to 40 months of incarceration a federal penitentiary.

## DEFENDANTS' DEFAMATORY CONDUCT

37.     Defendant Stone has appeared numerous times on programs of the Defendants, *The Alex Jones Show* and The *War Room (and has been a compensated Infowars host in his own right)*. These shows are hosted by Defendant Alex Jones and Shroyer and Stone where numerous false, misleading, malicious and defamatory statements of and concerning Plaintiffs were made, published, and or ratified by all of the Defendants, each and every one of them, as surrogates and agents of Defendant Stone.

38.     Plaintiffs have demanded retraction and correction of the defamatory videos and publications set forth below and generally in this Complaint, but Defendants have arrogantly

refused, thereby ratifying any and all defamatory statements contained therein, and compounding the damage alleged herein.

39.     Defendants, at a minimum, acted recklessly with disregard for the truth, as they have known Plaintiff Corsi for a long time, and even worked with him and are also intimately familiar with Plaintiff Klayman, so they were well aware that the statements made by the co-Defendant Stone, and their own false, misleading, malicious and defamatory statements were, indeed, false, as well as their acting as agents of, much less their ratification of the malicious false statements published by Defendant Stone on their networks and media sites.

40.     As the content containing the malicious false, misleading,  and defamatory statements were published on the internet and elsewhere, it is proliferated like a "cancerous virus," and is was and remains available for viewing from countless sources, thereby exponentially increasing the prejudicial and defamatory impact and severe damage inflicted on Plaintiffs.  Judge Jackson, in issuing her two gag orders against Stone, herself recognized how postings calling for physical harm to her and other threatening postings on the internet proliferate widely and once made cannot be taken back.

### I.     *The October 26, 2018 Video*

41.     In a video from October 26, 2018, Defendant Alex Jones, acting in concert with the other Defendants and at their direction, particularly Defendant Stone, makes several false, misleading, malicious and defamatory statements about Plaintiff Corsi.[9]

42.     At 0:45, Defendant Alex Jones maliciously and falsely published at the direction of Defendant Stone and the other Defendants that Plaintiff Corsi "seemed to be extremely mentally degraded to the point of what I would call dementia."

43.     In the same video, Defendant Alex Jones, acting in concert with and at the

[9] https://www.youtube.com/watch?v=UuXPAn0nZo8

direction of Defendant Stone and the other Defendants, maliciously fabricates a story where he purportedly saw Plaintiff Corsi at a steakhouse "on the ground at another table" and that his security staff "thought he was dead in the elevator."

44.     At 5:08, Defendant Alex Jones, acting in concert with and at the direction of Defendant Stone and the other Defendants, after accusing Plaintiff Corsi of having suffered a stroke, publishes maliciously that "whatever comes out of his mouth ain't the truth."

45.     Tellingly and not at all coincidentally, Stone appeared as a guest on the same video, as evidence of Defendants working in concert with and as agents of Stone.

46.     These malicious false, misleading, and defamatory statements were published by Defendants acting in concert and at the direction of Defendant Stone as Stone's agents to discredit and coerce into false testimony from Plaintiff Corsi in order to preserve the reputation of and assist their co-conspirator Stone before Mueller's Russian collusion investigation and later prosecution, as Stone had been indicted and Plaintiff Corsi named a material witness. Importantly, Plaintiff Corsi was not indicted. Plaintiff Klayman was known by all of the Defendants to be Dr. Corsi's legal counsel.

### II.     *The January 18, 2019 Video*

47.     Before Defendant Stone was indicted, on or about January 18, 2019, he appeared on *The War Room* with Defendant Shroyer, where he made several malicious false, misleading, and defamatory statements in this district,  nationally and internationally  regarding Plaintiffs (the "January 18 Video").[10] The same video was published on Stone's YouTube channel, "*Stone Cold Truth*," on January 18, 2019.[11]

48.     These malicious false, misleading, and defamatory statements were at the

[10] https://www.infowars.com/watch/?video=5c3fbf24fe49383dcf6996e4
[11] https://www.youtube.com/watch?v=cJyfgdvtFx8

direction of all of the Defendants and adopted and published by each and every one of the Defendants, rendering them joint tortfeasors and jointly and severally liable.

49.     At 2:09 in the January 18 Video, Stone and the other Defendants working in concert and at the direction of Defendant Stone as his agents maliciously and falsely published that Plaintiff Corsi was "fired from World Net Daily."

50.     At 2:27 in the January 18 Video, Stone and the other Defendants working in concert and at the direction of Defendant Stone as his agents maliciously falsely and misleadingly published that, "He (Corsi) was perfectly willing to lie, to perjure himself saying that a memo that he had wrote me was written on the 30th for the purposes of cover-up…. which is further proof that Jerry lied under oath."

51.     At 2:55 in the January 18 Video, Stone and the other Defendants working in concert with at the direction of and as agents of Defendant Stone maliciously falsely and misleadingly published, "and then states that I knew about John Podesta's emails being stolen in advance, the only proof of that is Jerry's feeble alcohol affected memory – it's a lie…."

52.     At 3:35 in the January 18 Video, Stone and the other Defendants working in concert at the direction of and as agents of Defendant Stone maliciously falsely and misleadingly published that "Jerry was prepared to stab a principle Trump supporter in the back, he was perfectly prepared to bear false witness against me, even though I had done nothing in my entire life other than help him."

53.     At 4:20 in the January 18 Video, Stone and the other Defendants working in concert with and at the direction and as agents of Defendant Stone  maliciously falsely and misleadingly published that "all I ever did was show Jerry Corsi friendship and support and try to help him and his family and what I get is Judas Iscariot, the willingness to testify against me and

help the deep state bury me….and then he makes up this story about helping me formulate a cover story."

54.     At 6:26 in the January 18 Video, Stone and the other Defendants working in concert with and as agents at the direction of Defendant Stone  maliciously falsely published that "you can always tell when Jerry Corsi is lying because his lips are moving…."

55.     At 1:25 in the January 18 Video, Stone and the other Defendants working in concert with and as agents at the direction of Defendant Stone maliciously falsely published that "He's (Klayman) never actually won a courtroom victory in his life."

56.     At 1:30 in the January 18 Video, Stone and the other Defendants working in concert and as agents at the direction of Defendant Stone maliciously  falsely published, "He (Klayman) was ousted at Judicial Watch. Ask Tom Fitton [the current president of Judicial Watch] why he left. He was 'ousted' because of a 'sexual harassment complaint.'"

57.     In actuality and truth, Plaintiff Klayman left Judicial Watch voluntarily on his own accord in order to run for U.S. Senate in Florida in 2003-2004.

58.     Not coincidentally, Plaintiff Klayman has a jury verdict and judgment against Fitton's Judicial Watch for having defamed him with malice. Punitive damages were also awarded by the jury in the U.S. District Court for the Southern District of Florida. *See* Exhibit 5-1.

59.     At 1:37 in the January 18 Video, Stone acting in concert with the other Defendants maliciously working in concert with the other Defendants falsely published, "He's (Klayman) incompetent, he's a numbskull, he's an idiot, he's an egomaniac, and he could be the single worst lawyer in America. With him as Jerry Corsi's lawyer, Corsi may get the electric chair. So your idea that he's a good guy is entirely wrong"

60.     In actuality, Plaintiff Klayman has been a practicing attorney for over four decades and has won numerous cases on behalf of his clients and also against the government for constitutional and other violations.  He is the founder of both Judicial Watch and Freedom Watch, a former candidate for the U.S. Senate in Florida, a former trial attorney and prosecutor of the Antitrust Division of the U.S. Department of Justice, where he was a member of the trial team that successfully broke up the AT&T monopoly and created competition in the telecommunications industry. Among many other legal victories, Plaintiff Klayman also won landmark decisions at the chairman and general counsel of Freedom Watch enjoining the illegal mass surveillance by the National Security Agency. *Klayman v. Obama*, 1:13-cv-851 (D.D.C). *See* Exhibit 6 --*Klayman biography*, which is incorporated herein by reference. Stone knew this when working in concert with the other Defendants he published acting in concert with the other Defedants the malicious false and misleading statements about Klayman and thus willfully and maliciously defamed Plaintiff Klayman.

61.     At 2:01 in the January 18 Video, Stone maliciously working in concert with the other Defendants falsely and misleadingly published that Plaintiff Klayman is a "piece of garbage."

62.     At 4:11 in the January 18 Video, Stone maliciously working in concert with the other Defendants falsely and misleadingly published, "For those people out there who think…that Larry Klayman's IQ is higher than 70, you're wrong…"

63.     Defendants, all of them working in concert and as agents of Defendant Stone, published these malicious false, misleading, and defamatory statements with malice and with full knowledge that they were false and misleading, and/or at a minimum, with a reckless disregard for its truthfulness. These statements falsely and misleadingly state that Plaintiff Corsi was fired

from World Net Daily, that he committed perjury (a federal offense), and that he is an untruthful person. They also create the false and misleading implication that Plaintiff Klayman is unqualified to be an attorney, public advocate and is a bad and loathsome person, unfit for his trades and professions. Plaintiff Klayman is also an author, columnist and  nationally syndicated radio and internet talk show host on Radio America, his show titled "Special Prosecutor with Larry Klayman." See www.radioamerica.com. The malicious false and misleading published statements as alleged herein also severely damaged Plaintiff Klayman personally and professionally in this regard, particularly since he and his show compete with Defendant InfoWars and and the other Defendants in media markets in this district, nationally and internationally. Plaintiff Corsi also competes with Defendant InfoWars and the other Defendants in media markets in this district, nationally and internationally.

### III.    Other Malicious Defamatory Publications

64.    In another appearance on InfoWars which was posted to YouTube[12] on January 17, 2019, Defendant Stone working in concert with the other Defendants at 6:22 maliciously falsely and misleadingly published that "He [Corsi] was perfectly willing to bear false witness against me on multiple points that are complete fabrications."

65.    In another appearance on InfoWars, this time on *The Alex Jones Show* from January 21, 2019, Defendant Stone maliciously working in concert with the other Defendants falsely and misleadingly published that "the good doctor [Corsi] has told a number of lies. In fact, he's starting to conflate his lies…. he was perfectly willing to lie about me…. but now lying about Alex Jones, lying about InfoWars, lying about Dr. (David) Jones, who's one of the nicest, gentlest, sweetest, most honest men I have ever met, it's beyond the pale…. Jerry Corsi can no

---

[12] https://www.youtube.com/watch?v=GJd8YBDvm1Q

longer be believed."[13]

66.    In the same appearance, Stone maliciously working in concert with the other Defendants falsely and misleadingly published that, "I think you've [Corsi] been deep state from the beginning. Your whole birther thing is used as a club to destroy conservatives….I look forward to our confrontation. I will demolish you. You're a fraudster, out of your alcoholic haze you have made up lies about David Jones and Alex Jones and Roger Stone and now I suspect they want you to lie about the President." This is clearly a threat, as well as being maliciously defamatory. It is akin to the threats against Person 2 in the Mueller Indictment, Randy Credico, who Defendant Stone, as set forth in the Mueller Indictment, based on Stone's own words contained in his own documentary evidence, threatened to kill along with Credico's service dog. Later Stone threatened the judge presiding over his criminal prosecution, the Honorable Amy Berman Jackson.

67.    In the same January 21, 2019 video, at 43:40, Defendant Alex Jones maliciously acting in concert with the other Defendants and as an agent at the direction of Defendant Stone falsely accuses Plaintiff Corsi of being a "spook, back and forth with different agencies," falsely saying that Dr. Corsi had worked with different government agencies.

68.    Defendant Alex Jones further maliciously acting in concert with the other Defendants and at the direction as an agent of Defendant Stone falsely accuses Plaintiff Corsi of sometimes "not being able to walk," creating the false and defamatory implication that he is an alcoholic.

69.    Defendants acting in concert as an agent at the direction of Stone published these false, misleading, and defamatory statements at the direction and agent of and  in concert with Stone with malice and with full knowledge that they were false and misleading, and/or at a

[13] https://www.youtube.com/watch?v=ANfe9d7YzL0 (Beginning at 38:00)

minimum, with a reckless disregard for their truthfulness. These statements falsely and misleadingly published that Plaintiff Corsi committed perjury (a federal offense), is an untruthful person, and is an alcoholic. They also contain threats, amplified by Defendants facial expressions and hostile demeanor against Plaintiff Corsi and his legal counsel Larry Klayman. Defendants, acting at the direction and working in concert with Stone, obviously believed that in order to advance their interests and improper if not criminal motivations, they also had to destroy and severely harm the legal counsel of Plaintiff Corsi, who had been at all material times representing Plaintiff Corsi before Special Counsel Robert Mueller, congressional committees and generally and  counseled Plaintiff Corsi when he was subpoenaed to testify truthfully in Stone's criminal trial for perjury, witness tampering, threatening to kill a material witness and his service dog, as well as  obstruction of justice. Corsi, despite all of this, was never called as a witness by Defendant Stone, since Stone and his legal counsel must have concluded that his truthful testimony would not have benefited Stone.

<u>FACTS PERTAINING TO DEFENDANTS' UNFAIR COMPETITION</u>

70.    In addition to being an investigative journalist/author and a public interest litigator/advocate, respectively, Plaintiffs Corsi and Plaintiff Klayman are both competitors to Defendants as conservative media personalities, broadcasters, authors and columnists on social media and elsewhere.

71.    For instance, Plaintiff Klayman also hosts a syndicated  broadcast and on-line radio show on about 50 networks and podcasts and produces videos that are posted on the internet, issues press releases, commentary and other publications.

72.    Defendants have directed, made, adopted, and or ratified numerous false or misleading statements of fact of and concerning Plaintiffs during their various subject programs

and media postings and publications as pled herein, which all contain significant advertisement or promotions.

73.     These false and/or misleading facts materially prejudice the viewers and/or listeners as to the quality, nature, and contents of Plaintiffs' services, which has caused significant competitive and commercial injury to Plaintiffs, as well as loss of good will and reputation.

74.     Plaintiffs, like Defendants, rely on viewer and listener financial and other support and sales and their reputations and good will in order to continue their work. Defendants' false and/or misleading statements concerning Plaintiffs is meant to, and has, diverted financial and other  support, referrals and sales away from Plaintiffs and to Defendants instead, and severely harmed Plaintiffs' personal and professional reputations.

## FIRST CAUSE OF ACTION
### *Defamation*

75.     Plaintiffs re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

76.     Acting in concert Defendants and as an agent at the direction of Defendant Stone published the aforementioned malicious, false, misleading and defamatory statements of and concerning Plaintiffs in this judicial district, nationwide, and worldwide.

77.     These false and misleading statements were published with malice, as Defendants knew that they were false and misleading, or at a minimum acted with a reckless disregard for the truth.

78.     Plaintiffs have been severely harmed and damaged by these false and misleading statements because they subjected him to hatred, distrust, ridicule, contempt, and disgrace.

79.     Plaintiffs have been damaged by these false and misleading statements because they severely injured Plaintiff Corsi and Plaintiff Klayman in their profession and businesses, as well as severely injured and damaged them personally and professionally, financially, emotionally, and in terms of their good will and reputations.

## SECOND CAUSE OF ACTION
### *Defamation Per Se*

80.     Plaintiffs re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

81.     Acting in concert, Defendants as alleged herein, published the aforementioned numerous false, misleading and defamatory statements to severely harm and damage Plaintiffs, which were republished elsewhere and widely in this district, nationally and internationally, and through surrogates, which and wo published the falsities that Plaintiffs have committed crimes, including perjury, and engaged in moral turpitude in the form of alcoholism, and committed sexual misconduct, as set forth in the preceding paragraphs. These malicious and false statements defamed Plaintiffs in their trades and professions.

