<div style="border:1px solid black; display:inline-block">**Exhibit A**</div>

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| LARRY KLAYMAN, | |
| Plaintiff | |
| v. | **Case Number:** |
| INFOWARS, LLC<br>100 Congress Ave., 22nd Floor<br>Austin, TX 78701 | **COMPLAINT** |
| And | |
| FREE SPEECH SYSTEMS, LLC<br>100 Congress Ave., 22nd Floor<br>Austin, TX 78701 | |
| And | |
| ALEX E. JONES, Individually<br>3019 Alvin Devane Blvd., Suite 300-350<br>Austin, TX 78741 | |
| And | |
| DAVID JONES, Individually<br>3019 Alvin Devane Blvd., Suite 300-350<br>Austin, TX 78741 | |
| And | |
| OWEN SHROYER, Individually<br>3019 Alvin Devane Blvd., Suite 300-350<br>Austin, TX 78741 | |
| Defendants. | |

## INTRODUCTION

Plaintiff LARRY KLAYMAN ("Klayman") hereby files this action against INFOWARS,

LLC ("Defendant InfoWars"), FREE SPEECH SYSTEMS, LLC ("Defendant Free Speech

Systems"), ALEX E. JONES ("Defendant Alex Jones"), DAVID JONES ("Defendant David Jones") and OWEN SHROYER ("Defendant Shroyer") for Defamation, violation of the Lanham Act, and violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 under diversity of citizenship. The parties are citizens of different states and the amount in controversy exceeds $75,000.

2. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) as this is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

## THE PARTIES

3. Plaintiff Klayman is a public interest legal advocate, private practitioner and litigator who represents Plaintiff Corsi with regard to Special Counsel Robert Mueller's ("Mueller") Russian collusion investigation. Plaintiff Klayman is also a media personality and author, columnist and syndicated radio talk show host. Plaintiff Klayman is a citizen of Florida.

4. Defendant InfoWars is a limited liability company with principal offices located in Austin, TX and does substantial commercial and other business in the district, from which it derives substantial revenues directly and/or indirectly.

5. Defendant Free Speech Systems is a limited liability company with principal offices located in Austin, TX and does substantial commercial and other business in this district, from which it derives substantial revenues directly and/or indirectly.

6. Defendant Alex Jones is a well-known extreme and totally discredited "conspiracy theorist" and media personality who creates content that is broadcasted on the radio and posted on the internet at www.infowars.com and elsewhere on the internet and other social media sites and

does substantial business in this district from which he derives substantial revenues, directly and/or indirectly. Defendant Alex Jones is a citizen of Texas.

7.      Defendant David Jones is Defendant Alex Jones's father and holds the official title of Director of Human Relations for Defendant Free Speech Systems. On information and belief, Defendant David Jones is the owner of Defendants InfoWars and Free Speech Systems and he manages the business activities for Defendants InfoWars and Free Speech Systems, as well as Defendant Alex Jones' other companies.  At all material times he worked in concert with the other Defendants and Roger Stone and furthered and ratified and furthered the illegal acts set forth in this Complaint and does substantial business in this district, from which he derives substantial revenues, directly and/or indirectly. Defendant David Jones is a citizen of Texas.

8.      Defendant Shroyer is a newscaster for Defendant InfoWars and does substantial business in this district, from which he derives substantial revenues, directly and/or indirectly. Defendant Shroyer is a citizen of Texas.

9.      All of the Defendants, each and every one of them, does substantial commercial and other business in this district, not only broadcasting daily into this district for profit, but also selling products for profit continuously in this district, from which they derives substantial revenues, directly and/or indirectly.

**GENERAL ALLEGATIONS**

10.      Defendant InfoWars and Defendant Free Speech Systems are both owned, controlled, and operated by Defendant Alex Jones and David Jones. Defendant Free Speech Systems owns www.infowars.com, where content created by Defendants Alex Jones and Shroyer are posted and broadcast into this district, nationally and internationally.

11.      Defendant Alex Jones hosts *The Alex Jones Show*, which is broadcast on radio

and internet social media networks throughout the United States of America and internationally, including this judicial district, and online.

12. Defendant Shroyer hosts *The War Room* along with Roger Stone ("Stone"), which is broadcast on radio and internet social media networks throughout the United States of America and internationally, including this judicial district, and online.

13. Defendants' reach and influence are enormous. On information and belief, Defendant Alex Jones and InfoWars has a radio audience of over two million people. Before it was banned from YouTube, Defendant Alex Jones' and InfoWars' channel had more than 2.4 million subscribers, which in part accounts for the huge amount of substantial business which it does in this district.[1]

14. Defendants, each and every one of them, in concert, do substantial business and promote and sell various goods in this judicial district and nation-wide, including medicine, supplements, and "tchotchkes" with InfoWars branding. The money earned from these sales funds the conspiracy between Defendants and Stone to defame, intimidate, coerce and threaten Plaintiff Klayman in order to have tried to improperly influence the Mueller Russian collusion investigation and to coerce false testimony from Plaintiff's client, Jerome Corsi, favorable to Stone in his upcoming criminal prosecution.

15. Stone also does business promotes and sells various goods in this judicial district and nation-wide, including medicine, supplements, books, and "tchotchkes" with his own branding. The money earned from these sales funds Stone's legal defense fund and the conspiracy between Defendants and Stone to defame, intimidate, coerce and threaten Plaintiffs in

---

[1] Casey Newton, *YouTube deletes Alex Jones' channel for violating its community guidelines*, The Verge, Aug. 6, 2018, available at: https://www.theverge.com/2018/8/6/17656708/youtube-alex-jones-infowars-account-deleted-facebook-apple-spotify

were used in order to try to improperly influence the Mueller Russian collusion investigation and to have attempted to coerce false testimony from Plaintiff Corsi favorable to Stone in his criminal prosecution, for which he was convicted on seven felony counts of perjury, obstruction of justice and witness tampering.

16.     Defendants, each and every one of them, jointly and severally,  have a long and sordid history of publishing and broadcasting defamatory material, including falsely, recklessly such as by baselessly accusing the families of the schoolchildren who lost their lives during the 2012 Sandy Hook Elementary School massacre of staging the massacre and faking the deaths of their children.[2]

17.     The Sandy Hook families had to endure years of abuse and torture from Defendants before finally filing suit against numerous parties involved with InfoWars, including Defendant Alex Jones and Shroyer, for defamation.

18.     As just one example, a Florida woman was arrested for making  death threats to a parent of a Sandy Hook victim.[3] According to the U.S. Department of Justice, the motivation behind the threats was the lies propagated by Defendants that the Sandy Hook massacre was a hoax.[4]  This underscores Defendants substantial activities and reach into Florida and this district.

19.     Furthermore, Defendant Alex Jones in concert with the other Defendants propagated and promoted the "Pizzagate" conspiracy on his show, accusing a restaurant called Comet Ping Pong in the Washington D.C. area of operating a child sex ring in its non-existent

---

[2] Aaron Katersky, *Families of Sandy Hook shooting victims win legal victory in lawsuit against InfoWars, Alex Jones*, ABC News, Jan. 11, 2019, available at:
https://abcnews.go.com/US/families-sandy-hook-shooting-victims-win-legal-victory/story?id=60314174
[3] Daniella Silva, *Conspiracy Theorist Arrested for Death Threats Against Sandy Hook Parent*, NBC News, Dec. 7, 2016, available at: https://www.nbcnews.com/news/us-news/conspiracy-theorist-arrested-death-threats-against-sandy-hook-parent-n693396
[4] *Id*.

basement that purportedly involved Hillary Clinton and John Podesta. This caused one of his listeners to shoot up the restaurant after being told by Defendant Jones to "self-investigate" the "Pizzagate" conspiracy theory.[5]

20.     Defendants, acting in concert, propagated these outrageous lies in this district and elsewhere in Florida  with no regard for the grief of their victims in order to gain notoriety, fame, and profit.

