IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS, AUSTIN DIVISION

---

DR. JEROME CORSI, et. al.

        Plaintiff(s),

v.

INFOWARS, LLC et. al.,

        Defendant(s)

Case No.: 1:20-cv-00298-LY

---

### DEFENDANT ROGER STONE'S NOTICE OF EXHIBIT TO REPLY TO PLAINTIFF'S RESPONSE TO THE MOTION TO DISMISS

Defendant, Roger Stone, through counsel files this Exhibit inadvertently not attached to the reply to the response to motion to dismiss the amended complaint. (Reply ECF No. [83]). It is referred to in the reply as ECF No. [83-1], In re: Larry E. Klayman, Board Docket No. 17-BD 063, Report and Recommendation of the Board of Professional Responsibility, (Oct. 2, 2020).

Respectfully submitted,

Robert C. Buschel, Esq.
BUSCHEL GIBBONS, P.A.
One Financial Plaza
100 S.E. Third Avenue, Suite 1300
Fort Lauderdale, Florida 33394
Tele: (954) 530-5301
Email: Buschel@BGlaw-pa.com

Attorneys for Roger J. Stone

By: __/s/__Robert Buschel_____
ROBERT C. BUSCHEL
Florida Bar No. 0063436
(admitted *pro hac vice* pending admission to W.D. Texas)

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above document was filed and served upon all parties of record on October  13, 2020 by CM/ECF, the court's electronic filing system.

By: __ /s/ _Robert Buschel_____
        ROBERT C. BUSCHEL

**1:20-cv-00298-LY** Corsi et al v. Infowars, LLC et al

**Sanjay Biswas**
Sanjay Biswas Attorney at Law PC
11720 Duxbury Drive
Frisco, TX 75035
972-866-5879                          representing
800-506-6804 (fax)
sanjaybiswas41@gmail.com
 *Assigned: 07/29/2020*
 *ATTORNEY TO BE NOTICED*

**Jerome Corsi**
*(Plaintiff)*

**Larry Klayman**
*(Plaintiff)*

**Larry Klayman**
Klayman Law Group P.A.
2020 Pennsylvania Ave. NW #800
Washington, DC 20006
561-558-536                           representing
202-318-8839 (fax)
leklayman@gmail.com
 *Assigned: 03/07/2019*
 *ATTORNEY TO BE NOTICED*

**Jerome Corsi**
*(Plaintiff)*

**Larry Klayman**
*(Plaintiff)*

**Marc J. Randazza**
Randazza Legal Group, PLLC
2764 Lake Sahara Drive, Suite 109
Las Vegas, NV 89117
702-420-2001                          representing
702-297-6584 (fax)
mjr@randazza.com
 *Assigned: 07/24/2019*
 *PRO HAC VICE*
 *ATTORNEY TO BE NOTICED*
cell is 702-757-1001

**Free Speech Systems, LLC**
*(Defendant)*

**Infowars, LLC**
*(Defendant)*
**Alex E. Jones**
*(Defendant)*
**David Jones**
*(Defendant)*
**Owen Shroyer**
*(Defendant)*

3

**Bradley Jordan Reeves**
Reeves Law, PLLC
702 Rio Grande St., Suite 306
Austin, TX 78701
512-827-2246                        representing        **Free Speech Systems, LLC**
512-318-2484 (fax)                                      *(Defendant)*
brad@brtx.law
 *Assigned: 04/02/2020*
 *ATTORNEY TO BE NOTICED*

                                                        **Infowars, LLC**
                                                        *(Defendant)*
                                                        **Alex E. Jones**
                                                        *(Defendant)*
                                                        **Owen Shroyer**
                                                        *(Defendant)*

**Gregory P. Sapire**
Soltero Sapire Murrell PLLC
7320 North MoPac Expy.
Suite 309
Austin, TX 78731-2311
512-431-9518                        representing        **David Jones**
512-359-7996 (fax)                                      *(Defendant)*
greg@ssmlawyers.com
 *Assigned: 04/02/2020*
 *ATTORNEY TO BE NOTICED*

**David Scott Wachen**
Wachen LLC
11605 Montague Court
Potomac, MD 20854
(240) 292-9121                      representing        **David Jones**
301-259-3846 (fax)                                      *(Defendant)*
david@wachenlaw.com
 *Assigned: 04/24/2019*
 *LEAD ATTORNEY*
 *ATTORNEY TO BE NOTICED*

**Jay Marshall Wolman**
Randazza Legal Group, PLLC
100 Pearl Street, 14th Floor
Hartford, CT 06103
(702) 420-2001                      representing        **Free Speech Systems, LLC**
(305) 437-7662 (fax)                                    *(Defendant)*
jmw@randazza.com
 *Assigned: 04/04/2019*
 *LEAD ATTORNEY*
 *ATTORNEY TO BE NOTICED*

**Infowars, LLC**
*(Defendant)*

**Alex E. Jones**
*(Defendant)*

**David Jones**
*(Defendant)*

**Owen Shroyer**
*(Defendant)*

THIS REPORT IS NOT A FINAL ORDER OF DISCIPLINE*

DISTRICT OF COLUMBIA COURT OF APPEALS
BOARD ON PROFESSIONAL RESPONSIBILITY

ISSUED

Oct 2 2020 12:24pm

Board on Professional
Responsibility

In the Matter of:              :
                               :
   LARRY E. KLAYMAN,           :
                               :   Board Docket No. 17-BD-063
Respondent.                    :   Disciplinary Docket No. 2011-D028
                               :
A Suspended Member of the Bar of the  :
District of Columbia Court of Appeals  :
(Bar Registration No. 334581)[1]   :

REPORT AND RECOMMENDATION OF THE
BOARD ON PROFESSIONAL RESPONSIBILITY

A lawyer's ability to communicate with her client is at the heart of the
attorney-client relationship. Not only does a lawyer have a duty to communicate with
her client under Rule 1.4, but effective communication undergirds an attorney's
ability to ethically represent her client in many other ways. If a lawyer cannot
effectively communicate with her client, the client cannot agree to a strategy, consent
to have confidential information shared, or waive a conflict of interest. In most
representations, an inability to communicate with the client is, in many ways, an
inability to ethically represent that client.

This case shows the challenges that arise when that communication breaks
down. Here, after agreeing to an attorney-client relationship at a restaurant, over
dinner, Respondent developed romantic feelings towards his client. This caused a

---

[1] During the pendency of this matter before the Board, the Court entered an order
suspending Respondent for 90 days. *See In re Klayman*, 228 A.3d 713, 720 (D.C.
2020) (*Klayman I*).

