**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**

DR. JEROME CORSI, et al

　　　　　　Plaintiffs

　　　v.

INFOWARS, LLC, et al

　　　　　　Defendants.

**Case Number:   1:20-cv-298-LY**

**PLAINTIFFS JEROME CORSI AND LARRY KLAYMAN'S  MOTION TO HAVE**
**PRESIDING JUDGE DECIDE OUTSTANDING MOTIONS TO DISMISS**

Plaintiffs Dr. Jerome Corsi and Larry Klayman hereby respectfully move the presiding

judge, the Honorable Lee Yeakel ("Judge Yeakel"), to decide the outstanding motions to dismiss

and vacate the order staying discovery and would respectfully show the following:

At the very outset of this case, after it was transferred from the U.S. District Court for the

District of Columbia, with the presiding judge there having found that the Western District of

Texas was the more appropriate venue and jurisdiction, this honorable Court made it crystal clear

that he likes to move cases quickly to trial and strong disfavors motions to dismiss unless under

the most compelling of circumstances. Here is what this honorable Court stated in two status

conferences at the outset of this case before it:

> You're going to have to figure how much time you want because once I get it set,
> once I fill in after a subsequent conference your trial month and final pretrial
> conference date and time, you're not likely to get a continuance or a
> postponement.

> I like to try lawsuits. If I had my way and could pass one law, I would do away
> with motion practice altogether, and you would either settle your case or try your
> case, the way it was in the olden days. Exhibit A.

Accordingly, Plaintiffs, who continue to suffer severe damage by virtue of the continuing

defamation and other illegal actions of Defendants – which defamation is not new but is a pattern

and practice with regard to many  their victims, including but hardly limited to the Sandy Hook families. It was thus  expected that when this honorable Court assigned these motions to dismiss to the Magistrate Judge to make a report and recommendation that this would occur promptly or at least within a reasonable amount of time. However, this has not occurred, and the Magistrate Judge has not made any such recommendation for over  seven months, since the motions were filed.

More troubling are unjustified statements made at a hearing on March 23, 2021, where the Magistrate Judge also stayed discovery, with the primary premise that it does not matter since it will be a long time until this case ever gets trial, if at all – adding that he is retiring on May 31, 2021. To add insult to injury, the Magistrate Judge also made statements which show that he has, without good cause and likely without thoroughly reviewing the pleadings, prejudged the merits of Plaintiffs' Amended Complaint.

Here is what the Magistrate Judge said at the hearing of March 23, 2021 where he unjustifiably stayed discovery contrary to this Honorable Court's expressed desire to move things along:

> Thank you. So I -- my ruling is going to be that I'm going to continue the stay that was put in place through today or through this hearing until we get rulings on the 12(b)(6) motions. And we will try to give those priority as much as possible. I can give you one deadline, which is that I'm retiring on May 31st is my last day on the bench. So I'm going to get it done before then. So you should get rulings on the 12(b)(6). They'll be, obviously, report and recommendations of a magistrate judge, so you'll have proceedings after that in front of Judge Yeakel. But I'll get them done before then.

However, the basis of the Magistrate Judge's prejudgment are invalid and while a simple review of the Amended Complaint shows this, his statements were based on a newly appointed ethically challenged 39 year old judge Roy Altman in Palm Beach, Florida, who, even before the complaint before the U.S. District Court for the Southern District of Florida was served, issued

an unprecedented "Order Requiring More Definite Statement,' which belittles the serious allegations of Mr. Klayman, and seeks to protect Roger Stone, a close Trump confidant who likely recommended this Palm Beach judge to the federal bench during the Trump presidency. Stone lives in South Florida and he and the Palm Beach judge undoubtedly know each other through Republican circles in this close-knit community.

At the outset of his bizarre and improper order, the Palm Beach judge, Roy Altman, incredibly wrote:

> "Larry Klayman was upset when Roger Stone called him "incompetent" on national television (ECF No. 1) para 44. So, he filed this Complaint – which when attachment are included – is 47 pages long. See id. at 1-46."

A review of the Complaint and this case shows that the malicious defamation of the Defendants goes far beyond that, as it does in this case before this honorable Court. *See* <u>Exhibit B</u>.

As a result of this apparent bias, if not unethical conduct by Judge Altman in violation of the Code of Judicial Conduct, Mr. Klayman filed "Plaintiff Larry Klayman's Notice of Voluntary Dismissal and the case was dismissed, since he obviously saw that he could not get a fair adjudication before this apparently compromised judge. <u>Exhibit B</u>. The complaint was thus voluntarily dismissed and thus Judge Altman's unsolicited, improper and highly prejudiced Order Requiring More Definite Statement is of no force or effect.

Moreover, Mr. Klayman wanting to confirm the motivation for Judge Altman's unprecedented and at best rogue Order, filed "Plaintiff Larry Klayman's Request for Disclosure," inquiring and asking for a good faith response about Judge Altman's likely involvement with Roger Stone. And when this request went unanswered, Mr. Klayman filed a complaint with the Judicial Council of the Eleventh Circuit, seeking to compel a response. Predictably, the Judicial

Council has sat on this complaint and never responded to Mr. Klayman.

All of this was hopefully past but sad history, that is until the Magistrate Judge, improperly relying on Judge Altman's unethical missive, showed his hand:

> THE COURT: And I agree. I'm not suggesting that.  But -- but I think you -- it's hard to read those two orders  and think that they -- they thought that this was a very strong  case.
>  Obviously, the sua sponte order entered in Florida was done because that judge, at least, did not think there was enough pled there to demonstrate that it overcame problems that  he saw with it.
> MR. KLAYMAN: Your Honor –
> THE COURT: We're not bound by those courts, nor –
>  MR. KLAYMAN: I have a -- I have a complaint pending against that judge, Roy Altman, with the Judicial Council.  Okay. He overstepped his bounds.
> THE COURT: Good luck.
> MR. KLAYMAN: He probably knows -- yeah. I know "good luck." Judges usually just avoid them. Okay? I'm being  kind. We have to answer as lawyers, but judges don't have to  answer generally. Exhibit C.

For these reasons, as well as the inordinate delay in ruling on Defendants motions to dismiss, and without good cause staying discovery, Plaintiffs respectfully request that this Honorable Court itself rule on them as well as to vacate the stay on discovery, to allow this case to finally move forward. In addition, any report and recommendation by the Magistrate Judge will be subject to objections by either side, further delaying adjudication of this case, contrary to the expressed practice of this honorable Court. Finally, there is the issue of prejudgment by the Magistrate Judge unjustifiably based on Judge Altman's unethical and rogue order, and this improper Order does not apply or relate to Plaintiff Corsi in any event, however outrageous it was.

Finally, on several occasions Plaintiff Larry Klayman has offered to defense counsel to agree to consolidate the action against Roger Stone and the Infowars Defendants, *Klayman v. Infowars* 20-cv-61912 (S.D. FL), before this Honorable Court, but his counsel have refused to agree, instead complaining strategically to this honorable Court about the case in Florida.

For all of these compelling reasons, Plaintiffs respectfully request that the pending

motions be decided by the presiding judge, the Honorable Lee Yeakel, as justice delayed is justice denied, especially given the continuing damage inflicted upon Dr. Corsi and Mr. Klayman by the Infowars Defendants, who have a documented history of similar acts against others, such as the Sandy Hook families who lost their children in an heinous massacre which the Infowars Defendants falsely claimed was a hoax. It is no coincidence that the Infowars Defendants were also sued in this regard, which is not isolated but is their modus operandi to make money on the internet. Exhibit D.

Plaintiffs have asked Defendants for their consent to this motion and they refused to agree.

Dated: April 13, 2021                                     Respectfully Submitted,


                                                         /s/Sanjay Biswas
                                                         SANJAY BISWAS, Esq.
                                                         #24061235—Texas
                                                         #24966--Louisiana
                                                         11720 Duxbury Dr.
                                                         Frisco, Texas 75035
                                                         Telephone: (972)-866-5879
                                                         Email:sanjaybiswas41@gmail.com
                                                         Fax: 1-800-506-6804

                                                         *Counsel for Dr. Jerome Corsi*

                                                         /s/Larry Klayman
                                                         Larry Klayman
                                                         7050 W. Palmetto Park Rd
                                                         Boca Raton FL, 33433
                                                         Email:leklayman@gmail.com
                                                         Fax: 561-558-5336

                                                         *Plaintiff Pro Se*

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on April 13, 2021, a true copy of the foregoing was filed via

ECF and served to all counsel of record though the Court's ECF system.

*<u>/s/ Sanjay Biswas</u>*

EXHIBIT A

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF TEXAS
 2                       AUSTIN DIVISION

 3  JEROME CORSI, LARRY KLAYMAN,          ) AU:20-CV-00298-LY
                                          )
 4     Plaintiffs,                        )
                                          )
 5  v.                                    ) AUSTIN, TEXAS
                                          )
 6  INFOWARS, LLC, FREE SPEECH SYSTEMS, LLC, )
    ALEX E. JONES, DAVID JONES, OWEN SHROYER, )
 7                                        )
       Defendants.                        ) MAY 21, 2020
 8
            ***********************************************
 9              TRANSCRIPT OF TELEPHONE CONFERENCE
                BEFORE THE HONORABLE LEE YEAKEL
10          ***********************************************

11  APPEARANCES:

12  FOR THE PLAINTIFFS:  LARRY KLAYMAN
                         KLAYMAN LAW GROUP P.A.
13                       2020 PENNSYLVANIA AVENUE NW, SUITE 800
                         WASHINGTON, D.C. 20006
14
    FOR THE DEFENDANTS:  JAY MARSHALL WOLMAN
15                       RANDAZZA LEGAL GROUP, PLLC
                         100 PEARL STREET, 14TH FLOOR
16                       HARTFORD, CONNECTICUT 06103

17                       BRADLEY JORDAN REEVES
                         REEVES LAW, PLLC
18                       702 RIO GRANDE STREET, SUITE 306
                         AUSTIN, TEXAS 78701
19
                         MARC J. RANDAZZA
20                       RANDAZZA LEGAL GROUP, PLLC
                         2764 LAKE SAHARA DRIVE, SUITE 109
21                       LAS VEGAS, NEVADA 89117

22                       DAVID SCOTT WACHEN
                         WACHEN LLC
23                       11605 MONTAGUE COURT
                         POTOMAC, MARYLAND 20854
24

25
```

```
 1                          GREGORY P. SAPIRE
                           SOLTERO SAPIRE MURRELL PLLC
 2                         7320 NORTH MOPAC EXPRESSWAY, SUITE 309
                           AUSTIN, TEXAS 78731-2311
 3
    COURT REPORTER:        ARLINDA RODRIGUEZ, CSR
 4                         501 WEST 5TH STREET, SUITE 4152
                           AUSTIN, TEXAS 78701
 5                         (512) 391-8791

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24  Proceedings recorded by computerized stenography, transcript