82.     These false, misleading and defamatory statements were published in this district and on the internet and elsewhere, domestically and internationally for the entire world to see and hear and in so doing Defendants published false and misleading facts, *inter alia*, that Plaintiffs' conduct, characteristics or a condition are incompatible with the proper exercise of their lawful business, trades, professions or offices, as well as personally.

83.     These false and misleading statements were published with malice, as Defendants knew that they were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

84.     This statements are *per se* defamatory because they falsely and misleadingly

21

published that Plaintiff Corsi committed perjury and Plaintiff Klayman had committed sexual misconduct which are federal offense and felony, as well as defamed Plaintiffs in their trades and professions. Defamation *per se* gives rise to the presumption that severe harm and damage has arisen by virtue of the malicious false and misleading statements.

85.     These malicious false, misleading, and defamatory statements are defamatory *per se* and these false and misleading statements severely harmed and damaged Plaintiff Corsi in this profession and business as a journalist, author and political commentator, whose credibility is the most important trait, as well as personally and Plaintiff Klayman in his professions as a public interest and private advocate and litigator and as an author, columnist and radio and internet radio talk show and syndicated host, as well as personally.

## THIRD CAUSE OF ACTION
### *Defamation by Implication*

86.     Plaintiffs re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

87.     Acting in concert, Defendants published the aforementioned numerous false, misleading and defamatory statements about Plaintiffs, as set forth in the preceding paragraphs.

88.     These false, misleading and defamatory statements were published on the internet and published and republished elsewhere in this district, domestically and internationally for the entire world to see and hear.

89.     These false and misleading statements were published with malice, as Defendants knew that they were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

90.     These statements created the false and misleading implication that Plaintiff Corsi is dishonest, committed perjury and is an alcoholic, and that Plaintiff Klayman committed sexual

misconduct and is incompetent, among other false and misleading statements as pled in the preceding paragraphs.  These malicious false statements also defamed Plaintiffs in their trades and professions.

91.     Plaintiffs have been severely harmed and damaged by these false and misleading statements because they subject him to hatred, distrust, ridicule, contempt, and disgrace.

92.     Plaintiffs has been damaged by these malicious false and misleading statements because the statements severely harmed and damaged Plaintiffs in their trades and professions as journalists, authors, columnists, pubic interest and private practitioner lawyers and syndicated radio talk show hosts, whose credibility is the most important trait, as well as personally.

### FOURTH CAUSE OF ACTION
*Intentional Infliction of Emotional Distress*

93.     Plaintiffs re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

94.     Acting in concert, Defendants engaged in extreme and outrageous conduct by threatening Plaintiffs, acting as agents in concert with Stone, who has made death threats to at least one witness involved in Special Counsel Mueller's Russian collusion investigation, Person 2 Randy Credico, as well as incited violence against Judge Amy Berman Jackson by posting a meme on Instagram with a crosshairs and gun pointed at the jurist's head, for which Stone was sanctioned with a total gag order and threat of incarceration if this type of violative conduct of the Court's gag order occurred again, which it apparently has. *See* Exhibit 7.

95.     Defendants knowingly and intentionally threatened Plaintiffs, in a manner similar to other death threats co-conspirator and Defendant Stone made to at least one material witness, involved in Special Counsel Mueller's Russian collusion investigation, such as Randy Credico, Person 2 in the Mueller Indictment, as well as Judge Amy Berman Jackson.

96.     Defendants' extreme and outrageous conduct directly caused Plaintiffs severe emotional distress and resulting severe harm and damage.

## FIFTH CAUSE OF ACTION
### *Assault*

97.     Plaintiffs re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

98.     Acting in concert, Defendants placed Plaintiffs in apprehension of an imminent harmful or offensive contact and physical harm and death, by coercing and threatening Plaintiffs, in a similar manner that co-conspirator Stone has used to make death threats to at least one material witness involved in Special Counsel Mueller's Russian collusion investigation, such as Person 2 in the Mueller Indictment, Randy Credico and Judge Amy Berman Jackson.

99.     The threats issued by Defendants are credible, as co-conspirator Stone portrays and sees himself as a "Mafia" figure, as set forth above.

100.    Furthermore, as set forth above, acting in concert Defendants have a pattern and practice of calling their followers "to arms," which has resulted in deadly violence against their victims.

101.    Plaintiffs did not consent to Defendants' conduct.

102.    As a direct and proximate result of Defendants' wrongful conduct, acting in concert and as an agent at the direction of Defendant Stone, Plaintiffs suffered conscious pain, suffering, severe emotional distress and the fear of imminent serious bodily injury or death, and other mental and physical injuries, and Plaintiffs were severely harmed and damaged thereby.

## SIXTH CAUSE OF ACTION
### *Unfair Competition – Lanham Act 15 U.S.C. § 1125(a)*

103.     Plaintiffs re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

104.     Defendants have and are engaged in acts of unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a) and common law

105.     Defendants have made false and/or misleading statements that have deceived and/or had the tendency to deceive a substantial segment of the receiving audience.

106.     Defendants' false and/or misleading statements misrepresent the nature, characteristics, and qualities of Plaintiff Klayman and Plaintiff Corsi's goods or services.

107.     Defendants false and/or misleading statements are material because that were highly likely to mislead and influence supporters' decisions to provide financial support and sales to Defendants instead of Plaintiffs

108.     These false and misleading statements were made in interstate commerce, as they were widely broadcast on radio, on the internet, in social media, and elsewhere in this district, nationally and internationally.

109.     Plaintiffs have suffered significant damages, which are ongoing, due to Defendants' false and/or misleading statements. By law these damages are calculated based  on Defendants' gross  sales and receipts, which are trebled,  plus an award of attorneys fees and costs.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

a.     Awarding Plaintiffs compensatory including actual, consequential, incidental and punitive  damages for malicious tortious concerted conduct, jointly and severally in an amount to be determined at trial and in excess of $75, 000,000 U.S. Dollars

for each Plaintiff.

b.      Awarding Treble Damages Under the Lanham Act, 15 U.S.C. 1125(a).

b.      Awarding Plaintiffs attorney fees and costs

c.      Granting such other   relief as the Court deems appropriate and necessary

including preliminary and permanent injunctive relief.


**PLAINTIFFS DEMAND TRIAL BY JURY ON ALL CLAIMS SO TRIABLE**.


Dated: July 29, 2020                                Respectfully Submitted,


                                                    *   /s/ Larry Klayman   *
                                                    Larry Klayman, Esq.
                                                    KLAYMAN LAW GROUP, P.A.

                                                    2020 Pennsylvania Ave NW #800
                                                    Washington, DC, 20006
                                                    Telephone:  (310)-595-0800
                                                    Email: leklayman@gmail.com

                                                    *Counsel for Klayman Pro Se*

                                                    */s/Sanjay Biswas*
                                                    SANJAY BISWAS, Esq.
                                                    #24061235—Texas
                                                    #24966--Louisiana
                                                    11720 Duxbury Dr.
                                                    Frisco, Texas 75035
                                                    Telephone: (972)-866-5879
                                                    Email:sanjaybiswas41@gmail.com
                                                    Fax: 1-800-506-6804

                                                    *Counsel for Dr. Jerome Corsi*

## <u>CERTIFICATE OF SERVICE</u>

I, Larry Klayman, hereby certify that on this day, July 29, 2020, I electronically filed the foregoing with the Clerk of Court using the Court's ECF system. I also certify that the foregoing document is being served this day on all counsel of record through the Court's eservice procedures

*/s/ Larry Klayman*_____

EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. |
| | * | |
| v. | * | Grand Jury Original |
| | * | |
| ROGER JASON STONE, JR., | * | 18 U.S.C. §§ 1001, 1505, 1512, 2 |
| | * | |
| Defendant. | * | |
| | * | |
| | * | |
| | * | |
| | ******* | |

## **INDICTMENT**

The Grand Jury for the District of Columbia charges:

### **Introduction**

1.      By in or around May 2016, the Democratic National Committee ("DNC") and the Democratic Congressional Campaign Committee ("DCCC") became aware that their computer systems had been compromised by unauthorized intrusions and hired a security company ("Company 1") to identify the extent of the intrusions.

2.      On or about June 14, 2016, the DNC—through Company 1—publicly announced that it had been hacked by Russian government actors.

3.      From in or around July 2016 through in or around November 2016, an organization ("Organization 1"), which had previously posted documents stolen by others from U.S. persons, entities, and the U.S. government, released tens of thousands of documents stolen from the DNC and the personal email account of the chairman of the U.S. presidential campaign of Hillary Clinton ("Clinton Campaign").

a.   On or about July 22, 2016, Organization 1 released documents stolen from the DNC.

b.   Between on or about October 7, 2016 and on or about November 7, 2016, Organization 1 released approximately 33 tranches of documents that had been stolen from the personal email account of the Clinton Campaign chairman, totaling over 50,000 stolen documents.

4.   ROGER JASON STONE, JR. was a political consultant who worked for decades in U.S. politics and on U.S. political campaigns. STONE was an official on the U.S. presidential campaign of Donald J. Trump ("Trump Campaign") until in or around August 2015, and maintained regular contact with and publicly supported the Trump Campaign through the 2016 election.

5.   During the summer of 2016, STONE spoke to senior Trump Campaign officials about Organization 1 and information it might have had that would be damaging to the Clinton Campaign. STONE was contacted by senior Trump Campaign officials to inquire about future releases by Organization 1.

6.   By in or around early August 2016, STONE was claiming both publicly and privately to have communicated with Organization 1. By in or around mid-August 2016, Organization 1 made a public statement denying direct communication with STONE. Thereafter, STONE said that his communication with Organization 1 had occurred through a person STONE described as a "mutual friend," "go-between," and "intermediary." STONE also continued to communicate with members of the Trump Campaign about Organization 1 and its intended future releases.

7.   After the 2016 U.S. presidential election, the U.S. House of Representatives Permanent Select Committee on Intelligence ("HPSCI"), the U.S. Senate Select Committee on Intelligence ("SSCI"), and the Federal Bureau of Investigation ("FBI") opened or announced their respective

investigations into Russian interference in the 2016 U.S. presidential election, which included investigating STONE's claims of contact with Organization 1.

8.      In response, STONE took steps to obstruct these investigations. Among other steps to obstruct the investigations, STONE:

   a.      Made multiple false statements to HPSCI about his interactions regarding Organization 1, and falsely denied possessing records that contained evidence of these interactions; and

   b.      Attempted to persuade a witness to provide false testimony to and withhold pertinent information from the investigations.

### Other Relevant Individuals

9.      Person 1 was a political commentator who worked with an online media publication during the 2016 U.S. presidential campaign. Person 1 spoke regularly with STONE throughout the campaign, including about the release of stolen documents by Organization 1.

10.     Person 2 was a radio host who had known STONE for more than a decade. In testimony before HPSCI on or about September 26, 2017, STONE described Person 2 (without naming him) as an "intermediary," "go-between," and "mutual friend" to the head of Organization 1. In a follow-up letter to HPSCI dated October 13, 2017, STONE identified Person 2 by name and claimed Person 2 was the "gentleman who confirmed for Mr. Stone" that the head of Organization 1 had "'[e]mails related to Hillary Clinton which are pending publication.'"

### Background

### STONE's Communications About Organization 1 During the Campaign

11.     By in or around June and July 2016, STONE informed senior Trump Campaign officials that he had information indicating Organization 1 had documents whose release would be

damaging to the Clinton Campaign.  The head of Organization 1 was located at all relevant times at the Ecuadorian Embassy in London, United Kingdom.

12.    After the July 22, 2016 release of stolen DNC emails by Organization 1, a senior Trump Campaign official was directed to contact STONE about any additional releases and what other damaging information Organization 1 had regarding the Clinton Campaign.  STONE thereafter told the Trump Campaign about potential future releases of damaging material by Organization 1.

13.    STONE also corresponded with associates about contacting Organization 1 in order to obtain additional emails damaging to the Clinton Campaign.

     a.    On or about July 25, 2016, STONE sent an email to Person 1 with the subject line, "Get to [the head of Organization 1]."  The body of the message read, "Get to [the head of Organization 1] [a]t Ecuadorian Embassy in London and get the pending [Organization 1] emails . . . they deal with Foundation, allegedly."  On or about the same day, Person 1 forwarded STONE's email to an associate who lived in the United Kingdom and was a supporter of the Trump Campaign.

     b.    On or about July 31, 2016, STONE emailed Person 1 with the subject line, "Call me MON."  The body of the email read in part that Person 1's associate in the United Kingdom "should see [the head of Organization 1]."

     c.    On or about August 2, 2016, Person 1 emailed STONE.  Person 1 wrote that he was currently in Europe and planned to return in or around mid-August.  Person 1 stated in part, "Word is friend in embassy plans 2 more dumps.  One shortly after I'm back.  2nd in Oct.  Impact planned to be very damaging."  The phrase "friend in embassy" referred to the head of Organization 1.  Person 1 added in the same email, "Time to let more than [the Clinton Campaign chairman] to be exposed as in bed w

4

enemy if they are not ready to drop HRC.  That appears to be the game hackers are now about.  Would not hurt to start suggesting HRC old, memory bad, has stroke – neither he nor she well.  I expect that much of next dump focus, setting stage for Foundation debacle."

14.	Starting in early August 2016, after receiving the August 2, 2016 email from Person 1, STONE made repeated statements about information he claimed to have learned from the head of Organization 1.

a.	On or about August 8, 2016, STONE attended a public event at which he stated, "I actually have communicated with [the head of Organization 1].  I believe the next tranche of his documents pertain to the Clinton Foundation, but there's no telling what the October surprise may be."

b.	On or about August 12, 2016, STONE stated during an interview that he was "in communication with [the head of Organization 1]" but was "not at liberty to discuss what I have."

c.	On or about August 16, 2016, STONE stated during an interview that "it became known on this program that I have had some back-channel communication with [Organization 1] and [the head of Organization 1]."  In a second interview on or about the same day, STONE stated that he "communicated with [the head of Organization 1]" and that they had a "mutual acquaintance who is a fine gentleman."

d.	On or about August 18, 2016, STONE stated during a television interview that he had communicated with the head of Organization 1 through an "intermediary, somebody who is a mutual friend."

   e.    On or about August 23, 2016, Person 2 asked STONE during a radio interview,

         "You've been in touch indirectly with [the head of Organization 1]. . . .  Can you

         give us any kind of insight?  Is there an October surprise happening?"  STONE

         responded, "Well, first of all, I don't want to intimate in any way that I control or

         have influence with [the head of Organization 1] because I do not. . . .  We have a

         mutual friend, somebody we both trust and therefore I am a recipient of pretty good

         information."

15.    Beginning on or about August 19, 2016, STONE exchanged written communications,

including by text message and email, with Person 2 about Organization 1 and what the head of

Organization 1 planned to do.

   a.    On or about August 19, 2016, Person 2 sent a text message to STONE that read in

         part, "I'm going to have [the head of Organization 1] on my show next Thursday."