21.     Defendants, acting in concert, as part of their latest scheme for notoriety, fame, and profit, are now working in concert with Stone to defame, intimidate, and threaten Plaintiff.

22.     Stone, who was indicted and then convicted on witness tampering and obstruction of justice by Special Counsel Robert Mueller, placed under a total gag order by the jurist, the Honorable Amy Berman Jackson,  presiding over his prosecution for, in part, even threatening her, and then convicted has appeared numerous times on shows broadcasted by Defendant InfoWars, and hosted by Defendants Alex Jones and Shroyer, where Stone and Defendants have published malicious false, misleading, and defamatory statements concerning Plaintiff

23.     The indictment comprised seven different felony counts. *See* <u>Exhibit 1 – Mueller Indictment</u>.  Importantly, Dr. Corsi was not accused of any wrongdoing or illegality in the Mueller Indictment, in which he named as Person 1, a material witness to the alleged crimes committed by Stone. (Note: The facts set forth in all Exhibits attached to and referenced in this Complaint are factually incorporated into this Complaint by reference).

24.     Specifically, the seven count Mueller Indictment against Stone, pursuant to which he was convicted on seven felony counts for perjury, obstruction of justice and witness

---

[5] James Doubek, *Conspiracy Theorist Alex Jones Apologizes For Promoting 'Pizzagate'*, NPR, Mar. 26, 2017, available at: https://www.npr.org/sections/thetwo-way/2017/03/26/521545788/conspiracy-theorist-alex-jones-apologizes-for-promoting-pizzagate

tampering alleged lying under oath - that is, perjury - witness tampering and obstruction of justice by threatening to kill a material witness, Randy Credico ("Credico") and his service dog, if Credico did not lie to government authorities concerning his involvement with Roger Stone. Credico is Person 2 in the Mueller Indictment of Stone. *Id.* Person 1 in this Mueller Indictment is Dr. Corsi.

25. Even before Stone was indicted, he began a public relations campaign in this district, nationally and internationally to maliciously defame, smear, intimidate and threaten Dr. Corsi and Plaintiff Klayman, Dr. Corsi's lawyer and defense counsel.

26. Stone knew that he was going to be indicted, and therefore began this public relations campaign to maliciously defame smear, intimidate and threaten Plaintiff Klayman, even before his actual indictment on January 25, 2019, in order to try to influence public opinion and Special Counsel Robert Mueller – by trying to attribute guilt to Dr. Corsi and not him - as well as to try to raise money for his legal defense.

27. Stone likes to portray himself as Mafia, and indeed on information and belief has Mafia connections, frequently making reference to Mafia figures who he admires, as well as other unsavory types who have been alleged to have engaged in unethical and/or illegal behavior. For example, he frequently makes reference to his heroes being Hyman Roth in the 'Godfather," who was the movie version of Meyer Lansky, and Roy Cohn, not to mention, Richard Nixon, for his role in Watergate. In this regard, after Stone was indicted he held a press conference on the courthouse steps of the federal courthouse in Ft. Lauderdale, where he was booked, with his arms defiantly in the air in the "victory' pose used by Nixon after he resigned in disgrace as a result of the Watergate scandal. At the time, Stone had been employed by a Nixon group called CREEP, or the Committee to Reelect the President. Defendant Stone even has a large tattoo of Richard

Nixon affixed to his back. Thus, given his admiration for persons such as these, particularly Mafia figures, his actions as pled herein can be taken as threats, as well as being defamatory. And, Plaintiff Corsi is 72 years old and thus very vulnerable emotionally and physically to these threats. Stone's intentional infliction of emotional distress and coercion and threats are intended to try even cause Plaintiff Corsi to have heart attacks and strokes, in order that Plaintiff will be unable to testify at Stone's criminal trial. Tellingly, Stone threatened kill a material witness and his service dog, Credico, Person 2 in the Mueller Indictment, "Mafia style." Stone also fashions himself and indeed has the reputation, at a minimum, as being the preeminent "dirty trickster." *See* "Get Me Roger Stone" on Netflix.

28.     By defaming Plaintiff, Stone was hoping to not only intimidate Plaintiff to severely harm and damage their reputations, but also to try to coerce and threaten Dr. Corsi to testify falsely if subpoenaed if he had been called as a material witness in Stone's ensuing criminal trial. He was also trying divert funds away from Dr. Corsi's legal defense fund and drain Plaintiff Klayman while boosting his own legal defense fund.

29.     Defendants and Stone's conspiracy to defame, smear, intimidate, tamper with and threaten Plaintiffs was calculated to improperly and illegally influence the Russian collusion investigation, for which Stone was later criminally indicted and convicted and to coerce false testimony favorable to Stone at his criminal prosecution.  This illegal conduct is also maliciously intended to harm Plaintiff Klayman's reputations and credibility as Stone fears that Dr. Corsi, Klayman's client,  would have testified truthfully once subpoenaed by Special Counsel Mueller at Stone's criminal prosecution, which Dr. Corsi was by all parties but did not ultimately testify.

30.     Tellingly, in a video published by The Daily Caller, Defendant Shroyer appearing with Stone, admits that he will serve as a surrogate for Stone if Stone receives a gag order, which

he has.6 The other Defendants, like Stoyer, are also surrogates of Stone.

31. Stone's illegal and improper attempts to influence the Russian collusion investigation were even been recognized by the presiding judge, the Honorable Amy Berman Jackson ("Judge Jackson"), who issued a complete "gag" order on Stone after Stone attempted to incite violence against Judge Jackson by putting a picture of her face and gun crosshairs up on his Instagram account.7

32. In her minute order of February 21, 2019 imposing the total "gag" order on Stone, Judge Jackson directly cites and references his use of surrogates:

> Furthermore, the defendant may not comment publicly about the case indirectly by having statements made publicly on his behalf by surrogates, family members, spokespersons, representatives, or volunteers.

33. Defendants, each and every one of them, jointly and severally, have, by working in concert with Stone, therefore engaged in illegal witness tampering, intimidation and threats in violation of 18 U.S.C. § 1512 by virtue of the defamatory and threatening acts and practices as alleged herein. Not coincidentally, this was what largely Stone was indicted and later convicted for by Special Counsel Robert Mueller.

## DEFENDANTS' DEFAMATORY CONDUCT

34. Stone has appeared numerous times on programs of the Defendants, *The Alex Jones Show* and The *War Room*, which are hosted by Defendant Alex Jones and Shroyer where numerous false, misleading, malicious and defamatory statements of and concerning Plaintiff were made, published, and or ratified by all of the Defendants, each and every one of them.

---

6 https://www.youtube.com/watch?v=SSDkh5RYtGo
7 *Judge in Roger Stone case orders hearing after he appeared to threaten her on Instagram*, Washington Post, Feb. 19, 2019, available at:
https://www.washingtonpost.com/politics/2019/02/18/roger-stone-deletes-photo-judge-presiding-over-his-case-says-he-didnt-mean-threaten-her/?utm_term=.2d3c5afa6326

35.     Plaintiff has demanded retraction and correction of the defamatory videos and publications set forth below and generally in this Complaint, but Defendants have refused, thereby ratifying any and all defamatory statements contained therein.