---

* Consult the 'Disciplinary Decisions' tab on the Board on Professional Responsibility's website
(www.dcattorneydiscipline.org) to view any prior or subsequent decisions in this case.

breakdown in his ability to effectively communicate with his client. As his client described it:

> He would nonstop text or email, or [make] phone calls, and talked to me that I talk [sic] about respect, that I'm not respecting him, and why I'm not taking him to the gatherings.
>
> Then he explained his feelings to me and told me that he loves me and then he told me that he never loved anyone the way he loved me ever in his life and that nobody is going to love me the way he loved me, no other man can ever love me the way he loves me.

FF 31.

In Respondent's own words, his "emotions had rendered [him] non-functional even as a lawyer." FF 44. As a result of his emotional attachment to his client, he lost the ability to effectively communicate with her. For example, at one point, while driving, Respondent berated his client so much she leapt from his car and ran into a hotel lobby and hid in the women's bathroom; Respondent followed her in. Respondent wanted to talk to his client about his feelings. His client wanted to talk about her case.

The Hearing Committee issued a lengthy, detailed, and thoughtful report that determined that Respondent violated a number of Rules of Professional Conduct by failing to effectively communicate with his client and to follow her instructions about the objectives of the representation, representing her under a conflict of interest, and breaching his duties of confidentiality to her, among other Rule violations. Respondent's defense to many of these findings is that he had his client's consent. But consent requires effective communication; here, because Respondent

was unable to effectively communicate with his client, he was unable to effectively obtain her consent.

For that reason, and as set out below, we agree that Respondent violated Rules 1.2(a), 1.4(b), 1.5(c), 1.6(a)(1), 1.6(a)(3), 1.7(b)(4), and 1.16(a)(3). We recommend a sanction of an 18-month suspension with a requirement that he demonstrate a fitness to practice law before he is reinstated.

## I.    PROCEDURAL BACKGROUND

Respondent was charged with failing to abide by his client's objectives for a representation in violation of Rule 1.2(a), failing to communicate with his client in violation of Rule 1.4(b), failing to enter into a written engagement agreement in violation of Rule 1.5(b), failing to have a written fee agreement for a contingent fee case in violation of 1.5(c), revealing client confidences in violation of Rules 1.6(a)(1) and 1.6(a)(3), representing a client with a conflict of interest in violation of Rule 1.7(b)(4), representing a client after he was fired in violation of Rule 1.16(a)(3), and engaging in dishonesty and/or misrepresentation in violation of Rule 8.4(c). The Hearing Committee unanimously recommended that the Board conclude that Disciplinary Counsel established by clear and convincing evidence that Respondent violated Rules 1.2(a), 1.4(b), 1.5(b), 1.5(c), 1.6(a)(1), 1.6(a)(3), 1.7(b)(4), and 1.16(a)(3). The Hearing Committee recommended that the Board find that Disciplinary Counsel did not prove by clear and convincing evidence that

3

Respondent violated Rule 8.4(c). Disciplinary Counsel disagrees with this determination but does not take exception to it.[2]

The Hearing Committee recommended that Respondent be suspended for 33 months and that he be required to prove his fitness to practice law prior to reinstatement. Disciplinary Counsel asks that the Board adopt both the Hearing Committee's findings of fact and conclusions of law but takes exception to the recommended sanction, arguing that Respondent should be disbarred instead.

In addition, Respondent asks that the Board dismiss the pending charges due to the delay in prosecution. In the alternative, he asks that the Board reject the Hearing Committee's findings of fact, on grounds that they are not supported by the record, and that the Board reject the Hearing Committee's conclusions of law.[3] He further argues that the proposed 33-month suspension with a fitness requirement is not consistent with discipline in similar cases.

Unless otherwise specified, we adopt the detailed and careful factual findings of the Hearing Committee. As set out in more detail below, we conclude that

---

[2] Given the absence of a substantive objection to the Hearing Committee's recommendation, we see no reason on the face of the record to disturb its conclusion that Disciplinary Counsel did not prove by clear and convincing evidence that Respondent violated Rule 8.4(c).

[3] Respondent appears to concede the Rule 1.5(b) violation in stating that he failed to provide a written fee agreement because he "suffered from a not uncommon misunderstanding of the Rules believing that because he did not intend to charge a fee, he did not need a fee letter or other writing." Resp. Br. to Board at 32.  As discussed below, we conclude that Respondent violated Rule 1.5(c) by not providing a contingent fee agreement in writing.

4

Disciplinary Counsel has proven violations of Rules 1.2(a), 1.4(b), 1.5(c), 1.6(a)(1), 1.6(a)(3), 1.7(b)(4), and 1.16(a)(3). We recommend that Respondent be suspended from the practice of law for 18 months and that he be required to prove his fitness to practice law before he is reinstated.

## II.    STANDARD OF REVIEW

The Board must accept Hearing Committee findings of fact where there is substantial evidence to support them "even where evidence may support a contrary view as well." *In re Robbins*, 192 A.3d 558, 564 (D.C. 2018) (per curiam) "[T]he Hearing Committee is not required to enumerate every fact that has possible relevance to an issue in its report." *Id.*; *see also In re Szymkowicz*, 124 A.3d 1078, 1084 (D.C. 2015) (per curiam) (the Court will not disregard the findings of the hearing committee even where there is substantial evidence pointing in the opposite direction); *In re Godette*, 919 A.2d 1157, 1163 (D.C. 2007) ("This court must accept a finding that is supported by substantial evidence in the record as a whole, 'even though there may also be substantial evidence in the record to support a contrary finding.'"). When making its own findings of fact, the Board employs a "clear and convincing evidence" standard. Board Rule 13.7. The Board reviews *de novo* the Hearing Committee's legal conclusions and its determinations of ultimate fact. *In re Bradley*, 70 A.3d 1189, 1194 (D.C. 2013) (per curiam).

III.   FACTUAL BACKGROUND

Respondent met E.S.[4] at a speech on the steps of the United States Capitol in November 2009. E.S. was a reporter for Voice of America (VOA); she was there covering a press conference that Respondent was also attending. They exchanged business cards, and he called her a number of times in the days that followed. When she learned that he was a lawyer, E.S. asked him for help with a legal problem: she had made a sexual harassment allegation against a coworker and was not satisfied with her employer's response. Respondent asked E.S. to dinner. Respondent agreed to represent E.S. with her sexual harassment case over dinner. *See* FF 8. Respondent and E.S. verbally agreed that he would represent her on a contingent fee basis, but no written agreement was ever executed between them. FF 9.