25  produced by computer.
```

09:44:34   1   months here doesn't mean anything.  I realize this case may

09:44:38   2   have sat around in the previous court for a while.  That's not

09:44:43   3   your fault; that's not my fault.  I got it for new when it got

09:44:49   4   filed this year, and that's what I'm picking up with.

09:44:54   5          You're going to have to figure how much time you want

09:45:00   6   because once I get it set, once I fill in after a subsequent

09:45:06   7   conference your trial month and final pretrial conference date

09:45:16   8   and time, you're not likely to get a continuance or a

09:45:20   9   postponement.

09:45:21   10          So sit down, presume for the moment that the motion

09:45:28   11   to dismiss is denied, and schedule your case accordingly.  And

09:45:33   12   then if the motions to dismiss are granted, then it just got

09:45:36   13   easier for everybody.  So put those dates firmly in your mind

09:45:45   14   because, as I said, once I have scheduled you for final

09:45:50   15   pretrial conference and trial, I am not likely to change those

09:45:55   16   dates.

09:45:55   17          You'll hear about this again.  I've told you about

09:45:59   18   the large dockets we have.  It creates far too big a ripple

09:46:03   19   effect through my docket if I start trying to reset things, so

09:46:08   20   I simply don't do it.

09:46:10   21          Each of you needs to understand you only have one

09:46:12   22   role in this case, and that's to resolve it.  And you can do in

09:46:17   23   one of three ways -- and you will hear this again -- you could

09:46:21   24   settle it or I could grant a well-taken dispositive motion for

09:46:26   25   one or more defendants, be it a motion to dismiss or a motion

| | | |
|---|---|---|
| 09:46:32 | 1 | for summary judgment or any other nature of dispositive motion, |
| 09:46:37 | 2 | or you can try the case.  And I don't care which of the three |
| 09:46:40 | 3 | alternatives it is. |
| 09:46:42 | 4 | I like to try lawsuits.  If I had my way and could |
| 09:46:47 | 5 | pass one law, I would do away with motion practice altogether, |
| 09:46:51 | 6 | and you would either settle your case or try your case, the way |
| 09:46:55 | 7 | it was in the olden days.  And it was a much better system |
| 09:47:00 | 8 | before we developed this cottage industry about discovery and |
| 09:47:04 | 9 | motions practice. |
| 09:47:05 | 10 | So I'm not going to get you back here before your |
| 09:47:07 | 11 | trial and knock you around about why you haven't settled. |
| 09:47:12 | 12 | You're not going to be pushed as you go along to get your case |
| 09:47:16 | 13 | settled.  If you get it settled, that will be fine.  But that |
| 09:47:20 | 14 | is not anything that particularly bothers me. |
| 09:47:23 | 15 | I also don't care about controversial cases or |
| 09:47:28 | 16 | parties, and I don't care how long it takes to try a case. |
| 09:47:31 | 17 | Lengthy cases do not bother me.  However, I will tell you now |
| 09:47:36 | 18 | that you will get put on a clock.  At the appropriate point in |
| 09:47:43 | 19 | this case we will discuss how much time you're going to get to |
| 09:47:46 | 20 | try in your case, so you need to factor into what you're doing |
| 09:47:49 | 21 | that you're not going to get unlimited time to try your case. |
| 09:47:52 | 22 | So how long do you think you need to get in a |
| 09:47:56 | 23 | scheduling order for me? |
| 09:48:02 | 24 | MR. KLAYMAN:  Your Honor, I think we can do it in |
| 09:48:04 | 25 | ten days. |

EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

LARRY KLAYMAN,

               Plaintiff

        v.

INFOWARS, LLC
100 Congress Ave., 22nd Floor
Austin, TX 78701

And

FREE SPEECH SYSTEMS, LLC
100 Congress Ave., 22nd Floor
Austin, TX 78701

And

ALEX E. JONES, Individually
3019 Alvin Devane Blvd., Suite 300-350
Austin, TX 78741

And

DAVID JONES, Individually
3019 Alvin Devane Blvd., Suite 300-350
Austin, TX 78741

And

OWEN SHROYER, Individually
3019 Alvin Devane Blvd., Suite 300-350
Austin, TX 78741

               Defendants.

**Case Number:**

**COMPLAINT**

## INTRODUCTION

Plaintiff LARRY KLAYMAN ("Klayman") hereby files this action against INFOWARS,

LLC ("Defendant InfoWars"), FREE SPEECH SYSTEMS, LLC ("Defendant Free Speech

1

Systems"), ALEX E. JONES ("Defendant Alex Jones"), DAVID JONES ("Defendant David Jones") and OWEN SHROYER ("Defendant Shroyer") for Defamation, violation of the Lanham Act, and violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 under diversity of citizenship. The parties are citizens of different states and the amount in controversy exceeds $75,000.

2.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) as this is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

## THE PARTIES

3.      Plaintiff Klayman is a public interest legal advocate, private practitioner and litigator who represents Plaintiff Corsi with regard to Special Counsel Robert Mueller's ("Mueller") Russian collusion investigation.  Plaintiff Klayman is also a media personality and author, columnist and syndicated radio talk show host. Plaintiff Klayman is a citizen of Florida.

4.      Defendant InfoWars is a limited liability company with principal offices located in Austin, TX and does substantial commercial and other business in the district, from which it derives substantial revenues directly and/or indirectly.

5.      Defendant Free Speech Systems is a  limited liability company with principal offices located in Austin, TX and does substantial commercial and other business in this district, from which it derives substantial revenues directly and/or indirectly.

6.      Defendant Alex Jones is a well-known extreme and totally discredited "conspiracy theorist" and media personality who creates content that is broadcasted on the radio and posted on the internet at www.infowars.com and elsewhere on the internet and other social media sites and

does substantial business in this district from which he derives substantial revenues, directly and/or indirectly. Defendant Alex Jones is a citizen of Texas.

7.     Defendant David Jones is Defendant Alex Jones's father and holds the official title of Director of Human Relations for Defendant Free Speech Systems. On information and belief, Defendant David Jones is the owner of Defendants InfoWars and Free Speech Systems and he manages the business activities for Defendants InfoWars and Free Speech Systems, as well as Defendant Alex Jones' other companies.  At all material times he worked in concert with the other Defendants and Roger Stone and furthered and ratified and furthered the illegal acts set forth in this Complaint and does substantial business in this district, from which he derives substantial revenues, directly and/or indirectly. Defendant David Jones is a citizen of Texas.

8.     Defendant Shroyer is a newscaster for Defendant InfoWars and does substantial business in this district, from which he derives substantial revenues, directly and/or indirectly. Defendant Shroyer is a citizen of Texas.

9.     All of the Defendants, each and every one of them, does substantial commercial and other business in this district, not only broadcasting daily into this district for profit, but also selling products for profit continuously in this district, from which they derives substantial revenues, directly and/or indirectly.

## **GENERAL ALLEGATIONS**

10.     Defendant InfoWars and Defendant Free Speech Systems are both owned, controlled, and operated by Defendant Alex Jones and David Jones. Defendant Free Speech Systems owns www.infowars.com, where content created by Defendants Alex Jones and Shroyer are posted and broadcast into this district, nationally and internationally.

11.     Defendant Alex Jones hosts *The Alex Jones Show*, which is broadcast on radio

and internet social media networks throughout the United States of America and internationally, including this judicial district, and online.

12. Defendant Shroyer hosts *The War Room* along with Roger Stone ("Stone"), which is broadcast on radio and internet social media networks throughout the United States of America and internationally, including this judicial district, and online.

13. Defendants' reach and influence are enormous. On information and belief, Defendant Alex Jones and InfoWars has a radio audience of over two million people. Before it was banned from YouTube, Defendant Alex Jones' and InfoWars' channel had more than 2.4 million subscribers, which in part accounts for the huge amount of substantial business which it does in this district.[1]

14. Defendants, each and every one of them, in concert, do substantial business and promote and sell various goods in this judicial district and nation-wide, including medicine, supplements, and "tchotchkes" with InfoWars branding. The money earned from these sales funds the conspiracy between Defendants and Stone to defame, intimidate, coerce and threaten Plaintiff Klayman  in order to have tried to improperly influence the Mueller Russian collusion investigation and to coerce false testimony from Plaintiff's client, Jerome Corsi, favorable to Stone in his upcoming criminal prosecution.

15. Stone also does business promotes and sells various goods in this judicial district and nation-wide, including medicine, supplements, books, and "tchotchkes" with his own branding. The money earned from these sales funds Stone's legal defense fund and the conspiracy between Defendants and Stone to defame, intimidate, coerce and threaten Plaintiffs in

[1] Casey Newton, *YouTube deletes Alex Jones' channel for violating its community guidelines*, The Verge, Aug. 6, 2018, available at: https://www.theverge.com/2018/8/6/17656708/youtube-alex-jones-infowars-account-deleted-facebook-apple-spotify

were used in order to try to improperly influence the Mueller Russian collusion investigation and to have attempted to coerce false testimony from Plaintiff Corsi favorable to Stone in his criminal prosecution, for which he was convicted on seven felony counts of perjury, obstruction of justice and witness tampering.

16.     Defendants, each and every one of them, jointly and severally,  have a long and sordid history of publishing and broadcasting defamatory material, including falsely, recklessly such as by baselessly accusing the families of the schoolchildren who lost their lives during the 2012 Sandy Hook Elementary School massacre of staging the massacre and faking the deaths of their children.[2]

17.     The Sandy Hook families had to endure years of abuse and torture from Defendants before finally filing suit against numerous parties involved with InfoWars, including Defendant Alex Jones and Shroyer, for defamation.

18.     As just one example, a Florida woman was arrested for making  death threats to a parent of a Sandy Hook victim.[3] According to the U.S. Department of Justice, the motivation behind the threats was the lies propagated by Defendants that the Sandy Hook massacre was a hoax.[4]  This underscores Defendants substantial activities and reach into Florida and this district.

19.     Furthermore, Defendant Alex Jones in concert with the other Defendants propagated and promoted the "Pizzagate" conspiracy on his show, accusing a restaurant called Comet Ping Pong in the Washington D.C. area of operating a child sex ring in its non-existent

---

[2] Aaron Katersky, *Families of Sandy Hook shooting victims win legal victory in lawsuit against InfoWars, Alex Jones*, ABC News, Jan. 11, 2019, available at:
https://abcnews.go.com/US/families-sandy-hook-shooting-victims-win-legal-victory/story?id=60314174
[3] Daniella Silva, *Conspiracy Theorist Arrested for Death Threats Against Sandy Hook Parent*, NBC News, Dec. 7, 2016, available at: https://www.nbcnews.com/news/us-news/conspiracy-theorist-arrested-death-threats-against-sandy-hook-parent-n693396
[4] *Id.*

basement that purportedly involved Hillary Clinton and John Podesta. This caused one of his listeners to shoot up the restaurant after being told by Defendant Jones to "self-investigate" the "Pizzagate" conspiracy theory.[5]

20.     Defendants, acting in concert, propagated these outrageous lies in this district and elsewhere in Florida  with no regard for the grief of their victims in order to gain notoriety, fame, and profit.

21.     Defendants, acting in concert, as part of their latest scheme for notoriety, fame, and profit, are now working in concert with Stone to defame, intimidate, and threaten Plaintiff.

22.     Stone, who was indicted and then convicted on witness tampering and obstruction of justice by Special Counsel Robert Mueller, placed under a total gag order by the jurist, the Honorable Amy Berman Jackson,  presiding over his prosecution for, in part, even threatening her, and then convicted has appeared numerous times on shows broadcasted by Defendant InfoWars, and hosted by Defendants Alex Jones and Shroyer, where Stone and Defendants have published malicious false, misleading, and defamatory statements concerning Plaintiff

23.     The indictment comprised seven different felony counts. *See* Exhibit 1 – Mueller Indictment.  Importantly, Dr. Corsi was not accused of any wrongdoing or illegality in the Mueller Indictment, in which he named as Person 1, a material witness to the alleged crimes committed by Stone. (Note: The facts set forth in all Exhibits attached to and referenced in this Complaint are factually incorporated into this Complaint by reference).

24.     Specifically, the seven count Mueller Indictment against Stone, pursuant to which he was convicted on seven felony counts for perjury, obstruction of justice and witness

---

[5] James Doubek, *Conspiracy Theorist Alex Jones Apologizes For Promoting 'Pizzagate'*, NPR, Mar. 26, 2017, available at: https://www.npr.org/sections/thetwo-way/2017/03/26/521545788/conspiracy-theorist-alex-jones-apologizes-for-promoting-pizzagate

tampering  alleged lying under oath - that is, perjury - witness tampering and obstruction of justice by threatening to kill a material witness, Randy Credico ("Credico") and his service dog, if Credico did not lie to government authorities concerning his involvement with Roger Stone. Credico is Person 2 in the Mueller Indictment of Stone. *Id.* Person 1 in this Mueller Indictment is Dr. Corsi.

25.     Even before Stone was indicted, he began a public relations campaign in this district, nationally and internationally to maliciously defame, smear, intimidate and threaten Dr. Corsi and Plaintiff Klayman, Dr. Corsi's lawyer and defense counsel.

26.     Stone knew that he was going to be indicted, and therefore began this public relations campaign to maliciously defame smear, intimidate and threaten Plaintiff Klayman, even before his actual indictment on January 25, 2019, in order to try to influence public opinion and Special Counsel Robert Mueller – by trying to attribute guilt to Dr. Corsi and not him - as well as to try to raise money for his legal defense.

27.     Stone likes to portray himself as Mafia, and indeed on information and belief has Mafia connections, frequently making reference to Mafia figures who he admires, as well as other unsavory types who have been alleged to have engaged in unethical and/or illegal behavior. For example, he frequently makes reference to his heroes being Hyman Roth in the 'Godfather," who was the movie version of Meyer Lansky, and Roy Cohn, not to mention, Richard Nixon, for his role in Watergate. In this regard, after Stone was indicted he held a press conference on the courthouse steps of the federal courthouse in Ft. Lauderdale, where he was booked, with his arms defiantly in the air in the "victory' pose used by Nixon after he resigned in disgrace as a result of the Watergate scandal. At the time, Stone had been employed by a Nixon group called CREEP, or the Committee to Reelect the President.  Defendant Stone even has a large tattoo of Richard

Nixon affixed to his back. Thus, given his admiration for persons such as these, particularly Mafia figures, his actions as pled herein can be taken as threats, as well as being defamatory. And, Plaintiff Corsi is 72 years old and thus very vulnerable emotionally and physically to these threats. Stone's intentional infliction of emotional distress and coercion and threats are intended to try even cause Plaintiff Corsi to have heart attacks and strokes, in order that Plaintiff will be unable to testify at Stone's criminal trial. Tellingly, Stone threatened kill a material witness and his service dog, Credico, Person 2 in the Mueller Indictment, "Mafia style." Stone also fashions himself and indeed has the reputation, at a minimum, as being the preeminent "dirty trickster." *See* "Get Me Roger Stone" on Netflix.

28.     By defaming Plaintiff, Stone was hoping to not only intimidate Plaintiff to severely harm and damage their reputations, but also to try to coerce and threaten Dr. Corsi to testify falsely if subpoenaed if he had been called as a material witness in Stone's ensuing criminal trial. He was also trying divert funds away from Dr. Corsi's legal defense fund and drain Plaintiff Klayman while boosting his own legal defense fund.

29.     Defendants and Stone's conspiracy to defame, smear, intimidate, tamper with and threaten Plaintiffs was calculated to improperly and illegally influence the Russian collusion investigation, for which Stone was later criminally indicted and convicted and to coerce false testimony favorable to Stone at his criminal prosecution.  This illegal conduct is also maliciously intended to harm Plaintiff Klayman's reputations and credibility as Stone fears that Dr. Corsi, Klayman's client,  would have testified truthfully once subpoenaed by Special Counsel Mueller at Stone's criminal prosecution, which Dr. Corsi was by all parties but did not ultimately testify.

30.     Tellingly, in a video published by The Daily Caller, Defendant Shroyer appearing with Stone, admits that he will serve as a surrogate for Stone if Stone receives a gag order, which

he has. [6] The other Defendants, like Stoyer, are also surrogates of Stone.

31.     Stone's illegal and improper attempts to influence the Russian collusion investigation were even been recognized by the presiding judge, the Honorable Amy Berman Jackson ("Judge Jackson"), who issued a complete "gag" order on Stone after Stone attempted to incite violence against Judge Jackson by putting a picture of her face and gun crosshairs up on his Instagram account.[7]

32.     In her minute order of February 21, 2019 imposing the total "gag" order on Stone, Judge Jackson directly cites and references his use of surrogates:

> Furthermore, the defendant may not comment publicly about the case indirectly by having statements made publicly on his behalf by surrogates, family members, spokespersons, representatives, or volunteers.

33.     Defendants, each and every one of them, jointly and severally, have, by working in concert with Stone, therefore engaged in illegal witness tampering, intimidation and threats in violation of 18 U.S.C. § 1512 by virtue of the defamatory and threatening acts and practices as alleged herein. Not coincidentally, this was what largely Stone was indicted  and later convicted for  by Special Counsel Robert Mueller.

<u>DEFENDANTS' DEFAMATORY CONDUCT</u>

34.     Stone has appeared numerous times on programs of the Defendants, *The Alex Jones Show* and The *War Room*, which are hosted by Defendant Alex Jones and Shroyer where numerous false, misleading, malicious and defamatory statements of and concerning Plaintiff were made, published, and or ratified by all of the Defendants, each and every one of them.

---

[6] https://www.youtube.com/watch?v=SSDkh5RYtGo
[7] *Judge in Roger Stone case orders hearing after he appeared to threaten her on Instagram*, Washington Post, Feb. 19, 2019, available at:
https://www.washingtonpost.com/politics/2019/02/18/roger-stone-deletes-photo-judge-presiding-over-his-case-says-he-didnt-mean-threaten-her/?utm_term=.2d3c5afa6326

35.     Plaintiff has demanded retraction and correction of the defamatory videos and publications set forth below and generally in this Complaint, but Defendants have refused, thereby ratifying any and all defamatory statements contained therein.

36.     Defendants, each and every one of them, as set forth herein,  acted with actual malice, in concert, as joint tortfeasors, as they knew that the statements which they published were false, especially since have known Plaintiff Klayman and had him as a guest commentator and newsmaker on their broadcasts  for many years and intimately know of his background and significant accomplishments. As a result,  each of the Defendants were well aware that the statements made by Stone were false, misleading, malicious  defamatory statements, published with actual malice by an unstable self-styled dirty trickster and now convicted felon.  In addition, all of the Defendants, each and every one of them,  ratified  the malicious false statements published by Stone on their networks and media sites and when Plaintiff made a demand to retract them, each of the Defendants refused. Defendants, having been sued by other victims in similar situations, think they are above the law of defamation in particular,  and have engaged, as pled herein, in a pattern and practice of behavior which flouts not just the law but human decency.

37.     As the content containing the malicious false, misleading, and defamatory statements were published on the internet, it is proliferated like a "cancerous virus," and is now available for viewing from countless sources, thereby exponentially increasing the prejudicial and defamatory impact and severe damage inflicted on Plaintiff. Judge Jackson, in issuing her two gag orders against Stone, herself recognized how postings on the internet proliferate widely and once made cannot be taken back.

   *I.     The January 18, 2019 Video*

38.     Before Stone was indicted, on or about January 18, 2019, he appeared on *The War Room* with Defendant Shroyer, where he made several malicious false, misleading, and defamatory statements in this district, nationally and internationally regarding Plaintiff (the "January 18 Video").8 The same video was published on Stone's YouTube channel, "*Stone Cold Truth*," on January 18, 2019.9

39.     These malicious false, misleading, and defamatory statements were adopted and published by each and every one of the Defendants, rendering them joint tortfeasors and jointly and severally liable.

40.     At 1:25 in the January 18 Video, Stone maliciously falsely published that "He's (Klayman) never actually won a courtroom victory in his life."

41.     At 1:30 in the January 18 Video, Stone and the Defendants, each and every one of them jointly and severally at joint tortfeasors, maliciously falsely published, "He (Klayman) was ousted at Judicial Watch. Ask Tom Fitton [the current president of Judicial Watch] why he left. He was 'ousted' because of a 'sexual harassment complaint.'"

42.     In actuality and truth, Plaintiff Klayman left Judicial Watch on his own accord in order to run for U.S. Senate in Florida in 2003-2004.

43.     Not coincidentally, Plaintiff Klayman has a jury verdict and judgment against Fitton's Judicial Watch for having defamed him with malice. Punitive damages were also awarded by the jury in the U.S. District Court for the Southern District of Florida.

44.     At 1:37 in the January 18 Video, Stone maliciously falsely published, "He's (Klayman) incompetent, he's a numbskull, he's an idiot, he's an egomaniac, and he could be the single worst lawyer in America. With him as Jerry Corsi's lawyer, Corsi may get the electric

8 https://www.infowars.com/watch/?video=5c3fbf24fe49383dcf6996e4
9 https://www.youtube.com/watch?v=cJyfgdvtFx8

chair. So your idea that he's a good guy is entirely wrong"

45.     In actuality, Plaintiff Klayman has been a practicing attorney for over four decades and has won numerous cases on behalf of his clients and also against the government for constitutional and other violations.  He is the founder of both Judicial Watch and Freedom Watch, a former candidate for the U.S. Senate in Florida, a former trial attorney and prosecutor of the Antitrust Division of the U.S. Department of Justice, where he was a member of the trial team that successfully broke up the AT&T monopoly and created competition in the telecommunications industry. Among many other legal victories, Plaintiff Klayman also won landmark decisions at the chairman and general counsel of Freedom Watch enjoining the illegal mass surveillance by the National Security Agency. *Klayman v. Obama*, 1:13-cv-851 (D.D.C). *See* Exhibit 2 --*Klayman biography*, which is incorporated herein by reference. Stone knew this when he published the malicious false and misleading statements about Klayman and thus willfully and maliciously defamed Plaintiff Klayman.

46.     At 2:01 in the January 18 Video, Stone and each and every one of the Defendants, jointly and severally as joint tortfeasors, maliciously falsely and misleadingly published that Plaintiff Klayman is a "piece of garbage."

47.     At 4:11 in the January 18 Video, Stone and each and every one of the Defendants, jointly and severally as joint tortfeasors, maliciously falsely and misleadingly published, "For those people out there who think…that Larry Klayman's IQ is higher than 70, you're wrong…"

48.     Defendants published these malicious false, misleading, and defamatory statements with malice and with full knowledge that they were false and misleading, and/or at a minimum, with a reckless disregard for its truthfulness. These statements falsely and misleadingly state that Plaintiff Corsi was fired from World Net Daily, that he committed perjury