         On or about August 21, 2016, Person 2 sent another text message to STONE,

         writing in part, "I have [the head of Organization 1] on Thursday so I'm completely

         tied up on that day."

   b.    On or about August 25, 2016, the head of Organization 1 was a guest on Person 2's

         radio show for the first time.  On or about August 26, 2016, Person 2 sent a text

         message to STONE that stated, "[the head of Organization 1] talk[ed] about you

         last night."  STONE asked what the head of Organization 1 said, to which Person 2

         responded, "He didn't say anything bad we were talking about how the Press is

         trying to make it look like you and he are in cahoots."

   c.    On or about August 27, 2016, Person 2 sent text messages to STONE that said, "We

         are working on a [head of Organization 1] radio show," and that he (Person 2) was

6

"in charge" of the project.  In a text message sent later that day, Person 2 added, "[The head of Organization 1] has kryptonite on Hillary."

d.       On or about September 18, 2016, STONE sent a text message to Person 2 that said, "I am e-mailing u a request to pass on to [the head of Organization 1]."  Person 2 responded "Ok," and added in a later text message, "[j]ust remember do not name me as your connection to [the head of Organization 1] you had one before that you referred to."

   i.       On or about the same day, September 18, 2016, STONE emailed Person 2 an article with allegations against then-candidate Clinton related to her service as Secretary of State.  STONE stated, "Please ask [the head of Organization 1] for any State or HRC e-mail from August 10 to August 30—particularly on August 20, 2011 that mention [the subject of the article] or confirm this narrative."

   ii.       On or about September 19, 2016, STONE texted Person 2 again, writing, "Pass my message . . . to [the head of Organization 1]."  Person 2 responded, "I did."  On or about September 20, 2016, Person 2 forwarded the request to a friend who was an attorney with the ability to contact the head of Organization 1.  Person 2 blind-copied STONE on the forwarded email.

e.       On or about September 30, 2016, Person 2 sent STONE via text message a photograph of Person 2 standing outside the Ecuadorian Embassy in London where the head of Organization 1 was located.

f.     On or about October 1, 2016, which was a Saturday, Person 2 sent STONE text messages that stated, "big news Wednesday . . . now pretend u don't know me . . . Hillary's campaign will die this week."  In the days preceding these messages, the press had reported that the head of Organization 1 planned to make a public announcement on or about Tuesday, October 4, 2016, which was reported to be the ten-year anniversary of the founding of Organization 1.

g.     On or about October 2, 2016, STONE emailed Person 2, with the subject line "WTF?," a link to an article reporting that Organization 1 was canceling its "highly anticipated Tuesday announcement due to security concerns."  Person 2 responded to STONE, "head fake."

h.     On or about the same day, October 2, 2016, STONE texted Person 2 and asked, "Did [the head of Organization 1] back off."  On or about October 3, 2016, Person 2 initially responded, "I can't tal[k] about it."  After further exchanges with STONE, Person 2 said, "I think it[']s on for tomorrow."  Person 2 added later that day, "Off the Record Hillary and her people are doing a full-court press they [*sic*] keep [the head of Organization 1] from making the next dump . . . That's all I can tell you on this line . . . Please leave my name out of it."

16.    In or around October 2016, STONE made statements about Organization 1's future releases, including statements similar to those that Person 2 made to him.  For example:

a.     On or about October 3, 2016, STONE wrote to a supporter involved with the Trump Campaign, "Spoke to my friend in London last night.  The payload is still coming."

b.     Also on or about October 3, 2016, STONE received an email from a reporter who had connections to a high-ranking Trump Campaign official that asked, "[the head

of Organization 1] – what's he got?  Hope it's good."  STONE responded in part, "It is.  I'd tell [the high-ranking Trump Campaign official] but he doesn't call me back."

    c.    On or about October 4, 2016, the head of Organization 1 held a press conference but did not release any new materials pertaining to the Clinton Campaign.  Shortly afterwards, STONE received an email from the high-ranking Trump Campaign official asking about the status of future releases by Organization 1.  STONE answered that the head of Organization 1 had a "[s]erious security concern" but that Organization 1 would release "a load every week going forward."

    d.    Later that day, on or about October 4, 2016, the supporter involved with the Trump Campaign asked STONE via text message if he had "hear[d] anymore from London."  STONE replied, "Yes - want to talk on a secure line - got Whatsapp?"  STONE subsequently told the supporter that more material would be released and that it would be damaging to the Clinton Campaign.

17.    On or about October 7, 2016, Organization 1 released the first set of emails stolen from the Clinton Campaign chairman.  Shortly after Organization 1's release, an associate of the high-ranking Trump Campaign official sent a text message to STONE that read "well done."  In subsequent conversations with senior Trump Campaign officials, STONE claimed credit for having correctly predicted the October 7, 2016 release.

The Investigations

18.    In or around 2017, government officials publicly disclosed investigations into Russian interference in the 2016 U.S. presidential election and possible links to individuals associated with the campaigns.

9

a.    On or about January 13, 2017, the chairman and vice chairman of SSCI announced the committee would conduct an inquiry that would investigate, among other things, any intelligence regarding links between Russia and individuals associated with political campaigns, as well as Russian cyber activity and other "active measures" directed against the United States in connection with the 2016 election.

b.    On or about January 25, 2017, the chairman and ranking member of HPSCI announced that HPSCI had been conducting an inquiry similar to SSCI's.

c.    On or about March 20, 2017, the then-director of the FBI testified at a HPSCI hearing and publicly disclosed that the FBI was investigating Russian interference in the 2016 election and possible links and coordination between the Trump Campaign and the Russian government.

d.    By in or around August 2017, news reports stated that a federal grand jury had opened an investigation into matters relating to Russian government efforts to interfere in the 2016 election, including possible links and coordination between the Trump Campaign and the Russian government.

### STONE's False Testimony to HPSCI

19.    In or around May 2017, HPSCI sent a letter requesting that STONE voluntarily appear before the committee and produce:

> Any documents, records, electronically stored information including e-mail, communication, recordings, data and tangible things (including, but not limited to, graphs, charts, photographs, images and other documents) regardless of form, other than those widely available (e.g., newspaper articles) that reasonably could lead to the discovery of any facts within the investigation's publicly-announced parameters.

On or about May 22, 2017, STONE caused a letter to be submitted to HPSCI stating that "Mr.

Stone has no documents, records, or electronically stored information, regardless of form, other than those widely available that reasonably could lead to the discovery of any facts within the investigation's publicly-announced parameters."

20. On or about September 26, 2017, STONE testified before HPSCI in Washington, D.C. as part of the committee's ongoing investigation. In his opening statement, STONE stated, "These hearings are largely based on a yet unproven allegation that the Russian state is responsible for the hacking of the DNC and [the Clinton Campaign chairman] and the transfer of that information to [Organization 1]." STONE further stated that "[m]embers of this Committee" had made certain "assertions against me which must be rebutted here today," which included "[t]he charge that I knew in advance about, and predicted, the hacking of Clinton campaign chairman['s] email, [and] that I had advanced knowledge of the source or actual content of the [Organization 1] disclosures regarding Hillary Clinton."

21. In the course of his HPSCI testimony, STONE made deliberately false and misleading statements to the committee concerning, among other things, his possession of documents pertinent to HPSCI's investigation; the source for his early August 2016 statements about Organization 1; requests he made for information from the head of Organization 1; his communications with his identified intermediary; and his communications with the Trump Campaign about Organization 1.

<u>STONE's False and Misleading Testimony About His Possession of Documents Pertinent to HPSCI's Investigation</u>

22. During his HPSCI testimony, STONE was asked, "So you have no emails to anyone concerning the allegations of hacked documents . . . or any discussions you have had with third parties about [the head of Organization 1]? You have no emails, no texts, no documents whatsoever, any kind of that nature?" STONE falsely and misleadingly answered, "That is correct.

Not to my knowledge."

23.     In truth and in fact, STONE had sent and received numerous emails and text messages during the 2016 campaign in which he discussed Organization 1, its head, and its possession of hacked emails.  At the time of his false testimony, STONE was still in possession of many of these emails and text messages, including:

     a.     The email from STONE to Person 1 on or about July 25, 2016 that read in part, "Get to [the head of Organization 1] [a]t Ecuadorian Embassy in London and get the pending [Organization 1] emails . . . they deal with Foundation, allegedly.";

     b.     The email from STONE to Person 1 on or about July 31, 2016 that said an associate of Person 1 "should see [the head of Organization 1].";

     c.     The email from Person 1 to STONE on or about August 2, 2016 that stated in part, "Word is friend in embassy plans 2 more dumps.  One shortly after I'm back.  2nd in Oct.  Impact planned to be very damaging.";

     d.     Dozens of text messages and emails, beginning on or about August 19, 2016 and continuing through the election, between STONE and Person 2 in which they discussed Organization 1 and the head of Organization 1;

     e.     The email from STONE on or about October 3, 2016 to the supporter involved with the Trump Campaign, which read in part, "Spoke to my friend in London last night. The payload is still coming."; and

     f.     The emails on or about October 4, 2016 between STONE and the high-ranking member of the Trump Campaign, including STONE's statement that Organization 1 would release "a load every week going forward."

24.     By falsely claiming that he had no emails or text messages in his possession that referred to the head of Organization 1, STONE avoided providing a basis for HPSCI to subpoena records in his possession that could have shown that other aspects of his testimony were false and misleading.

<u>STONE's False and Misleading Testimony About His Early August 2016 Statements</u>

25.     During his HPSCI testimony on or about September 26, 2017, STONE was asked to explain his statements in early August 2016 about being in contact with the head of Organization 1. STONE was specifically asked about his statement on or about August 8, 2016 that "I've actually communicated with [the head of Organization 1]," as well as his statement on or about August 12, 2016 that he was "in communication with [the head of Organization 1]" but was "not at liberty to discuss what I have."

26.     STONE responded that his public references to having a means of contacting Organization 1 referred exclusively to his contact with a journalist, who STONE described as a "go-between, as an intermediary, as a mutual friend" of the head of Organization 1.  STONE stated that he asked this individual, his intermediary, "to confirm what [the head of Organization 1] ha[d] tweeted, himself, on July 21st, that he ha[d] the Clinton emails and that he [would] publish them."  STONE further stated that the intermediary "was someone I knew had interviewed [the head of Organization 1].  And I merely wanted confirmation of what he had tweeted on the 21st."  STONE declined to tell HPSCI the name of this "intermediary" but provided a description in his testimony that was consistent with Person 2.

27.     On or about October 13, 2017, STONE caused a letter to be submitted to HPSCI that identified Person 2 by name as the "gentleman who confirmed for Mr. Stone" that the head of Organization 1 had "'[e]mails related to Hillary Clinton which are pending publication.'"

28.    STONE's explanation of his August 2016 statements about communicating with the head of Organization 1 was false and misleading.  In truth and in fact, the first time Person 2 interviewed the head of Organization 1 was on or about August 25, 2016, after STONE made his August 8 and August 12, 2016 public statements.   Similarly, at the time STONE made his August 2016 statements, STONE had directed Person 1—not Person 2—to contact the head of Organization 1. And Person 1—not Person 2—had told STONE in advance of STONE's August 8 and August 12, 2016 public statements that "[w]ord is friend in embassy plans 2 more dumps," including one in October.  At no time did STONE identify Person 1 to HPSCI as another individual STONE contacted to serve as a "go-between," "intermediary," or other source of information from Organization 1.  STONE also never disclosed his exchanges with Person 1 when answering HPSCI's questioning about STONE's August 8 and August 12, 2016 statements.

<u>STONE's False and Misleading Testimony About Requests He Made for Information from the Head of Organization 1</u>

29.    During his HPSCI testimony, STONE was asked, "[W]hat was the extent of the communication with [the intermediary]?"  STONE replied, "I asked him to confirm . . . that the tweet of [the head of Organization 1] of the 21st was accurate, that they did in fact have . . . Hillary Clinton emails and that they would release them."  STONE was then asked, "Did you ask [the intermediary] to communicate anything else to [the head of Organization 1]?"  STONE falsely and misleadingly responded, "I did not."  STONE was then asked, "Did you ask [the intermediary] to do anything on your own behalf?"  STONE falsely and misleadingly responded, "I did not."

30.    In truth and in fact, STONE directed both Person 1 and Person 2 to pass on requests to the head of Organization 1 for documents that STONE believed would be damaging to the Clinton Campaign.  For example:

        a.    As described above, on or about July 25, 2016, STONE sent Person 1 an email that

read, "Get to [the head of Organization 1] [a]t Ecuadorian Embassy in London and

get the pending [Organization 1] emails . . . they deal with Foundation, allegedly."

b.      On or about September 18, 2016, STONE sent a text message to Person 2 that said,

"I am e-mailing u a request to pass on to [the head of Organization 1]," and then

emailed Person 2 an article with allegations against then-candidate Clinton related

to her service as Secretary of State.  STONE added, "Please ask [the head of

Organization 1] for any State or HRC e-mail from August 10 to August 30—

particularly on August 20, 2011 that mention [the subject of the article] or confirm

this narrative."

c.      On or about September 19, 2016, STONE texted Person 2 again, writing "Pass my

message . . . to [the head of Organization 1]."  Person 2 responded, "I did," and the

next day Person 2, on an email blind-copied to STONE, forwarded the request to

an attorney who had the ability to contact the head of Organization 1.

<u>STONE's False and Misleading Testimony About Communications with His Identified
Intermediary</u>

31.    During his HPSCI testimony, STONE was asked repeatedly about his communications

with the person he identified as his intermediary.  STONE falsely and misleadingly stated that he

had never communicated with his intermediary in writing in any way.  During one exchange,

STONE falsely and misleadingly claimed only to have spoken with the intermediary

telephonically:

      Q:     [H]ow did you communicate with the intermediary?

      A:     Over the phone.

      Q:     And did you have any other means of communicating with
             the intermediary?

      A:     No.

      Q:     No text messages, no – none of the list, right?

<blockquote>
A:      No.
</blockquote>

Later during his testimony, STONE again falsely denied ever communicating with his intermediary in writing:

<blockquote>
Q:      So you never communicated with your intermediary in writing in any way?

A:      No.

Q:      Never emailed him or texted him?

A:      He's not an email guy.

Q:      So all your conversations with him were in person or over the phone.

A:      Correct.
</blockquote>

32.     In truth and in fact, as described above, STONE and Person 2 (who STONE identified to HPSCI as his intermediary) engaged in frequent written communication by email and text message. STONE also engaged in frequent written communication by email and text message with Person 1, who also provided STONE with information regarding Organization 1.

33.     Written communications between STONE and Person 1 and between STONE and Person 2 continued through STONE's HPSCI testimony. Indeed, on or about September 26, 2017—the day that STONE testified before HPSCI and denied having ever sent or received emails or text messages from Person 2—STONE and Person 2 exchanged over thirty text messages.

34.     Certain electronic messages between STONE and Person 1 and between STONE and Person 2 would have been material to HPSCI. For example:

a.      In or around July 2016, STONE emailed Person 1 to "get to" the head of Organization 1 and obtain the pending emails.

b.      In or around September 2016, STONE sent messages directing Person 2 to pass a request to the head of Organization 1.

c.      On or about January 6, 2017, Person 2 sent STONE an email that had the subject

line "Back channel bs."  In the email, Person 2 wrote, "Well I have put together

timelines[] and you [] said you have a back-channel way back a month before I had

[the head of Organization 1] on my show . . .  I have never had a conversation with

[the head of Organization 1] other than my radio show . . . I have pieced it all

together . . . so you may as well tell the truth that you had no back-channel or there's

the guy you were talking about early August."

  STONE's False and Misleading Testimony About Communications with the Trump Campaign

35.     During his HPSCI testimony, STONE was asked, "did you discuss your conversations with

the intermediary with anyone involved in the Trump campaign?"  STONE falsely and misleadingly

answered, "I did not."  In truth and in fact, and as described above, STONE spoke to multiple

individuals involved in the Trump Campaign about what he claimed to have learned from his

intermediary to Organization 1, including the following:

  a.     On multiple occasions, STONE told senior Trump Campaign officials about

         materials possessed by Organization 1 and the timing of future releases.

  b.     On or about October 3, 2016, STONE wrote to a supporter involved with the Trump

         Campaign, "Spoke to my friend in London last night.  The payload is still coming."

  c.     On or about October 4, 2016, STONE told a high-ranking Trump Campaign official

         that the head of Organization 1 had a "[s]erious security concern" but would release

         "a load every week going forward."