36.     Defendants, each and every one of them, as set forth herein,  acted with actual malice, in concert, as joint tortfeasors, as they knew that the statements which they published were false, especially since have known Plaintiff Klayman and had him as a guest commentator and newsmaker on their broadcasts  for many years and intimately know of his background and significant accomplishments. As a result,  each of the Defendants were well aware that the statements made by Stone were false, misleading, malicious  defamatory statements, published with actual malice by an unstable self-styled dirty trickster and now convicted felon.  In addition, all of the Defendants, each and every one of them,  ratified  the malicious false statements published by Stone on their networks and media sites and when Plaintiff made a demand to retract them, each of the Defendants refused. Defendants, having been sued by other victims in similar situations, think they are above the law of defamation in particular,  and have engaged, as pled herein, in a pattern and practice of behavior which flouts not just the law but human decency.

37.     As the content containing the malicious false, misleading, and defamatory statements were published on the internet, it is proliferated like a "cancerous virus," and is now available for viewing from countless sources, thereby exponentially increasing the prejudicial and defamatory impact and severe damage inflicted on Plaintiff. Judge Jackson, in issuing her two gag orders against Stone, herself recognized how postings on the internet proliferate widely and once made cannot be taken back.

*I.*     ***The January 18, 2019 Video***

38.     Before Stone was indicted, on or about January 18, 2019, he appeared on *The War Room* with Defendant Shroyer, where he made several malicious false, misleading, and defamatory statements in this district, nationally and internationally regarding Plaintiff (the "January 18 Video").[8] The same video was published on Stone's YouTube channel, "*Stone Cold Truth*," on January 18, 2019.[9]

39.     These malicious false, misleading, and defamatory statements were adopted and published by each and every one of the Defendants, rendering them joint tortfeasors and jointly and severally liable.

40.     At 1:25 in the January 18 Video, Stone maliciously falsely published that "He's (Klayman) never actually won a courtroom victory in his life."

41.     At 1:30 in the January 18 Video, Stone and the Defendants, each and every one of them jointly and severally at joint tortfeasors, maliciously falsely published, "He (Klayman) was ousted at Judicial Watch. Ask Tom Fitton [the current president of Judicial Watch] why he left. He was 'ousted' because of a 'sexual harassment complaint.'"

42.     In actuality and truth, Plaintiff Klayman left Judicial Watch on his own accord in order to run for U.S. Senate in Florida in 2003-2004.

43.     Not coincidentally, Plaintiff Klayman has a jury verdict and judgment against Fitton's Judicial Watch for having defamed him with malice. Punitive damages were also awarded by the jury in the U.S. District Court for the Southern District of Florida.

44.     At 1:37 in the January 18 Video, Stone maliciously falsely published, "He's (Klayman) incompetent, he's a numbskull, he's an idiot, he's an egomaniac, and he could be the single worst lawyer in America. With him as Jerry Corsi's lawyer, Corsi may get the electric

---

[8] https://www.infowars.com/watch/?video=5c3fbf24fe49383dcf6996e4
[9] https://www.youtube.com/watch?v=cJyfgdvtFx8

chair. So your idea that he's a good guy is entirely wrong"

45.     In actuality, Plaintiff Klayman has been a practicing attorney for over four decades and has won numerous cases on behalf of his clients and also against the government for constitutional and other violations.  He is the founder of both Judicial Watch and Freedom Watch, a former candidate for the U.S. Senate in Florida, a former trial attorney and prosecutor of the Antitrust Division of the U.S. Department of Justice, where he was a member of the trial team that successfully broke up the AT&T monopoly and created competition in the telecommunications industry. Among many other legal victories, Plaintiff Klayman also won landmark decisions at the chairman and general counsel of Freedom Watch enjoining the illegal mass surveillance by the National Security Agency. *Klayman v. Obama*, 1:13-cv-851 (D.D.C). *See* Exhibit 2 --*Klayman biography*, which is incorporated herein by reference. Stone knew this when he published the malicious false and misleading statements about Klayman and thus willfully and maliciously defamed Plaintiff Klayman.

46.     At 2:01 in the January 18 Video, Stone and each and every one of the Defendants, jointly and severally as joint tortfeasors, maliciously falsely and misleadingly published that Plaintiff Klayman is a "piece of garbage."

47.     At 4:11 in the January 18 Video, Stone and each and every one of the Defendants, jointly and severally as joint tortfeasors, maliciously falsely and misleadingly published, "For those people out there who think…that Larry Klayman's IQ is higher than 70, you're wrong…"

48.     Defendants published these malicious false, misleading, and defamatory statements with malice and with full knowledge that they were false and misleading, and/or at a minimum, with a reckless disregard for its truthfulness. These statements falsely and misleadingly state that Plaintiff Corsi was fired from World Net Daily, that he committed perjury

(a federal offense), and that he is an untruthful person. They also create the false and misleading implication that Plaintiff Klayman is unqualified to be an attorney, public advocate and is a bad and loathsome person. Plaintiff Klayman is also an author, columnist and nationally syndicated radio and internet talk show host on Radio America, his show titled "*Special Prosecutor with Larry Klayman.*" *See* www.radioamerica.com. The malicious false and misleading published statements as alleged herein also severely damaged Plaintiff Klayman personally and professionally in this regard, particularly since he and his show compete with Defendant InfoWars and and the other Defendants in media markets in this district, nationally and internationally. Plaintiff Corsi also competes with Defendant InfoWars and the other Defendants in media markets in this district, nationally and internationally.

<u>FACTS PERTAINING TO DEFENDANTS' UNFAIR COMPETITION</u>

49.     In addition to being an investigative journalist/author and a public interest litigator/advocate, respectively, Plaintiff Klayman is a competitor to Defendants as conservative media personalities, broadcasters, authors and columnists on social media and elsewhere.

50.     For instance, Plaintiff Klayman also hosts an online radio show and produces videos that are posted on the internet, issues press releases, commentary and other publications.

51.     Defendants, each and every one of them jointly and severally as joint tortfeasors, have made, adopted, and or ratified numerous false or misleading statements of fact of and concerning Plaintiff during their various programs and media postings and publication, which all contain significant advertisement or promotions.

52.     These false and/or misleading facts materially prejudice the viewers and/or listeners as to the quality, nature, and contents of Plaintiff's services, which has caused significant competitive and commercial injury to Plaintiff, as well as loss of good will and

reputation.

53.     Plaintiff, like Defendants, rely on viewer and listener financial support and sales in order to continue their work. Defendants' false and/or misleading statements concerning Plaintiffs is meant to, and has, diverted financial support and sales away from Plaintiffs and to Defendants instead.

## FIRST CAUSE OF ACTION
### *Defamation*

54.     Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

55.     Acting in concert, Defendants published malicious, false, misleading and defamatory statements of and concerning Plaintiff in this judicial district, nationwide, and worldwide.

56.     These false and misleading statements were published with malice, as Defendants knew that they were false and misleading, or at a minimum acted with a reckless disregard for the truth.

57.     Plaintiff has been severely harmed and damaged by these false and misleading statements because they subjected him to hatred, distrust, ridicule, contempt, and disgrace.

58.     Plaintiff has been damaged by these false and misleading statements because they severely injured Plaintiff Klayman in his profession and businesses, as well as severely injured and damaged him personally, financially and in terms of his good will and reputation.

## SECOND CAUSE OF ACTION
### *Defamation Per Se*

59.     Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

60.     Acting in concert, Defendants, as alleged herein, published numerous false, misleading and defamatory statements to severely harm and damage Plaintiff, which were republished elsewhere, and through surrogates, which published the falsity that Plaintiff have committed crimes, engaged in moral turpitude, and committed sexual misconduct, as set forth in the preceding paragraphs.

61.     These false, misleading and defamatory statements were published in this district and on the internet and elsewhere, domestically and for the entire world to see and hear and in so doing Defendants published false and misleading facts, *inter alia*, that Plaintiff's conduct, characteristics or a condition are incompatible with the proper exercise of his lawful business, trade, profession or office, as well as personally.