In February 2010, Respondent began negotiating with VOA on E.S.'s behalf and advising her about her case. E.S. was stationed in Washington, D.C. She wanted to move to Los Angeles, to be away from the man she had brought a sexual harassment claim against. This request was denied because E.S. was an on-air reporter; VOA did not have a television studio in Los Angeles where she could do her job. Respondent was, at the time, living in Los Angeles. He advised E.S. to move to Los Angeles despite VOA's position that she could not work from California. Respondent insisted that E.S. stay in Los Angeles – and not show up at work in Washington, D.C. He paid the rent on an apartment to facilitate her relocation to Los

---

[4] We refer to Respondent's client by her initials because her name is not material to the resolution of any issues before the Board.

Angeles. In May 2010, when E.S. was deemed Absent Without Leave for not coming to work after she followed Respondent's advice, Respondent provided her with funds equivalent to her salary, claiming that he would simply take the amounts out of whatever recovery he eventually secured. *See* FF 51-52.

During this time, while working on her case, Respondent began to share with E.S. the intense romantic feelings he had for her. In a May 8, 2010 email, he told her that she ought to find a new lawyer because his feelings for her were so strong. *See* FF 42-43. She pleaded with him to stay involved in her case. He wrote to the therapist that he had hired to develop portions of E.S.'s claim for damages that his "own emotions had rendered [him] non-functional even as a lawyer." FF 44. Yet Respondent continued to represent E.S.

His emotional interest in E.S. infected his ability to communicate with her. He brought her to an event in Los Angeles but became jealous when she did not speak to him as much as he would have liked. As he drove her home, he berated her so much that she ran out of his car when it was stopped at a traffic light and into a nearby hotel, then into the women's bathroom in the hotel lobby. Respondent followed her into the bathroom to continue to yell at her. A hotel receptionist intervened and helped E.S. flee the hotel – and Respondent – by the back door.

He brought her to meet with members of Congress to attempt to get Congressional pressure on her case. At one point, the Chief of Staff for Congressman Rohrbacher approached E.S., after watching Respondent and E.S.'s body language during a meeting, to ask if E.S. was afraid of Respondent.  FF 48.

Beyond his personal feelings for E.S., Disciplinary Counsel alleged – and the Hearing Committee found – that Respondent's litigation strategy was driven by a desire to harm then Secretary of State Hillary Clinton and by a desire for publicity for himself.[5] He filed suit on behalf of E.S. against VOA and named the members of the Broadcasting Board of Governors individually – the Board is chaired *ex officio* by the Secretary of State, who, at the time, was Hillary Clinton.

Over E.S.'s initial objection, Respondent engineered a public relations campaign that he said would help her case. Each article on the case also promoted Respondent's interests and notoriety as an attorney. The public statements Respondent either made or caused someone else to make also revealed information that E.S. had asked him to keep nonpublic and that was embarrassing to her or otherwise damaging to her professional standing – particularly her political views, which could harm her reputation as a journalist.

After months of Respondent's conduct, E.S. told him she wanted to end her lawsuit against VOA. She sent an email to VOA saying that she had instructed Respondent to dismiss her claims. Instead of withdrawing from the case, Respondent sent a number of intemperate emails to E.S. over the next several months and continued to file pleadings in her case.

---

[5] Respondent has previously engaged in extensive litigation relating to Secretary Clinton and her husband.

IV.   DISCUSSION

**Rule 1.7(b)(4)**

Disciplinary Counsel alleged, and the Hearing Committee found, that Respondent had a personal interest conflict of interest under Rule 1.7(b)(4) in his representation of E.S.

Rule 1.7(b)(4) provides that "a lawyer shall not represent a client with respect to a matter if . . . [t]he lawyer's professional judgment on behalf of the client will be or reasonably may be adversely affected by the lawyer's responsibilities to or interests in a third party or the lawyer's own financial, business, property, or personal interests."

However, a lawyer can represent a client when there is a personal interest conflict if Rule 1.7(c)'s requirements are met. Rule 1.7(c) provides that a lawyer may represent a client despite a personal interest conflict if:

> (1)   "[e]ach potentially affected client provides informed consent to such representation after full disclosure of the existence and nature of the possible conflict and the possible adverse consequences of such representation" and

> (2)   "[t]he lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client."

Disciplinary Counsel charged that Respondent violated Rule 1.7(b)(4) in three ways: by representing E.S. despite his strong personal feelings for her; by turning

her case into a vehicle to attack Hillary Clinton to further an alleged personal vendetta; and by using E.S.'s case to promote himself at her expense.

We consider each in turn.

*Emotional Conflict*

Respondent concedes that he had a strong emotional interest in E.S. He argues, however, that he disclosed his feelings for her and that she elected to continue with the representation so, as a result, he had informed consent to continue with the representation under Rule 1.7(c).

While it is true that Respondent repeatedly communicated his feelings to E.S., and that she asked him to continue with the representation, that is not sufficient to satisfy Rule 1.7(c). Assuming E.S. effectively consented to the conflicted representation, Respondent could not have "reasonably believe[d] that [he could] provide competent and diligent representation to [her]." Rule 1.7(c)(2).

In light of Respondent's own statement at the time that he was "non-functional . . . as a lawyer" because of his romantic interests in E.S., we have little trouble concluding that Respondent could not reasonably believe that he could have provided competent and diligent representation to her. In light of this statement to E.S.'s therapist – and his conduct at the time – he both did not believe he could provide appropriate representation to her and even if he thought he could represent her despite his feelings, that belief would not have been reasonable.

As a result, regardless of whether E.S. provided informed consent to the representation – a proposition we are skeptical of but do not resolve – Respondent's representation of her was not permissible under Rule 1.7(c).[6]

As a result, we agree with the Hearing Committee that Respondent violated Rule 1.7(b)(4) by representing E.S. in light of his emotional interest in her.

*Hillary Clinton and Publicity Conflict*

We do not reach the same conclusion with the alleged conflicts of interest involving Respondent's interest in suing Hillary Clinton or seeking publicity.

There is little doubt that Respondent has a history of bringing litigation against Secretary Clinton and her husband. And, clearly, Respondent is able to get attention in the media and uses that as a strategy in his legal work; he benefits from media attention. We, therefore, assume without deciding that Respondent has a personal interest both in bringing litigation against the Clintons and in publicizing his work.