(a federal offense), and that he is an untruthful person. They also create the false and misleading implication that Plaintiff Klayman is unqualified to be an attorney, public advocate and is a bad and loathsome person. Plaintiff Klayman is also an author, columnist and nationally syndicated radio and internet talk show host on Radio America, his show titled "*Special Prosecutor with Larry Klayman.*" *See* www.radioamerica.com. The malicious false and misleading published statements as alleged herein also severely damaged Plaintiff Klayman personally and professionally in this regard, particularly since he and his show compete with Defendant InfoWars and and the other Defendants in media markets in this district, nationally and internationally. Plaintiff Corsi also competes with Defendant InfoWars and the other Defendants in media markets in this district, nationally and internationally.

<u>FACTS PERTAINING TO DEFENDANTS' UNFAIR COMPETITION</u>

49.　　In addition to being an investigative journalist/author and a public interest litigator/advocate, respectively, Plaintiff Klayman is a competitor to Defendants as conservative media personalities, broadcasters, authors and columnists on social media and elsewhere.

50.　　For instance, Plaintiff Klayman also hosts an online radio show and produces videos that are posted on the internet, issues press releases, commentary and other publications.

51.　　Defendants, each and every one of them jointly and severally as joint tortfeasors, have made, adopted, and or ratified numerous false or misleading statements of fact of and concerning Plaintiff during their various programs and media postings and publication, which all contain significant advertisement or promotions.

52.　　These false and/or misleading facts materially prejudice the viewers and/or listeners as to the quality, nature, and contents of Plaintiff's services, which has caused significant competitive and commercial injury to Plaintiff, as well as loss of good will and

reputation.

53.    Plaintiff, like Defendants, rely on viewer and listener financial support and sales in order to continue their work. Defendants' false and/or misleading statements concerning Plaintiffs is meant to, and has, diverted financial support and sales away from Plaintiffs and to Defendants instead.

**FIRST CAUSE OF ACTION**
*Defamation*

54.    Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

55.    Acting in concert, Defendants published malicious, false, misleading and defamatory statements of and concerning Plaintiff in this judicial district, nationwide, and worldwide.

56.    These false and misleading statements were published with malice, as Defendants knew that they were false and misleading, or at a minimum acted with a reckless disregard for the truth.

57.    Plaintiff has been severely harmed and damaged by these false and misleading statements because they subjected him to hatred, distrust, ridicule, contempt, and disgrace.

58.    Plaintiff has been damaged by these false and misleading statements because they severely injured Plaintiff Klayman in his profession and businesses, as well as severely injured and damaged him personally, financially and in terms of his good will and reputation.

**SECOND CAUSE OF ACTION**
*Defamation Per Se*

59.    Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

60.     Acting in concert, Defendants, as alleged herein, published numerous false, misleading and defamatory statements to severely harm and damage Plaintiff, which were republished elsewhere, and through surrogates, which published the falsity that Plaintiff have committed crimes, engaged in moral turpitude, and committed sexual misconduct, as set forth in the preceding paragraphs.

61.     These false, misleading and defamatory statements were published in this district and on the internet and elsewhere, domestically and for the entire world to see and hear and in so doing Defendants published false and misleading facts, *inter alia*, that Plaintiff's conduct, characteristics or a condition are incompatible with the proper exercise of his lawful business, trade, profession or office, as well as personally.

62.     These false and misleading statements were published with malice, as Defendants knew that they were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

63.     This statements are *per se* defamatory because they falsely and misleadingly published that Plaintiff Klayman had committed sexual misconduct which are federal offense and felony. Defamation *per se* gives rise to the presumption that severe harm and damage has arisen by virtue of the malicious false and misleading statements.

64.     These malicious false, misleading, and defamatory statements are defamatory *per se* and these false and misleading statements severely harmed and damaged  Plaintiff Klayman in his profession as a public interest and private advocate and litigator and as an author, columnist and radio and internet radio talk show and syndicated host, as well as personally.

**THIRD CAUSE OF ACTION**
***Defamation by Implication***

65.     Plaintiff re-alleges and incorporates by reference the allegations in the preceding

paragraphs of the Complaint as if fully set forth herein.

66.     Acting in concert, Defendants published numerous false, misleading and defamatory statements about Plaintiff, as set forth in the preceding paragraphs.

67.     These false, misleading and defamatory statements were published on the internet and published and republished elsewhere in this district, domestically and for the entire world to see and hear.

68.     These false and misleading statements were published with malice, as Defendants knew that they were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

69.     These statements created the false and misleading implication that Plaintiff Klayman committed sexual misconduct and is incompetent, among other false and misleading statements as pled in the preceding paragraphs.

70.     Plaintiff has been severely harmed and damaged by these false and misleading statements because they subject him to hatred, distrust, ridicule, contempt, and disgrace.

71.     Plaintiff has been damaged by these malicious false and misleading statements because the statements severely harmed and damaged Plaintiff in his professions as pubic interest and private practitioner lawyers and radio talk show hosts, whose credibility is the most important trait, as well as personally.

**FOURTH  CAUSE OF ACTION**
*Unfair Competition – Lanham Act 15 U.S.C. § 1125(a)*

72.     Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

73.     Defendants, acting together and in concert have and are engaged in acts of unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a) and common law.

74. Defendants have made false and/or misleading statements that have deceived and/or had the tendency to deceive a substantial segment of the receiving audience.

75. Defendants' false and/or misleading statements misrepresent the nature, characteristics, and qualities of Plaintiff Klayman's goods or services.

76. Defendants' false and/or misleading statements are material because that were highly likely to mislead and influence supporters' decisions to provide financial support and sales to Defendants instead of Plaintiff.

77. These false and misleading statements were made in interstate commerce, as they were widely broadcast on radio, on the internet, in social media, and elsewhere in this district, nationally and internationally.

78. Plaintiff has suffered significant damages, which are ongoing, due to Defendants' false and/or misleading statements. By law these damages are calculated based on Defendants' gross sales and receipts, which are trebled, plus an award of attorneys fees and costs.

## FIFTH CAUSE OF ACTION

79. Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

80. Defendants, acting together and in concert have violated the Florida Deceptive and Unfair Trade Practices Act.

81. Mr. Klayman is a competitor to Defendants.

82. Defendants have engaged in both deceptive acts and unfair practices by making misleading statements that misrepresent the nature, characteristics, and qualities of Plaintiff Klayman's goods or services.

83. Defendants' false and/or misleading statements misrepresent the nature,

characteristics, and qualities of Plaintiff Klayman's goods or services.

84.     Defendants' false and/or misleading statements are material because that were highly likely to mislead and influence supporters' decisions to provide financial support and sales to Defendants instead of Plaintiff.

85.     Defendants' misstatements would likely mislead the objective consumer acting reasonably under the circumstances.

86.     Defendants' misstatements have actually misled numerous consumers, which has had a direct negative impact on the amount of financial support received by Mr. Klayman.

87.     Plaintiff has suffered significant pecuniary damages directly and proximately caused by Defendants' deceptive acts and unfair practices, which are ongoing.

<strong><u>PRAYER FOR RELIEF</u></strong>

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

a.     As a result of significant damage caused by each of the Defendants, acting in concert, jointly and severally, in this district and throughout Florida, the nation and internationally, awarding Plaintiff compensatory including actual, consequential, incidental and punitive damages for malicious tortious conduct, perpetrated with actual malice, in an amount to be determined at trial and in excess of $50, 000,000 U.S. Dollars as redress for loss of his personal and professional reputations and good will, as well as past and prospective financial losses, personally and professionally.

b.     Awarding Plaintiff attorney fees and costs

c.     Granting such other relief as the Court deems appropriate and necessary including preliminary and permanent injunctive relief.

<strong>PLAINTIFF DEMANDS TRIAL BY JURY ON ALL CLAIMS SO TRIABLE</strong>.

Dated:  April 9, 2020       Respectfully Submitted,

            _/s/ Larry Klayman_

            Larry Klayman, Esq.
            7050 W. Palmetto Park Rd
            Boca Raton FL 33433
            Telephone: 561-558-5336
            Email: leklayman@gmail.com

            _PLAINTIFF PRO SE_

EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. |
| | * | |
| v. | * | Grand Jury Original |
| | * | |
| ROGER JASON STONE, JR., | * | 18 U.S.C. §§ 1001, 1505, 1512, 2 |
| | * | |
| Defendant. | * | |
| | * | |
| | * | |
| | * | |
| | ******* | |

## **INDICTMENT**

The Grand Jury for the District of Columbia charges:

### **Introduction**

1.      By in or around May 2016, the Democratic National Committee ("DNC") and the Democratic Congressional Campaign Committee ("DCCC") became aware that their computer systems had been compromised by unauthorized intrusions and hired a security company ("Company 1") to identify the extent of the intrusions.

2.      On or about June 14, 2016, the DNC—through Company 1—publicly announced that it had been hacked by Russian government actors.

3.      From in or around July 2016 through in or around November 2016, an organization ("Organization 1"), which had previously posted documents stolen by others from U.S. persons, entities, and the U.S. government, released tens of thousands of documents stolen from the DNC and the personal email account of the chairman of the U.S. presidential campaign of Hillary Clinton ("Clinton Campaign").

    a.      On or about July 22, 2016, Organization 1 released documents stolen from the DNC.

    b.      Between on or about October 7, 2016 and on or about November 7, 2016, Organization 1 released approximately 33 tranches of documents that had been stolen from the personal email account of the Clinton Campaign chairman, totaling over 50,000 stolen documents.

4.      ROGER JASON STONE, JR. was a political consultant who worked for decades in U.S. politics and on U.S. political campaigns. STONE was an official on the U.S. presidential campaign of Donald J. Trump ("Trump Campaign") until in or around August 2015, and maintained regular contact with and publicly supported the Trump Campaign through the 2016 election.

5.      During the summer of 2016, STONE spoke to senior Trump Campaign officials about Organization 1 and information it might have had that would be damaging to the Clinton Campaign. STONE was contacted by senior Trump Campaign officials to inquire about future releases by Organization 1.

6.      By in or around early August 2016, STONE was claiming both publicly and privately to have communicated with Organization 1. By in or around mid-August 2016, Organization 1 made a public statement denying direct communication with STONE. Thereafter, STONE said that his communication with Organization 1 had occurred through a person STONE described as a "mutual friend," "go-between," and "intermediary." STONE also continued to communicate with members of the Trump Campaign about Organization 1 and its intended future releases.

7.      After the 2016 U.S. presidential election, the U.S. House of Representatives Permanent Select Committee on Intelligence ("HPSCI"), the U.S. Senate Select Committee on Intelligence ("SSCI"), and the Federal Bureau of Investigation ("FBI") opened or announced their respective

investigations into Russian interference in the 2016 U.S. presidential election, which included investigating STONE's claims of contact with Organization 1.

8.     In response, STONE took steps to obstruct these investigations.  Among other steps to obstruct the investigations, STONE:

    a.     Made multiple false statements to HPSCI about his interactions regarding Organization 1, and falsely denied possessing records that contained evidence of these interactions; and

    b.     Attempted to persuade a witness to provide false testimony to and withhold pertinent information from the investigations.

### Other Relevant Individuals

9.     Person 1 was a political commentator who worked with an online media publication during the 2016 U.S. presidential campaign.  Person 1 spoke regularly with STONE throughout the campaign, including about the release of stolen documents by Organization 1.

10.    Person 2 was a radio host who had known STONE for more than a decade.  In testimony before HPSCI on or about September 26, 2017, STONE described Person 2 (without naming him) as an "intermediary," "go-between," and "mutual friend" to the head of Organization 1.  In a follow-up letter to HPSCI dated October 13, 2017, STONE identified Person 2 by name and claimed Person 2 was the "gentleman who confirmed for Mr. Stone" that the head of Organization 1 had "'[e]mails related to Hillary Clinton which are pending publication.'"

### Background

#### STONE's Communications About Organization 1 During the Campaign

11.    By in or around June and July 2016, STONE informed senior Trump Campaign officials that he had information indicating Organization 1 had documents whose release would be

damaging to the Clinton Campaign.  The head of Organization 1 was located at all relevant times at the Ecuadorian Embassy in London, United Kingdom.

12.    After the July 22, 2016 release of stolen DNC emails by Organization 1, a senior Trump Campaign official was directed to contact STONE about any additional releases and what other damaging information Organization 1 had regarding the Clinton Campaign.  STONE thereafter told the Trump Campaign about potential future releases of damaging material by Organization 1.

13.    STONE also corresponded with associates about contacting Organization 1 in order to obtain additional emails damaging to the Clinton Campaign.

    a.    On or about July 25, 2016, STONE sent an email to Person 1 with the subject line, "Get to [the head of Organization 1]."  The body of the message read, "Get to [the head of Organization 1] [a]t Ecuadorian Embassy in London and get the pending [Organization 1] emails . . . they deal with Foundation, allegedly."  On or about the same day, Person 1 forwarded STONE's email to an associate who lived in the United Kingdom and was a supporter of the Trump Campaign.

    b.    On or about July 31, 2016, STONE emailed Person 1 with the subject line, "Call me MON."  The body of the email read in part that Person 1's associate in the United Kingdom "should see [the head of Organization 1]."

    c.    On or about August 2, 2016, Person 1 emailed STONE.  Person 1 wrote that he was currently in Europe and planned to return in or around mid-August.  Person 1 stated in part, "Word is friend in embassy plans 2 more dumps.  One shortly after I'm back.  2nd in Oct.  Impact planned to be very damaging."  The phrase "friend in embassy" referred to the head of Organization 1.  Person 1 added in the same email, "Time to let more than [the Clinton Campaign chairman] to be exposed as in bed w

4

enemy if they are not ready to drop HRC. That appears to be the game hackers are now about. Would not hurt to start suggesting HRC old, memory bad, has stroke – neither he nor she well. I expect that much of next dump focus, setting stage for Foundation debacle."

14.     Starting in early August 2016, after receiving the August 2, 2016 email from Person 1, STONE made repeated statements about information he claimed to have learned from the head of Organization 1.

    a.    On or about August 8, 2016, STONE attended a public event at which he stated, "I actually have communicated with [the head of Organization 1]. I believe the next tranche of his documents pertain to the Clinton Foundation, but there's no telling what the October surprise may be."

    b.    On or about August 12, 2016, STONE stated during an interview that he was "in communication with [the head of Organization 1]" but was "not at liberty to discuss what I have."

    c.    On or about August 16, 2016, STONE stated during an interview that "it became known on this program that I have had some back-channel communication with [Organization 1] and [the head of Organization 1]." In a second interview on or about the same day, STONE stated that he "communicated with [the head of Organization 1]" and that they had a "mutual acquaintance who is a fine gentleman."

    d.    On or about August 18, 2016, STONE stated during a television interview that he had communicated with the head of Organization 1 through an "intermediary, somebody who is a mutual friend."

e.     On or about August 23, 2016, Person 2 asked STONE during a radio interview, "You've been in touch indirectly with [the head of Organization 1]. . . . Can you give us any kind of insight? Is there an October surprise happening?" STONE responded, "Well, first of all, I don't want to intimate in any way that I control or have influence with [the head of Organization 1] because I do not. . . . We have a mutual friend, somebody we both trust and therefore I am a recipient of pretty good information."

15.     Beginning on or about August 19, 2016, STONE exchanged written communications, including by text message and email, with Person 2 about Organization 1 and what the head of Organization 1 planned to do.

a.     On or about August 19, 2016, Person 2 sent a text message to STONE that read in part, "I'm going to have [the head of Organization 1] on my show next Thursday." On or about August 21, 2016, Person 2 sent another text message to STONE, writing in part, "I have [the head of Organization 1] on Thursday so I'm completely tied up on that day."

b.     On or about August 25, 2016, the head of Organization 1 was a guest on Person 2's radio show for the first time. On or about August 26, 2016, Person 2 sent a text message to STONE that stated, "[the head of Organization 1] talk[ed] about you last night." STONE asked what the head of Organization 1 said, to which Person 2 responded, "He didn't say anything bad we were talking about how the Press is trying to make it look like you and he are in cahoots."

c.     On or about August 27, 2016, Person 2 sent text messages to STONE that said, "We are working on a [head of Organization 1] radio show," and that he (Person 2) was

"in charge" of the project.  In a text message sent later that day, Person 2 added, "[The head of Organization 1] has kryptonite on Hillary."

d.  On or about September 18, 2016, STONE sent a text message to Person 2 that said, "I am e-mailing u a request to pass on to [the head of Organization 1]."  Person 2 responded "Ok," and added in a later text message, "[j]ust remember do not name me as your connection to [the head of Organization 1] you had one before that you referred to."

   i.  On or about the same day, September 18, 2016, STONE emailed Person 2 an article with allegations against then-candidate Clinton related to her service as Secretary of State.  STONE stated, "Please ask [the head of Organization 1] for any State or HRC e-mail from August 10 to August 30—particularly on August 20, 2011 that mention [the subject of the article] or confirm this narrative."

   ii.  On or about September 19, 2016, STONE texted Person 2 again, writing, "Pass my message . . . to [the head of Organization 1]."  Person 2 responded, "I did."  On or about September 20, 2016, Person 2 forwarded the request to a friend who was an attorney with the ability to contact the head of Organization 1.  Person 2 blind-copied STONE on the forwarded email.

e.  On or about September 30, 2016, Person 2 sent STONE via text message a photograph of Person 2 standing outside the Ecuadorian Embassy in London where the head of Organization 1 was located.

f.    On or about October 1, 2016, which was a Saturday, Person 2 sent STONE text messages that stated, "big news Wednesday . . . now pretend u don't know me . . . Hillary's campaign will die this week."  In the days preceding these messages, the press had reported that the head of Organization 1 planned to make a public announcement on or about Tuesday, October 4, 2016, which was reported to be the ten-year anniversary of the founding of Organization 1.

g.    On or about October 2, 2016, STONE emailed Person 2, with the subject line "WTF?," a link to an article reporting that Organization 1 was canceling its "highly anticipated Tuesday announcement due to security concerns."  Person 2 responded to STONE, "head fake."

h.    On or about the same day, October 2, 2016, STONE texted Person 2 and asked, "Did [the head of Organization 1] back off."  On or about October 3, 2016, Person 2 initially responded, "I can't tal[k] about it."  After further exchanges with STONE, Person 2 said, "I think it[']s on for tomorrow."  Person 2 added later that day, "Off the Record Hillary and her people are doing a full-court press they [*sic*] keep [the head of Organization 1] from making the next dump . . . That's all I can tell you on this line . . . Please leave my name out of it."

16.    In or around October 2016, STONE made statements about Organization 1's future releases, including statements similar to those that Person 2 made to him.  For example:

a.    On or about October 3, 2016, STONE wrote to a supporter involved with the Trump Campaign, "Spoke to my friend in London last night.  The payload is still coming."

b.    Also on or about October 3, 2016, STONE received an email from a reporter who had connections to a high-ranking Trump Campaign official that asked, "[the head

of Organization 1] – what's he got? Hope it's good." STONE responded in part, "It is. I'd tell [the high-ranking Trump Campaign official] but he doesn't call me back."

c.    On or about October 4, 2016, the head of Organization 1 held a press conference but did not release any new materials pertaining to the Clinton Campaign. Shortly afterwards, STONE received an email from the high-ranking Trump Campaign official asking about the status of future releases by Organization 1. STONE answered that the head of Organization 1 had a "[s]erious security concern" but that Organization 1 would release "a load every week going forward."

d.    Later that day, on or about October 4, 2016, the supporter involved with the Trump Campaign asked STONE via text message if he had "hear[d] anymore from London." STONE replied, "Yes - want to talk on a secure line - got Whatsapp?" STONE subsequently told the supporter that more material would be released and that it would be damaging to the Clinton Campaign.

17.    On or about October 7, 2016, Organization 1 released the first set of emails stolen from the Clinton Campaign chairman. Shortly after Organization 1's release, an associate of the high-ranking Trump Campaign official sent a text message to STONE that read "well done." In subsequent conversations with senior Trump Campaign officials, STONE claimed credit for having correctly predicted the October 7, 2016 release.

The Investigations

18.    In or around 2017, government officials publicly disclosed investigations into Russian interference in the 2016 U.S. presidential election and possible links to individuals associated with the campaigns.

9

a.      On or about January 13, 2017, the chairman and vice chairman of SSCI announced the committee would conduct an inquiry that would investigate, among other things, any intelligence regarding links between Russia and individuals associated with political campaigns, as well as Russian cyber activity and other "active measures" directed against the United States in connection with the 2016 election.

b.      On or about January 25, 2017, the chairman and ranking member of HPSCI announced that HPSCI had been conducting an inquiry similar to SSCI's.

c.      On or about March 20, 2017, the then-director of the FBI testified at a HPSCI hearing and publicly disclosed that the FBI was investigating Russian interference in the 2016 election and possible links and coordination between the Trump Campaign and the Russian government.