  **Attempts to Prevent Person 2 from Contradicting STONE's False Statements to HPSCI**

36.     On or about October 19, 2017, STONE sent Person 2 an excerpt of his letter to HPSCI that

identified Person 2 as his "intermediary" to Organization 1.  STONE urged Person 2, if asked by

HPSCI, to falsely confirm what STONE had previously testified to, including that it was Person 2

who provided STONE with the basis for STONE's early August 2016 statements about contact with Organization 1. Person 2 repeatedly told STONE that his testimony was false and told him to correct his testimony to HPSCI. STONE did not do so. STONE then engaged in a prolonged effort to prevent Person 2 from contradicting STONE's false statements to HPSCI.

37. In or around November 2017, Person 2 received a request from HPSCI to testify voluntarily before the committee. After being contacted by HPSCI, Person 2 spoke and texted repeatedly with STONE. In these discussions, STONE sought to have Person 2 testify falsely either that Person 2 was the identified intermediary or that Person 2 could not remember what he had told STONE. Alternatively, STONE sought to have Person 2 invoke his Fifth Amendment right against self-incrimination. For example:

a.  On or about November 19, 2017, in a text message to STONE, Person 2 said that his lawyer wanted to see him (Person 2). STONE responded, "'Stonewall it. Plead the fifth. Anything to save the plan' . . . Richard Nixon." On or about November 20, 2017, Person 2 informed HPSCI that he declined HPSCI's request for a voluntary interview.

b.  On or about November 21, 2017, Person 2 texted STONE, "I was told that the house committee lawyer told my lawyer that I will be getting a subpoena." STONE responded, "That was the point at which your lawyers should have told them you would assert your 5th Amendment rights if compelled to appear."

c.  On or about November 28, 2017, Person 2 received a subpoena compelling his testimony before HPSCI. Person 2 informed STONE of the subpoena.

d.  On or about November 30, 2017, STONE asked Person 1 to write publicly about Person 2. Person 1 responded, "Are you sure you want to make something out of

18

this now?  Why not wait to see what [Person 2] does.  You may be defending yourself too much—raising new questions that will fuel new inquiries.  This may be a time to say less, not more."  STONE responded by telling Person 1 that Person 2 "will take the 5th—but let's hold a day."

e.  On multiple occasions, including on or about December 1, 2017, STONE told Person 2 that Person 2 should do a "Frank Pentangeli" before HPSCI in order to avoid contradicting STONE's testimony.  Frank Pentangeli is a character in the film *The Godfather: Part II*, which both STONE and Person 2 had discussed, who testifies before a congressional committee and in that testimony claims not to know critical information that he does in fact know.

f.  On or about December 1, 2017, STONE texted Person 2, "And if you turned over anything to the FBI you're a fool."  Later that day, Person 2 texted STONE, "You need to amend your testimony before I testify on the 15th."  STONE responded, "If you testify you're a fool.  Because of tromp I could never get away with a certain [*sic*] my Fifth Amendment rights but you can.  I guarantee you you are the one who gets indicted for perjury if you're stupid enough to testify."

38.  On or about December 12, 2017, Person 2 informed HPSCI that he intended to assert his Fifth Amendment privilege against self-incrimination if required to appear by subpoena.  Person 2 invoked his Fifth Amendment privilege in part to avoid providing evidence that would show STONE's previous testimony to Congress was false.

39.  Following Person 2's invocation of his Fifth Amendment privilege not to testify before HPSCI, STONE and Person 2 continued to have discussions about the various investigations into Russian interference in the 2016 election and what information Person 2 would provide to

investigators.   During these conversations, STONE repeatedly made statements intended to prevent Person 2 from cooperating with the investigations.  For example:

a.    On or about December 24, 2017, Person 2 texted STONE, "I met [the head of Organization 1] for f[i]rst time this yea[r] sept 7 . . . docs prove that. . . .  You should be honest w fbi . . . there was no back channel . . . be honest."  STONE replied approximately two minutes later, "I'm not talking to the FBI and if your smart you won't either."

b.    On or about April 9, 2018, STONE wrote in an email to Person 2, "You are a rat. A stoolie.  You backstab your friends-run your mouth my lawyers are dying Rip you to shreds."  STONE also said he would "take that dog away from you," referring to Person 2's dog.  On or about the same day, STONE wrote to Person 2, "I am so ready.  Let's get it on.  Prepare to die [expletive]."

c.    On or about May 21, 2018, Person 2 wrote in an email to STONE, "You should have just been honest with the house Intel committee . . . you've opened yourself up to perjury charges like an idiot."  STONE responded, "You are so full of [expletive].  You got nothing.  Keep running your mouth and I'll file a bar complaint against your friend [the attorney who had the ability to contact the head of Organization 1]."

## COUNT ONE
**(Obstruction of Proceeding)**

40.     Paragraphs 1 through 39 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

41.     From in or around May 2017 through at least December 2017, within the District of Columbia and elsewhere, the defendant ROGER JASON STONE, JR., corruptly influenced, obstructed, impeded, and endeavored to influence, obstruct, and impede the due and proper exercise of the power of inquiry under which any inquiry and investigation is being had by either House, and any committee of either House and any joint committee of the Congress, to wit: STONE testified falsely and misleadingly at a HPSCI hearing in or around September 2017; STONE failed to turn over and lied about the existence of responsive records to HPSCI's requests about documents; STONE submitted and caused to be submitted a letter to HPSCI falsely and misleadingly describing communications with Person 2; and STONE attempted to have Person 2 testify falsely before HPSCI or prevent him from testifying.

        All in violation of Title 18, United States Code, Sections 1505 and 2.

## COUNTS TWO THROUGH SIX
### (False Statements)

42.     Paragraphs 1 through 39 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

43.     On or about September 26, 2017, within the District of Columbia and elsewhere, in a matter within the jurisdiction of the legislative branch of the Government of the United States, the defendant ROGER JASON STONE, JR., knowingly and willfully made and caused to be made materially false, fictitious, and fraudulent statements and representations, to wit:

| Count | False Statement |
|:---:|:---|
| 2 | STONE testified falsely that he did not have emails with third parties about the head of Organization 1, and that he did not have any documents, emails, or text messages that refer to the head of Organization 1. |
| 3 | STONE testified falsely that his August 2016 references to being in contact with the head of Organization 1 were references to communications with a single "go-between," "mutual friend," and "intermediary," who STONE identified as Person 2. |
| 4 | STONE testified falsely that he did not ask the person he referred to as his "go-between," "mutual friend," and "intermediary," to communicate anything to the head of Organization 1 and did not ask the intermediary to do anything on STONE's behalf. |
| 5 | STONE testified falsely that he and the person he referred to as his "go-between," "mutual friend," and "intermediary" did not communicate via text message or email about Organization 1. |
| 6 | STONE testified falsely that he had never discussed his conversations with the person he referred to as his "go-between," "mutual |

| Count | False Statement |
|-------|-----------------|
|       | friend," and "intermediary" with anyone involved in the Trump Campaign. |

All in violation of Title 18, United States Code, Sections 1001(a)(2) and 2.

## COUNT SEVEN
### (Witness Tampering)

44.    Paragraphs 1 through 39 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

45.    Between in or around September 2017 and present, within the District of Columbia and elsewhere, the defendant ROGER JASON STONE, JR., knowingly and intentionally corruptly persuaded and attempted to corruptly persuade another person, to wit: Person 2, with intent to influence, delay, and prevent the testimony of any person in an official proceeding.

All in violation of Title 18, United States Code, Section 1512(b)(1).


_____
Robert S. Mueller, III
Special Counsel
U.S. Department of Justice


A TRUE BILL:


_____
Foreperson

Date:  January 24, 2019

EXHIBIT 2

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
UNITED STATES OF AMERICA,           )
                                    )
            Plaintiff,              )
                                    )
    v.                              )          **Case No.: 1:19-CR-00018-ABJ**
                                    )
ROGER J. STONE, JR.,                )
                                    )
            Defendant.              )
_____ )

## MOTION FOR LEAVE TO FILE *AMICI CURIAE* BRIEF

Movant Dr. Jerome Corsi ("Dr. Corsi") through counsel, hereby moves this Court for leave to file an *amici curiae* brief in support of entry of an order pursuant to Local Criminal Rule 57.7(c), or colloquially, a "gag order."

Dr. Corsi's *amicus* brief, attached hereto as <u>Exhibit 1</u>, sets forth the compelling reasons why a "gag order" is necessary in this case, as he is named as Person 1, a material witness, in Defendant Roger Stone's ("Defendant Stone") indictment. Defendant Stone has engaged in a public relations campaign to defame, smear, intimidate and threaten both Dr. Corsi and his counsel, Mr. Larry Klayman, which is the same conduct that he was indicted for in the first place. Because Defendant Stone's defamation, witness tampering, intimidation, and threats with regard to Dr. Corsi and his counsel Mr. Klayman are not technically part of this criminal prosecution, Dr. Corsi's interests and position are not adequately represented by any party. Dr. Corsi's *amicus* brief will aid this Court in ruling upon the entry of an order pursuant to LCrR 57.7(c)

The United States has taken no position with regard to filing of an *amicus* brief, and

1

counsel for Defendant Stone has not substantively responded to Dr. Corsi's request for consent.

Dated:  February 8, 2019                         Respectfully submitted,


                                                 /s/ Larry Klayman_____
                                                 Larry Klayman, Esq.
                                                 K L A Y M A N  L A W  G R O U P,  P A
                                                 D.C. Bar No:
                                                 2020  Pennsylvania  Ave  NW  #800
                                                 Washington, DC 20006
                                                 Email: leklayman@gmail.com
                                                 Tel: 310-595-0800


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed electronically and served through the court's ECF system to all counsel of record or parties on February 8, 2019


                                                 /s/ Larry Klayman_____
                                                 Larry Klayman, Esq.

2

[SUB]EXHIBIT 1

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

UNITED STATES OF AMERICA,      )

                              )

           Plaintiff,        )

                              )

      v.                    )     **Case No.: 1:19-CR-00018-ABJ**

                              )

ROGER J. STONE, JR.,         )

                              )

           Defendant.      )

_____ )

## _AMICI CURIAE_ BRIEF OF DR. JEROME CORSI

Under Local Criminal Rule 57.7(b)(1):

> [i]t is the duty of the lawyer or law firm not to release or authorize the release of information or opinion which a reasonable person would expect to be disseminated by means of public communication, in connection with pending or imminent criminal litigation with which the lawyer or the law firm is associated, if there is a reasonable likelihood that such dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice.

Furthermore, LCrR 57.7(c), which offers additional specific guidance with regard to highly publicized cases - which this instant case certainly qualifies as – grants the Court with authority to issue a "special order governing such matters as extrajudicial statements by parties, witnesses and attorneys likely to interfere with the rights of the accused to a fair trial by an impartial jury."

As set forth in _Gentile v. State Bar of Nevada_, 501 U.S. 1030, 1075 (1991):

> The limitations are aimed at two principal evils: (1) comments that are likely to influence the actual outcome of the trial, and (2) comments that are likely to prejudice the jury venire, even if an untainted panel can ultimately be found. Few, if any, interests under the Constitution are more fundamental than the right to a fair trial by "impartial" jurors, and an outcome affected by extrajudicial statements would violate that fundamental right.

Here, Defendant Roger Stone ("Defendant Stone") has _already begun_ a public relations

1

campaign meant specifically to influence the outcome of his upcoming trial and which are meant to prejudice the jury venire. Defendant Stone is doing so by engaging in witness tampering, defamation, and intimidation and coercion with regard to Dr. Corsi, who is named as Person 1 in Defendant Stone's indictment. As such, Dr. Corsi will likely subpoenaed to be called as a material witness in Defendant Stone's upcoming trial.  Again he is Person 1 in the Mueller Indictment.

Defendant Stone is attempting to smear, defame, and discredit, tamper and threaten  Dr. Corsi so that when Dr. Corsi is called as a witness, the jurors will have a false impression of Dr. Corsi as a liar, perjurer, and alcoholic. This would, obviously, improperly and unethically benefit Defendant Stone. In fact, Defendant Stone's targeted efforts to defame, coerce, intimidate and threaten Dr. Corsi have resulted in a lawsuit filed in the U.S. District Court for the District of Columbia, which is attached hereto as Exhibit A and incorporated by reference.

Should this Court have any doubt as to Defendant Stone's improper motivations and already implemented and continuing designs to taint the jury venire, the content and article written by Sara Murray and Sam Fossum  titled, *Roger Stone, facing gag order, launches counterattack*, should put any such doubts to bed. Exhibit B. It is only one of many such analyses and accounts.  It is clear that Defendant Stone's strategy will be to use the media and publicity to argue his case and to try to get public sentiment on his side, as well as to tamper with witnesses like Dr. Corsi, which is exactly the type of conduct that LCrR 57.7 was meant to preclude.

Accordingly, Movant Dr. Corsi respectfully requests that this Court issue an order pursuant to LCrR 57.7(c) ordering Defendant Stone and his counsel from making statements to the media or in public settings that pose a substantial likelihood of material prejudice to this case and which in the context of Stone himself and in their ferocity also amount to witness tampering

and obstruction of justice. See Exbibit A – Corsi Complaint.

Dated:  February 8, 2019

Respectfully submitted,


/s/ Larry Klayman_____
Larry Klayman, Esq.
K L A Y M A N  L A W  G R O U P, P A
D.C. Bar No:  334581
2020  Pennsylvania  Ave  NW  #800
Washington, DC 20006
Email: leklayman@gmail.com
Tel: 310-595-0800

3

# [SUB]EXHIBIT A
# Intentionally Omitted.
# *See* Main Ex. 1

EXHIBIT B

# Roger Stone, facing gag order, launches counterattack

By Sara Murray and Sam Fossum, CNN

Updated 6:30 PM ET, Thu February 7, 2019

**Washington (CNN) —** In the days since a federal judge warned Roger Stone that he could soon face a gag order, Stone has peddled conspiracy theories, claimed he can't get a fair trial and criticized the judge.

"This is a lynching. This is a legal lynching of me," Stone said in a recent interview on the fringe right-wing website Infowars.

Stone was arrested last month in a pre-dawn raid and charged with obstruction of justice, making false statements and witness tampering as part of special counsel Robert Mueller's Russia investigation. On Friday, federal prosecutors and Stone's legal team are due to submit briefs on the merits of a gag order.

But rather than toning down his rhetoric, Stone appears to be abiding by the principles he espouses in his books. For instance, Stone's Rule #81: "Admit Nothing; Deny Everything; Launch Counterattack."

It's a dubious legal strategy.

"I would say that it's a terrible idea for Stone to be doing this," said CNN legal analyst Shan Wu. "I can't imagine a worse idea."

Judge Amy Berman Jackson informed Stone last week that she was considering a gag order. She was quick to put similar restrictions on former Trump campaign chairman Paul Manafort's case, which she is also presiding over in Washington. Jackson, an appointee of President Barack Obama, said she was cognizant of Stone's First Amendment right to free speech, but she wanted to protect his right to a fair trial and ensure it was possible to select an unbiased jury.

Stone's response, delivered via an Instagram post this week: "I will continue to defend myself unless an Obama appointed judge decides to suspend my first amendment rights." In another post, Stone exclaimed, "Fair Trial in DC? Impossible."

Stone, in his public diatribes, has claimed he is being targeted because he works for Infowars and supported Trump. And he has continued his long tradition of hyping fact-free conspiracy theories.

In one Instagram post, Stone is shaking hands William Binney, a former National Security Agency official who has turned into a vocal critic of the agency. "Bill Binney explained to me why the forensic evidence shows the DNC was never hacked by anyone including the Russians," Stone wrote.