62.     These false and misleading statements were published with malice, as Defendants knew that they were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

63.     This statements are *per se* defamatory because they falsely and misleadingly published that Plaintiff Klayman had committed sexual misconduct which are federal offense and felony. Defamation *per se* gives rise to the presumption that severe harm and damage has arisen by virtue of the malicious false and misleading statements.

64.     These malicious false, misleading, and defamatory statements are defamatory *per se* and these false and misleading statements severely harmed and damaged Plaintiff Klayman in his profession as a public interest and private advocate and litigator and as an author, columnist and radio and internet radio talk show and syndicated host, as well as personally.

### THIRD CAUSE OF ACTION
#### *Defamation by Implication*

65.     Plaintiff re-alleges and incorporates by reference the allegations in the preceding

paragraphs of the Complaint as if fully set forth herein.

66.     Acting in concert, Defendants published numerous false, misleading and defamatory statements about Plaintiff, as set forth in the preceding paragraphs.

67.     These false, misleading and defamatory statements were published on the internet and published and republished elsewhere in this district, domestically and for the entire world to see and hear.

68.     These false and misleading statements were published with malice, as Defendants knew that they were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

69.     These statements created the false and misleading implication that Plaintiff Klayman committed sexual misconduct and is incompetent, among other false and misleading statements as pled in the preceding paragraphs.

70.     Plaintiff has been severely harmed and damaged by these false and misleading statements because they subject him to hatred, distrust, ridicule, contempt, and disgrace.

71.     Plaintiff has been damaged by these malicious false and misleading statements because the statements severely harmed and damaged Plaintiff in his professions as pubic interest and private practitioner lawyers and radio talk show hosts, whose credibility is the most important trait, as well as personally.

### FOURTH  CAUSE OF ACTION
#### *Unfair Competition – Lanham Act 15 U.S.C. § 1125(a)*

72.     Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

73.     Defendants, acting together and in concert have and are engaged in acts of unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a) and common law.

74.     Defendants have made false and/or misleading statements that have deceived and/or had the tendency to deceive a substantial segment of the receiving audience.

75.     Defendants' false and/or misleading statements misrepresent the nature, characteristics, and qualities of Plaintiff Klayman's goods or services.

76.     Defendants' false and/or misleading statements are material because that were highly likely to mislead and influence supporters' decisions to provide financial support and sales to Defendants instead of Plaintiff.

77.     These false and misleading statements were made in interstate commerce, as they were widely broadcast on radio, on the internet, in social media, and elsewhere in this district, nationally and internationally.

78.     Plaintiff has suffered significant damages, which are ongoing, due to Defendants' false and/or misleading statements. By law these damages are calculated based on Defendants' gross sales and receipts, which are trebled, plus an award of attorneys fees and costs.

**FIFTH CAUSE OF ACTION**

79.     Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

80.     Defendants, acting together and in concert have violated the Florida Deceptive and Unfair Trade Practices Act.

81.     Mr. Klayman is a competitor to Defendants.

82.     Defendants have engaged in both deceptive acts and unfair practices by making misleading statements that misrepresent the nature, characteristics, and qualities of Plaintiff Klayman's goods or services.

83.     Defendants' false and/or misleading statements misrepresent the nature,

characteristics, and qualities of Plaintiff Klayman's goods or services.

84.    Defendants' false and/or misleading statements are material because that were highly likely to mislead and influence supporters' decisions to provide financial support and sales to Defendants instead of Plaintiff.

85.    Defendants' misstatements would likely mislead the objective consumer acting reasonably under the circumstances.

86.    Defendants' misstatements have actually misled numerous consumers, which has had a direct negative impact on the amount of financial support received by Mr. Klayman.

87.    Plaintiff has suffered significant pecuniary damages directly and proximately caused by Defendants' deceptive acts and unfair practices, which are ongoing.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

a.    As a result of significant damage caused by each of the Defendants, acting in concert, jointly and severally, in this district and throughout Florida, the nation and internationally, awarding Plaintiff compensatory including actual, consequential, incidental and punitive damages for malicious tortious conduct, perpetrated with actual malice, in an amount to be determined at trial and in excess of $50, 000,000 U.S. Dollars as redress for loss of his personal and professional reputations and good will, as well as past and prospective financial losses, personally and professionally.

b.    Awarding Plaintiff attorney fees and costs

c.    Granting such other relief as the Court deems appropriate and necessary including preliminary and permanent injunctive relief.

**PLAINTIFF DEMANDS TRIAL BY JURY ON ALL CLAIMS SO TRIABLE**.

Case 1:20-mc-00298-LY Document 57-1 Filed 09/02/20 Page 19 of 46

Dated: April 9, 2020

Respectfully Submitted,

_/s/ Larry Klayman_
Larry Klayman, Esq.
7050 W. Palmetto Park Rd
Boca Raton FL 33433
Telephone: 561-558-5336
Email: leklayman@gmail.com

*PLAINTIFF PRO SE*

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. |
| | * | |
| v. | * | Grand Jury Original |
| | * | |
| ROGER JASON STONE, JR., | * | 18 U.S.C. §§ 1001, 1505, 1512, 2 |
| | * | |
| Defendant. | * | |
| | * | |
| | * | |
| | * | |
| | ******* | |

## **INDICTMENT**

The Grand Jury for the District of Columbia charges:

### **Introduction**

1.      By in or around May 2016, the Democratic National Committee ("DNC") and the Democratic Congressional Campaign Committee ("DCCC") became aware that their computer systems had been compromised by unauthorized intrusions and hired a security company ("Company 1") to identify the extent of the intrusions.

2.      On or about June 14, 2016, the DNC—through Company 1—publicly announced that it had been hacked by Russian government actors.

3.      From in or around July 2016 through in or around November 2016, an organization ("Organization 1"), which had previously posted documents stolen by others from U.S. persons, entities, and the U.S. government, released tens of thousands of documents stolen from the DNC and the personal email account of the chairman of the U.S. presidential campaign of Hillary Clinton ("Clinton Campaign").

a.  On or about July 22, 2016, Organization 1 released documents stolen from the DNC.

b.  Between on or about October 7, 2016 and on or about November 7, 2016, Organization 1 released approximately 33 tranches of documents that had been stolen from the personal email account of the Clinton Campaign chairman, totaling over 50,000 stolen documents.

4.  ROGER JASON STONE, JR. was a political consultant who worked for decades in U.S. politics and on U.S. political campaigns. STONE was an official on the U.S. presidential campaign of Donald J. Trump ("Trump Campaign") until in or around August 2015, and maintained regular contact with and publicly supported the Trump Campaign through the 2016 election.

5.  During the summer of 2016, STONE spoke to senior Trump Campaign officials about Organization 1 and information it might have had that would be damaging to the Clinton Campaign. STONE was contacted by senior Trump Campaign officials to inquire about future releases by Organization 1.

6.  By in or around early August 2016, STONE was claiming both publicly and privately to have communicated with Organization 1. By in or around mid-August 2016, Organization 1 made a public statement denying direct communication with STONE. Thereafter, STONE said that his communication with Organization 1 had occurred through a person STONE described as a "mutual friend," "go-between," and "intermediary." STONE also continued to communicate with members of the Trump Campaign about Organization 1 and its intended future releases.

7.  After the 2016 U.S. presidential election, the U.S. House of Representatives Permanent Select Committee on Intelligence ("HPSCI"), the U.S. Senate Select Committee on Intelligence ("SSCI"), and the Federal Bureau of Investigation ("FBI") opened or announced their respective

investigations into Russian interference in the 2016 U.S. presidential election, which included investigating STONE's claims of contact with Organization 1.

8.    In response, STONE took steps to obstruct these investigations.  Among other steps to obstruct the investigations, STONE:

  a.    Made multiple false statements to HPSCI about his interactions regarding Organization 1, and falsely denied possessing records that contained evidence of these interactions; and

  b.    Attempted to persuade a witness to provide false testimony to and withhold pertinent information from the investigations.