We are concerned, however, about the effect of a rule that treats these personal dispositions as the same as the kind of interests that clearly generate a personal interest conflict under Rule 1.7(b)(4). The kinds of conflicts described in the Rule, the commentary, and relevant ethics opinions are concrete: a financial interest that would be adversely affected; a property interest that would be impacted; or a lawyer's interest in securing employment. *See* D.C. Ethics Opinions 210 and 367

---

[6] Respondent argues that this conflict is overstated because his feelings were unreciprocated and he did not have a physical relationship with E.S. As discussed above, we do not find that precludes a conflict of interest based on his intense romantic interest in her.

(dealing with lawyers seeking employment from an adverse party). In contrast, Respondent's two purported conflicts – his desire for publicity and his predisposition towards the Clintons – are more amorphous. These are less an "interest" of Respondent than a predisposition. We are troubled by a rule that requires lawyers to disclose these less obvious philosophical approaches to clients. *See, e.g.*, D.C. Ethics Opinion 367 (discussing D.C. Ethics Opinion 210 and advising a criminal defense lawyer that she does not need to disclose an application with a prosecutor's office that is not adverse to her client because "[a]lthough a client in a criminal matter may prefer that his lawyer be completely 'defense oriented' and not consider becoming a prosecutor with any employer while defending him, this preference does not mean that a potential or actual conflict of interest exists").

Lawyers have varied philosophical or habitual approaches to the practice of law. In the exercise of their professional judgment, some criminal defense lawyers may encourage their clients to cooperate with prosecutors more frequently than others. Some lawyers starting their practices may want publicity for their cases both to boost the lawyer's practice and the client's cause.[7] Some lawyers may prefer to bring cases against a particular defendant, or industry, motivated by a political or other ideological opposition to that industry's practices. If Disciplinary Counsel's expansive reading about Rule 1.7(b)(4) were adopted, it would create additional disclosure obligations for lawyers that go well beyond what attorneys are normally

---

[7] Of course, if the lawyer harms her client's case in the pursuit of publicity, that is a different problem and a different rule violation, depending on the nature of the harm.

required or expected to disclose. And we have seen no authority from Disciplinary Counsel for the proposition that a "personal interest" in Rule 1.7(b)(4) should be read so broadly.

Accordingly, we do not find that Respondent violated Rule 1.7(b)(4) based on a conflict of interest arising from a desire for publicity or litigation against the Clintons.

This is not to say, however, that a lawyer should let her desire for publicity or philosophical views ride roughshod over the interests of her client. But that restriction is found in Rule 1.2, not Rule 1.7.

## Rule 1.2(a)

Rule 1.2(a) obligates a lawyer to "abide by a client's decisions concerning the objectives of the representation . . . and . . . consult with the client as to the means by which they are to be pursued." Comment [1] to Rule 1.2 states that "[t]he client has ultimate authority to determine the purposes to be served by legal representation . . . ."

The Hearing Committee determined that Respondent failed to abide by E.S.'s objectives or consult with her about the means of the litigation, violating Rule 1.2(a), in five different ways: (i) he filed a motion to disqualify the judge in E.S.'s case because the judge was appointed by Secretary Clinton's husband; (ii) he named Secretary Clinton as a defendant in an action against VOA when she was not involved in any decision relating to E.S.; (iii) he filed a motion to have E.S.'s case re-assigned after he lost the motion to disqualify, based on the same arguments about

13

the judge's bias; (iv) he did not dismiss the entire case when directed by E.S. to do so; and (v) he wrote and/or facilitated a string of articles about E.S.'s case. HC Rpt. at 115.

Respondent argues that Rule 1.2 does not require the client's informed consent to a course of action. According to Respondent, if a client does not like the strategy employed by a lawyer, the client is free to discharge the lawyer, but may not exercise his or her own judgment as to the best legal strategy. Moreover, Respondent argues that he did consult with his client and that she was aware of the approach he took.[8]

As a factual matter, we agree with the Hearing Committee's findings of fact, which are supported by substantial evidence. E.S. made clear to Respondent from the outset of the representation that she intended to pursue her case with minimal

---

[8] As evidence that he consulted with his client, Respondent points to five declarations that she allegedly drafted and filed. However, only two of the five declarations are admitted into evidence – RX 3 (RRDE 0652-668) and DX 11 (11-58 to 11-64). Respondent points to a docket sheet (DX 3) as evidence that she filed the other declarations, but the actual declarations were not offered into evidence, and a docket sheet merely showing that they were filed is insufficient to demonstrate the content of the declarations.

Additionally, Respondent attaches, as Appendix 1, to his brief a letter addressed to Judge Kollar-Kotelly purportedly written by E.S. Respondent asserts that the letter evidences the fact that E.S. was aware of all filings in the case. Resp. Br. to Board at 28. We construe this language in Respondent's brief as a motion to supplement the record and admit this letter into evidence. However, because it is uncross-examined hearsay, we accord it no weight in our consideration of this matter. *See* Board Rules 11.3, 13.7. E.S. testified during the hearing and could presumptively have been cross-examined to provide an evidentiary foundation for the letter but was not.

publicity. Respondent's litigation strategy substantially ignored this clear – and reasonable – desire of the client. Respondent's decisions to name Secretary Clinton, distribute news stories about the case, and file a motion to disqualify the judge because she is biased against Respondent based on the President who appointed her, conflicted with the express desires of the client. It does not matter that Respondent may have later advised his client that he took these actions since he did not consult her before doing so.

We also disagree with Respondent's application of Rule 1.2 to these facts. While it is true that lawyers do not need informed consent to each aspect of the means of pursuing a client's objectives, here, E.S. told Respondent what mattered to her. Respondent simply went his own way. When a lawyer has notice that a client does not want her to use a particular means to achieve a result, the lawyer must respect that desire.

Similarly, by refusing to dismiss the case after having been directed to, Respondent violated Rule 1.2. E.S. wanted her case dismissed; Respondent ignored that lawful objective of the client.

On the other hand, we do not agree that Respondent violated Rule 1.2 when he filed the re-assignment motion. Such motions are reasonably ministerial and would not cause the matter to become more high profile that it was prior to the filing of the motion.

**Rule 1.4(b)**

Rule 1.4(b) requires that a lawyer communicate with her client; an attorney "shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." This Rule provides that the attorney "must be particularly careful to ensure that decisions of the client are made only after the client has been informed of all relevant considerations." Rule 1.4, cmt. [2]. The Rule places the burden on the attorney to "initiate and maintain the consultative and decision-making process if the client does not do so and [to] ensure that the ongoing process is thorough and complete." *Id.*

A lawyer is obligated to communicate with his or her client in such a way as to allow the client to make decisions about the representation and to be informed about what is happening in the case. Normally, this Rule is applied to require a lawyer to disclose information; it does not often address the manner in which the lawyer relates the information.