d.      By in or around August 2017, news reports stated that a federal grand jury had opened an investigation into matters relating to Russian government efforts to interfere in the 2016 election, including possible links and coordination between the Trump Campaign and the Russian government.

### STONE's False Testimony to HPSCI

19.    In or around May 2017, HPSCI sent a letter requesting that STONE voluntarily appear before the committee and produce:

> Any documents, records, electronically stored information including e-mail, communication, recordings, data and tangible things (including, but not limited to, graphs, charts, photographs, images and other documents) regardless of form, other than those widely available (e.g., newspaper articles) that reasonably could lead to the discovery of any facts within the investigation's publicly-announced parameters.

On or about May 22, 2017, STONE caused a letter to be submitted to HPSCI stating that "Mr.

Stone has no documents, records, or electronically stored information, regardless of form, other than those widely available that reasonably could lead to the discovery of any facts within the investigation's publicly-announced parameters."

20.     On or about September 26, 2017, STONE testified before HPSCI in Washington, D.C. as part of the committee's ongoing investigation.  In his opening statement, STONE stated, "These hearings are largely based on a yet unproven allegation that the Russian state is responsible for the hacking of the DNC and [the Clinton Campaign chairman] and the transfer of that information to [Organization 1]."  STONE further stated that  "[m]embers of this Committee" had made certain "assertions against me which must be rebutted here today," which included "[t]he charge that I knew in advance about, and predicted, the hacking of Clinton campaign chairman['s] email, [and] that I had advanced knowledge of the source or actual content of the [Organization 1] disclosures regarding Hillary Clinton."

21.     In the course of his HPSCI testimony, STONE made deliberately false and misleading statements to the committee concerning, among other things, his possession of documents pertinent to HPSCI's investigation; the source for his early August 2016 statements about Organization 1; requests he made for information from the head of Organization 1; his communications with his identified intermediary; and his communications with the Trump Campaign about Organization 1.

<u>STONE's False and Misleading Testimony About His Possession of Documents Pertinent to HPSCI's Investigation</u>

22.     During his HPSCI testimony, STONE was asked, "So you have no emails to anyone concerning the allegations of hacked documents . . . or any discussions you have had with third parties about [the head of Organization 1]?  You have no emails, no texts, no documents whatsoever, any kind of that nature?"  STONE falsely and misleadingly answered, "That is correct.

Not to my knowledge."

23.     In truth and in fact, STONE had sent and received numerous emails and text messages during the 2016 campaign in which he discussed Organization 1, its head, and its possession of hacked emails.  At the time of his false testimony, STONE was still in possession of many of these emails and text messages, including:

a.      The email from STONE to Person 1 on or about July 25, 2016 that read in part, "Get to [the head of Organization 1] [a]t Ecuadorian Embassy in London and get the pending [Organization 1] emails . . . they deal with Foundation, allegedly.";

b.      The email from STONE to Person 1 on or about July 31, 2016 that said an associate of Person 1 "should see [the head of Organization 1].";

c.      The email from Person 1 to STONE on or about August 2, 2016 that stated in part, "Word is friend in embassy plans 2 more dumps.  One shortly after I'm back.  2nd in Oct.  Impact planned to be very damaging.";

d.      Dozens of text messages and emails, beginning on or about August 19, 2016 and continuing through the election, between STONE and Person 2 in which they discussed Organization 1 and the head of Organization 1;

e.      The email from STONE on or about October 3, 2016 to the supporter involved with the Trump Campaign, which read in part, "Spoke to my friend in London last night.  The payload is still coming."; and

f.      The emails on or about October 4, 2016 between STONE and the high-ranking member of the Trump Campaign, including STONE's statement that Organization 1 would release "a load every week going forward."

24.     By falsely claiming that he had no emails or text messages in his possession that referred to the head of Organization 1, STONE avoided providing a basis for HPSCI to subpoena records in his possession that could have shown that other aspects of his testimony were false and misleading.

<u>STONE's False and Misleading Testimony About His Early August 2016 Statements</u>

25.     During his HPSCI testimony on or about September 26, 2017, STONE was asked to explain his statements in early August 2016 about being in contact with the head of Organization 1. STONE was specifically asked about his statement on or about August 8, 2016 that "I've actually communicated with [the head of Organization 1]," as well as his statement on or about August 12, 2016 that he was "in communication with [the head of Organization 1]" but was "not at liberty to discuss what I have."

26.     STONE responded that his public references to having a means of contacting Organization 1 referred exclusively to his contact with a journalist, who STONE described as a "go-between, as an intermediary, as a mutual friend" of the head of Organization 1. STONE stated that he asked this individual, his intermediary, "to confirm what [the head of Organization 1] ha[d] tweeted, himself, on July 21st, that he ha[d] the Clinton emails and that he [would] publish them." STONE further stated that the intermediary "was someone I knew had interviewed [the head of Organization 1]. And I merely wanted confirmation of what he had tweeted on the 21st." STONE declined to tell HPSCI the name of this "intermediary" but provided a description in his testimony that was consistent with Person 2.

27.     On or about October 13, 2017, STONE caused a letter to be submitted to HPSCI that identified Person 2 by name as the "gentleman who confirmed for Mr. Stone" that the head of Organization 1 had "'[e]mails related to Hillary Clinton which are pending publication.'"

28.     STONE's explanation of his August 2016 statements about communicating with the head of Organization 1 was false and misleading.  In truth and in fact, the first time Person 2 interviewed the head of Organization 1 was on or about August 25, 2016, after STONE made his August 8 and August 12, 2016 public statements.   Similarly, at the time STONE made his August 2016 statements, STONE had directed Person 1—not Person 2—to contact the head of Organization 1.  And Person 1—not Person 2—had told STONE in advance of STONE's August 8 and August 12, 2016 public statements that "[w]ord is friend in embassy plans 2 more dumps," including one in October.  At no time did STONE identify Person 1 to HPSCI as another individual STONE contacted to serve as a "go-between," "intermediary," or other source of information from Organization 1.  STONE also never disclosed his exchanges with Person 1 when answering HPSCI's questioning about STONE's August 8 and August 12, 2016 statements.

<u>STONE's False and Misleading Testimony About Requests He Made for Information from the Head of Organization 1</u>

29.     During his HPSCI testimony, STONE was asked, "[W]hat was the extent of the communication with [the intermediary]?"  STONE replied, "I asked him to confirm . . . that the tweet of [the head of Organization 1] of the 21st was accurate, that they did in fact have . . . Hillary Clinton emails and that they would release them."  STONE was then asked, "Did you ask [the intermediary] to communicate anything else to [the head of Organization 1]?"  STONE falsely and misleadingly responded, "I did not."  STONE was then asked, "Did you ask [the intermediary] to do anything on your own behalf?"  STONE falsely and misleadingly responded, "I did not."

30.     In truth and in fact, STONE directed both Person 1 and Person 2 to pass on requests to the head of Organization 1 for documents that STONE believed would be damaging to the Clinton Campaign.  For example:

        a.      As described above, on or about July 25, 2016, STONE sent Person 1 an email that

read, "Get to [the head of Organization 1] [a]t Ecuadorian Embassy in London and
get the pending [Organization 1] emails . . . they deal with Foundation, allegedly."

b.    On or about September 18, 2016, STONE sent a text message to Person 2 that said,
"I am e-mailing u a request to pass on to [the head of Organization 1]," and then
emailed Person 2 an article with allegations against then-candidate Clinton related
to her service as Secretary of State.  STONE added, "Please ask [the head of
Organization 1] for any State or HRC e-mail from August 10 to August 30—
particularly on August 20, 2011 that mention [the subject of the article] or confirm
this narrative."

c.    On or about September 19, 2016, STONE texted Person 2 again, writing "Pass my
message . . . to [the head of Organization 1]."  Person 2 responded, "I did," and the
next day Person 2, on an email blind-copied to STONE, forwarded the request to
an attorney who had the ability to contact the head of Organization 1.

<u>STONE's False and Misleading Testimony About Communications with His Identified
Intermediary</u>

31.    During his HPSCI testimony, STONE was asked repeatedly about his communications
with the person he identified as his intermediary.  STONE falsely and misleadingly stated that he
had never communicated with his intermediary in writing in any way.  During one exchange,
STONE falsely and misleadingly claimed only to have spoken with the intermediary
telephonically:

Q:    [H]ow did you communicate with the intermediary?

A:    Over the phone.

Q:    And did you have any other means of communicating with
the intermediary?

A:    No.

Q:    No text messages, no – none of the list, right?

> A:     No.

Later during his testimony, STONE again falsely denied ever communicating with his

intermediary in writing:

> Q:     So you never communicated with your intermediary in
>        writing in any way?
>
> A:     No.
>
> Q:     Never emailed him or texted him?
>
> A:     He's not an email guy.
>
> Q:     So all your conversations with him were in person or over
>        the phone.
>
> A:     Correct.

32.     In truth and in fact, as described above, STONE and Person 2 (who STONE identified to

HPSCI as his intermediary) engaged in frequent written communication by email and text

message.  STONE also engaged in frequent written communication by email and text message

with Person 1, who also provided STONE with information regarding Organization 1.

33.     Written communications between STONE and Person 1 and between STONE and Person 2

continued through STONE's HPSCI testimony.  Indeed, on or about September 26, 2017—the day

that STONE testified before HPSCI and denied having ever sent or received emails or text

messages from Person 2—STONE and Person 2 exchanged over thirty text messages.

34.     Certain electronic messages between STONE and Person 1 and between STONE and

Person 2 would have been material to HPSCI.  For example:

> a.      In or around July 2016, STONE emailed Person 1 to "get to" the head of
>         Organization 1 and obtain the pending emails.
>
> b.      In or around September 2016, STONE sent messages directing Person 2 to pass a
>         request to the head of Organization 1.
>
> c.      On or about January 6, 2017, Person 2 sent STONE an email that had the subject

line "Back channel bs."  In the email, Person 2 wrote, "Well I have put together

timelines[] and you [] said you have a back-channel way back a month before I had

[the head of Organization 1] on my show . . .  I have never had a conversation with

[the head of Organization 1] other than my radio show . . . I have pieced it all

together . . . so you may as well tell the truth that you had no back-channel or there's

the guy you were talking about early August."

<u>STONE's False and Misleading Testimony About Communications with the Trump Campaign</u>

35.       During his HPSCI testimony, STONE was asked, "did you discuss your conversations with

the intermediary with anyone involved in the Trump campaign?"  STONE falsely and misleadingly

answered, "I did not."  In truth and in fact, and as described above, STONE spoke to multiple

individuals involved in the Trump Campaign about what he claimed to have learned from his

intermediary to Organization 1, including the following:

a.       On multiple occasions, STONE told senior Trump Campaign officials about

materials possessed by Organization 1 and the timing of future releases.

b.       On or about October 3, 2016, STONE wrote to a supporter involved with the Trump

Campaign, "Spoke to my friend in London last night.  The payload is still coming."

c.       On or about October 4, 2016, STONE told a high-ranking Trump Campaign official

that the head of Organization 1 had a "[s]erious security concern" but would release

"a load every week going forward."

**<u>Attempts to Prevent Person 2 from Contradicting STONE's False Statements to HPSCI</u>**

36.       On or about October 19, 2017, STONE sent Person 2 an excerpt of his letter to HPSCI that

identified Person 2 as his "intermediary" to Organization 1.  STONE urged Person 2, if asked by

HPSCI, to falsely confirm what STONE had previously testified to, including that it was Person 2

who provided STONE with the basis for STONE's early August 2016 statements about contact with Organization 1.  Person 2 repeatedly told STONE that his testimony was false and told him to correct his testimony to HPSCI.  STONE did not do so.  STONE then engaged in a prolonged effort to prevent Person 2 from contradicting STONE's false statements to HPSCI.

37.     In or around November 2017, Person 2 received a request from HPSCI to testify voluntarily before the committee.  After being contacted by HPSCI, Person 2 spoke and texted repeatedly with STONE.  In these discussions, STONE sought to have Person 2 testify falsely either that Person 2 was the identified intermediary or that Person 2 could not remember what he had told STONE.  Alternatively, STONE sought to have Person 2 invoke his Fifth Amendment right against self-incrimination.  For example:

    a.    On or about November 19, 2017, in a text message to STONE, Person 2 said that his lawyer wanted to see him (Person 2).  STONE responded, "'Stonewall it.  Plead the fifth.  Anything to save the plan' . . . Richard Nixon."  On or about November 20, 2017, Person 2 informed HPSCI that he declined HPSCI's request for a voluntary interview.

    b.    On or about November 21, 2017, Person 2 texted STONE, "I was told that the house committee lawyer told my lawyer that I will be getting a subpoena."  STONE responded, "That was the point at which your lawyers should have told them you would assert your 5th Amendment rights if compelled to appear."

    c.    On or about November 28, 2017, Person 2 received a subpoena compelling his testimony before HPSCI.  Person 2 informed STONE of the subpoena.

    d.    On or about November 30, 2017, STONE asked Person 1 to write publicly about Person 2.  Person 1 responded, "Are you sure you want to make something out of

this now?  Why not wait to see what [Person 2] does.  You may be defending yourself too much—raising new questions that will fuel new inquiries.  This may be a time to say less, not more."  STONE responded by telling Person 1 that Person 2 "will take the 5th—but let's hold a day."

e.  On multiple occasions, including on or about December 1, 2017, STONE told Person 2 that Person 2 should do a "Frank Pentangeli" before HPSCI in order to avoid contradicting STONE's testimony.  Frank Pentangeli is a character in the film *The Godfather: Part II*, which both STONE and Person 2 had discussed, who testifies before a congressional committee and in that testimony claims not to know critical information that he does in fact know.

f.  On or about December 1, 2017, STONE texted Person 2, "And if you turned over anything to the FBI you're a fool."  Later that day, Person 2 texted STONE, "You need to amend your testimony before I testify on the 15th."  STONE responded, "If you testify you're a fool.  Because of tromp I could never get away with a certain [*sic*] my Fifth Amendment rights but you can.  I guarantee you you are the one who gets indicted for perjury if you're stupid enough to testify."

38.    On or about December 12, 2017, Person 2 informed HPSCI that he intended to assert his Fifth Amendment privilege against self-incrimination if required to appear by subpoena.  Person 2 invoked his Fifth Amendment privilege in part to avoid providing evidence that would show STONE's previous testimony to Congress was false.

39.    Following Person 2's invocation of his Fifth Amendment privilege not to testify before HPSCI, STONE and Person 2 continued to have discussions about the various investigations into Russian interference in the 2016 election and what information Person 2 would provide to

investigators.   During these conversations, STONE repeatedly made statements intended to prevent Person 2 from cooperating with the investigations.  For example:

a.      On or about December 24, 2017, Person 2 texted STONE, "I met [the head of Organization 1] for f[i]rst time this yea[r] sept 7 . . . docs prove that. . . .  You should be honest w fbi . . . there was no back channel . . . be honest."  STONE replied approximately two minutes later, "I'm not talking to the FBI and if your smart you won't either."

b.      On or about April 9, 2018, STONE wrote in an email to Person 2, "You are a rat. A stoolie.  You backstab your friends-run your mouth my lawyers are dying Rip you to shreds."  STONE also said he would "take that dog away from you," referring to Person 2's dog.  On or about the same day, STONE wrote to Person 2, "I am so ready.  Let's get it on.  Prepare to die [expletive]."

c.      On or about May 21, 2018, Person 2 wrote in an email to STONE, "You should have just been honest with the house Intel committee . . . you've opened yourself up to perjury charges like an idiot."  STONE responded, "You are so full of [expletive].  You got nothing.  Keep running your mouth and I'll file a bar complaint against your friend [the attorney who had the ability to contact the head of Organization 1]."

## COUNT ONE
### (Obstruction of Proceeding)

40.     Paragraphs 1 through 39 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

41.     From in or around May 2017 through at least December 2017, within the District of Columbia and elsewhere, the defendant ROGER JASON STONE, JR., corruptly influenced, obstructed, impeded, and endeavored to influence, obstruct, and impede the due and proper exercise of the power of inquiry under which any inquiry and investigation is being had by either House, and any committee of either House and any joint committee of the Congress, to wit: STONE testified falsely and misleadingly at a HPSCI hearing in or around September 2017; STONE failed to turn over and lied about the existence of responsive records to HPSCI's requests about documents; STONE submitted and caused to be submitted a letter to HPSCI falsely and misleadingly describing communications with Person 2; and STONE attempted to have Person 2 testify falsely before HPSCI or prevent him from testifying.

All in violation of Title 18, United States Code, Sections 1505 and 2.

## COUNTS TWO THROUGH SIX
### (False Statements)

42.     Paragraphs 1 through 39 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

43.     On or about September 26, 2017, within the District of Columbia and elsewhere, in a matter within the jurisdiction of the legislative branch of the Government of the United States, the defendant ROGER JASON STONE, JR., knowingly and willfully made and caused to be made materially false, fictitious, and fraudulent statements and representations, to wit:

| Count | False Statement |
|:---:|:---|
| 2 | STONE testified falsely that he did not have emails with third parties about the head of Organization 1, and that he did not have any documents, emails, or text messages that refer to the head of Organization 1. |
| 3 | STONE testified falsely that his August 2016 references to being in contact with the head of Organization 1 were references to communications with a single "go-between," "mutual friend," and "intermediary," who STONE identified as Person 2. |
| 4 | STONE testified falsely that he did not ask the person he referred to as his "go-between," "mutual friend," and "intermediary," to communicate anything to the head of Organization 1 and did not ask the intermediary to do anything on STONE's behalf. |
| 5 | STONE testified falsely that he and the person he referred to as his "go-between," "mutual friend," and "intermediary" did not communicate via text message or email about Organization 1. |
| 6 | STONE testified falsely that he had never discussed his conversations with the person he referred to as his "go-between," "mutual |

| Count | False Statement |
|-------|-----------------|
|       | friend," and "intermediary" with anyone involved in the Trump Campaign. |

All in violation of Title 18, United States Code, Sections 1001(a)(2) and 2.

## COUNT SEVEN
### (Witness Tampering)

44.    Paragraphs 1 through 39 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

45.    Between in or around September 2017 and present, within the District of Columbia and elsewhere, the defendant ROGER JASON STONE, JR., knowingly and intentionally corruptly persuaded and attempted to corruptly persuade another person, to wit: Person 2, with intent to influence, delay, and prevent the testimony of any person in an official proceeding.

All in violation of Title 18, United States Code, Section 1512(b)(1).


_____
Robert S. Mueller, III
Special Counsel
U.S. Department of Justice


A TRUE BILL:


_____
Foreperson

Date: January 24, 2019

EXHIBIT 2

# About Larry Klayman

Larry Klayman, founder of Judicial Watch and Freedom Watch, is known for his strong public interest advocacy in furtherance of ethics in government and individual freedoms and liberties. During his tenure at Judicial Watch, he obtained a court ruling that Bill Clinton committed a crime, the first lawyer ever to have done so against an American president. Larry became so famous for fighting corruption in the government and the legal profession that the NBC hit drama series "West Wing" created a character after him: [Harry Klaypool of Freedom Watch](). His character was played by actor John Diehl.

In 2004, Larry ran for the U.S. Senate as a Republican in Florida's primary. After the race ended, he founded Freedom Watch.

Larry graduated from Duke University with honors in political science and French literature. Later, he received a law degree from Emory University. During the administration of President Ronald Reagan, Larry was a Justice Department prosecutor and was on the trial team that succeeded in breaking up the telephone monopoly of AT&T, thereby creating competition in the telecommunications industry.

Between Duke and Emory, Larry worked for U.S. Senator Richard Schweiker (R-Pa.) during the Watergate era. He has also studied abroad and was a stagiaire for the Commission of the European Union in its Competition Directorate in Brussels, Belgium. During law school, Larry also worked for the U.S. International Trade Commission in Washington, D.C.

Larry speaks four languages—English, French, Italian, and Spanish—and is an international lawyer, among his many areas of legal expertise and practice.

The author of two books, *Fatal Neglect* and *Whores: Why and How I Came to Fight the Establishment,* Larry has a third book in the works dealing with the breakdown of our political and legal systems. His current book, *Whores,* is on now sale at WND.com, Amazon.com, BarnesandNoble.com, Borders.com, and all major stores and booksellers.

Larry is a frequent commentator on television and radio, as well as a weekly columnist, on Friday, for WND.com. He also writes a regular blog for Newsmax called "Klayman's Court."

Larry has been credited as being the inspiration for the Tea Party movement. (See "[Larry Klayman - The One Man TEA Party]()," by Dr. Richard Swier, http://fwusa.org/KFA)



**Support the work of Freedom Watch at [www.FreedomWatchUSA.org](http://www.FreedomWatchUSA.org)**

**CIVIL COVER SHEET**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)* <mark>NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.</mark>

## I. (a) PLAINTIFFS

## DEFENDANTS

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Attorneys *(If Known)*

**(d)** Check County Where Action Arose: ☐ MIAMI- DADE ☐ MONROE ☐ BROWARD ☐ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE ☐ HIGHLANDS

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question *(U.S. Government Not a Party)*

☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729 (a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 835 Patent – Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Mgmt. Relations | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Med. Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| | | | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | **Other:** | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 530 General | | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| | | ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee – Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☐ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Re-filed *(See VI below)*