US intelligence agencies have concluded Russian intelligence hacked the DNC and other top Democrats, and used platforms like WikiLeaks to disseminate the stolen material.

Stone concluded his post with a series of hashtags including "#sethrich."

Seth Rich was a Democratic National Committee staffer who was fatally shot in Washington in 2016. Police said evidence indicates Rich was the victim of a robbery gone wrong. But far-right activists and news organizations spread a conspiracy theory -- with no evidence -- that Rich was killed for leaking a trove of DNC emails to WikiLeaks.

Both Fox News and the Washington Times ended up retracting stories based on the murder-as-leaking-retribution conspiracy plot, but the lore has lived on, to the devastation of Rich's family.

As for Stone, he recently settled a lawsuit (unrelated to the Mueller probe) in which he admitted to making false statements on Infowars about a Chinese businessman and apologized for his commentary.

Stone's attorney and Mueller's office declined to comment.

Prior legal woes aside, Stone's eagerness to discuss his case publicly -- and in colorful fashion -- could make the judge more inclined to put a gag order on the case.

Stone and his attorneys have vowed to fight any such effort and are expected to make the case that Stone's livelihood depends on his ability to speak freely.

"I make a living writing and speaking," Stone argued in a recent Infowars appearance. "So they would be depriving me of making a living if I am entirely gagged."

Jackson appears to have anticipated that defense. In court last Friday, the judge said she was only considering limiting Stone's ability to talk about the case.

"He would still be free to discuss foreign relations, immigration or Tom Brady," Jackson said.

If she does crack down on public comments on the case, Stone's legal team could also appeal the move. Last year, Stone added First Amendment and constitutional law expert Bruce Rogow to his legal team.



Stone may have a solid legal premise for an appeal, Wu said, although most defendants consider it a risky move.

"Most defendants don't want to do that because they don't want to run afoul of the judge," Wu said. "He doesn't care."

Indeed, Stone is still racking up appearances and using nearly all of them to hammer the tactics used in the pre-dawn raid at his Florida home.

"This was a show of force, this was something you would expect from Nazi Germany or Soviet Russia. It was chilling," Stone told Infowars.

Stone has also compared the law enforcement presence the morning of his arrest to the forces deployed against drug lord Joaquín Guzmán, known as "El Chapo," and Osama bin Laden, the former al Qaeda leader who was killed by US Special Forces in a 2011 raid.

Stone's vocal complaints even sparked a response from ex-convict and former football star O.J. Simpson, who drew on his own experience with FBI raids, according to a video posted on celebrity news website TMZ.

"The FBI can be wrong," Simpson said, "But to try to compare to El Chapo and Bin Laden? Hey man, Bin Laden was carried out in a bag, not walked out in handcuffs."

Simpson's parting words for Stone: "Man up. Stop crying."

EXHIBIT 3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DR. JEROME CORSI, Individually
Denville, NJ, 07834

        Plaintiff

      v.

ROGER STONE, Individually
4300 Bayview Drive
Fort Lauderdale, FL, 33308

        Defendant.

**Case Number:**

**COMPLAINT**

## INTRODUCTION

Plaintiff, DR. JEROME CORSI ("Plaintiff" or "Corsi") hereby files this action against ROGER STONE ("Defendant Stone") for Defamation, Intentional Infliction of Emotional Distress and Assault

## JURISDICTION AND VENUE

1.     This Court has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

2.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2), (3) in that a substantial part of the events or omissions giving rise to Plaintiff Corsi's claims arose herein.

## THE PARTIES

3.     Plaintiff, Dr. Jerome Corsi, is an author and political commentator who publishes works in this judicial district and nationwide. Plaintiff Corsi is a citizen of New Jersey.

4.     Defendant, Roger Stone, is an individual and a citizen of Florida and a resident of

1

Fort Lauderdale, Florida. Defendant Stone was recently indicted by Special Counsel Robert Mueller as part of the alleged "Russian Collusion' investigation. His address is 4300 Bayview Drive, Fort Lauderdale, FL, 33308

## GENERAL ALLEGATIONS

5.     Defendant Stone was recently indicted by Special Counsel Robert Mueller ("Mueller Indictment") as part of his "Russian Collusion" investigation for the alleged crimes of perjury, witness tampering and obstruction of justice. The indictment comprises seven different felony counts. *See* Exhibit 1 – Mueller Indictment. Importantly, Plaintiff Corsi was not accused of any wrongdoing or illegality in the Mueller Indictment, in which he named as Person 1, a material witness to the alleged crimes committed by Stone.

6.     Specifically, the seven count Mueller Indictment against Defendant Stone involves alleged lying under oath - that is, perjury - witness tampering and obstruction of justice by threatening to kill a material witness, Randy Credico ("Credico") and his dog if Credico did not lie to government authorities concerning his involvement with Roger Stone. Credico is Person 2 in the Mueller Indictment of Defendant Stone. *Id.* Person 1 in this Mueller Indictment is Plaintiff Corsi.

7.     Even before Defendant Stone was indicted, he began a public relations campaign in this district, nationally and internationally to smear, intimidate and threaten Plaintiff Corsi, a material witness in the "Russian Collusion" investigation. Plaintiff Corsi is listed as Person 1 in the Mueller Indictment and was not indicted along with Defendant Stone, as he testified truthfully to the grand jury and in interviews.

8.     To the contrary, Plaintiff Corsi has never defamed or disparaged Defendant Stone.

9.     Defendant Stone knew that he was going to be indicted, and therefore began this

public relations campaign to smear, defame, intimidate and threaten Plaintiff Corsi, even before his actual indictment on January 25, 2019, in order to try to influence public opinion and Special Counsel Robert Mueller – by trying to attribute guilt to Plaintiff Corsi and not him - as well as to try to raise money for his legal defense. This pattern and practice of defaming, intimidating and threatening Plaintiff Corsi, and his legal counsel, is ongoing, so Plaintiff Corsi reserves the right to amend this Complaint.

10.     Defendant Stone likes to portray himself as Mafia, frequently making reference to Mafia figures who he admires, as well as other unsavory types who have been alleged to have engaged in unethical and/or illegal behavior.  He frequently makes reference to his heroes being Hyman Roth in the 'Godfather," who was the movie version of Meyer Lansky, and Roy Cohn, not to mention, Richard Nixon, for his role in Watergate. In this regard, after Stone was indicted he held a press conference on the courthouse steps of the federal courthouse in Ft. Lauderdale, where he was booked, with his arms defiantly in the air in the "victory' pose used by Nixon after he resigned in disgrace as a result of the Watergate scandal. At the time, Stone had been employed by a Nixon group called CREEP, or the Committee to Reelect the President. Defendant Stone even has a large tattoo of Richard Nixon affixed to his back. Thus, given his admiration for persons such as these, particularly Mafia figures, his actions as pled herein can be taken as threats, as well as being defamatory. And, Plaintiff Corsi is 72 years old. Defendant Stone's intentional infliction of emotional distress and coercion and threats are intended to try even cause Plaintiff Corsi to have heart attacks and strokes, in order that Plaintiff will be unable to testify at Stone's criminal trial. Tellingly, Defendant Stone threatened kill a material witness and his dog, Credico, Person 2 in the Mueller Indictment, "Mafia style."  Defendant Stone also fashions himself and indeed has the reputation, at a minimum, as being the preeminent "dirty

trickster." *See* "Get Me Roger Stone" on Netflix.

11.     Plaintiff Corsi has been named as a material witness to Defendant Stone's upcoming prosecution, which has prompted Defendant Stone to try to intimidate, coerce and threaten Plaintiff Corsi by defaming him and threatening him with physical violence, which is ironically what he was criminally indicted for, in part.

12.     By defaming Plaintiff Corsi, Defendant Stone is hoping to not only intimidate Plaintiff Corsi to severely harm and damage his reputation, but also to coerce and threaten Plaintiff Corsi to testify falsely if subpoenaed to be called as a material witness in Defendant Stone's ensuing criminal trial. He is also trying divert funds away from Plaintiff Corsi's legal defense fund, while boosting his own legal defense fund.

13.     Defendant Stone has also used and continues to employ surrogates, either out in the open or secretly, to defame Plaintiff Corsi, such as his "friend" Michael Caputo, Alex Jones and J. Owen Stroyer of InfoWars, Cassandra Fairbanks, and reporter Chuck Ross of The Daily Caller, to name just a few. More surrogates will be identified during discovery and they may be joined, with leave of court to amend this Complaint, as defendants herein. The use of surrogates is consistent with Defendant Stone's reputation as a "dirty trickster" who works as well under "cover of darkness" to harm and damage others who he sees for whatever reason as adversaries, political or otherwise as in the case of Plaintiff Corsi. Plaintiff Corsi is not Defendant Stone's adversary, as he simply is committed as Person 1 in the Mueller Indictment to testify truthfully if subpoenaed to testify at Stone's criminal trial.

14.     Defendant Stone is no stranger to defamation lawsuits. As reported by Splinter News, Defendant Stone was forced to - as part of a settlement in another defamation suit – apologize in newspapers and on social media for lying about Chinese Businessman Guo Wengui

on InfoWars, after having falsely published that Mr. Wengui is a "turncoat criminal who is convicted of crimes here and in China."[1]

15.　　Defendant Stone has therefore engaged in illegal witness tampering and intimidation, in violation of 18 U.S.C. § 1512 by virtue of the defamatory and threatening acts and practices as alleged herein. Not coincidentally, this was what largely he was indicted for by Special Counsel Robert Mueller.

<u>DEFENDANT STONE'S DEFAMATORY STATEMENTS</u>

16.　　Before Defendant Stone was indicted, on or about January 18, 2019, he appeared on InfoWars, where he made several false, misleading and defamatory statements in this district, nationally and internationally regarding Plaintiff Corsi (the "InfoWars Video").[2] The same video was published on Defendant Stone's YouTube channel, "*Stone Cold Truth*," on January 18, 2019.[3]

17.　　At 2:09 in the InfoWars Video, Defendant Stone falsely publishes that Plaintiff Corsi was "fired from World Net Daily."

18.　　At 2:27 in the InfoWars Video, Defendant Stone falsely and misleadingly publishes that, "He (Corsi) was perfectly willing to lie, to perjure himself saying that a memo that he had wrote me was written on the 30th for the purposes of cover-up…. which is further proof that Jerry lied under oath."

19.　　At 2:55 in the InfoWars Video, Defendant Stone falsely and misleadingly publishes, "and then states that I knew about John Podesta's emails being stolen in advance, the only proof of that is Jerry's feeble alcohol affected memory – it's a lie…."

---

[1] Sophie Weiner, *Roger Stone Lied About a Chinese Businessman on InfoWars and Now He Has to Tell Everyone*, Splinter News, Dec. 17, 2018, available at: https://splinternews.com/roger-stone-lied-about-a-chinese-businessman-on-infowar-1831162926
[2] https://www.infowars.com/watch/?video=5c3fbf24fe49383dcf6996e4
[3] https://www.youtube.com/watch?v=cJyfgdvtFx8

20.    At 3:35 in the InfoWars Video, Defendant Stone falsely and misleadingly publishes that "Jerry was prepared to stab a principle Trump supporter in the back, he was perfectly prepared to bear false witness against me, even though I had done nothing in my entire life other than help him."

21.    At 4:20 in the InfoWars Video, Defendant Stone falsely and misleadingly publishes that "all I ever did was show Jerry Corsi friendship and support and try to help him and his family and what I get is Judas Iscariot, the willingness to testify against me and help the deep state bury me….and then he makes up this story about helping me formulate a cover story."

22.    At 6:26 in the InfoWars Video, Defendant Stone falsely publishes that "you can always tell when Jerry Corsi is lying because his lips are moving…."

23.    Defendant Stone made these false, misleading and defamatory statements with malice and with full knowledge that they were false and misleading, and/or at a minimum, with a reckless disregard for its truthfulness. These statements falsely and misleadingly state that Plaintiff Corsi was fired from World Net Daily, that he committed perjury (a federal offense), and that he is an untruthful person.

24.    On January 2, 2019, Defendant Stone published an article on www.infowars.com titled "*ROGER STONE BELIEVES JEROME CORSI WORKS FOR MUELLER*[4]" in which Defendant Stone falsely, misleadingly, and maliciously writes, "Before you decide that Corsi is a hero you should be well aware of the fact that the good doctor was prepared to bear false witness against others in the Trump orbit if he thought it would save his own skin."

25.    Defendant Stone made these false, misleading and defamatory statements with malice and with full knowledge that they were false and misleading, and/or at a minimum, with a reckless disregard for its truthfulness. These statements falsely and misleadingly state that

_____

[4] https://www.infowars.com/roger-stone-the-treachery-of-jerome-corsi/

Plaintiff Corsi committed perjury (a federal offense), and that he is an untruthful person.

26.     In another appearance on InfoWars, which was posted to YouTube[5] on January 17, 2019, Defendant Stone at 6:22 falsely and misleadingly publishes that "He [Corsi] was perfectly willing to bear false witness against me on multiple points that are complete fabrications."

27.     In another appearance on InfoWars, which was posted to YouTube[6] on January 24, 2019, Defendant Stone at 5:58  falsely and misleadingly publishes that "the good doctor [Corsi] has told a number of lies. In fact, he's starting to conflate his lies…. he was perfectly willing to lie about me…. but now lying about Alex Jones, lying about InfoWars, lying about Dr. Jones, who's one of the nicest, gentlest, sweetest, most honest men I have ever met, it's beyond the pale…. Jerry Corsi can no longer be believed."

28.     In the same appearance, Defendant Stone at 8:34 falsely and misleadingly publishes that, "I think you've [Corsi] been deep state from the beginning. Your whole birther thing is used as a club to destroy conservatives….I look forward to our confrontation. I will demolish you. You're a fraudster, out of your alcoholic haze you have made up lies about David Jones and Alex Jones and Roger Stone and now I suspect they want you to lie about the President." This is clearly a threat, as well as being defamatory. It is akin to the threats against Person 2 in the Mueller Indictment, Randy Credico, who Defendant Stone, as set forth in the Mueller Indictment, based on Stone's own words contained in his own documentary evidence, threatened kill along with Credico's dog.

29.     Defendant Stone made these false, misleading and defamatory statements with malice and with full knowledge that they were false and misleading, and/or at a minimum, with a

---

[5] https://www.youtube.com/watch?v=GJd8YBDvm1Q
[6] https://www.youtube.com/watch?v=fXUlJZRxe6E

reckless disregard for their truthfulness. These statements falsely and misleadingly state that Plaintiff Corsi committed perjury (a federal offense), is an untruthful person, and is an alcoholic. They also contain threats against Plaintiff Corsi.

## FIRST CAUSE OF ACTION
### *Defamation*

30.     Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

31.     Defendant Stone published malicious, false, misleading and defamatory statements of and concerning Plaintiff Corsi in this judicial district, nationwide, and worldwide.

32.     These false and misleading statements were published with malice, as Defendant Stone knew that they were false and misleading, or at a minimum acted with a reckless disregard for the truth.

33.     Plaintiff Corsi has been severely harmed and damaged by these false and misleading statements because they subjected him to hatred, distrust, ridicule, contempt, and disgrace.

34.     Plaintiff Corsi has been damaged by these false and misleading statements because they injured Plaintiff Corsi in his profession and business as a journalist and author, whose credibility is the most important trait, as well as severely injured and damaged him personally.

## SECOND CAUSE OF ACTION
### *Defamation Per Se*

35.     Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

36.     Defendant Stone, as alleged herein, published numerous false, misleading and

defamatory statements to severely harm and damage Plaintiff Corsi, which were republished elsewhere, and through surrogates, which publish the falsity that Plaintiff Corsi has committed crimes, including perjury, and engaged in moral turpitude in the form of alcoholism, as set forth in the preceding paragraphs.