### Other Relevant Individuals

9.    Person 1 was a political commentator who worked with an online media publication during the 2016 U.S. presidential campaign.  Person 1 spoke regularly with STONE throughout the campaign, including about the release of stolen documents by Organization 1.

10.    Person 2 was a radio host who had known STONE for more than a decade.  In testimony before HPSCI on or about September 26, 2017, STONE described Person 2 (without naming him) as an "intermediary," "go-between," and "mutual friend" to the head of Organization 1.  In a follow-up letter to HPSCI dated October 13, 2017, STONE identified Person 2 by name and claimed Person 2 was the "gentleman who confirmed for Mr. Stone" that the head of Organization 1 had "'[e]mails related to Hillary Clinton which are pending publication.'"

### Background

#### STONE's Communications About Organization 1 During the Campaign

11.    By in or around June and July 2016, STONE informed senior Trump Campaign officials that he had information indicating Organization 1 had documents whose release would be

damaging to the Clinton Campaign.  The head of Organization 1 was located at all relevant times at the Ecuadorian Embassy in London, United Kingdom.

12.     After the July 22, 2016 release of stolen DNC emails by Organization 1, a senior Trump Campaign official was directed to contact STONE about any additional releases and what other damaging information Organization 1 had regarding the Clinton Campaign.  STONE thereafter told the Trump Campaign about potential future releases of damaging material by Organization 1.

13.     STONE also corresponded with associates about contacting Organization 1 in order to obtain additional emails damaging to the Clinton Campaign.

a.     On or about July 25, 2016, STONE sent an email to Person 1 with the subject line, "Get to [the head of Organization 1]."  The body of the message read, "Get to [the head of Organization 1] [a]t Ecuadorian Embassy in London and get the pending [Organization 1] emails . . . they deal with Foundation, allegedly."  On or about the same day, Person 1 forwarded STONE's email to an associate who lived in the United Kingdom and was a supporter of the Trump Campaign.

b.     On or about July 31, 2016, STONE emailed Person 1 with the subject line, "Call me MON."  The body of the email read in part that Person 1's associate in the United Kingdom "should see [the head of Organization 1]."

c.     On or about August 2, 2016, Person 1 emailed STONE.  Person 1 wrote that he was currently in Europe and planned to return in or around mid-August.  Person 1 stated in part, "Word is friend in embassy plans 2 more dumps.  One shortly after I'm back.  2nd in Oct.  Impact planned to be very damaging."  The phrase "friend in embassy" referred to the head of Organization 1.  Person 1 added in the same email, "Time to let more than [the Clinton Campaign chairman] to be exposed as in bed w

4

enemy if they are not ready to drop HRC. That appears to be the game hackers are now about. Would not hurt to start suggesting HRC old, memory bad, has stroke – neither he nor she well. I expect that much of next dump focus, setting stage for Foundation debacle."

14.     Starting in early August 2016, after receiving the August 2, 2016 email from Person 1, STONE made repeated statements about information he claimed to have learned from the head of Organization 1.

   a.     On or about August 8, 2016, STONE attended a public event at which he stated, "I actually have communicated with [the head of Organization 1]. I believe the next tranche of his documents pertain to the Clinton Foundation, but there's no telling what the October surprise may be."

   b.     On or about August 12, 2016, STONE stated during an interview that he was "in communication with [the head of Organization 1]" but was "not at liberty to discuss what I have."

   c.     On or about August 16, 2016, STONE stated during an interview that "it became known on this program that I have had some back-channel communication with [Organization 1] and [the head of Organization 1]." In a second interview on or about the same day, STONE stated that he "communicated with [the head of Organization 1]" and that they had a "mutual acquaintance who is a fine gentleman."

   d.     On or about August 18, 2016, STONE stated during a television interview that he had communicated with the head of Organization 1 through an "intermediary, somebody who is a mutual friend."

5

e.  On or about August 23, 2016, Person 2 asked STONE during a radio interview, "You've been in touch indirectly with [the head of Organization 1]. . . . Can you give us any kind of insight? Is there an October surprise happening?" STONE responded, "Well, first of all, I don't want to intimate in any way that I control or have influence with [the head of Organization 1 because I do not. . . . We have a mutual friend, somebody we both trust and therefore I am a recipient of pretty good information."

15.  Beginning on or about August 19, 2016, STONE exchanged written communications, including by text message and email, with Person 2 about Organization 1 and what the head of Organization 1 planned to do.

a.  On or about August 19, 2016, Person 2 sent a text message to STONE that read in part, "I'm going to have [the head of Organization 1] on my show next Thursday." On or about August 21, 2016, Person 2 sent another text message to STONE, writing in part, "I have [the head of Organization 1] on Thursday so I'm completely tied up on that day."

b.  On or about August 25, 2016, the head of Organization 1 was a guest on Person 2's radio show for the first time. On or about August 26, 2016, Person 2 sent a text message to STONE that stated, "[the head of Organization 1] talk[ed] about you last night." STONE asked what the head of Organization 1 said, to which Person 2 responded, "He didn't say anything bad we were talking about how the Press is trying to make it look like you and he are in cahoots."

c.  On or about August 27, 2016, Person 2 sent text messages to STONE that said, "We are working on a [head of Organization 1] radio show," and that he (Person 2) was

6

"in charge" of the project.  In a text message sent later that day, Person 2 added, "[The head of Organization 1] has kryptonite on Hillary."

d.    On or about September 18, 2016, STONE sent a text message to Person 2 that said, "I am e-mailing u a request to pass on to [the head of Organization 1]."  Person 2 responded "Ok," and added in a later text message, "[j]ust remember do not name me as your connection to [the head of Organization 1] you had one before that you referred to."

    i.    On or about the same day, September 18, 2016, STONE emailed Person 2 an article with allegations against then-candidate Clinton related to her service as Secretary of State.  STONE stated, "Please ask [the head of Organization 1] for any State or HRC e-mail from August 10 to August 30—particularly on August 20, 2011 that mention [the subject of the article] or confirm this narrative."

    ii.    On or about September 19, 2016, STONE texted Person 2 again, writing, "Pass my message . . . to [the head of Organization 1]."  Person 2 responded, "I did."  On or about September 20, 2016, Person 2 forwarded the request to a friend who was an attorney with the ability to contact the head of Organization 1.  Person 2 blind-copied STONE on the forwarded email.

e.    On or about September 30, 2016, Person 2 sent STONE via text message a photograph of Person 2 standing outside the Ecuadorian Embassy in London where the head of Organization 1 was located.

f. On or about October 1, 2016, which was a Saturday, Person 2 sent STONE text messages that stated, "big news Wednesday . . . now pretend u don't know me . . . Hillary's campaign will die this week." In the days preceding these messages, the press had reported that the head of Organization 1 planned to make a public announcement on or about Tuesday, October 4, 2016, which was reported to be the ten-year anniversary of the founding of Organization 1.

g. On or about October 2, 2016, STONE emailed Person 2, with the subject line "WTF?," a link to an article reporting that Organization 1 was canceling its "highly anticipated Tuesday announcement due to security concerns." Person 2 responded to STONE, "head fake."

h. On or about the same day, October 2, 2016, STONE texted Person 2 and asked, "Did [the head of Organization 1] back off." On or about October 3, 2016, Person 2 initially responded, "I can't tal[k] about it." After further exchanges with STONE, Person 2 said, "I think it[']s on for tomorrow." Person 2 added later that day, "Off the Record Hillary and her people are doing a full-court press they [*sic*] keep [the head of Organization 1] from making the next dump . . . That's all I can tell you on this line . . . Please leave my name out of it."