Here, by contrast, Respondent engaged in a lengthy and emotional series of communications with E.S. not to keep her abreast of developments in her case, but because of his feelings for her. By April 2010, Respondent had begun sending "nonstop" text and email messages or phone calls explaining his feelings to E.S., insisting that she was "not respecting him" or "taking him to the gatherings." FF 31; *see* FF 35 (April 9, 2010 email from Respondent discussing that a "friend" may be perceived as a "girlfriend, boyfriend, wife, husband or whatever"); FF 36 (April 23, 2010 message from Respondent stating "I am very sad because I really do love u . .

16

. ."); FF 38 (April 23, 2019 email from Respondent discussing his love for E.S.); FF 39 (email from Respondent to E.S. complaining that he was a "low priority" in her life).

While this is not the typical Rule 1.4 violation, there is simply no conclusion one can reach but that E.S. did not have the kind of communication with Respondent that a client ought to receive from her lawyer. In light of Respondent's frequent and highly inappropriate communications about his emotional states, and his intimidating and berating manner of speaking with her, any communications about E.S.'s case were drowned out by his other interests. We find, therefore, that Respondent failed to comply with Rule 1.4.

### Rule 1.5(c)

Respondent is alleged to have violated two provisions of Rule 1.5. First, Rule 1.5(b) requires that a client receive a written agreement that describes the basic financial relationship for the representation absent an exception not present here. Second, Rule 1.5(c) requires a written fee agreement in every contingent fee case.

The Hearing Committee found that from the initial dinner when Respondent agreed to represent E.S., this representation was a contingent fee representation. FF 10. That finding is supported by substantial evidence – the testimony of E.S. As a result, we adopt the Hearing Committee's finding that this was a contingent fee representation. Because a contingent fee agreement must be in writing, and this agreement was not, Respondent violated Rule 1.5(c).

**Rule 1.6**

Disciplinary Counsel alleged, and the Hearing Committee found, that Respondent disclosed client secrets – confidential information about E.S.'s work experiences, alleged political views, personal appearance, physical health, mental health and/or financial condition – without E.S.'s consent and, therefore, violated Rule 1.6(a)(1).[9] Further, the Hearing Committee found that Respondent did so for his own advantage in violation of Rule 1.6(a)(3).

Respondent acknowledges that he shared this information on the internet. However, he contends that all of the information that was posted on the internet was already contained in information that had been filed in E.S.'s lawsuit in the United States District Court for the District of Columbia. As a result, he contends that his disclosures were not confidences or secrets or, if they were, they were "clearly protected free speech" under the First Amendment. Resp. Br. to Board at 35. Moreover, Respondent contends that E.S. consented to have this information made public. We consider each in turn.

---

[9] Specifically, the Hearing Committee found that "Respondent disclosed client secrets without his client's consent in violation of Rules 1.6(a)(1) and 1.6(e)(1)." HC Rpt. at 128. We first note that Respondent was not charged with a violation of Rule 1.6(e)(1). Nor could he have been; Rule 1.6(e) provides an enumerated list of instances when "[a] lawyer may use or reveal client confidences or secrets," including "with the informed consent of the client," Rule 1.6(e)(1). Because Rule 1.6(e) operates as an exception to Rule 1.6(a), if Rule 1.6(e) doesn't allow a lawyer's conduct, she violates Rule 1.6(a), not Rule 1.6(e).

*The Record Before the Hearing Committee*

At the start, we acknowledge some frustration with Respondent's argument that his internet disclosures either did not involve secrets or were protected by the First Amendment if they did. These arguments were not raised before the Hearing Committee; they appeared for the first time in Respondent's brief before the Board. Respondent has done little to show that each statement of embarrassing information Respondent put on the internet was contained in the public materials available on the federal court's docket. In short, the state of the record is poor and the arguments before us are not fully developed.

However, the Court of Appeals has not licensed a waiver doctrine in this situation; a party does not forfeit his or her ability to raise an argument before the Board by failing to raise it before a Hearing Committee. And such a rule – while convenient at times – may not be consistent with the Court's Rules and its requirements for our review of a Hearing Committee's Report. In light of our obligation to make a determination that the Hearing Committee's Report is supported by substantial evidence, as well as the Board's express authority to make its own findings of fact employing a "clear and convincing" standard, it is not clear how the waiver doctrine would function when, as here, Respondent makes arguments to the Board. *See* Board Rule 13.7. Thus, absent further guidance from the Court, we decline to conclude that a respondent's arguments to the Board are limited to those made to a hearing committee. Accordingly, we believe that we are obligated to address this issue to the extent we can on the record before us.

*Were These Secrets?*

In his press campaign, Respondent disclosed a number of sensitive and embarrassing details about E.S. which then were posted on the internet. The Hearing Committee found that E.S. clearly expressed to Respondent that she did not want many of her personal details to get publicity, specifically her political views, personal appearance, health, and finances. This finding was supported by substantial evidence and, therefore, we adopt it. Indeed, E.S. testified that she told Respondent not to write the stories he was publishing. Tr. 400; FF 57.

Respondent argues that this sensitive information was not a confidence or secret within the meaning of Rule 1.6(b) because it was contained in documents filed in the United States District Court. Respondent asserts that the confidences and secrets which were revealed had all been included in those filings, but does not address where, specifically, those statements were contained. For purposes of resolving this issue, we assume that the sensitive information was contained in the filings on the federal court's docket. But, to be perfectly clear, we do not make such a finding.

Respondent contends that because this information was some place on the federal court's docket, Rule 1.6 no longer prohibits its disclosure. We disagree. Rule 1.6(b) describes what counts as a client secret: "'secret' refers to other information gained in the professional relationship that the client has requested be held inviolate, or the disclosure of which would be embarrassing, or would be likely to be

detrimental, to the client." There is no "prior disclosure" exception to the definition of "secret" in the plain language of Rule 1.6(b).

Comment [8] to Rule 1.6 is highly relevant to this question, and is inconsistent with Respondent's position: "This ethical precept [that a lawyer must maintain client confidences and secrets], unlike the evidentiary privilege, exists without regard to the nature or source of the information or the fact that others share the knowledge. It reflects not only the principles underlying the attorney-client privilege, but the lawyer's duty of loyalty to the client."