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district *(specify)*
☐ 6 Multidistrict Litigation Transfer
☐ 7 Appeal to District Judge from Magistrate Judgment
☐ 8 Multidistrict Litigation – Direct File
☐ 9 Remanded from Appellate Court

## VI. RELATED/ RE-FILED CASE(S)

(See instructions): a) Re-filed Case ☐ YES ☐ NO   b) Related Cases ☐ YES ☐ NO

JUDGE: _____ DOCKET NUMBER: _____

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause *(Do not cite jurisdictional statutes unless diversity)*

LENGTH OF TRIAL via _____ days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS A **CLASS ACTION** UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint:

JURY DEMAND: ☐ Yes ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

DATE

SIGNATURE OF ATTORNEY OF RECORD

*/s/* Larry Klayman

FOR OFFICE USE ONLY
RECEIPT # _____ AMOUNT _____ IFP _____ JUDGE _____ MAG JUDGE _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

**I.**     (a) **Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations.  If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence.  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing.  In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing.  (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys.  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**     **Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes.  If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.
United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States.  In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.  Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked.  (See Section III below; federal question actions take precedence over diversity cases.)

**III.**     **Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

**IV.**     **Nature of Suit.**  Nature of Suit. Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.**     **Origin**.  Place an "X" in one of the seven boxes.

Original Proceedings.  (1) Cases which originate in the United States district courts.

Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.  When the petition for removal is granted, check this box.

Refiled (3) Attach copy of Order for Dismissal of Previous case. Also complete VI.

Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.

Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.  When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment.  (7) Check this box for an appeal from a magistrate judge's decision.

Remanded from Appellate Court. (8) Check this box if remanded from Appellate Court.

**VI.**     **Related/Refiled Cases**.  This section of the JS 44 is used to reference related pending cases or re-filed cases. Insert the docket numbers and the corresponding judges name for such cases.

**VII.**     **Cause of Action**.  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity**. Example: U.S. Civil Statute: 47 USC 553
           Brief Description: Unauthorized reception of cable service

**VIII.**     **Requested in Complaint**.  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand.  In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

**Date and Attorney Signature**.  Date and sign the civil cover sheet.

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

_____ District of _____

|  |  |  |
|---|---|---|
|  | ) |  |
|  | ) |  |
|  | ) |  |
| _____ | ) |  |
| *Plaintiff(s)* | ) |  |
| v. | ) | Civil Action No. |
|  | ) |  |
|  | ) |  |
|  | ) |  |
| _____ | ) |  |
| *Defendant(s)* | ) |  |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____                    _____
                                                                        *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

### PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*

_____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

# UNITED STATES DISTRICT COURT

for the

_____ District of _____

| | ) | |
|---|---|---|
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |
| *Plaintiff(s)* | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |
| *Defendant(s)* | ) | |

**SUMMONS IN A CIVIL ACTION**

To: *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____
                                                                   *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*
_____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____          _____
                               *Server's signature*

                               _____
                               *Printed name and title*

                               _____
                               *Server's address*

Additional information regarding attempted service, etc:

# UNITED STATES DISTRICT COURT

for the

_____ District of _____

<table>
<tr><td></td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>_____<br>*Plaintiff(s)*</td><td>)</td><td></td></tr>
<tr><td>v.</td><td>)</td><td>Civil Action No.</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>_____<br>*Defendant(s)*</td><td>)</td><td></td></tr>
</table>

**SUMMONS IN A CIVIL ACTION**

To: *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____
                                                    *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

### PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

&#10065; I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

&#10065; I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

&#10065; I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

&#10065; I returned the summons unexecuted because _____ ; or

&#10065; Other *(specify):*
.

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the

_____ District of _____

|  |  |
|---|---|
| ) | |
| ) | |
| ) | |
| ) | |
| _____ ) | |
| *Plaintiff(s)* ) | Civil Action No. |
| v. ) | |
| ) | |
| ) | |
| ) | |
| _____ ) | |
| *Defendant(s)* ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____
                                                          *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*

_____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the

_____ District of _____

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |
| *Plaintiff(s)* | ) | Civil Action No. |
| v. | ) | |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |
| *Defendant(s)* | ) | |

### SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____     _____

*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*

_____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____            _____
                                         *Server's signature*

                                         _____
                                         *Printed name and title*

                                         _____
                                         *Server's address*

Additional information regarding attempted service, etc:

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 20-80614-CIV-ALTMAN

**LARRY KLAYMAN**,

     *Plaintiff*,

v.

**INFOWARS, LLC,** *et al.*,

     *Defendants*.

_____/

### <u>ORDER REQUIRING MORE DEFINITE STATEMENT</u>

Larry Klayman was upset when Roger Stone called him "incompetent" on national television. *See* Complaint [ECF No. 1] ¶ 44. So, he filed this Complaint—which, when attachments are included—is 46 pages long. *See id.* at 1–46.

In the Complaint, Klayman asserts five causes of actions against five Defendants. Somewhat surprisingly—given the allegations—none of the Defendants is named Roger Stone. Instead, Klayman has sued: Infowars, LLC; Free Speech Systems, LLC; Alex Jones; David Jones; and Owen Shroyer. *See id.* at 1. Against these Defendants, Klayman levies (1) three counts relating to Mr. Stone's allegedly defamatory statements; (2) one count of Unfair Competition under the Lanham Act; and (3) one count of Unfair and Deceptive Trade Practices under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). *See generally id.* at 1–21.

The Complaint, however, is a shotgun pleading. It is, in the words of the Eleventh Circuit, "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action." *Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1322 (11th Cir. 2015); *see also* FED. R. CIV. P. 8(a) ("A pleading that states a claim for relief must contain . . . a *short and plain* statement of the claim showing that the pleader is entitled to relief."

(emphasis added)).

To give some notable examples, Klayman avers that "Defendant Alex Jones is a well-known extreme and totally discredited 'conspiracy theorist' and media personality." *Id.* ¶ 6. He goes on to inform the Court that the "Sandy Hook families had to endure years of abuse and torture from Defendants before finally filing suit against numerous parties." *Id.* ¶ 17. "Furthermore," he continues, "Defendant Alex Jones in concert with the other Defendants propagated and promoted the 'Pizzagate' conspiracy on his show." *Id.* ¶ 19. These statements are wholly irrelevant to the Complaint's causes of action and serve none of its stated purposes: The Sandy Hook tragedy, for instance, plays no part in the Plaintiff's claims, and Defendant Jones' status as a conspiracy theorist—true or not—is similarly immaterial.

Of course, if these deficiencies plagued only one or two sentences in an otherwise-compliant complaint, the Court might look the other way. But the *whole* Complaint is littered with ostentatious irrelevancy. Take, for example, paragraph 27, which reads as follows:

> 27.     Stone likes to portray himself as Mafia, and indeed on information and belief has Mafia connections, frequently making reference to Mafia figures who he admires, as well as other unsavory types who have been alleged to have engaged in unethical and/or illegal behavior. For example, he frequently makes reference to his heroes being Hyman Roth in the 'Godfather," who was the movie version of Meyer Lansky, and Roy Cohn, not to mention, Richard Nixon, for his role in Watergate. In this regard, after Stone was indicted he held a press conference on the courthouse steps of the federal courthouse in Ft. Lauderdale, where he was booked, with his arms defiantly in the air in the "victory' pose used by Nixon after he resigned in disgrace as a result of the Watergate scandal. At the time, Stone had been employed by a Nixon group called CREEP, or the Committee to Reelect the President. Defendant Stone even has a large tattoo of Richard Nixon affixed to his back. Thus, given his admiration for persons such as these, particularly Mafia figures, his actions as pled herein can be taken as threats, as well as being defamatory. And, Plaintiff Corsi is 72 years old and thus very vulnerable emotionally and physically to these threats. Stone's intentional infliction of emotional distress and coercion and threats are intended to try even cause Plaintiff Corsi to have heart attacks and strokes, in order that Plaintiff will be unable to testify at Stone's criminal trial. Tellingly, Stone threatened kill a material witness and his service dog, Credico, Person 2 in the Mueller Indictment, "Mafia style."

Stone also fashions himself and indeed has the reputation, at a minimum, as being the preeminent "dirty trickster." See "Get Me Roger Stone" on Netflix.

Compl. ¶ 27 (grammatical errors in original).

In just one paragraph, Klayman manages to reference the Mafia, Hyman Roth, Meyer Lansky, Roy Cohn, Richard Nixon, the Watergate Scandal, a "group called CREEP," a "large tattoo of Richard Nixon," an emotional support animal, an internet streaming service, a documentary, and the Mueller Indictment—not to mention several serious allegations of witness tampering and intimidation. *Id.* ¶ 27. This paragraph plainly violates FED. R. CIV. P. 10(b), which requires that "[a] party . . . state its claims or defenses in numbered paragraphs, each limited as far as practicable to *a single set of circumstances*." (emphasis added).

But the problem lies, not so much in the sheer number or variety of allegations—though these are, in themselves, problematic. The problem is, rather, that the Defendants cannot properly answer this paragraph with a simple "Admitted," "Denied," or "I don't know"—as FED. R. CIV. P. 8(b) requires them to do. After all, some of these "facts" are true, others may not be, some are factual averments, others are legal conclusions, and many more may be the kinds of things the Defendants know nothing about—all within a single paragraph.

Again, it would be one thing if paragraph 27 were unique in this respect. But the entire Complaint is similarly deficient. So, for instance, whole pages of the Complaint are dedicated to Roger Stone's pending criminal prosecution. *See generally* Compl. at 6–8. In fact, the Plaintiff attaches to the Complaint a copy of the indictment against Mr. Stone—this, despite the fact that Mr. Stone is not a party to this case. *See id.* at 21. Either way, the pending criminal prosecution against Mr. Stone is wholly irrelevant to the Plaintiff's defamation claims.

The Plaintiff's decision to include a count of Unfair Competition under the Lanham Act

warrants separate discussion. *See* Compl. at 16–18. To have standing[1] to bring a claim under the Lanham Act, the Plaintiff's injuries must fall within the "zone of interests" the statute was intended to protect. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014) ("The zone-of-interests test is therefore an appropriate tool for determining who may invoke the cause of action in § 1125(a)."). Identifying those interests "requires no guesswork, since the Act includes an 'unusual, and extraordinarily helpful,' detailed statement of the statute's purposes." *Id.* at 131 (citation omitted). Those "purposes" are set out in 15 U.S.C. § 1127, which provides:

> The intent of this chapter is to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce; to protect registered marks used in such commerce from interference by State, or territorial legislation; to protect persons engaged in such commerce against unfair competition; to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks; and to provide rights and remedies stipulated by treaties and conventions respecting trademarks, trade names, and unfair competition entered into between the United States and foreign nations.

The Plaintiff's alleged injury appears to lie *well* outside the zone of these interests. He alleges no use of a "mark," mentions no "unfair competition," claims no "counterfeiting," and does not reference any international commerce. Instead, he brings a Lanham Act claim as an attorney whose reputation was (allegedly) harmed when a television personality (apparently) expressed a negative opinion of him. *See* Compl. ¶ 77 ("Defendants have made false and/or misleading statements that have deceived and/or had the tendency to deceive a substantial segment of the receiving audience."). Because this injury does not plausibly fall within the purview of the Lanham Act's "zone of interests," its inclusion in the Complaint is purely "conclusory."

---

[1] It is the Court's responsibility to "zealously insure that jurisdiction exists over a case." *Smith v. GTE Corp.*, 236 F.3d 1292, 1299 (11th Cir. 2001).

At its core, the Plaintiff's claim is straightforward: he was injured, he says, when a television personality defamed him on a national television program. Rather than plead *these* simple facts, however, the Plaintiff has delved deeply into the Defendants' personal histories in a way that untethers most of his factual allegations from the Complaint's causes of action. This type of shotgun pleading is inappropriate in federal court. *See, e.g.*, *Weiland*, 792 F.3d at 1323 ("The unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests.").

Nevertheless, the Eleventh Circuit has warned that a "district court abuses its discretion when it dismisses an action *sua sponte* without providing the plaintiff with notice of its intent to dismiss or an opportunity to respond, unless amendment would be futile or the complaint is patently frivolous." *Brinson v. Welsh*, 709 F. App'x 582, 584 (11th Cir. 2017) (citing *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1248 (11th Cir. 2015) (cleaned up)). And this Court is not prepared (at least not yet) to say that the Complaint is "patently frivolous"—and so, it will not be dismissed.

Fortunately, though, the Eleventh Circuit has approved of a less-drastic remedy in these circumstances: When faced with a shotgun pleading, the Circuit has said, district courts should *sua sponte* require the plaintiff to amend his complaint *before* the defendant wastes resources responding to a pleading that patently violates the Federal Rules of Civil Procedure. *See, e.g.*, *Ferrell v. Durbin*, 311 F. App'x 253, 259 n.8 (11th Cir. 2009) ("When presented with a shotgun complaint, the district court should order repleading *sua sponte*."); *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 984 (11th Cir. 2008) ("In light of defense counsel's failure to request a repleader, the court, acting sua sponte, should have [required a more definite statement]."

5

(cleaned up)); *Anderson v. Dist. Bd. of Trustees of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 367 n.5 (11th Cir. 1996) ("On examining those pleadings, the court, acting *sua sponte,* should have struck the plaintiff's complaint, and the defendants' answer, and instructed plaintiff's counsel to file a more definite statement."); *see also Paylor v. Hartford Fire Ins. Co.*, 748 F.3d 1117, 1127 (11th Cir. 2014) ("[W]hy should parties wait until discovery to identify, with precision, the subject of the litigation? That is exactly backward. Civil pleadings are supposed to mark the boundaries for discovery; discovery is not supposed to substitute for definite pleading."); *Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1279 (11th Cir. 2006) ("[Shotgun] pleadings divert already stretched judicial resources into disputes that are not structurally prepared to use those resources efficiently."); *Byrne v. Nezhat*, 261 F.3d 1075, 1130 (11th Cir. 2001) ("[S]hotgun pleadings wreak havoc on the judicial system.").

This Court will follow that admonition here and require the Plaintiff to amend his Complaint *before* any response is filed.

Accordingly, the Court hereby

**ORDERS** as follows:

1. The Plaintiff shall, by **April 23, 2020,** file an Amended Complaint that complies with the Eleventh Circuit's holding in *Weiland*, the Federal Rules of Civil Procedure, and this Order. In particular, the Plaintiff shall remove all references to irrelevant, conclusory, and scandalous material.

2. The Plaintiff shall then serve a copy of the Amended Complaint, together with this Order, on each of the Defendants.

3. If the Plaintiff chooses to include his Lanham Act claim in his Amended Complaint, he must **SHOW CAUSE**, by **April 27, 2020**, that he has standing to pursue that claim.

4. Failure to comply with this Order will result in dismissal without prejudice and without further notice.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 13th day of April 2020.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:    counsel of record

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

LARRY KLAYMAN

        Plaintiff

     v.

INFOWARS, LLC, *et al*

        Defendants.

**Case Number:   20-cv-80614**

## PLAINTIFF LARRY KLAYMAN'S NOTICE OF VOLUNTARY DISMISSAL

Plaintiff Larry Klayman ("Plaintiff Klayman") hereby voluntarily dismisses the above-referenced matter pursuant to Federal Rules of Civil Procedure 41(a)(1)(A)(i), without prejudice, as there appears, based upon the order of this Court show cause order on today's date, and prior orders with regard to the undersigned counsel's client Laura Loomer in *Loomer v. New York Media, LLC et al*, 9:19-cv-81555 that this Court cannot be an impartial arbiter.

Dated: April 14, 2020

Respectfully Submitted,

   */s/ Larry Klayman*
Larry Klayman, Esq.
KLAYMAN LAW GROUP, P.A.
7050 W. Palmetto Park Road
Boca Raton FL 33433
Telephone:  (561_558-5336
Email: leklayman@gmail.com

*Plaintiff Pro Se*

1

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 20-80614-CIV-ALTMAN

**LARRY KLAYMAN**,

    *Plaintiff*,

v.

**INFOWARS, LLC,** *et al.*,

    *Defendants*.

_____/

### ORDER OF DISMISSAL

**THIS MATTER** is before the Court on the Plaintiff's Notice of Voluntary Dismissal [ECF No. 4]. Being fully advised, the Court hereby

**ORDERS** that this action is **DISMISSED without prejudice**. The Clerk of Court is directed to **CLOSE** this case. All pending motions are **DENIED as moot**. All pending hearings and deadlines are **TERMINATED**.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 14th day of April 2020.

_____

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:    counsel of record

Case 1:06-cv-01498-RWR Document 101 Filed 04/13/2014 Page 2 of 2

2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

LARRY KLAYMAN

               Plaintiff

       v.

INFOWARS, LLC, *et al*

               Defendants.

**Case Number:   20-cv-80614**

<u>**PLAINTIFF LARRY KLAYMAN'S REQUEST FOR DISCLOSURE**</u>

    In light of and reflection upon the tenor and substance of the Court's order of April 14, 2020, which begins by misleadingly and gratuitously reducing Plaintiff's claims to "Larry Klayman was upset when Roger Stone called him "incompetent" on national television," which is inaccurate, condescending, disrespectful and disparaging, Plaintiff requests immediate disclosure as to whether court knows Roger Stone and/or was recommended to President Donald J. Trump by Roger Stone for a seat on the federal bench.

    Plaintiff respectfully requests a response by C.O.B. tomorrow, April 16, 2020. The Court's order of April 14, 2020, gratuitously issued before even the subject complaint was served and Defendants were able to plead, creates, at a minimum, this appearance, as the Court has taken on the role as an advocate for Roger Stone and the Defendants, all of whom published in this district, nationally and internationally, false factual statements, which severely harmed and damaged Plaintiff Klayman.

    The failure to respond timely will be taken as an admission that the Court does know Roger Stone and/or was recommended by Roger Stone for a seat on the federal bench to President Donald J. Trump.

1

Dated: April 15, 2020                                                    Respectfully Submitted,

                                                       _____*/s/ Larry Klayman*_____
                                                       Larry Klayman, Esq.
                                                       KLAYMAN LAW GROUP, P.A.
                                                     7050 W. Palmetto Park Road
                                                     Boca Raton FL 33433
                                                     Telephone:  (561_558-5336
                                                     Email: leklayman@gmail.com

                                                     *Plaintiff Pro Se*

EXHIBIT C

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF TEXAS
 2                      AUSTIN DIVISION

 3  JEROME CORSI, LARRY KLAYMAN,        ) AU:20-CV-00298-LY
                                        )
 4     Plaintiffs,                      )
                                        )
 5  v.                                  ) AUSTIN, TEXAS
                                        )
 6  INFOWARS, LLC,                      )
    FREE SPEECH SYSTEMS, LLC,           )
 7  ALEX E. JONES, DAVID JONES,         )
    OWEN SHROYER, ROGER STONE,          )
 8                                      )
       Defendants.                      ) MARCH 23, 2021
 9
              *********************************************
10                  TRANSCRIPT OF MOTIONS HEARING
                  BEFORE THE HONORABLE ANDREW AUSTIN
11            *********************************************

12  APPEARANCES:

13  FOR THE PLAINTIFFS:  LARRY KLAYMAN
                         KLAYMAN LAW GROUP P.A.
14                       2020 PENNSYLVANIA AVENUE NW #800
                         WASHINGTON, D.C. 20006
15
                         SANJAY BISWAS
16                       SANJAY BISWAS ATTORNEY AT LAW PC
                         11720 DUXBURY DRIVE
17                       FRISCO, TEXAS 75035

18  FOR THE DEFENDANTS:  JAY MARSHALL WOLMAN
                         RANDAZZA LEGAL GROUP, PLLC
19                       100 PEARL STREET, 14TH FLOOR
                         HARTFORD, CONNECTICUT 06103
20
                         BRADLEY JORDAN REEVES
21                       REEVES LAW, PLLC
                         702 RIO GRANDE ST., SUITE 203
22                       AUSTIN, TEXAS 78701

23                       MARC J. RANDAZZA
                         RANDAZZA LEGAL GROUP, PLLC
24                       2764 LAKE SAHARA DRIVE, SUITE 109
                         LAS VEGAS, NEVADA 89117
25
```

```
 1                         DAVID SCOTT WACHEN
                           WACHEN LLC
 2                         11605 MONTAGUE COURT
                           POTOMAC, MARYLAND 20854
 3
                           GREGORY P. SAPIRE
 4                         SOLTERO SAPIRE MURRELL PLLC
                           7320 NORTH MOPAC EXPRESSWAY, SUITE 309
 5                         AUSTIN, TEXAS 78731-2311

 6                         ROBERT C. BUSCHEL
                           BUSCHEL GIBBONS, P.A.
 7                         501 E LAS OLAS BOULEVARD, SUITE 304
                           FORT LAUDERDALE, FLORIDA 33301-2881
 8
     COURT REPORTER:       ARLINDA RODRIGUEZ, CSR
 9                         501 WEST 5TH STREET, SUITE 4152
                           AUSTIN, TEXAS 78701
10                         (512) 391-8791

11

12

13

14

15

16

17

18

19

20

21

22

23

24  Proceedings recorded by electronic sound recording, transcript

25  produced by computer.
```