37.     These false, misleading and defamatory statements were published in this district and on the internet and elsewhere, domestically and for the entire world to see and hear and specifically Stone published false and misleading facts, *inter alia*, that Plaintiff's conduct, characteristics or a condition is incompatible with the proper exercise of his lawful business, trade, profession or office.

38.     These false and misleading statements were published with malice, as Defendant Stone knew that they were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

39.     This statements are *per se* defamatory because they falsely and misleadingly publish that Plaintiff Corsi committed perjury, which is a federal offense and felony. Defamation *per se* gives rise to the presumption that severe harm and damage has arisen by virtue of the false and misleading statements.

40.     These false, misleading, and defamatory statements are defamatory *per se* and these false and misleading statements severely harmed and damaged Plaintiff Corsi in his profession and business as a journalist and author, whose credibility is the most important trait, as well as personally.

### THIRD CAUSE OF ACTION
#### *Defamation by Implication*

41.     Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

42.     Defendant Stone published numerous false, misleading and defamatory statements about Plaintiff Corsi, as set forth in the preceding paragraphs.

43.     These false, misleading and defamatory statements were published on the internet and published and republished elsewhere in this district, domestically and for the entire world to see and hear.

44.     These false and misleading statements were published with malice, as Defendant Stone knew that they were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

45.     These statements created the false and misleading implication that Plaintiff Corsi is dishonest, committed perjury and is an alcoholic, among other false and misleading statements as pled in the preceding paragraphs.

46.     Plaintiff Corsi has been severely harmed and damaged by these false and misleading statements because they subject him to hatred, distrust, ridicule, contempt, and disgrace.

47.     Plaintiff Corsi has been damaged by these false and misleading statements because the statements severely harmed and damaged Plaintiff Corsi in his profession as a journalist and author, whose credibility is the most important trait, as well as personally.

### FOURTH CAUSE OF ACTION
#### *Intentional Infliction of Emotional Distress*

48.     Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

49.     Defendant Stone engaged in extreme and outrageous conduct by threatening Plaintiff Corsi, in concert with Stone, who has made death threats to at least one witness involved in Special Counsel Mueller's Russian collusion investigation, Person 2 Randy Credico.

50.     Defendant Stone knowingly and intentionally threatened Plaintiff Corsi, in a manner similar to other death threats he made to at least one material witness, involved in Special Counsel Mueller's Russian collusion investigation, such as Randy Credico, Person 2 in the Mueller Indictment.

51.     Defendant Stone's extreme and outrageous conduct directly caused Plaintiff Corsi severe emotional distress and resulting severe harm and damage.

## FIFTH CAUSE OF ACTION
### *Assault*

52.     Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

53.     Defendant Stone placed Plaintiff Corsi in apprehension of an imminent harmful or offensive contact and physical harm and death, by coercing and threatening Plaintiff Corsi, in a similar manner he has used to make death threats to at least one material witness involved in Special Counsel Mueller's Russian collusion investigation, such as Person 2 in the Mueller Indictment, Randy Credico.

54.     The threats issued by Defendant Stone are credible, as he portrays himself as a "mafia" figure, as set forth above.

55.     Plaintiff Corsi did not consent to Defendant Stone' conduct.

56.     As a direct and proximate result of Defendant Stone's wrongful conduct, Plaintiff Corsi suffered conscious pain, suffering, severe emotional distress and the fear of imminent serious bodily injury or death, and other mental and physical injuries, and Plaintiff was severely harmed and damaged thereby.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Dr. Jerome Corsi prays for judgment against Defendant Stone as

follows:

a.      Awarding Plaintiff Corsi compensatory including actual, consequential, incidental and punitive damages for malicious tortious conduct in an amount to be determined at trial and in excess of $25, 000,000 U.S. Dollars. While Stone feigns being financially destitute as a result of his legal problems and uses this to raise money for his legal defense fund, on information and belief he is wealthy, perhaps hiding his wealth in overseas bank accounts.

b.      Awarding Plaintiff Corsi attorney's fees and costs.

c.      Granting any further relief as the Court deems appropriate including preliminary and permanent injunctive relief, as well as the entry of a gag order against Defendant Stone in his criminal prosecution before this Court in order that he be prevented from intimidating, coercing and threatening material witnesses, such as Plaintiff Corsi, who are likely to be subpoenaed to testify at his trial. In this regard, Plaintiff Corsi will also, with leave of court requested, file an amicus brief arguing for a gag order on Defendant Stone in the related criminal case *United States of America v. Stone*, 19-cr-18 (D.D.C).

Dated: February 7, 2019                                    Respectfully Submitted,


                                                              */s/ Larry Klayman*
                                                              Larry Klayman, Esq.
                                                              KLAYMAN LAW GROUP, P.A.
                                                              D.C.  Bar Number: 334581
                                                              2020 Pennsylvania Ave NW #800
                                                              Washington, DC, 20006
                                                              Telephone:  (310)-595-0800
                                                              Email: leklayman@gmail.com
                                                              *Counsel for Plaintiff*

# [SUB]EXHIBIT 1
# Intentionally Omitted. *See*
# Main Ex. 1

EXHIBIT 4

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

LARRY KLAYMAN, Individually

          Plaintiff

    v.

ROGER STONE, Individually

          Defendant.

**Case Number:**

## COMPLAINT FOR DEFAMATION

Plaintiff, LARRY KLAYMAN ("Plaintiff" or "Klayman") hereby files this action against ROGER STONE ("Defendant Stone") for Defamation, Defamation Per Se, and Defamation by Implication.

### JURISDICTION AND VENUE

1.    This is an action for Defamation and damages in excessive of $15,000.00, exclusive of interest, costs and attorney's fees.

2.    Venue for this action is properly in Broward County, Florida, as Defendant Stone is a resident of this county and judicial district and a citizen of Florida and the cause of actions arose in this country and circuit.

### THE PARTIES

3.    Plaintiff, Larry Klayman, is an attorney and public interest advocate who practices in this circuit and nationally.

4.    Defendant, Roger Stone, is an individual and a citizen of Florida and a resident of Fort Lauderdale, Florida. Defendant Stone was recently indicted by Special Counsel Robert Mueller as part of the alleged "Russian Collusion' investigation.  His address is 4300 Bayview Drive, Fort

*** FILED: BROWARD COUNTY, FL  BRENDA D. FORMAN,  CLERK 2/5/2019 9:37:57 PM.****

Lauderdale, FL, 33308

## **GENERAL ALLEGATIONS**

5.      Defendant Stone was recently indicted by Special Counsel Robert Mueller ("Mueller Indictment") as part of his "Russian Collusion" investigation for the alleged crimes of perjury, witness tampering and obstruction of justice. The indictment comprises seven different felony counts. *See* Exhibit 1 – Mueller Indictment.

6.      Specifically, the seven count Mueller Indictment against Defendant Stone involves alleged lying under oath - that is, perjury - witness tampering and obstruction of justice by threatening to kill a material witness, Randy Credico ("Credico") and his dog if Credico did not lie to government authorities concerning his involvement with Roger Stone. Credico is Person 2 in the Mueller Indictment of Defendant Stone. *Id.* Person 1 in this Mueller Indictment is Dr. Jerome Corsi, another material witness, who is Plaintiff Larry Klayman's client.

7.      Even before Defendant Stone was indicted, he began a public relations campaign in this circuit and nationally to smear and intimidate Dr. Jerome Corsi ("Dr. Corsi"), a material witness in the "Russian Collusion" investigation, and who is being represented by Plaintiff Klayman.  Dr. Corsi is listed as Person 1 in the Mueller Indictment and was not indicted along with Defendant Stone, as he testified truthfully to the grand jury.

8.      Defendant Stone knew that he was going to be indicted, and therefore began this public relations campaign to smear and defame Dr. Corsi and his lawyer, Larry Klayman, even before his actual indictment on January 25, 2019, in order to try to influence public opinion and Special Counsel Robert Mueller – by trying to attribute guilt to Dr. Corsi and not him - as well as to try to raise money for his legal defense. This pattern and practice of defaming Dr. Corsi and his lawyer Larry Klayman is ongoing, so Plaintiff reserves the right to amend this Complaint.

9. Defendant Stone likes to portray himself as Mafia, frequently making reference to Mafia figures who he admires, as well as other unsavory types who have been alleged to have engaged in unethical and/or illegal behavior. He frequently makes reference to his heroes being Hyman Roth in the 'Godfather," who was the movie version of Meyer Lansky, and Roy Cohn, not to mention, Richard Nixon, for his role in Watergate. In this regard, after Stone was indicted he held a press conference on the courthouse steps of the federal courthouse in Ft. Lauderdale, where he was booked, with his arms in the air in the victory pose used by Nixon after he resigned in disgrace as a result of the Watergate scandal. At the time, Stone had been employed by a Nixon group called CREEP, or the Committee to Reelect the President. Defendant Stone even has a large tattoo of Richard Nixon affixed to his back. Thus, given his admiration for persons such as these, particularly Mafia figures, his actions as pled herein can be taken as threats, as well as being defamatory. Tellingly, Defendant Stone threatened kill a material witness and his dog, Credico, Person 2 in the Mueller Indictment, "Mafia style." Defendant Stone also fashions himself and indeed has the reputation as being the preeminent "dirty trickster." *See* "Get Me Roger Stone" on Netflix.

10. Dr. Corsi has been named as a material witness to Defendant Stone's upcoming prosecution, which has prompted Defendant Stone to try to intimidate, coerce and threaten Dr. Corsi by defaming him and his defense counsel, Plaintiff Klayman, which is ironically what he was criminally indicted for, in part. And, the way to also get to Dr. Corsi is for Defendant Stone to also defame his lawyer, Plaintiff Larry Klayman.

11. By defaming Dr. Corsi and Plaintiff Klayman, he is hoping to not only intimidate Dr. Corsi and his counsel to severely harm and damage their reputations, but also to coerce and threaten Dr. Corsi to testify falsely if subpoenaed to be called as a material witness in Defendant

Stone's ensuing criminal trial. He is also trying divert funds away from Dr. Corsi's legal defense fund, while boosting his own legal defense fund.

12.      Defendant Stone has also used and continues to employ surrogates, either out in the open or secretly, to defame Plaintiff Klayman and his client Dr. Corsi, such as his "friend" Michael Caputo.

13.      Before Defendant Stone was indicted, on or about January 18, 2019, he appeared on InfoWars, where he made several false, misleading and defamatory statements in this circuit and nationally regarding Plaintiff Klayman (the "InfoWars Video").[1] The same video was published on Defendant Stone's YouTube channel, "*Stone Cold Truth*," on January 18, 2019.[2]

14.      Defendant Stone also previously published on March 22, 2017 a video on YouTube titled "Beware Larry Klayman" through his channel which defames Plaintiff Klayman (the "YouTube Video").[3]

15.      Defendant Stone is no stranger to defamation lawsuits. As reported by Splinter News, Defendant Stone was forced to - as part of a settlement in another defamation suit – apologize in newspapers and on social media for lying about Chinese Businessman Guo Wengui on InfoWars, after having falsely published that Mr. Wengui is a "turncoat criminal who is convicted of crimes here and in China."[4]

<u>FALSE STATEMENTS CONTAINED IN THE INFOWARS VIDEO</u>

16.      At 1:25, Defendant Stone says, "He's (Klayman) never actually won a courtroom victory in his life."

---

[1] https://www.infowars.com/watch/?video=5c3fbf24fe49383dcf6996e4
[2] https://www.youtube.com/watch?v=cJyfgdvtFx8
[3] https://www.youtube.com/watch?v=2K10SlTy8JU&feature=youtu.be
[4] Sophie Weiner, *Roger Stone Lied About a Chinese Businessman on InfoWars and Now He Has to Tell Everyone*, Splinter News, Dec. 17, 2018, available at: https://splinternews.com/roger-stone-lied-about-a-chinese-businessman-on-infowar-1831162926

17.     Defendant Stone made this false and misleading, defamatory statement of fact with malice and/or full knowledge that it was false, or at a minimum with reckless disregard for its truth. Plaintiff Klayman has won numerous courtroom and other legal victories in his life.

18.     At 1:30, Defendant Stone publishes, "He (Klayman) was ousted at Judicial Watch. Ask Tom Fitton [the current president of Judicial Watch] why he left. He was 'ousted' because of a 'sexual harassment complaint.'"

19.     Defendant Stone made this false, misleading and defamatory statement with malice and with full knowledge that it was false and misleading, and/or at a minimum, with a reckless disregard for its truthfulness. Defendant Stone is working in concert with Thomas Fitton ("Fitton") – whose public interest organization Judicial Watch already been hit with a jury verdict and judgment for maliciously defaming Plaintiff Klayman in the U.S. District Court for the Southern District of Florida for $181,000 in compensatory and punitive damages (*Klayman v. Judicial Watch, Inc.*, 13-cv-20610 (S.D. FL.) – to defame and discredit Plaintiff Klayman and Dr. Corsi in order to falsely attempt to justify and deflect from his indictment in the "Russian Collusion" investigation, among other improper and illegal reasons and actions as alleged herein.

20.     In actuality and truth, Plaintiff Klayman left Judicial Watch on his own accord in order to run for U.S. Senate in Florida in 2003-2004.

21.     At 1:37, Defendant Stone says, "He's (Klayman) incompetent, he's a numbskull, he's an idiot, he's an egomaniac, and he could be the single worst lawyer in America. With him as Jerry Corsi's lawyer, Corsi may get the electric chair. So your idea that he's a good guy is entirely wrong"

22.     Defendant Stone made this false, misleading and defamatory statement of fact with malice with full knowledge that it was false, and/or at a minimum with reckless disregard

for its truth. This false statement of fact creates the false and misleading published factual statement and implication that Plaintiff Klayman is unqualified to be an attorney, pubic advocate and defames him personally.

23.    In actuality, Plaintiff Klayman has been a practicing attorney for nearly four decades, and has won numerous cases on behalf of his clients and also against the government for constitutional and other violations.

24.    At 2:01, Defendant Stone also published that Plaintiff Klayman is a "piece of garbage."

25.    Defendant Stone made this false and misleading defamatory statement of fact with malice and full knowledge that it was misleading and false, and/or at a minimum with reckless disregard for its truth. This false and misleading statement of fact creates the false and misleading implication that Plaintiff Klayman is unqualified to be an attorney, public advocate and is a bad and loathsome person.

26.    At 4:11. Defendant Stone says, "For those people out there who think…that Larry Klayman's IQ is higher than 70, you're wrong…"

27.    Defendant Stone made this false, misleading and defamatory statement of fact with malice and full knowledge that it was false, or at a minimum with reckless disregard for its truth. This false statement of fact creates the false implication that Plaintiff Klayman is unqualified to be an attorney, is mentally retarded and is an unintelligent, bad, and loathsome person.

<u>FALSE STATEMENTS CONTAINED IN THE YOUTUBE VIDEO</u>

28.    At 0:45 in the YouTube Video, Defendant Stone says, "Now comes gadfly right-wing lawyer, Larry Klayman, to say that Alex Jones and InfoWars have violated the law in their

release of classified documents and will be prosecuted."

29. Defendant Stone made this false, misleading and defamatory statement of fact with malice and full knowledge that it was false, and/or at a minimum with reckless disregard for its truth. This false and misleading statement of fact creates the false implication that Plaintiff Klayman is unqualified to be an attorney and public advocate and a bad and loathsome person.

30. At 1:00 in the YouTube Video, Defendant Stone says, "To be clear Larry Klayman is a moron. He has never won a case in court in his life. He may have won a few motions. He is a lightweight. He is a know-nothing…."