16. In or around October 2016, STONE made statements about Organization 1's future releases, including statements similar to those that Person 2 made to him. For example:

a. On or about October 3, 2016, STONE wrote to a supporter involved with the Trump Campaign, "Spoke to my friend in London last night. The payload is still coming."

b. Also on or about October 3, 2016, STONE received an email from a reporter who had connections to a high-ranking Trump Campaign official that asked, "[the head

of Organization 1] – what's he got? Hope it's good." STONE responded in part, "It is. I'd tell [the high-ranking Trump Campaign official] but he doesn't call me back."

c. On or about October 4, 2016, the head of Organization 1 held a press conference but did not release any new materials pertaining to the Clinton Campaign. Shortly afterwards, STONE received an email from the high-ranking Trump Campaign official asking about the status of future releases by Organization 1. STONE answered that the head of Organization 1 had a "[s]erious security concern" but that Organization 1 would release "a load every week going forward."

d. Later that day, on or about October 4, 2016, the supporter involved with the Trump Campaign asked STONE via text message if he had "hear[d] anymore from London." STONE replied, "Yes - want to talk on a secure line - got Whatsapp?" STONE subsequently told the supporter that more material would be released and that it would be damaging to the Clinton Campaign.

17. On or about October 7, 2016, Organization 1 released the first set of emails stolen from the Clinton Campaign chairman. Shortly after Organization 1's release, an associate of the high-ranking Trump Campaign official sent a text message to STONE that read "well done." In subsequent conversations with senior Trump Campaign officials, STONE claimed credit for having correctly predicted the October 7, 2016 release.

<u>The Investigations</u>

18. In or around 2017, government officials publicly disclosed investigations into Russian interference in the 2016 U.S. presidential election and possible links to individuals associated with the campaigns.

a. On or about January 13, 2017, the chairman and vice chairman of SSCI announced the committee would conduct an inquiry that would investigate, among other things, any intelligence regarding links between Russia and individuals associated with political campaigns, as well as Russian cyber activity and other "active measures" directed against the United States in connection with the 2016 election.

b. On or about January 25, 2017, the chairman and ranking member of HPSCI announced that HPSCI had been conducting an inquiry similar to SSCI's.

c. On or about March 20, 2017, the then-director of the FBI testified at a HPSCI hearing and publicly disclosed that the FBI was investigating Russian interference in the 2016 election and possible links and coordination between the Trump Campaign and the Russian government.

d. By in or around August 2017, news reports stated that a federal grand jury had opened an investigation into matters relating to Russian government efforts to interfere in the 2016 election, including possible links and coordination between the Trump Campaign and the Russian government.

**STONE's False Testimony to HPSCI**

19. In or around May 2017, HPSCI sent a letter requesting that STONE voluntarily appear before the committee and produce:

> Any documents, records, electronically stored information including e-mail, communication, recordings, data and tangible things (including, but not limited to, graphs, charts, photographs, images and other documents) regardless of form, other than those widely available (e.g., newspaper articles) that reasonably could lead to the discovery of any facts within the investigation's publicly-announced parameters.

On or about May 22, 2017, STONE caused a letter to be submitted to HPSCI stating that "Mr.

Stone has no documents, records, or electronically stored information, regardless of form, other than those widely available that reasonably could lead to the discovery of any facts within the investigation's publicly-announced parameters."

20.     On or about September 26, 2017, STONE testified before HPSCI in Washington, D.C. as part of the committee's ongoing investigation.  In his opening statement, STONE stated, "These hearings are largely based on a yet unproven allegation that the Russian state is responsible for the hacking of the DNC and [the Clinton Campaign chairman] and the transfer of that information to [Organization 1]."  STONE further stated that  "[m]embers of this Committee" had made certain "assertions against me which must be rebutted here today," which included "[t]he charge that I knew in advance about, and predicted, the hacking of Clinton campaign chairman['s] email, [and] that I had advanced knowledge of the source or actual content of the [Organization 1] disclosures regarding Hillary Clinton."

21.     In the course of his HPSCI testimony, STONE made deliberately false and misleading statements to the committee concerning, among other things, his possession of documents pertinent to HPSCI's investigation; the source for his early August 2016 statements about Organization 1; requests he made for information from the head of Organization 1; his communications with his identified intermediary; and his communications with the Trump Campaign about Organization 1.

<u>STONE's False and Misleading Testimony About His Possession of Documents Pertinent to HPSCI's Investigation</u>

22.     During his HPSCI testimony, STONE was asked, "So you have no emails to anyone concerning the allegations of hacked documents . . . or any discussions you have had with third parties about [the head of Organization 1]?  You have no emails, no texts, no documents whatsoever, any kind of that nature?"  STONE falsely and misleadingly answered, "That is correct.

Not to my knowledge."

23. In truth and in fact, STONE had sent and received numerous emails and text messages during the 2016 campaign in which he discussed Organization 1, its head, and its possession of hacked emails. At the time of his false testimony, STONE was still in possession of many of these emails and text messages, including:

a.   The email from STONE to Person 1 on or about July 25, 2016 that read in part, "Get to [the head of Organization 1] [a]t Ecuadorian Embassy in London and get the pending [Organization 1] emails . . . they deal with Foundation, allegedly.";

b.   The email from STONE to Person 1 on or about July 31, 2016 that said an associate of Person 1 "should see [the head of Organization 1].";

c.   The email from Person 1 to STONE on or about August 2, 2016 that stated in part, "Word is friend in embassy plans 2 more dumps. One shortly after I'm back. 2nd in Oct. Impact planned to be very damaging.";

d.   Dozens of text messages and emails, beginning on or about August 19, 2016 and continuing through the election, between STONE and Person 2 in which they discussed Organization 1 and the head of Organization 1;

e.   The email from STONE on or about October 3, 2016 to the supporter involved with the Trump Campaign, which read in part, "Spoke to my friend in London last night. The payload is still coming."; and

f.   The emails on or about October 4, 2016 between STONE and the high-ranking member of the Trump Campaign, including STONE's statement that Organization 1 would release "a load every week going forward."

24.     By falsely claiming that he had no emails or text messages in his possession that referred to the head of Organization 1, STONE avoided providing a basis for HPSCI to subpoena records in his possession that could have shown that other aspects of his testimony were false and misleading.

<u>STONE's False and Misleading Testimony About His Early August 2016 Statements</u>

25.     During his HPSCI testimony on or about September 26, 2017, STONE was asked to explain his statements in early August 2016 about being in contact with the head of Organization 1. STONE was specifically asked about his statement on or about August 8, 2016 that "I've actually communicated with [the head of Organization 1]," as well as his statement on or about August 12, 2016 that he was "in communication with [the head of Organization 1]" but was "not at liberty to discuss what I have."

26.     STONE responded that his public references to having a means of contacting Organization 1 referred exclusively to his contact with a journalist, who STONE described as a "go-between, as an intermediary, as a mutual friend" of the head of Organization 1. STONE stated that he asked this individual, his intermediary, "to confirm what [the head of Organization 1] ha[d] tweeted, himself, on July 21st, that he ha[d] the Clinton emails and that he [would] publish them." STONE further stated that the intermediary "was someone I knew had interviewed [the head of Organization 1]. And I merely wanted confirmation of what he had tweeted on the 21st." STONE declined to tell HPSCI the name of this "intermediary" but provided a description in his testimony that was consistent with Person 2.

27.     On or about October 13, 2017, STONE caused a letter to be submitted to HPSCI that identified Person 2 by name as the "gentleman who confirmed for Mr. Stone" that the head of Organization 1 had "'[e]mails related to Hillary Clinton which are pending publication.'"