Thus, under the plain language of Comment [8], the mere fact that public filings in a court docket contain the statements later publicized on the internet does not mean that the information is no longer subject to the requirements of Rule 1.6.

The embarrassing information here was nominally public. A person with detailed knowledge of where to look, how to search on a federal court's docket, and a PACER account, could have found the information. Importantly, information that is in the federal courts' CM/ECF system does not appear in an internet search. For all but a very few people, the information was effectively "secret." Respondent took that nominally public information and made it easily retrievable by any person in the world who knows the client's name and has internet access. We believe this is precisely the kind of conduct meant to be covered by Comment [8] to Rule 1.6. *Cf.* ABA Ethics Opinion 479 at 2 ("A number of courts and other authorities conclude that information is not generally known merely because it is publicly available or might qualify as a public record or as a matter of public record.").

The information that Respondent broadcast would have been difficult to find but for his actions. He made it easily accessible to billions. This violates Rule 1.6.

*The First Amendment*

Separately, Respondent argues that his disclosure of this information was protected by the First Amendment. Respondent points to the Virginia Supreme Court's decision in *Hunter v. State Bar of Virginia*, 744 S.E.2d 611 (Va. 2013). There, the Virginia Supreme Court concluded that a restriction on a lawyer's First Amendment right to free expression cannot be limited by a rule of professional conduct that prohibits the disclosure of a fact that has already been publicly disclosed. Specifically, the *Hunter* court determined that there is no compelling government interest in regulating such speech. *Id.* at 619-620.

Importantly, *Hunter* examined Virginia law. Virginia's version of Rule 1.6 does not have a corollary of Comment [8]; the duty of confidentiality in Virginia is not grounded – in part – in the duty of loyalty as it is in the District of Columbia. Thus, *Hunter* is of limited value in resolving the question here.

Regardless of the Rule in Virginia, in the District of Columbia clients reasonably expect – and should expect – that a lawyer will not share their secrets, even those which had to be disclosed in a court proceeding or in a court filing, to the wider world. There is, in short, a compelling government interest in requiring lawyers to be loyal to their clients.

Above, we concluded that Respondent violated Rule 1.6 by converting nominally public but difficult to find information into information easily found on

the internet with a search engine, because to do so would violate Respondent's duty of loyalty to keep embarrassing information learned in a representation from public disclosure. Respondent asserts that to so conclude would violate the First Amendment. We disagree; there is a compelling government interest in requiring that lawyers are loyal to their clients.

There are other cases of lawyers sharing client information that may be harder. Under the rationale set forth here, one could argue, perhaps, a lawyer who shares at lunch with a colleague, or with her spouse, information that is in a public filing but is not known to anyone outside of the case violates Rule 1.6. Similarly, a lawyer who shares a proposition of law from a reported case that contains embarrassing information about her client may run afoul of one particularly aggressive reading of this decision.

We do not think such readings would be well founded, however. The core question in resolving whether a disclosure of public but difficult to find information is whether the lawyer acted disloyally by sharing her client's information. When determining whether a lawyer acted loyally, the reason for the disclosure by the lawyer matters. A lawyer who reveals information in the client's interests is very likely acting loyally. A lawyer revealing client secrets for self-aggrandizement, however, is more likely to run afoul of Comment [8] to Rule 1.6. While there may be hard cases of routine lawyer behavior that suggest *de minimis* violations of an aggressive reading of this decision, those issues are not before us now.

*Informed Consent*

Finally, Respondent argues that E.S. gave her informed consent to these disclosures and, as a result, they were therefore authorized by Rule 1.6(e)(1). Indeed, at one point, E.S. was handing out articles with this information in them to members of the public. FF 47.

At the heart of Rule 1.6(e)(1)'s requirement of informed consent is that the lawyer communicate with his client. Because we conclude that Respondent here violated Rule 1.4 and did not communicate appropriately with his client, we conclude that he did not and could not have obtained her informed consent to disclose her secrets.[10]

As a result, we conclude that Respondent violated Rule 1.6 by sharing his client's sensitive information on the internet.

## Rule 1.16(a)(3)

Rule 1.16(a)(3) provides that "a lawyer shall not represent a client or, where representation has commenced, shall withdraw from the representation of a client if . . . [t]he lawyer is discharged."

The Hearing Committee found that Respondent violated this Rule when, following his client's termination of his representation, he failed to withdraw and made at least six post-termination filings. HC Rpt. at 120-23. Respondent argues that

---

[10] Informed consent is defined as "the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct." Rule 1.0(e)

he had the obligation to communicate with his client concerning the "basic mechanics of his termination" and that, under the circumstances, he could not simply withdraw from the representation. Resp. Br. to Board at 52-53.

Had Respondent taken a few weeks or a month to accomplish the mechanics of termination, without continuing to file motions in the case, perhaps this conclusion would be different. But Respondent continued as E.S.'s counsel for over five months, continuing to file motions that did far more than preserve the status quo while he divined whether his client truly wanted him out of the case. As a result, we agree with the Hearing Committee's conclusion that Respondent violated Rule 1.16.

### Delay

Respondent argues that the lengthy delay in bringing this case should require dismissal of the charged Rule violations or, at a minimum, mitigation of the recommended sanction.

The Court of Appeals has never dismissed a disciplinary case on the basis of delay. *See In re Ponds*, 888 A.2d 234, 243 (D.C. 2005). In order for undue delay to amount to a violation of due process and serve as the basis for such a dismissal, the delay must be coupled with actual prejudice to the respondent, such that the respondent's defense to the charges was sufficiently impaired. *In re Williams*, 513 A.2d 793, 796-97 (D.C. 1986). As the Court explained:

> A disciplinary sanction differs from a criminal conviction. Although both protect the public, they do so in different ways. Most importantly, an attorney is in a continuing position of trust toward clients, the courts, and society in general. A member of the bar has accepted the onerous responsibility of participating in the administration of justice. We grant the license to practice law as a privilege, not as a right, and we do so

25

only on the strict condition that the attorney aspire to the highest standards of ethical conduct. Consequently, "[t]he purpose of a disciplinary proceeding is to question the continued fitness of a lawyer to practice his [or her] profession." *District of Columbia Bar v. Kleindienst*, [345 A.2d 146, 147 (D.C. 1975) (en banc) (per curiam)] . . . .