1          (Proceedings at began 3:00 p.m.)

2              THE CLERK:  The Court calls the following case for a

3   hearing on the Motions to Stay Discovery: 20-CV-298, *Corsi v.*

4   *Infowars*.

5              THE COURT:  Good afternoon, gentlemen.

6              If I could have all the counsel who are going to be

7   appearing on behalf of anyone, just introduce themselves and

8   state who they're representing.  And let's start with the

9   plaintiffs.  Mr. Klayman?

10             MR. KLAYMAN:  Larry Klayman, appearing pro se,

11  Your Honor.

12             MR. BUSCHEL:  Robert Buschel on behalf of Roger

13  Stone.

14             THE COURT:  One second, Mr. Buschel.

15             Mr. Biswas?

16             MR. BISWAS:  Sunjay Biswas on behalf of Mr. Corsi.

17             MR. BUSCHEL:  Robert Buschel on behalf of

18  Roger Stone.

19             MR. RANDAZZA:  Marc Randazza on behalf of Infowars

20  LLC, Free Speech Systems, LLC, Alex Jones, and Owen Shroyer.

21             THE COURT:  Good afternoon.

22             MR. WACHEN:  David Wachen on behalf of

23  Dr. David Jones.

24             MR. WOLMAN:  Good afternoon, Your Honor.  Jay Wolman

25  also on behalf of Infowars, Free Speech Systems, Alex Jones,

1  and Owen Shroyer.

2          MR. REEVES:  Your Honor, Brad Reeves.  I am local

3  counsel with Mr. Wolman and Mr. Randazza for those four

4  defendants.

5          MR. SAPIRE:  And this is Greg Sapire, local counsel,

6  with David Wachen for David Jones.

7          THE COURT:  Thank you.

8          As I indicated -- as Mr. Cheng indicated, we're here

9  just on the motions to stay discovery.

10          I have kept myself familiar with all of the other

11  pending motions.  I have, before today, reviewed all of those

12  motions to dismiss as well and am up to speed on that.

13          I also am aware that they've been pending a long

14  time.  This pandemic hasn't helped us catch up on our docket.

15  But the motion is -- the motions were filed by the defendants,

16  so I'll let you-all -- and I've read through all of that as

17  well, so you don't need to rehash things.  But I'll let the

18  movants address first, if you want to make any summary of your

19  argument or add anything with regard to that.

20          I don't know if Mr. Randazza, Mr. Wachen, who wants

21  to take the lead here?

22          MR. RANDAZZA:  Your Honor, I'll be happy to, and I'll

23  be brief.

24          You know, in any case, I think that the plaintiffs

25  should have to show at least some minimal merit before dragging

1   the defendants through expensive and time-consuming discovery.

2   But this is especially so when it is a case involving

3   First Amendment rights.  And it's compounded further when it's

4   a case like this, where we have the same -- essentially the

5   same case filed again and again in different courts after

6   different court trying to seek a different result, and,

7   frankly, for an improper purpose.  This seems to be a case more

8   about fundraising for an organization than to address any

9   actual grievances that are properly before the court.

10          Now, I don't want to jump right into the motions to

11  dismiss, although, if Your Honor would like to do that, we can.

12  But it's really they're -- they're somewhat difficult to

13  disambiguate from each other.

14          We have some defendants --

15          THE COURT:  And let me jump in.  Sorry.

16          MR. RANDAZZA:  Certainly.

17          THE COURT:  It's a lot harder to do this on Zoom than

18  it would be in a courtroom.

19          But I -- I am usually loath to stay things when

20  there's a pending 12(b)(6) motion, but I make exceptions when

21  it appears that there's a reasonable chance that that motion

22  will dispose of the case or there's a good chance of that.

23          And I will agree with you from what you've said about

24  this case being filed in multiple places and having looked at

25  those judges' orders and then having read all the motions to

 1  dismiss and responses here that I think this may well be that

 2  exceptional case where that is appropriate.

 3          I'm not impressed by the merits of the case at this

 4  point, having reviewed everything.

 5          MR. KLAYMAN:  May I address that, Your Honor?  It's

 6  Mr. Klayman.

 7          THE COURT:  You'll get to -- you'll get your

 8  opportunity, Mr. Klayman.  Let me hear from the movants.

 9          MR. RANDAZZA:  Well, then I'll pass the baton to the

10  other defendants if you like, or whoever you'd like to hear

11  from, Your Honor.

12          THE COURT:  Mr. Wachen?

13          MR. WACHEN:  Yes, Your Honor.  Thank you.

14          You know, just to summarize real quickly with respect

15  to my client, Dr. Jones, he's like the James Stockdale of this

16  case, saying "Why am I here?"

17          As the judge in D.C. said before he transferred the

18  case to this court, the plaintiffs make no allegations about

19  David Jones's conduct at all.  And so, if there is ever a

20  situation where a party who doesn't belong in a case, who's not

21  alleged to have done anything wrong, and shouldn't have to bear

22  the burden of discovery when he's had a motion to dismiss

23  pending for close to two years, I think this is that situation.

24          And, you know, as we cite in our papers a court --

25  the courts in this district have said that it's important to

1  balance the harm from delay against the possibility of a motion

2  being granted and eliminating the need for discovery.  And this

3  is such a situation.

4        The plaintiffs, frankly, haven't prosecuted the case

5  since we filed the motion.  They haven't pursued discovery.

6  They didn't conduct a 26(f) conference.  They didn't serve

7  initial disclosures.  They didn't do some of the things that

8  are required in the scheduling order.

9        And it was really only at the eleventh hour where we

10  heard that they wanted to conduct these depositions as the --

11  the deadline and the scheduling order was about to approach.

12  In fact, Mr. Klayman said nine months ago that he wanted to

13  depose Dr. Jones, but he never got around to it until February.

14        So, you know, this -- we think this is highly

15  meritorious, especially with respect to Dr. Jones, who hasn't

16  been alleged to have done anything wrong.  And, therefore, you

17  know, there's really no harm at this point that I can discern

18  from having to wait until the motions are decided.

19        If some of the case survives, then there will be

20  opportunity for the plaintiffs to conduct discovery.  But it

21  has no bearing on the motions, and at this point we think, you

22  know, other parts of the scheduling order are going to have to

23  be adjusted as well.  Dispositive motions are due on April 1st.

24  Obviously, we can't -- we haven't even got past 12(b)(6), so we

25  can't even move for summary judgment yet.  Answers haven't even

8

```
 1   been even been filed in the case.
 2           So it just seems like this is an appropriate
 3   situation for -- for a stay of discovery, until we find out
 4   whether the case is going to go any further.
 5           Thank you, Your Honor.
 6           THE COURT:  Thank you.
 7           Mr. Klayman?
 8           MR. KLAYMAN:  Yes, Your Honor.  First of all, in all
 9   due respect, Your Honor, there has been no finding by any court
10   with regard to the allegations of this complaint.  If
11   Your Honor has the time -- I know you've been busy and it's
12   COVID-19 -- but go back.  The allegations of this complaint are
13   about defamation, not just with regard to me, but Jerry Corsi,
14   Lanham Act violations, intentional infliction of emotional
15   distress.  There's no collateral estoppel.  There's no
16   res judicata from any court.
17           THE COURT:  And I agree.  I'm not suggesting that.
18   But -- but I think you -- it's hard to read those two orders
19   and think that they -- they thought that this was a very strong
20   case.
21           Obviously, the sua sponte order entered in Florida
22   was done because that judge, at least, did not think there was
23   enough pled there to demonstrate that it overcame problems that
24   he saw with it.
25           MR. KLAYMAN:  Your Honor --
```

1          THE COURT:  We're not bound by those courts, nor --

2          MR. KLAYMAN:  I have a -- I have a complaint pending

3  against that judge, Roy Altman, with the Judicial Council.

4  Okay.  He overstepped his bounds.

5          THE COURT:  Good luck.

6          MR. KLAYMAN:  He probably knows -- yeah.  I know

7  "good luck."  Judges usually just avoid them.  Okay?  I'm being

8  kind.  We have to answer as lawyers, but judges don't have to

9  answer generally.

10          But the question is that this -- there was no

11  *res judicata*.  He issued that order before there was even a

12  response by the other side, before I had a chance to file

13  anything, and he characterized these allegations, which are

14  very --

15          THE COURT:  Let me stop you, please.  Let me stop

16  you.  Let's focus on this case and not those.

17          I'm -- as I said, I'm not bound by those, and I'm

18  not -- you know, I'm not going -- it's not going to make a

19  difference in my opinion on the merits of that motion.  So

20  let's focus on --

21          MR. KLAYMAN:  All right.  I'm glad to hear that,

22  Your Honor.  Secondly --

23          THE COURT:  So let's focus on whether discovery

24  should go forward in this case.

25          MR. KLAYMAN:  Yeah.  This has been mischaracterized.

 1   Number one, all I asked for were depositions.  I didn't even

 2   ask for documentation.  Very simple, I want to get them under

 3   oath.

 4          Secondly, with regard to Dr. Jones, we have an

 5   affidavit from Alex Jones's former wife, Kelly Morales,

 6   formerly Kelly Jones, which ties Dr. Jones to the operations

 7   and directions and running Infowars.  So that was an incorrect

 8   statement.  Your Honor should take a look at that sworn

 9   declaration, and the complaint makes it clear --

10          THE COURT:  I've read it.

11          MR. KLAYMAN:  -- that Dr. Jones is in fact

12   operationally in charge of Infowars.

13          Next, with regard to the fact that I wanted to depose

14   them, they just admitted that they were on notice I wanted to

15   depose them.  I noticed them before the deadline was due.  They

16   noticed no discovery.  I made it clear that I could change the

17   dates, but that wasn't good enough for them.

18          Instead, they waited seven months after they filed

19   their motions to dismiss to move to stay.  Why didn't they file

20   it earlier?  They just don't want to have these people answer

21   questions under oath.

22          THE COURT:  Hang on.  I think the answer to that is

23   that they hadn't been served with any discovery until then.

24          MR. KLAYMAN:  Well, the way things work these days,

25   Your Honor -- I don't know about Texas; it probably works

1  better in Texas than it does in the District of Columbia.  In

2  Florida discovery generally goes forward, at least in state

3  courts it usually does.  And what -- Your Honor recognizes it

4  does in your courts, too.

5          Judge Yeakel made it very clear that he doesn't like

6  continuances; that he wants to try this case; that that's

7  where -- and dispositive motions are to be disfavored unless

8  they're very strong dispositive motions, which they're not in

9  this case.  And all I asked for was depositions.  Simple.

10 Answer questions.  They're frightened to death to answer

11 questions.

12         With regard to Rule 26, yeah, we did confer, and

13 that's how we came up with a discovery schedule and every other

14 schedule.  We conferred.  They knew I wanted to take -- and you

15 take the depositions of defendants.  I'm not out there in left

16 field, you know, taking depositions of people that have nothing

17 to do with this.

18         So, Your Honor, that's the bottom line here.

19 And this is not harassment.  You know -- this statement by

20 Mr. Randazza, this is not a case by Freedom Watch or by any

21 public interest group to raise money.  This is about

22 Larry Klayman and Jerry Corsi's reputations having been

23 destroyed.  This is about Infowars competing with Dr. Corsi and

24 Larry Klayman, who are competitors of them under Lanham Act.

25         You don't even have to get beyond the defamation.  It

1    was false advertising.  Calling Corsi an alcoholic, saying that
2    I had sexually harassed some woman, that my IQ is less than 70,
3    that I never won a case, that gets to your trade and
4    profession, which is defamation, per se, and also false
5    advertising.  And in that case damages are presumed,
6    Your Honor.
7            So I hope that you will not be swayed by the
8    incorrect statements -- and I'm being diplomatic -- made by
9    defense counsel.  And there has been no order in any court that
10   either, in terms of *res judicata* or collateral estoppel in any
11   way eliminated these claims.  And there's no SLAPP statute in
12   Texas, and this case should proceed.
13           There's no harm in taking the depositions of the
14   defendants.  Let them just answer questions.  I will be
15   respectful.  Mr. Biswas will be respectful.  We've been
16   respectful.  They haven't been respectful towards me, but I
17   will be respectful.
18           And, consequently, I would ask that Your Honor, you
19   know, recognize that the judge here, Judge Yeakel, likes to
20   move things along.  He doesn't like things to be delayed.
21           And, in any event, however Your Honor rules, whether
22   you rule in my favor or Mr. Corsi's favor or Defendants' favor,
23   whoever loses is going to take -- it's going to make an
24   objection to Judge Yeakel.  That will slow things down further.
25           So we might was well get along with taking some

 1   discovery here.  They didn't want to take any.  I did.  I just

 2   want to take their depositions.  I'm not harassing them.  And

 3   I'm entitled to that.

 4          THE COURT:  Thank you.  Mr. Randazza, you and

 5   Mr. Wachen get the last word here.

 6          MR. RANDAZZA:  I would just make one quick

 7   correction.  We have invoked the Florida anti-SLAPP law, so

 8   there actually is a pertinent anti-SLAPP law to be considered.

 9          And, you know, as far as the purpose of the

10   depositions, I mean, if we -- if we just look at how much he's

11   publicized Roger Stone's deposition, I just don't -- I don't

12   think it's accurate that these are sought for a proper purpose.

13          MR. KLAYMAN:  Well, let me point out, if I may,

14   Your Honor, in response --

15          THE COURT:  Mr. Klayman -- Mr. Klayman, I haven't

16   asked for you to respond.  Thank you.

17          Mr. Wachen?

18          MR. WACHEN:  Your Honor, Mr. Klayman mentioned the

19   court in D.C.  And in D.C., where he initiated this case,

20   discovery doesn't proceed until Rule 12(b)(6) motions are

21   disposed of, until a party answers the complaint.  That's

22   actually a local rule in that court that Mr. Klayman may be

23   familiar with.

24          But, in any case, in this situation here, Mr. Klayman

25   hasn't identified any harm that would come from him by

1   waiting -- which he's waited up you until now -- waiting until

2   the court rules on these 12(b)(6) motions.

3           If the court grants the motions, there will be no

4   discovery.  If the court denies the motions, then we'll go

5   ahead with discovery.  But there's nothing that needs to happen

6   now.  There's nothing in discovery that's going to have any

7   bearing on the motions.

8           And, given the way that COVID has upended the

9   schedule, I understand, in this court and across the country,

10  there's going to have to be adjustments anyway in the schedule.

11          So at this point what's the point in having the

12  parties subjected to what we think is going to be needless

13  discovery, because we think the motions are highly meritorious,

14  especially with respect to Dr. Jones, who isn't alleged to have

15  done anything and have to bear the burden of the costs of doing

16  that.  We're not afraid of anything.  We just like to have to

17  defend this case that has no merit.

18          Thank you, Your Honor.

19          THE COURT:  Yeah.  And I think one thing that -- that

20  I want to say, you know, just to clear this issue up, I know

21  what Judge Yeakel said at the status conference in May of last

22  year, almost a year ago now.  And I just want to put that in

23  context, that at the time we were two months, sort of, into our

24  shutdown and having closed the courthouse, and it was unclear

25  how long that would last.

1          We're still not holding trials.  The most recent

2   order goes through the end of April of 2021.  We had a meeting

3   as a court a week ago yesterday to look at the issue of when it

4   would be appropriate.  And I think it's likely that we will not

5   be open in May either for jury trials.  So -- but I think it's

6   likely that we may well be after that.

7          So this case I believe under the current schedule is

8   set for the final pretrial conference in the month of July.  I

9   think it's very clear that's not going to happen in this case,

10  just like it didn't in all of the other cases that were set for

11  similar time frames.  I think it is very likely that our

12  schedule in this case is going to have to get pushed back in

13  light of what COVID has done to the docket.

14         So I take that into account in deciding whether it's

15  appropriate to stay or not stay discovery right now.  And the

16  reality is that I think that this -- this docket -- I mean,

17  this scheduling order in this case is likely -- you can take

18  all of the dates and add 2022 to them instead of 2021 is what's

19  likely for the schedule of this case.

20         And you're right, Mr. Klayman.  Judge Yeakel does

21  like to keep his docket on a schedule and doesn't very often

22  change that -- those dates, continue trial dates and that kind

23  of thing.  But in this most recent year we've had to do that a

24  lot.