31. Defendant Stone made this false, misleading defamatory statement of fact with malice and with full knowledge that it was false, and/or at a minimum with reckless disregard for its truth. Ironically, Plaintiff Klayman won a defamation judgment against Fitton and Judicial Watch – with whom Defendant Stone is working in concert to again defame Plaintiff - in the Southern District of Florida, as set forth above, and has had many other courtroom and other legal victories.

## COUNT I – DEFAMATION

32. Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

33. Defendant Stone published numerous false, misleading and defamatory statements to severely harm and damage Plaintiff Klayman in both the InfoWars Video and the YouTube Video which include, but are not limited to, that (1) Plaintiff Klayman was ousted at Judicial Watch due to a sexual harassment complaint, and (2) Plaintiff Klayman has never won a courtroom victory in his life, as well as the other false and misleading statements set forth in this Complaint.

34.     These false, misleading and defamatory statements were published on the internet and republished elsewhere for persons in this circuit and the entire world see and hear.

35.     These false, misleading and defamatory statements were published with malice, as Defendant Stone knew that they were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

36.     Plaintiff Klayman has been severely harmed and damaged by these false and misleading statements because they subject him to hatred, distrust, ridicule, contempt, and disgrace.

37.     Plaintiff Klayman has been severely harmed and damaged by these false and misleading statements because the statements injured Plaintiff Klayman in his profession and business as a lawyer and public advocate, as well as personally.

<u>COUNT II – DEFAMATION PER SE</u>

38.     Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

39.     Defendant Stone, as alleged herein, published numerous false, misleading and defamatory statements to severely harm and damage Plaintiff Klayman in both the InfoWars Video and the YouTube Video, which were republished elsewhere, that publish the falsity that Plaintiff Klayman has committed crimes and engaged in moral turpitude, as set forth in the preceding paragraphs.

40.     Under Florida Law, "it is established…that an oral communication is actionable per se - that is, without a showing of special damage - if it imputes to another (a) a criminal offense amounting to a felony, or (b) a presently existing venereal or other loathsome and communicable disease, or (c) conduct, characteristics or a condition incompatible with the

proper exercise *of his lawful business*, trade, profession or office, or (d) the other being a woman, acts of unchastity." *Wolfson v. Kirk*, 273 So. 2d 774, 777 (Fla. Dist. Ct. App. 1973)

41.     These false, misleading and defamatory statements were published in this circuit and on the internet for the entire world to see and hear and specifically publish false and misleading facts, *inter alia*, that Plaintiff's conduct, characteristics or a condition is incompatible with the proper exercise of his lawful business, trade, profession or office.

42.     These false and misleading statements were published with malice, as Defendant Stone knew that they were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

43.     This statements are *per se* defamatory because they falsely accuse Plaintiff Klayman of sexual harassment and a related complaint - thereby falsely imputing a criminal offense upon Plaintiff Klayman - and him being "ousted" as the chairman and general counsel of Judicial Watch over this, as well as the other false and misleading published statements alleged herein.

44.     These false, misleading, and defamatory statements are defamatory *per se* because these false and misleading statements severely harmed and damaged Plaintiff Klayman in his profession and business as a lawyer and advocate, as they concern conduct and characteristics incompatible with being a lawyer.  Damage is presumed by law when defamation *per se* is proven.

## COUNT III – DEFAMATION BY IMPLICATION

45.     Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

46.     Defendant Stone published numerous false, misleading and defamatory

statements about Plaintiff Klayman in both the InfoWars Video and the YouTube Video, as set forth in the preceding paragraphs.

47.     These false, misleading and defamatory statements were published on the internet and published and republished elsewhere in this circuit for the entire world to see and hear.

48.     These false and misleading statements were published with malice, as Defendant Stone knew that they were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

49.     These statements created the false and misleading implication that Plaintiff Klayman has been the subject of a sexual harassment complaint and committed criminal sexual offenses, among other false and misleading statements as pled in the preceding paragraphs.

50.     Plaintiff Klayman has been severely harmed and damaged by these false and misleading statements because they subject him to hatred, distrust, ridicule, contempt, and disgrace.

51.     Plaintiff Klayman has been damaged by these false and misleading statements because the statements severely harmed and damaged Plaintiff Klayman in his profession and business as a public advocate and personally, as pled herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Larry Klayman prays for judgment against Defendant Stone as follows:

a.     Awarding Plaintiff Klayman compensatory and actual including consequential and incidental damages in excess of $ 35,000,000 million U.S. Dollars.

b.     Awarding Plaintiff Klayman attorney's fees and costs.

c.     Granting any further relief as the Court deems appropriate including preliminary and

permanent injunctive relief, as well as leave to later amend to add a claim for punitive damages pursuant to Section 768.72 of the Florida Statutes. When amended, Plaintiff Klayman will plead for punitive damages in excess of $40, 000,000 U.S. Dollars. On information and belief Defendant Stone is wealthy and has various hidden bank accounts overseas, in addition to assets in this circuit and domestically.

Dated: February 5, 2019                          Respectfully Submitted,

                                                  ___/s/ Larry Klayman___
                                                  Larry Klayman, Esq.
                                                  2020 Pennsylvania Ave NW #800
                                                  Washington, DC, 20006
                                                  Telephone: (310)-595-0800
                                                  Email: leklayman@gmail.com
                                                  *Plaintiff Pro Se*

[SUB]EXHIBIT 1 Intentionally Omitted. *See* Main Ex. 1

EXHIBIT 5

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

LARRY KLAYMAN, Individually

    Plaintiff

  v.

THOMAS J. FITTON, Individually      **Case Number:**

    Defendant.

---

## COMPLAINT FOR DEFAMATION

Plaintiff, LARRY KLAYMAN ("Plaintiff" or "Klayman") hereby files this action against

THOMAS J. FITTON ("Defendant Fitton") for Defamation, Defamation Per Se, and Defamation

by Implication.

## JURISDICTION AND VENUE

1.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

1332 under diversity of citizenship. The parties are citizens of different states and the amount in

controversy exceeds $75,000.

2.  Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) as this is the judicial district

in which a substantial part of the events or omissions giving rise to the claim occurred.

## THE PARTIES

3.  Plaintiff, Larry Klayman, is an individual and a citizen of Florida. Plaintiff is a

well-known private lawyer and conservative public interest advocate and litigator, as well as a

syndicated national radio talk show host on Radio America, his weekly show appropriately titled

"Special Prosecutor with Larry Klayman."  Plaintiff Klayman conceived of and founded both

Judicial Watch, Inc. and Freedom Watch, Inc. He is a former federal prosecutor of the Antitrust

Division of the U.S. Department of Justice, where he was on the trial team that broke up the AT&T monopoly.

4.       Defendant, Thomas Fitton, is an individual and a citizen of the District of Columbia, whose address is 5245 42nd St NW, Washington, DC 20015. Defendant Fitton is the current President of Judicial Watch, which was conceived of and founded by Plaintiff Klayman.  He is not a lawyer and at the time that Klayman left Judicial Watch on September 19, 2003 to run for the U.S. Senate in Florida, Defendant Fitton had not graduated from college. When Plaintiff Klayman hired him years earlier as an assistant, he lied to Klayman that he had graduated from George Washington University. Since then Defendant Fitton has had a book written for him by "ghost writer," Ben Shapiro, effectively claiming credit for Plaintiff Klayman's accomplishments in conceiving of, founding and running Judicial Watch for almost ten (10) years. Plaintiff Klayman was thus conspicuously and maliciously written out of the history of Judicial Watch. The book is titled "Corruption Chronicles" and remains on sale on the internet and in book stores. Defendant Fitton has also falsely testified multiple times under oath that he does not know who founded Judicial Watch, as he continues to try to spread the false narrative and impression he or someone other than Klayman founded Judicial Watch, in order to boost his own standing in the conservative community and elsewhere, as the expense of Plaintiff Klayman. In short, and regrettably Defendant Fitton, as set forth below, is a 'serial liar" and dishonest.

**STANDING**

5.       Plaintiff has standing to bring this action because he has been directly affected and victimized by the unlawful conduct complained herein. His injuries are proximately related to the conduct of Defendant Fitton, individually and working in concert with Roger Stone as set forth below.

## FACTS

6.      Defendant Fitton has engaged in a pattern and practice of defaming Plaintiff Klayman since Plaintiff's voluntary departure from Judicial Watch, Inc. to run for the U.S. Senate in Florida in 2003-2004.

7.      For instance, in 2013, a federal jury in the Southern District of Florida awarded Plaintiff Klayman judgment in the sum of $181,000, including punitive damages against Judicial Watch for having maliciously defamed Plaintiff.  See Exhibit 1 – Jury Verdict and Judgment. This jury verdict and judgment is final.

8.      Defendant Fitton is now conveniently and incredibly working with Roger Stone ("Stone") to again defame Plaintiff Klayman.

9.      Stone was recently indicted on seven (7) felony counts by Special Counsel Robert Mueller ("Mueller Indictment") as part of his "Russian Collusion" investigation for the alleged crimes of perjury, witness tampering and obstruction of justice.  See Exhibit 2 – Mueller Indictment.

10.     Specifically, the seven count Mueller Indictment against Defendant Stone involves alleged lying under oath - that is, perjury - witness tampering and obstruction of justice by threatening to kill a material witness, Randy Credico ("Credico") and his dog if Credico did not lie to government authorities concerning his involvement with Roger Stone. Credico is Person 2 in the Mueller Indictment of Defendant Stone. *Id.* Person 1 in this Mueller Indictment is Dr. Jerome Corsi, another material witness, who is Plaintiff Larry Klayman's client.

11.     Stone has since engaged in a public relations campaign to illegally smear, intimidate, coerce and threaten Dr. Jerome Corsi ("Dr. Corsi"), a witness in the "Russian Collusion" investigation, and who is being legally represented by Plaintiff Klayman.

12.     Stone knew that he was going to be indicted, and therefore began this illegal public relations campaign to smear and defame Dr. Corsi and his lawyer, Larry Klayman, even before his actual indictment on January 25, 2019, in order to try to influence public opinion and Special Counsel Robert Mueller – by illegally trying to attribute guilt to Dr. Corsi and not him - as well as to try to raise money for his legal defense. This pattern and practice of defaming Dr. Corsi and his lawyer Larry Klayman is ongoing, so Plaintiff reserves the right to amend this Complaint. Stone has recently been sued by Dr. Corsi for defamation, intentional infliction of emotional distress and assault.

13.     Dr. Corsi has been named as a material witness to Stone's upcoming prosecution, which has prompted Stone to try to intimidate, coerce and threaten Dr. Corsi by defaming him and his defense counsel, Plaintiff Klayman, which is ironically what he has been indicted for. And, the way to also "get to" Dr. Corsi is for Defendant Stone to also defame his lawyer, Plaintiff Larry Klayman

14.     By defaming Dr. Corsi and Plaintiff Klayman, Defendant Fitton and Stone are working in concert as joint tortfeasors hoping to not only intimidate Dr. Corsi and his counsel to severely harm and damage their reputations, but also to coerce and threaten Dr. Corsi to testify falsely if subpoenaed to be called as a material witness in Defendant Stone's ensuing criminal trial, as well as to impede and harm Dr. Corsi's criminal defense. They are also acting in concert to divert funds away from Dr. Corsi's legal defense fund, while boosting Stone's legal defense fund.

15.     Before Defendant was indicted, on or about January 18, 2019, he appeared on InfoWars, where he made several false, misleading and defamatory statements in this district,

4

nationally and internationally regarding Plaintiff Klayman (the "InfoWars Video").[1] The same video was published on Defendant Stone's YouTube channel, "*Stone Cold Truth*," on January 18, 2019.[2]

16.     At 1:30, Stone published, "He (Klayman) was ousted at Judicial Watch. Ask Tom Fitton [the current president of Judicial Watch] why he left. He left because of a sexual harassment complaint."

17.     Stone made this false, defamatory statement at the direction of Defendant Fitton, whom he attributes this false and defamatory statement to.

18.     Defendant Fitton knew that Plaintiff Klayman was not ousted at Judicial Watch as a result of a sexual harassment complaint, but, in actuality, Plaintiff Klayman left Judicial Watch on his own accord and voluntarily in order to run for U.S. Senate in Florida.

19.     Defendant Fitton with malice and/or a reckless disregard for the truth knew that Plaintiff Klayman did not leave Judicial Watch as a result of a sexual harassment complaint.

20.     Defendant Fitton knowingly published this false and defamatory statement to Stone, who in turn republished it during interviews which were broadcast by him and his surrogates in this district, nationally and internationally for the entire world to hear and see. On information and belief Fitton has also recently published, within the last two years up to the present, this and other false and misleading statements to others to severely harm and damage Plaintiff Klayman, such as to the Council for National Policy, the American Conservative Union, the Scaife Foundation, other conservative organizations, groups and donors, and media publications and television networks such as Fox News, to name just a few. As a non-lawyer who currently runs Judicial Watch, Defendant Fitton feels competitive with Klayman, and as

---

[1] https://www.infowars.com/watch/?video=5c3fbf24fe49383dcf6996e4
[2] https://www.youtube.com/watch?v=cJyfgdvtFx8

result of what in effect is an "inferiority complex" since he is a non-lawyer who tries to pass himself in the media off as a lawyer and legal expert as the current head of Judicial Watch, thus has engaged in a concerted campaign to severely damage and harm Klayman's reputation, professional and personal reputation, and family. By severely harming Plaintiff Klayman's reputation and standing in the legal, media and related communities, Defendant Stone's malicious intent is to boost his own reputation and standing at the expense of Klayman, who conceived of, founded and successfully ran Judicial Watch for nearly ten (10) years, making it the preeminent conservative public interest group fighting against corruption and for ethics and justice in government and the legal profession.

21. Defendant Fitton, in concert with Stone, have therefore also engaged in illegal witness tampering of Dr. Corsi and his lawyer Plaintiff Klayman in violation of 18 U.S.C. § 1512 by virtue of the defamatory acts and practices as alleged herein.

**FIRST CAUSE OF ACTION**
*Defamation*

22. Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

23. Defendant Fitton published the malicious, false and defamatory statement that Plaintiff Klayman was ousted at Judicial Watch due to a sexual harassment complaint to Stone, who in turn, and in concert with Defendant Fitton, republished this false and defamatory statement on the internet domestically, internationally and elsewhere for the entire world to see and hear.

24. This false and misleading statement was published with malice, as Defendant Fitton knew that it was false and misleading, or at a minimum acted with a reckless disregard for the truth.

25.     Plaintiff Klayman has been severely harmed and damaged by this and other false and misleading statements, more of which will be uncovered in discovery, because it subjected him to hatred, distrust, ridicule, contempt, and disgrace.

26.     Plaintiff Klayman has been severely damaged by this false and misleading statement because the malicious statement injured Plaintiff Klayman in his profession and business as a public interest and private lawyer and nationally syndicated radio talk show host who promotes ethics in government and the legal profession, as well as personally.

## SECOND CAUSE OF ACTION
### *Defamation Per Se*

27.     Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint.

28.     Defendant Fitton published to Stone the malicious false, misleading and defamatory statement that Plaintiff Klayman was ousted at Judicial Watch due to a sexual harassment complaint, who in turn, and in concert with Defendant Fitton, republished this malicious false and defamatory statement on the internet in this district, domestically and internationally and elsewhere for the entire world to see and hear.