28.     STONE's explanation of his August 2016 statements about communicating with the head of Organization 1 was false and misleading.  In truth and in fact, the first time Person 2 interviewed the head of Organization 1 was on or about August 25, 2016, after STONE made his August 8 and August 12, 2016 public statements.   Similarly, at the time STONE made his August 2016 statements, STONE had directed Person 1—not Person 2—to contact the head of Organization 1. And Person 1—not Person 2—had told STONE in advance of STONE's August 8 and August 12, 2016 public statements that "[w]ord is friend in embassy plans 2 more dumps," including one in October.  At no time did STONE identify Person 1 to HPSCI as another individual STONE contacted to serve as a "go-between," "intermediary," or other source of information from Organization 1.  STONE also never disclosed his exchanges with Person 1 when answering HPSCI's questioning about STONE's August 8 and August 12, 2016 statements.

<u>STONE's False and Misleading Testimony About Requests He Made for Information from the Head of Organization 1</u>

29.     During his HPSCI testimony, STONE was asked, "[W]hat was the extent of the communication with [the intermediary]?"  STONE replied, "I asked him to confirm . . . that the tweet of [the head of Organization 1] of the 21st was accurate, that they did in fact have . . . Hillary Clinton emails and that they would release them."  STONE was then asked, "Did you ask [the intermediary] to communicate anything else to [the head of Organization 1]?"  STONE falsely and misleadingly responded, "I did not."  STONE was then asked, "Did you ask [the intermediary] to do anything on your own behalf?"  STONE falsely and misleadingly responded, "I did not."

30.     In truth and in fact, STONE directed both Person 1 and Person 2 to pass on requests to the head of Organization 1 for documents that STONE believed would be damaging to the Clinton Campaign.  For example:

      a.     As described above, on or about July 25, 2016, STONE sent Person 1 an email that

<div align="center">14</div>

read, "Get to [the head of Organization 1] [a]t Ecuadorian Embassy in London and

get the pending [Organization 1] emails . . . they deal with Foundation, allegedly."

b. On or about September 18, 2016, STONE sent a text message to Person 2 that said, "I am e-mailing u a request to pass on to [the head of Organization 1]," and then emailed Person 2 an article with allegations against then-candidate Clinton related to her service as Secretary of State. STONE added, "Please ask [the head of Organization 1] for any State or HRC e-mail from August 10 to August 30—particularly on August 20, 2011 that mention [the subject of the article] or confirm this narrative."

c. On or about September 19, 2016, STONE texted Person 2 again, writing "Pass my message . . . to [the head of Organization 1]." Person 2 responded, "I did," and the next day Person 2, on an email blind-copied to STONE, forwarded the request to an attorney who had the ability to contact the head of Organization 1.

<u>STONE's False and Misleading Testimony About Communications with His Identified Intermediary</u>

31.    During his HPSCI testimony, STONE was asked repeatedly about his communications with the person he identified as his intermediary. STONE falsely and misleadingly stated that he had never communicated with his intermediary in writing in any way. During one exchange, STONE falsely and misleadingly claimed only to have spoken with the intermediary telephonically:

Q:    [H]ow did you communicate with the intermediary?

A:    Over the phone.

Q:    And did you have any other means of communicating with the intermediary?

A:    No.

Q:    No text messages, no – none of the list, right?

> A:     No.

Later during his testimony, STONE again falsely denied ever communicating with his intermediary in writing:

> Q:     So you never communicated with your intermediary in writing in any way?
>
> A:     No.
>
> Q:     Never emailed him or texted him?
>
> A:     He's not an email guy.
>
> Q:     So all your conversations with him were in person or over the phone.
>
> A:     Correct.

32.     In truth and in fact, as described above, STONE and Person 2 (who STONE identified to HPSCI as his intermediary) engaged in frequent written communication by email and text message. STONE also engaged in frequent written communication by email and text message with Person 1, who also provided STONE with information regarding Organization 1.

33.     Written communications between STONE and Person 1 and between STONE and Person 2 continued through STONE's HPSCI testimony. Indeed, on or about September 26, 2017—the day that STONE testified before HPSCI and denied having ever sent or received emails or text messages from Person 2—STONE and Person 2 exchanged over thirty text messages.

34.     Certain electronic messages between STONE and Person 1 and between STONE and Person 2 would have been material to HPSCI. For example:

> a.     In or around July 2016, STONE emailed Person 1 to "get to" the head of Organization 1 and obtain the pending emails.
>
> b.     In or around September 2016, STONE sent messages directing Person 2 to pass a request to the head of Organization 1.
>
> c.     On or about January 6, 2017, Person 2 sent STONE an email that had the subject

line "Back channel bs." In the email, Person 2 wrote, "Well I have put together timelines[] and you [] said you have a back-channel way back a month before I had [the head of Organization 1] on my show . . . I have never had a conversation with [the head of Organization 1] other than my radio show . . . I have pieced it all together . . . so you may as well tell the truth that you had no back-channel or there's the guy you were talking about early August."

STONE's False and Misleading Testimony About Communications with the Trump Campaign

35.     During his HPSCI testimony, STONE was asked, "did you discuss your conversations with the intermediary with anyone involved in the Trump campaign?" STONE falsely and misleadingly answered, "I did not." In truth and in fact, and as described above, STONE spoke to multiple individuals involved in the Trump Campaign about what he claimed to have learned from his intermediary to Organization 1, including the following:

a.     On multiple occasions, STONE told senior Trump Campaign officials about materials possessed by Organization 1 and the timing of future releases.

b.     On or about October 3, 2016, STONE wrote to a supporter involved with the Trump Campaign, "Spoke to my friend in London last night. The payload is still coming."

c.     On or about October 4, 2016, STONE told a high-ranking Trump Campaign official that the head of Organization 1 had a "[s]erious security concern" but would release "a load every week going forward."

**Attempts to Prevent Person 2 from Contradicting STONE's False Statements to HPSCI**

36.     On or about October 19, 2017, STONE sent Person 2 an excerpt of his letter to HPSCI that identified Person 2 as his "intermediary" to Organization 1. STONE urged Person 2, if asked by HPSCI, to falsely confirm what STONE had previously testified to, including that it was Person 2

who provided STONE with the basis for STONE's early August 2016 statements about contact with Organization 1. Person 2 repeatedly told STONE that his testimony was false and told him to correct his testimony to HPSCI. STONE did not do so. STONE then engaged in a prolonged effort to prevent Person 2 from contradicting STONE's false statements to HPSCI.

37.    In or around November 2017, Person 2 received a request from HPSCI to testify voluntarily before the committee. After being contacted by HPSCI, Person 2 spoke and texted repeatedly with STONE. In these discussions, STONE sought to have Person 2 testify falsely either that Person 2 was the identified intermediary or that Person 2 could not remember what he had told STONE. Alternatively, STONE sought to have Person 2 invoke his Fifth Amendment right against self-incrimination. For example:

a.    On or about November 19, 2017, in a text message to STONE, Person 2 said that his lawyer wanted to see him (Person 2). STONE responded, "'Stonewall it. Plead the fifth. Anything to save the plan' . . . Richard Nixon." On or about November 20, 2017, Person 2 informed HPSCI that he declined HPSCI's request for a voluntary interview.

b.    On or about November 21, 2017, Person 2 texted STONE, "I was told that the house committee lawyer told my lawyer that I will be getting a subpoena." STONE responded, "That was the point at which your lawyers should have told them you would assert your 5th Amendment rights if compelled to appear."

c.    On or about November 28, 2017, Person 2 received a subpoena compelling his testimony before HPSCI. Person 2 informed STONE of the subpoena.

d.    On or about November 30, 2017, STONE asked Person 1 to write publicly about Person 2. Person 1 responded, "Are you sure you want to make something out of

this now?  Why not wait to see what [Person 2] does.  You may be defending yourself too much—raising new questions that will fuel new inquiries.  This may be a time to say less, not more."   STONE responded by telling Person 1 that Person 2 "will take the 5th—but let's hold a day."

e.        On multiple occasions, including on or about December 1, 2017, STONE told Person 2 that Person 2 should do a "Frank Pentangeli" before HPSCI in order to avoid contradicting STONE's testimony.  Frank Pentangeli is a character in the film *The Godfather: Part II*, which both STONE and Person 2 had discussed, who testifies before a congressional committee and in that testimony claims not to know critical information that he does in fact know.

f.        On or about December 1, 2017, STONE texted Person 2, "And if you turned over anything to the FBI you're a fool."  Later that day, Person 2 texted STONE, "You need to amend your testimony before I testify on the 15th."  STONE responded, "If you testify you're a fool.  Because of tromp I could never get away with a certain [*sic*] my Fifth Amendment rights but you can.  I guarantee you you are the one who gets indicted for perjury if you're stupid enough to testify."