Any betrayal of the trust which the attorney is sworn to keep demands appropriate discipline; a delay in prosecution, without more, cannot override this necessity. The contrary conclusion would mean that, when licensing applicants, we would engage in a form of deceit: our endorsement of an unqualified attorney would belie our simultaneous assertion that attorneys possess the integrity and competence which they must constantly demonstrate in order to earn the privilege of practicing law in the District of Columbia. Speedy trial principles, which in criminal cases are a constitutionally required curb on the abuse of government power, in the disciplinary system take second place to other societal interests. We conclude, for these reasons, that an undue delay in prosecution is not in itself a proper ground for dismissal of charges of attorney misconduct. . . . .

We might hold differently if respondent had shown that the undue delay impaired his defense. **A delay coupled with actual prejudice could result in a due process violation, in which case we would be unable to agree with a finding that misconduct had actually been shown**.

*Id.* (emphasis added) (internal citations omitted).

On the other hand, mitigation of a sanction for undue delay is warranted when "the circumstances of the individual case [are] sufficiently unique and compelling to justify lessening what would otherwise be the sanction necessary to protect the public interest." *In re Fowler*, 642 A.2d 1327, 1331 (D.C. 1994); *see In re Howes*, 39 A.3d 1, 19 n.24 (D.C. 2012) (the gravity of the respondent's misconduct outweighed any mitigation of even a lengthy twelve-year delay). Determining whether "unique and compelling circumstances" exist requires consideration of

26

whether the respondent suffered prejudice as a result of the delay, such as impairment of the defense (lost witnesses, dimmed memory, etc.); anxiety caused to the respondent; and whether the respondent was suspended during the course of the proceedings. *In re Brown*, Bar Docket No. 88-97, at 26 (BPR Dec. 10, 2003), *recommendation adopted*, 851 A.2d 1278 (D.C. 2004) (per curiam) (sanction mitigated due to six and a half year undue delay where the respondent had been suspended from the Bar during that time and had no hand in causing the delay).

Here, roughly seven years elapsed between the events underlying this matter and the filing of the Specification of Charges. Respondent makes four main arguments in support of his claim that the delay deprived him of the opportunity to fairly defend himself in this matter. Prior to the hearing date, Respondent's expert witness (Professor Ronald Rotunda) passed away and E.S.'s psychiatrist (Dr. Aviera) became unavailable to testify because she was suffering from the effects of cancer. Respondent also points to both his and E.S.'s faded memories concerning events that occurred during the course of the representation and files that he lost or discarded during the pendency of the matter.

Respondent's arguments fail to demonstrate sufficient prejudice to dismiss the pending charges or to warrant mitigation of the recommended sanction. First, Professor Rotunda offered an expert report which was admitted into evidence and considered by the Hearing Committee. Moreover, any testimony that he may have offered as a "professional ethics expert" would have been exceedingly limited in scope. *See Steele v. D.C. Tiger Market*, 854 A.2d 175, 181 (D.C. 2004) ("[E]xpert

testimony is not permitted if it will usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." (internal quotations omitted)). With respect to Dr. Aviera, Respondent could have sought permission to depose her on grounds that he needed to preserve her testimony due to her illness. He did not. Finally, Respondent's general arguments that his and E.S.'s memories had faded and that he lost or destroyed his client files by the date of the hearing are also unpersuasive. Respondent fails to point to any hearing testimony demonstrating that either he or E.S. had faded memories concerning a material issue that would have impacted the fairness of the proceeding. Additionally, Respondent received notice of the disciplinary complaint close in time to the underlying events. *See* DX 2 (Respondent's response to disciplinary complaint filed by E.S.). He should have acted to preserve his file and other case-related materials.[11]

Because Respondent suffered no actual prejudice in this matter and we do not find that there are sufficiently unique and compelling circumstances here, we determine that neither dismissal of the disciplinary charges nor mitigation would be appropriate.

---

[11] Respondent complains that he was denied discovery of his email communications between himself and E.S. and that he was "forced to defend himself without the full record of his communications with his client." Resp. Br. to Board at 19. But E.S. produced, and Respondent reviewed, all email correspondence in her possession between herself and Respondent. *See* Tr. 20, 271. Also, Respondent had notice of this investigation. He could have simply not deleted his emails.

## V.    SANCTION

In determining the appropriate sanction for a disciplinary Rule violation, the factors we are to consider include (1) the nature and seriousness of the misconduct, (2) the prejudice to the client, (3) whether the conduct involved dishonesty or misrepresentation, (4) violation of other disciplinary rules, (5) Respondent's prior disciplinary history, (6) Respondent's attitude toward the underlying conduct, and (7) mitigating or aggravating circumstances. *See In re Martin*, 67 A.3d 1032, 1053 (D.C. 2013) (citation omitted); *In re Hutchinson*, 534 A.2d 919, 924 (D.C. 1987) (en banc). The disciplinary system does not seek to punish lawyers; rather, its purposes are to maintain the integrity of the legal profession, protect the public and the courts, and deter future or similar misconduct by the respondents and others. *Hutchinson*, 534 A.2d at 924; *In re Reback*, 513 A.2d 226, 231 (D.C. 1986) (en banc). In addition, sanctions imposed must not "foster a tendency toward inconsistent dispositions for comparable conduct or . . . otherwise be unwarranted." D.C. Bar Rule XI, § 9(h)(1).

The Hearing Committee painstakingly analyzed the appropriate sanction for each of Respondent's Rule violations, considering mitigating and aggravating factors. The Hearing Committee reasoned

> a suspension of some duration would be appropriate for each of Respondent's most serious Rule violations or groups of Rule violations, including approximately 15 months solely for the Rule 1.2(a) and 1.4(b) violations . . . and 12-18 months for the Rule 1.7(b)(4) violations . . . six months solely for the Rule 1.15 [sic] (b) & (c) violations, as well as perhaps an informal admonition for the Rule 1.16(a)(3) violation. We have also determined that there is only one arguably mitigating factor – substantial litigation and related work on matters in the public, non-commercial realm. Finally, we have identified numerous, mostly very

29

serious, and mostly very troubling aggravating factors, including (i) Respondent's recalcitrant refusal to acknowledge any of his missteps, (ii) Respondent's indisputable lack of remorse, (iii) the numerous and pervasive violations, (iv) Respondent's dismissive, self-pitying but groundless attitude toward this proceeding and abusive conduct herein and (v) the grave impact upon and prejudice to the client that resulted from Respondent's Rules violations. Thus we are convinced that strong deterrent, preventive and remedial measures are necessary in this matter and conclude that a suspension of 36 months would be appropriate, would be consistent with prior dispositions in this jurisdiction for comparable overall misconduct, and would serve as a meaningful deterrent to others who might share Respondent's disregard for the Rules that govern the basic elements of the attorney-client relationship. However, in light of the significant weight which the Court of Appeals accorded in [*In re*] *Hager*[, 812 A.2d 904 (D.C. 2002)] and [*In re*] *Wemhoff*[, Board Docket No. 14-BD-056 (BPR Nov. 20, 2015), appended Hearing Committee Report at 19, *recommendation adopted where no exceptions filed*, 142 A.3d 573 (D.C. 2016) (per curiam)] to substantial pro bono work throughout an attorney's career that is perhaps similar to Respondent's record of advocacy on public matters, we recommend a suspension of 33 months instead of 36 months.