25         So in light of that --

1              MR. KLAYMAN:  Before you rule, Your Honor, may I make

2    a couple of points?

3              THE COURT:  Briefly.  Very briefly.

4              MR. KLAYMAN:  Number one, this case is in Texas.

5    It's not in Florida; it's not in D.C.  The judge ruled that the

6    case belonged here.  So, therefore, there is no SLAPP statute,

7    and we're entitled to discovery.

8              Secondly, it is false that we don't allege that

9    David Jones did anything wrong.  The complaint is very clear,

10   and that's a very good reason to take his deposition, so we get

11   him under oath -- get him under oath.  If they maintain that

12   despite the fact that the complaint is clear and despite the

13   fact that Kelly Morales came forward and said he's the one

14   that's in control of the Infowars defendants, then let us take

15   his deposition, let him be under oath and tell us that, not

16   through his lawyer.

17             So that's what it's important right now, Your Honor

18   It will save time, ultimately, for you and for Judge Yeakel.

19             THE COURT:  Thank you.  So I -- my ruling is going to

20   be that I'm going to continue the stay that was put in place

21   through today or through this hearing until we get rulings on

22   the 12(b)(6) motions.  And we will try to give those priority

23   as much as possible.

24             I can give you one deadline, which is that I'm

25   retiring on May 31st is my last day on the bench.  So I'm going

1   to get it done before then.  So you should get rulings on the

2   12(b)(6).  They'll be, obviously, report and recommendations of

3   a magistrate judge, so you'll have proceedings after that in

4   front of Judge Yeakel.  But I'll get them done before then.

5           So that should allow you, Mr. Klayman, to keep your

6   case, if the 12(b)(6) motions are not granted or granted only

7   in part, to move forward with discovery and not prejudice your

8   ability to be ready for a trial or anything else, given that I

9   think our docket is getting pushed forward anyway.

10          So that will be my ruling.  We'll get a short brief

11  written order out to that effect, and then you should be

12  looking for a report and recommendation on the pending motions

13  to dismiss in the mean time.

14          MR. KLAYMAN:  Your Honor, may I put one other thing

15  on the record?

16          THE COURT:  Sure.

17          MR. KLAYMAN:  Is that this concept that I brought all

18  those cases is inappropriate.  That case I have offered to have

19  consolidated in this case, okay, the Florida case, where

20  there's no decision.  Okay?

21          So I have not tried to run up the pleadings or act

22  vexatiously or multiply the pleadings.  But they refuse to do

23  that.  So you can't talk out of both sides of your mouth.

24          THE COURT:  Mr. Randazza, Mr. Wachen, anything else

25  we need to address today?

1          MR. RANDAZZA:  No, thank you, Your Honor.

2          MR. WACHEN:  No, Your Honor.  Thank you.

3          THE COURT:  Thank you-all very much.  I appreciate

4    your being available, and we'll get that brief order out here

5    probably either today or tomorrow morning.

6          MR. BISWAS:  Thank you, Your Honor.

7          MR. BUSCHEL:  Thank you, Your Honor.

8          MR. RANDAZZA:  Thank you, Your Honor.

9          MR. WACHEN:  Thank you, Your Honor.

10          MR. WOLMAN:  Thank you, Your Honor.

11       (Proceedings concluded at 3:20 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**REPORTER'S CERTIFICATE**

1

2     I, Arlinda Rodriguez, do hereby certify that the foregoing

3 was transcribed from an electronic recording made at the time

4 of the aforesaid proceedings and is a correct transcript, to

5 the best of my ability, made from the proceedings in the

6 above-entitled matter, and that the transcript fees and format

7 comply with those prescribed by the Court and Judicial

8 Conference of the United States.

9

10 /S/ Arlinda Rodriguez                    March 26, 2021

11 ARLINDA RODRIGUEZ                        DATE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT D

# Alex Jones, Infowars, and the Sandy Hook Defamation Suits



Alex Jones and his website *Infowars* have been the subject of multiple defamation lawsuits over his repeated claims that the 2012 shooting at the Sandy Hook Elementary School in Newtown, Connecticut was a "giant hoax." Jones and *Infowars* continued to make these claims on broadcasts and in articles published on his website over the course of many years. Jones' followers have harassed the families of the victims and many, in turn, filed suit against him for making defamatory statements that were knowingly false, or made with a disregard for the truth.

*For news, analysis & additional materials read on.*

*First Amendment Watch Teaching Guide:* Can First Amendment Defenses Save Provocateur Alex Jones From The Sandy Hook Libel? (https://firstamendmentwatch.org/first-amendment-watch-teacher-guide-can-first-amendment-defenses-save-provocateur-alex-jones-from-the-sandy-hook-libel-suits/)

News & Updates  Analysis & Opinion  Documents & Resources

News & Updates

## April 5, 2021: U.S. Supreme Court Turns Down Appeal from Alex Jones

The U.S. Supreme Court rejected hearing an appeal from Alex Jones on April 5th. Jones was appealing a court sanction imposed by Connecticut Trial Court Judge Barbara Bellis after he made alarming comments on his radio show, Infowars, about an attorney for the families of the Sandy Hook victims. The Court announced its decision without a written explanation.

In July 2020, the Connecticut Supreme Court characterized Jones' comments as an "imminent and likely threat to the administration of justice," and therefore the sanctions were not inconsistent with the First Amendment.

The sanctions include a prohibition on Jones filing a motion to dismiss the ongoing defamation lawsuit against him.

Jones' attorney said that the decision of the U.S. Supreme Court was "a disappointment."

Associated Press (https://apnews.com/article/connecticut-shootings-lawsuits-alex-jones-school-shootings-59360449ed878c5cdfcbb550291c90a2)

## January 25, 2021: Texas Supreme Court Says Defamation Suits Against Alex Jones Can Continue (https://firstamendmentwatch.org/texas-supreme-court-says-defamation-suits-against-alex-jones-can-continue/)

On January 22nd, the Texas Supreme Court rejected conspiracy theorist Alex Jones' request to toss four defamation lawsuits filed by parents whose children died in the 2012 mass shooting at Sandy Hook Elementary School.

The parents filed the suits in Travis County, Texas, where Jones' and his media company, InfoWars, are based. The suits claim that Jones' statements calling the mass shooting a "giant hoax," and accusing the parents of faking their children's death were defamatory and caused the families emotional distress.

Defamatory statements are one of the few categories of speech that the First Amendment does not protect. For private persons, (https://firstamendmentwatch.org/libel-new-york-times-v-sullivan-sets-standard/) such as the victims' parents, to prove that another person's speech defamed them, they need to show that the defendant's statements were false and harmful, and that they published them carelessly.

See also: Can First Amendment Defenses Save Provocateur Alex Jones From The Sandy Hook Libel? (https://firstamendmentwatch.org/first-amendment-watch-teacher-guide-can-first-amendment-defenses-save-provocateur-alex-jones-from-the-sandy-hook-libel-suits/)

In their appeal to the Supreme Court, Jones' lawyers claimed that his statements were protected under the Texas Citizens Participation Act (https://texaslawhelp.org/article/slapp-lawsuits-and-texas-citizens-participation-act-introduction) because he was speaking on a matter of public concern.

"The pursuit of so-called 'conspiracy theories' concerning controversial government activities has been a part and parcel of American political discourse since our Founding, and it is protected by the First Amendment," the lawyers wrote in a brief for one of the lawsuits.

Mark Bankston, the attorney representing the parents, dismissed this notion in a response (https://infowarslawsuit.com/wp-content/uploads/2018/06/april-16-2018-heslin-original-petition-file-stamped.pdf) filed on behalf of Neil Heslin. "[A]ccusing Mr. Heslin of lying about holding the body of his dead son does not amount to a matter of public concern," Bankston wrote.

The ruling, first reported by the *Austin American-Statesman* (https://www.statesman.com/story/news/2021/01/22/alex-jones-sandy-hook-parents-texas-supreme-court/6670360002/), also gave a fifth plaintiff permission to continue with his defamation lawsuit against InfoWars and reporter Kit Daniels for mistakenly labeling him as a suspect in the 2018 mass shooting at Parkland High School.

### July 23rd, 2020: Connecticut Supreme Court Upholds Sanctions Against Alex Jones

The Connecticut Supreme Court upheld a lower courts' sanctions against conspiracy theorist Alex Jones for threatening the attorney and law firm representing Sandy Hook families in a defamation case against Jones.

"[T]he sanctions did not run afoul of the First Amendment because they addressed speech that was an imminent and likely threat to the administration of justice. Accordingly, it was not an abuse of the trial court's discretion to sanction the defendants for their discovery violations and Jones' vituperative speech," the Connecticut Supreme Court ruled on July 23rd.

In 2019, Jones accused Charles Mattei, and his law firm, Koskoff Koskoff & Bieder, of planting images of child pornography on his computer to discredit him. In an angry outburst during a live broadcast, Jones appeared to ask his fans to target Mattei.

"I pray for divine intervention against the powers of Satan. I literally would never have sex with children. I don't like having sex with children. I would never have sex with children. I am not a Democrat. I am not a liberal. I do not cut children's genitals off like the left does. And so, if they want war — you know, it's not a threat. It's like an AC/DC song. If you want blood, you've got it. Blood on the streets, man," Jones said in a televised broadcast.

On the same broadcast, Jones pounded a picture of Mattei and shouted, "I'm gonna kill … Anyway I'm done. Total war. You want it, you got it."

The ruling allows the defamation suit to move towards a jury trial in the fall.

News Times (https://www.newstimes.com/local/article/Supreme-Court-upholds-sanctions-for-Alex-Jones-15429879.php)

**March 27, 2020: Texas Appeals Court Rejects Alex Jones' Motion to Dismiss Heslin Defamation Suit** (https://firstamendmentwatch.org/texas-appeals-court-rejects-alex-jones-motion-to-dismiss-heslin-defamation-suit/)

On March 25th, the Texas Court of Appeals rejected Infowars founder Alex Jones' motion to dismiss a defamation lawsuit brought by Neil Heslin, whose son was killed in the 2012 mass shooting at Sandy Hook Elementary School. The judge has ordered Jones to pay Heslin $22,250 in attorney fees, making the total amount Jones now owes Heslin just under $150,000.

Heslin sued Jones in April 2018 over false statements he made on his site, claiming that the mass shooting in Sandy Hook was a government hoax and the victims' parents were "crisis actors". A number of Jones' readers went on to harass families of Sandy Hook victims, including the Heslins, causing them significant emotional distress.

Jones has tried on multiple occasions to have the lawsuit dismissed on free speech grounds, albeit with little success.

In October 2018, Jones was ordered to pay $25,000 for failing to comply with a discovery order. Then, in December 2019 (https://firstamendmentwatch.org/alex-jones-ordered-to-pay-100000-in-legal-fees-in-defamation-lawsuit/), a Texas district court judge ruled against Jones' motion to dismiss Heslin's lawsuit, finding that Heslin had met the standard for defamation under state law. The district judge ordered Jones to pay an additional $100,000 in legal costs to the attorneys representing Heslin.

In his opinion (https://www.courthousenews.com/wp-content/uploads/2020/03/Infowars.pdf), Judge Scott H. Jenkins affirmed the district court's denial of Jones' motion to dismiss.

"We affirm the district court's dismissal of Appellants' motion to dismiss, and we grant Heslin's motion for sanctions and award him $22,250 for attorney's fees," Jenkins opinion reads.

Huffington Post (https://www.huffingtonpost.co.uk/entry/alex-jones-loses-another-sandy-hook-court-battle-must-now-pay-150000-in-court-costs_n_5e7cf82dc5b6cb9dc19cadf0?ri18n=true&utm_source=CJR+Daily+News&utm_campaign=23284480cc-EMAIL_CAMPAIGN_2018_10_31_05_02_COPY_01&utm_medium=email&utm_term=0_9c93f57676-23284480cc-174753011&mc_cid=23284480cc&mc_eid=e4edaef73b&guccounter=2) Opinion (https://www.courthousenews.com/wp-content/uploads/2020/03/Infowars.pdf)

**December 20, 2019: Alex Jones Ordered to Pay $100,000 in Legal Fees in Defamation Lawsuit** (https://firstamendmentwatch.org/alex-jones-ordered-to-pay-100000-in-legal-fees-in-defamation-lawsuit/)

On December 20th, a Texas district court judge ordered Alex Jones to pay more than $100,000 in legal fees in a defamation suit brought by the father of one of the victims of the Sandy Hook Elementary School mass shooting.

The defamation suit brought by Neil Heslin is one of several suits filed against Jones by the families who lost children in the school shooting on December 14, 2012. Following the massacre, Jones repeatedly stated on his website, Infowars, that the shooting was a hoax and had been staged by the U.S. government in an attempt to confiscate Americans' guns.

The order by Travis County District Judge Scott Jenkins comes after Jones ignored a court order to provide documents and witnesses. Jenkins also ruled against a motion from Jones's attorneys to dismiss the suit, adding additional legal fees that brought the amount that Jones has had to pay to $126,024. (Jones was ordered to pay $25,875 last October for failing to comply with another ruling.) A trial date for the Heslin case has not yet been scheduled.

In an email to the *Daily Beast*, Heslin's lawyer, Mark Bankston, said that the suit could have been avoided if Jones had accepted responsibility for his lies and his harassment of Heslin and other Sandy Hook parents. "Instead, Mr. Jones seems to prefer exiting into the dustbin of history in the most expensive and embarrassing way possible," Bankston wrote.

Daily Beast (https://www.thedailybeast.com/alex-jones-and-infowars-ordered-to-pay-dollar100k-in-court-costs-for-sandy-hook-case) Hartford Courant (https://www.courant.com/breaking-news/hc-br-alex-jones-sandy-hook-legal-fees-20191231-wrj2xzoporh6lbk76bv7sdniue-story.html) CNN (https://www.cnn.com/2019/12/31/media/alex-jones-sandy-

**December 12, 2019: Lawyer files motion in *Heslin v Jones* case to hold Jones and *Infowars* liable without trial**

Mark Bankston, the attorney representing Neil Heslin in his defamation lawsuit against Alex Jones, filed a motion on December 12th, 2019 asking that the judge hold Jones and *Infowars* liable without trial.

In his motion, Bankston argues that the defendants committed "willful and flagrant discovery abuse." This behavior allegedly includes refusing to make good faith efforts to answer written discovery or respond at deposition, withholding tens of thousands of emails relating to Sandy Hook, and erasing many of the computers prior to collection efforts.

"Defendants have been given ample opportunity to take these lawsuits seriously and obey the rule of law," the filing said. "Yet despite a rotating cast of counsel, Defendants have remained stubborn in their refusal to respect the integrity of the proceedings."

The jury wouldn't decide whether Jones' was guilty, it would only be used to determine the amount of damages Jones. The motion is scheduled to be heard by the court on Wednesday, December 18th.

The Hill (https://thehill.com/regulation/court-battles/474335-lawyer-seeks-judgement-without-a-trial-for-alex-jones-in-sandy-hook)

**July 10, 2019: Connecticut Supreme Court Agrees to Hear Alex Jones' Appeal to Review Trial Court's Sanctions**

The Connecticut Supreme Court has agreed to review Alex Jones appeal regarding sanctions imposed by a trial court judge over alleged threats to lawyers in Sandy Hook case.

On June 17, 2019, trial Court Judge Barbara Bellis denied Jone's lawyers requests to pursue a special motion to dismiss the lawsuit by the Sandy Hook families. She also ordered Jones to pay for all legal fees associated with an incident that occurred during the discovery process when dozens of emails from Jones and Infowars were found to contain child pornography. An investigation cleared Jones of any wrongdoing, and revealed that none of the emails had ever been opened.

In his 10-page appeal to the Supreme Court, Jones' lawyer, Norm Pattis, argues that the penalties imposed on his client are too harsh, and threaten his First Amendment rights to speak on a matter of public interest.

According to the Hartford Courant, the Connecticut Supreme Court will now hold "a full hearing on Pattis' appeal" in which they "could overturn Bellis' ruling" and "restore Jones' right to possibly have the case dismissed."

The hearing will likely take place in September.

Hartford Courant (https://www.courant.com/news/connecticut/hc-news-sandy-hook-lawsuit-reversed-20190710-2jqandrmmrgn5okxfhaugoxkwm-story.html)

**June 24, 2019: Alex Jones Hit With Sanctions, His Attorney Requests Connecticut Supreme Court to Review**

The lawyer defending Alex Jones in the defamation suit brought the parents of some of the Sandy Hook victims has asked the Connecticut Supreme Court to review sanctions imposed on Jones by a trial judge.

On June 18, Bridgeport Superior Court Judge Barbara Bellis imposed the sanctions during an emergency hearing after Jones threatened the Sandy Hook families' attorney, Christopher Mattei, on Jones' webcast.

Jones' rant was triggered by a recent revelation that a dozen emails retrieved from him and his Infowars website during the discovery process had images of child pornography attached. The FBI investigated, and determined that they were sent to Jones from outside of his organization, and no one ever opened the files to view the images.

On his televised webcast, however, Jones accused Mattei and his law firm, Koskoff Koskoff & Bieder, of planting the images, and made threatening comments towards Mattei and his firm.

Norm Pattis, Jones' lawyer, is arguing that his client was only exercising his First Amendment right to speak on a matter of public interest.

Hartford Courant (https://www.courant.com/news/connecticut/hc-alex-jones-sandyhook-lawsuit-appeal-0625-20190624-5rslpozzkvaf7mgyqd2yidjfze-story.html)

## May 2, 2019: Alex Jones and InfoWars Banned on Facebook

Facebook is banning some controversial, well-known figures for violating the social media giant's policies on hate speech and promoting violence.

The list includes Sandy Hook-denier Alex Jones, right-wing provocateur Milo Yiannopoulos, conspiracy theorists Laura Loomer and Paul John Watson, Louis Farrakhan, who promotes anti-Semitic views, and Paul Nehlen, a white nationalist who ran for Congress in 2018.

"We've always banned individuals or organizations that promote or engage in violence and hate, regardless of ideology," a Facebook representative said Thursday in a statement. "The process for evaluating potential violators is extensive and it is what led us to our decision to remove these accounts today."

The ban includes their individual Facebook accounts, fan pages, and groups affiliated with them. These individuals are also banned from Instagram, the photo-sharing app owned by Facebook.

Jones, who has spread his conspiracy theories about the Sandy Hook school mass shooting on his InfoWars site, was temporarily banned on Facebook last year. His official fan page was also banned, but Jones was allowed to keep his personal account.

The new prohibition makes all of Jones' temporary bans permanent, bans Jones from having a personal Facebook account, and extends more broadly to fan pages and videos that promote InfoWars.

According to Angelo Carusone, the president of Media Matters, nonprofit that monitors conservative misinformation online, says that recent mass shootings and other acts of violence caused by online hate speech prompted Facebook to finally take action.