29.     Under Florida Law, "it is established…that an oral communication is actionable per se - that is, without a showing of special damage - if it imputes to another (a) a criminal offense amounting to a felony, or (b) a presently existing venereal or other loathsome and communicable disease, or (c) conduct, characteristics or a condition incompatible with the proper exercise *of his lawful business*, trade, profession or office, or (d) the other being a woman, acts of unchastity." *Wolfson v. Kirk*, 273 So. 2d 774, 777 (Fla. Dist. Ct. App. 1973).

30.     This false and misleading statement was published with malice, as Defendant Fitton knew that it was false and misleading, or at a minimum acted with a reckless disregard for

the truth.

31.     This malicious false, misleading and defamatory statement was published on the internet in this district, domestically and internationally for the entire world to see and hear and specifically Defendant Fitton published these malicious false and misleading "facts," *inter alia*, that Plaintiff's conduct, characteristics or a condition is incompatible with the proper exercise of his lawful business, trade, profession or office

32.     This malicious false and misleading statement is *per se* defamatory because it falsely accuses Plaintiff Klayman of being ousted from Judicial Watch because of sexual harassment - thereby falsely imputing a criminal and sexually related offense upon Plaintiff Klayman – as well as being "ousted" as the chairman and general counsel of Judicial Watch because of an actual sexual harassment complaint, as well as the other false and misleading published statements alleged herein. To the contrary, on information and belief Fitton himself hypocritically had and may continue to have an "intimate personal relationship" with another director and member of the board of Judicial Watch, Paul Orfanedes, which on information and belief may constitute sexual harassment, as Defendant Fitton is Orfanedes' superior as a result of Fitton being the president of Judicial Watch. Defendant Fitton also sits on the board of directors along with Orfanedes, one of only three (3) directors, all of whom are also employed by Judicial Watch. By maliciously defaming Plaintiff Klayman, Defendant Fitton intended and intends to deflect attention away from his issues, vulnerabilities and conduct.

33.     This false, misleading, and defamatory statement concerning Plaintiff Klayman is defamatory *per se* and this false and misleading statement, and others which will be uncovered in discovery, severely harmed and damaged Plaintiff Klayman in his profession and business as a lawyer and advocate and as a nationally syndicated radio talk show host, as they concern conduct

and characteristics incompatible with being a lawyer and radio talk show host who promotes ethics in government and the legal profession.  Damage is presumed by law when defamation *per se* is shown.

### THIRD CAUSE OF ACTION
### *Defamation by Implication*

34.     Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

35.     Defendant Fitton published to Stone the false, misleading and defamatory statement that Plaintiff Klayman was ousted at Judicial Watch due to a sexual harassment complaint, who in turn, and in concert with Defendant Fitton, republished this false and defamatory statement on the internet in this district, domestically and internationally and elsewhere for the entire world to see and hear.

36.     This false, misleading and defamatory statement was published with malice, as Defendant Fitton knew that it was false, or at a minimum acted with a reckless disregard for the truth.

37.     This malicious statement created the false and misleading implication that Plaintiff Klayman has engaged been subject to a sexual harassment complaint and was ousted from Judicial Watch for this reason and committed criminal sexual offenses, as well as other matters of moral turpitude as set forth in this Complaint.

38.     Plaintiff Klayman has been severely harmed damaged by this published statement because it subjected him to hatred, distrust, ridicule, contempt, and disgrace.

39.     Plaintiff Klayman has been damaged by malicious this false and misleading statement, and others which will be disclosed during discovery, because the statements severely harmed and damaged Plaintiff Klayman in his profession and business as a public advocate and

as a syndicated radio talk show host who promotes ethics in government and the legal profession, and personally, as pled herein.

40.     On information and belief Defendant Fitton's defamatory conduct, in concert with Stone and individually, is on-going and as more defamatory conduct is uncovered through discovery and otherwise, this defamatory conduct will be subject to a motion to amend this Complaint.

41.     Defendant Fitton's malicious intent to severely harm and damage Plaintiff Klayman is largely based on an "inferiority complex" that he is not a lawyer and thus he feels competitive with Klayman. Indeed, at the time that Plaintiff left Judicial Watch on September 19, 2003, to run for the U.S. Senate in Florida Fitton had not graduated from college, his having lied to Klayman that he did have a bachelor's degree from George Washington University. This false statement fraudulently induced Klayman to offer him a job at the public interest organization. As a non-lawyer Fitton inappropriately does not have the background and expertise to now head Judicial Watch and make expert legal commentary on television, radio, the internet and in print, as Judicial Watch was conceived to in effect be and is a public interest law firm.

42.     Plaintiff Klayman has steadfastly demanded that Defendant Fitton refrain from making the malicious false and misleading statement as alleged herein, but he has refused and Fitton has also refused to correct this and other false and misleading statements in the past, regrettably necessitating the need for this and other legal complaints. The false and misleading statement published in concert with Stone has since been republished by others to severely harm and damage Plaintiff Klayman and his client Dr. Corsi. Defendant Fitton's campaign to severely harm and damage Plaintiff Klayman is maliciously intended to boost his own standing at the expense of Plaintiff Klayman in the conservative community, media and with donors and

elsewhere and it continues unabated.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Larry Klayman prays for judgment against Defendant Fitton as follows:

a. Awarding Plaintiff Klayman compensatory including actual, consequential, incidental and punitive damages for malicious tortious conduct as alleged herein in an amount to be determined at trial and in excess of $35, 000,000 U.S. Dollars.

b. Awarding Plaintiff Klayman attorney's fees and costs.

c. Granting any such further relief as the Court deems appropriate including preliminary and permanent injunctive relief.

**PLAINTIFF KLAYMAN DEMANDS A JURY TRIAL ON ALL COUNTS SO TRIABLE.**

Dated: February 11, 2019                                    Respectfully Submitted,

                                                            ___/s/ Larry Klayman___
                                                            Larry Klayman, Esq.
                                                            FL Bar No. 246220
                                                            KLAYMAN LAW GROUP, P.A.
                                                            c/o 2020 Pennsylvania Ave., N.W.
                                                            Suite 800
                                                            Washington, D.C. 20006
                                                            Telephone:  (310) 595 - 0800
                                                            Email: leklayman@gmail.com

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.: 13-20610-CIV-ALTONAGA**

LARRY KLAYMAN,

     Plaintiff,

v.

JUDICIAL WATCH, INC.,

     Defendant.

                        /

**FINAL JUDGMENT**

**THIS CAUSE** came for trial before the Court and a jury, United States District Judge, Cecilia M. Altonaga, presiding, and the issues having been duly tried and the jury having duly rendered its verdict on June 10, 2014, it is

**ORDERED AND ADJUDGED** that Judgment is entered in favor of Plaintiff, Larry Klayman, and against Defendant, Judicial Watch Inc., in the amount of **$156,000.00** for compensatory damages and **$25,000.00** for punitive damages, totaling **$181,000.00**, for which sum let execution issue. Requests for costs and attorneys' fees shall not be submitted until after any post-trial motions are decided or an appeal is concluded, whichever occurs later. This judgment shall bear interest at the rate as prescribed by 28 U.S.C. section 1961, and shall be enforceable as prescribed by 28 U.S.C. sections 2001–2007, 28 U.S.C. sections 3001–3308, and Federal Rule of Civil Procedure 69(a). The Clerk shall mark this case closed.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 11th day of June, 2014.

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record

Certified to be a true and correct copy of the document on file
Steven M. Larimore, Clerk,
U.S. District Court
Southern District of Florida
By _Lisa I. Streets_
Deputy Clerk
Date _6-24-2016_

[SUB]EXHIBIT 2
Intentionally Omitted. *See*
Main Ex. 1

EXHIBIT 6

# ABOUT LARRY KLAYMAN

Larry Klayman, founder of Judicial Watch and Freedom Watch, is known for his strong public interest advocacy in furtherance of ethics in government and individual freedoms and liberties. During his tenure at Judicial Watch, he obtained a court ruling that Bill Clinton committed a crime, the first lawyer ever to have done so against an American president. Larry became so famous for fighting corruption in the government and the legal profession that the NBC hit drama series "West Wing" created a character after him: [Harry Klaypool of Freedom Watch](). His character was played by actor John Diehl.

In 2004, Larry ran for the U.S. Senate as a Republican in Florida's primary. After the race ended, he founded Freedom Watch.

Larry graduated from Duke University with honors in political science and French literature. Later, he received a law degree from Emory University. During the administration of President Ronald Reagan, Larry was a Justice Department prosecutor and was on the trial team that succeeded in breaking up the telephone monopoly of AT&T, thereby creating competition in the telecommunications industry.

Between Duke and Emory, Larry worked for U.S. Senator Richard Schweiker (R-Pa.) during the Watergate era. He has also studied abroad and was a stagiaire for the Commission of the European Union in its Competition Directorate in Brussels, Belgium. During law school, Larry also worked for the U.S. International Trade Commission in Washington, D.C.

Larry speaks four languages—English, French, Italian, and Spanish—and is an international lawyer, among his many areas of legal expertise and practice.

The author of two books, *Fatal Neglect* and *Whores: Why and How I Came to Fight the Establishment,* Larry has a third book in the works dealing with the breakdown of our political and legal systems. His current book, *Whores,* is on now sale at WND.com, Amazon.com, BarnesandNoble.com, Borders.com, and all major stores and booksellers.

Larry is a frequent commentator on television and radio, as well as a weekly columnist, on Friday, for WND.com. He also writes a regular blog for Newsmax called "Klayman's Court."

Larry has been credited as being the inspiration for the Tea Party movement. (See "[Larry Klayman - The One Man TEA Party](),") by Dr. Richard Swier, http://fwusa.org/KFA)



**Support the work of Freedom Watch at [www.FreedomWatchUSA.org]()**

EXHIBIT 7

MINUTE ORDER as to ROGER J. STONE, JR. On February 19, 2019, the Court ordered the defendant to show cause at a hearing to be held on February 21, 2019 as to why the media communications order entered in this case 36 and/or defendant's conditions of release 21 should not be modified or revoked. A hearing was held on this date. For the reasons set forth on the record, and based upon the entire record, including the sealed exhibit to the hearing 42 , the testimony of the defendant, the arguments of counsel, and the submissions of the parties 28 29 filed in connection with the potential imposition of a media communications order, the Court entered the following order at the hearing: the conditions of defendant's pretrial release 21 are hereby modified to include the condition that, and the February 15, 2019 media communications order 36 is hereby modified to provide that, the defendant is prohibited from making statements to the media or in public settings about the Special Counsel's investigation or this case or any of the participants in the investigation or the case. The prohibition includes, but is not limited to, statements made about the case through the following means: radio broadcasts; interviews on television, on the radio, with print reporters, or on internet based media; press releases or press conferences; blogs or letters to the editor; and posts on Facebook, Twitter, Instagram, or any other form of social media. Furthermore, the defendant may not comment publicly about the case indirectly by having statements made publicly on his behalf by surrogates, family members, spokespersons, representatives, or volunteers. The order to show cause is hereby vacated. Signed by Judge Amy Berman Jackson on 2/21/19. (DMK) (Entered: 02/21/2019)

Stone deleted the only image in that multi-image post that included "Who framed Roger Stone" language shortly after CNBC emailed his lawyer to ask about it.












Stone's post was put online less than 48 hours after the judge, Amy Berman Jackson, ordered lawyers for the admitted Republican "dirty trickster" to explain why they did not tell her earlier about the planned publication of a book by Stone that could violate her gag order on him.



**Constant Fatigue Is A Warning Sign – See The Simple Fix**

Gundry MD

by Taboola

House Democrats unveil a sweeping 'Medicare-for-all' bill — here's what's in it

Michael Cohen's testimony gives both sides fodder in a possible impeachment fight

A 'shock and awe' rally

Bloomberg aides interview staffers in New Hampshire, Iowa as the billionaire considers 2020 run

These are the cities where you can live comfortably on $50,000 a year

Michael Cohen says prosecutors are investigating previously undisclosed wrongdoing related to Trump

**TRENDING NOW**

1. **Brett Kavanaugh: State laws blocking taxpayer-funded church repairs are 'pure discrimination'**

2. **Southwest Airlines starts selling its first Hawaii flights, from $49 one way**

3. **Tesla's onslaught of announcements is raising red flags about demand for its cars**

Roger Stone suggests Robert



Stone announced on Instagram in January that he was coming out with the book, "The Myth of Russian Collusion: The Inside Story of How Trump Really Won."

In her gag order in U.S District Court in Washington, D.C., Jackson barred Stone from "making statements to the media or in public settings about the Special Counsel's investigation or this case or any of the participants in the investigation or the case."

The gag extends to "posts on Facebook, Twitter, Instagram or any other form of social media." If Stone violates the order, Jackson could order him jailed without bail until his trial.

Jackson had slapped that order on Stone on Feb. 21 after he posted on Instagram a photo showing the judge's face next to a rifle scope's



Mueller 'framed' him in Instagram post that could violate gag order



5. 'Beverly Hills, 90210' and 'Riverdale' star Luke Perry died at 52 after suffering a massive stroke



MARKETS     WATCHLIST     CNBC TV     MENU



rogerjstonejr

**Jon Swaine**
@jonswaine

Roger Stone now directly attacking the federal judge presiding over his case and posting a pic of her head beside crosshairs

9,929   11:12 AM - Feb 18, 2019

10.2K people are talking about this

Stone's new post is comprised of a rotating series of images that ask for money to support Stone's defense to charges that he lied to Congress and tampered with a witness.

One says, "I am committed to proving my innocence. But I need your help." Another photo, which shows a young Stone standing

behind Trump years ago, says, "I've always had Trump's back. Will you have mine?" Two other images tout a "Roger Stone Did Nothing Wrong" t-shirt and "Stone Cold Truth" sweatshirt.

The post originally had an image showing Stone wearing eyeglasses under the words "Who Framed Roger Stone," a reference to the movie "Who Framed Roger Rabbit." The image has been on the Internet for some time.



**Shelby Holliday**
@shelbyholliday

New in Instagramland: Roger Stone, using Insta stories (which disappear after 24 hrs), suggests he's being framed.

2,224   10:40 AM - Mar 3, 2019

2,253 people are talking about this

A spokesman for Mueller declined to comment Sunday. Stone's lawyer did not immediately respond to a request for comment.

Stone, who remains free on a $250,000 signature bond, was arrested in Florida in late January and has pleaded not guilty to the seven counts against him, including making false statements to Congress, witness tampering and obstructing justice.

Mueller has said Stone lied to Congress about his alleged efforts to have WikiLeaks release material hacked by Russian agents from Democrats, including Hillary Clinton's campaign chairman, during the 2016 campaign that ended with Trump's victory.

An indictment alleges Stone was in contact with top-ranking Trump campaign officials about efforts to leak damaging information about Clinton right before Election Day.



**Dan Mangan**
Reporter

FROM THE WEB                                                              Sponsored Links by Taboola

**Drivers who switch save an average of $668 on car insurance.**
Progressive

**Before you renew Amazon Prime, read this**
Wikibuy

**U.S. Cardiologist: It's Like a Pressure Wash for Your Insides**
Health Headlines

**Man Who Called DOW 20,000 Has Surprising New Prediction**
Investing Outlook



**These German hearing aids are going viral**
hear.com



**If Your Indoor Cat Vomits (Do This Every Day)**
Ultimate Pet Nutrition







MORE FROM CNBC                                                                    by Taboola

House Judiciary Committee chair Nadler says Trump obstructed justice, will request documents

Trump will be 'very tough to beat' in 2020 if he gets three things right: Scaramucci

Cohen brings Trump's net worth statements to hearing. Here's how to read them

Trump, from Vietnam, berates 'Da Nang Dick' Blumenthal for war record

Michael Cohen: 'I fear' Trump won't peacefully give up the White House if he loses the 2020 election

GOP Rep. tweets at Michael Cohen on eve of hearing: Does your wife 'know about your girlfriends?'