38.        On or about December 12, 2017, Person 2 informed HPSCI that he intended to assert his Fifth Amendment privilege against self-incrimination if required to appear by subpoena.  Person 2 invoked his Fifth Amendment privilege in part to avoid providing evidence that would show STONE's previous testimony to Congress was false.

39.        Following Person 2's invocation of his Fifth Amendment privilege not to testify before HPSCI, STONE and Person 2 continued to have discussions about the various investigations into Russian interference in the 2016 election and what information Person 2 would provide to

investigators. During these conversations, STONE repeatedly made statements intended to prevent Person 2 from cooperating with the investigations. For example:

    a.    On or about December 24, 2017, Person 2 texted STONE, "I met [the head of Organization 1] for f[i]rst time this yea[r] sept 7 . . . docs prove that. . . . You should be honest w fbi . . . there was no back channel . . . be honest." STONE replied approximately two minutes later, "I'm not talking to the FBI and if your smart you won't either."

    b.    On or about April 9, 2018, STONE wrote in an email to Person 2, "You are a rat. A stoolie. You backstab your friends-run your mouth my lawyers are dying Rip you to shreds." STONE also said he would "take that dog away from you," referring to Person 2's dog. On or about the same day, STONE wrote to Person 2, "I am so ready. Let's get it on. Prepare to die [expletive]."

    c.    On or about May 21, 2018, Person 2 wrote in an email to STONE, "You should have just been honest with the house Intel committee . . . you've opened yourself up to perjury charges like an idiot." STONE responded, "You are so full of [expletive]. You got nothing. Keep running your mouth and I'll file a bar complaint against your friend [the attorney who had the ability to contact the head of Organization 1]."

## COUNT ONE
### (Obstruction of Proceeding)

40.     Paragraphs 1 through 39 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

41.     From in or around May 2017 through at least December 2017, within the District of Columbia and elsewhere, the defendant ROGER JASON STONE, JR., corruptly influenced, obstructed, impeded, and endeavored to influence, obstruct, and impede the due and proper exercise of the power of inquiry under which any inquiry and investigation is being had by either House, and any committee of either House and any joint committee of the Congress, to wit: STONE testified falsely and misleadingly at a HPSCI hearing in or around September 2017; STONE failed to turn over and lied about the existence of responsive records to HPSCI's requests about documents; STONE submitted and caused to be submitted a letter to HPSCI falsely and misleadingly describing communications with Person 2; and STONE attempted to have Person 2 testify falsely before HPSCI or prevent him from testifying.

        All in violation of Title 18, United States Code, Sections 1505 and 2.

## COUNTS TWO THROUGH SIX
### (False Statements)

42.     Paragraphs 1 through 39 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

43.     On or about September 26, 2017, within the District of Columbia and elsewhere, in a matter within the jurisdiction of the legislative branch of the Government of the United States, the defendant ROGER JASON STONE, JR., knowingly and willfully made and caused to be made materially false, fictitious, and fraudulent statements and representations, to wit:

| Count | False Statement |
|:---:|:---|
| 2 | STONE testified falsely that he did not have emails with third parties about the head of Organization 1, and that he did not have any documents, emails, or text messages that refer to the head of Organization 1. |
| 3 | STONE testified falsely that his August 2016 references to being in contact with the head of Organization 1 were references to communications with a single "go-between," "mutual friend," and "intermediary," who STONE identified as Person 2. |
| 4 | STONE testified falsely that he did not ask the person he referred to as his "go-between," "mutual friend," and "intermediary," to communicate anything to the head of Organization 1 and did not ask the intermediary to do anything on STONE's behalf. |
| 5 | STONE testified falsely that he and the person he referred to as his "go-between," "mutual friend," and "intermediary" did not communicate via text message or email about Organization 1. |
| 6 | STONE testified falsely that he had never discussed his conversations with the person he referred to as his "go-between," "mutual |

| Count | False Statement |
|---|---|
| | friend," and "intermediary" with anyone involved in the Trump Campaign. |

All in violation of Title 18, United States Code, Sections 1001(a)(2) and 2.

## COUNT SEVEN
### (Witness Tampering)

44.     Paragraphs 1 through 39 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

45.     Between in or around September 2017 and present, within the District of Columbia and elsewhere, the defendant ROGER JASON STONE, JR., knowingly and intentionally corruptly persuaded and attempted to corruptly persuade another person, to wit: Person 2, with intent to influence, delay, and prevent the testimony of any person in an official proceeding.

All in violation of Title 18, United States Code, Section 1512(b)(1).

_____
Robert S. Mueller, III
Special Counsel
U.S. Department of Justice

A TRUE BILL:


_____
Foreperson

23

Case 1:20-mx-00298-LY   Document 57-1   Filed 09/02/20   Page 44 of 46

Date:  January 24, 2019

EXHIBIT 2

# ABOUT LARRY KLAYMAN

Larry Klayman, founder of Judicial Watch and Freedom Watch, is known for his strong public interest advocacy in furtherance of ethics in government and individual freedoms and liberties. During his tenure at Judicial Watch, he obtained a court ruling that Bill Clinton committed a crime, the first lawyer ever to have done so against an American president. Larry became so famous for fighting corruption in the government and the legal profession that the NBC hit drama series "West Wing" created a character after him: [Harry Klaypool of Freedom Watch](). His character was played by actor John Diehl.

In 2004, Larry ran for the U.S. Senate as a Republican in Florida's primary. After the race ended, he founded Freedom Watch.

Larry graduated from Duke University with honors in political science and French literature. Later, he received a law degree from Emory University. During the administration of President Ronald Reagan, Larry was a Justice Department prosecutor and was on the trial team that succeeded in breaking up the telephone monopoly of AT&T, thereby creating competition in the telecommunications industry.

Between Duke and Emory, Larry worked for U.S. Senator Richard Schweiker (R-Pa.) during the Watergate era. He has also studied abroad and was a stagiaire for the Commission of the European Union in its Competition Directorate in Brussels, Belgium. During law school, Larry also worked for the U.S. International Trade Commission in Washington, D.C.

Larry speaks four languages—English, French, Italian, and Spanish—and is an international lawyer, among his many areas of legal expertise and practice.

The author of two books, *Fatal Neglect* and *Whores: Why and How I Came to Fight the Establishment,* Larry has a third book in the works dealing with the breakdown of our political and legal systems. His current book, *Whores,* is on now sale at WND.com, Amazon.com, BarnesandNoble.com, Borders.com, and all major stores and booksellers.

Larry is a frequent commentator on television and radio, as well as a weekly columnist, on Friday, for WND.com. He also writes a regular blog for Newsmax called "Klayman's Court."

Larry has been credited as being the inspiration for the Tea Party movement. (See "[Larry Klayman - The One Man TEA Party]()," by Dr. Richard Swier, http://fwusa.org/KFA)



**Support the work of Freedom Watch at [www.FreedomWatchUSA.org]()**