HC Rpt. at 160-61.[12]

We concur with the Hearing Committee's careful analysis of the factors applicable to the sanction. Yet, we agree with Respondent that the recommended 33-

---

[12] During the pendency of this matter before the Board, the Court issued *Klayman I*, suspending Respondent from the practice of law for 90 days for engaging in misconduct in violation of Rule 1.9 (conflict of interest). In accordance with the Court's recent guidance in *In re Askew*, 225 A.3d 388, 399 (D.C. 2020) (per curiam), we do not treat this decision as an aggravating factor, but consider Respondent's violations in this case as if they were before the Board simultaneously with the violations sanctioned in the aforementioned matter. Thus, the sanction recommendation herein is inclusive of the misconduct at issue in *Klayman I*.

month suspensory sanction is not consistent with prior disciplinary cases involving comparable misconduct, as required by D.C. Bar Rule XI, § 9(h)(1).[13]

"[T]he choice of sanction is not an exact science but may depend on the facts and circumstances of each particular proceeding . . . . Indeed, each of these decisions emerges from a forest of varying considerations, many of which may be unique to the given case." *In re Edwards*, 870 A.2d 90, 94 (D.C. 2005) (internal quotations and citations omitted). Here, Respondent failed to effectively communicate with his client, follow her instructions about the objectives of the representation, provide a representation free of conflict of interest, or protect her confidences and secrets. The latter two instances of misconduct are the most concerning, coupled with Respondent's lack of remorse.

*In re Hager*, 812 A.2d 904 (D.C. 2002), and *In re Koeck*, 178 A.3d 463 (D.C. 2018) (per curiam), are instructive. In *In re Hager*, the respondent was suspended for one year for violations of, *inter alia*, Rules 1.2(a) (abiding by client's decisions); 1.4(a) (communication); 1.7(b)(4) (conflict of interest); 1.16(d) (failure to protect client interests upon termination of representation); 5.6(b) (agreement restricting right to practice); and 8.4(c) (dishonesty). 812 A.2d at 913-15, 917, 919-920. In *In re Koeck*, the respondent was suspended for 60 days for violating Rule 1.6(a)

---

[13] Disciplinary Counsel has argued that disbarment is the appropriate sanction. We simply do not see this case as equivalent to the other cases where the Court of Appeals has imposed disbarment for a crime of moral turpitude, flagrant dishonesty, or intentional or reckless misappropriation.

(revealing a client confidence or secret without authorization or other justification). 178 A.3d at 463-64.

Considering the factors as discussed by the Hearing Committee and taking into account the 90-day sanction recommendation imposed in *Klayman I*, we recommend that Respondent be suspended from the practice of law for 18 months.

In addition, we agree with the Hearing Committee that a fitness requirement is appropriate in accordance with the *Roundtree* factors. "[T]o justify requiring a suspended attorney to prove fitness as a condition of reinstatement, the record in the disciplinary proceeding must contain clear and convincing evidence that casts a serious doubt upon the attorney's continuing fitness to practice law." *In re Cater*, 887 A.2d 1, 6 (D.C. 2005). "To determine whether the requisite serious doubt has been substantiated, it may be 'useful' to consider the criteria we evaluate to determine if an attorney should be reinstated to the bar under *In re Roundtree*, 503 A.2d 1215, 1217 (D.C. 1985)." *In re Lattimer*, 223 A.3d 437, 453 (D.C. 2020) (per curiam).

Respondent engaged in numerous serious Rule violations that strike at the heart of the attorney-client relationship. He appears not to appreciate the seriousness of that misconduct. Further, his treatment of E.S. during the representation itself and following its termination was deeply troubling. Indeed, the Hearing Committee found that, in response to his client's complaint about his misconduct, he "denied that he sought a romantic relationship with [her,] . . . suggested that 'she imagines that people are sexually coming on to her,' 'often claims sexual harassment' or

32

'perhaps, she is just lying.'" HC Rpt. at 23 n.15. To the contrary, the Hearing Committee found, in part based on emails from Respondent, that Respondent was pursuing his client romantically and that his client was not lying on this front. While a respondent has every right to vigorously defend herself in a disciplinary matter, disparaging one's client to avoid taking responsibility for her misconduct is simply a bridge too far.

In sum, we find clear and convincing evidence that casts a serious doubt upon Respondent's continuing fitness to practice law.[14]

## VI.   CONCLUSION

For the reasons set forth above, the Board finds that Respondent violated Rules 1.2(a), 1.4(b), 1.5(c), 1.6(a)(1), 1.6(a)(3), 1.7(b)(4), and 1.16(a)(3). With respect to the misconduct at issue in the instant matter, as well as that in *Klayman I*, the Board recommends that Respondent be suspended for a period of 18 months and be required to demonstrate his fitness to practice as a condition of reinstatement. The Board further recommends that the Court direct Respondent's attention to the

---

[14] Before the Board, Respondent argues that a fitness requirement is not necessary because he has voluntarily undertaken a number of CLE requirements and he offers to take additional CLE courses "to stay current and heighten his awareness of ethical issues in his practice of law." Resp. Br. to Board at 63. Additionally, he volunteers to advise any future client of his litigation history with United States District Court Judge Kollar-Kotelly and to withdraw from any representation that would require him to appear before her. *Id*. Finally, he argues that he was suffering from financial and medical stress during the period in which the misconduct occurred. Resp. Br. to Board at 62 n.15. While these may all be worthwhile steps, the Board is not convinced these measures are adequate to prevent future harm to clients and views these issues as matters that would appropriately be raised during the reinstatement process. *See* Board Rule 9.1(c).

requirements of D.C. Bar R. XI, § 14, and their effect on eligibility for reinstatement. *See* D.C. Bar R. XI, § 16(c).

BOARD ON PROFESSIONAL RESPONSIBILITY

By: _____
      Matthew G. Kaiser

All members of the Board concur in this Report and Recommendation except Ms. Larkin, who is recused.