"The reality is, people are getting killed. There are mass shootings and mass murders that are clearly being connected to ideas like white genocide, which are fueling radicalization," Carusone told *The Washington Post*. "The conditions have changed. When you have these massive catalyzing moments that are connected to real-life consequences, it puts pressure on Facebook and others to look in the mirror."

Facebook isn't the first social media platform to ban some of these polarizing figures. In recent years, Twitter has temporarily or permanently banned Jones, Loomer, Nehlen, and Yiannopoulos for their inflammatory content.

Los Angeles Times (https://www.latimes.com/business/technology/la-fi-tn-facebook-ban-alex-jones-milo-yiannopoulos-20190502-story.html) The Washington Post (https://www.washingtonpost.com/technology/2019/05/02/facebook-bans-extremist-leaders-including-louis-farrakhan-alex-jones-milo-yiannopoulos-being-dangerous/?utm_term=.66811cd057dd)

## April 1, 2019: Under Oath, Jones Admitted His Opinion Was Wrong But Blamed "Psychosis"

During a three-hour long taped deposition as part of a defamation case brought by some of the families of the Sandy Hook victims, Alex Jones claimed he had a "form of psychosis" that caused him to question whether certain events like the Sandy Hook mass shootings were staged.

"And I, myself, have almost had like a form of psychosis back in the past where I basically thought everything was staged, even though I'm now learning a lot of times things aren't staged," Jones said in a video released by Kaster Lynch Farrar & Ball LLP, a Texas law firm representing some of the families.

Jones blamed the the media for leading him to distrust everything.

"So long before these lawsuits I said that in the past I thought everything was a conspiracy and I would kind of get into that mass group think of the communities that were out saying that," he said. "And so now I see that it's more in the middle… so that's where I stand."

Jones also acknowledged that some of his reporting was based off of Internet sources like YouTube and 4Chan.

Regardless, Jones would not admit that his conspiratorial claims caused the families pain, and described the lawsuits as an attack on him and on the First Amendment.

"I was stating that I was reporting on the general questioning when others were questioning. And, you know, it's painful that we have to question big public events. I think that's an essential part of the First Amendment in America. And I do not take responsibility for the entire train of things that lawyers and the media have said I've done."

CNN (https://www.cnn.com/2019/03/30/us/alex-jones-psychosis-sandy-hook/index.html) NBC (https://www.nbcnews.com/news/us-news/infowars-alex-jones-claims-psychosis-caused-him-question-sandy-hook-n989091) Deposition Videos (https://www.youtube.com/channel/UCeeCy2sW9BRXjlfsIOA5DgA)

## February 7, 2019: Judges Have Advanced The Cases In Favor Of The Sandy Hook Families In The Past Few Weeks

*The New York Times* reports on a series of legal victories in favor of the Sandy Hook families in three lawsuits against Alex Jones and Infowars.

In Texas, a judge ordered Jones and Infowars representatives to submit to questioning by the lawyers of one Sandy Hook mother, and also granted access to the company's business records against the wishes of Jones' lawyers, who wanted them to remain sealed.

In Connecticut, a judge ordered Infowars' business associates and partners to testify, and will soon rule on the deposition of Jones himself and other Infowars associates, as per the families' request.

The New York Times (https://www.nytimes.com/2019/02/07/us/politics/alex-jones-sandy-hook.html)

## January 11, 2019: CT Superior Court Judge Grants Sandy Hook Families' Discovery Request To Access Infowars' Internal Documents And Communications

The six families suing Alex Jones and *Infowars* in Connecticut over repeated defamatory comments about the Sandy Hook Elementary School massacre were granted a legal victory in their case. The judge ruled that the families can gain access to *Infowars'* financial and marketing documents, contracts between *Infowars* and platforms like Facebook and Twitter, and any communications including letters, emails, and text messages related to Sandy Hook, Adam Lanza, crisis actors, or mass shootings. According to an attorney for the families, this documentation is meant to corroborate the claims made in the lawsuit to prove that Alex Jones is a "conspiracy profiteer." The judge will decide whether to let the plaintiffs' legal team depose Jones at a hearing scheduled for this week.

The New York Times (https://www.nytimes.com/2019/01/12/us/alex-jones-infowars-lawsuit.html) ABC News (https://abcnews.go.com/US/families-sandy-hook-shooting-victims-win-legal-victory/story?id=60314174) Hartford Courant (https://www.courant.com/news/connecticut/hc-news-sandy-hook-jones-lawsuit-20190111-xao67zxhmnbrfm2wjnz5xjchcu-story.html)

## August 17, 2018: Motion Accuses Jones Of Intentionally Destroying Evidence Related to Suits

Lawyers representing the families of two Sandy Hook shooting victims accused Alex Jones of intentionally destroying evidence related to the lawsuit. According to the motion filed, Jones said on his broadcast that he instructed his staffers to delete select content like social media messages and videos, some of which was considered evidence in the Sandy Hook case.

The New York Times (https://www.nytimes.com/2018/08/01/us/politics/alex-jones-evidence-infowars.html?hp&action=click&pgtype=Homepage&clickSource=story-heading&module=first-column-region&region=top-news&WT.nav=top-news) Motion (https://int.nyt.com/data/documenthelper/171-alex-jones-sandy-hook-evidence/283173e237c0c133f158/optimized/full.pdf#page=1)

## August 1, 2018: First Of 3 Defamation Suits Against Jones Reaches Courtroom

Lawyers for Alex Jones are fighting to dismiss a defamation case brought against him and his site Infowars by parents of victims of the Sandy Hook shooting under the Texas Citizens Participation Act. His attorneys are arguing that what Jones says on his show is not fact, but rather his opinion. According to Reuters, an attorney for Jones told the judge, "Maybe it's fringe speech. Maybe it's dangerous speech, but it is not defamation."

The judge has 30 days to rule on a motion to dismiss the case.

The New York Times (https://www.nytimes.com/2018/08/01/us/politics/infowars-sandy-hook-alex-jones.html) Reuters (https://www.reuters.com/article/us-usa-lawsuit-alexjones/conspiracy-theorist-jones-seeks-halt-of-sandy-hook-defamation-suit-idUSKBN1KM4GI) Buzzfeed News (https://www.buzzfeednews.com/article/briannasacks/alex-jones-infowars-defamation-lawsuit)

## July 24, 2018: Alex Jones Compares Himself To Storied Watergate Journalists In Effort To Dismiss Lawsuit

In an attempt to dismiss a defamation lawsuit, Alex Jones of Infowars compared himself to Carl Bernstein and Bob Woodward, *The Washington Post* journalists who helped uncover the Watergate scandal, saying he acted like a journalist when he questioned the narrative of the Sandy Hook school shooting in 2012.

Lawyers for Jones wrote in his filing for dismissal: "Such journalism, questioning official narratives, would be chilled if reporters were subject to liability if they turned out to be wrong….To stifle the press (by making them liable for merely interviewing people who have strange theories) will simply turn this human tragedy into a Constitutional one."

Bill Bloss, an attorney for the families said in many news reports that, "The First Amendment simply does not protect false statements about the parents of one of the worst tragedies in our nation's history. Any effort by any of the defendants to avoid responsibility for the harm that they have inflicted will be unsuccessful."

CBS News (https://www.cbsnews.com/news/alex-jones-compares-himself-bob-woodward-carlbernstein-sandy-hook-lawsuit/) The Associated Press (https://apnews.com/ce04388309ee44249a0f9461d34bef5f) Motion to Dismiss (https://drive.google.com/file/d/1kxMDBH1QVV_tlceTsvrF1Jw_QVd14xAr/view)

## May 24, 2018: More Sandy Hook Families File Defamation Lawsuit Against Alex Jones For False Stories Promoted on Infowars

Six families of Sandy Hook victims and an FBI agent filed a third lawsuit Wednesday against Alex Jones and his businesses for repeated claims he made on his *Infowars* show that the 2012 massacre was a hoax. The families are suing on defamation, invasion of privacy by false light, intentional infliction of emotional distress, and negligent infliction of emotional distress. The suit, filed in Superior Court in Bridgeport, Connecticut, comes after two other suits that were filed last month in Texas by two other Sandy Hook victim families. The complaints from all eight families allege that Jones used his internet and radio platforms to push the conspiracy theory that the shooting in Newtown was a staged event. It lists a campaign of abuse starting from December 19, 2012 through June 26, 2017. On a complaint listed for January 13, 2015, the parents allege that during the broadcast of The Alex Jones Radio Show, Jones said, "… Sandy Hook is a synthetic completely fake with actors, in my view, manufactured. I couldn't believe it at first. I knew they had actors there, clearly, but I though they killed some real kids. And it just shows how bold they are, that they clearly used actors." The complaint says that "a reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones."

The lawsuit claims that while Jones' false accusation brought him attention and business, the plaintiffs suffered personal pain and abuse from the radio and internet personality and his fans.

*The New York Times* reporter Elizabeth Williamson writes that Jones claims First Amendment protection for his work and that the most recent lawsuit filed challenges that defense. "The First Amendment has never protected demonstrably false, malicious statements like the defendants'," it reads.

New York Times (https://www.nytimes.com/2018/05/23/us/politics/alex-jones-trump-sandy-hook.html) The Daily by The New York Times (https://www.nytimes.com/2018/05/24/podcasts/the-daily/sandy-hook-alex-jones-infowars-lawsuit.html) NBC News (https://www.nbcnews.com/business/business-news/six-more-families-sue-alex-jones-over-sandy-hook-conspiracy-n876881)

Connecticut Law Tribune (https://www.law.com/ctlawtribune/2018/05/23/connecticut-lawyers-sue-conspiracy-theorist-alex-jones-for-sandy-hook-families-fbi-agent/)

**April 17, 2018: Sandy Hook Parents Take on False Stories Promoted by Alex Jones in Defamation Suit**

The 2012 Sandy Hook school massacre which killed 20 children and 6 adults galvanized parents and relatives of those murdered to promote gun reform. One conservative commentator who responded negatively to their efforts: Alex Jones and his *Infowars* which ran segments claiming the massacre at Sandy Hook was "a giant hoax." Jones' followers have continued to harass Sandy Hook families. Now Leonard Pozner and his former wife, Veronique De La Rosa, parents of Noah Pozner, and Neil Heslin, the father of Jesse Lewis, have responded by filing two defamation suits against Alex Jones stating "defendants' defamatory statements were knowingly false or made with reckless disregard for the truth." They are seeking at least $1 million in damages. This is the second time this year Alex Jones has been sued for defamation. In March, Brennan Gilmore sued Jones for stories that led to threats against him.

New York Times (https://www.nytimes.com/2018/04/17/business/media/alex-jones-sandy-hook.html) Reuters TV (https://www.reuters.tv/v/u5t/2018/04/17/sandy-hook-parents-sue-infowars-alex-jones-for-defamation) Reuters (https://www.reuters.com/article/us-texas-lawsuit-alexjones/sandy-hook-parents-sue-conspiracy-theorist-alex-jones-for-defamation-idUSKBN1HO2FU)

Analysis & Opinion

**February 5, 2020: The Professor of Denial  (https://www.chronicle.com/article/the-professor-of-denial/)**

Amanda J. Crawford writes about James H. Fetzer, a retired philosophy professor who has promoted conspiracy theories since the 1990s. Among the theories he has promoted are that the Apollo moon landing was fake and that the Holocaust where 11 million Jews and others were killed, never occurred.

In 2015, Fetzer published a book *Sandy Hook: It Was a FEMA Drill to Promote Gun Control*, and began a movement of Sandy Hook "truthers." Though it was Alex Jones who, using Infowars, helped the lies spread more quickly, much of the theory itself was invented by Fetzer. In October 2019, a Wisconsin jury awarded Leonard Pozner $450,000 for accusing him of falsifying his son's death certificate. Pozner's son, Noah Pozner, was 6-year-old when he was killed in the Sandy Hook Elementary School shooting.

Unlike Jones, Fetzer says he still believes that the massacre was staged.

**December 5, 2019: I worked for Alex Jones. I Regret It.  (https://www.nytimes.com/2019/12/05/magazine/alex-jones-infowars.html)**

 Josh Ownes, a former writer for Infowars, gives a close-up view of what it was like to work with Alex Jones. Lured by Jones' combative personality, Owen's account may help explain why so many are attracted to Jones ' style of broadcasting.

"He railed against government corruption and secrecy, the militarization of police. He confronted those in power, traipsed through the California redwoods to expose the secretive all-male meeting of elites at Bohemian Grove and even appeared in two Richard Linklater films as himself, screaming into a megaphone."

But once he began working with Jones, Owens learned how many of the stories were made up and used to exploit the "prejudices and fears" of Jones's audiences.

**July 8, 2019: Newton Parents Fight Back (https://www.washingtonpost.com/local/education/first-they-lost-their-children-then-the-conspiracies-started-now-the-parents-of-newtown-are-fighting-back/2019/07/08/f167b880-9cef-11e9-9ed4-c9089972ad5a_story.html)**

Susan Svrluga writes in *The Washington Post* about the parents of Newtown and their experience battling conspiracy theorists in court. Using a number of interviews with the parents, she highlights the psychological and emotional toll of "unimpeded conspiracy theories" as well as the way in which social media enables their quick spread.

"Story by story, site by site, year after year," Svrluga writes," Pozner has been working to restore the truth about his son."

**March 31, 2019: Legal System Will Force Jones To Tell The Truth (https://www.nytimes.com/2019/03/31/opinion/alex-jones-sandy-hook.html)**

Charlie Warzel writes in the *New York Times* that the deposition of Alex Jones in one of the defamation lawsuits he is faced with "highlights a troubling reality: The legal system may be the only way to defang a well-known conspiracy theorist at the height of his powers."

**August 6, 2018: Alex Jones Lawsuit Will Change The Way We Think About Free Speech On The Internet (https://www.wired.com/story/alex-jones-lawsuit-will-help-redefine-free-speech/)**

Emma Grey Ellis asserts in *Wired* that the legal questions of free speech on the internet brought up in the defamation cases against Alex Jones will have formative implications. Are the victims' parents public figures? Is what Alex Jones says the truth, or is it trolling? Is Infowars a media institution? "This push and pull between internet and legal norms is a good thing—as long as it continues to evolve," she writes. "That's important is we learn to negotiate the balance between speaking safely, and freely, on the web."

**July 24, 2018: Are There Actual Constitutional Concerns In Jones' Lawsuit? (https://www.esquire.com/news-politics/politics/a22538181/alex-jones-sandy-hook-trial/)**

Charles P. Pierce writes in *Esquire* that the case contains may test the constitutional limits of talk radio, punditry, and extreme internet broadcasting. He also makes note of the other fringe figures that have been represented by Jones' legal team in the past.

-

Documents & Resources

*Pozner v. Jones*: Lawsuit against Alex Jones and Infowars and others by Sandy Hook shooting victim Noah Pozner's parents Leonard Pozner and Veronique De La Rosa in Texas.

Pozner Complaint (https://drive.google.com/file/d/1SnPMj3h2sdlCfL1e4nwm7d0jSCercoV1/view) Alex Jones Motion to Dismiss (https://www.courthousenews.com/wp-content/uploads/2018/08/Alex-Jones-Motion-to-Dismiss.pdf)

*Lafferty v. Jones:* Lawsuit against Alex Jones and Infowars and others by six families of Sandy Hook shooting victims in Connecticut.

Complaint (https://drive.google.com/file/d/12mHNXnFQo2nH555yJxC5JIEEeAoxi_Fj/view) Motion to Dismiss Plaintiffs' Complaint (https://drive.google.com/file/d/1kxMDBH1QVV_tlceTsvrF1Jw_QVd14xAr/view)

*Heslin v. Jones*: Lawsuit against Alex Jones and Infowars and others by father of Sandy Hook shooting victim Neil Heslin in Texas.

Complaint (https://drive.google.com/file/d/1opX6d3Bycbl4sWGo8o37SuPcjxDanzjL/view)

***Sherlach v. Jones*** — lawsuit against Alex Jones and Infowars and others by husband of Sandy Hook shooting victim William Sherlach spouse of Mary Sherlach in Connecticut.

Complaint (https://drive.google.com/file/d/1iNhsZCYo6ifS9M0JHBiLO1-x2KmjuLhT/view)

Allegations made by Alex Jones and Infowars that created the foundation for the complaints detailed in the lawsuit.

Below are a select few instances in which Jones and Infowars contributors made claims to support the Sandy Hook shooting conspiracy theory on broadcasts and in published articles over the course of many years.

In 2013, Jones called the shooting *"staged"* and said, *"It's got inside job written all over it."*

In March 2014, Alex Jones began stating his allegation regarding a "fake" interview between Anderson Cooper and Noah Pozner's mother, Veronique De La Rosa. The allegation that the interview took place in front of a "blue screen" became central to Jones' assertion that the Sandy Hook school shooting was manipulated by the government and performed by crisis actors.

*"Folks, we've got video of Anderson Cooper with clear blue-screen out there. [Shaking head]. He's not there in the town square. We got people clearly coming up and laughing and then doing the fake crying. We've clearly got people where it's actors playing different parts for different people, the building bulldozed, covering up everything. Adam Lanza trying to get guns five times we're told. The witnesses not saying it was him…I've looked at it and undoubtedly, there's a cover-up, there's actors, they're manipulating, they've been caught lying, and they were pre-planning before it and rolled out with it."*

In May 2014, InfoWars published an article titled: "CONNECTICUT TRIES TO HIDE SANDY HOOK TRUTH." (https://www.infowars.com/connecticut-tries-to-hide-sandy-hook-truth/)

In September 2014, Infowars published an article titled: "FBI SAYS NO ONE KILLED AT SANDY HOOK." (https://www.infowars.com/fbi-says-no-one-killed-at-sandy-hook/)

*"The whole thing is a giant hoax. How do you deal with a total hoax? It took me about a year, with Sandy Hook, to come to grips with the fact that the whole thing was fake. I did deep Research."* (December 2014)

*"The general public doesn't know the school was actually closed the year before. They don't know they've sealed it all, demolished the building. They don't know that they had the kids going in circles in and out of the building as a photo-op. Blue-screen, green-screens, they got caught using."* (December 2014)

*"You learn the school had been closed and re-opened. And you've got video of the kids going in circles, in and out of the building, and they don't call the rescue choppers for two hours, and then they tear the building down, and seal it. And they get caught using blue-screens, and an email by Bloomberg comes out in a lawsuit, where he's telling his people get ready in the next 24 hours to capitalize on a shooting. Yeah, so Sandy Hook is a synthetic, completely fake with actors, in my view, manufactured. I couldn't believe it at first. I knew they had actors there, clearly, but I thought they killed some real kids. And it just shows how bold they are that they clearly used actors. I mean they even ended up using photos of kids killed in mass shootings here in a fake mass shooting in Turkey, or Pakistan. The sky is now the limit."* (January 2015)





