**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS**

DR. JEROME CORSI, et al

        Plaintiffs

    v.

INFOWARS, LLC, et al

        Defendants.

**Case Number:   1:20-cv-298-LY**

---

**PLAINTIFFS JEROME CORSI AND LARRY KLAYMAN'S  MOTION FOR STATUS
CONFERENCE AND TO VACATE REPORT AND RECOMMENDATION OF THE
<u>UNITED STATES MAGISTRATE ANDREW W. AUSTIN</u>**

Plaintiffs Dr. Jerome Corsi and Larry Klayman ("Plaintiffs") hereby move the Honorable

Lee Yeakel ("Judge Yeakel") to set an expeditious status conference to discuss the Report and

Recommendation of the United States Magistrate Judge Andrew W. Austin ("Report") issued

after a long seven (7) months of supposed consideration of the motions to dismiss, oppositions

and related pleadings of the parties, and the other relief proposed below.

As previously briefed by the Plaintiffs Corsi and Klayman at the hearing of March 23,

2021 before Magistrate Andrew W. Austin ("Magistrate Austin"), he demonstrated a virtual

complete lack of understanding about the allegations of the Amended Complaint, and in so doing

appeared to have prejudged the case without a valid basis. *See* <u>Exhibits A-C</u>; *Amended

Complaint and Oppositions to Motions to Dismiss*. As a result, and because of the ill-informed

prejudgment and considerable delay in his rendering a Report, Plaintiffs Corsi and Klayman

urged the presiding judge to remove the matter from consideration by Magistrate Austin and to

decide the motions to dismiss himself. Indeed, given the delay that already was present --

compounded with a totally unjustified stay of discovery -- which loss of time now amounts to

seven (7) months with Magistrate Austin's issuance of his Report -- written, it would seem in

haste as he is about to retire at the end of this month, this flies in the face of the presiding judge's strong direction issued at the outset of this case, where he told the parties to move this case along to trial:

> You're going to have to figure how much time you want because once I get it set, once I fill in after a subsequent conference your trial month and final pretrial conference date and time, you're not likely to get a continuance or a postponement.

> I like to try lawsuits. If I had my way and could pass one law, I would do away with motion practice altogether, and you would either settle your case or try your case, the way it was in the olden days.

In this regard, the Magistrate's Report is so factually and legally flawed and, to put it most diplomatically, frankly contrived (since stronger language could be employed), as not to be worthy of any consideration by the presiding judge. The Report is so "cooked" as to be of no use by the Court, and should simply be vacated. This is true in several respects.

First, contrary to the Magistrate's early statement at page 2 of his Report, the federal court in the District of Columbia did not find that jurisdiction there was improper, but instead transferred the case to this Court due to venue forum non-convienens considerations. ECF No. 21. This swipe at Plaintiffs that they filed suit where there was no jurisdiction by the Magistrate foretells his bias and prejudice in hastily issuing his Report, long overdue, likely written on the eve of his retirement.

Second, the hastily crafted sloppiness and gross factual and legal flaws of the Magistrate's Report is also underscored by the hard fact that he dismissed the Amended Complaint against Defendant David Jones without prejudice on page 10 of his Report, but then, deciding on his own that even leave to amend would be futile, writes at page 17 "…the undersigned recommends that the Court not permit Corsi or Klayman leave to amend, and dismiss (all) the claims with prejudice." It is clear that, in haste, the Magistrate's right hand had

no idea what his left hand was doing and that he has some axe to grind.

Third, a simple review of the allegations of the Amended Complaint, backed up with sworn affidavits of Plaintiffs Corsi and Klayman, which are attached to related pleadings, and which should have been considered along with a sworn affidavit of Kelly Morales, Exhibits B-1, B-3, C-1, Alex Jones's former spouse, tying David Jones to the allegations of the Amended Complaint – even prior to needed discovery which the Magistrate also improperly stayed for some undisclosed reason -- shows that Plaintiffs Corsi and Klayman properly pled defamation and Lanham Act violations in particular, and that both Corsi and Klayman are commercial competitors of the Defendants such that commercial speech is implicated triggering the Lanham Act. And there is no argument much more dispute that the allegations against Defendant Stone, a seven-time convicted felon on five counts of perjury, one of witness tampering and one of obstruction of justice, fall within the four (4) year statute of limitations for the Lanham Act in Texas. But this does not deter the Magistrate from suggesting that the presiding judge can sanction Plaintiffs for pursuing rightful claims. One has to wonder what motivation or incentive the Magistrate may have had to make such a statement?

Fourth, the Magistrate turns the proper legal standard for motions to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure on its head by misusing and taking totally out of context *Ramming v*. *United States*, 281 F. 3d 158, 161 (5th Cir. 2001), by quoting this irrelevant portion of the opinion; "Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." What is the relevance, since there is no dispute that jurisdiction exists in this Court, as even the federal judge in the District of Columbia so ruled? Rather, the standard for a Rule 12(b)(6) motion is that a complaint "does not require detailed factual allegations." *Ashcroft v*. *Iqbal*, 556 U.S. 662, 678 (U.S. 2009) (internal quotations omitted). To

survive a motion to dismiss, a complaint need only "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id*. (internal quotations omitted). "According to the Fifth Circuit, a motion to dismiss under Rule 12(b)(6) is viewed with disfavor and is rarely granted. A complaint must be liberally construed in favor of a plaintiff, and all facts pleaded in the complaint must be taken as true in the context of a Rule 12(b)(6) motion. *Think3 Litig. Tr. v. Zuccarello (In re Think3, Inc.)*, 529 B.R. 147, 169 (Bankr. W.D. Tex. 2015) (internal citations and quotations omitted). "In determining a motion to dismiss under Rule 12(b)(6), the general rule is that a court may only consider factual allegations within the "four corners" of the complaint." *Id*.

Fifth, the Magistrate predictably dismisses all of the alleged defamatory statement as mere hyperbole, but the published statements show otherwise. According himself the "right" to supplant his 'wisdom" for the jury, he then as he did with other cases, misuses *Bell Atl. Corp. v. Twombl*y, 550 U.S. 544 (2007), where the Supreme Court in dicta stated that if a complaint has any plausibility, it must go to the jury. "A well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Id*. at 556. And, importantly in a defamation case, when alleged defamatory statements are capable of two or more interpretations, this cements the hard fact that the decisionmaker is the jury. In situations where resolution is necessarily fact intensive, like defamation, the U.S. Supreme Court has held that "[m]aintenance of the jury as a fact-finding body is of such  importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care." *Dimick v. Schiedt,* 293 U.S. 474, 486 (U.S. 1935). If a statement is capable of more than one meaning, it requires a jury to decide whether that statement is defamatory. "If, however, the

court finds the statement is capable of at least one defamatory meaning and at least one non-defamatory meaning, a jury must determine whether the defamatory meaning was conveyed." *Tu Nguyen v. Duy Tu Hoang*, 318 F. Supp. 3d 983, 1007 (S.D. Tex. 2018)

In this case, not only are the alleged defamatory statements, which are listed below with citations to the paragraphs of the Amended Complaint much more than sufficient to withstand a Rule 12(b)(6) motion to dismiss, but the Amended Complaint also is supported by attached sworn affidavits of Mr. Klayman, Dr. Corsi, and Kelly Morales, which the Magistrate conveniently ignores and does not even mention. *See* Exhibits B-1, B-3, C-1; *Affidavits of Dr. Corsi, Kelly Morales, and Larry Klayman*. On the other hand, Defendants have presented zero (0) affidavits! But again, at issue are Rule (12)(b)(6) motions and Plaintiffs went way beyond what they were required to plead in the Amended Complaint.

Here are the alleged defamatory statements at issue with regard to Mr. Klayman, which on their face are sufficient to put in front of a jury:

> **(1) "He (Klayman) was ousted at Judicial Watch. Ask Tom Fitton [the current president of Judicial Watch] why he left. He was 'ousted' because of a 'sexual harassment complaint.'" Am. Comp. ¶ 56.**

> **(2) "He's (Klayman) never actually won a courtroom victory in his life." Am. Comp. ¶ 55**

> **(3) "For those people out there who think...that Larry Klayman's IQ is higher than 70, you're wrong..." Am. Comp. ¶ 62.**

> **(4) "He's (Klayman) incompetent, he's a numbskull, he's an idiot, he's an egomaniac, and he could be the single worst lawyer in America. With him as Jerry Corsi's lawyer, Corsi may get the electric chair. So your idea that he's a good guy is entirely wrong" Am. Comp. ¶ 59**

> **(5) Plaintiff Klayman is a "piece of garbage." Am. Comp. ¶ 61**

With regard to Plaintiff Dr. Corsi, Defendants have falsely and maliciously published

that:

    **(1) "Plaintiff Corsi "seemed to be extremely mentally degraded to the point of what I would call dementia." Am. Comp. ¶ 42**

    **(2) Defendant Alex Jones purportedly saw Plaintiff Corsi at a steakhouse "on the ground at another table" and that his security staff "thought he was dead in the elevator." Am. Comp. ¶ 43**

    **(3) Accusing Plaintiff Corsi of having suffered a stroke, publishes maliciously that "whatever comes out of his mouth ain't the truth." Am. Comp. ¶ 44**

    **(4) that Plaintiff Corsi was "fired from World Net Daily." Am. Comp. ¶ 49**

    **(5) "He (Corsi) was perfectly willing to lie, to perjure himself saying that a memo that he had wrote me was written on the 30th for the purposes of cover-up.... which is further proof that Jerry lied under oath." Am. Comp. ¶ 50**

    **(6) "and then states that I knew about John Podesta's emails being stolen in advance, the only proof of that is Jerry's feeble alcohol affected memory – it's a lie...." Am. Comp. ¶ 51**

    **(7) "Jerry was prepared to stab a principle Trump supporter in the back, he was perfectly prepared to bear false witness against me, even though I had done nothing in my entire life other than help him." Am. Comp. ¶ 52**

    **(8) "all I ever did was show Jerry Corsi friendship and support and try to help him and his family and what I get is Judas Iscariot, the willingness to testify against me and help the deep state bury me....and then he makes up this story about helping me formulate a cover story." Am. Comp. ¶ 53**

    **(9) "… you can always tell when Jerry Corsi is lying because his lips are moving...." Am. Comp. ¶ 54**

    **(10)  "He [Corsi] was perfectly willing to bear false witness against me on multiple points that are complete fabrications." Am. Comp. ¶ 64**

    **(11)  "the good doctor [Corsi] has told a number of lies. In fact, he's starting to conflate his lies.... he was perfectly willing to lie about me.... but now lying about Alex Jones, lying about InfoWars, lying about Dr.**

**(David) Jones, who's one of the nicest, gentlest, sweetest, most honest men I have ever met, it's beyond the pale.... Jerry Corsi can no longer be believed." Am. Comp. ¶ 65**

**(12)   "I think you've [Corsi] been deep state from the beginning. Your whole birther thing is used as a club to destroy conservatives....I look forward to our confrontation. I will demolish you. You're a fraudster, out of your alcoholic haze you have made up lies about David Jones and Alex Jones and Roger Stone and now I suspect they want you to lie about the President." Am. Comp. ¶ 66**

**(13)   Plaintiff Corsi of being a "spook, back and forth with different agencies," Am. Comp. ¶ 67**

**(14)   Falsely publishing a false statement of Plaintiff Corsi "not being able to walk." Am. Comp. ¶ 68**

Sixth, the Magistrate on his own, without basis, makes a finding that Plaintiffs have not shown actual malice with regard to the defamatory statements, that is knowledge of their falsity or a reckless disregard for the truth, while staying discovery and not even allowing Plaintiffs Corsi and Klayman to take depositions of the Defendants. His approach is a "heads I win, tails you lose" manipulation of the facts and the law. And, as pled as well the Plaintiffs and Defendants have worked together in the past, he ignores that Defendants knew that what they published was false.

Seventh, the Magistrate, relying on a *sua sponte* order of another judge in another case which did not even involve Plaintiff Corsi, states at footnote 2 of his Report that he and Mr. Klayman had an obligation to amend a complaint which Mr. Klayman voluntarily dismissed given this judge's likely personal involvement with Stone recommending him to be appointed to the federal bench. *See* Exhibit D. This is more than strained reasoning shows a predetermined outcome determinative bias and prejudice and amounts to little more than theater of the absurd. This newly appointed and confirmed 38 year old judge has been referred to the Judicial Counsel of the Eleventh Circuit for investigation of his conduct.

Eighth, Plaintiffs Corsi and Klayman alleged that Defendants were acting in concert in defaming them as well as violating other legal rights, such as the Lanham Act. It was also alleged, because it is true, that Defendants were at all material times employed by Defendant Infowars and in the case of Defendants Alex Jones and David Jones, they are the owners of this rogue operation that defames people and entities to reap large profits, as also occurred with the Sandy Hook families, where a similar defamation case is proceeding to trial and is currently in the discovery phase, which the Magistrate prevented for his own apparent reasons here. Exhibit E. Obviously, were the Magistrate to even consider questioning the plain allegations on the face of the Amended Complaint and supporting affidavits with regard to concerted joint tortfeasor conduct, which he cannot do in any event to dispose of a Rule 12(b)(6) motion, he had a duty to allow discovery of the Defendants in this regard—at an absolute minimum.

The Magistrate, again twisting case law to suit his bias, writes at page 8, that "When a defamation suit is brought against a media defendant over a matter of public concern, the plaintiff bears the burden of proving falsity." Of course this is true if the matter were given to a jury, but it does not take legal rocket science to recognize that a plaintiff has no such burden on a Rule 12(b)(6) motion and when discovery rights have arbitrarily been cut off.

As for the allegations of concerted action by the Defendants, the law is clear that persons and entities can be held liable for defamation when agents and surrogates are used to accomplish this. Notwithstanding the affidavits incorporated into a well pled Amended Complaint and related pleadings, and the hard fact that Defendants all closely work together as part of Infowars and appeared together on the same defamatory broadcasts, the law, which was presented to the Magistrate, shows otherwise:

> Civil conspiracy is used to extend tort liability beyond the wrongdoer to those who merely planned, assisted, or encouraged his acts. *See Carroll v. Timmers*

*Chevrolet, Inc*., 592 S.W.2d 922, 925-26 (Tex. 1979); *Helping Hands Home Care, Inc*. *v*. *Home Health of Tarrant County, Inc*., 393 S.W.3d 492, 506 (Tex. App.-Dallas 2013, pet. denied). Once a civil conspiracy is proved, each conspirator is responsible for all acts done by any of the conspirators in furtherance of the conspiracy. *Bentley v*. *Bunton*, 94 S.W.3d 561, 619 (Tex. 2002); *Carroll*, 592 S.W.2d at 926 (Tex. 1979); *Helping Hands*, 393 S.W.3d at 506. A finding of civil conspiracy imposes joint and several liability on all conspirators for actual damages resulting from the acts in furtherance of the conspiracy. *Carrol*l, 592 S.W.2d at 925; *Helping Hands*, 393 S.W.3d at 506. When a jury finds that liability for a civil conspiracy exists, this finding requires the legal conclusion to impose joint and several liability on the co-conspirators. *LandAmerica Commonwealth Title Co*. *v*. *Wido*, No. 05-14-00036-CV, 2015 Tex. App. LEXIS 11201, at *29 (Tex. App. Oct. 29, 2015).

Additionally, under Restatement (Second) of Torts, § 577, comment f, "One is liable for defamation by a third person whom as his servant, agent, or otherwise he directs or procures to publish defamatory matter." *See also Universal Commun*. *Sys*. *v*. *Turner Broad*. *Sys*., 2005 U.S. Dist. LEXIS 58575, at *8 (S.D. Fla. Mar. 17, 2005) (""One is liable for defamation by a third person whom as his servant, agent, or otherwise he directs or procures to publish defamatory matter.")

Finally, Plaintiffs respectfully request that this honorable Court review the Amended Complaint, its attachments and related pleadings, which contain sworn affidavits of Plaintiffs Corsi and Klayman , along with the sworn affidavit of Kelly Morales, which buttresses with first hand knowledge Defendants' nefarious modus operandi, and simply vacate the Magistrate' order, un-stay discovery, and defer on ruling on the pending motions until discovery is conducted. *See* Exhibits B-1, B-3, C-1. While this is not necessary to dispose of the Magistrate's Report, given its bias and rank factual and legal errors, apparently written in haste after seven (7) months that it sat on his desk, and on the eve of his retirement, discovery will confirm all of the allegations in the Amended Complaint.

As this honorable Court warned the parties at the outset of this case that had already

languished before a District of Columbia federal court for over a year:

> You're going to have to figure how much time you want because once I get it set, once I fill in after a subsequent conference your trial month and final pretrial conference date and time, you're not likely to get a continuance or a postponement.

> I like to try lawsuits. If I had my way and could pass one law, I would do away with motion practice altogether, and you would either settle your case or try your case, the way it was in the olden days.

Indeed, this is the type of case that should go to a jury to decide, not be "deep sixed" by a Magistrate who, for whatever undisclosed reason, has his own unsupportable view, not backed up with facts or law, but instead bias, that it should not proceed, and who instead outrageously suggests that Plaintiffs should be sanctioned by the presiding judge for asserting their rights. And, that there are cases pending in other jurisdictions, which Plaintiffs offered to have transferred and consolidated, is no reason to dismiss the Amended Complaint with prejudice. This is not the concern of the Magistrate, but instead if at all these other courts, and simply shows that, for whatever undisclosed reason, he had a predetermined mindset and will used any unfounded excuse to deny Plaintiffs their rights to discovery and trial.

For these compelling reasons, the Magistrate's Report is of no use to this Court, so fatally flawed and inaccurate as it is, and the presiding judge respectfully is requested to vacate the Report and allow this case to go to discovery, so as not to waste more time arguing over a Report that is not worth the paper it is written on.

Both Plaintiff Corsi and Plaintiff Klayman, by and through the undersigned and pro se, agree that respectfully this honorable Court must take immediate action to prevent a manifest injustice. To further this end, Plaintiffs respectfully request an expeditious status conference and hearing with the presiding judge the Honorable Lee Yeakel.

Defendants predictably do not consent to this relief.

Dated: May 27, 2021                          Respectfully Submitted,

                                             /s/Sanjay Biswas
                                             SANJAY BISWAS, Esq.
                                             #24061235—Texas
                                             #24966--Louisiana
                                             11720 Duxbury Dr.
                                             Frisco, Texas 75035
                                             Telephone: (972)-866-5879
                                             Email:sanjaybiswas41@gmail.com
                                             Fax: 1-800-506-6804

                                             *Counsel for Dr. Jerome Corsi*

                                             /s/Larry Klayman
                                             Larry Klayman, Esq.
                                             7050 W. Palmetto Park Rd
                                             Boca Raton FL, 33433
                                             Email:leklayman@gmail.com
                                             Tel: 561-558-5336

                                             *Plaintiff Pro Se*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 27, 2021, a true copy of the foregoing was filed via

ECF and served to all counsel of record though the Court's ECF system.

                                             /s/ Sanjay Biswas

EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**

DR. JEROME CORSI, Individually
Denville, NJ, 07834

And

LARRY KLAYMAN, Individually          Case Number:   1:20-cv-298-LY
7050 W. Palmetto Park Rd. #15-287
Boca Raton, FL, 33433                AMENDED COMPLAINT

                Plaintiffs

          v.

INFOWARS, LLC
100 Congress Ave., 22nd Floor
Austin, TX 78701

And

FREE SPEECH SYSTEMS, LLC
100 Congress Ave., 22nd Floor
Austin, TX 78701

And

ALEX E. JONES, Individually
3019 Alvin Devane Blvd., Suite 300-350
Austin, TX 78741

And

DAVID JONES, Individually
3019 Alvin Devane Blvd., Suite 300-350
Austin, TX 78741

And

OWEN SHROYER, Individually
3019 Alvin Devane Blvd., Suite 300-350
Austin, TX 78741

And

1

ROGER STONE, Individually
447 Coral Way
Fort Lauderdale, FL 33301

                      Defendants.

## INTRODUCTION

Plaintiffs DR. JEROME CORSI ("Plaintiff Corsi or Dr. Corsi") and LARRY KLAYMAN ("Klayman") hereby files this action against INFOWARS, LLC ("Defendant InfoWars"), FREE SPEECH SYSTEMS, LLC ("Defendant Free Speech Systems"), ALEX E. JONES ("Defendant Alex Jones"), DAVID JONES ("Defendant David Jones"), OWEN SHROYER ("Defendant Shroyer") (collectively the "Infowars Defendants"), and ROGER STONE ("Defendant Stone") for Defamation, Intentional Infliction of Emotional Distress, and Assault, and violation of the Lanham Act.

## JURISDICTION AND VENUE

1.     This Court has federal question jurisdiction over this case pursuant to 28 U.S.C § 1331.

2.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2), (3) in that a substantial part of the events or omissions giving rise to Plaintiffs' claims arose in this district. The U.S. District Court in the Southern District of Florida transferred this action to this Court. Defendants actions were targeted to influence Special Counsel Robert Mueller's Russian collusion investigation and prosecution of Defendant Stone, a colleague of the other Defendants, which and who are centralized in this judicial district and the defamatory and other illegal acts occurred herein as well as throughout the United States and worldwide.

## THE PARTIES

3.      Plaintiff Corsi is an author and political commentator who publishes works in this judicial district and nationwide. Plaintiff Corsi is a citizen of New Jersey.

4.      Plaintiff Klayman is a public interest legal advocate, private practitioner and litigator who represented Plaintiff Corsi with regard to Special Counsel Robert Mueller's ("Mueller") Russian collusion investigation.  Plaintiff Klayman is also a media personality and author, columnist and syndicated radio talk show host. Plaintiff Klayman is a citizen of Florida.

5.      Defendant InfoWars is a Texas limited liability company with principal offices located in Austin, TX.

6.      Defendant Free Speech Systems is a Texas limited liability company with principal offices located in Austin, TX.

7.      Defendant Alex  Jones is a well-known extreme fabricator of false stories and conspiracies, who has been sued numerous times for alleged defamation. He is  media personality who creates frequently false and defamatory content that is broadcasted on the radio and posted on the internet at www.infowars.com and elsewhere on the internet and other social media sites in this district, nationally and internationally. Defendant Alex Jones is a citizen of Texas.

8.      Defendant David Jones is Defendant Alex Jones's father and holds the official title of Director of Human Relations for Defendant Free Speech Systems. On information and belief, Defendant David Jones is the owner of Defendant InfoWars and Free Speech Systems and he manages and controls the business and related activities for Defendants InfoWars and Free Speech Systems, as well as Defendant Alex Jones' other companies. Defendant David Jones is a citizen of Texas. At all material times he worked in concert with and as an agent for the other Defendants and Defendant Roger Stone and furthered, participated in  and ratified  the illegal acts set forth in this

Complaint. He profits and profited at all material times financially and otherwise from the tortious acts of the other Defendants.

9.      Defendant Shroyer is a newscaster for Defendant InfoWars. Defendant Shroyer is a citizen of Texas.

10.     Defendant Stone is an individual and a citizen of Florida and a resident of Fort Lauderdale, Florida. Defendant Stone was indicted by Special Counsel Robert Mueller as part of the alleged "Russian Collusion' investigation and subsequently convicted on seven felony counts of perjury, witness tampering and obstruction of justice. While his 40 month sentence to serve time federal prison was commuted by President Donald J. Trump, notably he was not pardoned and his felony convictions for perjury, witness tampering and obstruction of justice stand. He is a self-proclaimed "Dirty Trickster" who admires and frequently extols the "virtues" of Mafia figures and other unsavory persons, who he professes to pattern himself after. *See* Exhibit 1 – Mueller Indictment.

## **GENERAL ALLEGATIONS**

11.     Defendant InfoWars and Defendant Free Speech Systems are both owned, controlled, and operated by Defendant Alex Jones and David Jones. Defendant Free Speech Systems owns www.infowars.com, where content created by Defendants Alex Jones, Shroyer and Stone were at all material times posted and broadcast into this district, nationally and internationally.

12.     Defendant Alex Jones hosts *The Alex Jones Show*, which is broadcast on radio and internet social media networks throughout the United States of America and internationally, including this judicial district, and online.

13.     Defendant Shroyer hosts *The War Room* at all material times along with

Defendant Stone which is broadcast on radio and internet social media networks throughout the United States of America and internationally, including this judicial district, and online.

14. Defendants' reach and influence are enormous. On information and belief, Defendant Alex Jones and InfoWars has a radio audience of over two million people. Before it was banned from YouTube, Defendant Alex Jones' and InfoWars' channel had more than 2.4 million subscribers.[1]

15. Defendants, each and every one of them, in concert, do substantial business and promote and sell various goods in this judicial district and nationwide, including medicine, supplements, and "tchotchkes" with InfoWars branding. The money earned from these sales funded the conspiracy and concerted acts between amongst Defendants to defame, intimidate, coerce and threaten Plaintiffs in order to first try to improperly influence the Mueller Russian collusion investigation and subsequently try to coerce false testimony from Plaintiff Corsi at Stone's criminal prosecution favorable to Defendant Stone once he had been indicted.

16. Defendant Stone also does business promotes and sells various goods in this judicial district and nationwide, including medicine, supplements, books, and "tchotchkes" with his own branding, and he also fundraises by direct mail and the internet in this district. He claims to have raised millions of dollars with his fundraising, wherein he falsely claims to have been persecuted by a federal judge and the jury, despite not having presented one witness, including himself, at his criminal trial, obviously because he was guilty as charged. In fact, he was convicted on seven felony counts in this own words, as the undersigned pro se counsel, Mr. Klayman, who sat in on the trial for his client Plaintiff Corsi, can attest. The money earned from

---

[1] Casey Newton, *YouTube deletes Alex Jones' channel for violating its community guidelines*, The Verge, Aug. 6, 2018, available at: https://www.theverge.com/2018/8/6/17656708/youtube-alex-jones-infowars-account-deleted-facebook-apple-spotify

these sales funds Defendant Stone's legal defense fund and the conspiracy between Defendants and Stone to defame, intimidate, coerce and threaten Plaintiffs in order to first try to improperly influence the Mueller Russian collusion investigation and subsequently try to coerce false testimony from Plaintiff Corsi, Plaintiff Klayman's client, favorable to Defendant Stone once he had been indicted.

17.    The Defendants related to Infowars in particular have a long and sordid history of publishing and broadcasting defamatory material, including falsely, recklessly and baselessly accusing the families of the schoolchildren who lost their lives during the 2012 Sandy Hook Elementary School massacre of staging the massacre and faking the deaths of their children.[2]

18.    The Sandy Hook families had to endure years of abuse and torture from Defendants before finally filing suit against numerous parties involved with InfoWars, including Defendant Alex Jones and Shroyer, for defamation.

19.    As just one example, a Florida woman was arrested for making death threats to a parent of a Sandy Hook victim.[3] According to the U.S. Department of Justice, the motivation behind the threats was the lies propagated by these Defendants that the Sandy Hook massacre was a hoax.[4]

20.    Furthermore, Defendant Alex Jones in concert with the other Defendants propagated and promoted the "Pizzagate" conspiracy on his show, accusing a restaurant called Comet Ping Pong in the Washington D.C. area of operating a child sex ring in its non-existent

[2] Aaron Katersky, *Families of Sandy Hook shooting victims win legal victory in lawsuit against InfoWars, Alex Jones*, ABC News, Jan. 11, 2019, available at: https://abcnews.go.com/US/families-sandy-hook-shooting-victims-win-legal-victory/story?id=60314174
[3] Daniella Silva, *Conspiracy Theorist Arrested for Death Threats Against Sandy Hook Parent*, NBC News, Dec. 7, 2016, available at: https://www.nbcnews.com/news/us-news/conspiracy-theorist-arrested-death-threats-against-sandy-hook-parent-n693396
[4] *Id.*

basement that purportedly involved Hillary Clinton and John Podesta. This caused one of his listeners to shoot up the restaurant after being told by Defendant Jones to "self-investigate" the "Pizzagate" conspiracy theory.[5]

21.     Defendants, acting in concert, propagated these outrageous lies with no regard for the grief of their victims in order to gain notoriety, fame, and profit.

22.     The Defendants, acting in concert, as part of their latest scheme for notoriety, fame, and profit,  worked in concert with and on information and belief continue to work in concert with Defendant Stone, who was  at all material times an integral host on Infowars, and handsomely compensated by it,  to defame, intimidate, and threaten Plaintiffs.

23.     Defendant Stone - who was  indicted on  seven  counts of perjury, witness tampering and obstruction of justice by Special Counsel Robert Mueller and then placed under a total gag order by the jurist, the Honorable Amy Berman Jackson,  presiding over his prosecution for, in part, even threatening her by posting, among other coercive and threatening acts, an Instagram meme of a crosshairs, that is a gun, to her head,  and subsequently convicted on all seven felony counts - has appeared numerous times on shows broadcasted by Defendant InfoWars, and hosted by Defendants Alex Jones and Shroyer, where  Defendants at the direction of Stone and Stone himself have published malicious false, misleading, and defamatory statements concerning Plaintiffs.

24.     Specifically, the seven count Mueller Indictment against Stone involved lying under oath - that is, perjury - witness tampering and obstruction of justice by threatening to kill a material witness, Randy Credico ("Credico") and his service dog, if Credico did not lie or invoke

[5] James Doubek, *Conspiracy Theorist Alex Jones Apologizes For Promoting 'Pizzagate'*, NPR, Mar. 26, 2017, available at: https://www.npr.org/sections/thetwo-way/2017/03/26/521545788/conspiracy-theorist-alex-jones-apologizes-for-promoting-pizzagate

the Fifth Amendment to government authorities concerning his involvement with Roger Stone. Credico is Person 2 in the Mueller Indictment of Stone. *Id.* Person 1 in this Mueller Indictment is Dr. Corsi.

25.     Even before Defendant Stone was indicted, he began a public relations campaign in this district, nationally and internationally to maliciously defame, smear, intimidate and threaten Dr. Corsi and Plaintiff Klayman, Plaintiff Corsi's lawyer and defense counsel.

26.     As just one example, in an article from The New Yorker, Defendant Stone was quoted as saying about Plaintiff Corsi, "He's certifiably insane, and he has told multiple provable lies."[6] This malicious defamatory statement, among others, was published  in concert with Defendants.

27.     Defendant Stone knew that he was going to be indicted, and therefore began this public relations campaign to maliciously defame smear, intimidate and threaten Plaintiff Corsi and Plaintiff Klayman, Corsi's legal counsel, even before his actual indictment on January 25, 2019, in order to try to influence public opinion and Special Counsel Robert Mueller – by trying to attribute guilt to Plaintiff Corsi and not him - as well as to try to raise money for his legal defense.

28.     This defamatory public relations campaign was calculated to coerce Plaintiff Corsi to testify falsely at Defendant Stone's criminal trial before Judge Jackson.

29.     Defendant Stone likes to portray himself as Mafia, and indeed on information and belief has Mafia connections, frequently making reference to Mafia figures who he admires, as well as other unsavory types who have been alleged to have engaged in unethical and/or illegal

---

[6] Jeffrey Toobin, *Roger Stone's and Jerome Corsi's Time in the Barrel*, The New Yorker, Feb. 18 & 25 Issue, available at: https://www.newyorker.com/magazine/2019/02/18/roger-stones-and-jerome-corsis-time-in-the-barrel

behavior. For example, he frequently makes reference to his heroes being Hyman Roth in the 'Godfather," who was the movie version of Meyer Lansky, and Roy Cohn, not to mention, Richard Nixon, for his role in Watergate. In this regard, after Stone was indicted he held a press conference on the courthouse steps of the federal courthouse in Ft. Lauderdale, where he was booked, with his arms defiantly in the air in the "victory' pose used by Nixon after he resigned in disgrace as a result of the Watergate scandal. At the time, Stone had been employed by a Nixon group called CREEP, or the Committee to Reelect the President. Defendant Stone even has a large tattoo of Richard Nixon affixed to his back. Thus, given his admiration for persons such as these, particularly Mafia figures, his actions as pled herein must be taken as threats, as well as being defamatory. And, Plaintiff Corsi is 72 years old and thus very vulnerable emotionally, physically and financially to these threats. Stone's intentional infliction of emotional distress and coercion and threats were intended to try even cause Plaintiff Corsi to have heart attacks and strokes, in order that Plaintiff Corsi would be unable to testify at Stone's criminal trial. Tellingly, Stone threatened kill a material witness and his service dog, Credico, Person 2 in the Mueller Indictment, "Mafia style." During his criminal trial, testimony was elicited by the government prosecutors in proving their witness and obstruction of justice felony charges, that Defendant Stone had told material witness Credico to do a Frank Pentangeli, a Mafia character in the film The Godfather, that is not testify to the truth. Stone also fashions himself and indeed has the reputation, at a minimum, as being the preeminent "dirty trickster," of which he is proud. *See* "Get Me Roger Stone" on Netflix.

30. By defaming Plaintiffs, Defendant Stone had hoped to not only intimidate Plaintiffs to severely harm and damage their reputations, but also to coerce and threaten Plaintiff Corsi to testify falsely if subpoenaed to be called as a material witness in Stone's criminal trial.

He was also trying divert funds away from Dr. Corsi's legal defense fund, while boosting his own legal defense fund.

31.     Stone has also used and continues to employ surrogates and agents, either out in the open or secretly, to defame Plaintiffs, such as Defendants herein, and his "friend" Michael Caputo, Cassandra Fairbanks, reporter Chuck Ross of The Daily Caller, and Tom Fitton of Judicial Watch, to name just a few.

32.     Tellingly, in a video published by The Daily Caller, Defendant Shroyer appearing with Stone, admits that he will serve as a surrogate, that is an agent for Stone if Stone receives a gag order, which he did. 7   The other Defendants, like Shroyer, are also surrogates and agents of Stone, including but not limited to agent and Defendant David Jones, who controls and approves of and ratifies the conduct at all material times all of the Defendants.

33.     Defendant Stone's illegal and improper attempts to influence the Russian collusion investigation was even recognized by the presiding judge, the Honorable Amy Berman Jackson ("Judge Jackson"), who was forced to issue a complete "gag" order on Stone after Stone attempted to incite violence against Judge Jackson by putting a picture of her face and gun crosshairs up on his Instagram account.8

34.     In her minute order of February 21, 2019 imposing the total "gag" order on Stone, Judge Jackson directly cited and referenced his use of surrogates, such as all of the other Defendants herein :

> Furthermore, the defendant may not comment publicly about the case indirectly
> by having statements made publicly on his behalf by surrogates, family members,

7 https://www.youtube.com/watch?v=SSDkh5RYtGo
8 *Judge in Roger Stone case orders hearing after he appeared to threaten her on Instagram*,
Washington Post, Feb. 19, 2019, available at:
https://www.washingtonpost.com/politics/2019/02/18/roger-stone-deletes-photo-judge-presiding-over-his-case-says-he-didnt-mean-threaten-her/?utm_term=.2d3c5afa6326

spokespersons, representatives, or volunteers.

35.     Further evidence of Defendant Stone's collaboration and actions in concert as joint tortfeasors with the other Defendants, which other Defendants which and who were at all material times Stone's agents, as well as Stone's pattern and practice of defamatory, intimidating, coercive, threatening and defamatory conduct, is set forth in an *amicus curiae* brief filed by Plaintiff Klayman on behalf of Plaintiff Corsi in Defendant Stone's criminal case. Such evidence is attached hereto as Exhibit 2 and incorporated herein by reference, as well as civil complaint filed by Corsi and Klayman against Stone, and in a civil complaint filed by Klayman against Fitton. *See* Exhibits 3, 4, and 5, which are incorporated herein by reference.

36.     Defendants have, by working in concert with and as agents of Stone, therefore engaged in illegal witness tampering, intimidation and threats in violation of 18 U.S.C. § 1512 by virtue of the defamatory and threatening acts and practices as alleged herein. Not coincidentally, this was what largely Stone was indicted and convicted  for by Special Counsel Robert Mueller, for which he was sentenced to 40 months of incarceration a federal penitentiary.

## DEFENDANTS' DEFAMATORY CONDUCT

37.     Defendant Stone has appeared numerous times on programs of the Defendants, *The Alex Jones Show* and The *War Room (and has been a compensated Infowars host in his own right)*. These shows are hosted by Defendant Alex Jones and Shroyer and Stone where numerous false, misleading, malicious and defamatory statements of and concerning Plaintiffs were made, published, and or ratified by all of the Defendants, each and every one of them, as surrogates and agents of Defendant Stone.

38.     Plaintiffs have demanded retraction and correction of the defamatory videos and publications set forth below and generally in this Complaint, but Defendants have arrogantly

refused, thereby ratifying any and all defamatory statements contained therein, and compounding the damage alleged herein.

39.     Defendants, at a minimum, acted recklessly with disregard for the truth, as they have known Plaintiff Corsi for a long time, and even worked with him and are also intimately familiar with Plaintiff Klayman, so they were well aware that the statements made by the co-Defendant Stone, and their own false, misleading, malicious and defamatory statements were, indeed, false, as well as their acting as agents of, much less their ratification of the malicious false statements published by Defendant Stone on their networks and media sites.

40.     As the content containing the malicious false, misleading,  and defamatory statements were published on the internet and elsewhere, it is proliferated like a "cancerous virus," and is was and remains available for viewing from countless sources, thereby exponentially increasing the prejudicial and defamatory impact and severe damage inflicted on Plaintiffs.  Judge Jackson, in issuing her two gag orders against Stone, herself recognized how postings calling for physical harm to her and other threatening postings on the internet proliferate widely and once made cannot be taken back.

### I.     *The October 26, 2018 Video*

41.     In a video from October 26, 2018, Defendant Alex Jones, acting in concert with the other Defendants and at their direction, particularly Defendant Stone, makes several false, misleading, malicious and defamatory statements about Plaintiff Corsi.[9]

42.     At 0:45, Defendant Alex Jones maliciously and falsely published at the direction of Defendant Stone and the other Defendants that Plaintiff Corsi "seemed to be extremely mentally degraded to the point of what I would call dementia."

43.     In the same video, Defendant Alex Jones, acting in concert with and at the

[9] https://www.youtube.com/watch?v=UuXPAn0nZo8

direction of Defendant Stone and the other Defendants, maliciously fabricates a story where he purportedly saw Plaintiff Corsi at a steakhouse "on the ground at another table" and that his security staff "thought he was dead in the elevator."

44.     At 5:08, Defendant Alex Jones, acting in concert with and at the direction of Defendant Stone and the other Defendants, after accusing Plaintiff Corsi of having suffered a stroke, publishes maliciously that "whatever comes out of his mouth ain't the truth."

45.     Tellingly and not at all coincidentally, Stone appeared as a guest on the same video, as evidence of Defendants working in concert with and as agents of Stone.

46.     These malicious false, misleading, and defamatory statements were published by Defendants acting in concert and at the direction of Defendant Stone as Stone's agents to discredit and coerce into false testimony from Plaintiff Corsi in order to preserve the reputation of and assist their co-conspirator Stone before Mueller's Russian collusion investigation and later prosecution, as Stone had been indicted and Plaintiff Corsi named a material witness. Importantly, Plaintiff Corsi was not indicted. Plaintiff Klayman was known by all of the Defendants to be Dr. Corsi's legal counsel.

## II.    *The January 18, 2019 Video*

47.     Before Defendant Stone was indicted, on or about January 18, 2019, he appeared on *The War Room* with Defendant Shroyer, where he made several malicious false, misleading, and defamatory statements in this district,  nationally and internationally  regarding Plaintiffs (the "January 18 Video").[10] The same video was published on Stone's YouTube channel, "*Stone Cold Truth*," on January 18, 2019.[11]

48.     These  malicious  false,  misleading,  and  defamatory  statements  were  at  the

[10] https://www.infowars.com/watch/?video=5c3fbf24fe49383dcf6996e4
[11] https://www.youtube.com/watch?v=cJyfgdvtFx8

direction of all of the Defendants and adopted and published by each and every one of the Defendants, rendering them joint tortfeasors and jointly and severally liable.

49.    At 2:09 in the January 18 Video, Stone and the other Defendants working in concert and at the direction of Defendant Stone as his agents maliciously and falsely published that Plaintiff Corsi was "fired from World Net Daily."

50.    At 2:27 in the January 18 Video, Stone and the other Defendants working in concert and at the direction of Defendant Stone as his agents maliciously falsely and misleadingly published that, "He (Corsi) was perfectly willing to lie, to perjure himself saying that a memo that he had wrote me was written on the 30th for the purposes of cover-up…. which is further proof that Jerry lied under oath."

51.    At 2:55 in the January 18 Video, Stone and the other Defendants working in concert with at the direction of and as agents of Defendant Stone maliciously falsely and misleadingly published, "and then states that I knew about John Podesta's emails being stolen in advance, the only proof of that is Jerry's feeble alcohol affected memory – it's a lie…."

52.    At 3:35 in the January 18 Video, Stone and the other Defendants working in concert at the direction of and as agents of Defendant Stone maliciously falsely and misleadingly published that "Jerry was prepared to stab a principle Trump supporter in the back, he was perfectly prepared to bear false witness against me, even though I had done nothing in my entire life other than help him."

53.    At 4:20 in the January 18 Video, Stone and the other Defendants working in concert with and at the direction and as agents of Defendant Stone  maliciously falsely and misleadingly published that "all I ever did was show Jerry Corsi friendship and support and try to help him and his family and what I get is Judas Iscariot, the willingness to testify against me and

help the deep state bury me….and then he makes up this story about helping me formulate a cover story."

54.    At 6:26 in the January 18 Video, Stone and the other Defendants working in concert with and as agents at the direction of Defendant Stone  maliciously falsely published that "you can always tell when Jerry Corsi is lying because his lips are moving…."

55.    At 1:25 in the January 18 Video, Stone and the other Defendants working in concert with and as agents at the direction of Defendant Stone maliciously falsely published that "He's (Klayman) never actually won a courtroom victory in his life."

56.    At 1:30 in the January 18 Video, Stone and the other Defendants working in concert and as agents at the direction of Defendant Stone maliciously  falsely published, "He (Klayman) was ousted at Judicial Watch. Ask Tom Fitton [the current president of Judicial Watch] why he left. He was 'ousted' because of a 'sexual harassment complaint.'"

57.    In actuality and truth, Plaintiff Klayman left Judicial Watch voluntarily on his own accord in order to run for U.S. Senate in Florida in 2003-2004.

58.    Not coincidentally, Plaintiff Klayman has a jury verdict and judgment against Fitton's Judicial Watch for having defamed him with malice. Punitive damages were also awarded by the jury in the U.S. District Court for the Southern District of Florida. *See* <u>Exhibit 5-1</u>.

59.    At 1:37 in the January 18 Video, Stone acting in concert with the other Defendants maliciously working in concert with the other Defendants falsely published, "He's (Klayman) incompetent, he's a numbskull, he's an idiot, he's an egomaniac, and he could be the single worst lawyer in America. With him as Jerry Corsi's lawyer, Corsi may get the electric chair. So your idea that he's a good guy is entirely wrong"

60.     In actuality, Plaintiff Klayman has been a practicing attorney for over four decades and has won numerous cases on behalf of his clients and also against the government for constitutional and other violations.   He is the founder of both Judicial Watch and Freedom Watch, a former candidate for the U.S. Senate in Florida, a former trial attorney and prosecutor of the Antitrust Division of the U.S. Department of Justice, where he was a member of the trial team that successfully broke up the AT&T monopoly and created competition in the telecommunications industry. Among many other legal victories, Plaintiff Klayman also won landmark decisions at the chairman and general counsel of Freedom Watch enjoining the illegal mass surveillance by the National Security Agency. *Klayman v. Obama*, 1:13-cv-851 (D.D.C). *See* Exhibit 6 --*Klayman biography*, which is incorporated herein by reference. Stone knew this when working in concert with the other Defendants he published acting in concert with the other Defedants the malicious false and misleading statements about Klayman and thus willfully and maliciously defamed Plaintiff Klayman.

61.     At 2:01 in the January 18 Video, Stone maliciously working in concert with the other Defendants falsely and misleadingly published that Plaintiff Klayman is a "piece of garbage."

62.     At 4:11 in the January 18 Video, Stone maliciously working in concert with the other Defendants falsely and misleadingly published, "For those people out there who think…that Larry Klayman's IQ is higher than 70, you're wrong…"

63.     Defendants, all of them working in concert and as agents of Defendant Stone, published these malicious false, misleading, and defamatory statements with malice and with full knowledge that they were false and misleading, and/or at a minimum, with a reckless disregard for its truthfulness. These statements falsely and misleadingly state that Plaintiff Corsi was fired

from World Net Daily, that he committed perjury (a federal offense), and that he is an untruthful person. They also create the false and misleading implication that Plaintiff Klayman is unqualified to be an attorney, public advocate and is a bad and loathsome person, unfit for his trades and professions. Plaintiff Klayman is also an author, columnist and  nationally syndicated radio and internet talk show host on Radio America, his show titled "Special Prosecutor with Larry Klayman." See www.radioamerica.com. The malicious false and misleading published statements as alleged herein also severely damaged Plaintiff Klayman personally and professionally in this regard, particularly since he and his show compete with Defendant InfoWars and and the other Defendants in media markets in this district, nationally and internationally. Plaintiff Corsi also competes with Defendant InfoWars and the other Defendants in media markets in this district, nationally and internationally.

### III.    Other Malicious Defamatory Publications

64.    In another appearance on InfoWars which was posted to YouTube[12] on January 17, 2019, Defendant Stone working in concert with the other Defendants at 6:22 maliciously falsely and misleadingly published that "He [Corsi] was perfectly willing to bear false witness against me on multiple points that are complete fabrications."

65.    In another appearance on InfoWars, this time on *The Alex Jones Show* from January 21, 2019, Defendant Stone maliciously working in concert with the other Defendants falsely and misleadingly published that "the good doctor [Corsi] has told a number of lies. In fact, he's starting to conflate his lies…. he was perfectly willing to lie about me…. but now lying about Alex Jones, lying about InfoWars, lying about Dr. (David) Jones, who's one of the nicest, gentlest, sweetest, most honest men I have ever met, it's beyond the pale…. Jerry Corsi can no

---

[12] https://www.youtube.com/watch?v=GJd8YBDvm1Q

longer be believed."[13]

66.     In the same appearance, Stone maliciously working in concert with the other Defendants falsely and misleadingly published that, "I think you've [Corsi] been deep state from the beginning. Your whole birther thing is used as a club to destroy conservatives….I look forward to our confrontation. I will demolish you. You're a fraudster, out of your alcoholic haze you have made up lies about David Jones and Alex Jones and Roger Stone and now I suspect they want you to lie about the President." This is clearly a threat, as well as being maliciously defamatory. It is akin to the threats against Person 2 in the Mueller Indictment, Randy Credico, who Defendant Stone, as set forth in the Mueller Indictment, based on Stone's own words contained in his own documentary evidence, threatened to kill along with Credico's service dog. Later Stone threatened the judge presiding over his criminal prosecution, the Honorable Amy Berman Jackson.

67.     In the same January 21, 2019 video, at 43:40, Defendant Alex Jones maliciously acting in concert with the other Defendants and as an agent at the direction of Defendant Stone falsely accuses Plaintiff Corsi of being a "spook, back and forth with different agencies," falsely saying that Dr. Corsi had worked with different government agencies.

68.     Defendant Alex Jones further maliciously acting in concert with the other Defendants and at the direction as an agent of Defendant Stone falsely accuses Plaintiff Corsi of sometimes "not being able to walk," creating the false and defamatory implication that he is an alcoholic.

69.     Defendants acting in concert as an agent at the direction of Stone published these false, misleading, and defamatory statements at the direction and agent of and  in concert with Stone with malice and with full knowledge that they were false and misleading, and/or at a

[13] https://www.youtube.com/watch?v=ANfe9d7YzL0 (Beginning at 38:00)

minimum, with a reckless disregard for their truthfulness. These statements falsely and misleadingly published that Plaintiff Corsi committed perjury (a federal offense), is an untruthful person, and is an alcoholic. They also contain threats, amplified by Defendants facial expressions and hostile demeanor against Plaintiff Corsi and his legal counsel Larry Klayman. Defendants, acting at the direction and working in concert with Stone, obviously believed that in order to advance their interests and improper if not criminal motivations, they also had to destroy and severely harm the legal counsel of Plaintiff Corsi, who had been at all material times representing Plaintiff Corsi before Special Counsel Robert Mueller, congressional committees and generally and counseled Plaintiff Corsi when he was subpoenaed to testify truthfully in Stone's criminal trial for perjury, witness tampering, threatening to kill a material witness and his service dog, as well as obstruction of justice. Corsi, despite all of this, was never called as a witness by Defendant Stone, since Stone and his legal counsel must have concluded that his truthful testimony would not have benefited Stone.

<u>FACTS PERTAINING TO DEFENDANTS' UNFAIR COMPETITION</u>

70.    In addition to being an investigative journalist/author and a public interest litigator/advocate, respectively, Plaintiffs Corsi and Plaintiff Klayman are both competitors to Defendants as conservative media personalities, broadcasters, authors and columnists on social media and elsewhere.

71.    For instance, Plaintiff Klayman also hosts a syndicated broadcast and on-line radio show on about 50 networks and podcasts and produces videos that are posted on the internet, issues press releases, commentary and other publications.

72.    Defendants have directed, made, adopted, and or ratified numerous false or misleading statements of fact of and concerning Plaintiffs during their various subject programs

and media postings and publications as pled herein, which all contain significant advertisement or promotions.

73.    These false and/or misleading facts materially prejudice the viewers and/or listeners as to the quality, nature, and contents of Plaintiffs' services, which has caused significant competitive and commercial injury to Plaintiffs, as well as loss of good will and reputation.

74.    Plaintiffs, like Defendants, rely on viewer and listener financial and other support and sales and their reputations and good will in order to continue their work. Defendants' false and/or misleading statements concerning Plaintiffs is meant to, and has, diverted financial and other support, referrals and sales away from Plaintiffs and to Defendants instead, and severely harmed Plaintiffs' personal and professional reputations.

## FIRST CAUSE OF ACTION
### *Defamation*

75.    Plaintiffs re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

76.    Acting in concert Defendants and as an agent at the direction of Defendant Stone published the aforementioned malicious, false, misleading and defamatory statements of and concerning Plaintiffs in this judicial district, nationwide, and worldwide.

77.    These false and misleading statements were published with malice, as Defendants knew that they were false and misleading, or at a minimum acted with a reckless disregard for the truth.

78.    Plaintiffs have been severely harmed and damaged by these false and misleading statements because they subjected him to hatred, distrust, ridicule, contempt, and disgrace.

79.     Plaintiffs have been damaged by these false and misleading statements because they severely injured Plaintiff Corsi and Plaintiff Klayman in their profession and businesses, as well as severely injured and damaged them personally and professionally, financially, emotionally, and in terms of their good will and reputations.

## SECOND CAUSE OF ACTION
### *Defamation Per Se*

80.     Plaintiffs re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

81.     Acting in concert, Defendants as alleged herein, published the aforementioned numerous false, misleading and defamatory statements to severely harm and damage Plaintiffs, which were republished elsewhere and widely in this district, nationally and internationally, and through surrogates, which and wo published the falsities that Plaintiffs have committed crimes, including perjury, and engaged in moral turpitude in the form of alcoholism, and committed sexual misconduct, as set forth in the preceding paragraphs. These malicious and false statements defamed Plaintiffs in their trades and professions.

82.     These false, misleading and defamatory statements were published in this district and on the internet and elsewhere, domestically and internationally for the entire world to see and hear and in so doing Defendants published false and misleading facts, *inter alia*, that Plaintiffs' conduct, characteristics or a condition are incompatible with the proper exercise of their lawful business, trades, professions or offices, as well as personally.

83.     These false and misleading statements were published with malice, as Defendants knew that they were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

84.     This statements are *per se* defamatory because they falsely and misleadingly

published that Plaintiff Corsi committed perjury and Plaintiff Klayman had committed sexual misconduct which are federal offense and felony, as well as defamed Plaintiffs in their trades and professions. Defamation *per se* gives rise to the presumption that severe harm and damage has arisen by virtue of the malicious false and misleading statements.

85.     These malicious false, misleading, and defamatory statements are defamatory *per se* and these false and misleading statements severely harmed and damaged Plaintiff Corsi in this profession and business as a journalist, author and political commentator, whose credibility is the most important trait, as well as personally and Plaintiff Klayman in his professions as a public interest and private advocate and litigator and as an author, columnist and radio and internet radio talk show and syndicated host, as well as personally.

## THIRD CAUSE OF ACTION
### *Defamation by Implication*

86.     Plaintiffs re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

87.     Acting in concert, Defendants published the aforementioned numerous false, misleading and defamatory statements about Plaintiffs, as set forth in the preceding paragraphs.

88.     These false, misleading and defamatory statements were published on the internet and published and republished elsewhere in this district, domestically and internationally for the entire world to see and hear.

89.     These false and misleading statements were published with malice, as Defendants knew that they were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

90.     These statements created the false and misleading implication that Plaintiff Corsi is dishonest, committed perjury and is an alcoholic, and that Plaintiff Klayman committed sexual

misconduct and is incompetent, among other false and misleading statements as pled in the preceding paragraphs. These malicious false statements also defamed Plaintiffs in their trades and professions.

91.     Plaintiffs have been severely harmed and damaged by these false and misleading statements because they subject him to hatred, distrust, ridicule, contempt, and disgrace.

92.     Plaintiffs has been damaged by these malicious false and misleading statements because the statements severely harmed and damaged Plaintiffs in their trades and professions as journalists, authors, columnists, pubic interest and private practitioner lawyers and syndicated radio talk show hosts, whose credibility is the most important trait, as well as personally.

**FOURTH CAUSE OF ACTION**
*Intentional Infliction of Emotional Distress*

93.     Plaintiffs re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

94.     Acting in concert, Defendants engaged in extreme and outrageous conduct by threatening Plaintiffs, acting as agents in concert with Stone, who has made death threats to at least one witness involved in Special Counsel Mueller's Russian collusion investigation, Person 2 Randy Credico, as well as incited violence against Judge Amy Berman Jackson by posting a meme on Instagram with a crosshairs and gun pointed at the jurist's head, for which Stone was sanctioned with a total gag order and threat of incarceration if this type of violative conduct of the Court's gag order occurred again, which it apparently has. *See* Exhibit 7.

95.     Defendants knowingly and intentionally threatened Plaintiffs, in a manner similar to other death threats co-conspirator and Defendant Stone made to at least one material witness, involved in Special Counsel Mueller's Russian collusion investigation, such as Randy Credico, Person 2 in the Mueller Indictment, as well as Judge Amy Berman Jackson.

96.     Defendants' extreme and outrageous conduct directly caused Plaintiffs severe emotional distress and resulting severe harm and damage.

## FIFTH CAUSE OF ACTION
### *Assault*

97.     Plaintiffs re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

98.     Acting in concert, Defendants placed Plaintiffs in apprehension of an imminent harmful or offensive contact and physical harm and death, by coercing and threatening Plaintiffs, in a similar manner that co-conspirator Stone has used to make death threats to at least one material witness involved in Special Counsel Mueller's Russian collusion investigation, such as Person 2 in the Mueller Indictment, Randy Credico and Judge Amy Berman Jackson.

99.     The threats issued by Defendants are credible, as co-conspirator Stone portrays and sees himself as a "Mafia" figure, as set forth above.

100.    Furthermore, as set forth above, acting in concert Defendants have a pattern and practice of calling their followers "to arms," which has resulted in deadly violence against their victims.

101.    Plaintiffs did not consent to Defendants' conduct.

102.    As a direct and proximate result of Defendants' wrongful conduct, acting in concert and as an agent at the direction of Defendant Stone, Plaintiffs suffered conscious pain, suffering, severe emotional distress and the fear of imminent serious bodily injury or death, and other mental and physical injuries, and Plaintiffs were severely harmed and damaged thereby.

## SIXTH CAUSE OF ACTION
### *Unfair Competition – Lanham Act 15 U.S.C. § 1125(a)*

103.    Plaintiffs re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

104.    Defendants have and are engaged in acts of unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a) and common law

105.    Defendants have made false and/or misleading statements that have deceived and/or had the tendency to deceive a substantial segment of the receiving audience.

106.    Defendants' false and/or misleading statements misrepresent the nature, characteristics, and qualities of Plaintiff Klayman and Plaintiff Corsi's goods or services.

107.    Defendants false and/or misleading statements are material because that were highly likely to mislead and influence supporters' decisions to provide financial support and sales to Defendants instead of Plaintiffs

108.    These false and misleading statements were made in interstate commerce, as they were widely broadcast on radio, on the internet, in social media, and elsewhere in this district, nationally and internationally.

109.    Plaintiffs have suffered significant damages, which are ongoing, due to Defendants' false and/or misleading statements. By law these damages are calculated based on Defendants' gross sales and receipts, which are trebled, plus an award of attorneys fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

a.    Awarding Plaintiffs compensatory including actual, consequential, incidental and punitive damages for malicious tortious concerted conduct, jointly and severally in an amount to be determined at trial and in excess of $75, 000,000 U.S. Dollars

for each Plaintiff.

b.      Awarding Treble Damages Under the Lanham Act, 15 U.S.C. 1125(a).

b.      Awarding Plaintiffs attorney fees and costs

c.      Granting such other   relief as the Court deems appropriate and necessary including preliminary and permanent injunctive relief.


**PLAINTIFFS DEMAND TRIAL BY JURY ON ALL CLAIMS SO TRIABLE**.


Dated: July 29, 2020                                    Respectfully Submitted,


                                                        _  /s/ Larry Klayman_
                                                        Larry Klayman, Esq.
                                                        KLAYMAN LAW GROUP, P.A.

                                                        2020 Pennsylvania Ave NW #800
                                                        Washington, DC, 20006
                                                        Telephone:  (310)-595-0800
                                                        Email: leklayman@gmail.com

                                                        *Counsel for Klayman Pro Se*

                                                        _/s/Sanjay Biswas_
                                                        SANJAY BISWAS, Esq.
                                                        #24061235—Texas
                                                        #24966--Louisiana
                                                        11720 Duxbury Dr.
                                                        Frisco, Texas 75035
                                                        Telephone: (972)-866-5879
                                                        Email:sanjaybiswas41@gmail.com
                                                        Fax: 1-800-506-6804

                                                        *Counsel for Dr. Jerome Corsi*

## CERTIFICATE OF SERVICE

I, Larry Klayman, hereby certify that on this day, July 29, 2020, I electronically filed the foregoing with the Clerk of Court using the Court's ECF system. I also certify that the foregoing document is being served this day on all counsel of record through the Court's eservice procedures

/s/ Larry Klayman_____

EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. |
| | * | |
| v. | * | Grand Jury Original |
| | * | |
| ROGER JASON STONE, JR., | * | 18 U.S.C. §§ 1001, 1505, 1512, 2 |
| | * | |
| Defendant. | * | |
| | * | |
| | * | |
| | * | |
| | ******* | |

## **INDICTMENT**

The Grand Jury for the District of Columbia charges:

### **Introduction**

1.     By in or around May 2016, the Democratic National Committee ("DNC") and the Democratic Congressional Campaign Committee ("DCCC") became aware that their computer systems had been compromised by unauthorized intrusions and hired a security company ("Company 1") to identify the extent of the intrusions.

2.     On or about June 14, 2016, the DNC—through Company 1—publicly announced that it had been hacked by Russian government actors.

3.     From in or around July 2016 through in or around November 2016, an organization ("Organization 1"), which had previously posted documents stolen by others from U.S. persons, entities, and the U.S. government, released tens of thousands of documents stolen from the DNC and the personal email account of the chairman of the U.S. presidential campaign of Hillary Clinton ("Clinton Campaign").

a.  On or about July 22, 2016, Organization 1 released documents stolen from the DNC.

b.  Between on or about October 7, 2016 and on or about November 7, 2016, Organization 1 released approximately 33 tranches of documents that had been stolen from the personal email account of the Clinton Campaign chairman, totaling over 50,000 stolen documents.

4.  ROGER JASON STONE, JR. was a political consultant who worked for decades in U.S. politics and on U.S. political campaigns. STONE was an official on the U.S. presidential campaign of Donald J. Trump ("Trump Campaign") until in or around August 2015, and maintained regular contact with and publicly supported the Trump Campaign through the 2016 election.

5.  During the summer of 2016, STONE spoke to senior Trump Campaign officials about Organization 1 and information it might have had that would be damaging to the Clinton Campaign. STONE was contacted by senior Trump Campaign officials to inquire about future releases by Organization 1.

6.  By in or around early August 2016, STONE was claiming both publicly and privately to have communicated with Organization 1. By in or around mid-August 2016, Organization 1 made a public statement denying direct communication with STONE. Thereafter, STONE said that his communication with Organization 1 had occurred through a person STONE described as a "mutual friend," "go-between," and "intermediary." STONE also continued to communicate with members of the Trump Campaign about Organization 1 and its intended future releases.

7.  After the 2016 U.S. presidential election, the U.S. House of Representatives Permanent Select Committee on Intelligence ("HPSCI"), the U.S. Senate Select Committee on Intelligence ("SSCI"), and the Federal Bureau of Investigation ("FBI") opened or announced their respective

investigations into Russian interference in the 2016 U.S. presidential election, which included investigating STONE's claims of contact with Organization 1.

8.      In response, STONE took steps to obstruct these investigations.  Among other steps to obstruct the investigations, STONE:

      a.      Made multiple false statements to HPSCI about his interactions regarding Organization 1, and falsely denied possessing records that contained evidence of these interactions; and

      b.      Attempted to persuade a witness to provide false testimony to and withhold pertinent information from the investigations.

## Other Relevant Individuals

9.      Person 1 was a political commentator who worked with an online media publication during the 2016 U.S. presidential campaign.  Person 1 spoke regularly with STONE throughout the campaign, including about the release of stolen documents by Organization 1.

10.     Person 2 was a radio host who had known STONE for more than a decade.  In testimony before HPSCI on or about September 26, 2017, STONE described Person 2 (without naming him) as an "intermediary," "go-between," and "mutual friend" to the head of Organization 1.  In a follow-up letter to HPSCI dated October 13, 2017, STONE identified Person 2 by name and claimed Person 2 was the "gentleman who confirmed for Mr. Stone" that the head of Organization 1 had "'[e]mails related to Hillary Clinton which are pending publication.'"

## Background

### STONE's Communications About Organization 1 During the Campaign

11.     By in or around June and July 2016, STONE informed senior Trump Campaign officials that he had information indicating Organization 1 had documents whose release would be

damaging to the Clinton Campaign.  The head of Organization 1 was located at all relevant times at the Ecuadorian Embassy in London, United Kingdom.

12.  After the July 22, 2016 release of stolen DNC emails by Organization 1, a senior Trump Campaign official was directed to contact STONE about any additional releases and what other damaging information Organization 1 had regarding the Clinton Campaign.  STONE thereafter told the Trump Campaign about potential future releases of damaging material by Organization 1.

13.  STONE also corresponded with associates about contacting Organization 1 in order to obtain additional emails damaging to the Clinton Campaign.

    a.  On or about July 25, 2016, STONE sent an email to Person 1 with the subject line, "Get to [the head of Organization 1]."  The body of the message read, "Get to [the head of Organization 1] [a]t Ecuadorian Embassy in London and get the pending [Organization 1] emails . . . they deal with Foundation, allegedly."  On or about the same day, Person 1 forwarded STONE's email to an associate who lived in the United Kingdom and was a supporter of the Trump Campaign.

    b.  On or about July 31, 2016, STONE emailed Person 1 with the subject line, "Call me MON."  The body of the email read in part that Person 1's associate in the United Kingdom "should see [the head of Organization 1]."

    c.  On or about August 2, 2016, Person 1 emailed STONE.  Person 1 wrote that he was currently in Europe and planned to return in or around mid-August.  Person 1 stated in part, "Word is friend in embassy plans 2 more dumps.  One shortly after I'm back.  2nd in Oct.  Impact planned to be very damaging."  The phrase "friend in embassy" referred to the head of Organization 1.  Person 1 added in the same email, "Time to let more than [the Clinton Campaign chairman] to be exposed as in bed w

enemy if they are not ready to drop HRC.  That appears to be the game hackers are now about.  Would not hurt to start suggesting HRC old, memory bad, has stroke – neither he nor she well.  I expect that much of next dump focus, setting stage for Foundation debacle."

14.     Starting in early August 2016, after receiving the August 2, 2016 email from Person 1, STONE made repeated statements about information he claimed to have learned from the head of Organization 1.

    a.      On or about August 8, 2016, STONE attended a public event at which he stated, "I actually have communicated with [the head of Organization 1].  I believe the next tranche of his documents pertain to the Clinton Foundation, but there's no telling what the October surprise may be."

    b.      On or about August 12, 2016, STONE stated during an interview that he was "in communication with [the head of Organization 1]" but was "not at liberty to discuss what I have."

    c.      On or about August 16, 2016, STONE stated during an interview that "it became known on this program that I have had some back-channel communication with [Organization 1] and [the head of Organization 1]."  In a second interview on or about the same day, STONE stated that he "communicated with [the head of Organization 1]" and that they had a "mutual acquaintance who is a fine gentleman."

    d.      On or about August 18, 2016, STONE stated during a television interview that he had communicated with the head of Organization 1 through an "intermediary, somebody who is a mutual friend."

e.     On or about August 23, 2016, Person 2 asked STONE during a radio interview, "You've been in touch indirectly with [the head of Organization 1]. . . . Can you give us any kind of insight?  Is there an October surprise happening?"  STONE responded, "Well, first of all, I don't want to intimate in any way that I control or have influence with [the head of Organization 1] because I do not. . . . We have a mutual friend, somebody we both trust and therefore I am a recipient of pretty good information."

15.     Beginning on or about August 19, 2016, STONE exchanged written communications, including by text message and email, with Person 2 about Organization 1 and what the head of Organization 1 planned to do.

a.     On or about August 19, 2016, Person 2 sent a text message to STONE that read in part, "I'm going to have [the head of Organization 1] on my show next Thursday." On or about August 21, 2016, Person 2 sent another text message to STONE, writing in part, "I have [the head of Organization 1] on Thursday so I'm completely tied up on that day."

b.     On or about August 25, 2016, the head of Organization 1 was a guest on Person 2's radio show for the first time.  On or about August 26, 2016, Person 2 sent a text message to STONE that stated, "[the head of Organization 1] talk[ed] about you last night."  STONE asked what the head of Organization 1 said, to which Person 2 responded, "He didn't say anything bad we were talking about how the Press is trying to make it look like you and he are in cahoots."

c.     On or about August 27, 2016, Person 2 sent text messages to STONE that said, "We are working on a [head of Organization 1] radio show," and that he (Person 2) was

6

"in charge" of the project. In a text message sent later that day, Person 2 added, "[The head of Organization 1] has kryptonite on Hillary."

d.   On or about September 18, 2016, STONE sent a text message to Person 2 that said, "I am e-mailing u a request to pass on to [the head of Organization 1]." Person 2 responded "Ok," and added in a later text message, "[j]ust remember do not name me as your connection to [the head of Organization 1] you had one before that you referred to."

      i.   On or about the same day, September 18, 2016, STONE emailed Person 2 an article with allegations against then-candidate Clinton related to her service as Secretary of State. STONE stated, "Please ask [the head of Organization 1] for any State or HRC e-mail from August 10 to August 30—particularly on August 20, 2011 that mention [the subject of the article] or confirm this narrative."

      ii.   On or about September 19, 2016, STONE texted Person 2 again, writing, "Pass my message . . . to [the head of Organization 1]." Person 2 responded, "I did." On or about September 20, 2016, Person 2 forwarded the request to a friend who was an attorney with the ability to contact the head of Organization 1. Person 2 blind-copied STONE on the forwarded email.

e.   On or about September 30, 2016, Person 2 sent STONE via text message a photograph of Person 2 standing outside the Ecuadorian Embassy in London where the head of Organization 1 was located.

f.  On or about October 1, 2016, which was a Saturday, Person 2 sent STONE text messages that stated, "big news Wednesday . . . now pretend u don't know me . . . Hillary's campaign will die this week." In the days preceding these messages, the press had reported that the head of Organization 1 planned to make a public announcement on or about Tuesday, October 4, 2016, which was reported to be the ten-year anniversary of the founding of Organization 1.

g.  On or about October 2, 2016, STONE emailed Person 2, with the subject line "WTF?," a link to an article reporting that Organization 1 was canceling its "highly anticipated Tuesday announcement due to security concerns." Person 2 responded to STONE, "head fake."

h.  On or about the same day, October 2, 2016, STONE texted Person 2 and asked, "Did [the head of Organization 1] back off." On or about October 3, 2016, Person 2 initially responded, "I can't tal[k] about it." After further exchanges with STONE, Person 2 said, "I think it[']s on for tomorrow." Person 2 added later that day, "Off the Record Hillary and her people are doing a full-court press they [*sic*] keep [the head of Organization 1] from making the next dump . . . That's all I can tell you on this line . . . Please leave my name out of it."

16.  In or around October 2016, STONE made statements about Organization 1's future releases, including statements similar to those that Person 2 made to him. For example:

a.  On or about October 3, 2016, STONE wrote to a supporter involved with the Trump Campaign, "Spoke to my friend in London last night. The payload is still coming."

b.  Also on or about October 3, 2016, STONE received an email from a reporter who had connections to a high-ranking Trump Campaign official that asked, "[the head

of Organization 1] – what's he got?  Hope it's good."  STONE responded in part, "It is.  I'd tell [the high-ranking Trump Campaign official] but he doesn't call me back."

c.     On or about October 4, 2016, the head of Organization 1 held a press conference but did not release any new materials pertaining to the Clinton Campaign.  Shortly afterwards, STONE received an email from the high-ranking Trump Campaign official asking about the status of future releases by Organization 1.  STONE answered that the head of Organization 1 had a "[s]erious security concern" but that Organization 1 would release "a load every week going forward."

d.     Later that day, on or about October 4, 2016, the supporter involved with the Trump Campaign asked STONE via text message if he had "hear[d] anymore from London."  STONE replied, "Yes - want to talk on a secure line - got Whatsapp?"  STONE subsequently told the supporter that more material would be released and that it would be damaging to the Clinton Campaign.

17.     On or about October 7, 2016, Organization 1 released the first set of emails stolen from the Clinton Campaign chairman.  Shortly after Organization 1's release, an associate of the high-ranking Trump Campaign official sent a text message to STONE that read "well done."  In subsequent conversations with senior Trump Campaign officials, STONE claimed credit for having correctly predicted the October 7, 2016 release.

The Investigations

18.     In or around 2017, government officials publicly disclosed investigations into Russian interference in the 2016 U.S. presidential election and possible links to individuals associated with the campaigns.

a.  On or about January 13, 2017, the chairman and vice chairman of SSCI announced the committee would conduct an inquiry that would investigate, among other things, any intelligence regarding links between Russia and individuals associated with political campaigns, as well as Russian cyber activity and other "active measures" directed against the United States in connection with the 2016 election.

b.  On or about January 25, 2017, the chairman and ranking member of HPSCI announced that HPSCI had been conducting an inquiry similar to SSCI's.

c.  On or about March 20, 2017, the then-director of the FBI testified at a HPSCI hearing and publicly disclosed that the FBI was investigating Russian interference in the 2016 election and possible links and coordination between the Trump Campaign and the Russian government.

d.  By in or around August 2017, news reports stated that a federal grand jury had opened an investigation into matters relating to Russian government efforts to interfere in the 2016 election, including possible links and coordination between the Trump Campaign and the Russian government.

**STONE's False Testimony to HPSCI**

19.  In or around May 2017, HPSCI sent a letter requesting that STONE voluntarily appear before the committee and produce:

> Any documents, records, electronically stored information including e-mail, communication, recordings, data and tangible things (including, but not limited to, graphs, charts, photographs, images and other documents) regardless of form, other than those widely available (e.g., newspaper articles) that reasonably could lead to the discovery of any facts within the investigation's publicly-announced parameters.

On or about May 22, 2017, STONE caused a letter to be submitted to HPSCI stating that "Mr.

Stone has no documents, records, or electronically stored information, regardless of form, other than those widely available that reasonably could lead to the discovery of any facts within the investigation's publicly-announced parameters."

20. On or about September 26, 2017, STONE testified before HPSCI in Washington, D.C. as part of the committee's ongoing investigation. In his opening statement, STONE stated, "These hearings are largely based on a yet unproven allegation that the Russian state is responsible for the hacking of the DNC and [the Clinton Campaign chairman] and the transfer of that information to [Organization 1]." STONE further stated that "[m]embers of this Committee" had made certain "assertions against me which must be rebutted here today," which included "[t]he charge that I knew in advance about, and predicted, the hacking of Clinton campaign chairman['s] email, [and] that I had advanced knowledge of the source or actual content of the [Organization 1] disclosures regarding Hillary Clinton."

21. In the course of his HPSCI testimony, STONE made deliberately false and misleading statements to the committee concerning, among other things, his possession of documents pertinent to HPSCI's investigation; the source for his early August 2016 statements about Organization 1; requests he made for information from the head of Organization 1; his communications with his identified intermediary; and his communications with the Trump Campaign about Organization 1.

<u>STONE's False and Misleading Testimony About His Possession of Documents Pertinent to HPSCI's Investigation</u>

22. During his HPSCI testimony, STONE was asked, "So you have no emails to anyone concerning the allegations of hacked documents . . . or any discussions you have had with third parties about [the head of Organization 1]? You have no emails, no texts, no documents whatsoever, any kind of that nature?" STONE falsely and misleadingly answered, "That is correct.

Not to my knowledge."

23.     In truth and in fact, STONE had sent and received numerous emails and text messages during the 2016 campaign in which he discussed Organization 1, its head, and its possession of hacked emails.  At the time of his false testimony, STONE was still in possession of many of these emails and text messages, including:

a.     The email from STONE to Person 1 on or about July 25, 2016 that read in part, "Get to [the head of Organization 1] [a]t Ecuadorian Embassy in London and get the pending [Organization 1] emails . . . they deal with Foundation, allegedly.";

b.     The email from STONE to Person 1 on or about July 31, 2016 that said an associate of Person 1 "should see [the head of Organization 1].";

c.     The email from Person 1 to STONE on or about August 2, 2016 that stated in part, "Word is friend in embassy plans 2 more dumps.  One shortly after I'm back.  2nd in Oct.  Impact planned to be very damaging.";

d.     Dozens of text messages and emails, beginning on or about August 19, 2016 and continuing through the election, between STONE and Person 2 in which they discussed Organization 1 and the head of Organization 1;

e.     The email from STONE on or about October 3, 2016 to the supporter involved with the Trump Campaign, which read in part, "Spoke to my friend in London last night.  The payload is still coming."; and

f.     The emails on or about October 4, 2016 between STONE and the high-ranking member of the Trump Campaign, including STONE's statement that Organization 1 would release "a load every week going forward."

24.     By falsely claiming that he had no emails or text messages in his possession that referred to the head of Organization 1, STONE avoided providing a basis for HPSCI to subpoena records in his possession that could have shown that other aspects of his testimony were false and misleading.

### STONE's False and Misleading Testimony About His Early August 2016 Statements

25.     During his HPSCI testimony on or about September 26, 2017, STONE was asked to explain his statements in early August 2016 about being in contact with the head of Organization 1. STONE was specifically asked about his statement on or about August 8, 2016 that "I've actually communicated with [the head of Organization 1]," as well as his statement on or about August 12, 2016 that he was "in communication with [the head of Organization 1]" but was "not at liberty to discuss what I have."

26.     STONE responded that his public references to having a means of contacting Organization 1 referred exclusively to his contact with a journalist, who STONE described as a "go-between, as an intermediary, as a mutual friend" of the head of Organization 1. STONE stated that he asked this individual, his intermediary, "to confirm what [the head of Organization 1] ha[d] tweeted, himself, on July 21st, that he ha[d] the Clinton emails and that he [would] publish them." STONE further stated that the intermediary "was someone I knew had interviewed [the head of Organization 1]. And I merely wanted confirmation of what he had tweeted on the 21st." STONE declined to tell HPSCI the name of this "intermediary" but provided a description in his testimony that was consistent with Person 2.

27.     On or about October 13, 2017, STONE caused a letter to be submitted to HPSCI that identified Person 2 by name as the "gentleman who confirmed for Mr. Stone" that the head of Organization 1 had "'[e]mails related to Hillary Clinton which are pending publication.'"

28.     STONE's explanation of his August 2016 statements about communicating with the head of Organization 1 was false and misleading.  In truth and in fact, the first time Person 2 interviewed the head of Organization 1 was on or about August 25, 2016, after STONE made his August 8 and August 12, 2016 public statements.   Similarly, at the time STONE made his August 2016 statements, STONE had directed Person 1—not Person 2—to contact the head of Organization 1.  And Person 1—not Person 2—had told STONE in advance of STONE's August 8 and August 12, 2016 public statements that "[w]ord is friend in embassy plans 2 more dumps," including one in October.  At no time did STONE identify Person 1 to HPSCI as another individual STONE contacted to serve as a "go-between," "intermediary," or other source of information from Organization 1.  STONE also never disclosed his exchanges with Person 1 when answering HPSCI's questioning about STONE's August 8 and August 12, 2016 statements.

<u>STONE's False and Misleading Testimony About Requests He Made for Information from the Head of Organization 1</u>

29.     During his HPSCI testimony, STONE was asked, "[W]hat was the extent of the communication with [the intermediary]?"  STONE replied, "I asked him to confirm . . . that the tweet of [the head of Organization 1] of the 21st was accurate, that they did in fact have . . . Hillary Clinton emails and that they would release them."  STONE was then asked, "Did you ask [the intermediary] to communicate anything else to [the head of Organization 1]?"  STONE falsely and misleadingly responded, "I did not."  STONE was then asked, "Did you ask [the intermediary] to do anything on your own behalf?"  STONE falsely and misleadingly responded, "I did not."

30.     In truth and in fact, STONE directed both Person 1 and Person 2 to pass on requests to the head of Organization 1 for documents that STONE believed would be damaging to the Clinton Campaign.  For example:

        a.      As described above, on or about July 25, 2016, STONE sent Person 1 an email that

14

read, "Get to [the head of Organization 1] [a]t Ecuadorian Embassy in London and get the pending [Organization 1] emails . . . they deal with Foundation, allegedly."

b.    On or about September 18, 2016, STONE sent a text message to Person 2 that said, "I am e-mailing u a request to pass on to [the head of Organization 1]," and then emailed Person 2 an article with allegations against then-candidate Clinton related to her service as Secretary of State.  STONE added, "Please ask [the head of Organization 1] for any State or HRC e-mail from August 10 to August 30—particularly on August 20, 2011 that mention [the subject of the article] or confirm this narrative."

c.    On or about September 19, 2016, STONE texted Person 2 again, writing "Pass my message . . . to [the head of Organization 1]."  Person 2 responded, "I did," and the next day Person 2, on an email blind-copied to STONE, forwarded the request to an attorney who had the ability to contact the head of Organization 1.

<u>STONE's False and Misleading Testimony About Communications with His Identified Intermediary</u>

31.    During his HPSCI testimony, STONE was asked repeatedly about his communications with the person he identified as his intermediary.  STONE falsely and misleadingly stated that he had never communicated with his intermediary in writing in any way.  During one exchange, STONE falsely and misleadingly claimed only to have spoken with the intermediary telephonically:

Q:    [H]ow did you communicate with the intermediary?

A:    Over the phone.

Q:    And did you have any other means of communicating with the intermediary?

A:    No.

Q:    No text messages, no – none of the list, right?

15

> A:    No.

Later during his testimony, STONE again falsely denied ever communicating with his intermediary in writing:

> Q:    So you never communicated with your intermediary in writing in any way?
>
> A:    No.
>
> Q:    Never emailed him or texted him?
>
> A:    He's not an email guy.
>
> Q:    So all your conversations with him were in person or over the phone.
>
> A:    Correct.

32.    In truth and in fact, as described above, STONE and Person 2 (who STONE identified to HPSCI as his intermediary) engaged in frequent written communication by email and text message. STONE also engaged in frequent written communication by email and text message with Person 1, who also provided STONE with information regarding Organization 1.

33.    Written communications between STONE and Person 1 and between STONE and Person 2 continued through STONE's HPSCI testimony. Indeed, on or about September 26, 2017—the day that STONE testified before HPSCI and denied having ever sent or received emails or text messages from Person 2—STONE and Person 2 exchanged over thirty text messages.

34.    Certain electronic messages between STONE and Person 1 and between STONE and Person 2 would have been material to HPSCI. For example:

a.    In or around July 2016, STONE emailed Person 1 to "get to" the head of Organization 1 and obtain the pending emails.

b.    In or around September 2016, STONE sent messages directing Person 2 to pass a request to the head of Organization 1.

c.    On or about January 6, 2017, Person 2 sent STONE an email that had the subject

line "Back channel bs." In the email, Person 2 wrote, "Well I have put together timelines[] and you [] said you have a back-channel way back a month before I had [the head of Organization 1] on my show . . . I have never had a conversation with [the head of Organization 1] other than my radio show . . . I have pieced it all together . . . so you may as well tell the truth that you had no back-channel or there's the guy you were talking about early August."

<u>STONE's False and Misleading Testimony About Communications with the Trump Campaign</u>

35.     During his HPSCI testimony, STONE was asked, "did you discuss your conversations with the intermediary with anyone involved in the Trump campaign?" STONE falsely and misleadingly answered, "I did not." In truth and in fact, and as described above, STONE spoke to multiple individuals involved in the Trump Campaign about what he claimed to have learned from his intermediary to Organization 1, including the following:

a.     On multiple occasions, STONE told senior Trump Campaign officials about materials possessed by Organization 1 and the timing of future releases.

b.     On or about October 3, 2016, STONE wrote to a supporter involved with the Trump Campaign, "Spoke to my friend in London last night. The payload is still coming."

c.     On or about October 4, 2016, STONE told a high-ranking Trump Campaign official that the head of Organization 1 had a "[s]erious security concern" but would release "a load every week going forward."

**Attempts to Prevent Person 2 from Contradicting STONE's False Statements to HPSCI**

36.     On or about October 19, 2017, STONE sent Person 2 an excerpt of his letter to HPSCI that identified Person 2 as his "intermediary" to Organization 1. STONE urged Person 2, if asked by HPSCI, to falsely confirm what STONE had previously testified to, including that it was Person 2

17

who provided STONE with the basis for STONE's early August 2016 statements about contact with Organization 1. Person 2 repeatedly told STONE that his testimony was false and told him to correct his testimony to HPSCI. STONE did not do so. STONE then engaged in a prolonged effort to prevent Person 2 from contradicting STONE's false statements to HPSCI.

37.     In or around November 2017, Person 2 received a request from HPSCI to testify voluntarily before the committee. After being contacted by HPSCI, Person 2 spoke and texted repeatedly with STONE. In these discussions, STONE sought to have Person 2 testify falsely either that Person 2 was the identified intermediary or that Person 2 could not remember what he had told STONE. Alternatively, STONE sought to have Person 2 invoke his Fifth Amendment right against self-incrimination. For example:

    a.     On or about November 19, 2017, in a text message to STONE, Person 2 said that his lawyer wanted to see him (Person 2). STONE responded, "'Stonewall it. Plead the fifth. Anything to save the plan' . . . Richard Nixon." On or about November 20, 2017, Person 2 informed HPSCI that he declined HPSCI's request for a voluntary interview.

    b.     On or about November 21, 2017, Person 2 texted STONE, "I was told that the house committee lawyer told my lawyer that I will be getting a subpoena." STONE responded, "That was the point at which your lawyers should have told them you would assert your 5th Amendment rights if compelled to appear."

    c.     On or about November 28, 2017, Person 2 received a subpoena compelling his testimony before HPSCI. Person 2 informed STONE of the subpoena.

    d.     On or about November 30, 2017, STONE asked Person 1 to write publicly about Person 2. Person 1 responded, "Are you sure you want to make something out of

this now?  Why not wait to see what [Person 2] does.  You may be defending yourself too much—raising new questions that will fuel new inquiries.  This may be a time to say less, not more."  STONE responded by telling Person 1 that Person 2 "will take the 5th—but let's hold a day."

e.  On multiple occasions, including on or about December 1, 2017, STONE told Person 2 that Person 2 should do a "Frank Pentangeli" before HPSCI in order to avoid contradicting STONE's testimony.  Frank Pentangeli is a character in the film *The Godfather: Part II*, which both STONE and Person 2 had discussed, who testifies before a congressional committee and in that testimony claims not to know critical information that he does in fact know.

f.  On or about December 1, 2017, STONE texted Person 2, "And if you turned over anything to the FBI you're a fool."  Later that day, Person 2 texted STONE, "You need to amend your testimony before I testify on the 15th."  STONE responded, "If you testify you're a fool.  Because of tromp I could never get away with a certain [*sic*] my Fifth Amendment rights but you can.  I guarantee you you are the one who gets indicted for perjury if you're stupid enough to testify."

38.  On or about December 12, 2017, Person 2 informed HPSCI that he intended to assert his Fifth Amendment privilege against self-incrimination if required to appear by subpoena.  Person 2 invoked his Fifth Amendment privilege in part to avoid providing evidence that would show STONE's previous testimony to Congress was false.

39.  Following Person 2's invocation of his Fifth Amendment privilege not to testify before HPSCI, STONE and Person 2 continued to have discussions about the various investigations into Russian interference in the 2016 election and what information Person 2 would provide to

investigators. During these conversations, STONE repeatedly made statements intended to prevent Person 2 from cooperating with the investigations. For example:

a. On or about December 24, 2017, Person 2 texted STONE, "I met [the head of Organization 1] for f[i]rst time this yea[r] sept 7 . . . docs prove that. . . . You should be honest w fbi . . . there was no back channel . . . be honest." STONE replied approximately two minutes later, "I'm not talking to the FBI and if your smart you won't either."

b. On or about April 9, 2018, STONE wrote in an email to Person 2, "You are a rat. A stoolie. You backstab your friends-run your mouth my lawyers are dying Rip you to shreds." STONE also said he would "take that dog away from you," referring to Person 2's dog. On or about the same day, STONE wrote to Person 2, "I am so ready. Let's get it on. Prepare to die [expletive]."

c. On or about May 21, 2018, Person 2 wrote in an email to STONE, "You should have just been honest with the house Intel committee . . . you've opened yourself up to perjury charges like an idiot." STONE responded, "You are so full of [expletive]. You got nothing. Keep running your mouth and I'll file a bar complaint against your friend [the attorney who had the ability to contact the head of Organization 1]."

## COUNT ONE
### (Obstruction of Proceeding)

40.    Paragraphs 1 through 39 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

41.    From in or around May 2017 through at least December 2017, within the District of Columbia and elsewhere, the defendant ROGER JASON STONE, JR., corruptly influenced, obstructed, impeded, and endeavored to influence, obstruct, and impede the due and proper exercise of the power of inquiry under which any inquiry and investigation is being had by either House, and any committee of either House and any joint committee of the Congress, to wit: STONE testified falsely and misleadingly at a HPSCI hearing in or around September 2017; STONE failed to turn over and lied about the existence of responsive records to HPSCI's requests about documents; STONE submitted and caused to be submitted a letter to HPSCI falsely and misleadingly describing communications with Person 2; and STONE attempted to have Person 2 testify falsely before HPSCI or prevent him from testifying.

All in violation of Title 18, United States Code, Sections 1505 and 2.

## COUNTS TWO THROUGH SIX
### (False Statements)

42.     Paragraphs 1 through 39 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

43.     On or about September 26, 2017, within the District of Columbia and elsewhere, in a matter within the jurisdiction of the legislative branch of the Government of the United States, the defendant ROGER JASON STONE, JR., knowingly and willfully made and caused to be made materially false, fictitious, and fraudulent statements and representations, to wit:

| Count | False Statement |
|:---:|---|
| **2** | STONE testified falsely that he did not have emails with third parties about the head of Organization 1, and that he did not have any documents, emails, or text messages that refer to the head of Organization 1. |
| **3** | STONE testified falsely that his August 2016 references to being in contact with the head of Organization 1 were references to communications with a single "go-between," "mutual friend," and "intermediary," who STONE identified as Person 2. |
| **4** | STONE testified falsely that he did not ask the person he referred to as his "go-between," "mutual friend," and "intermediary," to communicate anything to the head of Organization 1 and did not ask the intermediary to do anything on STONE's behalf. |
| **5** | STONE testified falsely that he and the person he referred to as his "go-between," "mutual friend," and "intermediary" did not communicate via text message or email about Organization 1. |
| **6** | STONE testified falsely that he had never discussed his conversations with the person he referred to as his "go-between," "mutual |

| Count | False Statement |
|---|---|
| | friend," and "intermediary" with anyone involved in the Trump Campaign. |

All in violation of Title 18, United States Code, Sections 1001(a)(2) and 2.


## COUNT SEVEN
### (Witness Tampering)

44.    Paragraphs 1 through 39 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

45.    Between in or around September 2017 and present, within the District of Columbia and elsewhere, the defendant ROGER JASON STONE, JR., knowingly and intentionally corruptly persuaded and attempted to corruptly persuade another person, to wit: Person 2, with intent to influence, delay, and prevent the testimony of any person in an official proceeding.

All in violation of Title 18, United States Code, Section 1512(b)(1).


    _____
    Robert S. Mueller, III
    Special Counsel
    U.S. Department of Justice


A TRUE BILL:


_____
Foreperson

Case 1:20-cv-03590-JEB   Document 147-1   Filed 10/15/21   Page 64 of 360

Date:  January 24, 2019

EXHIBIT 2

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|   |   |   |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No.: 1:19-CR-00018-ABJ** |
| | ) | |
| ROGER J. STONE, JR., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MOTION FOR LEAVE TO FILE *AMICI CURIAE* BRIEF

Movant Dr. Jerome Corsi ("Dr. Corsi") through counsel, hereby moves this Court for leave to file an *amici curiae* brief in support of entry of an order pursuant to Local Criminal Rule 57.7(c), or colloquially, a "gag order."

Dr. Corsi's *amicus* brief, attached hereto as <u>Exhibit 1</u>, sets forth the compelling reasons why a "gag order" is necessary in this case, as he is named as Person 1, a material witness, in Defendant Roger Stone's ("Defendant Stone") indictment. Defendant Stone has engaged in a public relations campaign to defame, smear, intimidate and threaten both Dr. Corsi and his counsel, Mr. Larry Klayman, which is the same conduct that he was indicted for in the first place. Because Defendant Stone's defamation, witness tampering, intimidation, and threats with regard to Dr. Corsi and his counsel Mr. Klayman are not technically part of this criminal prosecution, Dr. Corsi's interests and position are not adequately represented by any party. Dr. Corsi's *amicus* brief will aid this Court in ruling upon the entry of an order pursuant to LCrR 57.7(c)

The United States has taken no position with regard to filing of an *amicus* brief, and

1

counsel for Defendant Stone has not substantively responded to Dr. Corsi's request for consent.

Dated:  February 8, 2019                              Respectfully submitted,


                                                     /s/ Larry Klayman_____
                                                     Larry Klayman, Esq.
                                                     K L A Y M A N  L A W  G R O U P, PA
                                                     D.C. Bar No:
                                                     2020 Pennsylvania Ave NW #800
                                                     Washington, DC 20006
                                                     Email: leklayman@gmail.com
                                                     Tel: 310-595-0800


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed electronically and served through the court's ECF system to all counsel of record or parties on February 8, 2019

                                                     /s/ Larry Klayman_____
                                                     Larry Klayman, Esq.

2

Case 1:21-cv-02552-AJN Document 14-1 Filed 07/29/21 Page 68 of 360

[SUB]EXHIBIT 1

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

)
UNITED STATES OF AMERICA,                    )
                                             )
        Plaintiff,                         )
                                             )
   v.                                      )     **Case No.: 1:19-CR-00018-ABJ**
                                             )
ROGER J. STONE, JR.,                         )
                                             )
        Defendant.                        )
_____  )

### _AMICI CURIAE_ BRIEF OF DR. JEROME CORSI

Under Local Criminal Rule 57.7(b)(1):

> [i]t is the duty of the lawyer or law firm not to release or authorize the release of information or opinion which a reasonable person would expect to be disseminated by means of public communication, in connection with pending or imminent criminal litigation with which the lawyer or the law firm is associated, if there is a reasonable likelihood that such dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice.

Furthermore, LCrR 57.7(c), which offers additional specific guidance with regard to highly publicized cases - which this instant case certainly qualifies as – grants the Court with authority to issue a "special order governing such matters as extrajudicial statements by parties, witnesses and attorneys likely to interfere with the rights of the accused to a fair trial by an impartial jury."

As set forth in _Gentile v. State Bar of Nevada_, 501 U.S. 1030, 1075 (1991):

> The limitations are aimed at two principal evils: (1) comments that are likely to influence the actual outcome of the trial, and (2) comments that are likely to prejudice the jury venire, even if an untainted panel can ultimately be found. Few, if any, interests under the Constitution are more fundamental than the right to a fair trial by "impartial" jurors, and an outcome affected by extrajudicial statements would violate that fundamental right.

Here, Defendant Roger Stone ("Defendant Stone") has _already begun_ a public relations

1

campaign meant specifically to influence the outcome of his upcoming trial and which are meant to prejudice the jury venire. Defendant Stone is doing so by engaging in witness tampering, defamation, and intimidation and coercion with regard to Dr. Corsi, who is named as Person 1 in Defendant Stone's indictment. As such, Dr. Corsi will likely subpoenaed to be called as a material witness in Defendant Stone's upcoming trial. Again he is Person 1 in the Mueller Indictment.

Defendant Stone is attempting to smear, defame, and discredit, tamper and threaten Dr. Corsi so that when Dr. Corsi is called as a witness, the jurors will have a false impression of Dr. Corsi as a liar, perjurer, and alcoholic. This would, obviously, improperly and unethically benefit Defendant Stone. In fact, Defendant Stone's targeted efforts to defame, coerce, intimidate and threaten Dr. Corsi have resulted in a lawsuit filed in the U.S. District Court for the District of Columbia, which is attached hereto as Exhibit A and incorporated by reference.

Should this Court have any doubt as to Defendant Stone's improper motivations and already implemented and continuing designs to taint the jury venire, the content and article written by Sara Murray and Sam Fossum titled, *Roger Stone, facing gag order, launches counterattack*, should put any such doubts to bed. Exhibit B. It is only one of many such analyses and accounts. It is clear that Defendant Stone's strategy will be to use the media and publicity to argue his case and to try to get public sentiment on his side, as well as to tamper with witnesses like Dr. Corsi, which is exactly the type of conduct that LCrR 57.7 was meant to preclude.

Accordingly, Movant Dr. Corsi respectfully requests that this Court issue an order pursuant to LCrR 57.7(c) ordering Defendant Stone and his counsel from making statements to the media or in public settings that pose a substantial likelihood of material prejudice to this case and which in the context of Stone himself and in their ferocity also amount to witness tampering

and obstruction of justice. See Exbibit A – Corsi Complaint.

Dated:  February 8, 2019                    Respectfully submitted,

                                       /s/ Larry Klayman
                                       Larry Klayman, Esq.
                                       K L A Y M A N  L A W  G R O U P, PA
                                       D.C. Bar No:  334581
                                       2020  Pennsylvania  Ave  NW  #800
                                       Washington, DC 20006
                                       Email: leklayman@gmail.com
                                       Tel: 310-595-0800

[SUB]EXHIBIT A
Intentionally Omitted.
*See* Main Ex. 1

EXHIBIT B

# Roger Stone, facing gag order, launches counterattack

By Sara Murray and Sam Fossum, CNN

Updated 6:30 PM ET, Thu February 7, 2019

**Washington (CNN)** — In the days since a federal judge warned Roger Stone that he could soon face a gag order, Stone has peddled conspiracy theories, claimed he can't get a fair trial and criticized the judge.

"This is a lynching. This is a legal lynching of me," Stone said in a recent interview on the fringe right-wing website Infowars.

Stone was arrested last month in a pre-dawn raid and charged with obstruction of justice, making false statements and witness tampering as part of special counsel Robert Mueller's Russia investigation. On Friday, federal prosecutors and Stone's legal team are due to submit briefs on the merits of a gag order.

But rather than toning down his rhetoric, Stone appears to be abiding by the principles he espouses in his books. For instance, Stone's Rule #81: "Admit Nothing; Deny Everything; Launch Counterattack."

It's a dubious legal strategy.

"I would say that it's a terrible idea for Stone to be doing this," said CNN legal analyst Shan Wu. "I can't imagine a worse idea."

Judge Amy Berman Jackson informed Stone last week that she was considering a gag order. She was quick to put similar restrictions on former Trump campaign chairman Paul Manafort's case, which she is also presiding over in Washington. Jackson, an appointee of President Barack Obama, said she was cognizant of Stone's First Amendment right to free speech, but she wanted to protect his right to a fair trial and ensure it was possible to select an unbiased jury.

Stone's response, delivered via an Instagram post this week: "I will continue to defend myself unless an Obama appointed judge decides to suspend my first amendment rights." In another post, Stone exclaimed, "Fair Trial in DC? Impossible."

Stone, in his public diatribes, has claimed he is being targeted because he works for Infowars and supported Trump. And he has continued his long tradition of hyping fact-free conspiracy theories.

In one Instagram post, Stone is shaking hands William Binney, a former National Security Agency official who has turned into a vocal critic of the agency. "Bill Binney explained to me why the forensic evidence shows the DNC was never hacked by anyone including the Russians," Stone wrote.

US intelligence agencies have concluded Russian intelligence hacked the DNC and other top Democrats, and used platforms like WikiLeaks to disseminate the stolen material.

Stone concluded his post with a series of hashtags including "#sethrich."

Seth Rich was a Democratic National Committee staffer who was fatally shot in Washington in 2016. Police said evidence indicates Rich was the victim of a robbery gone wrong. But far-right activists and news organizations spread a conspiracy theory -- with no evidence -- that Rich was killed for leaking a trove of DNC emails to WikiLeaks.

Both Fox News and the Washington Times ended up retracting stories based on the murder-as-leaking-retribution conspiracy plot, but the lore has lived on, to the devastation of Rich's family.

Case 1:19-cr-00018-ABJ Document 14-1 Filed 02/08/19 Page 75 of 360

As for Stone, he recently settled a lawsuit (unrelated to the Mueller probe) in which he admitted to making false statements on Infowars about a Chinese businessman and apologized for his commentary.

Stone's attorney and Mueller's office declined to comment.

Prior legal woes aside, Stone's eagerness to discuss his case publicly -- and in colorful fashion -- could make the judge more inclined to put a gag order on the case.

Stone and his attorneys have vowed to fight any such effort and are expected to make the case that Stone's livelihood depends on his ability to speak freely.

"I make a living writing and speaking," Stone argued in a recent Infowars appearance. "So they would be depriving me of making a living if I am entirely gagged."

Jackson appears to have anticipated that defense. In court last Friday, the judge said she was only considering limiting Stone's ability to talk about the case.

"He would still be free to discuss foreign relations, immigration or Tom Brady," Jackson said.

If she does crack down on public comments on the case, Stone's legal team could also appeal the move. Last year, Stone added First Amendment and constitutional law expert Bruce Rogow to his legal team.



rogerjs...
40.2k followers

View More on Instagram

Stone may have a solid legal premise for an appeal, Wu said, although most defendants consider it a risky move.

"Most defendants don't want to do that because they don't want to run afoul of the judge," Wu said. "He doesn't care."

Case 1:20-cv-00406-AMD Document 14-1 Filed 07/23/20 Page 74 of 136

Indeed, Stone is still racking up appearances and using nearly all of them to hammer the tactics used in the pre-dawn raid at his Florida home.

"This was a show of force, this was something you would expect from Nazi Germany or Soviet Russia. It was chilling," Stone told Infowars.

Stone has also compared the law enforcement presence the morning of his arrest to the forces deployed against drug lord Joaquín Guzmán, known as "El Chapo," and Osama bin Laden, the former al Qaeda leader who was killed by US Special Forces in a 2011 raid.

Stone's vocal complaints even sparked a response from ex-convict and former football star O.J. Simpson, who drew on his own experience with FBI raids, according to a video posted on celebrity news website TMZ.

"The FBI can be wrong," Simpson said, "But to try to compare to El Chapo and Bin Laden? Hey man, Bin Laden was carried out in a bag, not walked out in handcuffs."

Simpson's parting words for Stone: "Man up. Stop crying."

EXHIBIT 3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DR. JEROME CORSI, Individually<br>Denville, NJ, 07834<br><br>          Plaintiff<br><br>          v.<br><br>ROGER STONE, Individually<br>4300 Bayview Drive<br>Fort Lauderdale, FL, 33308<br><br><br>          Defendant. | **Case Number:**<br><br>**COMPLAINT** |

## INTRODUCTION

Plaintiff, DR. JEROME CORSI ("Plaintiff" or "Corsi") hereby files this action against ROGER STONE ("Defendant Stone") for Defamation, Intentional Infliction of Emotional Distress and Assault

## JURISDICTION AND VENUE

1.!     This Court has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

2.!     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2), (3) in that a substantial part of the events or omissions giving rise to Plaintiff Corsi's claims arose herein.

## THE PARTIES

3.!     Plaintiff, Dr. Jerome Corsi, is an author and political commentator who publishes works in this judicial district and nationwide. Plaintiff Corsi is a citizen of New Jersey.

4.!     Defendant, Roger Stone, is an individual and a citizen of Florida and a resident of

1

Fort Lauderdale, Florida. Defendant Stone was recently indicted by Special Counsel Robert Mueller as part of the alleged "Russian Collusion' investigation.  His address is 4300 Bayview Drive, Fort Lauderdale, FL, 33308

**GENERAL ALLEGATIONS**

5.!     Defendant Stone was recently indicted by Special Counsel Robert Mueller ("Mueller Indictment") as part of his "Russian Collusion" investigation for the alleged crimes of perjury, witness tampering and obstruction of justice. The indictment comprises seven different felony counts. *See* Exhibit 1 – Mueller Indictment. Importantly, Plaintiff Corsi was not accused of any wrongdoing or illegality in the Mueller Indictment, in which he named as Person 1, a material witness to the alleged crimes committed by Stone.

6.!     Specifically, the seven count Mueller Indictment against Defendant Stone involves alleged lying under oath - that is, perjury - witness tampering and obstruction of justice by threatening to kill a material witness, Randy Credico ("Credico") and his dog if Credico did not lie to government authorities concerning his involvement with Roger Stone. Credico is Person 2 in the Mueller Indictment of Defendant Stone. *Id.* Person 1 in this Mueller Indictment is Plaintiff Corsi.

7.!     Even before Defendant Stone was indicted, he began a public relations campaign in this district, nationally and internationally to smear, intimidate and threaten Plaintiff Corsi, a material witness in the "Russian Collusion" investigation.  Plaintiff Corsi is listed as Person 1 in the Mueller Indictment and was not indicted along with Defendant Stone, as he testified truthfully to the grand jury and in interviews.

8.!     To the contrary, Plaintiff Corsi has never defamed or disparaged Defendant Stone.

9.!     Defendant Stone knew that he was going to be indicted, and therefore began this

2

public relations campaign to smear, defame, intimidate and threaten Plaintiff Corsi, even before his actual indictment on January 25, 2019, in order to try to influence public opinion and Special Counsel Robert Mueller – by trying to attribute guilt to Plaintiff Corsi and not him - as well as to try to raise money for his legal defense. This pattern and practice of defaming, intimidating and threatening Plaintiff Corsi, and his legal counsel, is ongoing, so Plaintiff Corsi reserves the right to amend this Complaint.

10.! Defendant Stone likes to portray himself as Mafia, frequently making reference to Mafia figures who he admires, as well as other unsavory types who have been alleged to have engaged in unethical and/or illegal behavior. He frequently makes reference to his heroes being Hyman Roth in the 'Godfather," who was the movie version of Meyer Lansky, and Roy Cohn, not to mention, Richard Nixon, for his role in Watergate. In this regard, after Stone was indicted he held a press conference on the courthouse steps of the federal courthouse in Ft. Lauderdale, where he was booked, with his arms defiantly in the air in the "victory' pose used by Nixon after he resigned in disgrace as a result of the Watergate scandal. At the time, Stone had been employed by a Nixon group called CREEP, or the Committee to Reelect the President. Defendant Stone even has a large tattoo of Richard Nixon affixed to his back. Thus, given his admiration for persons such as these, particularly Mafia figures, his actions as pled herein can be taken as threats, as well as being defamatory. And, Plaintiff Corsi is 72 years old. Defendant Stone's intentional infliction of emotional distress and coercion and threats are intended to try even cause Plaintiff Corsi to have heart attacks and strokes, in order that Plaintiff will be unable to testify at Stone's criminal trial. Tellingly, Defendant Stone threatened kill a material witness and his dog, Credico, Person 2 in the Mueller Indictment, "Mafia style." Defendant Stone also fashions himself and indeed has the reputation, at a minimum, as being the preeminent "dirty

3

trickster." *See* "Get Me Roger Stone" on Netflix.

11.! Plaintiff Corsi has been named as a material witness to Defendant Stone's upcoming prosecution, which has prompted Defendant Stone to try to intimidate, coerce and threaten Plaintiff Corsi by defaming him and threatening him with physical violence, which is ironically what he was criminally indicted for, in part.

12.! By defaming Plaintiff Corsi, Defendant Stone is hoping to not only intimidate Plaintiff Corsi to severely harm and damage his reputation, but also to coerce and threaten Plaintiff Corsi to testify falsely if subpoenaed to be called as a material witness in Defendant Stone's ensuing criminal trial. He is also trying divert funds away from Plaintiff Corsi's legal defense fund, while boosting his own legal defense fund.

13.! Defendant Stone has also used and continues to employ surrogates, either out in the open or secretly, to defame Plaintiff Corsi, such as his "friend" Michael Caputo, Alex Jones and J. Owen Stroyer of InfoWars, Cassandra Fairbanks, and reporter Chuck Ross of The Daily Caller, to name just a few. More surrogates will be identified during discovery and they may be joined, with leave of court to amend this Complaint, as defendants herein. The use of surrogates is consistent with Defendant Stone's reputation as a "dirty trickster" who works as well under "cover of darkness" to harm and damage others who he sees for whatever reason as adversaries, political or otherwise as in the case of Plaintiff Corsi. Plaintiff Corsi is not Defendant Stone's adversary, as he simply is committed as Person 1 in the Mueller Indictment to testify truthfully if subpoenaed to testify at Stone's criminal trial.

14.! Defendant Stone is no stranger to defamation lawsuits. As reported by Splinter News, Defendant Stone was forced to - as part of a settlement in another defamation suit – apologize in newspapers and on social media for lying about Chinese Businessman Guo Wengui

on InfoWars, after having falsely published that Mr. Wengui is a "turncoat criminal who is convicted of crimes here and in China."[1]

15.!   Defendant Stone has therefore engaged in illegal witness tampering and intimidation, in violation of 18 U.S.C. § 1512 by virtue of the defamatory and threatening acts and practices as alleged herein. Not coincidentally, this was what largely he was indicted for by Special Counsel Robert Mueller.

<u>DEFENDANT STONE'S DEFAMATORY STATEMENTS</u>

16.!   Before Defendant Stone was indicted, on or about January 18, 2019, he appeared on InfoWars, where he made several false, misleading and defamatory statements in this district, nationally and internationally  regarding Plaintiff Corsi (the "InfoWars Video").[2] The same video was published on Defendant Stone's YouTube channel, "*Stone Cold Truth*," on January 18, 2019.[3]

17.!   At 2:09 in the InfoWars Video, Defendant Stone falsely publishes that Plaintiff Corsi was "fired from World Net Daily."

18.!   At 2:27 in the InfoWars Video, Defendant Stone falsely and misleadingly publishes that, "He (Corsi) was perfectly willing to lie, to perjure himself saying that a memo that he had wrote me was written on the 30th for the purposes of cover-up…. which is further proof that Jerry lied under oath."

19.!   At 2:55 in the InfoWars Video, Defendant Stone falsely and misleadingly publishes, "and then states that I knew about John Podesta's emails being stolen in advance, the only proof of that is Jerry's feeble alcohol affected memory – it's a lie…."

---

[1] Sophie Weiner, *Roger Stone Lied About a Chinese Businessman on InfoWars and Now He Has to Tell Everyone*, Splinter News, Dec. 17, 2018, available at: https://splinternews.com/roger-stone-lied-about-a-chinese-businessman-on-infowar-1831162926
[2] https://www.infowars.com/watch/?video=5c3fbf24fe49383dcf6996e4
[3] https://www.youtube.com/watch?v=cJyfgdvtFx8

20.!    At 3:35 in the InfoWars Video, Defendant Stone falsely and misleadingly publishes that "Jerry was prepared to stab a principle Trump supporter in the back, he was perfectly prepared to bear false witness against me, even though I had done nothing in my entire life other than help him."

21.!    At 4:20 in the InfoWars Video, Defendant Stone falsely and misleadingly publishes that "all I ever did was show Jerry Corsi friendship and support and try to help him and his family and what I get is Judas Iscariot, the willingness to testify against me and help the deep state bury me….and then he makes up this story about helping me formulate a cover story."

22.!    At 6:26 in the InfoWars Video, Defendant Stone falsely publishes that "you can always tell when Jerry Corsi is lying because his lips are moving…."

23.!    Defendant Stone made these false, misleading and defamatory statements with malice and with full knowledge that they were false and misleading, and/or at a minimum, with a reckless disregard for its truthfulness. These statements falsely and misleadingly state that Plaintiff Corsi was fired from World Net Daily, that he committed perjury (a federal offense), and that he is an untruthful person.

24.!    On January 2, 2019, Defendant Stone published an article on www.infowars.com titled "*ROGER STONE BELIEVES JEROME CORSI WORKS FOR MUELLER*[4]" in which Defendant Stone falsely, misleadingly, and maliciously writes, "Before you decide that Corsi is a hero you should be well aware of the fact that the good doctor was prepared to bear false witness against others in the Trump orbit if he thought it would save his own skin."

25.!    Defendant Stone made these false, misleading and defamatory statements with malice and with full knowledge that they were false and misleading, and/or at a minimum, with a reckless disregard for its truthfulness. These statements falsely and misleadingly state that

---

[4] https://www.infowars.com/roger-stone-the-treachery-of-jerome-corsi/

Plaintiff Corsi committed perjury (a federal offense), and that he is an untruthful person.

26.! In another appearance on InfoWars, which was posted to YouTube[5] on January 17, 2019, Defendant Stone at 6:22 falsely and misleadingly publishes that "He [Corsi] was perfectly willing to bear false witness against me on multiple points that are complete fabrications."

27.! In another appearance on InfoWars, which was posted to YouTube[6] on January 24, 2019, Defendant Stone at 5:58 falsely and misleadingly publishes that "the good doctor [Corsi] has told a number of lies. In fact, he's starting to conflate his lies…. he was perfectly willing to lie about me…. but now lying about Alex Jones, lying about InfoWars, lying about Dr. Jones, who's one of the nicest, gentlest, sweetest, most honest men I have ever met, it's beyond the pale…. Jerry Corsi can no longer be believed."

28.! In the same appearance, Defendant Stone at 8:34 falsely and misleadingly publishes that, "I think you've [Corsi] been deep state from the beginning. Your whole birther thing is used as a club to destroy conservatives….I look forward to our confrontation. I will demolish you. You're a fraudster, out of your alcoholic haze you have made up lies about David Jones and Alex Jones and Roger Stone and now I suspect they want you to lie about the President." This is clearly a threat, as well as being defamatory. It is akin to the threats against Person 2 in the Mueller Indictment, Randy Credico, who Defendant Stone, as set forth in the Mueller Indictment, based on Stone's own words contained in his own documentary evidence, threatened kill along with Credico's dog.

29.! Defendant Stone made these false, misleading and defamatory statements with malice and with full knowledge that they were false and misleading, and/or at a minimum, with a

---

[5] https://www.youtube.com/watch?v=GJd8YBDvm1Q
[6] https://www.youtube.com/watch?v=fXUlJZRxe6E

reckless disregard for their truthfulness. These statements falsely and misleadingly state that Plaintiff Corsi committed perjury (a federal offense), is an untruthful person, and is an alcoholic. They also contain threats against Plaintiff Corsi.

### FIRST CAUSE OF ACTION
*Defamation*

30.! Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

31.! Defendant Stone published malicious, false, misleading and defamatory statements of and concerning Plaintiff Corsi in this judicial district, nationwide, and worldwide.

32.! These false and misleading statements were published with malice, as Defendant Stone knew that they were false and misleading, or at a minimum acted with a reckless disregard for the truth.

33.! Plaintiff Corsi has been severely harmed and damaged by these false and misleading statements because they subjected him to hatred, distrust, ridicule, contempt, and disgrace.

34.! Plaintiff Corsi has been damaged by these false and misleading statements because they injured Plaintiff Corsi in his profession and business as a journalist and author, whose credibility is the most important trait, as well as severely injured and damaged him personally.

### SECOND CAUSE OF ACTION
*Defamation Per Se*

35.! Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

36.! Defendant Stone, as alleged herein, published numerous false, misleading and

defamatory statements to severely harm and damage Plaintiff Corsi, which were republished elsewhere, and through surrogates, which publish the falsity that Plaintiff Corsi has committed crimes, including perjury, and engaged in moral turpitude in the form of alcoholism, as set forth in the preceding paragraphs.

37.! These false, misleading and defamatory statements were published in this district and on the internet and elsewhere, domestically and for the entire world to see and hear and specifically Stone published false and misleading facts, *inter alia*, that Plaintiff's conduct, characteristics or a condition is incompatible with the proper exercise of his lawful business, trade, profession or office.

38.! These false and misleading statements were published with malice, as Defendant Stone knew that they were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

39.! This statements are *per se* defamatory because they falsely and misleadingly publish that Plaintiff Corsi committed perjury, which is a federal offense and felony. Defamation *per se* gives rise to the presumption that severe harm and damage has arisen by virtue of the false and misleading statements.

40.! These false, misleading, and defamatory statements are defamatory *per se* and these false and misleading statements severely harmed and damaged Plaintiff Corsi in his profession and business as a journalist and author, whose credibility is the most important trait, as well as personally.

### THIRD CAUSE OF ACTION
### *Defamation by Implication*

41.! Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

42.!    Defendant Stone published numerous false, misleading and defamatory statements about Plaintiff Corsi, as set forth in the preceding paragraphs.

43.!    These false, misleading and defamatory statements were published on the internet and published and republished elsewhere in this district, domestically and for the entire world to see and hear.

44.!    These false and misleading statements were published with malice, as Defendant Stone knew that they were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

45.!    These statements created the false and misleading implication that Plaintiff Corsi is dishonest, committed perjury and is an alcoholic, among other false and misleading statements as pled in the preceding paragraphs.

46.!    Plaintiff Corsi has been severely harmed and damaged by these false and misleading statements because they subject him to hatred, distrust, ridicule, contempt, and disgrace.

47.!    Plaintiff Corsi has been damaged by these false and misleading statements because the statements severely harmed and damaged Plaintiff Corsi in his profession as a journalist and author, whose credibility is the most important trait, as well as personally.

**FOURTH CAUSE OF ACTION**
*Intentional Infliction of Emotional Distress*

48.!    Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

49.!    Defendant Stone engaged in extreme and outrageous conduct by threatening Plaintiff Corsi, in concert with Stone, who has made death threats to at least one witness involved in Special Counsel Mueller's Russian collusion investigation, Person 2 Randy Credico.

50.! Defendant Stone knowingly and intentionally threatened Plaintiff Corsi, in a manner similar to other death threats he made to at least one material witness, involved in Special Counsel Mueller's Russian collusion investigation, such as Randy Credico, Person 2 in the Mueller Indictment.

51.! Defendant Stone's extreme and outrageous conduct directly caused Plaintiff Corsi severe emotional distress and resulting severe harm and damage.

### FIFTH CAUSE OF ACTION
*Assault*

52.! Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

53.! Defendant Stone placed Plaintiff Corsi in apprehension of an imminent harmful or offensive contact and physical harm and death, by coercing and threatening Plaintiff Corsi, in a similar manner he has used to make death threats to at least one material witness involved in Special Counsel Mueller's Russian collusion investigation, such as Person 2 in the Mueller Indictment, Randy Credico.

54.! The threats issued by Defendant Stone are credible, as he portrays himself as a "mafia" figure, as set forth above.

55.! Plaintiff Corsi did not consent to Defendant Stone' conduct.

56.! As a direct and proximate result of Defendant Stone's wrongful conduct, Plaintiff Corsi suffered conscious pain, suffering, severe emotional distress and the fear of imminent serious bodily injury or death, and other mental and physical injuries, and Plaintiff was severely harmed and damaged thereby.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Dr. Jerome Corsi prays for judgment against Defendant Stone as

follows:

a.!    Awarding Plaintiff Corsi compensatory including actual, consequential, incidental and punitive damages for malicious tortious conduct in an amount to be determined at trial and in excess of $25, 000,000 U.S. Dollars. While Stone feigns being financially destitute as a result of his legal problems and uses this to raise money for his legal defense fund, on information and belief he is wealthy, perhaps hiding his wealth in overseas bank accounts.

b.!    Awarding Plaintiff Corsi attorney's fees and costs.

c.!    Granting any further relief as the Court deems appropriate including preliminary and permanent injunctive relief, as well as the entry of a gag order against Defendant Stone in his criminal prosecution before this Court in order that he be prevented from intimidating, coercing and threatening material witnesses, such as Plaintiff Corsi, who are likely to be subpoenaed to testify at his trial. In this regard, Plaintiff Corsi will also, with leave of court requested, file an amicus brief arguing for a gag order on Defendant Stone in the related criminal case *United States of America v. Stone*, 19-cr-18 (D.D.C).

Dated: February 7, 2019                                    Respectfully Submitted,


                                             */s/ Larry Klayman*
                                             Larry Klayman, Esq.
                                             KLAYMAN LAW GROUP, P.A.
                                             D.C.  Bar Number: 334581
                                             2020 Pennsylvania Ave NW #800
                                             Washington, DC, 20006
                                             Telephone:  (310)-595-0800
                                             Email: leklayman@gmail.com
                                             *Counsel for Plaintiff*

[SUB]EXHIBIT 1
Intentionally Omitted. *See*
Main Ex. 1

EXHIBIT 4

Filing # 84473974 E-Filed 02/05/2019 09:37:59 PM

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

LARRY KLAYMAN, Individually

                  Plaintiff

      v.

ROGER STONE, Individually

              Defendant.

**Case Number:**

## COMPLAINT FOR DEFAMATION

Plaintiff, LARRY KLAYMAN ("Plaintiff" or "Klayman") hereby files this action against ROGER STONE ("Defendant Stone") for Defamation, Defamation Per Se, and Defamation by Implication.

## JURISDICTION AND VENUE

1.    This is an action for Defamation and damages in excessive of $15,000.00, exclusive of interest, costs and attorney's fees.

2.    Venue for this action is properly in Broward County, Florida, as Defendant Stone is a resident of this county and judicial district and a citizen of Florida and the cause of actions arose in this country and circuit.

## THE PARTIES

3.    Plaintiff, Larry Klayman, is an attorney and public interest advocate who practices in this circuit and nationally.

4.    Defendant, Roger Stone, is an individual and a citizen of Florida and a resident of Fort Lauderdale, Florida. Defendant Stone was recently indicted by Special Counsel Robert Mueller as part of the alleged "Russian Collusion' investigation. His address is 4300 Bayview Drive, Fort

*** FILED: BROWARD COUNTY, FL BRENDA D. FORMAN, CLERK 2/5/2019 9:37:57 PM.****

Lauderdale, FL, 33308

## **GENERAL ALLEGATIONS**

5.     Defendant Stone was recently indicted by Special Counsel Robert Mueller ("Mueller Indictment") as part of his "Russian Collusion" investigation for the alleged crimes of perjury, witness tampering and obstruction of justice. The indictment comprises seven different felony counts. *See* Exhibit 1 – Mueller Indictment.

6.     Specifically, the seven count Mueller Indictment against Defendant Stone involves alleged lying under oath - that is, perjury - witness tampering and obstruction of justice by threatening to kill a material witness, Randy Credico ("Credico") and his dog if Credico did not lie to government authorities concerning his involvement with Roger Stone. Credico is Person 2 in the Mueller Indictment of Defendant Stone. *Id.* Person 1 in this Mueller Indictment is Dr. Jerome Corsi, another material witness, who is Plaintiff Larry Klayman's client.

7.     Even before Defendant Stone was indicted, he began a public relations campaign in this circuit and nationally to smear and intimidate Dr. Jerome Corsi ("Dr. Corsi"), a material witness in the "Russian Collusion" investigation, and who is being represented by Plaintiff Klayman.  Dr. Corsi is listed as Person 1 in the Mueller Indictment and was not indicted along with Defendant Stone, as he testified truthfully to the grand jury.

8.     Defendant Stone knew that he was going to be indicted, and therefore began this public relations campaign to smear and defame Dr. Corsi and his lawyer, Larry Klayman, even before his actual indictment on January 25, 2019, in order to try to influence public opinion and Special Counsel Robert Mueller – by trying to attribute guilt to Dr. Corsi and not him - as well as to try to raise money for his legal defense. This pattern and practice of defaming Dr. Corsi and his lawyer Larry Klayman is ongoing, so Plaintiff reserves the right to amend this Complaint.

9.     Defendant Stone likes to portray himself as Mafia, frequently making reference to Mafia figures who he admires, as well as other unsavory types who have been alleged to have engaged in unethical and/or illegal behavior. He frequently makes reference to his heroes being Hyman Roth in the 'Godfather," who was the movie version of Meyer Lansky, and Roy Cohn, not to mention, Richard Nixon, for his role in Watergate. In this regard, after Stone was indicted he held a press conference on the courthouse steps of the federal courthouse in Ft. Lauderdale, where he was booked, with his arms in the air in the victory pose used by Nixon after he resigned in disgrace as a result of the Watergate scandal. At the time, Stone had been employed by a Nixon group called CREEP, or the Committee to Reelect the President. Defendant Stone even has a large tattoo of Richard Nixon affixed to his back. Thus, given his admiration for persons such as these, particularly Mafia figures, his actions as pled herein can be taken as threats, as well as being defamatory. Tellingly, Defendant Stone threatened kill a material witness and his dog, Credico, Person 2 in the Mueller Indictment, "Mafia style." Defendant Stone also fashions himself and indeed has the reputation as being the preeminent "dirty trickster." *See* "Get Me Roger Stone" on Netflix.

10.     Dr. Corsi has been named as a material witness to Defendant Stone's upcoming prosecution, which has prompted Defendant Stone to try to intimidate, coerce and threaten Dr. Corsi by defaming him and his defense counsel, Plaintiff Klayman, which is ironically what he was criminally indicted for, in part. And, the way to also get to Dr. Corsi is for Defendant Stone to also defame his lawyer, Plaintiff Larry Klayman.

11.     By defaming Dr. Corsi and Plaintiff Klayman, he is hoping to not only intimidate Dr. Corsi and his counsel to severely harm and damage their reputations, but also to coerce and threaten Dr. Corsi to testify falsely if subpoenaed to be called as a material witness in Defendant

Stone's ensuing criminal trial. He is also trying divert funds away from Dr. Corsi's legal defense fund, while boosting his own legal defense fund.

12.     Defendant Stone has also used and continues to employ surrogates, either out in the open or secretly, to defame Plaintiff Klayman and his client Dr. Corsi, such as his "friend" Michael Caputo.

13.     Before Defendant Stone was indicted, on or about January 18, 2019, he appeared on InfoWars, where he made several false, misleading and defamatory statements in this circuit and nationally regarding Plaintiff Klayman (the "InfoWars Video").[1] The same video was published on Defendant Stone's YouTube channel, "*Stone Cold Truth*," on January 18, 2019.[2]

14.     Defendant Stone also previously published on March 22, 2017 a video on YouTube titled "Beware Larry Klayman" through his channel which defames Plaintiff Klayman (the "YouTube Video").[3]

15.     Defendant Stone is no stranger to defamation lawsuits. As reported by Splinter News, Defendant Stone was forced to - as part of a settlement in another defamation suit – apologize in newspapers and on social media for lying about Chinese Businessman Guo Wengui on InfoWars, after having falsely published that Mr. Wengui is a "turncoat criminal who is convicted of crimes here and in China."[4]

<u>FALSE STATEMENTS CONTAINED IN THE INFOWARS VIDEO</u>

16.     At 1:25, Defendant Stone says, "He's (Klayman) never actually won a courtroom victory in his life."

---

[1] https://www.infowars.com/watch/?video=5c3fbf24fe49383dcf6996e4
[2] https://www.youtube.com/watch?v=cJyfgdvtFx8
[3] https://www.youtube.com/watch?v=2K10SlTy8JU&feature=youtu.be
[4] Sophie Weiner, *Roger Stone Lied About a Chinese Businessman on InfoWars and Now He Has to Tell Everyone*, Splinter News, Dec. 17, 2018, available at: https://splinternews.com/roger-stone-lied-about-a-chinese-businessman-on-infowar-1831162926

17.     Defendant Stone made this false and misleading, defamatory statement of fact with malice and/or full knowledge that it was false, or at a minimum with reckless disregard for its truth. Plaintiff Klayman has won numerous courtroom and other legal victories in his life.

18.     At 1:30, Defendant Stone publishes, "He (Klayman) was ousted at Judicial Watch. Ask Tom Fitton [the current president of Judicial Watch] why he left. He was 'ousted' because of a 'sexual harassment complaint.'"

19.     Defendant Stone made this false, misleading and defamatory statement with malice and with full knowledge that it was false and misleading, and/or at a minimum, with a reckless disregard for its truthfulness. Defendant Stone is working in concert with Thomas Fitton ("Fitton") – whose public interest organization Judicial Watch already been hit with a jury verdict and judgment for maliciously defaming Plaintiff Klayman in the U.S. District Court for the Southern District of Florida for $181,000 in compensatory and punitive damages (*Klayman v. Judicial Watch, Inc.*, 13-cv-20610 (S.D. FL.) – to defame and discredit Plaintiff Klayman and Dr. Corsi in order to falsely attempt to justify and deflect from his indictment in the "Russian Collusion" investigation, among other improper and illegal reasons and actions as alleged herein.

20.     In actuality and truth, Plaintiff Klayman left Judicial Watch on his own accord in order to run for U.S. Senate in Florida in 2003-2004.

21.     At 1:37, Defendant Stone says, "He's (Klayman) incompetent, he's a numbskull, he's an idiot, he's an egomaniac, and he could be the single worst lawyer in America. With him as Jerry Corsi's lawyer, Corsi may get the electric chair. So your idea that he's a good guy is entirely wrong"

22.     Defendant Stone made this false, misleading and defamatory statement of fact with malice with full knowledge that it was false, and/or at a minimum with reckless disregard

for its truth. This false statement of fact creates the false and misleading published factual statement and implication that Plaintiff Klayman is unqualified to be an attorney, pubic advocate and defames him personally.

23.     In actuality, Plaintiff Klayman has been a practicing attorney for nearly four decades, and has won numerous cases on behalf of his clients and also against the government for constitutional and other violations.

24.     At 2:01, Defendant Stone also published that Plaintiff Klayman is a "piece of garbage."

25.     Defendant Stone made this false and misleading defamatory statement of fact with malice and full knowledge that it was misleading and false, and/or at a minimum with reckless disregard for its truth. This false and misleading statement of fact creates the false and misleading implication that Plaintiff Klayman is unqualified to be an attorney, public advocate and is a bad and loathsome person.

26.     At 4:11. Defendant Stone says, "For those people out there who think…that Larry Klayman's IQ is higher than 70, you're wrong…"

27.     Defendant Stone made this false, misleading and defamatory statement of fact with malice and full knowledge that it was false, or at a minimum with reckless disregard for its truth. This false statement of fact creates the false implication that Plaintiff Klayman is unqualified to be an attorney, is mentally retarded and is an unintelligent, bad, and loathsome person.

<u>FALSE STATEMENTS CONTAINED IN THE YOUTUBE VIDEO</u>

28.     At 0:45 in the YouTube Video, Defendant Stone says, "Now comes gadfly right-wing lawyer, Larry Klayman, to say that Alex Jones and InfoWars have violated the law in their

6

release of classified documents and will be prosecuted."

29.     Defendant Stone made this false, misleading and defamatory statement of fact with malice and full knowledge that it was false, and/or at a minimum with reckless disregard for its truth. This false and misleading statement of fact creates the false implication that Plaintiff Klayman is unqualified to be an attorney and public advocate and a bad and loathsome person.

30.     At 1:00 in the YouTube Video, Defendant Stone says, "To be clear Larry Klayman is a moron. He has never won a case in court in his life. He may have won a few motions. He is a lightweight. He is a know-nothing…."

31.     Defendant Stone made this false, misleading defamatory statement of fact with malice and with full knowledge that it was false, and/or at a minimum with reckless disregard for its truth. Ironically, Plaintiff Klayman won a defamation judgment against Fitton and Judicial Watch – with whom Defendant Stone is working in concert to again defame Plaintiff - in the Southern District of Florida, as set forth above, and has had many other courtroom and other legal victories.

## COUNT I – DEFAMATION

32.     Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

33.     Defendant Stone published numerous false, misleading and defamatory statements to severely harm and damage Plaintiff Klayman in both the InfoWars Video and the YouTube Video which include, but are not limited to, that (1) Plaintiff Klayman was ousted at Judicial Watch due to a sexual harassment complaint, and (2) Plaintiff Klayman has never won a courtroom victory in his life, as well as the other false and misleading statements set forth in this Complaint.

34.     These false, misleading and defamatory statements were published on the internet and republished elsewhere for persons in this circuit and the entire world see and hear.

35.     These false, misleading and defamatory statements were published with malice, as Defendant Stone knew that they were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

36.     Plaintiff Klayman has been severely harmed and damaged by these false and misleading statements because they subject him to hatred, distrust, ridicule, contempt, and disgrace.

37.     Plaintiff Klayman has been severely harmed and damaged by these false and misleading statements because the statements injured Plaintiff Klayman in his profession and business as a lawyer and public advocate, as well as personally.

<u>COUNT II – DEFAMATION PER SE</u>

38.     Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

39.     Defendant Stone, as alleged herein, published numerous false, misleading and defamatory statements to severely harm and damage Plaintiff Klayman in both the InfoWars Video and the YouTube Video, which were republished elsewhere, that publish the falsity that Plaintiff Klayman has committed crimes and engaged in moral turpitude, as set forth in the preceding paragraphs.

40.     Under Florida Law, "it is established…that an oral communication is actionable per se - that is, without a showing of special damage - if it imputes to another (a) a criminal offense amounting to a felony, or (b) a presently existing venereal or other loathsome and communicable disease, or (c) conduct, characteristics or a condition incompatible with the

proper exercise *of his lawful business*, trade, profession or office, or (d) the other being a woman, acts of unchastity." *Wolfson v. Kirk*, 273 So. 2d 774, 777 (Fla. Dist. Ct. App. 1973)

41.    These false, misleading and defamatory statements were published in this circuit and on the internet for the entire world to see and hear and specifically publish false and misleading facts, *inter alia*, that Plaintiff's conduct, characteristics or a condition is incompatible with the proper exercise of his lawful business, trade, profession or office.

42.    These false and misleading statements were published with malice, as Defendant Stone knew that they were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

43.    This statements are *per se* defamatory because they falsely accuse Plaintiff Klayman of sexual harassment and a related complaint - thereby falsely imputing a criminal offense upon Plaintiff Klayman - and him being "ousted" as the chairman and general counsel of Judicial Watch over this, as well as the other false and misleading published statements alleged herein.

44.    These false, misleading, and defamatory statements are defamatory *per se* because these false and misleading statements severely harmed and damaged Plaintiff Klayman in his profession and business as a lawyer and advocate, as they concern conduct and characteristics incompatible with being a lawyer.  Damage is presumed by law when defamation *per se* is proven.

<u>COUNT III – DEFAMATION BY IMPLICATION</u>

45.    Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

46.    Defendant Stone published numerous false, misleading and defamatory

statements about Plaintiff Klayman in both the InfoWars Video and the YouTube Video, as set forth in the preceding paragraphs.

47.     These false, misleading and defamatory statements were published on the internet and published and republished elsewhere in this circuit for the entire world to see and hear.

48.     These false and misleading statements were published with malice, as Defendant Stone knew that they were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

49.     These statements created the false and misleading implication that Plaintiff Klayman has been the subject of a sexual harassment complaint and committed criminal sexual offenses, among other false and misleading statements as pled in the preceding paragraphs.

50.     Plaintiff Klayman has been severely harmed and damaged by these false and misleading statements because they subject him to hatred, distrust, ridicule, contempt, and disgrace.

51.     Plaintiff Klayman has been damaged by these false and misleading statements because the statements severely harmed and damaged Plaintiff Klayman in his profession and business as a public advocate and personally, as pled herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Larry Klayman prays for judgment against Defendant Stone as follows:

a.      Awarding Plaintiff Klayman compensatory and actual including consequential and incidental damages in excess of $ 35,000,000 million U.S. Dollars.

b.      Awarding Plaintiff Klayman attorney's fees and costs.

c.      Granting any further relief as the Court deems appropriate including preliminary and

permanent injunctive relief, as well as leave to later amend to add a claim for punitive damages pursuant to Section 768.72 of the Florida Statutes. When amended, Plaintiff Klayman will plead for punitive damages in excess of $40, 000,000 U.S. Dollars. On information and belief Defendant Stone is wealthy and has various hidden bank accounts overseas, in addition to assets in this circuit and domestically.

Dated: February 5, 2019                                Respectfully Submitted,

                                                        ___/s/ Larry Klayman___
                                                        Larry Klayman, Esq.
                                                        2020 Pennsylvania Ave NW #800
                                                        Washington, DC, 20006
                                                        Telephone: (310)-595-0800
                                                        Email: leklayman@gmail.com
                                                        *Plaintiff Pro Se*

# [SUB]EXHIBIT 1
Intentionally Omitted. *See* Main Ex. 1

EXHIBIT 5

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

LARRY KLAYMAN, Individually

        Plaintiff

    v.

THOMAS J. FITTON, Individually

        Defendant.

**Case Number:**

## COMPLAINT FOR DEFAMATION

Plaintiff, LARRY KLAYMAN ("Plaintiff" or "Klayman") hereby files this action against THOMAS J. FITTON ("Defendant Fitton") for Defamation, Defamation Per Se, and Defamation by Implication.

## JURISDICTION AND VENUE

1.! This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 under diversity of citizenship. The parties are citizens of different states and the amount in controversy exceeds $75,000.

2.! Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) as this is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

## THE PARTIES

3.! Plaintiff, Larry Klayman, is an individual and a citizen of Florida. Plaintiff is a well-known private lawyer and conservative public interest advocate and litigator, as well as a syndicated national radio talk show host on Radio America, his weekly show appropriately titled "Special Prosecutor with Larry Klayman." Plaintiff Klayman conceived of and founded both Judicial Watch, Inc. and Freedom Watch, Inc. He is a former federal prosecutor of the Antitrust

1

Division of the U.S. Department of Justice, where he was on the trial team that broke up the AT&T monopoly.

4.! Defendant, Thomas Fitton, is an individual and a citizen of the District of Columbia, whose address is 5245 42nd St NW, Washington, DC 20015. Defendant Fitton is the current President of Judicial Watch, which was conceived of and founded by Plaintiff Klayman. He is not a lawyer and at the time that Klayman left Judicial Watch on September 19, 2003 to run for the U.S. Senate in Florida, Defendant Fitton had not graduated from college. When Plaintiff Klayman hired him years earlier as an assistant, he lied to Klayman that he had graduated from George Washington University. Since then Defendant Fitton has had a book written for him by "ghost writer," Ben Shapiro, effectively claiming credit for Plaintiff Klayman's accomplishments in conceiving of, founding and running Judicial Watch for almost ten (10) years. Plaintiff Klayman was thus conspicuously and maliciously written out of the history of Judicial Watch. The book is titled "Corruption Chronicles" and remains on sale on the internet and in book stores. Defendant Fitton has also falsely testified multiple times under oath that he does not know who founded Judicial Watch, as he continues to try to spread the false narrative and impression he or someone other than Klayman founded Judicial Watch, in order to boost his own standing in the conservative community and elsewhere, as the expense of Plaintiff Klayman. In short, and regrettably Defendant Fitton, as set forth below, is a 'serial liar" and dishonest.

**STANDING**

5.! Plaintiff has standing to bring this action because he has been directly affected and victimized by the unlawful conduct complained herein. His injuries are proximately related to the conduct of Defendant Fitton, individually and working in concert with Roger Stone as set forth below.

## FACTS

6.!     Defendant Fitton has engaged in a pattern and practice of defaming Plaintiff Klayman since Plaintiff's voluntary departure from Judicial Watch, Inc. to run for the U.S. Senate in Florida in 2003-2004.

7.!     For instance, in 2013, a federal jury in the Southern District of Florida awarded Plaintiff Klayman judgment in the sum of $181,000, including punitive damages against Judicial Watch for having maliciously defamed Plaintiff.   See Exhibit 1 – Jury Verdict and Judgment. This jury verdict and judgment is final.

8.!     Defendant Fitton is now conveniently and incredibly working with Roger Stone ("Stone") to again defame Plaintiff Klayman.

9.!     Stone was recently indicted on seven (7) felony counts by Special Counsel Robert Mueller ("Mueller Indictment") as part of his "Russian Collusion" investigation for the alleged crimes of perjury, witness tampering and obstruction of justice.   See Exhibit 2 – Mueller Indictment.

10.!     Specifically, the seven count Mueller Indictment against Defendant Stone involves alleged lying under oath - that is, perjury - witness tampering and obstruction of justice by threatening to kill a material witness, Randy Credico ("Credico") and his dog if Credico did not lie to government authorities concerning his involvement with Roger Stone. Credico is Person 2 in the Mueller Indictment of Defendant Stone. *Id.* Person 1 in this Mueller Indictment is Dr. Jerome Corsi, another material witness, who is Plaintiff Larry Klayman's client.

11.!     Stone has since engaged in a public relations campaign to illegally smear, intimidate, coerce and threaten Dr. Jerome Corsi ("Dr. Corsi"), a witness in the "Russian Collusion" investigation, and who is being legally represented by Plaintiff Klayman.

12.!    Stone knew that he was going to be indicted, and therefore began this illegal public relations campaign to smear and defame Dr. Corsi and his lawyer, Larry Klayman, even before his actual indictment on January 25, 2019, in order to try to influence public opinion and Special Counsel Robert Mueller – by illegally trying to attribute guilt to Dr. Corsi and not him - as well as to try to raise money for his legal defense. This pattern and practice of defaming Dr. Corsi and his lawyer Larry Klayman is ongoing, so Plaintiff reserves the right to amend this Complaint. Stone has recently been sued by Dr. Corsi for defamation, intentional infliction of emotional distress and assault.

13.!    Dr. Corsi has been named as a material witness to Stone's upcoming prosecution, which has prompted Stone to try to intimidate, coerce and threaten Dr. Corsi by defaming him and his defense counsel, Plaintiff Klayman, which is ironically what he has been indicted for. And, the way to also "get to" Dr. Corsi is for Defendant Stone to also defame his lawyer, Plaintiff Larry Klayman

14.!    By defaming Dr. Corsi and Plaintiff Klayman, Defendant Fitton and Stone are working in concert as joint tortfeasors hoping to not only intimidate Dr. Corsi and his counsel to severely harm and damage their reputations, but also to coerce and threaten Dr. Corsi to testify falsely if subpoenaed to be called as a material witness in Defendant Stone's ensuing criminal trial, as well as to impede and harm Dr. Corsi's criminal defense. They are also acting in concert to divert funds away from Dr. Corsi's legal defense fund, while boosting Stone's legal defense fund.

15.!    Before Defendant was indicted, on or about January 18, 2019, he appeared on InfoWars, where he made several false, misleading and defamatory statements in this district,

nationally and internationally regarding Plaintiff Klayman (the "InfoWars Video").[1] The same video was published on Defendant Stone's YouTube channel, "*Stone Cold Truth*," on January 18, 2019.[2]

16.! At 1:30, Stone published, "He (Klayman) was ousted at Judicial Watch. Ask Tom Fitton [the current president of Judicial Watch] why he left. He left because of a sexual harassment complaint."

17.! Stone made this false, defamatory statement at the direction of Defendant Fitton, whom he attributes this false and defamatory statement to.

18.! Defendant Fitton knew that Plaintiff Klayman was not ousted at Judicial Watch as a result of a sexual harassment complaint, but, in actuality, Plaintiff Klayman left Judicial Watch on his own accord and voluntarily in order to run for U.S. Senate in Florida.

19.! Defendant Fitton with malice and/or a reckless disregard for the truth knew that Plaintiff Klayman did not leave Judicial Watch as a result of a sexual harassment complaint.

20.! Defendant Fitton knowingly published this false and defamatory statement to Stone, who in turn republished it during interviews which were broadcast by him and his surrogates in this district, nationally and internationally for the entire world to hear and see. On information and belief Fitton has also recently published, within the last two years up to the present, this and other false and misleading statements to others to severely harm and damage Plaintiff Klayman, such as to the Council for National Policy, the American Conservative Union, the Scaife Foundation, other conservative organizations, groups and donors, and media publications and television networks such as Fox News, to name just a few. As a non-lawyer who currently runs Judicial Watch, Defendant Fitton feels competitive with Klayman, and as

---

[1] https://www.infowars.com/watch/?video=5c3fbf24fe49383dcf6996e4
[2] https://www.youtube.com/watch?v=cJyfgdvtFx8

result of what in effect is an "inferiority complex" since he is a non-lawyer who tries to pass himself in the media off as a lawyer and legal expert  as the current head of Judicial Watch, thus has engaged in a concerted campaign to severely damage and harm Klayman's reputation, professional and personal reputation, and family. By severely harming Plaintiff Klayman's reputation and standing in the legal, media and related communities, Defendant Stone's malicious intent is to boost his own reputation and standing at the expense of Klayman, who conceived of,  founded and successfully ran Judicial Watch for nearly ten (10) years, making it the preeminent conservative public interest group fighting against corruption and for ethics and justice in government and the legal profession.

21.!    Defendant Fitton, in concert with Stone, have therefore also engaged in illegal witness tampering of Dr. Corsi and his lawyer Plaintiff Klayman in violation of 18 U.S.C. § 1512 by virtue of the defamatory acts and practices as alleged herein.

## FIRST CAUSE OF ACTION
### *Defamation*

22.!    Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

23.!    Defendant Fitton published the malicious, false and defamatory statement that Plaintiff Klayman was ousted at Judicial Watch due to a sexual harassment complaint to Stone, who in turn, and in concert with Defendant Fitton, republished this false and defamatory statement on the internet domestically, internationally and elsewhere for the entire world to see and hear.

24.!    This false and misleading statement was published with malice, as Defendant Fitton knew that it was false and misleading, or at a minimum acted with a reckless disregard for the truth.

25.!    Plaintiff Klayman has been severely harmed and damaged by this and other false and misleading statements, more of which will be uncovered in discovery, because it subjected him to hatred, distrust, ridicule, contempt, and disgrace.

26.!    Plaintiff Klayman has been severely damaged by this false and misleading statement because the malicious statement injured Plaintiff Klayman in his profession and business as a public interest and private lawyer and nationally syndicated radio talk show host who promotes ethics in government and the legal profession, as well as personally.

## SECOND CAUSE OF ACTION
### *Defamation Per Se*

27.!    Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint.

28.!    Defendant Fitton published to Stone the malicious false, misleading and defamatory statement that Plaintiff Klayman was ousted at Judicial Watch due to a sexual harassment complaint, who in turn, and in concert with Defendant Fitton, republished this malicious false and defamatory statement on the internet in this district, domestically and internationally and elsewhere for the entire world to see and hear.

29.!    Under Florida Law, "it is established…that an oral communication is actionable per se - that is, without a showing of special damage - if it imputes to another (a) a criminal offense amounting to a felony, or (b) a presently existing venereal or other loathsome and communicable disease, or (c) conduct, characteristics or a condition incompatible with the proper exercise *of his lawful business*, trade, profession or office, or (d) the other being a woman, acts of unchastity." *Wolfson v. Kirk*, 273 So. 2d 774, 777 (Fla. Dist. Ct. App. 1973).

30.!    This false and misleading statement was published with malice, as Defendant Fitton knew that it was false and misleading, or at a minimum acted with a reckless disregard for

the truth.

31.! This malicious false, misleading and defamatory statement was published on the internet in this district, domestically and internationally for the entire world to see and hear and specifically Defendant Fitton published these malicious false and misleading "facts," *inter alia*, that Plaintiff's conduct, characteristics or a condition is incompatible with the proper exercise of his lawful business, trade, profession or office

32.! This malicious false and misleading statement is *per se* defamatory because it falsely accuses Plaintiff Klayman of being ousted from Judicial Watch because of sexual harassment - thereby falsely imputing a criminal and sexually related offense upon Plaintiff Klayman – as well as being "ousted" as the chairman and general counsel of Judicial Watch because of an actual sexual harassment complaint, as well as the other false and misleading published statements alleged herein. To the contrary, on information and belief Fitton himself hypocritically had and may continue to have an "intimate personal relationship" with another director and member of the board of Judicial Watch, Paul Orfanedes, which on information and belief may constitute sexual harassment, as Defendant Fitton is Orfanedes' superior as a result of Fitton being the president of Judicial Watch. Defendant Fitton also sits on the board of directors along with Orfanedes, one of only three (3) directors, all of whom are also employed by Judicial Watch. By maliciously defaming Plaintiff Klayman, Defendant Fitton intended and intends to deflect attention away from his issues, vulnerabilities and conduct.

33.! This false, misleading, and defamatory statement concerning Plaintiff Klayman is defamatory *per se* and this false and misleading statement, and others which will be uncovered in discovery, severely harmed and damaged Plaintiff Klayman in his profession and business as a lawyer and advocate and as a nationally syndicated radio talk show host, as they concern conduct

and characteristics incompatible with being a lawyer and radio talk show host who promotes ethics in government and the legal profession. Damage is presumed by law when defamation *per se* is shown.

### THIRD CAUSE OF ACTION
#### *Defamation by Implication*

34.! Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

35.! Defendant Fitton published to Stone the false, misleading and defamatory statement that Plaintiff Klayman was ousted at Judicial Watch due to a sexual harassment complaint, who in turn, and in concert with Defendant Fitton, republished this false and defamatory statement on the internet in this district, domestically and internationally and elsewhere for the entire world to see and hear.

36.! This false, misleading and defamatory statement was published with malice, as Defendant Fitton knew that it was false, or at a minimum acted with a reckless disregard for the truth.

37.! This malicious statement created the false and misleading implication that Plaintiff Klayman has engaged been subject to a sexual harassment complaint and was ousted from Judicial Watch for this reason and committed criminal sexual offenses, as well as other matters of moral turpitude as set forth in this Complaint.

38.! Plaintiff Klayman has been severely harmed damaged by this published statement because it subjected him to hatred, distrust, ridicule, contempt, and disgrace.

39.! Plaintiff Klayman has been damaged by malicious this false and misleading statement, and others which will be disclosed during discovery, because the statements severely harmed and damaged Plaintiff Klayman in his profession and business as a public advocate and

as a syndicated radio talk show host who promotes ethics in government and the legal profession, and personally, as pled herein.

40.!    On information and belief Defendant Fitton's defamatory conduct, in concert with Stone and individually, is on-going and as more defamatory conduct is uncovered through discovery and otherwise, this defamatory conduct will be subject to a motion to amend this Complaint.

41.!    Defendant Fitton's malicious intent to severely harm and damage Plaintiff Klayman is largely based on an "inferiority complex" that he is not a lawyer and thus he feels competitive with Klayman. Indeed, at the time that Plaintiff left Judicial Watch on September 19, 2003, to run for the U.S. Senate in Florida Fitton had not graduated from college, his having lied to Klayman that he did have a bachelor's degree from George Washington University. This false statement fraudulently induced Klayman to offer him a job at the public interest organization. As a non-lawyer Fitton inappropriately does not have the background and expertise to now head Judicial Watch and make expert legal commentary on television, radio, the internet and in print, as Judicial Watch was conceived to in effect be and is a public interest law firm.

42.!    Plaintiff Klayman has steadfastly demanded that Defendant Fitton refrain from making the malicious false and misleading statement as alleged herein, but he has refused and Fitton has also refused to correct this and other false and misleading statements in the past, regrettably necessitating the need for this and other legal complaints. The false and misleading statement published in concert with Stone has since been republished by others to severely harm and damage Plaintiff Klayman and his client Dr. Corsi. Defendant Fitton's campaign to severely harm and damage Plaintiff Klayman is maliciously intended to boost his own standing at the expense of Plaintiff Klayman in the conservative community, media and with donors and

elsewhere and it continues unabated.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff Larry Klayman prays for judgment against Defendant Fitton as follows:

a.!    Awarding Plaintiff Klayman compensatory including actual, consequential, incidental and punitive damages for malicious tortious conduct as alleged herein in an amount to be determined at trial and in excess of $35, 000,000 U.S. Dollars.

b.!    Awarding Plaintiff Klayman attorney's fees and costs.

c.!    Granting any such further relief as the Court deems appropriate including preliminary and permanent injunctive relief.

**PLAINTIFF KLAYMAN DEMANDS A JURY TRIAL ON ALL COUNTS SO TRIABLE.**

Dated: February 11, 2019                                    Respectfully Submitted,

                                                         *__/s/ Larry Klayman___*
                                                          Larry Klayman, Esq.
                                                          FL Bar No. 246220
                                                           KLAYMAN LAW GROUP, P.A.
                                                           c/o 2020 Pennsylvania Ave., N.W.
                                                           Suite 800
                                                           Washington, D.C. 20006
                                                           Telephone:  (310) 595 - 0800
                                                           Email: leklayman@gmail.com

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.: 13-20610-CIV-ALTONAGA

**LARRY KLAYMAN,**

Plaintiff,

v.

**JUDICIAL WATCH, INC.,**

Defendant.

_____/

### FINAL JUDGMENT

**THIS CAUSE** came for trial before the Court and a jury, United States District Judge, Cecilia M. Altonaga, presiding, and the issues having been duly tried and the jury having duly rendered its verdict on June 10, 2014, it is

**ORDERED AND ADJUDGED** that Judgment is entered in favor of Plaintiff, Larry Klayman, and against Defendant, Judicial Watch Inc., in the amount of **$156,000.00** for compensatory damages and **$25,000.00** for punitive damages, totaling **$181,000.00**, for which sum let execution issue. Requests for costs and attorneys' fees shall not be submitted until after any post-trial motions are decided or an appeal is concluded, whichever occurs later. This judgment shall bear interest at the rate as prescribed by 28 U.S.C. section 1961, and shall be enforceable as prescribed by 28 U.S.C. sections 2001–2007, 28 U.S.C. sections 3001–3308, and Federal Rule of Civil Procedure 69(a). The Clerk shall mark this case closed.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 11th day of June, 2014.

Cecilia M. Altonaga

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record

Certified to be a true and correct copy of the document on file
Steven M. Larimore, Clerk,
U.S. District Court
Southern District of Florida

By Lisa J. Street
Deputy Clerk

Date 6-24-2016

# [SUB]EXHIBIT 2
Intentionally Omitted. *See* Main Ex. 1

EXHIBIT 6

# ABOUT LARRY KLAYMAN

Larry Klayman, founder of Judicial Watch and Freedom Watch, is known for his strong public interest advocacy in furtherance of ethics in government and individual freedoms and liberties. During his tenure at Judicial Watch, he obtained a court ruling that Bill Clinton committed a crime, the first lawyer ever to have done so against an American president. Larry became so famous for fighting corruption in the government and the legal profession that the NBC hit drama series "West Wing" created a character after him: Harry Klaypool of Freedom Watch. His character was played by actor John Diehl.

In 2004, Larry ran for the U.S. Senate as a Republican in Florida's primary. After the race ended, he founded Freedom Watch.

Larry graduated from Duke University with honors in political science and French literature. Later, he received a law degree from Emory University. During the administration of President Ronald Reagan, Larry was a Justice Department prosecutor and was on the trial team that succeeded in breaking up the telephone monopoly of AT&T, thereby creating competition in the telecommunications industry.

Between Duke and Emory, Larry worked for U.S. Senator Richard Schweiker (R-Pa.) during the Watergate era. He has also studied abroad and was a stagiaire for the Commission of the European Union in its Competition Directorate in Brussels, Belgium. During law school, Larry also worked for the U.S. International Trade Commission in Washington, D.C.

Larry speaks four languages—English, French, Italian, and Spanish—and is an international lawyer, among his many areas of legal expertise and practice.

The author of two books, *Fatal Neglect* and *Whores: Why and How I Came to Fight the Establishment,* Larry has a third book in the works dealing with the breakdown of our political and legal systems. His current book, *Whores,* is on now sale at WND.com, Amazon.com, BarnesandNoble.com, Borders.com, and all major stores and booksellers.

Larry is a frequent commentator on television and radio, as well as a weekly columnist, on Friday, for WND.com. He also writes a regular blog for Newsmax called "Klayman's Court."

Larry has been credited as being the inspiration for the Tea Party movement. (See "Larry Klayman - The One Man TEA Party," by Dr. Richard Swier, http://fwusa.org/KFA)



**Support the work of Freedom Watch at www.FreedomWatchUSA.org**

EXHIBIT 7

Case 1:30-ov-00007-200-2008-2019-AMAD Document 14451 Filed 00/00/27 22 Page Page 1021 0f 1360

MINUTE ORDER as to ROGER J. STONE, JR. On February 19, 2019, the Court ordered the defendant to show cause at a hearing to be held on February 21, 2019 as to why the media communications order entered in this case 36 and/or defendant's conditions of release 21 should not be modified or revoked. A hearing was held on this date. For the reasons set forth on the record, and based upon the entire record, including the sealed exhibit to the hearing 42 , the testimony of the defendant, the arguments of counsel, and the submissions of the parties 28 29 filed in connection with the potential imposition of a media communications order, the Court entered the following order at the hearing: the conditions of defendant's pretrial release 21 are hereby modified to include the condition that, and the February 15, 2019 media communications order 36 is hereby modified to provide that, the defendant is prohibited from making statements to the media or in public settings about the Special Counsel's investigation or this case or any of the participants in the investigation or the case. The prohibition includes, but is not limited to, statements made about the case through the following means: radio broadcasts; interviews on television, on the radio, with print reporters, or on internet based media; press releases or press conferences; blogs or letters to the editor; and posts on Facebook, Twitter, Instagram, or any other form of social media. Furthermore, the defendant may not comment publicly about the case indirectly by having statements made publicly on his behalf by surrogates, family members, spokespersons, representatives, or volunteers. The order to show cause is hereby vacated. Signed by Judge Amy Berman Jackson on 2/21/19. (DMK) (Entered: 02/21/2019)

Stone deleted the only image in that multi-image post that included "Who framed Roger Stone" language shortly after CNBC emailed his lawyer to ask about it.







Stone's post was put online less than 48 hours after the judge, Amy Berman Jackson, ordered lawyers for the admitted Republican "dirty trickster" to explain why they did not tell her earlier about the planned publication of a book by Stone that could violate her gag order on him.

**LIVE, NEWS-MAKING DISCUSSIONS UNIQUE, IN-PERSON EXPERIENCES**

LEARN MORE + JOIN US



Constant Fatigue Is A Warning Sign – See The Simple Fix

Gundry MD

by Taboola




House Democrats unveil a sweeping 'Medicare-for-all' bill — here's what's in it

Michael Cohen's testimony gives both sides fodder in a possible impeachment fight

A 'shock and awe' rally

Bloomberg aides interview staffers in New Hampshire, Iowa as the billionaire considers 2020 run

These are the cities where you can live comfortably on $50,000 a year

Michael Cohen says prosecutors are investigating previously undisclosed wrongdoing related to Trump

**TRENDING NOW**


1. Brett Kavanaugh: State laws blocking taxpayer-funded church repairs are 'pure discrimination'


2. Southwest Airlines starts selling its first Hawaii flights, from $49 one way


3. Tesla's onslaught of announcements is raising red flags about demand for its cars

Roger Stone suggests Robert

Stone announced on Instagram in January that he was coming out with the book, "The Myth of Russian Collusion: The Inside Story of How Trump Really Won."

In her gag order in U.S District Court in Washington, D.C., Jackson barred Stone from "making statements to the media or in public settings about the Special Counsel's investigation or this case or any of the participants in the investigation or the case."

The gag extends to "posts on Facebook, Twitter, Instagram or any other form of social media." If Stone violates the order, Jackson could order him jailed without bail until his trial.

Jackson had slapped that order on Stone on Feb. 21 after he posted on Instagram a photo showing the judge's face next to a rifle scope's



Mueller 'framed' him in Instagram post that could violate gag order



5. 'Beverly Hills, 90210' and 'Riverdale' star Luke Perry died at 52 after suffering a massive stroke

 MARKETS     WATCHLIST     CNBC TV     MENU



**Jon Swaine**
@jonswaine

Roger Stone now directly attacking the federal judge presiding over his case and posting a pic of her head beside crosshairs

9,929   11:12 AM - Feb 18, 2019

10.2K people are talking about this

Stone's new post is comprised of a rotating series of images that ask for money to support Stone's defense to charges that he lied to Congress and tampered with a witness.

One says, "I am committed to proving my innocence. But I need your help." Another photo, which shows a young Stone standing

behind Trump years ago, says, "I've always had Trump's back. Will you have mine?" Two other images tout a "Roger Stone Did Nothing Wrong" t-shirt and "Stone Cold Truth" sweatshirt.

The post originally had an image showing Stone wearing eyeglasses under the words "Who Framed Roger Stone," a reference to the movie "Who Framed Roger Rabbit." The image has been on the Internet for some time.



rogerjstonejr 12m

 **Shelby Holliday**
@shelbyholliday

New in Instagramland: Roger Stone, using Insta stories (which disappear after 24 hrs), suggests he's being framed.

2,224  10:40 AM - Mar 3, 2019

2,253 people are talking about this

A spokesman for Mueller declined to comment Sunday. Stone's lawyer did not immediately respond to a request for comment.

Stone, who remains free on a $250,000 signature bond, was arrested in Florida in late January and has pleaded not guilty to the seven counts against him, including making false statements to Congress, witness tampering and obstructing justice.

Mueller has said Stone lied to Congress about his alleged efforts to have WikiLeaks release material hacked by Russian agents from Democrats, including Hillary Clinton's campaign chairman, during the 2016 campaign that ended with Trump's victory.

An indictment alleges Stone was in contact with top-ranking Trump campaign officials about efforts to leak damaging information about Clinton right before Election Day.



**Dan Mangan**
Reporter

---

FROM THE WEB                                    Sponsored Links by Taboola

**Drivers who switch save an average of $668 on car insurance.**
Progressive

**Before you renew Amazon Prime, read this**
Wikibuy

**U.S. Cardiologist: It's Like a Pressure Wash for Your Insides**
Health Headlines

**Man Who Called DOW 20,000 Has Surprising New Prediction**
Investing Outlook



**These German hearing aids are going viral**
hear.com





**If Your Indoor Cat Vomits (Do This Every Day)**
Ultimate Pet Nutrition





MORE FROM CNBC                                          by Taboola

House Judiciary Committee chair Nadler says Trump obstructed justice, will request documents

Trump will be 'very tough to beat' in 2020 if he gets three things right: Scaramucci

Cohen brings Trump's net worth statements to hearing. Here's how to read them

Trump, from Vietnam, berates 'Da Nang Dick' Blumenthal for war record

Michael Cohen: 'I fear' Trump won't peacefully give up the White House if he loses the 2020 election

GOP Rep. tweets at Michael Cohen on eve of hearing: Does your wife 'know about your girlfriends?'

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**

DR. JEROME CORSI, et al

          Plaintiffs

    v.

INFOWARS, LLC, et al

          Defendants.

**Case Number:   1:20-cv-298-LY**

**PLAINTIFF JEROME CORSI'S OPPOSITION TO DEFENDANTS' MOTIONS TO
DISMISS AND MOTION FOR SANCTIONS**

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

LEGAL STANDARD ..............................................................................................3

LEGAL ARGUMENT..............................................................................................3

    The Amended Complaint Alleges That Each of the Infowars Defendants Were Working Together in Concert, and are Therefore Jointly and Severally Liable ................................3

    Dr. Corsi Has More Than Adequately Pled Defamation Causes of Action ......................5

        Dr. Corsi is Not a Public Figure....................................................................6

        Dr. Corsi Has More Than Adequately Pled Malice.................................................7

        Dr. Corsi 's Specific Allegations as to Defamation.................................................8

            The October 26, 2018 Video ........................................................................8

            The January 18, 2019 Video ......................................................................11

            Other Defamatory Publications..................................................................11

        Defendant Shroyer Personally Participated in the Defamation ............................12

    Dr. Corsi Has More Than Adequately Pled Intentional Infliction of Emotional Distress .13

    Dr. Corsi Has More Than Adequately Pled Claim for Assault.........................................14

    Dr. Corsi Has More Than Adequately Pled Unfair Competition Cause of Action............15

    Dr. Corsi Did Not Need to Comply With the Texas Defamation Mitigation Act..................................................................................................................16

    The Honorable Roy K. Altman's Order in the U.S District Court for the Southern District of Florida is Not Binding on this Court ......................................................16

    Defendant Shroyer's Motion for Sanctions Must be Denied.............................................17

CONCLUSION .....................................................................................................18

# TABLE OF AUTHORITIES

**Cases**

*Bentley v. Bunton*, 94 S.W.3d 561 (Tex. 2002) ...........................................................6, 9

*Dall. Morning News, Inc. v. Tatum*, 554 S.W.3d 614 (Tex. 2018) ....................................6

*Household Credit Servs., Inc. v. Driscol*, 989 S.W.2d 72 (Tex. App. El Paso 1998) .................13

*In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549 (S.D. Tex. 2002 ...........3

*LandAmerica Commonwealth Title Co. v. Wido*, 2015 Tex. App. LEXIS 11201 (Tex. App. Oct. 29, 2015 ......................................................................................................4

*Lowrey v. Tex. A&M Univ. Sys.*, 117 F.3d 242 (5th Cir. 1997 .......................................3

*Mahone v. Addicks Utility District of Harris County*, 836 F.2d 921 (5th Cir. 1988 .....................3

*Moore v. City of Wylie*, 319 S.W.3d 778 (Tex. App. 2010) ...........................................14

*Rodriguez v. Gonzales*, 566 S.W.3d 844 (Tex. App. 2018 .......................................5, 6

*Sosa v. Coleman*, 646 F.2d 991 (5th Cir. 1981 .....................................................3

*SR Int'l Bus. Ins. Co. Ltd. V. Energy Future Holdings Corp.*, 539 F. Supp. 2d 871 (N.D. Tex. 2008 .......................................................................................................3

*Tobinick v. Novella*, 848 F.3d 935 (11th Cir. 2017) ................................................15

*Twyman v. Twyman*, 855 S.W.2d 619 (Tex. 1993) ..................................................13

*Van Der Linden v. Khan*, 535 S.W.3d 179 (Tex. App. 2017) .......................................6

**Statutes**

Texas Defense Mitigation Act ........................................................................16

Federal Rule of Civil Procedure 11 .................................................................18

Plaintiff DR. JEROME CORSI ("Dr. Corsi") hereby opposes (1) Defendant Infowars LLC ("Infowars"), Alex E. Jones ("Alex Jones"), and Free Speech Systems, LLC's ("FSS") Motion to Dismiss, ECF No. 58, (2) Defendant Owen Shroyer's ("Shroyer") Motion to Dismiss, ECF No. 55, (3) Defendant Shroyer's Motion for Sanctions, ECF No. 56, and Defendant David Jones' ("David Jones") Motion to Dismiss, ECF No. 57. These Defendants are heretofore collectively referred to as the "Infowars Defendants."

## I.     INTRODUCTION

This case is centered around the Infowars Defendants' latest attempt at pecuniary gain and notoriety through their pattern and practice of spewing false, malicious, and defamatory statements. In collaboration with their co-conspirator, Defendant Roger Stone ("Stone"), the Infowars Defendants are doing everything that they can to smear, discredit, and threaten Dr. Dr. Corsi in order try to have helped Stone avoid prison time for his role Special Counsel Robert Mueller's Russian collusion investigation, for which he was indicted on seven separate felony charges and had a pending criminal case in the District of Columbia. Defendant Stone was then convicted on seven counts of perjury, witness tampering and obstruction of justice and was sentenced to 40 months in a federal penitentiary. Am. Comp. ¶ 36. His sentence was commuted by President Donald J. Trump.

To that end, Stone had already made numerous false, malicious, and defamatory statements in public in order to try to improperly influence and corrupt Mr. Mueller's investigation and prosecution. Defendant Stone has falsely accused Dr. Corsi of repeatedly lying, the crime of committing perjury, and being an alcoholic who has no capacity for memory, among a myriad of other defamatory published statements as pled in the Complaint. It is easy to see why Defendant Stone made these types of statements – he was trying to do everything in his power to

discredit, coerce, intimidate, and threaten Dr. Corsi, who had no choice but to cooperate with Mr. Mueller's investigation, and if subpoenaed, to testify truthfully at Defendant Stone's trial. Tellingly, Dr. Corsi was not indicted, while Defendant Stone was. This speaks for itself.

The Infowars Defendants have now stepped in to aid their co-conspirator, Stone, who works as a co-host along with Defendant Shroyer's on *The War Room*, in hopes of not only discrediting Dr. Corsi to aid Stone, but also to eliminate them as competitors. The Infowars Defendants have come up with a myriad of lies and blatant falsities that have severely damaged Dr. Corsi's reputation.

Tellingly, this is not the Infowars Defendants' first foray into the misinformation business:

> The Defendants related to Infowars in particular have a long and sordid history of publishing and broadcasting defamatory material, including falsely, recklessly and baselessly accusing the families of the schoolchildren who lost their lives during the 2012 Sandy Hook Elementary School massacre of staging the massacre and faking the deaths of their children.
>
> The Sandy Hook families had to endure years of abuse and torture from Defendants before finally filing suit against numerous parties involved with InfoWars, including Defendant Alex Jones and Shroyer, for defamation.
>
> As just one example, a Florida woman was arrested for making death threats to a parent of a Sandy Hook victim. According to the U.S. Department of Justice, the motivation behind the threats was the lies propagated by these Defendants that the Sandy Hook massacre
> was a hoax.
>
> Furthermore, Defendant Alex Jones in concert with the other Defendants propagated and promoted the "Pizzagate" conspiracy on his show, accusing a restaurant called Comet Ping Pong in the Washington D.C. area of operating a child sex ring in its non-existent basement that purportedly involved Hillary Clinton and John Podesta. This caused one of his listeners to shoot up the restaurant after being told by Defendant Jones to "self-investigate" the "Pizzagate" conspiracy theory. Am. Comp. ¶¶ 17-21.

The Infowars Defendants have shown time and time again that they are willing to say just about

anything for notoriety, fame, and profit. Thus, it is hardly surprising that they are willing to come to the defense of their co-conspirator Roger Stone in this instance.

## II.  LEGAL STANDARD

A Rule 12(b)(6) motion is disfavored and is rarely granted. *Sosa v. Coleman*, 646 F.2d 991, 993 (5th Cir. 1981). When "reviewing the sufficiency of a complaint in response to a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6) . . . the district court's task is limited." *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 563 n.3 (S.D. Tex. 2002). Motion to dismiss are viewed with disfavor and rarely granted. *See Lowrey v. Tex. A&M Univ. Sys.*, 117 F.3d 242, 247 (5th Cir. 1997); *SR Int'l Bus. Ins. Co. Ltd. V. Energy Future Holdings Corp.*, 539 F. Supp. 2d 871, 874-75 (N.D. Tex. 2008) (citations omitted); *Mahone v. Addicks Utility District of Harris County*, 836 F.2d 921, 926 (5th Cir. 1988) (holding that Rule 12(b)(6) motions are disfavored in the law, and a court will rarely encounter circumstances that justify granting them.

## III.  LEGAL ARGUMENT

### A.  The Amended Complaint Alleges That Each of the Infowars Defendants Were Working Together in Concert, and are Therefore Jointly and Severally Liable

The Amended Complaint specifically and expressly alleges that the Infowars Defendants were at all material times "working together in concert with and as agents of Stone…." Am. Comp. ¶ 36. Furthermore, "Plaintiffs have demanded retraction and correction of the defamatory videos and publications…but Defendant shave arrogantly refused, thereby ratifying any and all defamatory statements contained therein…." Am. Comp. ¶ 38.

There is nothing conclusory about these allegations:

Defendant InfoWars and Defendant Free Speech Systems are both owned, controlled, and operated by Defendant Alex Jones and David Jones. Defendant

> Free Speech Systems owns www.infowars.com, where content created by Defendants Alex Jones, Shroyer and Stone were at all material times posted and broadcast into this district, nationally and internationally. Am. Comp. ¶ 11.
>
> Defendant David Jones is Defendant Alex Jones's father and holds the official title of Director of Human Relations for Defendant Free Speech Systems. On information and belief, Defendant David Jones is the owner of Defendant InfoWars and Free Speech Systems and he manages and controls the business and related activities for Defendants InfoWars and Free Speech Systems, as well as Defendant Alex Jones' other companies. Am. Comp. ¶ 8.

Thus, given the fact that each of every one of the Infowars Defendants are intricately bound together by virtue of the fact that they all directly participate in creating and publishing the content on the Infowars site, it is more than merely plausible that they are working together in concert.

> Under Texas law:
>
> Civil conspiracy is used to extend tort liability beyond the wrongdoer to those who merely planned, assisted, or encouraged his acts. *See Carroll v. Timmers Chevrolet, Inc.*, 592 S.W.2d 922, 925-26 (Tex. 1979); *Helping Hands Home Care, Inc. v. Home Health of Tarrant County, Inc.*, 393 S.W.3d 492, 506 (Tex. App.-Dallas 2013, pet. denied). Once a civil conspiracy is proved, each conspirator is responsible for all acts done by any of the conspirators in furtherance of the conspiracy. *Bentley v. Bunton*, 94 S.W.3d 561, 619 (Tex. 2002); *Carroll*, 592 S.W.2d at 926 (Tex. 1979); *Helping Hands*, 393 S.W.3d at 506. A finding of civil conspiracy imposes joint and several liability on all conspirators for actual damages resulting from the acts in furtherance of the conspiracy. *Carroll*, 592 S.W.2d at 925; *Helping Hands*, 393 S.W.3d at 506. When a jury finds that liability for a civil conspiracy exists, this finding requires the legal conclusion to impose joint and several liability on the co-conspirators.

*LandAmerica Commonwealth Title Co. v. Wido*, No. 05-14-00036-CV, 2015 Tex. App. LEXIS 11201, at *29 (Tex. App. Oct. 29, 2015). Thus, as the Amended Complaint clearly alleges that each and every one of the Infowars Defendants conspired with Defendant Stone, to maliciously defame and otherwise harm Dr. Corsi, they are jointly and severally liable for each others' actions.

Furthermore, any assertion by Defendant David Jones that he was not involved in the defamation of Mr. Klayman is rebutted by the attached affidavit of Kelly Morales, Defendant Alex Jones' ex-wife. <u>Exhibit 4</u>. For instance, Ms. Morales states, "David Jones runs Infowars with Alex Jones and helps him with his activities, including fixing media stories and endorsing and/or aiding his slanderous and/or fraudulent behaviors." Furthermore, "Alex Jones could not function without David Jones, and has conspired with him on the past to commit this breach of fiduciary duty and fraud on my business/estate with Alex Jones." In fact, in an affidavit filed by David Jones in Alex Jones' bankruptcy case, he swears, "I have been involved with Alex Jones' personal and business finances for many years…." <u>Exhibit 4</u>.

Given this, it is not surprising that Defendant David Jones, along with the other Infowars Defendants, were given a chance to retract the defamatory statements, but chose not to, thereby ratifying them. Am. Comp. ¶ 38.

Lastly, Defendant Stone is still appearing regularly on Infowars, as recently as a few weeks ago, as reported by the Huffington Post.[1] This shows that Defendant Stone is still working together closely with the Infowars Defendants after being pardoned by President Trump.

### B.    Dr. Corsi Has More Than Adequately Pled Defamation Causes of Action

The elements that a defamation plaintiff must prove are that (a) the defendant published a false statement of fact; (b) the statement defamed the plaintiff; (c) the defendant acted with actual malice, if the plaintiff is a public figure or a public official, or negligently, if the plaintiff is a private individual; and (d) the statement proximately caused damages." *Rodriguez v. Gonzales*, 566 S.W.3d 844, 848 (Tex. App. 2018). Furthermore, in a claim for defamation *per se,*

---

[1] Allison Quinn, *Roger Stone's Election Plan: Have Feds Block Voting, Arrest 'Seditious' Daily Beast Staff*, Daily Beast, Sept. 13, 2020, available at: https://www.thedailybeast.com/roger-stones-election-plan-have-feds-block-voting-arrest-seditious-daily-beast-staff

damages are presumed, as the "statements are so obviously harmful that damages, such as mental anguish and loss of reputation, are presumed." *Van Der Linden v. Khan*, 535 S.W.3d 179, 198 (Tex. App. 2017). A defamation by implication claim arises when a "when discrete facts, literally or substantially true, are published in such a way that they create a substantially false and defamatory impression by omitting material facts or juxtaposing facts in a misleading way." *Dall. Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 627 (Tex. 2018).

Furthermore, the Supreme Court of Texas has found that a defendant may not escape liability for his defamatory conduct simply by couching his defamatory statement as an "opinion." *Bentley v. Bunton*, 94 S.W.3d 561 (Tex. 2002). The *Bentley* court gave an example:

> If a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, "In my opinion Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar." As Judge Friendly aptly stated: "[It] would be destructive of the law of libel if a writer could escape liability for accusations of [defamatory conduct] simply by using, explicitly or implicitly, the words 'I think.'" See *Cianci* [*v. New Times Publishing Co.*, 639 F.2d 54, 64 (2d Cir., 1980)]. It is worthy of note that at common law, even the privilege of fair comment did not extend to "a false statement of fact, whether it was expressly stated or implied from an expression of opinion." Restatement (Second) of Torts, § 566, Comment *a* (1977). *Id.* at 583-84.

## 1. Dr. Corsi is Not a Public Figure

First and foremost, it is important to establish that Dr. Corsi is not a public figure. Thus, he does not need to have alleged that the Infowars Defendants acted with actual malice, even though he has done so. "In the context of defamation claims, there are two types of 'public figures.' 'All-purpose' or 'general purpose' public figures are those 'who have achieved such pervasive fame or notoriety that they become public figures for all purposes and in all contexts.'"

*Rodriguez v. Gonzales*, 566 S.W.3d 844, 850 (Tex. App. 2018). "In contrast, a 'limited-purpose' public figure is a public figure only "for a limited range of issues surrounding a particular public controversy.' *Id.* To determine whether a defamation claimant is a limited-purpose public figure, Texas courts apply the following three-part test: (1) the controversy at issue must be public both in the sense that people are discussing it and people other than the immediate participants in the controversy are likely to feel the impact of its resolution; (2) the plaintiff must have more than a trivial or tangential role in the controversy; and (3) the alleged defamation must be germane to the plaintiff's participation in the controversy. *Id.*

It is clear that Dr. Corsi is not a general purpose public figure. In the context of the defamation, Dr. Corsi is not a limited purpose public figure either. Here, Dr. Corsi did not injected himself into the purported "public controversy." Their involvement was not by choice, but instead forced by Defendants and Special Counsel Mueller and his staff, who named Dr. Corsi as a witness on Defendant Stone's indictment. Dr. Corsi was then forced to retain counsel, Plaintiff Klayman, and make public statements in order to protect his own reputation as an investigative journalist. Put another way, Dr. Corsi never sought out any of the media attention, but was involuntarily brought into the controversy and forced to defend himself once Defendants began maliciously defaming them. Furthermore, it is abundantly clear that Defendants' false, malicious, and misleading statements essentially, such as by way of just one example, calling Dr. Corsi an alcoholic are not germane in any way to the Russian collusion investigation and prosecution, and were made by Defendants solely to discredit Dr. Corsi and tarnish his reputation in this district. Comp. ¶¶ 42 – 47

### 2.     Dr. Corsi Has More Than Adequately Pled Actual Malice

As set forth above, neither Dr. Corsi is not a public figure the purposes of this litigation,

rendering a showing of malice unnecessary. However, even in the unlikely event that this Court finds that Dr. Corsi is a limited-public figure, it is clear that the Infowars Defendants acted with malice. Dr. Corsi specifically pled that each of the false and defamatory statements were made by Defendants <u>with malice</u> and actual knowledge of their falsity.

The Amended Complaint sets forth the fact that Defendants "have known Plaintiff Corsi for a long time and even worked with him… so they were well aware that the statements made by the co- Defendant Stone, and their own false, misleading, malicious and defamatory statements were, indeed, false, as well as their acting as agents of, much less their ratification of the malicious false statements published by Defendant Stone on their networks and media sites." Am. Comp. ¶ 39.

Indeed, the fact that the Infowars Defendants have known Dr. Corsi for a long time and even worked with him conclusively shows the actual malice stemming from the false and defamatory statements now being made. Why would the Infowars Defendants have worked so closely with an individual that they allegedly knew was an "alcoholic" or someone that the knew was a "liar?" They would not have, because they know that Dr. Corsi is neither of those things. Indeed, Dr .Corsi's book, "*Killing the Deep State,*" is still available for sale on the Infowars website! <u>Exhibit 1</u>; *Affidavit of Dr. Corsi*. This shows that the Infowars Defendants at all times knew that Dr. Corsi was neither an alcoholic nor a liar, yet still willingly participated in branding him as such. This is textbook actual malice. Dr. Corsi has attached a sworn affidavit hereto in this regard. <u>Exhibit 1</u>.

### 3. Dr. Corsi's Specific Allegations as to Defamation

#### i. The October 26, 2018 Video

Defendants' primary defense appears to be trying to couch their false, malicious, and

defamatory statements of fact as opinion. However, it is clear that a tortfeasor may not escape liability for defamation simply by couching their statement as opinion. *See Bentley v. Bunton*, 94 S.W.3d 561 (Tex. 2002). Indeed, this makes perfect sense. Otherwise, a tortfeasor would be given free reign to defame any other person simply be using the word "seems" in the defamatory publication.

The first statement at issue appears in paragraph 42 of the Amended Complaint, where Defendant Alex Jones stated that Dr. Corsi "seemed to be extremely mentally degraded to the point of what I would call dementia." Despite the Infowars Defendants' attempts to argue opinion, based solely on the inclusion of the word "seemed," it is clear that the defamatory statement provides an objectively verifiable statement of fact. Whether a person is "mentally degraded" is a medical question of fact. One either is, or is not. Defendant Alex Jones takes it a step further, making a diagnosis of "dementia." Again, this is an objective medical diagnosis that is a statement of fact. One either has dementia or he doesn't. Dr. Corsi is neither "mentally degraded" not does he have "dementia." Thus, the statements of "fact" spewed by Defendant Alex Jones are objectively and provably false. These statements were made simply to discredit Dr. Corsi as a witness in Stone's indictment and prosecution. Lastly, this false statement was based on a supposed first hand account, so Defendant Alex Jones must know the truth or falsity of his statement. Thus, if false, it is clear that he acted with malice. This statement falls under the rule set forth in *Bentley*, which prohibits a tortfeasor from simply couching their statements of fact as opinion.

The second statement at issue appears in paragraph 43 of the Amended Complaint, where "Defendant Alex Jones, acting in concert with the other Defendants, maliciously fabricates a story where he purportedly saw Plaintiff Corsi at a steakhouse "on the ground at another table"

and that his security staff "thought he was dead in the elevator." These are two statements of objectively verifiable fact. Either Dr. Corsi collapsed or he didn't, and either his security staff thought he "was dead in the elevator" or they didn't. It is especially important that these statements were made in the context of Defendant Alex Jones clearly trying to discredit Dr. Corsi, as he immediately tries to defend Stone in the context of Mueller's investigation and prosecution immediately afterwards. Indeed, a person that simply passes out on the ground at a restaurant would not be a reputable source of information, as he would be seen as feeble, weak, and therefore not in the state of mind to be able to tell the truth. This is exacerbated by the lie compounded by Alex Jones that his security staff thought Dr. Corsi was "dead in the elevator." Again, this statement of false objectively verifiably fact only seeks to further discredit Dr. Corsi's credibility. Lastly, this false statement was based on a supposed first hand account, so Defendant Alex Jones must know the truth or falsity of his statement. Thus, if false, it is clear that he acted with malice.

The third statement at issue appears in paragraph 44 of the Amended Complaint, where "after accusing Plaintiff Corsi of having suffered a stroke, publishes maliciously that "whatever comes out of his mouth ain't the truth." This is textbook defamation, especially in the context of Defendant Alex Jones' previous attempts to cast Dr. Corsi as a liar or, at a minimum, someone mentally incapable of telling the truth. As set forth above, falsely accusing someone of having suffered a stroke is not only reprehensible, but it is also stating a false, objectively verifiable fact. Defendants likely recognize this and put forth the weak assertion that Defendant Alex Jones "did not call Dr. Corsi an intentional liar." ECF No. 58 at 16. This is a distinction without a difference. The bottom line is that Defendant Alex Jones has publicly broadcasted that Dr. Corsi is a liar who cannot be trusted. This has undeniably harmed Dr. Corsi' profession as an

investigative journalist, as an investigative journalist with a reputation for lying is no longer an investigative journalist. Thus, th.is statements was *per se* defamator

Lastly, it is clear that this was no "hyperbole" or that was a mere "expression of outrage." From the context of the entire broadcast, as conveniently set forth by the Infowars Defendants themselves, this was a carefully calculated segment to try to discredit Dr. Corsi and smear his reputation to the benefit of their co-conspirator, Stone. Defendant Alex Jones gave specific, albeit false and fabricated, instances of Dr. Corsi's mental health supposedly being compromised, all leading up the payoff that "whatever comes out of his mouth ain't the truth." There is no opinion, no hyperbole, and no rhetoric. These are fabricated facts.

### ii.     The January 18, 2019 Video

While the false and defamatory statements contained in this video range from paragraphs 47 – 63 of the Amended Complaint, the Infowars Defendants offer up no actual defense to any of them pertaining to Dr. Corsi, which shows that they concede the defamatory nature of these statements. Likely, the Infowars Defendants knew that there was no defense to be made, as they are clearly false statements of fact. Indeed, as just one example, at "2:09 in the January 18 Video, Stone maliciously and falsely published that Plaintiff Corsi was "fired from World Net Daily." Comp. ¶ 50. This is purely a question of fact.

### iii.     Other Defamatory Publications

While the false and defamatory statements contained in this section range from paragraphs 64 – 69 of the Complaint, Defendants only address paragraphs 67 and 68. Thus, the rest must be treated as conceded.

"Defendant Alex Jones maliciously and falsely accuses Plaintiff Corsi of being a 'spook, back and forth with different agencies,' falsely saying that Dr. Corsi had worked with different

government agencies." Am. Comp. ¶ 67. The defamatory nature of this false statement of fact is apparent when considering the context in which it was made. This statement was made to advance the false notion that Dr. Corsi was cooperating with Special Counsel Mueller to try to take down Stone, and by extension, President Trump. By publishing the false statement that Dr. Corsi is now working with Mueller to take down Trump, the Infowars Defendants has severely harmed Plaintiff Corsi professional image and reputation. This has negatively impacted Plaintiff Corsi's ability to garner support in the conservative community. Falsely accusing Dr. Corsi of working with Mueller to take down President Trump is tantamount to an accusation of "treason" in the conservative community. Indeed, conservatives who support Trump and believed Defendants' false statements would understandably be turned off to Dr. Corsi's work.

"Lastly, Defendant Alex Jones further maliciously falsely accuses Plaintiff Corsi of sometimes "not being able to walk," creating the false and defamatory implication that he is an alcoholic." Am. Comp. ¶ 68. There is no possible "context" where this is not defamatory. Merely falsely asserting that at some point, Dr. Corsi had been, or continues to be unable to even walk, especially when trying to accuse Dr. Corsi of alcoholism, clearly tends to injure reputation in the popular sense; to diminish the esteem, respect, goodwill or confidence in which the plaintiff is held, or to excite adverse, derogatory or unpleasant feelings or opinions against him.

### 4. Defendant Shroyer Personally Participated in the Defamation

Defendant Shroyer makes the incredibly curious –to put it generously – argument that "Plaintiffs Do Not Allege Mr. Shoryer Did Anything." ECF No. 55 at 7. This is a bizarre allegation, especially given the fact that one of the defamatory videos at issue – the January 18, 2019 video, Am. Comp. ¶¶ 47 – 63 – happened to be from an episode of "*The War Room*," which is hosted by Defendant Shroyer. Defendant Shroyer is prominently featured in the January

18, 2019 video, which is in question and answer format, and he proceeds to set up Defendant Stone's malicious defamation of Dr. Corsi. The only way that there was no "meeting of the minds" between Defendant Shroyer and Defendant Stone, as Defendant Shroyer apparently suggests, is if there was absolutely zero preparation that went into this segment and Defendants Shroyer and Stone had no idea what they were planning on discussing. This is obviously not the case from even a cursory viewing of the January 18 video, as both Defendant Stone and Shroyer are clearly prepared and have questions and answers mapped out. Thus, it is disingenuous at best for Defendant Shroyer to allege that the Amended Complaint does not set forth his personal participation.

### C.     Dr. Corsi Has Adequately Pled Intentional Infliction of Emotional Distress

To succeed on a claim of intentional infliction of emotional distress, a plaintiff must who that "1) the defendant acted intentionally or recklessly, 2) the conduct was extreme and outrageous, 3) the actions of the defendant caused the plaintiff emotional distress, and 4) the emotional distress suffered by the plaintiff was severe." *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex. 1993). Texas Courts have held that a single threat of physical harm or death can sustain a claim for intentional infliction of emotional distress. "With the possible exceptions of the bomb and death threats, no single action…rises to the level of intentional infliction of emotional distress." *Household Credit Servs., Inc. v. Driscol*, 989 S.W.2d 72, 82 (Tex. App. El Paso 1998).

Here, the Infowars Defendants' co-conspirator, Defendant Stone directly threatens Dr. Corsi, after maliciously defaming him, saying "I think you've [Corsi] been deep state from the beginning. Your whole birther thing is used as a club to destroy conservatives…. ***I look forward to our confrontation. I will demolish you***. You're a fraudster, out of your alcoholic haze you

have made up lies about David Jones and Alex Jones and Roger Stone and now I suspect they want you to lie about the President." Am. Comp. ¶ 66. (emphasis added). This is a direct, credible threat to Dr. Corsi's life and the lives of those around him.

### D. Dr. Corsi Has Adequately Pled Claim for Assault

In order to sustain a claim for assault, a Plaintiff need only plead that the Defendant "intentionally or knowingly threatens another with imminent bodily injury." *Moore v. City of Wylie*, 319 S.W.3d 778, 782 (Tex. App. 2010)

As set forth in the previous section, the Infowars Defendant's co-conspirator, Defendant Stone made direct threats to Dr. Corsi's life, saying "**I look forward to our confrontation. I will demolish you**." Am. Comp ¶ 66. These threats are more than credible, as Stone also threatened to kill Randy Credico and his service dog. Am. Comp. ¶ 66. Like Plaintiff Corsi, Mr. Credico was named as Person 2 in Defendant Stone's indictment. Dr. Corsi was named as Person 1 as a material witness to Stone's crimes. Even more, as set forth previously, Defendant Stone went so far as to publicly threaten the life of the judge assigned to his criminal case, Judge Amy Berman Jackson, which caused her to issue a total gag order, for which this Court can take judicial notice. These types of threats are what Defendant Stone are known for:

> Defendant Stone likes to portray himself as Mafia, frequently making reference to Mafia figures who he admires, as well as other unsavory types who have been alleged to have engaged in unethical and/or illegal behavior. He frequently makes reference to his heroes being Hyman Roth in the 'Godfather,' who was the movie version of Meyer Lansky, and Roy Cohn, not to mention, Richard Nixon, for his role in Watergate. In this regard, after Stone was indicted he held a press conference on the courthouse steps of the federal courthouse in Ft. Lauderdale, where he was booked, with his arms defiantly in the air in the "victory' pose used by Nixon after he resigned in disgrace as a result of the Watergate scandal. At the time, Stone had been employed by a Nixon group called CREEP, or the Committee to Reelect the President. Defendant Stone even has a large tattoo of Richard Nixon affixed to his back. Thus, given his admiration for persons such as these, particularly Mafia figures, his actions as pled herein can be taken as threats, as well as being defamatory. And, Plaintiff Corsi is 72 years old. Defendant

Stone's intentional infliction of emotional distress and coercion and threats are intended to try even cause Plaintiff Corsi to have heart attacks and strokes, in order that Plaintiff will be unable to testify at Stone's criminal trial. Tellingly, Defendant Stone threatened kill a material witness and his dog, Credico, Person 2 in the Mueller Indictment, "Mafia style." Defendant Stone also fashions himself and indeed has the reputation, at a minimum, as being the preeminent "dirty trickster." *See* "Get Me Roger Stone" on Netflix. Am. Comp. ¶ 29.

Dr. Corsi took this as a viable threat of severe bodily injury or death. Apparently the FBI took his threats the same way when they raided his house with 27 armed agents.[2]

### E.    Dr. Corsi Has Adequately Pled Unfair Competition Cause of Action

The Infowars Defendants falsely assert that Dr. Corsi's claim under the Lanham Act for Unfair Competition must fail because there is no "commercial" speech at issue. However, it is clear that at all times, the Infowars Defendants had a strong economic motivation for distributing the material at issue. *Tobinick v. Novella*, 848 F.3d 935, 950 (11th Cir. 2017) quoting *Bolger*, 463 U.S. at 66-67. The Amended Complaint alleges that "Defendants, acting in concert, as part of their latest scheme for notoriety, fame, **and profit**, are now working in concert with Stone to defame, intimidate, and threaten Plaintiffs." Am. Comp. ¶ 22 (emphasis added). Indeed, the Am. Complaint sets forth the fact that "Plaintiffs Corsi and Plaintiff Klayman are both competitors to Defendants as conservative media personalities, broadcasters, authors and columnists on social media and elsewhere." Am. Comp. ¶ 70. Thus, by discrediting and defaming Dr. Corsi, the Infowars Defendants are trying to "materially prejudice the viewers and/or listeners as to the quality, nature, and contents of Plaintiffs' services, which has caused significant competitive and commercial injury to Plaintiffs, as well as loss of good will and reputation." Am. Comp. ¶ 73. Thus, in essence, the motivation behind the Infowars Defendants' misconducts entirely financial,

---

[2] James A. Gagliano, *Retired FBI agent: The Roger Stone raid was totally by the book*, CNN, January 31, 2019, available at: https://www.cnn.com/2019/01/31/opinions/lindsey-graham-roger-stone-fbi-raid-response-gagliano/index.html

as they seek to destroy Dr. Corsi's reputation in order to eliminate them as competition.

    **F.    Dr. Corsi Did Not Need to Comply With the Texas Defamation Mitigation Act**

In an obvious attempt to invoke the Texas one-year statute of limitations for defamation claims, the Infowars Defendants assert that Dr. Corsi did not comply with the notice requirements of the Texas Defamation Mitigation Act ("TDMA"). Their motivations are clear, as they assert that "[t]his is not a case where the plaintiffs can dismiss, send a TDMA request, and re-file." ECF No. 55 at 9. However, this argument ignores the fact that this action was filed first in the U.S. District Court for the District of Columbia and was transferred to this Court after the fact. Indeed, the Honorable Timothy Kelly ("Judge Kelly") mooted out this issue in his March 3, 2020 order transferring the case to this Court. In his memorandum opinion, in deciding to transfer the case instead of dismissing it, stated, "And because Texas has a one-year statute of limitations for libel and slander, Plaintiffs would be unable to refile those claims in the Western District of Texas were the Court to dismiss their suit. Tex. Civ. Prac. & Rem. Code § 16.002. Because Plaintiffs would be prejudiced by dismissal but it appears Defendants will not be prejudiced by transfer, the Court will transfer the case to the Western District of Texas in the interest of justice." *Corsi v. Infowars, LLC et al*, 19-cv-656 (D.D.C) ECF No. 21 at 6.

Accordingly, Judge Kelly transferred this case to this Court so the Dr. Corsi would have to opportunity to litigate it substantively. Thus, any statute of limitations or other procedural issues raised by the Infowars Defendants have been mooted out.

Lastly, in any event, Mr. Klayman – back when he was representing Dr. Corsi - put counsel for the Infowars Defendants, Marc Randazza on notice of his clients' defamation on January 25, 2019, prior to this case being originally filed in the District of Columbia. Exhibit 2.

    **G.    The Honorable Roy K. Altman's Order in the U.S. District Court for the**

**Southern District of Florida is Not Binding on this Court**

The Infowars Defendants cite a case previously filed by co-Plaintiff Larry Klayman in the U.S. District Court for the Southern District of Florida styled *Klayman v. Infowars,* 20-cv-80614 (S.D. Fl.)(the "Florida Complaint") as evidence that this instant complaint is a "shotgun pleading."

First and foremost, Dr. Corsi was not a party to that action, and therefore it has no bearing on him as a Plaintiff here.

Secondly, the Florida Complaint was dismissed voluntarily by Mr. Klayman, and was therefore never adjudicated substantively.

Third, the Honorably Roy K. Altman ("Judge Altman") appears to have been a highly politicized judge, which caused Mr. Klayman to voluntarily dismiss the Florida Complaint shortly after filing it. Indeed, Judge Altman *sua sponte* issued an Order Requiring More Definite Statement before the Defendants were even served. Due to the bizarre and unusual nature of this order, and because Defendant Stone is a close confidant of President Trump and had recommended people to the bench in the past, Mr. Klayman respectfully asked if Judge Altman had been recommended to the bench by Defendant Stone. This would have explained the unusual order from Judge Altman. Judge Altman refused to give an answer. Thus, Mr. Klayman saw no recourse but to dismiss the Florida Complaint, as it was clear that he would not receive unbiased adjudication.

**H.    Defendant Shroyer's Motion for Sanctions Must be Denied**

Defendants Shroyer has filed a motion for sanctions under Rule 11 of the Federal Rules o Civil Procedure, which simply repeats the arguments set forth by theInfowars Defendants in their motions to dismiss. As shown conclusively above, Dr. Corsi has alleged proper causes of action

against each and every Infowars Defendant, including Defendant Shroyer, who personally participated in the defamation of Dr. Corsi on his show, *The War Room*.

Accordingly, for the same reason that Defendant Shroyer's motion to dismiss must be denied, so too must his motion for sanctions under Rule 11. Indeed when a Rule 11 motion itself is not well grounded in fact or law, or is filed for an improper purpose, the court may sanction the *moving* party. *Safe-Strap Co., Inc. v. Koala Corp.*, 270 F. Supp. 2d 407 (S.D.N.Y.2003).

## IV. CONCLUSION

Based on the foregoing, Dr. Corsi respectfully requests that this Court deny the Infowars Defendants motion to dismiss and motions for sanctions so that this matter may proceed expeditiously to discovery and trial.

Dated: October 1, 2020                                          Respectfully Submitted,

                                                               */s/Sanjay Biswas*
                                                               SANJAY BISWAS, Esq.
                                                               #24061235—Texas
                                                               #24966--Louisiana
                                                               11720 Duxbury Dr.
                                                               Frisco, Texas 75035
                                                               Telephone: (972)-866-5879
                                                               Email:sanjaybiswas41@gmail.com
                                                               Fax: 1-800-506-6804

                                                               *Counsel for Dr. Jerome Corsi*


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 30th day of September, 2020, a true copy of the foregoing was filed via ECF and served to all counsel of record though the Court's ECF system.


                                                               */s/ Sanjay Biswas*

EXHIBIT 1

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| **DR. JEROME CORSI** and **LARRY KLAYMAN**, | § § § § § | CIVIL ACTION NO. 1:20-CV-00298-LY |
| Plaintiffs, | § § | |
| vs. | § § | |
| **INFOWARS, LLC, FREE SPEECH SYSTEMS, LLC, ALEX E. JONES, DAVID JONES, OWEN SHROYER**, and **ROGER STONE** | § § § § § | |
| Defendants. | § | |

## SWORN DECLARATION OF DR. JEROME CORSI

I, Dr. Jerome Corsi, being over eighteen years of age and duly competent to testify, hereby swear and affirm as follows:

1.      I have personal knowledge of the following facts and if called upon as a witness, could testify competently thereto.

2.      I graduated magna cum laude with a B.A. in Political Science and Economics from Case Western Reserve University in 1968.

3.      I received a Ph.D. in Political Science from Harvard University in 1972.

4.      For over twenty-five (25) years, I worked in banking and finance, establishing investment programs for banks in the United States and worldwide to create financial planning services for their retail customers.

5.      From 1968 to 1981, I worked at various universities where I conducted research on federally funded grants.

1

6.      In 1981, I published "Terrorism as a Desperate Game: Fear, Bargaining, and Communication in the Terrorist Event" in *Journal of Conflict Resolution*, a mathematical game-theoretical model for predicting the outcome of terrorist events.

7.      The content of my publication resulted in a top-secret clearance by the U.S. Department of State's ("State Department") Agency for International Development, where I joined a team of psychiatrists and psychologists to develop a hostage-survival training program for State Department's officials overseas.

8.      Since 2004, I have published over twenty-five (25) books, seven (7) of which were *New York Times* Bestsellers, including two (2) #1 *New York Times* Best-sellers.

9.      In addition to being a New York Times Bestselling author, I am also an investigative journalist and political analyst.

10.      I currently hold active Life & Health insurance licenses, as well as Property & Casualty insurance licenses in New Jersey.

11.      For over twenty (20) years, I have been a licensed National Association of Security Dealers registered representative, currently holding FINRA-registered licenses as a Registered Principal, Financial Principal, Options Principal and Municipals Principal.

12.      I have been a frequent guest on radio and television shows, including but not limited to appearances on CNN, Fox News, Fox Business, MSNBC, and on Infowars, before having been defamed by Defendants.

13.      I personally know Defendant Roger Stone ("Defendant Stone") and he personally knows my qualifications and me. I have even ghostwritten books for Defendant Stone and we used to be friends and colleagues. Defendant Stone is thus intimately familiar with my personal and professional history.

14.     In 2016, after the presidential election, I worked very closely with Alex Jones and his father David Jones, as well as with the Infowars staff, including Owen Shroyer. I made multiple trips to Austin, Texas, to appear live in-studio on Infowars broadcasts.  I accepted an assignment from Alex Jones to create for Infowars a news bureau in Washington, D.C.  From the beginning, I found Alex Jones to be erratic, subjects to emotional outbursts, even reacting that I was trying to "steal his company" when with his father's assistance, I brought a multi-million dollar legitimate investment offer from highly credible sources to the table to discuss the proposal with Alex and his father.

15.     Several times, concerned that I might quit over how badly Alex Jones was treating me, Dr. Jones met with me privately, often over breakfast.  In those breakfasts, I counseled Dr. Jones over my concerns that Alex should seek professional psychological help.  While in my work under various contracts with federal government agencies to consult over anti-terrorism tactics, I had the opportunity to work with very experienced psychiatrists and psychologists.  Still, I am not medically trained, and I cautioned Dr. Jones that the problems I perceived with Alex's behavior should be professionally evaluated by qualified medical professionals.

16.     My efforts to create a news bureau in the nation's capital failed because Alex Jones insisted that staff I wanted to hire must work for free as "interns."  Throughout my 12 years at World Net Daily, I frequently had White House press credentials.  In 2012, the Secret Service cleared me to work as "traveling press," riding on the Romney campaign airplane for the last 3 weeks of the presidential campaign.  At no time was I ever denied press credentials at the highest levels was alcohol ever raised as an issue in the many extensive background checks I underwent.  In the early 1980s, I received Top Secret clearance from the federal government to

work on anti-terrorism contracts with the Agency for International Development at the State Department in Washington, D.C.

17.     Throughout the time I spent with Infowars, Dr. Jones would typically pick me up at the Austin Airport to transport me to the downtown hotel where Dr. Jones had made my room reservations.  At various times, we had breakfast together, often on trips when he was returning me to the airport to depart Austin.

18.     I am today 74 years-old.  I have no alcohol-related offenses on my record.  Since the mid-1980s, I have held securities licenses, first with the NASD and now with FINRA, agencies that conduct licensing in the securities industry for the federal government.  My securities records over that time, contain no customer complaints and no reports of behavior problems of any kind, including no alcohol-related problems.  I also have held for decades property and casualty as well as life and health insurance licenses in New Jersey.  I have created two broker/dealers in my financial services career.

19.     On my website, CorsiNation.com — a website I founded and managed as CEO — I conduct a daily hour-long podcast, live-streamed on multiple Internet channels simultaneously. I hold a Ph.D. from Harvard University's Department of Political Science, dating back to 1972.  I appear regularly on various news programs, including those broadcast by the major networks.  I have conducted thousands of radio interviews going back to 2004, when I entered the third phase of my career, currently working full-time as an investigative journalist and political commentator.

20.     Charges of alcoholism by the Defendants including broadcast charges made by Alex Jones and Defendant Roger Stone, have no basis in fact or substantiation in the extensive public record that exists of my life and professional career.

4

21.     Special Counsel Robert Mueller indicted Defendant Stone on seven counts of perjury, witness tampering and obstruction of justice.

22.     The Honorable Amy Berman Jackson who presided over Defendant Stone's prosecution, placed a gag order on him in part for threatening the judge herself by posing an Instagram meme of a crosshairs (gun) to her head.

23.     The seven-count indictment against Defendant Stone included lying under oath, witness tampering and obstruction of justice by threatening to kill a material witness, Randy Credico ("Credico") and his service dog if Credico did not lie or invoke the Fifth Amendment to government authorities concerning his involvement with Defendant Stone. Credico is Person 2 in the indictment. I am Person 1. Defendant Stone was later convicted of all seven (7) felony counts.

24.     Based on my personal knowledge of the interactions of Defendant Stone and the other Defendants, I assert that Defendant Stone, acting in concert with the other Defendants including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars, began a calculated and premeditated public relations campaign against my lawyer, Mr. Larry Klayman ("Mr. Klayman") and myself.

25.     Defendant Stone knew of his imminent indictment and therefore began his malicious crusade against Mr. Klayman and myself in order to influence public opinion and Special Counsel Robert Mueller by trying to attribute guilt to me.

26.     It is apparent that the malicious crusade against me by Defendants, who acted in concert, was calculated to coerce me to testify falsely at Defendant Stone's criminal trial.

27.     Defendant Stone, acting in concert with the other Defendants, also sought to divert funds away from my legal defense fund, while boosting his own.

28.     Contrary to Defendant Stone's false publication, I am not "certifiably insane and I have not "told multiple provable lies." Compl. at ¶ 26. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

29.     Contrary to Defendant Stone's false publication, I am not "mentally degraded to the point of [] dementia." Compl. at ¶ 42. I do not have dementia and have never been diagnosed with any mental illness. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

30.     Importantly, I was under contract with Infowars until the relationship ended and Defendants would not have retained me if I was "mentally degraded to the point of [] dementia." Compl. at ¶ 42.

31.     Contrary to Defendant Stone's false publication, he never saw me at a steakhouse where I was "on the ground at another table" where security staff "thought that [I] was dead in the elevator." Compl. at ¶ 43. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

32.     Contrary to Defendant Stone's false publication, I never suffered a stroke and it is a false statement of fact that "whatever comes out of [my] mouth ain't the truth." Compl. at ¶ 44. In publishing this false statement that Defendants knew to be false or published recklessly

because they are intimately familiar with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

33. Contrary to Defendant Stone's false publication, I was not "fired from World Net Daily." Compl. at ¶ 49. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

34. Contrary to Defendant Stone's false publication, I was not "perfectly willing to lie, to perjure [myself] saying that a memp that [I] had [written] [Defendant Stone] on the 30th for the purposes of cover-up . . . which is further proof that [I] lied under oath." Compl. at ¶ 50. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

35. Contrary to Defendant Stone's false publication, I do not have a "feeble alcohol affected memory." Compl. at ¶ 51. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

36. Contrary to Defendant Stone's publication, I was not "prepared to stab a principle Trump supported in the back" nor was I "perfectly prepared to bear false witness against [Defendant Stone]." Compl. at ¶ 52. In publishing this false statement that Defendants knew to

be false or published recklessly because they are intimately familiar with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

37.     Contrary to Defendant Stone's publication, it is a false statement of fact that "all [Defendant Stone] ever did was show [me] friendship and support and try to help [me] and [my] family and what [Defendant Stone] got was Judas Iscariot, the willingness to testify against [Defendant Stone] and help the deep state bury [Defendant Stone] . . . and then [I] make[] up this story about helping [Defendant Stone] formulate a cover story." Compl. at ¶ 53. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

38.     Contrary to Defendant Stone's false publication, it is a false statement of fact that "you can always tell when [I] [am] lying because [my] lips are moving . . ." Compl. at ¶ 54. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

39.     Contrary to Defendant Stone's false publication, it is a false statement of fact that Mr. Klayman "never actually won a courtroom victory in his life." Compl. at ¶ 55. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

40.     Contrary to Defendant Stone's false publication, it is a false statement of fact that Mr. Klayman "was ousted at Judicial Watch. Ask Tom Fitton why he left .he was 'ousted' because of a sexual harassment complaint." Compl. at ¶ 56. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar Mr. Klayman and with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

41.     Contrary to Defendant Stone's false publication, it is a false statement of fact that Mr. Klayman is "incompetent, he's a numbskull, he's an idiot, he's an egomaniac, and he could be the worst single lawyer in America. With him as [my] lawyer, [I] may get the electric chair. So [the] idea that he's a good guy is entirely wrong." Compl. at ¶ 59. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with Mr. Klayman and me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

42.     Contrary to Defendant Stone's false publication, it is a false statement of fact that Mr. Klayman is "a piece of garbage." Compl. at ¶ 61. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with Mr. Klayman and me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

43.     Contrary to Defendant Stone's false publication, Mr. Klayman's IQ is higher than 70. Compl. at ¶ 62. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

44.     Contrary to Defendant Stone's false publication, it is a false statement of fact that "[I] was perfectly willing to bear false witness against [Defendant Stone] on multiple points that are complete fabrications." Compl. at ¶ 64. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

45.     Contrary to Defendant Stone's false publication, it is a false statement of fact that "[I] had told a number of lies. In fact, [I] [am] starting to conflate [my] lies . . . [I] was perfectly willing to lie about [Defendant Stone] . . . but now lying about Alex Jones, lying about Infowars, lying about Dr. [David] Jones . . . [I] can no longer be believed." Compl. at ¶ 65.

46.     Defendant Stone falsely published: "I think you've [Corsi] been deep state from the beginning. Your whole birther thing is used as a club to destroy conservatives . . . **I look forward to our confrontation. I will demolish you.** You're a fraudster, out of your alcoholic haze you have made up lies about David Jones and Alex Jones and Roger Stone and now I suspect they want you to lie about the President." Compl. at ¶ 66 (emphasis added). Not only does Defendant Stone know this to be false but this malicious rant is also a threat. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with me,, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

47.     Contrary to Defendant Stone's false publication, I am not a "spook, back and forth with different agencies[.]" Compl. at ¶ 67. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with me,

as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

48.     Contrary to Defendant Stone's false publication, it is a false statement of fact that sometimes I am "not being able to walk" which creates the false and defamatory implication that I am an alcoholic. Compl. at ¶ 68. I am not an alcoholic. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

49.     As an investigative journalist, as well as my other professions and hobbies, I rely on my virtue and integrity.

50.     My reputation determines everything from the amount of books I sell to the frequency of my radio and television appearances.

51.     I have ghostwritten books for Defendant Stone and he intimately knows my qualifications and me. Thus, Defendant Stone and the other Defendants falsely published these statements when they knew them to be false or at least with a reckless disregard for their truth.

52.     Defendant Stone, acting in concert with Defendants Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars, has caused severe harm to my reputation, good will and well-being, financially and otherwise. They also caused my family and me severe emotional distress for which I have had to seek medical care.

SWORN TO UNDER OATH THIS 30TH DAY OF SEPTEMBER OF 2020.

Dr. Jerome Corsi

11

EXHIBIT 2

 Gmail

**Oliver Peer <oliver.peerfw@gmail.com>**

---

## Re: Defamation by Roger Stone, InfoWars, and Alex Jones with regard to Dr. Jerome Corsi

---

**Oliver Peer** <oliver.peerfw@gmail.com>                                      Fri, Jan 25, 2019 at 11:43 AM
To: buschel@bglaw-pa.com, gsmith@strategysmith.com, kcoffey@coffeyburlington.com, contact@randazza.com
Cc: jrlc@optonline.net, Larry Klayman <leklayman@gmail.com>, dgray@graylawgroupnj.com

*This email is being forwarded at the direction of Larry Klayman, counsel to Dr. Jerome Corsi.*

Dear Counsel for Roger Stone, Infowars, and Alex Jones,

As instructed by my client, Dr. Jerome Corsi, please be advised that any further defamation about Dr. Corsi and the undersigned will result in immediate legal action. If you have any further questions, you may contact me at (310) 595-0800.

Sincerely,
Larry Klayman, Esq.
Klayman Law Group P.A.

# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS**

DR. JEROME CORSI, ET AL

Plaintiffs

        v.

INFOWARS, LLC, et al

        Defendants.

**Case Number:**   **1:20-cv-298-LY**

## SWORN DECLARATION OF KELLY MORALES

    1. I, Kelly Morales, hereby declare under penalty of perjury that the following is true and correct and based on my personal knowledge and belief.

    2. I am over the age of 18 and mentally and legally competent to make this affidavit, sworn under oath.

    3. I am the former wife of Defendant Alex Jones. I was married to Alex Jones for 12 years and with him for 15 years and we have 3 children together. During our time together, I was involved in the activities of Alex, his father David and Infowars and am intimately knowledgeable about their activities and business structure.

    4. Based on my personal knowledge and experience, David Jones runs Infowars with Alex Jones and helps him with his activities, including fixing media stories and endorsing and/or aiding his slanderous and/or fraudulent behaviors, all for profit.

    5. Infowars, LLC is a sub-entity of Free Speech Systems, LLC ("FSS"), and David Jones is an employee of FSS, or he has been.

    6. David Jones is additionally a managing member of multiple entities that are closely held businesses, constituting financial holding companies or financial distribution centered around Infowars/Alex Jones' supplement line, which are quintessential to funding and running Infowars.

    7. Alex Jones could not function without David Jones, and has conspired with him on the past to commit this breach of fiduciary duty and fraud on my business/estate with Alex Jones. While David Jones did this, he slandered and/or defamed me to experts and assisted Alex Jones and his attorneys to do the same, so as to steal/hide my estate and his grandchildren's inheritance.

    8. Alex Jones is quasi-illiterate, and cannot use technology or apps such as email with any fluency, and he cannot function without assistance from those around him, including David Jones.

    I hereby swear under oath and penalty of perjury that the foregoing facts are true and correct to the best of my knowledge and belief.

    Executed on September 30, 2020

Kelly Morales

2

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| Alexander E. Jones, | § | CASE NO. 20-10118-hcm |
| | § | |
| Alleged Debtor. | § | Chapter 11 |
| | § | |

**Affidavit of David Jones in Support of Alleged Debtor's Motion to Dismiss**

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF TRAVIS | § |

BEFORE ME, the undersigned authority, on this day personally appeared David Jones, who after being sworn did state upon his oath, as follows:

1.     "My name is David Jones. I am over 18 years of age and otherwise competent and capable of making this Affidavit. I have personal knowledge of the facts set forth herein and they are true and correct.

2.     "I have been involved with Alex Jones' personal and business finances for many years and have personal knowledge of the matters set forth herein, and they are true and correct.

3.     "I have personally reviewed the Real Estate Lien Note from Alexander Jones to Kelly R. Jones dated March 19, 2015 (the "*Note*"), which is attached to the Involuntary Bankruptcy Petition filed in the above referenced case and have reviewed the record of payments made by Alexander Jones to Kelly R. Jones under the Note. I have personally calculated the remaining balance of the Note. The balance of the Note is $596,267.16 as of the date hereof.

"Further Affiant sayeth not."

SIGNED on this 12th day of February, 2020.

_____
David Jones

Sworn to and subscribed before me, the undersigned authority, on this 13th day of February, 2020.

_____
Notary Public for the State of Texas
EXP   09-24-2022

PATRICK RILEY
Notary Public, State of Texas
Comm. Expires 09-24-2022
Notary ID 131734177

4837-5475-576

1

# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**

DR. JEROME CORSI, et al

               Plaintiffs

     v.

INFOWARS, LLC, et al

              Defendants.

**Case Number:   1:20-cv-298-LY**

**PLAINTIFF LARRY KLAYMAN'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND MOTION FOR SANCTIONS[1]**

---

[1] While the local rules provide for a 20-page limit for responses to dispositive motions, Mr. Klayman is responding to three separate dispositive motions in one response for the sake of judicial economy. Thus, he is well within the page limits set forth in the local rules.

## TABLE OF CONTENTS

INTRODUCTION ...................................................................1

LEGAL STANDARD .............................................................3

LEGAL ARGUMENT.............................................................3

    The Amended Complaint Alleges That Each of the Infowars Defendants Were Working Together in Concert, and are Therefore Jointly and Severally Liable ................................3

    Mr. Klayman Has More Than Adequately Pled Defamation Causes of Action ................6

        Mr. Klayman is Not a Public Figure .......................................7

        Mr. Klayman Has More Than Adequately Pled Malice. .........................8

        Mr. Klayman's Specific Allegations as to Defamation. .......................10

            The January 18, 2019 Video ...............................10

        Defendant Shroyer Personally Participated in the Defamation ...........................12

    Mr. Klayman Has More Than Adequately Pled Intentional Infliction of Emotional Distress.........................................................................13

    Mr. Klayman Has More Than Adequately Pled Claim for Assault.................................14

    Mr. Klayman Has More Than Adequately Pled Unfair Competition Cause of Action .....15

    Mr. Klayman Has Did Not Need to Comply With the Texas Defamation Mitigation Act.............................................................................16

    The Honorable Roy K. Altman's Order in the U.S District Court for the Southern District of Florida is Not Binding on this Court ...............................................17

    The Infowars Defendants Assertions Regarding Fla. Stat § 768.295 Are Plainly Erroneous ......................................................................18

        Florida's Anti-SLAPP Statute Does Not Protect Defamatory Speech .................19

        The Infowars Defendants Cannot Show that Mr. Klayman's lawsuit is Without Merit........................................................................19

        The Infowars Defendants Cannot Show that Mr. Klayman's Lawsuit was Filed Because of the Exercise of Constitutional Free Speech in Connection with a Public Issue. ............................................................20

    Defendant Shroyer's Motion for Sanctions Must be Denied............................................21

CONCLUSION ....................................................................21

# TABLE OF AUTHORITIES

## Cases

*Abbas v. Foreign Policy Group,* 783 F.3d 1328 (D.C. Cir. 2015) ................................................18

*Beauharnais v. Illinois*, 343 U.S. 250 (1952) ..............................................................19

*Bentley v. Bunton*, 94 S.W.3d 561 (Tex. 2002) ...........................................................6

*Dall. Morning News, Inc. v. Tatum*, 554 S.W.3d 614 (Tex. 2018) ................................6

*Gertz v. Robert Welch, Inc.,* 418 U.S. 323 (1974) ........................................................19

*Household Credit Servs., Inc. v. Driscol*, 989 S.W.2d 72 (Tex. App. El Paso 1998) .................13

*In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549 (S.D. Tex. 2002 ..........3

*LandAmerica Commonwealth Title Co. v. Wido*, 2015 Tex. App. LEXIS 11201 (Tex. App. Oct. 29, 2015 ....................................................................................5

*Lowrey v. Tex. A&M Univ. Sys.*, 117 F.3d 242 (5th Cir. 1997 .........................................3

*Mahone v. Addicks Utility District of Harris County*, 836 F.2d 921 (5th Cir. 1988 .....................3

*Moore v. City of Wylie*, 319 S.W.3d 778 (Tex. App. 2010) ............................................1

*Rodriguez v. Gonzales*, 566 S.W.3d 844 (Tex. App. 2018 .........................................6, 7

*Sosa v. Coleman*, 646 F.2d 991 (5th Cir. 1981 ...........................................................3

*SR Int'l Bus. Ins. Co. Ltd. V. Energy Future Holdings Corp.*, 539 F. Supp. 2d 871 (N.D. Tex. 2008 ....................................................................................3

*Tobinick v. Novella*, 848 F.3d 935 (11th Cir. 2017) ...................................................15

*Twyman v. Twyman*, 855 S.W.2d 619 (Tex. 1993) ....................................................13

*Van Der Linden v. Khan*, 535 S.W.3d 179 (Tex. App. 2017) ........................................6

## Statutes

Texas Defense Mitigation Act ...............................................................................16

Fla. Stat § 768.295 ...............................................................................18, 19, 20

Federal Rule of Civil Procedure 11 ........................................................................21

Plaintiff LARRY KLAYMAN ("Mr. Klayman") hereby opposes (1) Defendant Infowars LLC ("Infowars"), Alex E. Jones ("Alex Jones"), and Free Speech Systems, LLC's ("FSS") Motion to Dismiss, ECF No. 59, (2) Defendant Owen Shroyer's ("Shroyer") Motion to Dismiss, ECF No. 55, (3) Defendant Shroyer's Motion for Sanctions, ECF No. 56, and Defendant David Jones' ("David Jones") Motion to Dismiss, ECF No. 57. These Defendants are heretofore collectively referred to as the "Infowars Defendants."

## I.    INTRODUCTION

This case is centered around the Infowars Defendants' latest attempt at pecuniary gain and notoriety through their pattern and practice of spewing false, malicious, and defamatory statements. In collaboration with their co-conspirator, Defendant Roger Stone ("Stone"), the Infowars Defendants did everything that they could muster to smear, discredit, and threaten Mr. Klayman and his client, Dr. Jerome Corsi ("Dr. Corsi") in order try to have helped Stone avoid prison time for his role Special Counsel Robert Mueller's Russian collusion investigation, for which he was indicted on seven separate felony charges and had a pending criminal case in the District of Columbia. Defendant Stone was then convicted on seven counts of perjury, witness tampering and obstruction of justice and was sentenced to 40 months in a federal penitentiary. Am. Comp. ¶ 36. His sentence was commuted by President Donald J. Trump.

To that end, Defendant Stone had already made numerous false, malicious, and defamatory statements in public in order to try to improperly influence and corrupt Special Counsel Mueller's investigation and prosecution. Defendant Stone, in concert with the Infowars Defendants, has falsely broadcasted that Mr. Klayman was ousted from Judicial Watch as the result of a sexual harassment complaint. Am. Comp. ¶ 56. This is a provably and demonstrable false statement of fact. Defendant Stone has also made other malicious and defamatory

statements regarding Mr. Klayman's trade and profession as an attorney, in concert with the Infowars Defendants.

It is easy to see why Defendant Stone made these types of statements – he was trying to do everything in his power to discredit, coerce, intimidate, and threaten Mr. Klayman and his client, Dr. Corsi, who had no choice but to cooperate with Mueller's investigation, and if subpoenaed, to testify truthfully at Defendant Stone's trial. Tellingly, Dr. Corsi was not indicted, while Defendant Stone was and later convicted. This speaks for itself.

The Infowars Defendants stepped in at Stone's direction to aid their co-conspirator Stone who worked as a co-host along with Defendant Shroyer's on *The War Room*, in hopes of not only discrediting Dr. Corsi to aid Stone, but also to eliminate them as competitors. The Infowars Defendants, all acting in concert, have come up with and published a myriad of lies and blatant falsities that have severely damaged Mr. Klayman's  reputation, good will and standing in his trades and professions.

Tellingly, this is not the Infowars Defendants' first foray into the misinformation business all for profit:

> The Defendants related to Infowars in particular have a long and sordid history of publishing and broadcasting defamatory material, including falsely, recklessly and baselessly accusing the families of the schoolchildren who lost their lives during the 2012 Sandy Hook Elementary School massacre of staging the massacre and faking the deaths of their children.

> The Sandy Hook families had to endure years of abuse and torture from Defendants before finally filing suit against numerous parties involved with InfoWars, including Defendant Alex Jones and Shroyer, for defamation.

> As just one example, a Florida woman was arrested for making death threats to a parent of a Sandy Hook victim. According to the U.S. Department of Justice, the motivation behind the threats was the lies propagated by these Defendants that the Sandy Hook massacre
> was a hoax.

2

Furthermore, Defendant Alex Jones in concert with the other Defendants propagated and promoted the "Pizzagate" conspiracy on his show, accusing a restaurant called Comet Ping Pong in the Washington D.C. area of operating a child sex ring in its non-existent basement that purportedly involved Hillary Clinton and John Podesta. This caused one of his listeners to shoot up the restaurant after being told by Defendant Jones to "self-investigate" the "Pizzagate" conspiracy theory. Am. Comp. ¶¶ 17-21.

The Infowars Defendants have shown time and time again that they are willing to say just about anything for notoriety, fame, and profit. Thus, it is hardly surprising that they are willing to come to the defense of their co-conspirator Roger Stone in this instance.

## II.  LEGAL STANDARD

A Rule 12(b)(6) motion is disfavored and is rarely granted. *Sosa v. Coleman*, 646 F.2d 991, 993 (5th Cir. 1981). When "reviewing the sufficiency of a complaint in response to a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6) . . . the district court's task is limited." *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 563 n.3 (S.D. Tex. 2002). Motion to dismiss are viewed with disfavor and rarely granted. *See Lowrey v. Tex. A&M Univ. Sys.*, 117 F.3d 242, 247 (5th Cir. 1997); *SR Int'l Bus. Ins. Co. Ltd. V. Energy Future Holdings Corp.*, 539 F. Supp. 2d 871, 874-75 (N.D. Tex. 2008) (citations omitted); *Mahone v. Addicks Utility District of Harris County*, 836 F.2d 921, 926 (5th Cir. 1988) (holding that Rule 12(b)(6) motions are disfavored in the law, and a court will rarely encounter circumstances that justify granting them.

## III.  LEGAL ARGUMENT

### A.  The Amended Complaint Alleges That Each of the Infowars Defendants Were Working Together in Concert, and Are Therefore Jointly and Severally Liable

The Amended Complaint specifically and expressly alleges that the Infowars Defendants were at all material times "working together in concert with and as agents of Stone…." Am.

Comp. ¶ 36. Furthermore, "Plaintiffs have demanded retraction and correction of the defamatory videos and publications…but Defendant have arrogantly refused, thereby ratifying any and all defamatory statements contained therein…." Am. Comp. ¶ 38.

> There is nothing conclusory about these allegations:

> Defendant InfoWars and Defendant Free Speech Systems are both owned, controlled, and operated by Defendant Alex Jones and David Jones. Defendant Free Speech Systems owns www.infowars.com, where content created by Defendants Alex Jones, Shroyer and Stone were at all material times posted and broadcast into this district, nationally and internationally. Am. Comp. ¶ 11.

> Defendant David Jones is Defendant Alex Jones's father and holds the official title of Director of Human Relations for Defendant Free Speech Systems. On information and belief, Defendant David Jones is the owner of Defendant InfoWars and Free Speech Systems and he manages and controls the business and related activities for Defendants InfoWars and Free Speech Systems, as well as Defendant Alex Jones' other companies. Am. Comp. ¶ 8.

Thus, given the fact that each of every one of the Infowars Defendants are intricately bound together by virtue of the fact that they all directly participate in creating and publishing the content on the Infowars site, it is more than merely plausible that they are working together in concert.

> Under Texas law:

> Civil conspiracy is used to extend tort liability beyond the wrongdoer to those who merely planned, assisted, or encouraged his acts. *See Carroll v. Timmers Chevrolet, Inc.*, 592 S.W.2d 922, 925-26 (Tex. 1979); *Helping Hands Home Care, Inc. v. Home Health of Tarrant County, Inc.*, 393 S.W.3d 492, 506 (Tex. App.-Dallas 2013, pet. denied). Once a civil conspiracy is proved, each conspirator is responsible for all acts done by any of the conspirators in furtherance of the conspiracy. *Bentley v. Bunton*, 94 S.W.3d 561, 619 (Tex. 2002); *Carroll*, 592 S.W.2d at 926 (Tex. 1979); *Helping Hands*, 393 S.W.3d at 506. A finding of civil conspiracy imposes joint and several liability on all conspirators for actual damages resulting from the acts in furtherance of the conspiracy. *Carroll*, 592 S.W.2d at 925; *Helping Hands*, 393 S.W.3d at 506. When a jury finds that liability for a civil conspiracy exists, this finding requires the legal conclusion to impose joint and several liability on the co-conspirators.

*LandAmerica Commonwealth Title Co. v. Wido*, No. 05-14-00036-CV, 2015 Tex. App. LEXIS 11201, at *29 (Tex. App. Oct. 29, 2015). Thus, as the Amended Complaint clearly alleges that each and every one of the Infowars Defendants conspired with Defendant Stone, to maliciously defame and otherwise harm Mr. Klayman, they are jointly and severally liable for each others' actions.

Furthermore, any assertion by Defendant David Jones that he was not involved in the defamation of Mr. Klayman is rebutted by the attached affidavit of Kelly Morales, Defendant Alex Jones' ex-wife. Exhibit 4. For instance, Ms. Morales states, "David Jones runs Infowars with Alex Jones and helps him with his activities, including fixing media stories and endorsing and/or aiding his slanderous and/or fraudulent behaviors." Furthermore, "Alex Jones could not function without David Jones, and has conspired with him on the past to commit this breach of fiduciary duty and fraud on my business/estate with Alex Jones." In fact, in an affidavit filed by David Jones in Alex Jones' bankruptcy case, he swears, "I have been involved with Alex Jones' personal and business finances for many years…." Exhibit 4.

Given this, it is not surprising that Defendant David Jones, along with the other Infowars Defendants, were given a chance to retract the defamatory statements, but chose not to, thereby ratifying them. Am. Comp. ¶ 38.

Lastly, Defendant Stone is still appearing regularly on Infowars, as recently as a few weeks ago, as reported by the Huffington Post.[2] This shows that Defendant Stone is still working together closely with the Infowars Defendants after having his 40 month prison sentence commuted by President Trump, evidencing their intimate relationship.

---

[2] Allison Quinn, *Roger Stone's Election Plan: Have Feds Block Voting, Arrest 'Seditious' Daily Beast Staff*, Daily Beast, Sept. 13, 2020, available at: https://www.thedailybeast.com/roger-stones-election-plan-have-feds-block-voting-arrest-seditious-daily-beast-staff

### B. Mr. Klayman Has More Than Adequately Pled Defamation Causes of Action

The elements that a defamation plaintiff must prove are that (a) the defendant published a false statement of fact; (b) the statement defamed the plaintiff; (c) the defendant acted with actual malice, if the plaintiff is a public figure or a public official, or negligently, if the plaintiff is a private individual; and (d) the statement proximately caused damages." *Rodriguez v. Gonzales*, 566 S.W.3d 844, 848 (Tex. App. 2018). Furthermore, in a claim for defamation *per se,* damages are presumed, as the "statements are so obviously harmful that damages, such as mental anguish and loss of reputation, are presumed." *Van Der Linden v. Khan*, 535 S.W.3d 179, 198 (Tex. App. 2017). A defamation by implication claim arises when a "when discrete facts, literally or substantially true, are published in such a way that they create a substantially false and defamatory impression by omitting material facts or juxtaposing facts in a misleading way." *Dall. Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 627 (Tex. 2018).

Furthermore, the Supreme Court of Texas has found that a defendant may not escape liability for his defamatory conduct simply by attempting to couch his defamatory statement as an "opinion." *Bentley v. Bunton*, 94 S.W.3d 561 (Tex. 2002). The *Bentley* court gave an example:

> If a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, "In my opinion Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar." As Judge Friendly aptly stated: "[It] would be destructive of the law of libel if a writer could escape liability for accusations of [defamatory conduct] simply by using, explicitly or implicitly, the words 'I think.'" See *Cianci* [*v. New Times Publishing Co.*, 639 F.2d 54, 64 (2d Cir., 1980)]. It is worthy of note that at common law, even the privilege of fair comment did not extend to "a false statement of fact, whether it was expressly stated or implied from an expression of opinion." Restatement (Second) of Torts,

§ 566, Comment *a* (1977). *Id*. at 583-84.

## 1. Mr. Klayman is Not a Public Figure

First and foremost, it is important to establish that Mr. Klayman is not a public figure. Thus, he does not need to have alleged that the Infowars Defendants acted with actual malice, even though he has done so. "In the context of defamation claims, there are two types of 'public figures.' 'All-purpose' or 'general purpose' public figures are those 'who have achieved such pervasive fame or notoriety that they become public figures for all purposes and in all contexts.'" *Rodriguez v. Gonzales*, 566 S.W.3d 844, 850 (Tex. App. 2018). "In contrast, a 'limited-purpose' public figure is a public figure only "for a limited range of issues surrounding a particular public controversy.' *Id.* To determine whether a defamation claimant is a limited-purpose public figure, Texas courts apply the following three-part test: (1) the controversy at issue must be public both in the sense that people are discussing it and people other than the immediate participants in the controversy are likely to feel the impact of its resolution; (2) the plaintiff must have more than a trivial or tangential role in the controversy; and (3) the alleged defamation must be germane to the plaintiff's participation in the controversy. *Id.*

It is clear that Mr. Klayman is not a general purpose public figure. In the context of the defamation, Mr. Klayman is not a limited purpose public figure either. Here, Mr. Klayman did not inject himself into the purported "public controversy." His involvement was not by choice, but instead forced by Defendants and Special Counsel Mueller and his staff, who named Dr. Corsi, and then Mr. Klayman, as his counsel, had make public statements in order to protect Dr. Corsi's critical reputation as an investigative journalist. Put another way, Mr. Klayman never sought out any of the media attention from the Defendants, but was involuntarily brought into the controversy and forced to defend himself once Defendants began maliciously defaming them.

Furthermore, it is abundantly clear that Defendants' false, malicious, and misleading statements essentially, such as by way of just one example, falsely stating that Mr. Klayman was ousted from Judicial Watch as the result of sexual harassment complaint, have absolutely nothing to do with Special Counsel Mueller's investigation and prosecution, and were made simply to try to destroy Mr. Klayman's reputation.

### 2. Mr. Klayman Has More Than Adequately Pled Actual Malice

As set forth above, Mr. Klayman  is not a public figure the purposes of this litigation, rendering a showing of malice unnecessary. However, even in the unlikely event that this Court finds  that Mr. Klayman is a limited-public figure, it is clear that the Infowars Defendants acted with actual malice. Mr. Klayman specifically pled that each of the false and defamatory statements were made by Defendants <u>with malice</u> and actual knowledge of their falsity.

The Amended Complaint sets forth the fact that the Infowars Defendants "are…intimately familiar with Plaintiff Klayman, so they were well aware that the statements made by the co- Defendant Stone, and their own false, misleading, malicious and defamatory statements were, indeed, false, as well as their acting as agents of, much less their ratification of the malicious false statements published by Defendant Stone on their networks and media sites." Am. Comp. ¶ 39.

Indeed, the fact that the Infowars Defendants have known Mr. Klayman for a long time and even worked with him conclusively shows the actual malice stemming from the false and defamatory statements now being made. Why would the Infowars Defendants have worked so closely with an individual that they allegedly knew was a "sexual harasser" or was "incompetent…a numbskull…and idiot…an egomaniac…the single worst lawyer in America…." Am. Comp. ¶ 59. They would not have, because they know that Mr. Klayman is

none of those things. Exhibit 1; *Affidavit of Larry Klayman.*

Mr. Klayman's affidavit is of particular importance in this regard. It sets forth his detailed history with Defendant Stone, who has now defamed him in concert with the Infowars Defendants. The affidavit shows exactly how Defendant Stone knew at all material times that the statements that he made on Infowars, in concert with the Infowars Defendants, were false or at minimum acted with reckless disregard for the truth.

> Defendant Stone was a "political consultant" who claimed to help get presidents and other politicians elected. The firm made money by then lobbying the very men they put in office.
> Defendant Stone backed Republican candidate Jack Kemp for President and he recommended that I be put on the executive finance committee, which also included Donald J. Trump.
> Because Defendant Stone knew of my successes and capabilities as a private lawyer, he told me that he had recommended me for U.S. Attorney when George Bush was President in 1992.
> In 1996, at a Republican Convention in San Diego, California, Defendant Stone was filmed at a "toga party" with his wife at a "swingers party."
> The media at the time went after Defendant Stone because of his alleged participation in the "sex party" and created a scandal.
> The media alleged at the time that Defendant Stone solicited sex half-naked, and that there was a picture of Defendant Stone in a compromising position to back up the story.
> Defendant Stone contacted me and, because he knew my capabilities and acumen as a lawyer, retained me to represent him to get the media to cease what he claimed then was a smear campaign.
> I successfully got the media to back off Defendant Stone through my skill as a lawyer and Defendant Stone was grateful. Exhibit 1 at ¶ 37 – 44.

Furthermore:

> Because he was aware of my prior successes at Judicial Watch and before, Defendant Stone wanted to work with me as my U.S. Senate campaign manager. During this time, the spring, summer, and fall of 2003, and in preparation for my U.S. Senate run, Defendant Stone researched and kept books and records of many of my accomplishments. He had several binders (2-3 feet) full of information about me and the victories that I had obtained at Judicial Watch and elsewhere. Again, because Defendant Stone knew of my successes and legal political acumen, Defendant Stone wanted to be on my team and help me run for the U.S. Senate.
> Defendant Stone thus knew of many cases I had won in courtrooms and other

legal accomplishments and in fact had kept records of successes in a book of my accomplishments. Exhibit 1 at ¶ 49-50.

Accordingly, this shows that Defendant Stone, in concert with the Infowars Defendants, had underline actual knowledge that his statements regarding Mr. Klayman's abilities as a lawyer were flat out false, including but not limited to the "fact" that Mr. Klayman had "never won a courtroom victory in his life." Thus, Mr. Klayman has far exceeded any requisite showing of actual malice, should the Court determine that Mr. Klayman is a public figure. Dr. Corsi has also submitted an affidavit that further bears this out, along with the fact that, based on his experience, David Jones runs Infowars with Alex Jones.

### 3.    Mr. Klayman's Specific Allegations as to Defamation

### i.    The January 18, 2019 Video

The Infowars Defendants' sole argument pertains to paragraph 56 of the Amended Complaint, which states that "At 1:30 in the January 18 Video, Stone maliciously falsely published, "He (Klayman) was ousted at Judicial Watch. Ask Tom Fitton [the current president of Judicial Watch] why he left. He was 'ousted' because of a 'sexual harassment complaint.'" In their defense, Defendants cite a paragraph from *Klayman v. Judicial Watch, Inc.,* 247 F.R.D. 10, 12-13 (D.D.C. 2007) which read:

> Judicial Watch alleges that in May 2003, Klayman informed Fitton and Orfanedes that his wife, a former Judicial Watch employee, had commenced divorce proceedings against him and that she alleged that Klayman had had an inappropriate relationship with a Judicial Watch employee with whom he had been in love and that Klayman had assaulted her physically. According to Judicial Watch, Klayman denied having a sexual relationship with the employee but acknowledged that he had been in love with the employee, that he had purchased gifts for the employee and had kissed her, and also acknowledged an incident with his wife that clearly provided the basis for his wife's allegation of physical assault. Judicial Watch alleges that Fitton and Orfanedes considered Klayman's acknowledged behavior entirely inconsistent with that of a leader of a conservative, pro-family organization, as well as

> Klayman's fiduciary duties to the organization, and that they were
> concerned about Klayman's possible misuse of Judicial Watch
> resources. Judicial Watch further alleges that, as a result of these
> revelations, Fitton requested that Klayman resign, and Fitton and
> Orfanedes also insisted that Judicial Watch undertake an internal
> investigation into Klayman's conduct, including an audit. According to
> Judicial Watch, Klayman offered to resign rather than face such an
> inquiry, and the parties began negotiating for his separation from Judicial
> Watch, which eventually culminated in the September 19, 2003 Severance
> Agreement.

Absolutely nothing contained in this excerpt supports the factual finding that Mr. Klayman was "ousted" from Judicial Watch due to a "sexual harassment complaint." Indeed, plain language of the excerpt clearly states that Mr. Klayman "offered to resign." This is not being "ousted." Furthermore, the unfounded "sexual harassment complaint" allegation appears to be based solely on allegations from Mr. Klayman's ex-wife as grounds for divorce, which Mr. Klayman denied. "Klayman denied having a sexual relationship with the employee but acknowledged that he had been in love with the employee…." *Id*. Indeed, this is false as well, but in any event this is not sexual harassment. Defendant Stone had no basis to make these false, malicious, and defamatory claims.

As pled in the Amended Complaint, Mr. Klayman "left Judicial Watch voluntarily on his own accord in order to run for U.S. Senate in Florida in 2003-2004." Am. Comp. ¶57. This is a fact. Defendant Stone's false revisionist history is a malicious and false statement of fact.

Furthermore, as the final "nail in the coffin" to the Infowars Defendants' assertions, Thomas Fitton ("Fitton"), under oath, at a deposition in another matter testified that "[y]ou [Mr. Klayman] weren't ousted as a result of a sexual harassment complaint." Exhibit 2. This conclusively shows that Defendant Stone, in concert with

the Infowars Defendants, published an objectively verifiable false statement. Indeed, at the same deposition, Fitton admits to never have spoken to Stone, which shows that Stone simply made this lie up. Exhibit 2. Stone admitted under oath in a deposition that he did not speak to Fitton about this either, so it's clear that Stone made this up to defame Mr. Klayman. Exhibit 2.

Tellingly, the Infowars Defendants do not even attempt to defend the numerous other false and defamatory statements set forth in Am. Comp. ¶¶ 55-63. They must be treated as conceded. For instance, Defendant Stone, in concert with the Infowars Defendants made the false statement that Mr. Klayman had "never actually won a courtroom victory in his life." Am. Comp. ¶ 55. To the contrary:

> Klayman has been a practicing attorney for over four decades and has won numerous cases on behalf of his clients and also against the government for constitutional and other violations. He is the founder of both Judicial Watch and Freedom Watch, a former candidate for the U.S. Senate in Florida, a former trial attorney and prosecutor of the Antitrust Division of the U.S. Department of Justice, where he was a member of the trial team that successfully broke up the AT&T monopoly and created competition in the telecommunications industry. Among many other legal victories, Plaintiff Klayman also won landmark decisions at the chairman and general counsel of Freedom Watch enjoining the illegal mass surveillance by the National Security Agency. *Klayman v. Obama*, 1:13-cv-851 (D.D.C). Am. Comp. ¶ 60.

With regard to the remaining false and defamatory statements, the Infowars Defendants offer nothing more than a half-hearted assertion of "opinion" and "hyperbole." However, as set forth above, a tortfeasor may not escape liability by simply couching their defamatory statements as opinion. Since Defendants make no showing of how these statements are supposedly "opinion" or "hyperbole"- nor could they - these unaddressed statements of fact should be treated as conceded to be defamatory, as they clearly are factually based. Indeed, as just one example, Stone stated that Mr. Klayman had an "I.Q. of 70." This is an objectively

verifiable statement of fact.

### 4. Defendant Shroyer Personally Participated in the Defamation

Defendant Shroyer makes the incredibly curious –to put it generously – argument that "Plaintiffs Do Not Allege Mr. Shoryer Did Anything." ECF No. 55 at 7. This is a bizarre allegation, especially given the fact that one of the defamatory videos at issue – the January 18, 2019 video, Am. Comp. ¶¶ 47 – 63 – happened to be from an episode of *The War Room*," which is hosted by Defendant Shroyer. Defendant Shroyer is prominently featured in the January 18, 2019 video, which is in question and answer format, and he proceeds to set up Defendant Stone's malicious defamation of Mr. Klayman. The only way that there was no "meeting of the minds" between Defendant Shroyer and Defendant Stone, as Defendant Shroyer apparently suggests, is if there was absolutely zero preparation that went into this segment and Defendants Shroyer and Stone had no idea what they were planning on discussing. This is obviously not the case from even a cursory viewing of the January 18 video, as both Defendant Stone and Shroyer are clearly prepared and have questions and answers mapped out. Thus, it is disingenuous at best for Defendant Shroyer to allege that the Amended Complaint does not set forth his personal participation. Discovery will confirm this falsity.

### C. Mr. Klayman Has Adequately Pled Intentional Infliction of Emotional Distress

To succeed on a claim of intentional infliction of emotional distress, a plaintiff must who that "1) the defendant acted intentionally or recklessly, 2) the conduct was extreme and outrageous, 3) the actions of the defendant caused the plaintiff emotional distress, and 4) the emotional distress suffered by the plaintiff was severe." *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex. 1993). Texas Courts have held that a single threat of physical harm or death can sustain a claim for intentional infliction of emotional distress. "With the possible exceptions of

the bomb and death threats, no single action…rises to the level of intentional infliction of emotional distress." *Household Credit Servs., Inc. v. Driscol*, 989 S.W.2d 72, 82 (Tex. App. El Paso 1998).

Here, the Infowars Defendants' co-conspirator, Defendant Stone directly threatens Dr. Corsi, and by extension, his counsel, Mr. Klayman, after maliciously defaming him, saying "I think you've [Corsi] been deep state from the beginning. Your whole birther thing is used as a club to destroy conservatives…. ***I look forward to our confrontation. I will demolish you***. You're a fraudster, out of your alcoholic haze you have made up lies about David Jones and Alex Jones and Roger Stone and now I suspect they want you to lie about the President." Am. Comp. ¶ 66. (emphasis added). This is a direct, credible threat to Dr. Corsi's life and the lives of those around him, including Mr. Klayman, which is alleged to have caused severe emotional distress.

### D.    Mr. Klayman Has Adequately Pled Claim for Assault

In order to sustain a claim for assault, a Plaintiff need only plead that the Defendant "intentionally or knowingly threatens another with imminent bodily injury." *Moore v. City of Wylie*, 319 S.W.3d 778, 782 (Tex. App. 2010)

As set forth in the previous section, the Infowars Defendant's co-conspirator, Defendant Stone made direct threats to Dr. Corsi's life and to those around him, like his counsel Mr. Klayman,, saying "**I look forward to our confrontation. I will demolish you**." Am. Comp ¶ 66. These threats are more than credible, as Stone also threatened to kill Randy Credico and his service dog. Am. Comp. ¶ 66. Like Dr. Corsi, Mr. Credico was named as Person 2 in Defendant Stone's indictment. Dr. Corsi was named as Person 1 as a material witness to Stone's crimes. Even more, as set forth previously, Defendant Stone went so far as to publicly threaten the life of the judge assigned to his criminal case, Judge Amy Berman Jackson, which caused her to issue a

total gag order, for which this Court can take judicial notice. These types of threats are what Defendant Stone are known for:

> Defendant Stone likes to portray himself as Mafia, frequently making reference to Mafia figures who he admires, as well as other unsavory types who have been alleged to have engaged in unethical and/or illegal behavior. He frequently makes reference to his heroes being Hyman Roth in the 'Godfather," who was the movie version of Meyer Lansky, and Roy Cohn, not to mention, Richard Nixon, for his role in Watergate. In this regard, after Stone was indicted he held a press conference on the courthouse steps of the federal courthouse in Ft. Lauderdale, where he was booked, with his arms defiantly in the air in the "victory' pose used by Nixon after he resigned in disgrace as a result of the Watergate scandal. At the time, Stone had been employed by a Nixon group called CREEP, or the Committee to Reelect the President. Defendant Stone even has a large tattoo of Richard Nixon affixed to his back. Thus, given his admiration for persons such as these, particularly Mafia figures, his actions as pled herein can be taken as threats, as well as being defamatory. And, Plaintiff Corsi is 72 years old. Defendant Stone's intentional infliction of emotional distress and coercion and threats are intended to try even cause Plaintiff Corsi to have heart attacks and strokes, in order that Plaintiff will be unable to testify at Stone's criminal trial. Tellingly, Defendant Stone threatened kill a material witness and his dog, Credico, Person 2 in the Mueller Indictment, "Mafia style." Defendant Stone also fashions himself and indeed has the reputation, at a minimum, as being the preeminent "dirty trickster." *See* "Get Me Roger Stone" on Netflix. Am. Comp. ¶ 29.

Mr. Klayman took this as a viable threat of severe bodily injury or death. Apparently the FBI took his threats the same way when they raided his house with 27 armed agents, fearing for their own safety.[3]

### E.      Mr. Klayman Has Adequately Pled Unfair Competition Cause of Action

The Infowars Defendants falsely assert that Mr. Klayman's claim under the Lanham Act for Unfair Competition must fail because there is no "commercial" speech at issue. However, it is clear that at all times, the Infowars Defendants had a strong economic motivation for distributing the material at issue. *Tobinick v. Novella*, 848 F.3d 935, 950 (11th Cir. 2017) quoting

---

[3] James A. Gagliano, *Retired FBI agent: The Roger Stone raid was totally by the book*, CNN, January 31, 2019, available at: https://www.cnn.com/2019/01/31/opinions/lindsey-graham-roger-stone-fbi-raid-response-gagliano/index.html

*Bolger*, 463 U.S. at 66-67. The Amended Complaint alleges that "Defendants, acting in concert, as part of their latest scheme for notoriety, fame, **and profit**, are now working in concert with Stone to defame, intimidate, and threaten Plaintiffs." Am. Comp. ¶ 22 (emphasis added). Indeed, the Am. Complaint sets forth the fact that "Plaintiffs Corsi and Plaintiff Klayman are both competitors to Defendants as conservative media personalities, broadcasters, authors and columnists on social media and elsewhere." Am. Comp. ¶ 70. Thus, by discrediting and defaming Mr. Klayman, the Infowars Defendants are trying to "materially prejudice the viewers and/or listeners as to the quality, nature, and contents of Plaintiffs' services, which has caused significant competitive and commercial injury to Plaintiffs, as well as loss of good will and reputation." Am. Comp. ¶ 73. Thus, in essence, the motivation behind the Infowars Defendants' misconducts entirely financial, as they seek to destroy Mr. Klayman's reputation in order to eliminate them as competition.

### F. Mr. Klayman Did Not Need to Comply With the Texas Defamation Mitigation Act

In an obvious attempt to invoke the Texas one-year statute of limitations for defamation claims, the Infowars Defendants assert that Mr. Klayman did not comply with the notice requirements of the Texas Defamation Mitigation Act ("TDMA"). Their motivations are clear, as they assert that "[t]his is not a case where the plaintiffs can dismiss, send a TDMA request, and re-file." ECF No. 55 at 9. However, this argument ignores the fact that this action was filed first in the U.S. District Court for the District of Columbia and was transferred to this Court after the fact. Indeed, the Honorable Timothy Kelly ("Judge Kelly") mooted out this issue in his March 3, 2020 order transferring the case to this Court. In his memorandum opinion, in deciding to transfer the case instead of dismissing it, stated, "And because Texas has a one-year statute of limitations for libel and slander, Plaintiffs would be unable to refile those claims in the Western

16

District of Texas were the Court to dismiss their suit. Tex. Civ. Prac. & Rem. Code § 16.002. Because Plaintiffs would be prejudiced by dismissal but it appears Defendants will not be prejudiced by transfer, the Court will transfer the case to the Western District of Texas in the interest of justice." *Corsi v. Infowars, LLC et al*, 19-cv-656 (D.D.C) ECF No. 21 at 6.

Accordingly, Judge Kelly transferred this case to this Court so the Mr. Klayman would have to opportunity to litigate it substantively. Thus, any statute of limitations or other procedural issues raised by the Infowars Defendants have been mooted out.

Lastly, in any event, Mr. Klayman put counsel for the Infowars Defendants, Marc Randazza on notice of his clients' defamation on January 25, 2019, prior to this case being originally filed in the District of Columbia. Exhibit 3.

### G. The Honorable Roy K. Altman's Order in the U.S. District Court for the Southern District of Florida is Not Binding on this Court

The Infowars Defendants cite a case previously filed by Mr. Klayman in the U.S. District Court for the Southern District of Florida styled *Klayman v. Infowars,* 20-cv-80614 (S.D. Fl.)(the "Florida Complaint") as evidence that this instant complaint is a "shotgun pleading."

First and foremost, the Florida Complaint was dismissed voluntarily by Mr. Klayman, and was therefore never adjudicated substantively.

Furthermore, the Honorably Roy K. Altman ("Judge Altman") appears to have been a highly politicized judge, which caused Mr. Klayman to voluntarily dismiss the Florida Complaint shortly after filing it. Indeed, Judge Altman *sua sponte* issued an Order Requiring More Definite Statement before the Defendants were even served. Due to the bizarre and unusual nature of this order, and because Defendant Stone is a close confidant of President Trump and had recommended people to the bench in the past, Mr. Klayman respectfully asked if Judge Altman had been recommended to the bench by Defendant Stone. This would have explained the unusual

order from Judge Altman. Judge Altman refused to give an answer. Thus, Mr. Klayman saw no recourse but to dismiss the Florida Complaint, as it was clear that he would not receive unbiased adjudication.

Lastly, to the extent that the Infowars Defendants are asserting that Mr. Klayman has "forum shopped" to end up before this honorable Court, it is clear that such an assertion is wholly invalid. This case was transferred to this Court on a motion by the Infowars Defendants. This is not forum shopping by Mr. Klayman.

### H. The Infowars Defendants Assertions Regarding Fla. Stat § 768.295 Are Plainly Erroneous

The Infowars Defendants are asserting that Fla. Stat. § 768.295 ("Anti-SLAPP") applies to Mr. Klayman because he is a citizen of Florida. Mr. Klayman has absolutely no problem with Florida law, and its two year statute of limitations for defamation, being applied to this case. However, even if Florida law, and the Florida Anti-SLAPP statute, were to be applied here, it is clear that the Infowars Defendants' conduct does not merit Anti-SLAPP protection.

However, it is important to note that this case was filed in federal court in the District of Columbia, where the U.S. Court of Appeals for the District of Columbia Circuit has expressly held that Anti-SLAPP statutes conflict with the Federal Rules of Civil Procedure, and therefore are inapplicable. *See Abbas v. Foreign Policy Group,* 783 F.3d 1328 (D.C. Cir. 2015). Since this Court, as well as every federal court follows the same Federal Rules of Civil Procedure, Anti-SLAPP should not be applied.

However, even if Anti-SLAPP were to be applied, the Infowars Defendants fall far short. The Infowars Defendants must satisfy three prongs in order to succeed on an Anti-SLAPP motion. This Court can only dismiss Mr. Klayman's claims pursuant to Florida's Anti-SLAPP statute if it finds that (1) Defendants presented a prima facie case that the statute applies; and (2)

that Mr. Klayman's Complaint is "without merit[;]" and (3) the suit was filed "primarily because [the Infowars Defendants] exercised the constitutional right of free speech in connection with a public issue . . ." Fla. Stat. § 768.295(3). "Free speech in connection with a public issue" is defined as the following:

> any written or oral statement that is protected under applicable law and is made before a governmental entity in connection with an issue under consideration or review by a governmental entity, or is made in or in connection with a play, movie, television program, radio broadcast, audiovisual work, book, magazine article, musical work, news report, or other similar work. *Id.* at § 768.295(2)(a).

The Infowars Defendants have the burden of presenting a prima facie case that the Anti-SLAPP statute applies. *Gundel v. AV Homes, Inc*., 44 Fla. L. Weekly 351 (Dist. Ct. App. 2019). They have fallen woefully short.

### A. Florida's Anti-SLAPP Statute Does No Protect Defamatory Speech

Straight away, the Infowars Defendants assertions fail because the express purpose of Florida's Anti-SLAPP statute is "to protect the right in Florida to exercise the rights of free speech in connection with public issues . . . as protected by the First Amendment to the [U.S.] Constitution . . ." Fla. Stat. § 768.295(1). However, is no Anti-SLAPP statute in the country that protects against malicious, defamatory speech. The statutes only apply to a limited number of legal actions that are based on, or relate to, or are in response to a party's exercise of certain rights protected by the U.S. Constitution, including the right of free speech. The right of free speech does not protect defamatory statements. *Beauharnais v. Illinois*, 343 U.S. 250, 266 (1952) (holding that libelous statements are outside the realm of constitutionally protected speech); *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 340 (1974) (holding that "there is no constitutional value in false statements of fact"). Because the Infowars Defendants' defamatory speech at issue is not constitutionally protected, they fail the first necessary prong of the Anti-SLAPP statute.

**B.  The Infowars Defendants Cannot Show that Mr. Klayman's Lawsuit is Without Merit**

As set forth in detail above, it is the Infowars Defendants' motions to dismiss that are "without merit." Mr. Klayman's amended complaint states clearly valid causes of action against the Infowars Defendants.

Mr. Klayman has further supported his allegations with his sworn affidavit, Exhibit 1, and that of Defendant Alex Jones' former wife and daughter-in-law to David Jones, Exhibit 5 that further demonstrate the meritorious nature of his allegations.  Because Mr. Klayman has provided a sworn affidavit, and Plaintiff Corsi has as well in his pleadings, there is no question that the Infowars cannot show that his claims are "without merit" subject to dismissal under the Anti-SLAPP statute. Mr. Klayman has more than sufficiently pled causes of action, **and buttressed his claims with sworn affidavits.** Thus, the Infowars Defendant also fail the second prong as well.

**C.  The Infowars Defendants Cannot Show that Mr. Klayman's Lawsuit Was Filed Because of the Exercise of Constitutional Free Speech in Connection with a Public Issue**

Crucially, there is no suggestion that the filing of this lawsuit had anything to do with the Infowars Defendants' right to comment on a public issue, peaceably assemble, instruct representatives of government or to petition for redress of grievances. See Fla. Stat § 768.295(3). This is because Mr. Klayman did not strategically file this lawsuit to choke legitimate public criticism; he was forced to file this lawsuit because the Infowars Defendants intentionally and maliciously published false statements of fact concerning Mr. Klayman that have severely damaged his reputation and standing in his community.

There is simply no "public issue" here. It is not a public issue to falsely publish that Mr. Klayman"[has] never actually won a courtroom victory in his life…." It is not a public issue to

falsely publish Mr. Klayman "he was ousted at Judicial Watch . . . because of a sexual harassment complaint," or that that "he's incompetent, he's a numbskull, he's an idiot, he's an egomaniac, and he could be the single worst lawyer in America. Each and every one of these maliciously published statements is a false statement of fact that has absolutely nothing to do with public debate, public concern or any public issue. It is frankly, laughable, that the Infowars Defendants are even making the argument that the Anti-SLAPP statute applies to their misconduct.

## I.    Defendant Shroyer's Motion for Sanctions Must be Denied

Defendants Shroyer has filed a motion for sanctions under Rule 11 of the Federal Rules o Civil Procedure, which simply repeats the arguments set forth by the Infowars Defendants in their motions to dismiss. As shown conclusively above, Mr. Klayman has alleged proper causes of action against each and every Infowars Defendant, including Defendant Shroyer, who personally participated in the defamation of Mr. Klayman on his show, *The War Room*.

 Defendant Shroyer's motion is inoperative and must respectfully be denied for the same reason that Defendant Shroyer's motion to dismiss must be denied and his counsel should be sanctioned for filing a frivolous motion. Indeed when a Rule 11 motion itself is not well grounded in fact or law, or is filed for an improper purpose, the court may sanction the *moving* party. *Safe-Strap Co., Inc. v. Koala Corp.*, 270 F. Supp. 2d 407 (S.D.N.Y.2003).

## IV.    CONCLUSION

Based on the foregoing, Mr. Klayman respectfully requests that this Court deny the Infowars Defendants motion to dismiss and motions for sanctions.

Dated: October 1, 2020                                          Respectfully Submitted,


                                                                   */s/ Larry Klayman*

Larry Klayman, Esq.
7050 W. Palmetto Park Rd
Boca Raton, FL, 33433
Telephone: (561)558-5336
Email:leklayman@gmail.com

*Pro Se*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 30th day of September, 2020, a true copy of the

foregoing was filed via ECF and served to all counsel of record though the Court's ECF system.

*/s/ Larry Klayman*

EXHIBIT 1

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| **DR. JEROME CORSI** and<br>**LARRY KLAYMAN**,<br><br>Plaintiffs,<br><br>vs.<br><br>**INFOWARS, LLC, FREE SPEECH SYSTEMS, LLC, ALEX E. JONES, DAVID JONES, OWEN SHROYER**, and **ROGER STONE**<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. 1:20-CV-00298-LY |

## SWORN AFFIDAVIT OF LARRY KLAYMAN

I, Larry Klayman, being over eighteen years of age and duly competent to testify, hereby swear and affirm as follows:

### A BRIEF HISTORY OF MY BACKGROUND

1.      I have personal knowledge of the following facts and if called upon as a witness, could testify competently thereto.

2.      In 1973, I graduated from Duke University where I majored in political science and French literature. I excelled academically and graduated with honors.

3.      I then matriculated at Emory Law School where I excelled academically and graduated in 1977. While in law school, I worked as an intern at the U.S. International Trade Commission, the Georgia Attorney General and the U.S. Attorney for the Northern District of Georgia.

4.      I passed The Florida Bar the first time I took the exam.

5.      I passed all bar exams on my first attempt, including the District of Columbia Bar.

6.     I began my legal career in this circuit in Miami, Florida as an associate for Blackwell, Walker, Gray, Roberts, Flick & Hoehl (. Blackwell") which was then the largest and most prestigious law firm in Florida. I was admitted into The Florida Bar having been sworn in on December 7, 1977. I have practiced law in this circuit continuously and extensively throughout my forty-two-year career and have active cases pending in this circuit and elsewhere in Florida, including during the period that I was a trial attorney for the U.S. Department of Justice's ("DOJ") Antitrust Division, from 1980 to 1982, where I was assigned litigation in this circuit.

7.     I conceived of and founded Judicial Watch, Inc. ("Judicial Watch") in 1994, a public interest group that's mission was to investigate and prosecute government corruption and abuse. I was the Chairman, General Counsel, and Corporate Treasurer of Judicial Watch until I voluntarily departed in 2003 to run as a candidate for the U.S. Senate in Florida in the Republican primary election.

8.     In 1998, during the time I ran Judicial Watch, I hired Thomas J. Fitton ("Fitton") as my contract assistant. I later appointed him president of the organization I founded.

9.     In September of 2003, I voluntarily departed from Judicial Watch to run for the U.S. Senate in Florida. At the time I left Judicial Watch, I learned that Fitton had never graduated from college, which he had told me he had when I initially hired him.

10.     Contrary to Defendant Roger Stone's ("Defendant Stone") false and defamatory publications, I have enjoyed many successes in my career as a lawyer, many of which have been brought to the attention of the public by complimentary newspapers, magazines, editorials and journals.

11.     For example, I practiced law at Blackwell with my supervising partners Paul Larkin and Layton Mank and participating in winning product liability cases as defense counsel for Blackwell including cases involving Raleigh bicycles, pharmaceutical drugs manufactured by

2

Burroughs-Wellcome, and allegedly misdiagnosed cancer victims, and other personal injury and medical malpractice cases. Additionally, I handled lawsuits in admiralty.

12.     I left Blackwell to join the DOJ as a trial lawyer, prosecutor and defense lawyer in late 1979. During my time at the DOJ, I had many victories in the courtroom as well as favorable settlements for the government, i.e., such as for the Consumer Affairs Section of the Antitrust Division over misbranded, adulterated food and drug products including fruit drinks and prophylactics for the Food & Drug Administration ("FDA") and successful seizures and criminal prosecutions of dangerous products on behalf of the Consumer Product Safety Commission ("CPSC") such as slant-sided refuse bins, flammable children's sleepwear, and intraocular lens implants for cataract patients.

13.     Importantly, I was also on the trial team that successfully broke up the AT&T monopoly – creating competition in the telecommunications industry. I left the DOJ in late 1981.

14.     Then, working as an international trade lawyer for Busby, Rehm & Leonard and after a few years having founded my own firm The Law Offices of Larry E. Klayman, later named Klayman & Associates, P.C., I won countervailing duty and antidumping duty cases concerning steel from South Africa, garden furniture from Italy, musical instrument pads from Italy, coffee filters from Brazil, key limes from Peru, fireworks from China and a host of other product imports. I represented both importers and exporters. (While at Busby, Rehm & Leonard, I also took some months on hiatus and worked in the Competition Directorate (DG-4) of the Commission of the European Communities Section ("E.C.").

15.     Later, with my law firm, I won Section 337 unfair trade practice cases at the U.S. International Trade Commission ("USITC") concerning tennis rackets from Belgium, power tools from Taiwan, luggage from Taiwan, mass spectrometers from France, jam from Belgium, and machine tools from Brazil. I won a landmark case concerning recloseable plastic bags, which

broke the patents of Minigrip and Dow Corning, Minigrip's licensee. That case victory opened up competition for zip lock bags, a multi-trillion dollar industry.

16. There was also an USITC patent case, pursuant to Section 337, which I litigated and won involving motorcycle helmets and another antidumping and countervailing duty cases before the Commerce Department and USITC concerning fire protection products and scuba diving neoprene body suits.

17. I also won a Section 302 case involving paper from Brazil.

18. All of the Section 337 cases were judge-tried and I won every one of them.

19. I won a jury trial against Makita over power tools, another jury trial against a domestic manufacture of removable swimming pools for my client Remove Pool Fence Co., and yet another jury trial for my client, Maccaferri, on a contract dispute. These are only some of the jury trials I won during my early career.

20. Because of my work during the time I ran Judicial Watch, a court ruled that President William Clinton committed a crime during the Filegate litigation. I also triggered the famous Chinagate scandal in a Freedom of Information Act, 5 U.S.C. § 552 et seq., which gave rise to Judicial Watch ultimately being awarded almost a million dollars. I filed cases which ended Bill and Hillary Clinton's attempted illegal purchase at below market rates for their mortgage of their home at Chappaqua, New York and ended the illegal payment of legal fees to the Clintons by State Farm, which was a form of bribery. I also participated in the famous *Gore v. Bush* litigation in Tallahassee, Florida that settled the 2000 presidential elections by the U.S Supreme Court. I also brought a case under the Foreign Agents Registration Act ("FARA") over the Cheney Energy Task Force that made its way to the U.S. Supreme Court.

21. I brought a case for Jose Basulto of Brothers to the Rescue in a Florida court, which resulted in a $1.8 million judgment against the Republic of Cuba for shooting down Brothers to

the Rescue planes, and I represented the Miami family of Elian Gonzales and other victims of Fidel Castro, such as journalists who were jailed by Castro for their political beliefs. In this regard, I not only filed criminal complaints for these victims against Fidel Castro in Belgium courts, but also lobbied and testified in both Italian and French in Italy and France, as I am fluent in both languages, before various European parliaments to increase economic sanctions on Cuba for abuse of human rights. I also lobbied the European Union in Brussels, Belgium for increased sanctions on Cuba.

22.     On December 16, 2013, Judge Richard J. Leon granted my request for a preliminary injunction in my case against the National Security Agency ("NSA") and the Obama administration, when Judge Leon found for the first time in history that the collection of metadata telephony records by the NSA was likely unconstitutional.

23.     Because of that ruling, Congress enacted the USA Freedom Act, which sought to end illegal and unconstitutional mass surveillance by government intelligence agencies and the Federal Bureau of Investigation ("FBI").

24.     I obtained a jury verdict in the U.S. District Court for the Southern District of Florida against my former public interest group Judicial Watch, which was then run by Fitton, for maliciously defaming me in the amount of $181,000, which included punitive damages.

25.     My client Sheriff Joe Arpaio and I were the first to challenge former President Obama's unconstitutional executive amnesty for over 5 million illegal aliens and were ultimately successful, along with 25 other attorneys general, in front of the U.S. Supreme Court.

26.     It was my efforts that prevented Dr. Jerome Corsi ("Dr. Corsi") from getting indicted, first because he told the truth and did not engage in witness tampering and threaten to kill a witness such as Randy Credico, as Defendant Stone did, and second because of my legal skill and acumen. Dr. Corsi is a material witness in the Russian Collusion investigation by Special

Counsel Robert Mueller ("Mueller") and is listed as a material witness as Person 1 in Defendant Stone's Mueller indictment.

27.     I have had many other successes in addition to the above-listed victories.

28.     I myself authored a book titled "Whores: Why and How I Came to Fight the Establishment" published in 2009. In it, I wrote about my unfortunate experience with Defendant Stone. *See* Exhibit A. I authored this book myself without a ghostwriter and I came runner-up at an International Book Fair. It also still has a review on www.Barnesandnoble.com of 4.5 stars out of the maximum 5 stars.

29.     Upon its publication, Jack Cashill, the author of "Ron Brown's Body" had this to say about me: "That *Time* magazine has yet to name Larry Klayman 'Man of the Year' is a failure of *Time*, not Klayman's. The work he and Judicial Watch did on the Brown case is stunning." *See* Exhibit B.

30.     Joseph Farah, the founder of WorldNetDaily.com, had this to say about me: "Larry Klayman is my hero because he has integrity – enough to prevent him from blind loyalty to party or ideology . . . That's because he is fearless and relentless in the pursuit of justice . . . There were other men like Larry early in American history. Their names were Washington, Jefferson, Madison and Henry. *See* Exhibit B.

31.     Louis Jacobson of the National Journal said this of me: " . . . through his challenge of secrecy rules, Larry Klayman has become a force in Washington. *See* Exhibit B.

32.     Bill Moyers, of "Now" PBS, said this: ". . . his idea of fun is trying to kick down a door some public official has marked secret . . . Larry Klayman is himself a conservative, but there's nothing partisan bout his indignation."

33.     Frank Rich, famed columnist for "The New York Times" said this: "Larry . . . I appreciate your own maverick – if we can still use that word! – thinking and stands."

34.     These are just a few of the accolades I have received over the years from conservatives and liberals alike, who appreciate and admire my work. *See* my biography attached as Exhibit C and incorporated herein by reference; *see also* Exhibit D, "Larry Klayman, the One Man Tea Party" which attributes the genesis of the Tea Party to me.

35.     I am now the founder, Chairman and General Counsel of Freedom Watch, Inc., which has the mission of investigating and prosecuting government corruption and abuse through legal advocacy. I also am in private practice with The Klayman Law Group, P.A. I am unique as a public interest advocate. I am a columnist for World Net Daily and have had about 500+ columns published over the last 10 years. I have also been a columnist for Newsmax through a blog titled "Klayman' Court" and in addition to my book "Whores: How and Why I Came to Fight the Establishment", I also published two other books: "Fatal Neglect" and "Essays of a Mad Man." I also have my own syndicated radio show with Radio America called "Special Prosecutor with Larry Klayman."

## MY EXPERIENCES WITH DEFENDANT ROGER STONE

36.     I met Defendant Stone at the Old Ebbitt Grill in Washington, D.C. in 1988 while he was a partner with Paul Manafort and others and was working as a lobbyist for the firm Black, Manafort, Stone, & Kelly.

37.     Defendant Stone was a "political consultant" who claimed to help get presidents and other politicians elected. The firm made money by then lobbying the very men they put in office.

38.     Defendant Stone backed Republican candidate Jack Kemp for President and he recommended that I be put on the executive finance committee, which also included Donald J. Trump.

39.     Because Defendant Stone knew of my successes and capabilities as a private lawyer, he told me that he had recommended me for U.S. Attorney when George Bush was President in 1992.

40.     In 1996, at a Republican Convention in San Diego, California, Defendant Stone was filmed at a "toga party" with his wife at a "swingers party."

41.     The media at the time went after Defendant Stone because of his alleged participation in the "sex party" and created a scandal.

42.     The media alleged at the time that Defendant Stone solicited sex half-naked, and that there was a picture of Defendant Stone in a compromising position to back up the story.

43.     Defendant Stone contacted me and, because he knew my capabilities and acumen as a lawyer, retained me to represent him to get the media to cease what he claimed then was a smear campaign.

44.     I successfully got the media to back off Defendant Stone through my skill as a lawyer and Defendant Stone was grateful.

45.     I maintained in sporadic contact with Defendant Stone until 2003 when I told him of my plans to voluntarily leave Judicial Watch and run for the U.S. Senate.

46.     There were confirmed rumors that Senator Bob Graham would retire from the U.S Senate well before he announced his retirement in November 2003. Defendant Stone traveled in Republican and political circles and knew that the Senator would be retiring in early to mid 2003.

47.     Thus, I was in contact with Defendant Stone in early to mid 2003, having been put in contact with him by Scott Reed, then Chief of Staff to Jack Kemp, who then was Secretary of Housing and Urban Development, and Defendant Stone was made aware by Scott Reed that I intended to run for the U.S. Senate to fill Bob Graham's seat.

8

48.     As I was a newcomer to politics, it would have been virtually impossible for me to beat Bob Graham, the incumbent, given the privileges and name recognition an incumbent receives, unless he or she is enmeshed in a major scandal. Senator Bob Graham was never enmeshed in such scandal.

49.     Because he was aware of my prior successes at Judicial Watch and before, Defendant Stone wanted to work with me as my U.S. Senate campaign manager. During this time, the spring, summer, and fall of 2003, and in preparation for my U.S. Senate run, Defendant Stone researched and kept books and records of many of my accomplishments. He had several binders (2-3 feet) full of information about me and the victories that I had obtained at Judicial Watch and elsewhere. Again, because Defendant Stone knew of my successes and legal political acumen, Defendant Stone wanted to be on my team and help me run for the U.S. Senate.

50.     Defendant Stone thus knew of many cases I had won in courtrooms and other legal accomplishments and in fact had kept records of successes in a book of my accomplishments.

51.     Soon after I hired him and during the height of my U.S. Senate campaign, I discovered that Defendant Stone had a conflict of interest and was working with Al Sharpton, while simultaneously working with me. He had agreed to represent me exclusively and I considered Al Sharpton to be an unsavory character. He also was not competently running my campaign with a staff of his friends which he had hired at great expense to me.

52.     I let Defendant Stone go roughly after about one month of his working with me on my U.S. Senate campaign. Shortly after his being let go, Defendant Stone and his sidekick Mike Caputo, whom he hired on my behalf as the campaign's press secretary, along with other staff Defendant Stone had hired, stole thousands of dollars of campaign cell phones and laptops, which I had purchased with my personal funds for the campaign.

53.     I have not spoken to Defendant Stone since I parted ways with him in 2003 given
this experience.

54.     Defendant Stone is an individual and citizen of Florida. Special Counsel Robert
Mueller ("Mueller") indicted Stone as part of the alleged "Russian Collusion" investigation with
seven different felony counts, including lying under oath, witness tampering and obstruction of
justice by threatening to kill a material witness and his service dog.

55.     The January 18, 2019 InfoWars video, published in this circuit, contained several
false, misleading and defamatory statements concerning me. These false and defamatory
statements include but are not limited to:

> A` 1:25, Defe. dant Stone says, "He's (Klayman) never actually won a
> courtroom victory in his life."
>
> At 1:30, Defendant Stone says, "He (Klayman) was ousted at Judicial Watch.
> Ask Tom Fitton why he left. He was 'ousted' because of a 'sexual harassment
> complaint.'"
>
> At 1:37, Defendant Stone says, "He's (Klayman) incompetent, he's a
> numbskull, he's an idiot, he's an egomaniac, and he could be the single worst
> lawyer in America. With him as Jerry Cori's lawyer, Corsi may get the
> electric chair. So your idea that he's a good guy is entirely wrong."
>
> At 2:01, Defendant Stone published that Plaintiff is "a piece of garbage."
>
> At 4:11, Defendant Stone says, "For those people out there who think . . . that
> Larry Klayman's IQ is higher than 70, you're wrong . . ."

Am. Compl. at ¶¶ 55, 56, 59, 61, 62.

56.     Defendant Stone acted with actual when he published the false, misleading and
defamatory statements concerning me because he knew they were false or acted with a reckless
disregard to their truth, as set forth herein.

57.     Defendant Stone not only acted with actual malice when he published the false,
misleading and defamatory statements concerning me, but he also had motives to maliciously

defame me. He published the false and misleading statements knowing that they were false or with a reckless disregard for their truth. Defendant Stone had reason to know that his statements were false.

58.     Defendant Stone is aware of *many, many* victories of mine as he was in charge of putting together the book of my accomplishments for fundraising purposes for my U.S. Senate campaign, among other reasons.

59.     Since the time I let Defendant Stone go as my campaign manager in late 2003, Defendant Stone has tried to trade off my clients like a "scavenger." I have warned my clients not to become involved with him as, in my opinion and through my experience, Defendant Stone is not an honorable, ethical or honest person. He has been widely and rightly called a self-styled "dirty trickster" In my opinion, this characterization is accurate based on my experience dealing with him. *See* "Get me Roger Stone" on Netflix,

https://www.netflix.com/title/80114666. He tried to trade off my clients for his own profit and purposes.

60.     When the National Enquirer contacted me in 2018 to get a comment on a story it was writing about President Donald Trump and to get my legal opinion on the Mueller investigation, I told the reporter not to quote me in the same article as Defendant Stone, or any article in which he wrote, as Defendant Stone wrote for the National Enquirer at the time. The National Enquirer is located in South Florida and is apparently close with Defendant Stone, a South Florida citizen. I did not want to be quoted or associated at all with Defendant Stone because I consider him – like others do – to be a self-styled dirty trickster who was likely going to be indicted for alleged criminal behavior by Mueller and in fact was indicted by Mueller.

61.     In 2018, I also told Alex Jones and his show producers on InfoWars that I did not want to appear on any show which included Defendant Stone or had ties to Defendant Stone,

either as a guest or as a host, because I strongly felt at the time that Mueller may indict Defendant Stone. Defendant Stone was at the time a host on InfoWars.

62.     I also warned Alex Jones not to release any information – that was potentially under seal in the contempt case of *Melendrez v. Arpaio*, 07-cv-02513 (D. Ariz. 2007) – which he may have improperly obtained from Defendant Stone or others concerning Dennis Montgomery, another whistleblower client of mine who contracted with the U.S. government so it could use his software capabilities for intelligence gathering.

63.     During the criminal trial of my client Cliven Bundy, again to try to scavenge off my clients, Defendant Stone flew to Las Vegas, Nevada where the Bundys lived and boasted that he could get a pardon for Cliven Bundy and his sons. I told Carol Bundy, Cliven's wife and the sons' mother, to stay away from Defendant Stone and she did.

64.     I also warned my then client at the time, Dennis Montgomery, to stay away from Defendant Stone.

65.     Defendant Stone wanted to – and did – intimate and threaten my client Dr. Corsi since he is a material witness in the Mueller investigation as Defendant Stone obviously feared that he would testify against him to Mueller. Defendant Stone feared me as Dr. Corsi's lawyer as he knew that I know what type of person he is and must have thought falsely that my representation of Dr. Corsi was my revenge for him having harmed me during my U.S. Senate campaign.

66.     In sum, Defendant Stone tried to trade off my clients and I shut this down every time in order to protect my clients from Defendant Stone. He also knew that I wanted nothing to do with him and I predicted early on in the Russian collusion investigation that Mueller would most likely indict Defendant Stone because of – in my experience with him – his rank dishonesty and dirty tricks.

67.     This, in addition to other information that will be meted out in discovery, supplies the motive to maliciously defame me. That he attacks my acumen and ability as a lawyer and defamed me personally with false sexual harassment complaint claims is directly related to my having kept him away from my clients.

68.     This vindictive, malicious retaliation by Defendant Stone had a logical purpose. He tried to intimate and threaten Dr. Corsi and me in order for us not to collaborate with Mueller. We obviously did not collaborate with Mueller but Defendant Stone is both unstable and unhinged (*See* CDs containing videos of defamatory statements and publications) and apparently paranoid and he tried to prevent collaboration at all costs in order to save his own skin. His conduct toward us is similar to his conduct toward Material Witness 2 in the Mueller investigation, Randy Credico, who he allegedly threatened "Mafioso style" to kill. He even allegedly threatened to kill Credico's service dog, for which he was in part indicted.

## DAMAGES

69.     As an attorney, I rely on my virtue and integrity, as my reputation and good will determines the amount of clients that come to me to earn a living for their legal matters in the public interest and privately.

70.     Any damage done to my reputation harms my ability to practice law as a lawyer, particularly in this circuit, which is my community. This also harms my work as an author, columnist and syndicated radio talk show host, all of which depend on reputation and good will.

71.     Defendant Stone's statements in this instance have caused harm to my reputation, good will and well being in this circuit, the United States, and globally, as I am also an international lawyer as previously set forth in this affidavit.

72.    There was never any single instance of someone making a sexual harassment complaint against me during my almost ten years at Judicial Watch. Defendant Stone's statements to the contrary are false and defamatory and made with actual malice.

73.    Defendant Stone acted with actual malice when he published that I was "ousted" because of a sexual harassment complaint because he knew that was false. Am. Compl. at ¶ 56. Defendant Stone knew or had reason to know that this was false, as he was my campaign manager when I left Judicial Watch.

74.    As set forth in my opposition to Defendants' motions to dismiss, which attaches the testimony of Fitton of Judicial Watch, this also proves the falsity of this statement. Indeed, both Fitton and Defendant Stone have been forced to testify under oath that they never spoke about my being "ousted." Defendant Stone thus fabricated this falsity, according to Fitton's sworn testimony.

75.    The damage done to me and my clients Dr. Corsi, Cliven Bundy, and the Gold Star parents of Extortion 17 whose sons died in combat in Afghanistan, because of Defendant Stone is continuing. As just one example, a person approached me in an elevator and told me that I was "ousted" at Judicial Watch.

76.    Defendant Stone acted with actual malice when he published all of the defamatory statements. He knew the statements were false or had a reckless disregard for their truth. He had reason to know his false and misleading statements were false.

77.    I was damaged financially, as well as to my reputation and good will, and emotionally, by the defamatory and other tortious acts of Defendant Stone.

78.    Each of the Defendants, Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars, is intimately familiar with my background, qualifications and successes as a public interest and private attorney. For this reason, I was previously invited to appear on Infowars on

many occasions before Defendants decided – at the direction of Defendant Stone – to defame my client, Dr. Corsi and me.

Affiant Sayeth Not

SWORN TO UNDER OATH THIS 30TH DAY OF SEPTEMBER OF 2020.

_____
Larry Klayman

# EXHIBIT A



# EXHIBIT B



© 1998, The Washington Post. Photography by Larry Morris. *Reprinted with permission.*

*...his idea of fun is trying to kick down a door some public official has marked secret...Larry Klayman is himself a conservative, but there's nothing partisan about his indignation.*
—BILL MOYERS, "NOW" PBS

*Larry...I appreciate your own maverick—if we can still use that word!—thinking and stands.*
—FRANK RICH, COLUMNIST FOR *THE NEW YORK TIMES*

*That* Time *magazine has yet to name Larry Klayman "Man of the Year" is a failure of* Time, *not Klayman's. The work he and Judicial Watch did on the Brown case is stunning.*
—JACK CASHILL, AUTHOR OF *RON BROWN'S BODY*

*Larry Klayman is my hero because he has integrity—enough to prevent him from blind loyalty to party or ideology...That's because he is fearless and relentless in the pursuit of justice...There were other men like Larry early in American history. Their names were Washington, Jefferson, Madison and Henry.*
—JOSEPH FARAH, WORLDNETDAILY.COM

*...through his challenge of secrecy rules, Larry Klayman has become a force in Washington.*
—LOUIS JACOBSON, *NATIONAL JOURNAL*

*Nobody ever accused Larry Klayman of thinking small, but his latest suit may be outsized by even his standards. The former head of conservative watchdog Judicial Watch who now runs Freedom Watch has filed a $10 trillion class action against Iran at the U.S. District Court for the District of Columbia.*
—THE NATIONAL LAW JOURNAL

$26.95

ISBN: 978-0-9792012-2-6

5 2 6 9 5

9 780979 201226

# EXHIBIT C



# ABOUT LARRY KLAYMAN



Larry Klayman, founder of Judicial Watch and Freedom Watch, is known for his strong public interest advocacy in furtherance of ethics in government and individual freedoms and liberties. During his tenure at Judicial Watch, he obtained a court ruling that Bill Clinton committed a crime, the first lawyer ever to have done so against an American president. Larry became so famous for fighting corruption in the government and the legal profession that the NBC hit drama series "West Wing" created a character after him: Harry Klaypool of Freedom Watch. His character was played by actor John Diehl.

In 2004, Larry ran for the U.S. Senate as a Republican in Florida's primary. After the race ended, he founded Freedom Watch.

Larry graduated from Duke University with honors in political science and French literature. Later, he received a law degree from Emory University. During the administration of President Ronald Reagan, Larry was a Justice Department prosecutor and was on the trial team that succeeded in breaking up the telephone monopoly of AT&T, thereby creating competition in the telecommunications industry.

Between Duke and Emory, Larry worked for U.S. Senator Richard Schweiker (R-Pa.) during the Watergate era. He has also studied abroad and was a stagiaire for the Commission of the European Union in its Competition Directorate in Brussels, Belgium. During law school, Larry also worked for the U.S. International Trade Commission in Washington, D.C.

Larry speaks four languages—English, French, Italian, and Spanish —and is an international lawyer, among his many areas of legal expertise and practice.



The author of two books, *Fatal Neglect* and *Whores: Why and How I Came to Fight the Establishment,* Larry has a third book in the works dealing with the breakdown of our political and legal systems. His current book, *Whores,* is on now sale at WND.com, Amazon.com, BarnesandNoble.com, Borders.com, and all major stores and booksellers.

Larry is a frequent commentator on television and radio, as well as a weekly columnist, on Friday, for WND.com. He also writes a regular blog for Newsmax called "Klayman's Court."

Larry has been credited as being the inspiration for the Tea Party movement. (See "Larry Klayman - The One Man TEA Party," by Dr. Richard Swier.)

# EXHIBIT D

 **FREEDOMWATCH**    JOIN OUR FIGHT AT WWW.FWUSA.ORG

# LARRY KLAYMAN – THE ONE MAN TEA PARTY

By Dr. Richard Swier (Scribe)
RedCounty.com
July 31, 2010

Long before there was a TEA Party, Glenn Beck 912 movement, 13 Patriots and thousands of others, there was Larry Klayman. Larry believes it is more important to be virtuous than be liked.

**Larry believes there is an ultimate right and wrong.**

Some of you may not know Larry Klayman but you should. If you believe in the Constitution of the United States and that the Executive, Legislative and Judicial branches of our federal government are corrupt to the core then you need to read Larry's book, *WHORES: Why and How I Came to Fight the Establishment.*

If you see our courts legislating from the bench rather than enforcing the law as in Arizona then you will love Larry Klayman. If you love politics and want to understand what really happens behind the scenes get his book. I just finished reading WHORES and could not put it down. It is a mosaic of both the man and his struggles against an out of control government bent on aggrandizing itself at the expense of the people and the law. It is about corruption on the part of both parties writ large. I found it particularly interesting because of Larry's insights into Florida politics. You see Larry ran for the very same U.S. Senate seat Marco Rubio is seeking. Larry ran against, among others, Bill McCollum and Mel Martinez. If you want to learn more about Florida politics and political insiders, read this book.

Larry is the founder of Judicial Watch and Freedom Watch USA. Freedom Watch USA "is the only group that speaks through actions, rather than just words." When reading his book I found it a fascinating personal and professional journey that reflects the work of a real patriot. Larry has won my patriot award for being a thorn in the side of Iran, Hugo Chavez, Bill and Hillary Clinton, Dick Cheney, George W. Bush and Barack Obama. Not a bad record if I say so myself.

I really felt a symbiotic relationship with Larry as I read his story. When you speak truth to power you are always attacked. The progressive model is identify the target, marginalize it and then demonize it. That is the cross that Larry, TEA Party members and others who are like minded bear today.

**Larry was fighting the establishment since the early 1990s and he continues to do so even today with the filing of a lawsuit against Elena Kagan, President Obama's nominee for the U.S. Supreme Court.**

According to the WorldNetDaily.com column, *Papers prepped to disbar Elena Kagan*:

One of Washington, D.C.'s most feared and fearless corruption watchers has told WND he intends to file an ethics complaint to have Supreme Court nominee Elena Kagan disbarred from practicing before the court she aspires to join – and possibly subjected to criminal prosecution – for her role in an escalating controversy over partial-birth abortion.

As WND reported, dozens of pro-life organizations are already asking the Senate to investigate Kagan's 1997 amendment to an American College of Obstetricians and Gynecologists report, which was then used by the Supreme Court as justification for overturning Nebraska's partial-birth abortion ban in 2000.

In her confirmation hearings, Kagan defended the amendment, saying, "My only dealings with (the College) were about talking with them about how to ensure that their statement expressed their views."

Several analyses have concluded, however, that Kagan's amendment dramatically changed the meaning of the organization statement, and court records show the statement was passed off on the Supreme Court as official scientific opinion, even though the organization's panel of scientists never approved Kagan's wording.

Klayman told WND he believes Kagan's behind-the-scenes work constitutes "conspiracy to defraud the Supreme Court," and he intends to take the evidence that has been compiled by the pro-life groups to file a complaint before the clerk's office of the U.S. Supreme Court, seeking to have Kagan disbarred as a practicing lawyer infront of the Supreme Court.

So the battle goes on for Larry, you and me. I hope you will read Larry's book and make it a point to learn more about the great work he is doing to stop corruption in our courts, at the White House and in Congress. Larry has been a one man TEA Party, now it is time for us to join with him as we together fight in the same cause – a grass roots revolution to save the Republic.

http://www.redcounty.com/content/larry-klayman-one-man-tea-party

# EXHIBIT 2



# Transcript of Thomas J. Fitton

**Date:** June 6, 2019
**Case:** Klayman -v- Fitton

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
www.planetdepos.com

WORLDWIDE COURT REPORTING | INTERPRETATION | TRIAL SERVICES

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT

 2        FOR THE SOUTHERN DISTRICT OF FLORIDA

 3

 4   LARRY KLAYMAN,          *

 5        Plaintiff,         *

 6   vs.                     *  Civil Action

 7   THOMAS FITTON,          *  No. 1:19-cv-20544

 8        Defendant.         *

 9

10

11

12      Videotaped Deposition of THOMAS J. FITTON

13                  Washington, D.C.

14             Thursday, June 6, 2019

15                    3:06 p.m.

16

17

18

19   Job No.: 247643

20   Pages 1 - 92

21   Reported by:  Vicki L. Forman

22

23

24

25
```

**Page 2**

```
 1        Videotaped Deposition of THOMAS J. FITTON,

 2   held at the offices of:

 3

 4        Planet Depos

 5        Suite 950

 6        1100 Connecticut Avenue, Northwest

 7        Washington, D.C.  20036

 8        (888) 433-3767

 9

10

11

12            Pursuant to agreement, before Vicki L.

13   Forman, Court Reporter and Notary Public in and

14   for the District of Columbia.

15

16

17

18

19

20

21

22

23

24

25
```

**Page 3**

```
 1               A P P E A R A N C E S

 2

 3   ON BEHALF OF THE PLAINTIFF PRO SE:

 4        LARRY KLAYMAN, ESQUIRE

 5        Klayman Law Group, P.A.

 6        Suite 345

 7        2020 Pennsylvania Avenue, Northwest

 8        Washington, D.C.  20006

 9        (310) 595-8088

10

11

12

13   ON BEHALF OF THE DEFENDANT:

14        RICHARD W. DRISCOLL, ESQUIRE

15        Driscoll & Seltzer

16        Suite 610

17        300 North Washington Street

18        Alexandria, Virginia  22314

19        (703) 822-5001

20

21

22

23

24

25
```

**Page 4**

```
 1   ON BEHALF OF THE DEFENDANT:

 2        KATIE M. MERWIN, ESQUIRE

 3        Cole, Scott & Kissane, P.A.

 4        Suite 120

 5        222 Lakeview Avenue

 6        West Palm Beach, Florida  33401

 7        (561) 383-9206

 8        (Present via Telephone.)

 9

10

11

12   ALSO PRESENT:  Joannis Arsenis, Videographer

13

14

15

16

17

18

19

20

21

22

23

24

25
```

41

1     MR. KLAYMAN:  Certify it.
2     Q So as President of Judicial Watch you
3 would have known for sure that this Complaint had
4 been filed, correct?
5     MR. DRISCOLL:  Objection to form.
6     **A Well, the press release indicates it was**
7 **filed and I recall we sued about the raid, yes.**
8     Q And you gave interviews about suing in the
9 raid, correct, in the media?
10    **A I don't remember.**
11    Q Turn to the last page, page five.
12    The Complaint is signed by James F
13 Peterson, correct?
14    **A His name is on the last page of the**
15 **Complaint as a signatory.**
16    Q He is an attorney at Judicial Watch,
17 correct?
18    **A Yes.**
19    Q Now, Mr. Peterson had contact with Roger
20 Stone over the issue of the raid on his house, did
21 he not?
22    **A Not that I'm aware of.**
23    MR. DRISCOLL:  Objection to form.
24    Q You're saying you don't know one way or
25 the other?

42

1     **A I don't believe he has.  I said I would**
2 **know if he had.**
3     Q How would you know if you couldn't even
4 identify the Complaint?
5     **A Another abusive harassing question.**
6     MR. DRISCOLL:  It's a foundation question.
7 You can go ahead and answer it.
8     How would you know if he had contacted
9 Roger Stone?
10    MR. KLAYMAN:  Or if Roger Stone contacted
11 him.
12    **A Is it privileged?**
13    MR. DRISCOLL:  That's an interesting
14 question.  The fact of the communication would not
15 be.  The contents of it would be.
16    **A How I would know is my question of whether**
17 **it's privileged or not.**
18    MR. DRISCOLL:  No, I'm going to allow you
19 to answer that one.
20    **A How I would know about what my attorneys**
21 **are doing or Judicial Watch's attorneys are doing?**
22    MR. DRISCOLL:  Yeah, and you're not
23 disclosing a communication.  You're just
24 describing a process.
25    **A Typically that type of communication would**

43

1 **have been disclosed to me.**
2     Q But you don't know for sure that
3 Mr. Peterson didn't have contact with Roger Stone?
4     MR. DRISCOLL:  Objection to form.
5     **A I'm confident there was no such contact.**
6     Q You have told Mr. Peterson in the past,
7 have you not, that I was ousted from Judicial
8 Watch because of a sexual harassment complaint?
9     MR. DRISCOLL:  Objection to form.
10 Mr. Peterson is an in-house counsel and I'm going
11 to direct the witness not to answer.  That's an
12 attorney-client privilege.
13    MR. KLAYMAN:  Certify it.
14    Q So you don't know whether or not
15 Mr. Peterson repeating what you had told him then
16 republished that to Roger Stone?
17    MR. DRISCOLL:  The communications between
18 an in-house counsel and the President of the
19 corporation relating to legal advice and
20 assistance are privileged.  He can't answer the
21 question about the contents of the communication
22 or derivative questions that would disclose the
23 content of the communication.
24    MR. KLAYMAN:  That's the crux of the
25 lawsuit.  That does not apply in this context.

44

1     MR. DRISCOLL:  That doesn't waive the
2 privilege.
3     Q Are you saying that you never told anyone
4 at Judicial Watch that I was ousted because of a
5 sexual harassment complaint?
6     MR. DRISCOLL:  Anyone other than the
7 attorneys?
8     MR. KLAYMAN:  Anyone.
9     MR. DRISCOLL:  No, I can't allow him to
10 answer that question.
11    Q Are you saying that you never told anyone
12 that I was -- regardless -- let's take attorneys
13 out of it.
14    Have you ever -- you have told other
15 people in addition to -- strike that.
16    You have told other people excluding
17 attorneys that I was ousted from Judicial Watch
18 because of a sexual harassment complaint?
19    **A You have to ask the question again.**
20    MR. KLAYMAN:  Read it back, please.
21    **A Please.**
22    MR. KLAYMAN:  Let me rephrase it.
23    Q I'm taking attorneys out of this question.
24 I'm saying you have told others who aren't
25 attorneys over the course of the last 16 years

Transcript of Thomas J. Fitton
Conducted on June 6, 2019

45

1  since I left Judicial Watch that I was ousted
2  because of a sexual harassment complaint?
3      A  No, because that's not true.  You weren't
4  ousted as a result of a sexual harassment
5  complaint.
6      Q  After I sued you in this particular case
7  has anyone -- have you or anyone at Judicial Watch
8  or your counsel tried to contact Roger Stone?
9      MR. DRISCOLL:  Objection to form.  The
10 question invades the attorney-client privilege and
11 the attorney work product.  I direct the witness
12 not to answer.
13     MR. KLAYMAN:  Certify it.
14     Madam court reporter, have a page in the
15 front where you have all the certified questions
16 and where you can find them to make it easy for
17 the Magistrate Judge.  Thank you.
18     Q  Now, I turn your attention back to your
19 affidavit which is --
20     A  Exhibit 3.
21     Q  Exhibit 3.  Turn your attention to
22 paragraph seven where it says "I have no
23 recollection of ever having any communication with
24 Roger Stone," do you see that?
25     A  Uh-huh.

46

1      Q  Now, it doesn't say you didn't have a
2  communication with Roger Stone.  It just says that
3  you have no recollection of having one, correct?
4      A  That's correct.
5      Q  Do you remember during the Clinton years
6  that witnesses would always come in and say we
7  have no specific recollection and we would contest
8  that?
9      MR. DRISCOLL:  Just ask your question,
10 Larry.
11     Q  So you can't say categorically that you
12 haven't had communications with Roger Stone?
13 You're just saying you don't have a recollection
14 of ever having it, correct?
15     A  I think the statement speaks for itself.
16     Q  You could have said I have never
17 communicated with Roger Stone, correct, if that's
18 what you were trying to say, that you never had
19 any contact?
20     A  The statement speaks for itself.
21     Q  Then you state in the next sentence "I
22 have never published, uttered or implied to Roger
23 Stone that Klayman was the subject of a sexual
24 harassment complaint during his employment by
25 Judicial Watch or that his resignation from

47

1  Judicial Watch was motivated by an employee's
2  sexual harassment complaint," do you see that?
3      A  Yeah.
4      Q  Again, that statement does not say that
5  you never spoke with Roger Stone, just that you've
6  never published that particular issue, correct?
7      A  It says what it says.
8      Q  And then it states "Any statement by Roger
9  Stone regarding Klayman was made without my
10 knowledge or information and therefore I did not
11 intend and could not intend to harm Klayman or his
12 reputation," do you see that?
13     A  Yes.
14     Q  Now, you're not saying in that statement
15 that you didn't communicate with Roger Stone.
16 You're saying that you didn't know that he was
17 going to republish anything about me, correct?
18     MR. DRISCOLL:  Objection to form.  The
19 document speaks for itself.
20     A  The document speaks for itself.
21     Q  If you don't want to explain it that's
22 fine.
23     A  You're mischaracterizing it.
24     Q  I do agree.  It speaks for itself and
25 there's a lot of loopholes in it.

48

1      MR. DRISCOLL:  Why don't you just ask him
2  the question.  Did he ever --
3      MR. KLAYMAN:  I will ask the questions
4  that I want to ask, Mr. --
5      MR. DRISCOLL:  All right.
6      Q  I want to turn to paragraph eight.
7      Do you see the statements in the last
8  sentence of paragraph eight where it says "To
9  support his claim Judicial Watch submitted
10 evidence demonstrating that Klayman was forced to
11 resign due to inappropriate conduct" and you list
12 three examples of your alleged inappropriate
13 conduct, do you see that?
14     A  Yeah.
15     Q  Now, you have in the last 16 years told
16 many people, and I'm excluding any attorneys,
17 exactly what is written in this affidavit and
18 which you swore to under oath?
19     MR. DRISCOLL:  I'm going to object to the
20 question and direct the witness not to answer that
21 question to the extent it's related to the other
22 lawsuit that is currently pending in the U.S.
23 District Court for the District of Columbia, Case
24 Number 06-cv-670.
25     MR. KLAYMAN:  That's not a basis to tell

```
 1            IN THE CIRCUIT COURT OF THE SEVENTEENTH CIRCUIT
         IN AND FOR BROWARD COUNTY AND THE FIFTEENTH JUDICIAL
 2            CIRCUIT FOR PALM BEACH COUNTY, FLORIDA, FLORIDA


 3


 4   LARRY KLAYMAN,
                                    CASE NO. 19-011394
 5              Plaintiff,


 6      -vs-


 7   ROGER STONE,


 8              Defendant.
     _____/
 9
     JEROME CORSI, et al
10
                  Plaintiff
11

12   vs.                    CASE NO. 50-2019-CA-013711

13

14   ROGER STONE, et al

15              Defendant
     _____/

16

17            VIDEOTAPED DEPOSITION OF ROGER STONE

                         VOLUME I OF II
18
                  Wednesday, February 12, 2020
19                  9:42 a.m. - 4:28 p.m.

20

21            110 Southeast 6th Street, Suite 1700
                  Fort Lauderdale, Florida 33301

22

     Stenographically Reported By:
23   PATRICIA BAILEY-ENTIN, FPR
     Notary Public, State of Florida
24   BAILEY & ASSOCIATES REPORTING, INC.
     Fort Lauderdale Office
25   Phone - 954-358-9090
```

1        But let's start with my sworn affidavit on top,

2    and I'll ask that that be marked.  It -- it entails --

3            MR. KLAYMAN:  And you can just mark it right in

4        the book --

5            THE REPORTER:  Sure.

6            MR. KLAYMAN:  -- to make it easy.

7            That's Exhibit 2 to the Stone deposition and it

8        entails 59 pages.

9            (Plaintiffs' No. 2, Affidavit of Larry Klayman,

10    was marked for Identification.)

11   BY MR. KLAYMAN:

12       Q.   You are aware, Mr. Stone, that I'm the founder

13   of Judicial Watch?

14       A.   I am.

15       Q.   You've spoken to Tom Fitton, haven't you?

16       A.   One time in my entire life.  I saw him

17   backstage at a conference in -- at Dural, maybe a couple

18   months ago, and we -- we shook hands in passing.  Beyond

19   that, I've never spoken to the man.

20       Q.   You've spoken to others at Judicial Watch,

21   though, haven't you?

22       A.   No, actually, I haven't.  Not that I recall.

23       Q.   You -- you may have, but you just don't recall?

24       A.   I don't recall ever speaking to anyone at -- at

25   Judicial Watch.  I couldn't name anybody else at

EXHIBIT 3



**Oliver Peer <oliver.peerfw@gmail.com>**

---

## Re: Defamation by Roger Stone, InfoWars, and Alex Jones with regard to Dr. Jerome Corsi

---

**Oliver Peer** <oliver.peerfw@gmail.com>                                   Fri, Jan 25, 2019 at 11:43 AM
To: buschel@bglaw-pa.com, gsmith@strategysmith.com, kcoffey@coffeyburlington.com, contact@randazza.com
Cc: jrlc@optonline.net, Larry Klayman <leklayman@gmail.com>, dgray@graylawgroupnj.com

*This email is being forwarded at the direction of Larry Klayman, counsel to Dr. Jerome Corsi.*

Dear Counsel for Roger Stone, Infowars, and Alex Jones,

As instructed by my client, Dr. Jerome Corsi, please be advised that any further defamation about Dr. Corsi and the undersigned will result in immediate legal action. If you have any further questions, you may contact me at (310) 595-0800.

Sincerely,
Larry Klayman, Esq.
Klayman Law Group P.A.

# EXHIBIT 4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**

DR. JEROME CORSI, ET AL

Plaintiffs

       v.

INFOWARS, LLC, et al

       Defendants.

**Case Number:   1:20-cv-298-LY**

**SWORN DECLARATION OF KELLY MORALES**

1. I, Kelly Morales, hereby declare under penalty of perjury that the following is true and correct and based on my personal knowledge and belief.

2. I am over the age of 18 and mentally and legally competent to make this affidavit, sworn under oath.

3. I am the former wife of Defendant Alex Jones.  I was married to Alex Jones for 12 years and with him for 15 years and we have 3 children together. During our time together, I was involved in the activities of Alex, his father David and Infowars and am intimately knowledgeable about their activities and business structure.

4. Based on my personal knowledge and experience, David Jones runs Infowars with Alex Jones and helps him with his activities, including fixing media stories and endorsing and/or aiding his slanderous and/or fraudulent behaviors, all for profit.

5. Infowars, LLC is a sub-entity of Free Speech Systems, LLC ("FSS"), and David Jones is an employee of FSS, or he has been.

6. David Jones is additionally a managing member of multiple entities that are closely held businesses, constituting financial holding companies or financial distribution centered around Infowars/Alex Jones' supplement line, which are quintessential to funding and running Infowars.

7. Alex Jones could not function without David Jones, and has conspired with him on the past to commit this breach of fiduciary duty and fraud on my business/estate with Alex Jones. While David Jones did this, he slandered and/or defamed me to experts and assisted Alex Jones and his attorneys to do the same, so as to steal/hide my estate and his grandchildren's inheritance.

8. Alex Jones is quasi-illiterate, and cannot use technology or apps such as email with any fluency, and he cannot function without assistance from those around him, including David Jones.

I hereby swear under oath and penalty of perjury that the foregoing facts are true and correct to the best of my knowledge and belief.

Executed on September 30, 2020

Kelly Morales

2

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| Alexander E. Jones, | § | CASE NO. 20-10118-hcm |
| | § | |
| Alleged Debtor. | § | Chapter 11 |
| | § | |

**Affidavit of David Jones in Support of Alleged Debtor's Motion to Dismiss**

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF TRAVIS | § |

BEFORE ME, the undersigned authority, on this day personally appeared David Jones, who after being sworn did state upon his oath, as follows:

1. "My name is David Jones. I am over 18 years of age and otherwise competent and capable of making this Affidavit. I have personal knowledge of the facts set forth herein and they are true and correct.

2. "I have been involved with Alex Jones' personal and business finances for many years and have personal knowledge of the matters set forth herein, and they are true and correct.

3. "I have personally reviewed the Real Estate Lien Note from Alexander Jones to Kelly R. Jones dated March 19, 2015 (the "*Note*"), which is attached to the Involuntary Bankruptcy Petition filed in the above referenced case and have reviewed the record of payments made by Alexander Jones to Kelly R. Jones under the Note. I have personally calculated the remaining balance of the Note. The balance of the Note is $596,267.16 as of the date hereof.

"Further Affiant sayeth not."

SIGNED on this 1⁄1 day of February, 2020.

_____
David Jones

Sworn to and subscribed before me, the undersigned authority, on this 13th day of February, 2020.

_____
Notary Public for the State of Texas
EXP   09-24-2022

PATRICK RILEY
Notary Public, State of Texas
Comm. Expires 09-24-2022
Notary ID 131734177

4837-5475-576

1

Email:leklayman@gmail.com

*Pro Se*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 30th day of September, 2020, a true copy of the

foregoing was filed via ECF and served to all counsel of record though the Court's ECF system.

*/s/ Larry Klayman*

# EXHIBIT D

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS**

DR. JEROME CORSI, et al

        Plaintiffs

    v.

INFOWARS, LLC, et al

        Defendants.

**Case Number: 1:20-cv-298-LY**

**PLAINTIFFS JEROME CORSI AND LARRY KLAYMAN'S MOTION TO HAVE
PRESIDING JUDGE DECIDE OUTSTANDING MOTIONS TO DISMISS**

Plaintiffs Dr. Jerome Corsi and Larry Klayman hereby respectfully move the presiding judge, the Honorable Lee Yeakel ("Judge Yeakel"), to decide the outstanding motions to dismiss and vacate the order staying discovery and would respectfully show the following:

At the very outset of this case, after it was transferred from the U.S. District Court for the District of Columbia, with the presiding judge there having found that the Western District of Texas was the more appropriate venue and jurisdiction, this honorable Court made it crystal clear that he likes to move cases quickly to trial and strong disfavors motions to dismiss unless under the most compelling of circumstances. Here is what this honorable Court stated in two status conferences at the outset of this case before it:

> You're going to have to figure how much time you want because once I get it set, once I fill in after a subsequent conference your trial month and final pretrial conference date and time, you're not likely to get a continuance or a postponement.

> I like to try lawsuits. If I had my way and could pass one law, I would do away with motion practice altogether, and you would either settle your case or try your case, the way it was in the olden days. Exhibit A.

Accordingly, Plaintiffs, who continue to suffer severe damage by virtue of the continuing defamation and other illegal actions of Defendants – which defamation is not new but is a pattern

and practice with regard to many  their victims, including but hardly limited to the Sandy Hook families. It was thus  expected that when this honorable Court assigned these motions to dismiss to the Magistrate Judge to make a report and recommendation that this would occur promptly or at least within a reasonable amount of time. However, this has not occurred, and the Magistrate Judge has not made any such recommendation for over  seven months, since the motions were filed.

More troubling are unjustified statements made at a hearing on March 23, 2021, where the Magistrate Judge also stayed discovery, with the primary premise that it does not matter since it will be a long time until this case ever gets trial, if at all – adding that he is retiring on May 31, 2021. To add insult to injury, the Magistrate Judge also made statements which show that he has, without good cause and likely without thoroughly reviewing the pleadings, prejudged the merits of Plaintiffs' Amended Complaint.

Here is what the Magistrate Judge said at the hearing of March 23, 2021 where he unjustifiably stayed discovery contrary to this Honorable Court's expressed desire to move things along:

> Thank you. So I -- my ruling is going to be that I'm going to continue the stay that was put in place through today or through this hearing until we get rulings on the 12(b)(6) motions. And we will try to give those priority as much as possible. I can give you one deadline, which is that I'm retiring on May 31st is my last day on the bench. So I'm going to get it done before then. So you should get rulings on the 12(b)(6). They'll be, obviously, report and recommendations of a magistrate judge, so you'll have proceedings after that in front of Judge Yeakel. But I'll get them done before then.

However, the basis of the Magistrate Judge's prejudgment are invalid and while a simple review of the Amended Complaint shows this, his statements were based on a newly appointed ethically challenged 39 year old judge Roy Altman in Palm Beach, Florida, who, even before the complaint before the U.S. District Court for the Southern District of Florida was served, issued

an unprecedented "Order Requiring More Definite Statement,' which belittles the serious allegations of Mr. Klayman, and seeks to protect Roger Stone, a close Trump confidant who likely recommended this Palm Beach judge to the federal bench during the Trump presidency. Stone lives in South Florida and he and the Palm Beach judge undoubtedly know each other through Republican circles in this close-knit community.

At the outset of his bizarre and improper order, the Palm Beach judge, Roy Altman, incredibly wrote:

> "Larry Klayman was upset when Roger Stone called him "incompetent" on national television (ECF No. 1) para 44. So, he filed this Complaint – which when attachment are included – is 47 pages long. See id. at 1-46."

A review of the Complaint and this case shows that the malicious defamation of the Defendants goes far beyond that, as it does in this case before this honorable Court. *See* Exhibit B.

As a result of this apparent bias, if not unethical conduct by Judge Altman in violation of the Code of Judicial Conduct, Mr. Klayman filed "Plaintiff Larry Klayman's Notice of Voluntary Dismissal and the case was dismissed, since he obviously saw that he could not get a fair adjudication before this apparently compromised judge. Exhibit B. The complaint was thus voluntarily dismissed and thus Judge Altman's unsolicited, improper and highly prejudiced Order Requiring More Definite Statement is of no force or effect.

Moreover, Mr. Klayman wanting to confirm the motivation for Judge Altman's unprecedented and at best rogue Order, filed "Plaintiff Larry Klayman's Request for Disclosure," inquiring and asking for a good faith response about Judge Altman's likely involvement with Roger Stone. And when this request went unanswered, Mr. Klayman filed a complaint with the Judicial Council of the Eleventh Circuit, seeking to compel a response. Predictably, the Judicial

Council has sat on this complaint and never responded to Mr. Klayman.

All of this was hopefully past but sad history, that is until the Magistrate Judge, improperly relying on Judge Altman's unethical missive, showed his hand:

> THE COURT: And I agree. I'm not suggesting that. But -- but I think you -- it's hard to read those two orders and think that they -- they thought that this was a very strong case.
> Obviously, the sua sponte order entered in Florida was done because that judge, at least, did not think there was enough pled there to demonstrate that it overcame problems that he saw with it.
> MR. KLAYMAN: Your Honor –
> THE COURT: We're not bound by those courts, nor –
> MR. KLAYMAN: I have a -- I have a complaint pending against that judge, Roy Altman, with the Judicial Council. Okay. He overstepped his bounds.
> THE COURT: Good luck.
> MR. KLAYMAN: He probably knows -- yeah. I know "good luck." Judges usually just avoid them. Okay? I'm being kind. We have to answer as lawyers, but judges don't have to answer generally. Exhibit C.

For these reasons, as well as the inordinate delay in ruling on Defendants motions to dismiss, and without good cause staying discovery, Plaintiffs respectfully request that this Honorable Court itself rule on them as well as to vacate the stay on discovery, to allow this case to finally move forward. In addition, any report and recommendation by the Magistrate Judge will be subject to objections by either side, further delaying adjudication of this case, contrary to the expressed practice of this honorable Court. Finally, there is the issue of prejudgment by the Magistrate Judge unjustifiably based on Judge Altman's unethical and rogue order, and this improper Order does not apply or relate to Plaintiff Corsi in any event, however outrageous it was.

Finally, on several occasions Plaintiff Larry Klayman has offered to defense counsel to agree to consolidate the action against Roger Stone and the Infowars Defendants, *Klayman v. Infowars* 20-cv-61912 (S.D. FL), before this Honorable Court, but his counsel have refused to agree, instead complaining strategically to this honorable Court about the case in Florida.

For all of these compelling reasons, Plaintiffs respectfully request that the pending

motions be decided by the presiding judge, the Honorable Lee Yeakel, as justice delayed is

justice denied, especially given the continuing damage inflicted upon Dr. Corsi and Mr. Klayman

by the Infowars Defendants, who have a documented history of similar acts against others, such

as the Sandy Hook families who lost their children in an heinous massacre which the Infowars

Defendants falsely claimed was a hoax. It is no coincidence that the Infowars Defendants were

also sued in this regard, which is not isolated but is their modus operandi to make money on the

internet. Exhibit D.

Plaintiffs have asked Defendants for their consent to this motion and they refused to

agree.

Dated: April 13, 2021                                    Respectfully Submitted,


                                                         /s/Sanjay Biswas
                                                         SANJAY BISWAS, Esq.
                                                         #24061235—Texas
                                                         #24966--Louisiana
                                                         11720 Duxbury Dr.
                                                         Frisco, Texas 75035
                                                         Telephone: (972)-866-5879
                                                         Email:sanjaybiswas41@gmail.com
                                                         Fax: 1-800-506-6804

                                                         *Counsel for Dr. Jerome Corsi*

                                                         /s/Larry Klayman
                                                         Larry Klayman
                                                         7050 W. Palmetto Park Rd
                                                         Boca Raton FL, 33433
                                                         Email:leklayman@gmail.com
                                                         Fax: 561-558-5336

                                                         *Plaintiff Pro Se*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on April 13, 2021, a true copy of the foregoing was filed via ECF and served to all counsel of record though the Court's ECF system.

*/s/ Sanjay Biswas*

EXHIBIT A

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE WESTERN DISTRICT OF TEXAS
 2                        AUSTIN DIVISION

 3   JEROME CORSI, LARRY KLAYMAN,         ) AU:20-CV-00298-LY
                                          )
 4      Plaintiffs,                       )
                                          )
 5   v.                                   ) AUSTIN, TEXAS
                                          )
 6   INFOWARS, LLC, FREE SPEECH SYSTEMS, LLC, )
     ALEX E. JONES, DAVID JONES, OWEN SHROYER, )
 7                                        )
        Defendants.                       ) MAY 21, 2020
 8
             ***********************************************
 9              TRANSCRIPT OF TELEPHONE CONFERENCE
                BEFORE THE HONORABLE LEE YEAKEL
10           ***********************************************

11   APPEARANCES:

12   FOR THE PLAINTIFFS:  LARRY KLAYMAN
                          KLAYMAN LAW GROUP P.A.
13                        2020 PENNSYLVANIA AVENUE NW, SUITE 800
                          WASHINGTON, D.C. 20006
14
     FOR THE DEFENDANTS:  JAY MARSHALL WOLMAN
15                        RANDAZZA LEGAL GROUP, PLLC
                          100 PEARL STREET, 14TH FLOOR
16                        HARTFORD, CONNECTICUT 06103

17                        BRADLEY JORDAN REEVES
                          REEVES LAW, PLLC
18                        702 RIO GRANDE STREET, SUITE 306
                          AUSTIN, TEXAS 78701
19
                          MARC J. RANDAZZA
20                        RANDAZZA LEGAL GROUP, PLLC
                          2764 LAKE SAHARA DRIVE, SUITE 109
21                        LAS VEGAS, NEVADA 89117

22                        DAVID SCOTT WACHEN
                          WACHEN LLC
23                        11605 MONTAGUE COURT
                          POTOMAC, MARYLAND 20854
24

25
```

```
 1                          GREGORY P. SAPIRE
                            SOLTERO SAPIRE MURRELL PLLC
 2                          7320 NORTH MOPAC EXPRESSWAY, SUITE 309
                            AUSTIN, TEXAS 78731-2311
 3
     COURT REPORTER:        ARLINDA RODRIGUEZ, CSR
 4                          501 WEST 5TH STREET, SUITE 4152
                            AUSTIN, TEXAS 78701
 5                          (512) 391-8791

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   Proceedings recorded by computerized stenography, transcript

25   produced by computer.
```

| | | |
|---|---|---|
| 09:44:34 | 1 | months here doesn't mean anything.  I realize this case may |
| 09:44:38 | 2 | have sat around in the previous court for a while.  That's not |
| 09:44:43 | 3 | your fault; that's not my fault.  I got it for new when it got |
| 09:44:49 | 4 | filed this year, and that's what I'm picking up with. |
| 09:44:54 | 5 | You're going to have to figure how much time you want |
| 09:45:00 | 6 | because once I get it set, once I fill in after a subsequent |
| 09:45:06 | 7 | conference your trial month and final pretrial conference date |
| 09:45:16 | 8 | and time, you're not likely to get a continuance or a |
| 09:45:20 | 9 | postponement. |
| 09:45:21 | 10 | So sit down, presume for the moment that the motion |
| 09:45:28 | 11 | to dismiss is denied, and schedule your case accordingly.  And |
| 09:45:33 | 12 | then if the motions to dismiss are granted, then it just got |
| 09:45:36 | 13 | easier for everybody.  So put those dates firmly in your mind |
| 09:45:45 | 14 | because, as I said, once I have scheduled you for final |
| 09:45:50 | 15 | pretrial conference and trial, I am not likely to change those |
| 09:45:55 | 16 | dates. |
| 09:45:55 | 17 | You'll hear about this again.  I've told you about |
| 09:45:59 | 18 | the large dockets we have.  It creates far too big a ripple |
| 09:46:03 | 19 | effect through my docket if I start trying to reset things, so |
| 09:46:08 | 20 | I simply don't do it. |
| 09:46:10 | 21 | Each of you needs to understand you only have one |
| 09:46:12 | 22 | role in this case, and that's to resolve it.  And you can do in |
| 09:46:17 | 23 | one of three ways -- and you will hear this again -- you could |
| 09:46:21 | 24 | settle it or I could grant a well-taken dispositive motion for |
| 09:46:26 | 25 | one or more defendants, be it a motion to dismiss or a motion |

| | | |
|---|---|---|
| 09:46:32 | 1 | for summary judgment or any other nature of dispositive motion, |
| 09:46:37 | 2 | or you can try the case.  And I don't care which of the three |
| 09:46:40 | 3 | alternatives it is. |
| 09:46:42 | 4 | I like to try lawsuits.  If I had my way and could |
| 09:46:47 | 5 | pass one law, I would do away with motion practice altogether, |
| 09:46:51 | 6 | and you would either settle your case or try your case, the way |
| 09:46:55 | 7 | it was in the olden days.  And it was a much better system |
| 09:47:00 | 8 | before we developed this cottage industry about discovery and |
| 09:47:04 | 9 | motions practice. |
| 09:47:05 | 10 | So I'm not going to get you back here before your |
| 09:47:07 | 11 | trial and knock you around about why you haven't settled. |
| 09:47:12 | 12 | You're not going to be pushed as you go along to get your case |
| 09:47:16 | 13 | settled.  If you get it settled, that will be fine.  But that |
| 09:47:20 | 14 | is not anything that particularly bothers me. |
| 09:47:23 | 15 | I also don't care about controversial cases or |
| 09:47:28 | 16 | parties, and I don't care how long it takes to try a case. |
| 09:47:31 | 17 | Lengthy cases do not bother me.  However, I will tell you now |
| 09:47:36 | 18 | that you will get put on a clock.  At the appropriate point in |
| 09:47:43 | 19 | this case we will discuss how much time you're going to get to |
| 09:47:46 | 20 | try in your case, so you need to factor into what you're doing |
| 09:47:49 | 21 | that you're not going to get unlimited time to try your case. |
| 09:47:52 | 22 | So how long do you think you need to get in a |
| 09:47:56 | 23 | scheduling order for me? |
| 09:48:02 | 24 | MR. KLAYMAN:  Your Honor, I think we can do it in |
| 09:48:04 | 25 | ten days. |

EXHIBIT B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

LARRY KLAYMAN,

        Plaintiff

    v.

INFOWARS, LLC
100 Congress Ave., 22nd Floor
Austin, TX 78701

And

FREE SPEECH SYSTEMS, LLC
100 Congress Ave., 22nd Floor
Austin, TX 78701

And

ALEX E. JONES, Individually
3019 Alvin Devane Blvd., Suite 300-350
Austin, TX 78741

And

DAVID JONES, Individually
3019 Alvin Devane Blvd., Suite 300-350
Austin, TX 78741

And

OWEN SHROYER, Individually
3019 Alvin Devane Blvd., Suite 300-350
Austin, TX 78741

        Defendants.

**Case Number:**

**COMPLAINT**

## INTRODUCTION

Plaintiff LARRY KLAYMAN ("Klayman") hereby files this action against INFOWARS,

LLC ("Defendant InfoWars"), FREE SPEECH SYSTEMS, LLC ("Defendant Free Speech

Systems"), ALEX E. JONES ("Defendant Alex Jones"), DAVID JONES ("Defendant David Jones") and OWEN SHROYER ("Defendant Shroyer") for Defamation, violation of the Lanham Act, and violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

## JURISDICTION AND VENUE

1.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 under diversity of citizenship. The parties are citizens of different states and the amount in controversy exceeds $75,000.

2.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) as this is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

## THE PARTIES

3.    Plaintiff Klayman is a public interest legal advocate, private practitioner and litigator who represents Plaintiff Corsi with regard to Special Counsel Robert Mueller's ("Mueller") Russian collusion investigation.  Plaintiff Klayman is also a media personality and author, columnist and syndicated radio talk show host. Plaintiff Klayman is a citizen of Florida.

4.    Defendant InfoWars is a limited liability company with principal offices located in Austin, TX and does substantial commercial and other business in the district, from which it derives substantial revenues directly and/or indirectly.

5.    Defendant Free Speech Systems is a  limited liability company with principal offices located in Austin, TX and does substantial commercial and other business in this district, from which it derives substantial revenues directly and/or indirectly.

6.    Defendant Alex Jones is a well-known extreme and totally discredited "conspiracy theorist" and media personality who creates content that is broadcasted on the radio and posted on the internet at www.infowars.com and elsewhere on the internet and other social media sites and

does substantial business in this district from which he derives substantial revenues, directly and/or indirectly. Defendant Alex Jones is a citizen of Texas.

7.      Defendant David Jones is Defendant Alex Jones's father and holds the official title of Director of Human Relations for Defendant Free Speech Systems. On information and belief, Defendant David Jones is the owner of Defendants InfoWars and Free Speech Systems and he manages the business activities for Defendants InfoWars and Free Speech Systems, as well as Defendant Alex Jones' other companies. At all material times he worked in concert with the other Defendants and Roger Stone and furthered and ratified and furthered the illegal acts set forth in this Complaint and does substantial business in this district, from which he derives substantial revenues, directly and/or indirectly. Defendant David Jones is a citizen of Texas.

8.      Defendant Shroyer is a newscaster for Defendant InfoWars and does substantial business in this district, from which he derives substantial revenues, directly and/or indirectly. Defendant Shroyer is a citizen of Texas.

9.      All of the Defendants, each and every one of them, does substantial commercial and other business in this district, not only broadcasting daily into this district for profit, but also selling products for profit continuously in this district, from which they derives substantial revenues, directly and/or indirectly.

## **GENERAL ALLEGATIONS**

10.      Defendant InfoWars and Defendant Free Speech Systems are both owned, controlled, and operated by Defendant Alex Jones and David Jones. Defendant Free Speech Systems owns www.infowars.com, where content created by Defendants Alex Jones and Shroyer are posted and broadcast into this district, nationally and internationally.

11.      Defendant Alex Jones hosts *The Alex Jones Show*, which is broadcast on radio

and internet social media networks throughout the United States of America and internationally, including this judicial district, and online.

12.    Defendant Shroyer hosts *The War Room* along with Roger Stone ("Stone"), which is broadcast on radio and internet social media networks throughout the United States of America and internationally, including this judicial district, and online.

13.    Defendants' reach and influence are enormous. On information and belief, Defendant Alex Jones and InfoWars has a radio audience of over two million people. Before it was banned from YouTube, Defendant Alex Jones' and InfoWars' channel had more than 2.4 million subscribers, which in part accounts for the huge amount of substantial business which it does in this district.[1]

14.    Defendants, each and every one of them, in concert, do substantial business and promote and sell various goods in this judicial district and nation-wide, including medicine, supplements, and "tchotchkes" with InfoWars branding. The money earned from these sales funds the conspiracy between Defendants and Stone to defame, intimidate, coerce and threaten Plaintiff Klayman  in order to have tried to improperly influence the Mueller Russian collusion investigation and to coerce false testimony from Plaintiff's client, Jerome Corsi, favorable to Stone in his upcoming criminal prosecution.

15.    Stone also does business promotes and sells various goods in this judicial district and nation-wide, including medicine, supplements, books, and "tchotchkes" with his own branding. The money earned from these sales funds Stone's legal defense fund and the conspiracy between Defendants and Stone to defame, intimidate, coerce and threaten Plaintiffs in

---

[1] Casey Newton, *YouTube deletes Alex Jones' channel for violating its community guidelines*, The Verge, Aug. 6, 2018, available at: https://www.theverge.com/2018/8/6/17656708/youtube-alex-jones-infowars-account-deleted-facebook-apple-spotify

were used in order to try to improperly influence the Mueller Russian collusion investigation and to have attempted to coerce false testimony from Plaintiff Corsi favorable to Stone in his criminal prosecution, for which he was convicted on seven felony counts of perjury, obstruction of justice and witness tampering.

16.     Defendants, each and every one of them, jointly and severally,  have a long and sordid history of publishing and broadcasting defamatory material, including falsely, recklessly such as by baselessly accusing the families of the schoolchildren who lost their lives during the 2012 Sandy Hook Elementary School massacre of staging the massacre and faking the deaths of their children.[2]

17.     The Sandy Hook families had to endure years of abuse and torture from Defendants before finally filing suit against numerous parties involved with InfoWars, including Defendant Alex Jones and Shroyer, for defamation.

18.     As just one example, a Florida woman was arrested for making  death threats to a parent of a Sandy Hook victim.[3] According to the U.S. Department of Justice, the motivation behind the threats was the lies propagated by Defendants that the Sandy Hook massacre was a hoax.[4]  This underscores Defendants substantial activities and reach into Florida and this district.

19.     Furthermore, Defendant Alex Jones in concert with the other Defendants propagated and promoted the "Pizzagate" conspiracy on his show, accusing a restaurant called Comet Ping Pong in the Washington D.C. area of operating a child sex ring in its non-existent

---

[2] Aaron Katersky, *Families of Sandy Hook shooting victims win legal victory in lawsuit against InfoWars, Alex Jones*, ABC News, Jan. 11, 2019, available at:
https://abcnews.go.com/US/families-sandy-hook-shooting-victims-win-legal-victory/story?id=60314174
[3] Daniella Silva, *Conspiracy Theorist Arrested for Death Threats Against Sandy Hook Parent*, NBC News, Dec. 7, 2016, available at: https://www.nbcnews.com/news/us-news/conspiracy-theorist-arrested-death-threats-against-sandy-hook-parent-n693396
[4] *Id.*

basement that purportedly involved Hillary Clinton and John Podesta. This caused one of his listeners to shoot up the restaurant after being told by Defendant Jones to "self-investigate" the "Pizzagate" conspiracy theory.[5]

20.     Defendants, acting in concert, propagated these outrageous lies in this district and elsewhere in Florida  with no regard for the grief of their victims in order to gain notoriety, fame, and profit.

21.     Defendants, acting in concert, as part of their latest scheme for notoriety, fame, and profit, are now working in concert with Stone to defame, intimidate, and threaten Plaintiff.

22.     Stone, who was indicted and then convicted on witness tampering and obstruction of justice by Special Counsel Robert Mueller, placed under a total gag order by the jurist, the Honorable Amy Berman Jackson,  presiding over his prosecution for, in part, even threatening her, and then convicted has appeared numerous times on shows broadcasted by Defendant InfoWars, and hosted by Defendants Alex Jones and Shroyer, where Stone and Defendants have published malicious false, misleading, and defamatory statements concerning Plaintiff

23.     The indictment comprised seven different felony counts. *See* Exhibit 1 – Mueller Indictment.  Importantly, Dr. Corsi was not accused of any wrongdoing or illegality in the Mueller Indictment, in which he named as Person 1, a material witness to the alleged crimes committed by Stone. (Note: The facts set forth in all Exhibits attached to and referenced in this Complaint are factually incorporated into this Complaint by reference).

24.     Specifically, the seven count Mueller Indictment against Stone, pursuant to which he was convicted on seven felony counts for perjury, obstruction of justice and witness

---

[5] James Doubek, *Conspiracy Theorist Alex Jones Apologizes For Promoting 'Pizzagate'*, NPR, Mar. 26, 2017, available at: https://www.npr.org/sections/thetwo-way/2017/03/26/521545788/conspiracy-theorist-alex-jones-apologizes-for-promoting-pizzagate

tampering  alleged lying under oath - that is, perjury - witness tampering and obstruction of justice by threatening to kill a material witness, Randy Credico ("Credico") and his service dog, if Credico did not lie to government authorities concerning his involvement with Roger Stone. Credico is Person 2 in the Mueller Indictment of Stone. *Id.* Person 1 in this Mueller Indictment is Dr. Corsi.

25.     Even before Stone was indicted, he began a public relations campaign in this district, nationally and internationally to maliciously defame, smear, intimidate and threaten Dr. Corsi and Plaintiff Klayman, Dr. Corsi's lawyer and defense counsel.

26.     Stone knew that he was going to be indicted, and therefore began this public relations campaign to maliciously defame smear, intimidate and threaten Plaintiff Klayman, even before his actual indictment on January 25, 2019, in order to try to influence public opinion and Special Counsel Robert Mueller – by trying to attribute guilt to Dr. Corsi and not him - as well as to try to raise money for his legal defense.

27.     Stone likes to portray himself as Mafia, and indeed on information and belief has Mafia connections, frequently making reference to Mafia figures who he admires, as well as other unsavory types who have been alleged to have engaged in unethical and/or illegal behavior. For example, he frequently makes reference to his heroes being Hyman Roth in the 'Godfather," who was the movie version of Meyer Lansky, and Roy Cohn, not to mention, Richard Nixon, for his role in Watergate. In this regard, after Stone was indicted he held a press conference on the courthouse steps of the federal courthouse in Ft. Lauderdale, where he was booked, with his arms defiantly in the air in the "victory' pose used by Nixon after he resigned in disgrace as a result of the Watergate scandal. At the time, Stone had been employed by a Nixon group called CREEP, or the Committee to Reelect the President.  Defendant Stone even has a large tattoo of Richard

Nixon affixed to his back. Thus, given his admiration for persons such as these, particularly Mafia figures, his actions as pled herein can be taken as threats, as well as being defamatory. And, Plaintiff Corsi is 72 years old and thus very vulnerable emotionally and physically to these threats. Stone's intentional infliction of emotional distress and coercion and threats are intended to try even cause Plaintiff Corsi to have heart attacks and strokes, in order that Plaintiff will be unable to testify at Stone's criminal trial. Tellingly, Stone threatened kill a material witness and his service dog, Credico, Person 2 in the Mueller Indictment, "Mafia style." Stone also fashions himself and indeed has the reputation, at a minimum, as being the preeminent "dirty trickster." *See* "Get Me Roger Stone" on Netflix.

28. By defaming Plaintiff, Stone was hoping to not only intimidate Plaintiff to severely harm and damage their reputations, but also to try to coerce and threaten Dr. Corsi to testify falsely if subpoenaed if he had been called as a material witness in Stone's ensuing criminal trial. He was also trying divert funds away from Dr. Corsi's legal defense fund and drain Plaintiff Klayman while boosting his own legal defense fund.

29. Defendants and Stone's conspiracy to defame, smear, intimidate, tamper with and threaten Plaintiffs was calculated to improperly and illegally influence the Russian collusion investigation, for which Stone was later criminally indicted and convicted and to coerce false testimony favorable to Stone at his criminal prosecution.  This illegal conduct is also maliciously intended to harm Plaintiff Klayman's reputations and credibility as Stone fears that Dr. Corsi, Klayman's client,  would have testified truthfully once subpoenaed by Special Counsel Mueller at Stone's criminal prosecution, which Dr. Corsi was by all parties but did not ultimately testify.

30. Tellingly, in a video published by The Daily Caller, Defendant Shroyer appearing with Stone, admits that he will serve as a surrogate for Stone if Stone receives a gag order, which

he has. 6  The other Defendants, like Stoyer, are also surrogates of Stone.

31.     Stone's illegal and improper attempts to influence the Russian collusion investigation were even been recognized by the presiding judge, the Honorable Amy Berman Jackson ("Judge Jackson"), who issued a complete "gag" order on Stone after Stone attempted to incite violence against Judge Jackson by putting a picture of her face and gun crosshairs up on his Instagram account.7

32.     In her minute order of February 21, 2019 imposing the total "gag" order on Stone, Judge Jackson directly cites and references his use of surrogates:

> Furthermore, the defendant may not comment publicly about the case indirectly by having statements made publicly on his behalf by surrogates, family members, spokespersons, representatives, or volunteers.

33.     Defendants, each and every one of them, jointly and severally, have, by working in concert with Stone, therefore engaged in illegal witness tampering, intimidation and threats in violation of 18 U.S.C. § 1512 by virtue of the defamatory and threatening acts and practices as alleged herein. Not coincidentally, this was what largely Stone was indicted  and later convicted for  by Special Counsel Robert Mueller.

## DEFENDANTS' DEFAMATORY CONDUCT

34.     Stone has appeared numerous times on programs of the Defendants, *The Alex Jones Show* and The *War Room*, which are hosted by Defendant Alex Jones and Shroyer where numerous false, misleading, malicious and defamatory statements of and concerning Plaintiff were made, published, and or ratified by all of the Defendants, each and every one of them.

---

6 https://www.youtube.com/watch?v=SSDkh5RYtGo
7 *Judge in Roger Stone case orders hearing after he appeared to threaten her on Instagram*, Washington Post, Feb. 19, 2019, available at:
https://www.washingtonpost.com/politics/2019/02/18/roger-stone-deletes-photo-judge-presiding-over-his-case-says-he-didnt-mean-threaten-her/?utm_term=.2d3c5afa6326

35.    Plaintiff has demanded retraction and correction of the defamatory videos and publications set forth below and generally in this Complaint, but Defendants have refused, thereby ratifying any and all defamatory statements contained therein.

36.    Defendants, each and every one of them, as set forth herein,  acted with actual malice, in concert, as joint tortfeasors, as they knew that the statements which they published were false, especially since have known Plaintiff Klayman and had him as a guest commentator and newsmaker on their broadcasts  for many years and intimately know of his background and significant accomplishments. As a result,  each of the Defendants were well aware that the statements made by Stone were false, misleading, malicious  defamatory statements, published with actual malice by an unstable self-styled dirty trickster and now convicted felon.  In addition, all of the Defendants, each and every one of them,  ratified  the malicious false statements published by Stone on their networks and media sites and when Plaintiff made a demand to retract them, each of the Defendants refused. Defendants, having been sued by other victims in similar situations, think they are above the law of defamation in particular,  and have engaged, as pled herein, in a pattern and practice of behavior which flouts not just the law but human decency.

37.    As the content containing the malicious false, misleading, and defamatory statements were published on the internet, it is proliferated like a "cancerous virus," and is now available for viewing from countless sources, thereby exponentially increasing the prejudicial and defamatory impact and severe damage inflicted on Plaintiff. Judge Jackson, in issuing her two gag orders against Stone, herself recognized how postings on the internet proliferate widely and once made cannot be taken back.

### I.    *The January 18, 2019 Video*

10

38.     Before Stone was indicted, on or about January 18, 2019, he appeared on *The War Room* with Defendant Shroyer, where he made several malicious false, misleading, and defamatory statements in this district,  nationally and internationally  regarding Plaintiff (the "January 18 Video").8 The same video was published on Stone's YouTube channel, "*Stone Cold Truth*," on January 18, 2019.9

39.     These malicious false, misleading, and defamatory statements were adopted and published by each and every one of the Defendants, rendering them joint tortfeasors and jointly and severally liable.

40.     At 1:25 in the January 18 Video, Stone maliciously falsely published that "He's (Klayman) never actually won a courtroom victory in his life."

41.     At 1:30 in the January 18 Video, Stone and the Defendants, each and every one of them jointly and severally at joint tortfeasors, maliciously falsely published, "He (Klayman) was ousted at Judicial Watch. Ask Tom Fitton [the current president of Judicial Watch] why he left. He was 'ousted' because of a 'sexual harassment complaint.'"

42.     In actuality and truth, Plaintiff Klayman left Judicial Watch on his own accord in order to run for U.S. Senate in Florida in 2003-2004.

43.     Not coincidentally, Plaintiff Klayman has a jury verdict and judgment against Fitton's Judicial Watch for having defamed him with malice. Punitive damages were also awarded by the jury in the U.S. District Court for the Southern District of Florida.

44.     At 1:37 in the January 18 Video, Stone maliciously falsely published, "He's (Klayman) incompetent, he's a numbskull, he's an idiot, he's an egomaniac, and he could be the single worst lawyer in America. With him as Jerry Corsi's lawyer, Corsi may get the electric

8 https://www.infowars.com/watch/?video=5c3fbf24fe49383dcf6996e4
9 https://www.youtube.com/watch?v=cJyfgdvtFx8

chair. So your idea that he's a good guy is entirely wrong"

45.     In actuality, Plaintiff Klayman has been a practicing attorney for over four decades and has won numerous cases on behalf of his clients and also against the government for constitutional and other violations.   He is the founder of both Judicial Watch and Freedom Watch, a former candidate for the U.S. Senate in Florida, a former trial attorney and prosecutor of the Antitrust Division of the U.S. Department of Justice, where he was a member of the trial team that successfully broke up the AT&T monopoly and created competition in the telecommunications industry. Among many other legal victories, Plaintiff Klayman also won landmark decisions at the chairman and general counsel of Freedom Watch enjoining the illegal mass surveillance by the National Security Agency. *Klayman v. Obama*, 1:13-cv-851 (D.D.C). *See* Exhibit 2 --*Klayman biography*, which is incorporated herein by reference. Stone knew this when he published the malicious false and misleading statements about Klayman and thus willfully and maliciously defamed Plaintiff Klayman.

46.     At 2:01 in the January 18 Video, Stone and each and every one of the Defendants, jointly and severally as joint tortfeasors, maliciously falsely and misleadingly published that Plaintiff Klayman is a "piece of garbage."

47.     At 4:11 in the January 18 Video, Stone and each and every one of the Defendants, jointly and severally as joint tortfeasors, maliciously falsely and misleadingly published, "For those people out there who think…that Larry Klayman's IQ is higher than 70, you're wrong…"

48.     Defendants published these malicious false, misleading, and defamatory statements with malice and with full knowledge that they were false and misleading, and/or at a minimum, with a reckless disregard for its truthfulness. These statements falsely and misleadingly state that Plaintiff Corsi was fired from World Net Daily, that he committed perjury

(a federal offense), and that he is an untruthful person. They also create the false and misleading implication that Plaintiff Klayman is unqualified to be an attorney, public advocate and is a bad and loathsome person. Plaintiff Klayman is also an author, columnist and nationally syndicated radio and internet talk show host on Radio America, his show titled "*Special Prosecutor with Larry Klayman*." *See* www.radioamerica.com. The malicious false and misleading published statements as alleged herein also severely damaged Plaintiff Klayman personally and professionally in this regard, particularly since he and his show compete with Defendant InfoWars and and the other Defendants in media markets in this district, nationally and internationally. Plaintiff Corsi also competes with Defendant InfoWars and the other Defendants in media markets in this district, nationally and internationally.

## FACTS PERTAINING TO DEFENDANTS' UNFAIR COMPETITION

49.    In addition to being an investigative journalist/author and a public interest litigator/advocate, respectively, Plaintiff Klayman is a competitor to Defendants as conservative media personalities, broadcasters, authors and columnists on social media and elsewhere.

50.    For instance, Plaintiff Klayman also hosts an online radio show and produces videos that are posted on the internet, issues press releases, commentary and other publications.

51.    Defendants, each and every one of them jointly and severally as joint tortfeasors, have made, adopted, and or ratified numerous false or misleading statements of fact of and concerning Plaintiff during their various programs and media postings and publication, which all contain significant advertisement or promotions.

52.    These false and/or misleading facts materially prejudice the viewers and/or listeners as to the quality, nature, and contents of Plaintiff's services, which has caused significant competitive and commercial injury to Plaintiff, as well as loss of good will and

reputation.

53.     Plaintiff, like Defendants, rely on viewer and listener financial support and sales in order to continue their work. Defendants' false and/or misleading statements concerning Plaintiffs is meant to, and has, diverted financial support and sales away from Plaintiffs and to Defendants instead.

## FIRST CAUSE OF ACTION
### *Defamation*

54.     Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

55.     Acting in concert, Defendants published malicious, false, misleading and defamatory statements of and concerning Plaintiff in this judicial district, nationwide, and worldwide.

56.     These false and misleading statements were published with malice, as Defendants knew that they were false and misleading, or at a minimum acted with a reckless disregard for the truth.

57.     Plaintiff has been severely harmed and damaged by these false and misleading statements because they subjected him to hatred, distrust, ridicule, contempt, and disgrace.

58.     Plaintiff has been damaged by these false and misleading statements because they severely injured Plaintiff Klayman in his profession and businesses, as well as severely injured and damaged him personally, financially and in terms of his good will and reputation.

## SECOND CAUSE OF ACTION
### *Defamation Per Se*

59.     Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

60.     Acting in concert, Defendants, as alleged herein, published numerous false, misleading and defamatory statements to severely harm and damage Plaintiff, which were republished elsewhere, and through surrogates, which published the falsity that Plaintiff have committed crimes, engaged in moral turpitude, and committed sexual misconduct, as set forth in the preceding paragraphs.

61.     These false, misleading and defamatory statements were published in this district and on the internet and elsewhere, domestically and for the entire world to see and hear and in so doing Defendants published false and misleading facts, *inter alia*, that Plaintiff's conduct, characteristics or a condition are incompatible with the proper exercise of his lawful business, trade, profession or office, as well as personally.

62.     These false and misleading statements were published with malice, as Defendants knew that they were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

63.     This statements are *per se* defamatory because they falsely and misleadingly published that Plaintiff Klayman had committed sexual misconduct which are federal offense and felony. Defamation *per se* gives rise to the presumption that severe harm and damage has arisen by virtue of the malicious false and misleading statements.

64.     These malicious false, misleading, and defamatory statements are defamatory *per se* and these false and misleading statements severely harmed and damaged Plaintiff Klayman in his profession as a public interest and private advocate and litigator and as an author, columnist and radio and internet radio talk show and syndicated host, as well as personally.

### THIRD CAUSE OF ACTION
### *Defamation by Implication*

65.     Plaintiff re-alleges and incorporates by reference the allegations in the preceding

paragraphs of the Complaint as if fully set forth herein.

66.     Acting in concert, Defendants published numerous false, misleading and defamatory statements about Plaintiff, as set forth in the preceding paragraphs.

67.     These false, misleading and defamatory statements were published on the internet and published and republished elsewhere in this district, domestically and for the entire world to see and hear.

68.     These false and misleading statements were published with malice, as Defendants knew that they were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

69.     These statements created the false and misleading implication that Plaintiff Klayman committed sexual misconduct and is incompetent, among other false and misleading statements as pled in the preceding paragraphs.

70.     Plaintiff has been severely harmed and damaged by these false and misleading statements because they subject him to hatred, distrust, ridicule, contempt, and disgrace.

71.     Plaintiff has been damaged by these malicious false and misleading statements because the statements severely harmed and damaged Plaintiff in his professions as pubic interest and private practitioner lawyers and radio talk show hosts, whose credibility is the most important trait, as well as personally.

### FOURTH  CAUSE OF ACTION
*Unfair Competition – Lanham Act 15 U.S.C. § 1125(a)*

72.     Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

73.     Defendants, acting together and in concert have and are engaged in acts of unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a) and common law.

74. Defendants have made false and/or misleading statements that have deceived and/or had the tendency to deceive a substantial segment of the receiving audience.

75. Defendants' false and/or misleading statements misrepresent the nature, characteristics, and qualities of Plaintiff Klayman's goods or services.

76. Defendants' false and/or misleading statements are material because that were highly likely to mislead and influence supporters' decisions to provide financial support and sales to Defendants instead of Plaintiff.

77. These false and misleading statements were made in interstate commerce, as they were widely broadcast on radio, on the internet, in social media, and elsewhere in this district, nationally and internationally.

78. Plaintiff has suffered significant damages, which are ongoing, due to Defendants' false and/or misleading statements. By law these damages are calculated based on Defendants' gross sales and receipts, which are trebled, plus an award of attorneys fees and costs.

## FIFTH CAUSE OF ACTION

79. Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

80. Defendants, acting together and in concert have violated the Florida Deceptive and Unfair Trade Practices Act.

81. Mr. Klayman is a competitor to Defendants.

82. Defendants have engaged in both deceptive acts and unfair practices by making misleading statements that misrepresent the nature, characteristics, and qualities of Plaintiff Klayman's goods or services.

83. Defendants' false and/or misleading statements misrepresent the nature,

characteristics, and qualities of Plaintiff Klayman's goods or services.

84.     Defendants' false and/or misleading statements are material because that were highly likely to mislead and influence supporters' decisions to provide financial support and sales to Defendants instead of Plaintiff.

85.     Defendants' misstatements would likely mislead the objective consumer acting reasonably under the circumstances.

86.     Defendants' misstatements have actually misled numerous consumers, which has had a direct negative impact on the amount of financial support received by Mr. Klayman.

87.     Plaintiff has suffered significant pecuniary damages directly and proximately caused by Defendants' deceptive acts and unfair practices, which are ongoing.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

a.     As a result of significant damage caused by each of the Defendants, acting in concert, jointly and severally, in this district and throughout Florida, the nation and internationally, awarding Plaintiff compensatory including actual, consequential, incidental and punitive damages for malicious tortious conduct, perpetrated with actual malice, in an amount to be determined at trial and in excess of $50, 000,000 U.S. Dollars as redress for loss of his personal and professional reputations and good will, as well as past and prospective financial losses, personally and professionally.

b.     Awarding Plaintiff attorney fees and costs

c.     Granting such other relief as the Court deems appropriate and necessary including preliminary and permanent injunctive relief.

**PLAINTIFF DEMANDS TRIAL BY JURY ON ALL CLAIMS SO TRIABLE**.

Dated:  April 9, 2020                                    Respectfully Submitted,

                                                         ___/s/ Larry Klayman___
                                                         Larry Klayman, Esq.
                                                         7050 W. Palmetto Park Rd
                                                         Boca Raton FL 33433
                                                         Telephone: 561-558-5336
                                                         Email: leklayman@gmail.com

                                                         *PLAINTIFF PRO SE*

EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. |
| | * | |
| v. | * | Grand Jury Original |
| | * | |
| ROGER JASON STONE, JR., | * | 18 U.S.C. §§ 1001, 1505, 1512, 2 |
| | * | |
| Defendant. | * | |
| | * | |
| | * | |
| | * | |
| | ******* | |

## **INDICTMENT**

The Grand Jury for the District of Columbia charges:

### **Introduction**

1.      By in or around May 2016, the Democratic National Committee ("DNC") and the Democratic Congressional Campaign Committee ("DCCC") became aware that their computer systems had been compromised by unauthorized intrusions and hired a security company ("Company 1") to identify the extent of the intrusions.

2.      On or about June 14, 2016, the DNC—through Company 1—publicly announced that it had been hacked by Russian government actors.

3.      From in or around July 2016 through in or around November 2016, an organization ("Organization 1"), which had previously posted documents stolen by others from U.S. persons, entities, and the U.S. government, released tens of thousands of documents stolen from the DNC and the personal email account of the chairman of the U.S. presidential campaign of Hillary Clinton ("Clinton Campaign").

    a.    On or about July 22, 2016, Organization 1 released documents stolen from the DNC.

    b.    Between on or about October 7, 2016 and on or about November 7, 2016, Organization 1 released approximately 33 tranches of documents that had been stolen from the personal email account of the Clinton Campaign chairman, totaling over 50,000 stolen documents.

4.    ROGER JASON STONE, JR. was a political consultant who worked for decades in U.S. politics and on U.S. political campaigns. STONE was an official on the U.S. presidential campaign of Donald J. Trump ("Trump Campaign") until in or around August 2015, and maintained regular contact with and publicly supported the Trump Campaign through the 2016 election.

5.    During the summer of 2016, STONE spoke to senior Trump Campaign officials about Organization 1 and information it might have had that would be damaging to the Clinton Campaign. STONE was contacted by senior Trump Campaign officials to inquire about future releases by Organization 1.

6.    By in or around early August 2016, STONE was claiming both publicly and privately to have communicated with Organization 1. By in or around mid-August 2016, Organization 1 made a public statement denying direct communication with STONE. Thereafter, STONE said that his communication with Organization 1 had occurred through a person STONE described as a "mutual friend," "go-between," and "intermediary." STONE also continued to communicate with members of the Trump Campaign about Organization 1 and its intended future releases.

7.    After the 2016 U.S. presidential election, the U.S. House of Representatives Permanent Select Committee on Intelligence ("HPSCI"), the U.S. Senate Select Committee on Intelligence ("SSCI"), and the Federal Bureau of Investigation ("FBI") opened or announced their respective

investigations into Russian interference in the 2016 U.S. presidential election, which included investigating STONE's claims of contact with Organization 1.

8.     In response, STONE took steps to obstruct these investigations. Among other steps to obstruct the investigations, STONE:

   a.     Made multiple false statements to HPSCI about his interactions regarding Organization 1, and falsely denied possessing records that contained evidence of these interactions; and

   b.     Attempted to persuade a witness to provide false testimony to and withhold pertinent information from the investigations.

**Other Relevant Individuals**

9.     Person 1 was a political commentator who worked with an online media publication during the 2016 U.S. presidential campaign. Person 1 spoke regularly with STONE throughout the campaign, including about the release of stolen documents by Organization 1.

10.     Person 2 was a radio host who had known STONE for more than a decade. In testimony before HPSCI on or about September 26, 2017, STONE described Person 2 (without naming him) as an "intermediary," "go-between," and "mutual friend" to the head of Organization 1. In a follow-up letter to HPSCI dated October 13, 2017, STONE identified Person 2 by name and claimed Person 2 was the "gentleman who confirmed for Mr. Stone" that the head of Organization 1 had "'[e]mails related to Hillary Clinton which are pending publication.'"

**Background**

STONE's Communications About Organization 1 During the Campaign

11.     By in or around June and July 2016, STONE informed senior Trump Campaign officials that he had information indicating Organization 1 had documents whose release would be

3

damaging to the Clinton Campaign. The head of Organization 1 was located at all relevant times at the Ecuadorian Embassy in London, United Kingdom.

12. After the July 22, 2016 release of stolen DNC emails by Organization 1, a senior Trump Campaign official was directed to contact STONE about any additional releases and what other damaging information Organization 1 had regarding the Clinton Campaign. STONE thereafter told the Trump Campaign about potential future releases of damaging material by Organization 1.

13. STONE also corresponded with associates about contacting Organization 1 in order to obtain additional emails damaging to the Clinton Campaign.

   a.   On or about July 25, 2016, STONE sent an email to Person 1 with the subject line, "Get to [the head of Organization 1]." The body of the message read, "Get to [the head of Organization 1] [a]t Ecuadorian Embassy in London and get the pending [Organization 1] emails . . . they deal with Foundation, allegedly." On or about the same day, Person 1 forwarded STONE's email to an associate who lived in the United Kingdom and was a supporter of the Trump Campaign.

   b.   On or about July 31, 2016, STONE emailed Person 1 with the subject line, "Call me MON." The body of the email read in part that Person 1's associate in the United Kingdom "should see [the head of Organization 1]."

   c.   On or about August 2, 2016, Person 1 emailed STONE. Person 1 wrote that he was currently in Europe and planned to return in or around mid-August. Person 1 stated in part, "Word is friend in embassy plans 2 more dumps. One shortly after I'm back. 2nd in Oct. Impact planned to be very damaging." The phrase "friend in embassy" referred to the head of Organization 1. Person 1 added in the same email, "Time to let more than [the Clinton Campaign chairman] to be exposed as in bed w

4

enemy if they are not ready to drop HRC. That appears to be the game hackers are now about. Would not hurt to start suggesting HRC old, memory bad, has stroke – neither he nor she well. I expect that much of next dump focus, setting stage for Foundation debacle."

14. Starting in early August 2016, after receiving the August 2, 2016 email from Person 1, STONE made repeated statements about information he claimed to have learned from the head of Organization 1.

    a.    On or about August 8, 2016, STONE attended a public event at which he stated, "I actually have communicated with [the head of Organization 1]. I believe the next tranche of his documents pertain to the Clinton Foundation, but there's no telling what the October surprise may be."

    b.    On or about August 12, 2016, STONE stated during an interview that he was "in communication with [the head of Organization 1]" but was "not at liberty to discuss what I have."

    c.    On or about August 16, 2016, STONE stated during an interview that "it became known on this program that I have had some back-channel communication with [Organization 1] and [the head of Organization 1]." In a second interview on or about the same day, STONE stated that he "communicated with [the head of Organization 1]" and that they had a "mutual acquaintance who is a fine gentleman."

    d.    On or about August 18, 2016, STONE stated during a television interview that he had communicated with the head of Organization 1 through an "intermediary, somebody who is a mutual friend."

e.  On or about August 23, 2016, Person 2 asked STONE during a radio interview, "You've been in touch indirectly with [the head of Organization 1]. . . . Can you give us any kind of insight? Is there an October surprise happening?" STONE responded, "Well, first of all, I don't want to intimate in any way that I control or have influence with [the head of Organization 1] because I do not. . . . We have a mutual friend, somebody we both trust and therefore I am a recipient of pretty good information."

15.  Beginning on or about August 19, 2016, STONE exchanged written communications, including by text message and email, with Person 2 about Organization 1 and what the head of Organization 1 planned to do.

a.  On or about August 19, 2016, Person 2 sent a text message to STONE that read in part, "I'm going to have [the head of Organization 1] on my show next Thursday." On or about August 21, 2016, Person 2 sent another text message to STONE, writing in part, "I have [the head of Organization 1] on Thursday so I'm completely tied up on that day."

b.  On or about August 25, 2016, the head of Organization 1 was a guest on Person 2's radio show for the first time. On or about August 26, 2016, Person 2 sent a text message to STONE that stated, "[the head of Organization 1] talk[ed] about you last night." STONE asked what the head of Organization 1 said, to which Person 2 responded, "He didn't say anything bad we were talking about how the Press is trying to make it look like you and he are in cahoots."

c.  On or about August 27, 2016, Person 2 sent text messages to STONE that said, "We are working on a [head of Organization 1] radio show," and that he (Person 2) was

6

"in charge" of the project. In a text message sent later that day, Person 2 added, "[The head of Organization 1] has kryptonite on Hillary."

d.   On or about September 18, 2016, STONE sent a text message to Person 2 that said, "I am e-mailing u a request to pass on to [the head of Organization 1]." Person 2 responded "Ok," and added in a later text message, "[j]ust remember do not name me as your connection to [the head of Organization 1] you had one before that you referred to."

  i.   On or about the same day, September 18, 2016, STONE emailed Person 2 an article with allegations against then-candidate Clinton related to her service as Secretary of State. STONE stated, "Please ask [the head of Organization 1] for any State or HRC e-mail from August 10 to August 30—particularly on August 20, 2011 that mention [the subject of the article] or confirm this narrative."

  ii.   On or about September 19, 2016, STONE texted Person 2 again, writing, "Pass my message . . . to [the head of Organization 1]." Person 2 responded, "I did." On or about September 20, 2016, Person 2 forwarded the request to a friend who was an attorney with the ability to contact the head of Organization 1. Person 2 blind-copied STONE on the forwarded email.

e.   On or about September 30, 2016, Person 2 sent STONE via text message a photograph of Person 2 standing outside the Ecuadorian Embassy in London where the head of Organization 1 was located.

7

f.  On or about October 1, 2016, which was a Saturday, Person 2 sent STONE text messages that stated, "big news Wednesday . . . now pretend u don't know me . . . Hillary's campaign will die this week."  In the days preceding these messages, the press had reported that the head of Organization 1 planned to make a public announcement on or about Tuesday, October 4, 2016, which was reported to be the ten-year anniversary of the founding of Organization 1.

g.  On or about October 2, 2016, STONE emailed Person 2, with the subject line "WTF?," a link to an article reporting that Organization 1 was canceling its "highly anticipated Tuesday announcement due to security concerns."  Person 2 responded to STONE, "head fake."

h.  On or about the same day, October 2, 2016, STONE texted Person 2 and asked, "Did [the head of Organization 1] back off."  On or about October 3, 2016, Person 2 initially responded, "I can't tal[k] about it."  After further exchanges with STONE, Person 2 said, "I think it[']s on for tomorrow."  Person 2 added later that day, "Off the Record Hillary and her people are doing a full-court press they [*sic*] keep [the head of Organization 1] from making the next dump . . . That's all I can tell you on this line . . . Please leave my name out of it."

16.  In or around October 2016, STONE made statements about Organization 1's future releases, including statements similar to those that Person 2 made to him.  For example:

a.  On or about October 3, 2016, STONE wrote to a supporter involved with the Trump Campaign, "Spoke to my friend in London last night.  The payload is still coming."

b.  Also on or about October 3, 2016, STONE received an email from a reporter who had connections to a high-ranking Trump Campaign official that asked, "[the head

of Organization 1] – what's he got?  Hope it's good."  STONE responded in part, "It is.  I'd tell [the high-ranking Trump Campaign official] but he doesn't call me back."

c.  On or about October 4, 2016, the head of Organization 1 held a press conference but did not release any new materials pertaining to the Clinton Campaign.  Shortly afterwards, STONE received an email from the high-ranking Trump Campaign official asking about the status of future releases by Organization 1.  STONE answered that the head of Organization 1 had a "[s]erious security concern" but that Organization 1 would release "a load every week going forward."

d.  Later that day, on or about October 4, 2016, the supporter involved with the Trump Campaign asked STONE via text message if he had "hear[d] anymore from London."  STONE replied, "Yes - want to talk on a secure line - got Whatsapp?"  STONE subsequently told the supporter that more material would be released and that it would be damaging to the Clinton Campaign.

17.  On or about October 7, 2016, Organization 1 released the first set of emails stolen from the Clinton Campaign chairman.  Shortly after Organization 1's release, an associate of the high-ranking Trump Campaign official sent a text message to STONE that read "well done."  In subsequent conversations with senior Trump Campaign officials, STONE claimed credit for having correctly predicted the October 7, 2016 release.

<u>The Investigations</u>

18.  In or around 2017, government officials publicly disclosed investigations into Russian interference in the 2016 U.S. presidential election and possible links to individuals associated with the campaigns.

9

a. On or about January 13, 2017, the chairman and vice chairman of SSCI announced the committee would conduct an inquiry that would investigate, among other things, any intelligence regarding links between Russia and individuals associated with political campaigns, as well as Russian cyber activity and other "active measures" directed against the United States in connection with the 2016 election.

b. On or about January 25, 2017, the chairman and ranking member of HPSCI announced that HPSCI had been conducting an inquiry similar to SSCI's.

c. On or about March 20, 2017, the then-director of the FBI testified at a HPSCI hearing and publicly disclosed that the FBI was investigating Russian interference in the 2016 election and possible links and coordination between the Trump Campaign and the Russian government.

d. By in or around August 2017, news reports stated that a federal grand jury had opened an investigation into matters relating to Russian government efforts to interfere in the 2016 election, including possible links and coordination between the Trump Campaign and the Russian government.

### STONE's False Testimony to HPSCI

19. In or around May 2017, HPSCI sent a letter requesting that STONE voluntarily appear before the committee and produce:

> Any documents, records, electronically stored information including e-mail, communication, recordings, data and tangible things (including, but not limited to, graphs, charts, photographs, images and other documents) regardless of form, other than those widely available (e.g., newspaper articles) that reasonably could lead to the discovery of any facts within the investigation's publicly-announced parameters.

On or about May 22, 2017, STONE caused a letter to be submitted to HPSCI stating that "Mr.

Stone has no documents, records, or electronically stored information, regardless of form, other than those widely available that reasonably could lead to the discovery of any facts within the investigation's publicly-announced parameters."

20.      On or about September 26, 2017, STONE testified before HPSCI in Washington, D.C. as part of the committee's ongoing investigation.  In his opening statement, STONE stated, "These hearings are largely based on a yet unproven allegation that the Russian state is responsible for the hacking of the DNC and [the Clinton Campaign chairman] and the transfer of that information to [Organization 1]."  STONE further stated that  "[m]embers of this Committee" had made certain "assertions against me which must be rebutted here today," which included "[t]he charge that I knew in advance about, and predicted, the hacking of Clinton campaign chairman['s] email, [and] that I had advanced knowledge of the source or actual content of the [Organization 1] disclosures regarding Hillary Clinton."

21.      In the course of his HPSCI testimony, STONE made deliberately false and misleading statements to the committee concerning, among other things, his possession of documents pertinent to HPSCI's investigation; the source for his early August 2016 statements about Organization 1; requests he made for information from the head of Organization 1; his communications with his identified intermediary; and his communications with the Trump Campaign about Organization 1.

<u>STONE's False and Misleading Testimony About His Possession of Documents Pertinent to HPSCI's Investigation</u>

22.      During his HPSCI testimony, STONE was asked, "So you have no emails to anyone concerning the allegations of hacked documents . . . or any discussions you have had with third parties about [the head of Organization 1]?  You have no emails, no texts, no documents whatsoever, any kind of that nature?"  STONE falsely and misleadingly answered, "That is correct.

11

Not to my knowledge."

23.     In truth and in fact, STONE had sent and received numerous emails and text messages during the 2016 campaign in which he discussed Organization 1, its head, and its possession of hacked emails.  At the time of his false testimony, STONE was still in possession of many of these emails and text messages, including:

a.     The email from STONE to Person 1 on or about July 25, 2016 that read in part, "Get to [the head of Organization 1] [a]t Ecuadorian Embassy in London and get the pending [Organization 1] emails . . . they deal with Foundation, allegedly.";

b.     The email from STONE to Person 1 on or about July 31, 2016 that said an associate of Person 1 "should see [the head of Organization 1].";

c.     The email from Person 1 to STONE on or about August 2, 2016 that stated in part, "Word is friend in embassy plans 2 more dumps.  One shortly after I'm back.  2nd in Oct.  Impact planned to be very damaging.";

d.     Dozens of text messages and emails, beginning on or about August 19, 2016 and continuing through the election, between STONE and Person 2 in which they discussed Organization 1 and the head of Organization 1;

e.     The email from STONE on or about October 3, 2016 to the supporter involved with the Trump Campaign, which read in part, "Spoke to my friend in London last night.  The payload is still coming."; and

f.     The emails on or about October 4, 2016 between STONE and the high-ranking member of the Trump Campaign, including STONE's statement that Organization 1 would release "a load every week going forward."

24.     By falsely claiming that he had no emails or text messages in his possession that referred to the head of Organization 1, STONE avoided providing a basis for HPSCI to subpoena records in his possession that could have shown that other aspects of his testimony were false and misleading.

<u>STONE's False and Misleading Testimony About His Early August 2016 Statements</u>

25.     During his HPSCI testimony on or about September 26, 2017, STONE was asked to explain his statements in early August 2016 about being in contact with the head of Organization 1. STONE was specifically asked about his statement on or about August 8, 2016 that "I've actually communicated with [the head of Organization 1]," as well as his statement on or about August 12, 2016 that he was "in communication with [the head of Organization 1]" but was "not at liberty to discuss what I have."

26.     STONE responded that his public references to having a means of contacting Organization 1 referred exclusively to his contact with a journalist, who STONE described as a "go-between, as an intermediary, as a mutual friend" of the head of Organization 1.  STONE stated that he asked this individual, his intermediary, "to confirm what [the head of Organization 1] ha[d] tweeted, himself, on July 21st, that he ha[d] the Clinton emails and that he [would] publish them."  STONE further stated that the intermediary "was someone I knew had interviewed [the head of Organization 1].  And I merely wanted confirmation of what he had tweeted on the 21st."  STONE declined to tell HPSCI the name of this "intermediary" but provided a description in his testimony that was consistent with Person 2.

27.     On or about October 13, 2017, STONE caused a letter to be submitted to HPSCI that identified Person 2 by name as the "gentleman who confirmed for Mr. Stone" that the head of Organization 1 had "'[e]mails related to Hillary Clinton which are pending publication.'"

28.     STONE's explanation of his August 2016 statements about communicating with the head of Organization 1 was false and misleading.  In truth and in fact, the first time Person 2 interviewed the head of Organization 1 was on or about August 25, 2016, after STONE made his August 8 and August 12, 2016 public statements.   Similarly, at the time STONE made his August 2016 statements, STONE had directed Person 1—not Person 2—to contact the head of Organization 1.  And Person 1—not Person 2—had told STONE in advance of STONE's August 8 and August 12, 2016 public statements that "[w]ord is friend in embassy plans 2 more dumps," including one in October.  At no time did STONE identify Person 1 to HPSCI as another individual STONE contacted to serve as a "go-between," "intermediary," or other source of information from Organization 1.  STONE also never disclosed his exchanges with Person 1 when answering HPSCI's questioning about STONE's August 8 and August 12, 2016 statements.

STONE's False and Misleading Testimony About Requests He Made for Information from the
Head of Organization 1

29.     During his HPSCI testimony, STONE was asked, "[W]hat was the extent of the communication with [the intermediary]?"  STONE replied, "I asked him to confirm . . . that the tweet of [the head of Organization 1] of the 21st was accurate, that they did in fact have . . . Hillary Clinton emails and that they would release them."  STONE was then asked, "Did you ask [the intermediary] to communicate anything else to [the head of Organization 1]?"  STONE falsely and misleadingly responded, "I did not."  STONE was then asked, "Did you ask [the intermediary] to do anything on your own behalf?"  STONE falsely and misleadingly responded, "I did not."

30.     In truth and in fact, STONE directed both Person 1 and Person 2 to pass on requests to the head of Organization 1 for documents that STONE believed would be damaging to the Clinton Campaign.  For example:

        a.      As described above, on or about July 25, 2016, STONE sent Person 1 an email that

read, "Get to [the head of Organization 1] [a]t Ecuadorian Embassy in London and get the pending [Organization 1] emails . . . they deal with Foundation, allegedly."

b.  On or about September 18, 2016, STONE sent a text message to Person 2 that said, "I am e-mailing u a request to pass on to [the head of Organization 1]," and then emailed Person 2 an article with allegations against then-candidate Clinton related to her service as Secretary of State.  STONE added, "Please ask [the head of Organization 1] for any State or HRC e-mail from August 10 to August 30—particularly on August 20, 2011 that mention [the subject of the article] or confirm this narrative."

c.  On or about September 19, 2016, STONE texted Person 2 again, writing "Pass my message . . . to [the head of Organization 1]."  Person 2 responded, "I did," and the next day Person 2, on an email blind-copied to STONE, forwarded the request to an attorney who had the ability to contact the head of Organization 1.

<u>STONE's False and Misleading Testimony About Communications with His Identified Intermediary</u>

31.    During his HPSCI testimony, STONE was asked repeatedly about his communications with the person he identified as his intermediary.  STONE falsely and misleadingly stated that he had never communicated with his intermediary in writing in any way.  During one exchange, STONE falsely and misleadingly claimed only to have spoken with the intermediary telephonically:

Q:    [H]ow did you communicate with the intermediary?

A:    Over the phone.

Q:    And did you have any other means of communicating with the intermediary?

A:    No.

Q:    No text messages, no – none of the list, right?

> A:    No.

Later during his testimony, STONE again falsely denied ever communicating with his intermediary in writing:

> Q:    So you never communicated with your intermediary in writing in any way?
>
> A:    No.
>
> Q:    Never emailed him or texted him?
>
> A:    He's not an email guy.
>
> Q:    So all your conversations with him were in person or over the phone.
>
> A:    Correct.

32.    In truth and in fact, as described above, STONE and Person 2 (who STONE identified to HPSCI as his intermediary) engaged in frequent written communication by email and text message. STONE also engaged in frequent written communication by email and text message with Person 1, who also provided STONE with information regarding Organization 1.

33.    Written communications between STONE and Person 1 and between STONE and Person 2 continued through STONE's HPSCI testimony. Indeed, on or about September 26, 2017—the day that STONE testified before HPSCI and denied having ever sent or received emails or text messages from Person 2—STONE and Person 2 exchanged over thirty text messages.

34.    Certain electronic messages between STONE and Person 1 and between STONE and Person 2 would have been material to HPSCI. For example:

> a.    In or around July 2016, STONE emailed Person 1 to "get to" the head of Organization 1 and obtain the pending emails.
>
> b.    In or around September 2016, STONE sent messages directing Person 2 to pass a request to the head of Organization 1.
>
> c.    On or about January 6, 2017, Person 2 sent STONE an email that had the subject

line "Back channel bs."  In the email, Person 2 wrote, "Well I have put together timelines[] and you [] said you have a back-channel way back a month before I had [the head of Organization 1] on my show . . .  I have never had a conversation with [the head of Organization 1] other than my radio show . . . I have pieced it all together . . . so you may as well tell the truth that you had no back-channel or there's the guy you were talking about early August."

STONE's False and Misleading Testimony About Communications with the Trump Campaign

35.     During his HPSCI testimony, STONE was asked, "did you discuss your conversations with the intermediary with anyone involved in the Trump campaign?"  STONE falsely and misleadingly answered, "I did not."  In truth and in fact, and as described above, STONE spoke to multiple individuals involved in the Trump Campaign about what he claimed to have learned from his intermediary to Organization 1, including the following:

a.     On multiple occasions, STONE told senior Trump Campaign officials about materials possessed by Organization 1 and the timing of future releases.

b.     On or about October 3, 2016, STONE wrote to a supporter involved with the Trump Campaign, "Spoke to my friend in London last night.  The payload is still coming."

c.     On or about October 4, 2016, STONE told a high-ranking Trump Campaign official that the head of Organization 1 had a "[s]erious security concern" but would release "a load every week going forward."

**Attempts to Prevent Person 2 from Contradicting STONE's False Statements to HPSCI**

36.     On or about October 19, 2017, STONE sent Person 2 an excerpt of his letter to HPSCI that identified Person 2 as his "intermediary" to Organization 1.  STONE urged Person 2, if asked by HPSCI, to falsely confirm what STONE had previously testified to, including that it was Person 2

who provided STONE with the basis for STONE's early August 2016 statements about contact with Organization 1. Person 2 repeatedly told STONE that his testimony was false and told him to correct his testimony to HPSCI. STONE did not do so. STONE then engaged in a prolonged effort to prevent Person 2 from contradicting STONE's false statements to HPSCI.

37. In or around November 2017, Person 2 received a request from HPSCI to testify voluntarily before the committee. After being contacted by HPSCI, Person 2 spoke and texted repeatedly with STONE. In these discussions, STONE sought to have Person 2 testify falsely either that Person 2 was the identified intermediary or that Person 2 could not remember what he had told STONE. Alternatively, STONE sought to have Person 2 invoke his Fifth Amendment right against self-incrimination. For example:

    a.    On or about November 19, 2017, in a text message to STONE, Person 2 said that his lawyer wanted to see him (Person 2). STONE responded, "'Stonewall it. Plead the fifth. Anything to save the plan' . . . Richard Nixon." On or about November 20, 2017, Person 2 informed HPSCI that he declined HPSCI's request for a voluntary interview.

    b.    On or about November 21, 2017, Person 2 texted STONE, "I was told that the house committee lawyer told my lawyer that I will be getting a subpoena." STONE responded, "That was the point at which your lawyers should have told them you would assert your 5th Amendment rights if compelled to appear."

    c.    On or about November 28, 2017, Person 2 received a subpoena compelling his testimony before HPSCI. Person 2 informed STONE of the subpoena.

    d.    On or about November 30, 2017, STONE asked Person 1 to write publicly about Person 2. Person 1 responded, "Are you sure you want to make something out of

this now?  Why not wait to see what [Person 2] does.  You may be defending yourself too much—raising new questions that will fuel new inquiries.  This may be a time to say less, not more."  STONE responded by telling Person 1 that Person 2 "will take the 5th—but let's hold a day."

e.    On multiple occasions, including on or about December 1, 2017, STONE told Person 2 that Person 2 should do a "Frank Pentangeli" before HPSCI in order to avoid contradicting STONE's testimony.  Frank Pentangeli is a character in the film *The Godfather: Part II*, which both STONE and Person 2 had discussed, who testifies before a congressional committee and in that testimony claims not to know critical information that he does in fact know.

f.    On or about December 1, 2017, STONE texted Person 2, "And if you turned over anything to the FBI you're a fool."  Later that day, Person 2 texted STONE, "You need to amend your testimony before I testify on the 15th."  STONE responded, "If you testify you're a fool.  Because of tromp I could never get away with a certain [*sic*] my Fifth Amendment rights but you can.  I guarantee you you are the one who gets indicted for perjury if you're stupid enough to testify."

38.    On or about December 12, 2017, Person 2 informed HPSCI that he intended to assert his Fifth Amendment privilege against self-incrimination if required to appear by subpoena.  Person 2 invoked his Fifth Amendment privilege in part to avoid providing evidence that would show STONE's previous testimony to Congress was false.

39.    Following Person 2's invocation of his Fifth Amendment privilege not to testify before HPSCI, STONE and Person 2 continued to have discussions about the various investigations into Russian interference in the 2016 election and what information Person 2 would provide to

investigators. During these conversations, STONE repeatedly made statements intended to prevent Person 2 from cooperating with the investigations. For example:

a.  On or about December 24, 2017, Person 2 texted STONE, "I met [the head of Organization 1] for f[i]rst time this yea[r] sept 7 . . . docs prove that. . . . You should be honest w fbi . . . there was no back channel . . . be honest." STONE replied approximately two minutes later, "I'm not talking to the FBI and if your smart you won't either."

b.  On or about April 9, 2018, STONE wrote in an email to Person 2, "You are a rat. A stoolie. You backstab your friends-run your mouth my lawyers are dying Rip you to shreds." STONE also said he would "take that dog away from you," referring to Person 2's dog. On or about the same day, STONE wrote to Person 2, "I am so ready. Let's get it on. Prepare to die [expletive]."

c.  On or about May 21, 2018, Person 2 wrote in an email to STONE, "You should have just been honest with the house Intel committee . . . you've opened yourself up to perjury charges like an idiot." STONE responded, "You are so full of [expletive]. You got nothing. Keep running your mouth and I'll file a bar complaint against your friend [the attorney who had the ability to contact the head of Organization 1]."

## COUNT ONE
### (Obstruction of Proceeding)

40.     Paragraphs 1 through 39 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

41.     From in or around May 2017 through at least December 2017, within the District of Columbia and elsewhere, the defendant ROGER JASON STONE, JR., corruptly influenced, obstructed, impeded, and endeavored to influence, obstruct, and impede the due and proper exercise of the power of inquiry under which any inquiry and investigation is being had by either House, and any committee of either House and any joint committee of the Congress, to wit: STONE testified falsely and misleadingly at a HPSCI hearing in or around September 2017; STONE failed to turn over and lied about the existence of responsive records to HPSCI's requests about documents; STONE submitted and caused to be submitted a letter to HPSCI falsely and misleadingly describing communications with Person 2; and STONE attempted to have Person 2 testify falsely before HPSCI or prevent him from testifying.

All in violation of Title 18, United States Code, Sections 1505 and 2.

## COUNTS TWO THROUGH SIX
### (False Statements)

42.    Paragraphs 1 through 39 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

43.    On or about September 26, 2017, within the District of Columbia and elsewhere, in a matter within the jurisdiction of the legislative branch of the Government of the United States, the defendant ROGER JASON STONE, JR., knowingly and willfully made and caused to be made materially false, fictitious, and fraudulent statements and representations, to wit:

| Count | False Statement |
|:---:|:---|
| 2 | STONE testified falsely that he did not have emails with third parties about the head of Organization 1, and that he did not have any documents, emails, or text messages that refer to the head of Organization 1. |
| 3 | STONE testified falsely that his August 2016 references to being in contact with the head of Organization 1 were references to communications with a single "go-between," "mutual friend," and "intermediary," who STONE identified as Person 2. |
| 4 | STONE testified falsely that he did not ask the person he referred to as his "go-between," "mutual friend," and "intermediary," to communicate anything to the head of Organization 1 and did not ask the intermediary to do anything on STONE's behalf. |
| 5 | STONE testified falsely that he and the person he referred to as his "go-between," "mutual friend," and "intermediary" did not communicate via text message or email about Organization 1. |
| 6 | STONE testified falsely that he had never discussed his conversations with the person he referred to as his "go-between," "mutual |

| Count | False Statement |
|---|---|
| | friend," and "intermediary" with anyone involved in the Trump Campaign. |

All in violation of Title 18, United States Code, Sections 1001(a)(2) and 2.

## COUNT SEVEN
### (Witness Tampering)

44.     Paragraphs 1 through 39 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

45.     Between in or around September 2017 and present, within the District of Columbia and elsewhere, the defendant ROGER JASON STONE, JR., knowingly and intentionally corruptly persuaded and attempted to corruptly persuade another person, to wit: Person 2, with intent to influence, delay, and prevent the testimony of any person in an official proceeding.

All in violation of Title 18, United States Code, Section 1512(b)(1).

 

 

_____
Robert S. Mueller, III
Special Counsel
U.S. Department of Justice

A TRUE BILL:

_____
Foreperson

Date:  January 24, 2019

Case 9:20-cv-81205-RAR Document 1061 Filed 05/23/24 Page 290 of 360

# EXHIBIT 2

# About Larry Klayman

Larry Klayman, founder of Judicial Watch and Freedom Watch, is known for his strong public interest advocacy in furtherance of ethics in government and individual freedoms and liberties. During his tenure at Judicial Watch, he obtained a court ruling that Bill Clinton committed a crime, the first lawyer ever to have done so against an American president. Larry became so famous for fighting corruption in the government and the legal profession that the NBC hit drama series "West Wing" created a character after him: [Harry Klaypool of Freedom Watch](). His character was played by actor John Diehl.

In 2004, Larry ran for the U.S. Senate as a Republican in Florida's primary. After the race ended, he founded Freedom Watch.

Larry graduated from Duke University with honors in political science and French literature. Later, he received a law degree from Emory University. During the administration of President Ronald Reagan, Larry was a Justice Department prosecutor and was on the trial team that succeeded in breaking up the telephone monopoly of AT&T, thereby creating competition in the telecommunications industry.

Between Duke and Emory, Larry worked for U.S. Senator Richard Schweiker (R-Pa.) during the Watergate era. He has also studied abroad and was a stagiaire for the Commission of the European Union in its Competition Directorate in Brussels, Belgium. During law school, Larry also worked for the U.S. International Trade Commission in Washington, D.C.

Larry speaks four languages—English, French, Italian, and Spanish—and is an international lawyer, among his many areas of legal expertise and practice.

The author of two books, *Fatal Neglect* and *Whores: Why and How I Came to Fight the Establishment,* Larry has a third book in the works dealing with the breakdown of our political and legal systems. His current book, *Whores,* is on now sale at WND.com, Amazon.com, BarnesandNoble.com, Borders.com, and all major stores and booksellers.

Larry is a frequent commentator on television and radio, as well as a weekly columnist, on Friday, for WND.com. He also writes a regular blog for Newsmax called "Klayman's Court."

Larry has been credited as being the inspiration for the Tea Party movement. (See "[Larry Klayman - The One Man TEA Party]()," by Dr. Richard Swier, http://fwusa.org/KFA)



**Support the work of Freedom Watch at [www.FreedomWatchUSA.org](http://www.FreedomWatchUSA.org)**

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)* **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

## I. (a) PLAINTIFFS

## DEFENDANTS

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Attorneys *(If Known)*

**(d)** Check County Where Action Arose: ☐ MIAMI- DADE ☐ MONROE ☐ BROWARD ☐ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE ☐ HIGHLANDS

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1 U.S. Government Plaintiff

☐ 3 Federal Question *(U.S. Government Not a Party)*

☐ 2 U.S. Government Defendant

☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff)*
*(For Diversity Cases Only)* and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*     Click here for: Nature of Suit Code Descriptions

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729 (a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 835 Patent – Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Mgmt. Relations | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Med. Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| | | | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | **Other:** | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 530 General | | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| | | ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee – Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☐ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Re-filed *(See VI below)* ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district *(specify)* ☐ 6 Multidistrict Litigation Transfer ☐ 7 Appeal to District Judge from Magistrate Judgment ☐ 8 Multidistrict Litigation – Direct File ☐ 9 Remanded from Appellate Court

## VI. RELATED/ RE-FILED CASE(S)

(See instructions): a) Re-filed Case ☐ YES ☐ NO   b) Related Cases ☐ YES ☐ NO

JUDGE: DOCKET NUMBER:

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause *(Do not cite jurisdictional statutes unless diversity)*

LENGTH OF TRIAL via _____ days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23   DEMAND $ _____   CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☐ No

**ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE**
DATE   SIGNATURE OF ATTORNEY OF RECORD

/s/ Larry Klayman

**FOR OFFICE USE ONLY**
RECEIPT # _____ AMOUNT _____ IFP _____ JUDGE _____ MAG JUDGE _____

JS 44 (Rev. 06/17) FLSD Revised 06/01/2017

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.** (a) **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked. Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Nature of Suit. Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Refiled (3) Attach copy of Order for Dismissal of Previous case. Also complete VI.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

Remanded from Appellate Court. (8) Check this box if remanded from Appellate Court.

**VI.** **Related/Refiled Cases.** This section of the JS 44 is used to reference related pending cases or re-filed cases. Insert the docket numbers and the corresponding judges name for such cases.

**VII.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553
Brief Description: Unauthorized reception of cable service

**VIII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the

_____ District of _____

<table>
<tr><td></td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>_____</td><td>)</td><td></td></tr>
<tr><td><em>Plaintiff(s)</em></td><td>)</td><td></td></tr>
<tr><td>v.</td><td>)</td><td>Civil Action No.</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>_____</td><td>)</td><td></td></tr>
<tr><td><em>Defendant(s)</em></td><td>)</td><td></td></tr>
</table>

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____
                                                          *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)*
_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)*
_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*

_____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

_____ District of _____

|  |  |
|---|---|
| ) | |
| ) | |
| ) | |
| ) | |
| _____ ) | |
| *Plaintiff(s)* ) | |
| v. ) | Civil Action No. |
| ) | |
| ) | |
| ) | |
| _____ ) | |
| *Defendant(s)* ) | |

**SUMMONS IN A CIVIL ACTION**

To: *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____
                                                             *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

&#10065; I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

&#10065; I left the summons at the individual's residence or usual place of abode with *(name)*
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

&#10065; I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

&#10065; I returned the summons unexecuted because _____ ; or

&#10065; Other *(specify):*

                                                                                                    .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the

_____ District of _____

|  |  |
|---|---|
|  | ) |
|  | ) |
|  | ) |
|  | ) |
| _____ | ) |
| *Plaintiff(s)* | ) |
| v. | ) Civil Action No. |
|  | ) |
|  | ) |
| _____ | ) |
| *Defendant(s)* | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____        _____
                                                                                    *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*
_____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

_____ District of _____

|  |  |
|---|---|
| _____<br>*Plaintiff(s)*<br><br>v.<br><br>_____<br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>Civil Action No. |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____        _____
                                                          *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*

.

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the

_____ District of _____

| | | |
|---|---|---|
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| _____ *Plaintiff(s)* | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| | ) | |
| | ) | |
| _____ *Defendant(s)* | ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____
                                              *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

### PROOF OF SERVICE
#### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*

_____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 20-80614-CIV-ALTMAN

**LARRY KLAYMAN**,

    *Plaintiff*,

v.

**INFOWARS, LLC,** *et al.*,

    *Defendants*.

_____/

## <u>ORDER REQUIRING MORE DEFINITE STATEMENT</u>

Larry Klayman was upset when Roger Stone called him "incompetent" on national television. *See* Complaint [ECF No. 1] ¶ 44. So, he filed this Complaint—which, when attachments are included—is 46 pages long. *See id.* at 1–46.

In the Complaint, Klayman asserts five causes of actions against five Defendants. Somewhat surprisingly—given the allegations—none of the Defendants is named Roger Stone. Instead, Klayman has sued: Infowars, LLC; Free Speech Systems, LLC; Alex Jones; David Jones; and Owen Shroyer. *See id.* at 1. Against these Defendants, Klayman levies (1) three counts relating to Mr. Stone's allegedly defamatory statements; (2) one count of Unfair Competition under the Lanham Act; and (3) one count of Unfair and Deceptive Trade Practices under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). *See generally id.* at 1–21.

The Complaint, however, is a shotgun pleading. It is, in the words of the Eleventh Circuit, "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action." *Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1322 (11th Cir. 2015); *see also* FED. R. CIV. P. 8(a) ("A pleading that states a claim for relief must contain . . . a *short and plain* statement of the claim showing that the pleader is entitled to relief."

(emphasis added)).

To give some notable examples, Klayman avers that "Defendant Alex Jones is a well-known extreme and totally discredited 'conspiracy theorist' and media personality." *Id.* ¶ 6. He goes on to inform the Court that the "Sandy Hook families had to endure years of abuse and torture from Defendants before finally filing suit against numerous parties." *Id.* ¶ 17. "Furthermore," he continues, "Defendant Alex Jones in concert with the other Defendants propagated and promoted the 'Pizzagate' conspiracy on his show." *Id.* ¶ 19. These statements are wholly irrelevant to the Complaint's causes of action and serve none of its stated purposes: The Sandy Hook tragedy, for instance, plays no part in the Plaintiff's claims, and Defendant Jones' status as a conspiracy theorist—true or not—is similarly immaterial.

Of course, if these deficiencies plagued only one or two sentences in an otherwise-compliant complaint, the Court might look the other way. But the *whole* Complaint is littered with ostentatious irrelevancy. Take, for example, paragraph 27, which reads as follows:

> 27. Stone likes to portray himself as Mafia, and indeed on information and belief has Mafia connections, frequently making reference to Mafia figures who he admires, as well as other unsavory types who have been alleged to have engaged in unethical and/or illegal behavior. For example, he frequently makes reference to his heroes being Hyman Roth in the 'Godfather," who was the movie version of Meyer Lansky, and Roy Cohn, not to mention, Richard Nixon, for his role in Watergate. In this regard, after Stone was indicted he held a press conference on the courthouse steps of the federal courthouse in Ft. Lauderdale, where he was booked, with his arms defiantly in the air in the "victory' pose used by Nixon after he resigned in disgrace as a result of the Watergate scandal. At the time, Stone had been employed by a Nixon group called CREEP, or the Committee to Reelect the President. Defendant Stone even has a large tattoo of Richard Nixon affixed to his back. Thus, given his admiration for persons such as these, particularly Mafia figures, his actions as pled herein can be taken as threats, as well as being defamatory. And, Plaintiff Corsi is 72 years old and thus very vulnerable emotionally and physically to these threats. Stone's intentional infliction of emotional distress and coercion and threats are intended to try even cause Plaintiff Corsi to have heart attacks and strokes, in order that Plaintiff will be unable to testify at Stone's criminal trial. Tellingly, Stone threatened kill a material witness and his service dog, Credico, Person 2 in the Mueller Indictment, "Mafia style."

2

> Stone also fashions himself and indeed has the reputation, at a minimum, as being the preeminent "dirty trickster." See "Get Me Roger Stone" on Netflix.

Compl. ¶ 27 (grammatical errors in original).

In just one paragraph, Klayman manages to reference the Mafia, Hyman Roth, Meyer Lansky, Roy Cohn, Richard Nixon, the Watergate Scandal, a "group called CREEP," a "large tattoo of Richard Nixon," an emotional support animal, an internet streaming service, a documentary, and the Mueller Indictment—not to mention several serious allegations of witness tampering and intimidation. *Id.* ¶ 27. This paragraph plainly violates FED. R. CIV. P. 10(b), which requires that "[a] party . . . state its claims or defenses in numbered paragraphs, each limited as far as practicable to *a single set of circumstances*." (emphasis added).

But the problem lies, not so much in the sheer number or variety of allegations—though these are, in themselves, problematic. The problem is, rather, that the Defendants cannot properly answer this paragraph with a simple "Admitted," "Denied," or "I don't know"—as FED. R. CIV. P. 8(b) requires them to do. After all, some of these "facts" are true, others may not be, some are factual averments, others are legal conclusions, and many more may be the kinds of things the Defendants know nothing about—all within a single paragraph.

Again, it would be one thing if paragraph 27 were unique in this respect. But the entire Complaint is similarly deficient. So, for instance, whole pages of the Complaint are dedicated to Roger Stone's pending criminal prosecution. *See generally* Compl. at 6–8. In fact, the Plaintiff attaches to the Complaint a copy of the indictment against Mr. Stone—this, despite the fact that Mr. Stone is not a party to this case. *See id.* at 21. Either way, the pending criminal prosecution against Mr. Stone is wholly irrelevant to the Plaintiff's defamation claims.

The Plaintiff's decision to include a count of Unfair Competition under the Lanham Act

3

warrants separate discussion. *See* Compl. at 16–18. To have standing[1] to bring a claim under the Lanham Act, the Plaintiff's injuries must fall within the "zone of interests" the statute was intended to protect. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014) ("The zone-of-interests test is therefore an appropriate tool for determining who may invoke the cause of action in § 1125(a)."). Identifying those interests "requires no guesswork, since the Act includes an 'unusual, and extraordinarily helpful,' detailed statement of the statute's purposes." *Id.* at 131 (citation omitted). Those "purposes" are set out in 15 U.S.C. § 1127, which provides:

> The intent of this chapter is to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce; to protect registered marks used in such commerce from interference by State, or territorial legislation; to protect persons engaged in such commerce against unfair competition; to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks; and to provide rights and remedies stipulated by treaties and conventions respecting trademarks, trade names, and unfair competition entered into between the United States and foreign nations.

The Plaintiff's alleged injury appears to lie *well* outside the zone of these interests. He alleges no use of a "mark," mentions no "unfair competition," claims no "counterfeiting," and does not reference any international commerce. Instead, he brings a Lanham Act claim as an attorney whose reputation was (allegedly) harmed when a television personality (apparently) expressed a negative opinion of him. *See* Compl. ¶ 77 ("Defendants have made false and/or misleading statements that have deceived and/or had the tendency to deceive a substantial segment of the receiving audience."). Because this injury does not plausibly fall within the purview of the Lanham Act's "zone of interests," its inclusion in the Complaint is purely "conclusory."

---

[1] It is the Court's responsibility to "zealously insure that jurisdiction exists over a case." *Smith v. GTE Corp.*, 236 F.3d 1292, 1299 (11th Cir. 2001).

At its core, the Plaintiff's claim is straightforward: he was injured, he says, when a television personality defamed him on a national television program. Rather than plead *these* simple facts, however, the Plaintiff has delved deeply into the Defendants' personal histories in a way that untethers most of his factual allegations from the Complaint's causes of action. This type of shotgun pleading is inappropriate in federal court. *See, e.g.*, *Weiland*, 792 F.3d at 1323 ("The unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests.").

Nevertheless, the Eleventh Circuit has warned that a "district court abuses its discretion when it dismisses an action *sua sponte* without providing the plaintiff with notice of its intent to dismiss or an opportunity to respond, unless amendment would be futile or the complaint is patently frivolous." *Brinson v. Welsh*, 709 F. App'x 582, 584 (11th Cir. 2017) (citing *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1248 (11th Cir. 2015) (cleaned up)). And this Court is not prepared (at least not yet) to say that the Complaint is "patently frivolous"—and so, it will not be dismissed.

Fortunately, though, the Eleventh Circuit has approved of a less-drastic remedy in these circumstances: When faced with a shotgun pleading, the Circuit has said, district courts should *sua sponte* require the plaintiff to amend his complaint *before* the defendant wastes resources responding to a pleading that patently violates the Federal Rules of Civil Procedure. *See, e.g.*, *Ferrell v. Durbin*, 311 F. App'x 253, 259 n.8 (11th Cir. 2009) ("When presented with a shotgun complaint, the district court should order repleading *sua sponte.*"); *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 984 (11th Cir. 2008) ("In light of defense counsel's failure to request a repleader, the court, acting sua sponte, should have [required a more definite statement]."

(cleaned up)); *Anderson v. Dist. Bd. of Trustees of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 367 n.5 (11th Cir. 1996) ("On examining those pleadings, the court, acting *sua sponte,* should have struck the plaintiff's complaint, and the defendants' answer, and instructed plaintiff's counsel to file a more definite statement."); *see also Paylor v. Hartford Fire Ins. Co.*, 748 F.3d 1117, 1127 (11th Cir. 2014) ("[W]hy should parties wait until discovery to identify, with precision, the subject of the litigation? That is exactly backward. Civil pleadings are supposed to mark the boundaries for discovery; discovery is not supposed to substitute for definite pleading."); *Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1279 (11th Cir. 2006) ("[Shotgun] pleadings divert already stretched judicial resources into disputes that are not structurally prepared to use those resources efficiently."); *Byrne v. Nezhat*, 261 F.3d 1075, 1130 (11th Cir. 2001) ("[S]hotgun pleadings wreak havoc on the judicial system.").

This Court will follow that admonition here and require the Plaintiff to amend his Complaint *before* any response is filed.

Accordingly, the Court hereby

**ORDERS** as follows:

1. The Plaintiff shall, by **April 23, 2020,** file an Amended Complaint that complies with the Eleventh Circuit's holding in *Weiland*, the Federal Rules of Civil Procedure, and this Order. In particular, the Plaintiff shall remove all references to irrelevant, conclusory, and scandalous material.

2. The Plaintiff shall then serve a copy of the Amended Complaint, together with this Order, on each of the Defendants.

6

3. If the Plaintiff chooses to include his Lanham Act claim in his Amended Complaint, he must **SHOW CAUSE**, by **April 27, 2020**, that he has standing to pursue that claim.

4. Failure to comply with this Order will result in dismissal without prejudice and without further notice.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 13th day of April 2020.

_____

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

LARRY KLAYMAN

     Plaintiff

   v.

INFOWARS, LLC, *et al*

     Defendants.

**Case Number: 20-cv-80614**

### PLAINTIFF LARRY KLAYMAN'S NOTICE OF VOLUNTARY DISMISSAL

Plaintiff Larry Klayman ("Plaintiff Klayman") hereby voluntarily dismisses the above-referenced matter pursuant to Federal Rules of Civil Procedure 41(a)(1)(A)(i), without prejudice, as there appears, based upon the order of this Court show cause order on today's date, and prior orders with regard to the undersigned counsel's client Laura Loomer in *Loomer v. New York Media, LLC et al*, 9:19-cv-81555 that this Court cannot be an impartial arbiter.

Dated: April 14, 2020

         Respectfully Submitted,

          */s/ Larry Klayman*
         Larry Klayman, Esq.
         KLAYMAN LAW GROUP, P.A.
         7050 W. Palmetto Park Road
         Boca Raton FL 33433
         Telephone: (561_558-5336
         Email: leklayman@gmail.com

         *Plaintiff Pro Se*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 20-80614-CIV-ALTMAN

**LARRY KLAYMAN**,

    *Plaintiff,*

v.

**INFOWARS, LLC,** *et al.*,

    *Defendants.*

_____/

### ORDER OF DISMISSAL

**THIS MATTER** is before the Court on the Plaintiff's Notice of Voluntary Dismissal [ECF No. 4]. Being fully advised, the Court hereby

**ORDERS** that this action is **DISMISSED without prejudice**. The Clerk of Court is directed to **CLOSE** this case. All pending motions are **DENIED as moot**. All pending hearings and deadlines are **TERMINATED**.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 14th day of April 2020.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:    counsel of record

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

LARRY KLAYMAN

           Plaintiff

         v.

INFOWARS, LLC, *et al*

          Defendants.

**Case Number:   20-cv-80614**

## PLAINTIFF LARRY KLAYMAN'S REQUEST FOR DISCLOSURE

In light of and reflection upon the tenor and substance of the Court's order of April 14, 2020, which begins by misleadingly and gratuitously reducing Plaintiff's claims to "Larry Klayman was upset when Roger Stone called him "incompetent" on national television," which is inaccurate, condescending, disrespectful and disparaging, Plaintiff requests immediate disclosure as to whether court knows Roger Stone and/or was recommended to President Donald J. Trump by Roger Stone for a seat on the federal bench.

Plaintiff respectfully requests a response by C.O.B. tomorrow, April 16, 2020. The Court's order of April 14, 2020, gratuitously issued before even the subject complaint was served and Defendants were able to plead, creates, at a minimum, this appearance, as the Court has taken on the role as an advocate for Roger Stone and the Defendants, all of whom published in this district, nationally and internationally, false factual statements, which severely harmed and damaged Plaintiff Klayman.

The failure to respond timely will be taken as an admission that the Court does know Roger Stone and/or was recommended by Roger Stone for a seat on the federal bench to President Donald J. Trump.

1

Dated: April 15, 2020

Respectfully Submitted,

_____/s/ Larry Klayman____
Larry Klayman, Esq.
KLAYMAN LAW GROUP, P.A.
7050 W. Palmetto Park Road
Boca Raton FL 33433
Telephone: (561_558-5336
Email: leklayman@gmail.com

*Plaintiff Pro Se*

EXHIBIT C

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF TEXAS
 2                        AUSTIN DIVISION

 3  JEROME CORSI, LARRY KLAYMAN,        ) AU:20-CV-00298-LY
                                        )
 4     Plaintiffs,                      )
                                        )
 5  v.                                  ) AUSTIN, TEXAS
                                        )
 6  INFOWARS, LLC,                      )
    FREE SPEECH SYSTEMS, LLC,           )
 7  ALEX E. JONES, DAVID JONES,         )
    OWEN SHROYER, ROGER STONE,          )
 8                                      )
       Defendants.                      ) MARCH 23, 2021
 9
             ************************************************
10                 TRANSCRIPT OF MOTIONS HEARING
                 BEFORE THE HONORABLE ANDREW AUSTIN
11           ************************************************

12  APPEARANCES:

13  FOR THE PLAINTIFFS:  LARRY KLAYMAN
                         KLAYMAN LAW GROUP P.A.
14                       2020 PENNSYLVANIA AVENUE NW #800
                         WASHINGTON, D.C. 20006
15
                         SANJAY BISWAS
16                       SANJAY BISWAS ATTORNEY AT LAW PC
                         11720 DUXBURY DRIVE
17                       FRISCO, TEXAS 75035

18  FOR THE DEFENDANTS:  JAY MARSHALL WOLMAN
                         RANDAZZA LEGAL GROUP, PLLC
19                       100 PEARL STREET, 14TH FLOOR
                         HARTFORD, CONNECTICUT 06103
20
                         BRADLEY JORDAN REEVES
21                       REEVES LAW, PLLC
                         702 RIO GRANDE ST., SUITE 203
22                       AUSTIN, TEXAS 78701

23                       MARC J. RANDAZZA
                         RANDAZZA LEGAL GROUP, PLLC
24                       2764 LAKE SAHARA DRIVE, SUITE 109
                         LAS VEGAS, NEVADA 89117
25
```

2

```
 1                              DAVID SCOTT WACHEN
                                WACHEN LLC
 2                              11605 MONTAGUE COURT
                                POTOMAC, MARYLAND 20854
 3
                                GREGORY P. SAPIRE
 4                              SOLTERO SAPIRE MURRELL PLLC
                                7320 NORTH MOPAC EXPRESSWAY, SUITE 309
 5                              AUSTIN, TEXAS 78731-2311

 6                              ROBERT C. BUSCHEL
                                BUSCHEL GIBBONS, P.A.
 7                              501 E LAS OLAS BOULEVARD, SUITE 304
                                FORT LAUDERDALE, FLORIDA 33301-2881
 8
   COURT REPORTER:             ARLINDA RODRIGUEZ, CSR
 9                              501 WEST 5TH STREET, SUITE 4152
                                AUSTIN, TEXAS 78701
10                              (512) 391-8791

11

12

13

14

15

16

17

18

19

20

21

22

23

24  Proceedings recorded by electronic sound recording, transcript

25  produced by computer.
```

ARLINDA L. RODRIGUEZ, OFFICIAL COURT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

```
 1        (Proceedings at began 3:00 p.m.)
 2             THE CLERK:  The Court calls the following case for a
 3   hearing on the Motions to Stay Discovery: 20-CV-298, Corsi v.
 4   Infowars.
 5             THE COURT:  Good afternoon, gentlemen.
 6             If I could have all the counsel who are going to be
 7   appearing on behalf of anyone, just introduce themselves and
 8   state who they're representing.  And let's start with the
 9   plaintiffs.  Mr. Klayman?
10             MR. KLAYMAN:  Larry Klayman, appearing pro se,
11   Your Honor.
12             MR. BUSCHEL:  Robert Buschel on behalf of Roger
13   Stone.
14             THE COURT:  One second, Mr. Buschel.
15             Mr. Biswas?
16             MR. BISWAS:  Sunjay Biswas on behalf of Mr. Corsi.
17             MR. BUSCHEL:  Robert Buschel on behalf of
18   Roger Stone.
19             MR. RANDAZZA:  Marc Randazza on behalf of Infowars
20   LLC, Free Speech Systems, LLC, Alex Jones, and Owen Shroyer.
21             THE COURT:  Good afternoon.
22             MR. WACHEN:  David Wachen on behalf of
23   Dr. David Jones.
24             MR. WOLMAN:  Good afternoon, Your Honor.  Jay Wolman
25   also on behalf of Infowars, Free Speech Systems, Alex Jones,
```

1    and Owen Shroyer.

2           MR. REEVES:  Your Honor, Brad Reeves.  I am local

3    counsel with Mr. Wolman and Mr. Randazza for those four

4    defendants.

5           MR. SAPIRE:  And this is Greg Sapire, local counsel,

6    with David Wachen for David Jones.

7           THE COURT:  Thank you.

8           As I indicated -- as Mr. Cheng indicated, we're here

9    just on the motions to stay discovery.

10          I have kept myself familiar with all of the other

11   pending motions.  I have, before today, reviewed all of those

12   motions to dismiss as well and am up to speed on that.

13          I also am aware that they've been pending a long

14   time.  This pandemic hasn't helped us catch up on our docket.

15   But the motion is -- the motions were filed by the defendants,

16   so I'll let you-all -- and I've read through all of that as

17   well, so you don't need to rehash things.  But I'll let the

18   movants address first, if you want to make any summary of your

19   argument or add anything with regard to that.

20          I don't know if Mr. Randazza, Mr. Wachen, who wants

21   to take the lead here?

22          MR. RANDAZZA:  Your Honor, I'll be happy to, and I'll

23   be brief.

24          You know, in any case, I think that the plaintiffs

25   should have to show at least some minimal merit before dragging

     1    the defendants through expensive and time-consuming discovery.

     2    But this is especially so when it is a case involving

     3    First Amendment rights.  And it's compounded further when it's

     4    a case like this, where we have the same -- essentially the

     5    same case filed again and again in different courts after

     6    different court trying to seek a different result, and,

     7    frankly, for an improper purpose.  This seems to be a case more

     8    about fundraising for an organization than to address any

     9    actual grievances that are properly before the court.

    10            Now, I don't want to jump right into the motions to

    11    dismiss, although, if Your Honor would like to do that, we can.

    12    But it's really they're -- they're somewhat difficult to

    13    disambiguate from each other.

    14            We have some defendants --

    15            THE COURT:  And let me jump in.  Sorry.

    16            MR. RANDAZZA:  Certainly.

    17            THE COURT:  It's a lot harder to do this on Zoom than

    18    it would be in a courtroom.

    19            But I -- I am usually loath to stay things when

    20    there's a pending 12(b)(6) motion, but I make exceptions when

    21    it appears that there's a reasonable chance that that motion

    22    will dispose of the case or there's a good chance of that.

    23            And I will agree with you from what you've said about

    24    this case being filed in multiple places and having looked at

    25    those judges' orders and then having read all the motions to

 1  dismiss and responses here that I think this may well be that
 2  exceptional case where that is appropriate.
 3          I'm not impressed by the merits of the case at this
 4  point, having reviewed everything.
 5          MR. KLAYMAN:  May I address that, Your Honor?  It's
 6  Mr. Klayman.
 7          THE COURT:  You'll get to -- you'll get your
 8  opportunity, Mr. Klayman.  Let me hear from the movants.
 9          MR. RANDAZZA:  Well, then I'll pass the baton to the
10  other defendants if you like, or whoever you'd like to hear
11  from, Your Honor.
12          THE COURT:  Mr. Wachen?
13          MR. WACHEN:  Yes, Your Honor.  Thank you.
14          You know, just to summarize real quickly with respect
15  to my client, Dr. Jones, he's like the James Stockdale of this
16  case, saying "Why am I here?"
17          As the judge in D.C. said before he transferred the
18  case to this court, the plaintiffs make no allegations about
19  David Jones's conduct at all.  And so, if there is ever a
20  situation where a party who doesn't belong in a case, who's not
21  alleged to have done anything wrong, and shouldn't have to bear
22  the burden of discovery when he's had a motion to dismiss
23  pending for close to two years, I think this is that situation.
24          And, you know, as we cite in our papers a court --
25  the courts in this district have said that it's important to

1  balance the harm from delay against the possibility of a motion

2  being granted and eliminating the need for discovery.  And this

3  is such a situation.

4          The plaintiffs, frankly, haven't prosecuted the case

5  since we filed the motion.  They haven't pursued discovery.

6  They didn't conduct a 26(f) conference.  They didn't serve

7  initial disclosures.  They didn't do some of the things that

8  are required in the scheduling order.

9          And it was really only at the eleventh hour where we

10  heard that they wanted to conduct these depositions as the --

11  the deadline and the scheduling order was about to approach.

12  In fact, Mr. Klayman said nine months ago that he wanted to

13  depose Dr. Jones, but he never got around to it until February.

14          So, you know, this -- we think this is highly

15  meritorious, especially with respect to Dr. Jones, who hasn't

16  been alleged to have done anything wrong.  And, therefore, you

17  know, there's really no harm at this point that I can discern

18  from having to wait until the motions are decided.

19          If some of the case survives, then there will be

20  opportunity for the plaintiffs to conduct discovery.  But it

21  has no bearing on the motions, and at this point we think, you

22  know, other parts of the scheduling order are going to have to

23  be adjusted as well.  Dispositive motions are due on April 1st.

24  Obviously, we can't -- we haven't even got past 12(b)(6), so we

25  can't even move for summary judgment yet.  Answers haven't even

 1   been even been filed in the case.

 2          So it just seems like this is an appropriate

 3   situation for -- for a stay of discovery, until we find out

 4   whether the case is going to go any further.

 5          Thank you, Your Honor.

 6          THE COURT:  Thank you.

 7          Mr. Klayman?

 8          MR. KLAYMAN:  Yes, Your Honor.  First of all, in all

 9   due respect, Your Honor, there has been no finding by any court

10   with regard to the allegations of this complaint.  If

11   Your Honor has the time -- I know you've been busy and it's

12   COVID-19 -- but go back.  The allegations of this complaint are

13   about defamation, not just with regard to me, but Jerry Corsi,

14   Lanham Act violations, intentional infliction of emotional

15   distress.  There's no collateral estoppel.  There's no

16   *res judicata* from any court.

17          THE COURT:  And I agree.  I'm not suggesting that.

18   But -- but I think you -- it's hard to read those two orders

19   and think that they -- they thought that this was a very strong

20   case.

21          Obviously, the *sua sponte* order entered in Florida

22   was done because that judge, at least, did not think there was

23   enough pled there to demonstrate that it overcame problems that

24   he saw with it.

25          MR. KLAYMAN:  Your Honor --

1      THE COURT:  We're not bound by those courts, nor --

2      MR. KLAYMAN:  I have a -- I have a complaint pending

3  against that judge, Roy Altman, with the Judicial Council.

4  Okay.  He overstepped his bounds.

5      THE COURT:  Good luck.

6      MR. KLAYMAN:  He probably knows -- yeah.  I know

7  "good luck."  Judges usually just avoid them.  Okay?  I'm being

8  kind.  We have to answer as lawyers, but judges don't have to

9  answer generally.

10      But the question is that this -- there was no

11  *res judicata*.  He issued that order before there was even a

12  response by the other side, before I had a chance to file

13  anything, and he characterized these allegations, which are

14  very --

15      THE COURT:  Let me stop you, please.  Let me stop

16  you.  Let's focus on this case and not those.

17      I'm -- as I said, I'm not bound by those, and I'm

18  not -- you know, I'm not going -- it's not going to make a

19  difference in my opinion on the merits of that motion.  So

20  let's focus on --

21      MR. KLAYMAN:  All right.  I'm glad to hear that,

22  Your Honor.  Secondly --

23      THE COURT:  So let's focus on whether discovery

24  should go forward in this case.

25      MR. KLAYMAN:  Yeah.  This has been mischaracterized.

1  Number one, all I asked for were depositions.  I didn't even

2  ask for documentation.  Very simple, I want to get them under

3  oath.

4          Secondly, with regard to Dr. Jones, we have an

5  affidavit from Alex Jones's former wife, Kelly Morales,

6  formerly Kelly Jones, which ties Dr. Jones to the operations

7  and directions and running Infowars.  So that was an incorrect

8  statement.  Your Honor should take a look at that sworn

9  declaration, and the complaint makes it clear --

10          THE COURT:  I've read it.

11          MR. KLAYMAN:  -- that Dr. Jones is in fact

12  operationally in charge of Infowars.

13          Next, with regard to the fact that I wanted to depose

14  them, they just admitted that they were on notice I wanted to

15  depose them.  I noticed them before the deadline was due.  They

16  noticed no discovery.  I made it clear that I could change the

17  dates, but that wasn't good enough for them.

18          Instead, they waited seven months after they filed

19  their motions to dismiss to move to stay.  Why didn't they file

20  it earlier?  They just don't want to have these people answer

21  questions under oath.

22          THE COURT:  Hang on.  I think the answer to that is

23  that they hadn't been served with any discovery until then.

24          MR. KLAYMAN:  Well, the way things work these days,

25  Your Honor -- I don't know about Texas; it probably works

1  better in Texas than it does in the District of Columbia.  In

2  Florida discovery generally goes forward, at least in state

3  courts it usually does.  And what -- Your Honor recognizes it

4  does in your courts, too.

5         Judge Yeakel made it very clear that he doesn't like

6  continuances; that he wants to try this case; that that's

7  where -- and dispositive motions are to be disfavored unless

8  they're very strong dispositive motions, which they're not in

9  this case.  And all I asked for was depositions.  Simple.

10 Answer questions.  They're frightened to death to answer

11 questions.

12        With regard to Rule 26, yeah, we did confer, and

13 that's how we came up with a discovery schedule and every other

14 schedule.  We conferred.  They knew I wanted to take -- and you

15 take the depositions of defendants.  I'm not out there in left

16 field, you know, taking depositions of people that have nothing

17 to do with this.

18        So, Your Honor, that's the bottom line here.

19 And this is not harassment.  You know -- this statement by

20 Mr. Randazza, this is not a case by Freedom Watch or by any

21 public interest group to raise money.  This is about

22 Larry Klayman and Jerry Corsi's reputations having been

23 destroyed.  This is about Infowars competing with Dr. Corsi and

24 Larry Klayman, who are competitors of them under Lanham Act.

25        You don't even have to get beyond the defamation.  It

1   was false advertising.  Calling Corsi an alcoholic, saying that

2   I had sexually harassed some woman, that my IQ is less than 70,

3   that I never won a case, that gets to your trade and

4   profession, which is defamation, per se, and also false

5   advertising.  And in that case damages are presumed,

6   Your Honor.

7           So I hope that you will not be swayed by the

8   incorrect statements -- and I'm being diplomatic -- made by

9   defense counsel.  And there has been no order in any court that

10  either, in terms of *res judicata* or collateral estoppel in any

11  way eliminated these claims.  And there's no SLAPP statute in

12  Texas, and this case should proceed.

13          There's no harm in taking the depositions of the

14  defendants.  Let them just answer questions.  I will be

15  respectful.  Mr. Biswas will be respectful.  We've been

16  respectful.  They haven't been respectful towards me, but I

17  will be respectful.

18          And, consequently, I would ask that Your Honor, you

19  know, recognize that the judge here, Judge Yeakel, likes to

20  move things along.  He doesn't like things to be delayed.

21          And, in any event, however Your Honor rules, whether

22  you rule in my favor or Mr. Corsi's favor or Defendants' favor,

23  whoever loses is going to take -- it's going to make an

24  objection to Judge Yeakel.  That will slow things down further.

25          So we might was well get along with taking some

1    discovery here.  They didn't want to take any.  I did.  I just

2    want to take their depositions.  I'm not harassing them.  And

3    I'm entitled to that.

4         THE COURT:  Thank you.  Mr. Randazza, you and

5    Mr. Wachen get the last word here.

6         MR. RANDAZZA:  I would just make one quick

7    correction.  We have invoked the Florida anti-SLAPP law, so

8    there actually is a pertinent anti-SLAPP law to be considered.

9         And, you know, as far as the purpose of the

10   depositions, I mean, if we -- if we just look at how much he's

11   publicized Roger Stone's deposition, I just don't -- I don't

12   think it's accurate that these are sought for a proper purpose.

13        MR. KLAYMAN:  Well, let me point out, if I may,

14   Your Honor, in response --

15        THE COURT:  Mr. Klayman -- Mr. Klayman, I haven't

16   asked for you to respond.  Thank you.

17        Mr. Wachen?

18        MR. WACHEN:  Your Honor, Mr. Klayman mentioned the

19   court in D.C.  And in D.C., where he initiated this case,

20   discovery doesn't proceed until Rule 12(b)(6) motions are

21   disposed of, until a party answers the complaint.  That's

22   actually a local rule in that court that Mr. Klayman may be

23   familiar with.

24        But, in any case, in this situation here, Mr. Klayman

25   hasn't identified any harm that would come from him by

1  waiting -- which he's waited up you until now -- waiting until

2  the court rules on these 12(b)(6) motions.

3       If the court grants the motions, there will be no

4  discovery.  If the court denies the motions, then we'll go

5  ahead with discovery.  But there's nothing that needs to happen

6  now.  There's nothing in discovery that's going to have any

7  bearing on the motions.

8       And, given the way that COVID has upended the

9  schedule, I understand, in this court and across the country,

10  there's going to have to be adjustments anyway in the schedule.

11       So at this point what's the point in having the

12  parties subjected to what we think is going to be needless

13  discovery, because we think the motions are highly meritorious,

14  especially with respect to Dr. Jones, who isn't alleged to have

15  done anything and have to bear the burden of the costs of doing

16  that.  We're not afraid of anything.  We just like to have to

17  defend this case that has no merit.

18       Thank you, Your Honor.

19       THE COURT:  Yeah.  And I think one thing that -- that

20  I want to say, you know, just to clear this issue up, I know

21  what Judge Yeakel said at the status conference in May of last

22  year, almost a year ago now.  And I just want to put that in

23  context, that at the time we were two months, sort of, into our

24  shutdown and having closed the courthouse, and it was unclear

25  how long that would last.

 1          We're still not holding trials.  The most recent

 2   order goes through the end of April of 2021.  We had a meeting

 3   as a court a week ago yesterday to look at the issue of when it

 4   would be appropriate.  And I think it's likely that we will not

 5   be open in May either for jury trials.  So -- but I think it's

 6   likely that we may well be after that.

 7          So this case I believe under the current schedule is

 8   set for the final pretrial conference in the month of July.  I

 9   think it's very clear that's not going to happen in this case,

10   just like it didn't in all of the other cases that were set for

11   similar time frames.  I think it is very likely that our

12   schedule in this case is going to have to get pushed back in

13   light of what COVID has done to the docket.

14          So I take that into account in deciding whether it's

15   appropriate to stay or not stay discovery right now.  And the

16   reality is that I think that this -- this docket -- I mean,

17   this scheduling order in this case is likely -- you can take

18   all of the dates and add 2022 to them instead of 2021 is what's

19   likely for the schedule of this case.

20          And you're right, Mr. Klayman.  Judge Yeakel does

21   like to keep his docket on a schedule and doesn't very often

22   change that -- those dates, continue trial dates and that kind

23   of thing.  But in this most recent year we've had to do that a

24   lot.

25          So in light of that --

 1          MR. KLAYMAN:  Before you rule, Your Honor, may I make

 2    a couple of points?

 3          THE COURT:  Briefly.  Very briefly.

 4          MR. KLAYMAN:  Number one, this case is in Texas.

 5    It's not in Florida; it's not in D.C.  The judge ruled that the

 6    case belonged here.  So, therefore, there is no SLAPP statute,

 7    and we're entitled to discovery.

 8          Secondly, it is false that we don't allege that

 9    David Jones did anything wrong.  The complaint is very clear,

10    and that's a very good reason to take his deposition, so we get

11    him under oath -- get him under oath.  If they maintain that

12    despite the fact that the complaint is clear and despite the

13    fact that Kelly Morales came forward and said he's the one

14    that's in control of the Infowars defendants, then let us take

15    his deposition, let him be under oath and tell us that, not

16    through his lawyer.

17          So that's what it's important right now, Your Honor

18    It will save time, ultimately, for you and for Judge Yeakel.

19          THE COURT:  Thank you.  So I -- my ruling is going to

20    be that I'm going to continue the stay that was put in place

21    through today or through this hearing until we get rulings on

22    the 12(b)(6) motions.  And we will try to give those priority

23    as much as possible.

24          I can give you one deadline, which is that I'm

25    retiring on May 31st is my last day on the bench.  So I'm going

1    to get it done before then.  So you should get rulings on the

2    12(b)(6).  They'll be, obviously, report and recommendations of

3    a magistrate judge, so you'll have proceedings after that in

4    front of Judge Yeakel.  But I'll get them done before then.

5           So that should allow you, Mr. Klayman, to keep your

6    case, if the 12(b)(6) motions are not granted or granted only

7    in part, to move forward with discovery and not prejudice your

8    ability to be ready for a trial or anything else, given that I

9    think our docket is getting pushed forward anyway.

10          So that will be my ruling.  We'll get a short brief

11   written order out to that effect, and then you should be

12   looking for a report and recommendation on the pending motions

13   to dismiss in the mean time.

14          MR. KLAYMAN:  Your Honor, may I put one other thing

15   on the record?

16          THE COURT:  Sure.

17          MR. KLAYMAN:  Is that this concept that I brought all

18   those cases is inappropriate.  That case I have offered to have

19   consolidated in this case, okay, the Florida case, where

20   there's no decision.  Okay?

21          So I have not tried to run up the pleadings or act

22   vexatiously or multiply the pleadings.  But they refuse to do

23   that.  So you can't talk out of both sides of your mouth.

24          THE COURT:  Mr. Randazza, Mr. Wachen, anything else

25   we need to address today?

1          MR. RANDAZZA:  No, thank you, Your Honor.

2          MR. WACHEN:  No, Your Honor.  Thank you.

3          THE COURT:  Thank you-all very much.  I appreciate

4  your being available, and we'll get that brief order out here

5  probably either today or tomorrow morning.

6          MR. BISWAS:  Thank you, Your Honor.

7          MR. BUSCHEL:  Thank you, Your Honor.

8          MR. RANDAZZA:  Thank you, Your Honor.

9          MR. WACHEN:  Thank you, Your Honor.

10          MR. WOLMAN:  Thank you, Your Honor.

11       (Proceedings concluded at 3:20 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **REPORTER'S CERTIFICATE**

2        I, Arlinda Rodriguez, do hereby certify that the foregoing

3    was transcribed from an electronic recording made at the time

4    of the aforesaid proceedings and is a correct transcript, to

5    the best of my ability, made from the proceedings in the

6    above-entitled matter, and that the transcript fees and format

7    comply with those prescribed by the Court and Judicial

8    Conference of the United States.

9

10   /S/ Arlinda Rodriguez                    March 26, 2021

11   ARLINDA RODRIGUEZ                        DATE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT D

# Alex Jones, Infowars, and the Sandy Hook Defamation Suits



Alex Jones and his website *Infowars* have been the subject of multiple defamation lawsuits over his repeated claims that the 2012 shooting at the Sandy Hook Elementary School in Newtown, Connecticut was a "giant hoax." Jones and *Infowars* continued to make these claims on broadcasts and in articles published on his website over the course of many years. Jones' followers have harassed the families of the victims and many, in turn, filed suit against him for making defamatory statements that were knowingly false, or made with a disregard for the truth.

*For news, analysis & additional materials read on.*

*First Amendment Watch Teaching Guide:* Can First Amendment Defenses Save Provocateur Alex Jones From The Sandy Hook Libel? (https://firstamendmentwatch.org/first-amendment-watch-teacher-guide-can-first-amendment-defenses-save-provocateur-alex-jones-from-the-sandy-hook-libel-suits/)

News & Updates   Analysis & Opinion   Documents & Resources

News & Updates

## April 5, 2021: U.S. Supreme Court Turns Down Appeal from Alex Jones

The U.S. Supreme Court rejected hearing an appeal from Alex Jones on April 5th. Jones was appealing a court sanction imposed by Connecticut Trial Court Judge Barbara Bellis after he made alarming comments on his radio show, Infowars, about an attorney for the families of the Sandy Hook victims. The Court announced its decision without a written explanation.

In July 2020, the Connecticut Supreme Court characterized Jones' comments as an "imminent and likely threat to the administration of justice," and therefore the sanctions were not inconsistent with the First Amendment.

The sanctions include a prohibition on Jones filing a motion to dismiss the ongoing defamation lawsuit against him.

Jones' attorney said that the decision of the U.S. Supreme Court was "a disappointment."

Associated Press (https://apnews.com/article/connecticut-shootings-lawsuits-alex-jones-school-shootings-59360449ed878c5cdfcbb550291c90a2)

## January 25, 2021: Texas Supreme Court Says Defamation Suits Against Alex Jones Can Continue (https://firstamendmentwatch.org/texas-supreme-court-says-defamation-suits-against-alex-jones-can-continue/)

On January 22nd, the Texas Supreme Court rejected conspiracy theorist Alex Jones' request to toss four defamation lawsuits filed by parents whose children died in the 2012 mass shooting at Sandy Hook Elementary School.

The parents filed the suits in Travis County, Texas, where Jones and his media company, InfoWars, are based. The suits claim that Jones' statements calling the mass shooting a "giant hoax," and accusing the parents of faking their children's death were defamatory and caused the families emotional distress.

Defamatory statements are one of the few categories of speech that the First Amendment does not protect. For private persons, (https://firstamendmentwatch.org/libel-new-york-times-v-sullivan-sets-standard/) such as the victims' parents, to prove that another person's speech defamed them, they need to show that the defendant's statements were false and harmful, and that they published them carelessly.

See also: Can First Amendment Defenses Save Provocateur Alex Jones From The Sandy Hook Libel? (https://firstamendmentwatch.org/first-amendment-watch-teacher-guide-can-first-amendment-defenses-save-provocateur-alex-jones-from-the-sandy-hook-libel-suits/)

In their appeal to the Supreme Court, Jones' lawyers claimed that his statements were protected under the Texas Citizens Participation Act (https://texaslawhelp.org/article/slapp-lawsuits-and-texas-citizens-participation-act-introduction) because he was speaking on a matter of public concern.

"The pursuit of so-called 'conspiracy theories' concerning controversial government activities has been a part and parcel of American political discourse since our Founding, and it is protected by the First Amendment," the lawyers wrote in a brief for one of the lawsuits.

Mark Bankston, the attorney representing the parents, dismissed this notion in a response (https://infowarslawsuit.com/wp-content/uploads/2018/06/april-16-2018-heslin-original-petition-file-stamped.pdf) filed on behalf of Neil Heslin. "[A]ccusing Mr. Heslin of lying about holding the body of his dead son does not amount to a matter of public concern," Bankston wrote.

The ruling, first reported by the *Austin American-Statesman* (https://www.statesman.com/story/news/2021/01/22/alex-jones-sandy-hook-parents-texas-supreme-court/6670360002/), also gave a fifth plaintiff permission to continue with his defamation lawsuit against InfoWars and reporter Kit Daniels for mistakenly labeling him as a suspect in the 2018 mass shooting at Parkland High School.

## July 23rd, 2020: Connecticut Supreme Court Upholds Sanctions Against Alex Jones

The Connecticut Supreme Court upheld a lower courts' sanctions against conspiracy theorist Alex Jones for threatening the attorney and law firm representing Sandy Hook families in a defamation case against Jones.

"[T]he sanctions did not run afoul of the First Amendment because they addressed speech that was an imminent and likely threat to the administration of justice. Accordingly, it was not an abuse of the trial court's discretion to sanction the defendants for their discovery violations and Jones' vituperative speech," the Connecticut Supreme Court ruled on July 23rd.

In 2019, Jones accused Charles Mattei, and his law firm, Koskoff Koskoff & Bieder, of planting images of child pornography on his computer to discredit him. In an angry outburst during a live broadcast, Jones appeared to ask his fans to target Mattei.

"I pray for divine intervention against the powers of Satan. I literally would never have sex with children. I don't like having sex with children. I would never have sex with children. I am not a Democrat. I am not a liberal. I do not cut children's genitals off like the left does. And so, if they want war — you know, it's not a threat. It's like an AC/DC song. If you want blood, you've got it. Blood on the streets, man," Jones said in a televised broadcast.

On the same broadcast, Jones pounded a picture of Mattei and shouted, "I'm gonna kill … Anyway I'm done. Total war. You want it, you got it."

The ruling allows the defamation suit to move towards a jury trial in the fall.

News Times (https://www.newstimes.com/local/article/Supreme-Court-upholds-sanctions-for-Alex-Jones-15429879.php)

**March 27, 2020: Texas Appeals Court Rejects Alex Jones' Motion to Dismiss Heslin Defamation Suit**
(https://firstamendmentwatch.org/texas-appeals-court-rejects-alex-jones-motion-to-dismiss-heslin-defamation-suit/)

On March 25th, the Texas Court of Appeals rejected Infowars founder Alex Jones' motion to dismiss a defamation lawsuit brought by Neil Heslin, whose son was killed in the 2012 mass shooting at Sandy Hook Elementary School. The judge has ordered Jones to pay Heslin $22,250 in attorney fees, making the total amount Jones now owes Heslin just under $150,000.

Heslin sued Jones in April 2018 over false statements he made on his site, claiming that the mass shooting in Sandy Hook was a government hoax and the victims' parents were "crisis actors". A number of Jones' readers went on to harass families of Sandy Hook victims, including the Heslins, causing them significant emotional distress.

Jones has tried on multiple occasions to have the lawsuit dismissed on free speech grounds, albeit with little success.

In October 2018, Jones was ordered to pay $25,000 for failing to comply with a discovery order. Then, in December 2019 (https://firstamendmentwatch.org/alex-jones-ordered-to-pay-100000-in-legal-fees-in-defamation-lawsuit/), a Texas district court judge ruled against Jones' motion to dismiss Heslin's lawsuit, finding that Heslin had met the standard for defamation under state law. The district judge ordered Jones to pay an additional $100,000 in legal costs to the attorneys representing Heslin.

In his opinion (https://www.courthousenews.com/wp-content/uploads/2020/03/Infowars.pdf), Judge Scott H. Jenkins affirmed the district court's denial of Jones' motion to dismiss.

"We affirm the district court's dismissal of Appellants' motion to dismiss, and we grant Heslin's motion for sanctions and award him $22,250 for attorney's fees," Jenkins opinion reads.

Huffington Post (https://www.huffingtonpost.co.uk/entry/alex-jones-loses-another-sandy-hook-court-battle-must-now-pay-150000-in-court-costs_n_5e7cf82dc5b6cb9dc19cadf0?ri18n=true&utm_source=CJR+Daily+News&utm_campaign=23284480cc-EMAIL_CAMPAIGN_2018_10_31_05_02_COPY_01&utm_medium=email&utm_term=0_9c93f57676-23284480cc-174753011&mc_cid=23284480cc&mc_eid=e4edaef73b&guccounter=2) Opinion (https://www.courthousenews.com/wp-content/uploads/2020/03/Infowars.pdf)

**December 20, 2019: Alex Jones Ordered to Pay $100,000 in Legal Fees in Defamation Lawsuit**
(https://firstamendmentwatch.org/alex-jones-ordered-to-pay-100000-in-legal-fees-in-defamation-lawsuit/)

On December 20th, a Texas district court judge ordered Alex Jones to pay more than $100,000 in legal fees in a defamation suit brought by the father of one of the victims of the Sandy Hook Elementary School mass shooting.

The defamation suit brought by Neil Heslin is one of several suits filed against Jones by the families who lost children in the school shooting on December 14, 2012. Following the massacre, Jones repeatedly stated on his website, Infowars, that the shooting was a hoax and had been staged by the U.S. government in an attempt to confiscate Americans' guns.

The order by Travis County District Judge Scott Jenkins comes after Jones ignored a court order to provide documents and witnesses. Jenkins also ruled against a motion from Jones's attorneys to dismiss the suit, adding additional legal fees that brought the amount that Jones has had to pay to $126,024. (Jones was ordered to pay $25,875 last October for failing to comply with another ruling.) A trial date for the Heslin case has not yet been scheduled.

In an email to the *Daily Beast*, Heslin's lawyer, Mark Bankston, said that the suit could have been avoided if Jones had accepted responsibility for his lies and his harassment of Heslin and other Sandy Hook parents. "Instead, Mr. Jones seems to prefer exiting into the dustbin of history in the most expensive and embarrassing way possible," Bankston wrote.

Daily Beast (https://www.thedailybeast.com/alex-jones-and-infowars-ordered-to-pay-dollar100k-in-court-costs-for-sandy-hook-case) Hartford Courant (https://www.courant.com/breaking-news/hc-br-alex-jones-sandy-hook-legal-fees-20191231-wrj2xzoporh6lbk76bv7sdniue-story.html) CNN (https://www.cnn.com/2019/12/31/media/alex-jones-sandy-

**December 12, 2019: Lawyer files motion in *Heslin v Jones* case to hold Jones and *Infowars* liable without trial**

Mark Bankston, the attorney representing Neil Heslin in his defamation lawsuit against Alex Jones, filed a motion on December 12th, 2019 asking that the judge hold Jones and *Infowars* liable without trial.

In his motion, Bankston argues that the defendants committed "willful and flagrant discovery abuse." This behavior allegedly includes refusing to make good faith efforts to answer written discovery or respond at deposition, withholding tens of thousands of emails relating to Sandy Hook, and erasing many of the computers prior to collection efforts.

"Defendants have been given ample opportunity to take these lawsuits seriously and obey the rule of law," the filing said. "Yet despite a rotating cast of counsel, Defendants have remained stubborn in their refusal to respect the integrity of the proceedings."

The jury wouldn't decide whether Jones' was guilty, it would only be used to determine the amount of damages Jones. The motion is scheduled to be heard by the court on Wednesday, December 18th.

The Hill (https://thehill.com/regulation/court-battles/474335-lawyer-seeks-judgement-without-a-trial-for-alex-jones-in-sandy-hook)

**July 10, 2019: Connecticut Supreme Court Agrees to Hear Alex Jones' Appeal to Review Trial Court's Sanctions**

The Connecticut Supreme Court has agreed to review Alex Jones appeal regarding sanctions imposed by a trial court judge over alleged threats to lawyers in Sandy Hook case.

On June 17, 2019, trial Court Judge Barbara Bellis denied Jone's lawyers requests to pursue a special motion to dismiss the lawsuit by the Sandy Hook families. She also ordered Jones to pay for all legal fees associated with an incident that occurred during the discovery process when dozens of emails from Jones and Infowars were found to contain child pornography. An investigation cleared Jones of any wrongdoing, and revealed that none of the emails had ever been opened.

In his 10-page appeal to the Supreme Court, Jones' lawyer, Norm Pattis, argues that the penalties imposed on his client are too harsh, and threaten his First Amendment rights to speak on a matter of public interest.

According to the Hartford Courant, the Connecticut Supreme Court will now hold "a full hearing on Pattis' appeal" in which they "could overturn Bellis' ruling" and "restore Jones' right to possibly have the case dismissed."

The hearing will likely take place in September.

Hartford Courant (https://www.courant.com/news/connecticut/hc-news-sandy-hook-lawsuit-reversed-20190710-2jqandrmmrgn5okxfhaugoxkwm-story.html)

**June 24, 2019: Alex Jones Hit With Sanctions, His Attorney Requests Connecticut Supreme Court to Review**

The lawyer defending Alex Jones in the defamation suit brought the parents of some of the Sandy Hook victims has asked the Connecticut Supreme Court to review sanctions imposed on Jones by a trial judge.

On June 18, Bridgeport Superior Court Judge Barbara Bellis imposed the sanctions during an emergency hearing after Jones threatened the Sandy Hook families' attorney, Christopher Mattei, on Jones' webcast.

Jones' rant was triggered by a recent revelation that a dozen emails retrieved from him and his Infowars website during the discovery process had images of child pornography attached. The FBI investigated, and determined that they were sent to Jones from outside of his organization, and no one ever opened the files to view the images.

On his televised webcast, however, Jones accused Mattei and his law firm, Koskoff Koskoff & Bieder, of planting the images, and made threatening comments towards Mattei and his firm.

Norm Pattis, Jones' lawyer, is arguing that his client was only exercising his First Amendment right to speak on a matter of public interest.

Hartford Courant (https://www.courant.com/news/connecticut/hc-alex-jones-sandyhook-lawsuit-appeal-0625-20190624-5rslpozzkvaf7mgyqd2yidjfze-story.html)

## May 2, 2019: Alex Jones and InfoWars Banned on Facebook

Facebook is banning some controversial, well-known figures for violating the social media giant's policies on hate speech and promoting violence.

The list includes Sandy Hook-denier Alex Jones, right-wing provocateur Milo Yiannopoulos, conspiracy theorists Laura Loomer and Paul John Watson, Louis Farrakhan, who promotes anti-Semitic views, and Paul Nehlen, a white nationalist who ran for Congress in 2018.

"We've always banned individuals or organizations that promote or engage in violence and hate, regardless of ideology," a Facebook representative said Thursday in a statement. "The process for evaluating potential violators is extensive and it is what led us to our decision to remove these accounts today."

The ban includes their individual Facebook accounts, fan pages, and groups affiliated with them. These individuals are also banned from Instagram, the photo-sharing app owned by Facebook.

Jones, who has spread his conspiracy theories about the Sandy Hook school mass shooting on his InfoWars site, was temporarily banned on Facebook last year. His official fan page was also banned, but Jones was allowed to keep his personal account.

The new prohibition makes all of Jones' temporary bans permanent, bans Jones from having a personal Facebook account, and extends more broadly to fan pages and videos that promote InfoWars.

According to Angelo Carusone, the president of Media Matters, nonprofit that monitors conservative misinformation online, says that recent mass shootings and other acts of violence caused by online hate speech prompted Facebook to finally take action.

"The reality is, people are getting killed. There are mass shootings and mass murders that are clearly being connected to ideas like white genocide, which are fueling radicalization," Carusone told *The Washington Post*. "The conditions have changed. When you have these massive catalyzing moments that are connected to real-life consequences, it puts pressure on Facebook and others to look in the mirror."

Facebook isn't the first social media platform to ban some of these polarizing figures. In recent years, Twitter has temporarily or permanently banned Jones, Loomer, Nehlen, and Yiannopoulos for their inflammatory content.

Los Angeles Times (https://www.latimes.com/business/technology/la-fi-tn-facebook-ban-alex-jones-milo-yiannopoulos-20190502-story.html) The Washington Post (https://www.washingtonpost.com/technology/2019/05/02/facebook-bans-extremist-leaders-including-louis-farrakhan-alex-jones-milo-yiannopoulos-being-dangerous/?utm_term=.66811cd057dd)

## April 1, 2019: Under Oath, Jones Admitted His Opinion Was Wrong But Blamed "Psychosis"

During a three-hour long taped deposition as part of a defamation case brought by some of the families of the Sandy Hook victims, Alex Jones claimed he had a "form of psychosis" that caused him to question whether certain events like the Sandy Hook mass shootings were staged.

"And I, myself, have almost had like a form of psychosis back in the past where I basically thought everything was staged, even though I'm now learning a lot of times things aren't staged," Jones said in a video released by Kaster Lynch Farrar & Ball LLP, a Texas law firm representing some of the families.

Jones blamed the same media for leading him to distrust everything.

"So long before these lawsuits I said that in the past I thought everything was a conspiracy and I would kind of get into that mass group think of the communities that were out saying that," he said. "And so now I see that it's more in the middle… so that's where I stand."

Jones also acknowledged that some of his reporting was based off of Internet sources like YouTube and 4Chan.

Regardless, Jones would not admit that his conspiratorial claims caused the families pain, and described the lawsuits as an attack on him and on the First Amendment.

"I was stating that I was reporting on the general questioning when others were questioning. And, you know, it's painful that we have to question big public events. I think that's an essential part of the First Amendment in America. And I do not take responsibility for the entire train of things that lawyers and the media have said I've done."

CNN (https://www.cnn.com/2019/03/30/us/alex-jones-psychosis-sandy-hook/index.html) NBC (https://www.nbcnews.com/news/us-news/infowars-alex-jones-claims-psychosis-caused-him-question-sandy-hook-n989091) Deposition Videos (https://www.youtube.com/channel/UCeeCy2sW9BRXjlfsIOA5DgA)

### February 7, 2019: Judges Have Advanced The Cases In Favor Of The Sandy Hook Families In The Past Few Weeks

*The New York Times* reports on a series of legal victories in favor of the Sandy Hook families in three lawsuits against Alex Jones and Infowars.

In Texas, a judge ordered Jones and Infowars representatives to submit to questioning by the lawyers of one Sandy Hook mother, and also granted access to the company's business records against the wishes of Jones' lawyers, who wanted them to remain sealed.

In Connecticut, a judge ordered Infowars' business associates and partners to testify, and will soon rule on the deposition of Jones himself and other Infowars associates, as per the families' request.

The New York Times (https://www.nytimes.com/2019/02/07/us/politics/alex-jones-sandy-hook.html)

### January 11, 2019: CT Superior Court Judge Grants Sandy Hook Families' Discovery Request To Access Infowars' Internal Documents And Communications

The six families suing Alex Jones and *Infowars* in Connecticut over repeated defamatory comments about the Sandy Hook Elementary School massacre were granted a legal victory in their case. The judge ruled that the families can gain access to *Infowars'* financial and marketing documents, contracts between *Infowars* and platforms like Facebook and Twitter, and any communications including letters, emails, and text messages related to Sandy Hook, Adam Lanza, crisis actors, or mass shootings. According to an attorney for the families, this documentation is meant to corroborate the claims made in the lawsuit to prove that Alex Jones is a "conspiracy profiteer." The judge will decide whether to let the plaintiffs' legal team depose Jones at a hearing scheduled for this week.

The New York Times (https://www.nytimes.com/2019/01/12/us/alex-jones-infowars-lawsuit.html) ABC News (https://abcnews.go.com/US/families-sandy-hook-shooting-victims-win-legal-victory/story?id=60314174) Hartford Courant (https://www.courant.com/news/connecticut/hc-news-sandy-hook-jones-lawsuit-20190111-xao67zxhmnbrfm2wjnz5xjchcu-story.html)

### August 17, 2018: Motion Accuses Jones Of Intentionally Destroying Evidence Related to Suits

Lawyers representing the families of two Sandy Hook shooting victims accused Alex Jones of intentionally destroying evidence related to the lawsuit. According to the motion filed, Jones said on his broadcast that he instructed his staffers to delete select content like social media messages and videos, some of which was considered evidence in the Sandy Hook case.

The New York Times (https://www.nytimes.com/2008/08/01/us/politics/01congress-evidence-344.html?hp&action=click&pgtype=Homepage&clickSource=story-heading&module=first-column-region&region=top-news&WT.nav=top-news) Motion (https://int.nyt.com/data/documenthelper/171-alex-jones-sandy-hook-evidence/283173e237c0c133f158/optimized/full.pdf#page=1)

## August 1, 2018: First Of 3 Defamation Suits Against Jones Reaches Courtroom

Lawyers for Alex Jones are fighting to dismiss a defamation case brought against him and his site Infowars by parents of victims of the Sandy Hook shooting under the Texas Citizens Participation Act. His attorneys are arguing that what Jones says on his show is not fact, but rather his opinion. According to Reuters, an attorney for Jones told the judge, "Maybe it's fringe speech. Maybe it's dangerous speech, but it is not defamation."

The judge has 30 days to rule on a motion to dismiss the case.

The New York Times (https://www.nytimes.com/2018/08/01/us/politics/infowars-sandy-hook-alex-jones.html) Reuters (https://www.reuters.com/article/us-usa-lawsuit-alexjones/conspiracy-theorist-jones-seeks-halt-of-sandy-hook-defamation-suit-idUSKBN1KM4GI) Buzzfeed News (https://www.buzzfeednews.com/article/briannasacks/alex-jones-infowars-defamation-lawsuit)

## July 24, 2018: Alex Jones Compares Himself To Storied Watergate Journalists In Effort To Dismiss Lawsuit

In an attempt to dismiss a defamation lawsuit, Alex Jones of Infowars compared himself to Carl Bernstein and Bob Woodward, *The Washington Post* journalists who helped uncover the Watergate scandal, saying he acted like a journalist when he questioned the narrative of the Sandy Hook school shooting in 2012.

Lawyers for Jones wrote in his filing for dismissal: "Such journalism, questioning official narratives, would be chilled if reporters were subject to liability if they turned out to be wrong….To stifle the press (by making them liable for merely interviewing people who have strange theories) will simply turn this human tragedy into a Constitutional one."

Bill Bloss, an attorney for the families said in many news reports that, "The First Amendment simply does not protect false statements about the parents of one of the worst tragedies in our nation's history. Any effort by any of the defendants to avoid responsibility for the harm that they have inflicted will be unsuccessful."

CBS News (https://www.cbsnews.com/news/alex-jones-compares-himself-bob-woodward-carlbernstein-sandy-hook-lawsuit/) The Associated Press (https://apnews.com/ce04388309ee44249a0f9461d34bef5f) Motion to Dismiss (https://drive.google.com/file/d/1kxMDBH1QVV_tlceTsvrF1Jw_QVd14xAr/view)

## May 24, 2018: More Sandy Hook Families File Defamation Lawsuit Against Alex Jones For False Stories Promoted on Infowars

Six families of Sandy Hook victims and an FBI agent filed a third lawsuit Wednesday against Alex Jones and his businesses for repeated claims he made on his *Infowars* show that the 2012 massacre was a hoax. The families are suing on defamation, invasion of privacy by false light, intentional infliction of emotional distress, and negligent infliction of emotional distress. The suit, filed in Superior Court in Bridgeport, Connecticut, comes after two other suits that were filed last month in Texas by two other Sandy Hook victim families. The complaints from all eight families allege that Jones used his internet and radio platforms to push the conspiracy theory that the shooting in Newtown was a staged event. It lists a campaign of abuse starting from December 19, 2012 through June 26, 2017. On a complaint listed for January 13, 2015, the parents allege that during the broadcast of The Alex Jones Radio Show, Jones said, "…Sandy Hook is a synthetic completely fake with actors, in my view, manufactured. I couldn't believe it at first. I knew they had actors there, clearly, but I though they killed some real kids. And it just shows how bold they are, that they clearly used actors." The complaint says that "a reasonable person would understand these statements to assert that the Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones."

The lawsuit claims that while Jones' false accusation brought him attention and business, the plaintiffs suffered personal pain and abuse from the radio and internet personality and his fans.

*The New York Times* reporter Elizabeth Williamson writes that Jones claims First Amendment protection for his work and that the most recent lawsuit filed challenges that defense. "The First Amendment has never protected demonstrably false, malicious statements like the defendants'," it reads.

New York Times (https://www.nytimes.com/2018/05/23/us/politics/alex-jones-trump-sandy-hook.html) The Daily by The New York Times (https://www.nytimes.com/2018/05/24/podcasts/the-daily/sandy-hook-alex-jones-infowars-lawsuit.html) NBC News (https://www.nbcnews.com/business/business-news/six-more-families-sue-alex-jones-over-sandy-hook-conspiracy-n876881)

Connecticut Law Tribune (https://www.law.com/ctlawtribune/2018/05/23/connecticut-lawyers-sue-conspiracy-theorist-alex-jones-for-sandy-hook-families-fbi-agent/)

**April 17, 2018: Sandy Hook Parents Take on False Stories Promoted by Alex Jones in Defamation Suit**

The 2012 Sandy Hook school massacre which killed 20 children and 6 adults galvanized parents and relatives of those murdered to promote gun reform. One conservative commentator who responded negatively to their efforts: Alex Jones and his *Infowars* which ran segments claiming the massacre at Sandy Hook was "a giant hoax." Jones' followers have continued to harass Sandy Hook families. Now Leonard Pozner and his former wife, Veronique De La Rosa, parents of Noah Pozner, and Neil Heslin, the father of Jesse Lewis, have responded by filing two defamation suits against Alex Jones stating "defendants' defamatory statements were knowingly false or made with reckless disregard for the truth." They are seeking at least $1 million in damages. This is the second time this year Alex Jones has been sued for defamation. In March, Brennan Gilmore sued Jones for stories that led to threats against him.

New York Times (https://www.nytimes.com/2018/04/17/business/media/alex-jones-sandy-hook.html) Reuters TV (https://www.reuters.tv/v/u5t/2018/04/17/sandy-hook-parents-sue-infowars-alex-jones-for-defamation) Reuters (https://www.reuters.com/article/us-texas-lawsuit-alexjones/sandy-hook-parents-sue-conspiracy-theorist-alex-jones-for-defamation-idUSKBN1HO2FU)

Analysis & Opinion

**February 5, 2020: The Professor of Denial  (https://www.chronicle.com/article/the-professor-of-denial/)**

Amanda J. Crawford writes about James H. Fetzer, a retired philosophy professor who has promoted conspiracy theories since the 1990s. Among the theories he has promoted are that the Apollo moon landing was fake and that the Holocaust where 11 million Jews and others were killed, never occurred.

In 2015, Fetzer published a book *Sandy Hook: It Was a FEMA Drill to Promote Gun Control*, and began a movement of Sandy Hook "truthers." Though it was Alex Jones who, using Infowars, helped the lies spread more quickly, much of the theory itself was invented by Fetzer. In October 2019, a Wisconsin jury awarded Leonard Pozner $450,000 for accusing him of falsifying his son's death certificate. Pozner's son, Noah Pozner, was 6-year-old when he was killed in the Sandy Hook Elementary School shooting.

Unlike Jones, Fetzer says he still believes that the massacre was staged.

**December 5, 2019: I worked for Alex Jones. I Regret It.  (https://www.nytimes.com/2019/12/05/magazine/alex-jones-infowars.html)**

 Josh Owens, a former writer for Infowars, gives a close-up view of what it was like to work with Alex Jones. Lured by Jones' combative personality, Owen's account may help explain why so many are attracted to Jones ' style of broadcasting.

"He railed against government corruption and secrecy, the militarization of police. He confronted those in power, traipsed through the California redwoods to expose the secretive all-male meeting of elites at Bohemian Grove and even appeared in two Richard Linklater films as himself, screaming into a megaphone."

But once he began working with Jones, Owens learned how many of the stories were made up and used to exploit the "prejudices and fears" of Jones's audiences.

**July 8, 2019: <u>Newton Parents Fight Back (https://www.washingtonpost.com/local/education/first-they-lost-their-children-then-the-conspiracies-started-now-the-parents-of-newtown-are-fighting-back/2019/07/08/f167b880-9cef-11e9-9ed4-c9089972ad5a_story.html)</u>**

Susan Svrluga writes in *The Washington Post* about the parents of Newtown and their experience battling conspiracy theorists in court. Using a number of interviews with the parents, she highlights the psychological and emotional toll of "unimpeded conspiracy theories" as well as the way in which social media enables their quick spread.

"Story by story, site by site, year after year," Svrluga writes," Pozner has been working to restore the truth about his son."

**March 31, 2019: <u>Legal System Will Force Jones To Tell The Truth (https://www.nytimes.com/2019/03/31/opinion/alex-jones-sandy-hook.html)</u>**

Charlie Warzel writes in the *New York Times* that the deposition of Alex Jones in one of the defamation lawsuits he is faced with "highlights a troubling reality: The legal system may be the only way to defang a well-known conspiracy theorist at the height of his powers."

**August 6, 2018: <u>Alex Jones Lawsuit Will Change The Way We Think About Free Speech On The Internet (https://www.wired.com/story/alex-jones-lawsuit-will-help-redefine-free-speech/)</u>**

Emma Grey Ellis asserts in *Wired* that the legal questions of free speech on the internet brought up in the defamation cases against Alex Jones will have formative implications. Are the victims' parents public figures? Is what Alex Jones says the truth, or is it trolling? Is Infowars a media institution? "This push and pull between internet and legal norms is a good thing—as long as it continues to evolve," she writes. "That's important is we learn to negotiate the balance between speaking safely, and freely, on the web."

**July 24, 2018: <u>Are There Actual Constitutional Concerns In Jones' Lawsuit? (https://www.esquire.com/news-politics/politics/a22538181/alex-jones-sandy-hook-trial/)</u>**

Charles P. Pierce writes in *Esquire* that the case contains may test the constitutional limits of talk radio, punditry, and extreme internet broadcasting. He also makes note of the other fringe figures that have been represented by Jones' legal team in the past.

-

Documents & Resources

***Pozner v. Jones*:** Lawsuit against Alex Jones and Infowars and others by Sandy Hook shooting victim Noah Pozner's parents Leonard Pozner and Veronique De La Rosa in Texas.

<u>Pozner Complaint (https://drive.google.com/file/d/1SnPMj3h2sdlCfL1e4nwm7d0jSCercoV1/view)</u> <u>Alex Jones Motion to Dismiss (https://www.courthousenews.com/wp-content/uploads/2018/08/Alex-Jones-Motion-to-Dismiss.pdf)</u>

***Lafferty v. Jones:*** Lawsuit against Alex Jones and Infowars and others by six families of Sandy Hook shooting victims in Connecticut.

<u>Complaint (https://drive.google.com/file/d/12mHNXnFQo2nH555yJxC5JIEEeAoxi_Fj/view)</u> <u>Motion to Dismiss Plaintiffs' Complaint (https://drive.google.com/file/d/1kxMDBH1QVV_tlceTsvrF1Jw_QVd14xAr/view)</u>

***Heslin v. Jones*:** Lawsuit against Alex Jones and Infowars and others by father of Sandy Hook shooting victim Neil Heslin in Texas.

<u>Complaint (https://drive.google.com/file/d/1opX6d3Bycbl4sWGo8o37SuPcjxDanzjL/view)</u>

*Sherlach v. Jones* - Lawsuit against Alex Jones and Infowars and others by husband of Sandy Hook shooting victim William Sherlach spouse of Mary Sherlach in Connecticut.

Complaint (https://drive.google.com/file/d/1iNhsZCYo6ifS9M0JHBiLO1-x2KmjuLhT/view)

Allegations made by Alex Jones and Infowars that created the foundation for the complaints detailed in the lawsuit.

Below are a select few instances in which Jones and Infowars contributors made claims to support the Sandy Hook shooting conspiracy theory on broadcasts and in published articles over the course of many years.

In 2013, Jones called the shooting *"staged"* and said, *"It's got inside job written all over it."*

In March 2014, Alex Jones began stating his allegation regarding a "fake" interview between Anderson Cooper and Noah Pozner's mother, Veronique De La Rosa. The allegation that the interview took place in front of a "blue screen" became central to Jones' assertion that the Sandy Hook school shooting was manipulated by the government and performed by crisis actors.

*"Folks, we've got video of Anderson Cooper with clear blue-screen out there. [Shaking head]. He's not there in the town square. We got people clearly coming up and laughing and then doing the fake crying. We've clearly got people where it's actors playing different parts for different people, the building bulldozed, covering up everything. Adam Lanza trying to get guns five times we're told. The witnesses not saying it was him...I've looked at it and undoubtedly, there's a cover-up, there's actors, they're manipulating, they've been caught lying, and they were pre-planning before it and rolled out with it."*

In May 2014, InfoWars published an article titled: "CONNECTICUT TRIES TO HIDE SANDY HOOK TRUTH." (https://www.infowars.com/connecticut-tries-to-hide-sandy-hook-truth/)

In September 2014, Infowars published an article titled: "FBI SAYS NO ONE KILLED AT SANDY HOOK." (https://www.infowars.com/fbi-says-no-one-killed-at-sandy-hook/)

*"The whole thing is a giant hoax. How do you deal with a total hoax? It took me about a year, with Sandy Hook, to come to grips with the fact that the whole thing was fake. I did deep Research."* (December 2014)

*"The general public doesn't know the school was actually closed the year before. They don't know they've sealed it all, demolished the building. They don't know that they had the kids going in circles in and out of the building as a photo-op. Blue-screen, green-screens, they got caught using."* (December 2014)

*"You learn the school had been closed and re-opened. And you've got video of the kids going in circles, in and out of the building, and they don't call the rescue choppers for two hours, and then they tear the building down, and seal it. And they get caught using blue-screens, and an email by Bloomberg comes out in a lawsuit, where he's telling his people get ready in the next 24 hours to capitalize on a shooting. Yeah, so Sandy Hook is a synthetic, completely fake with actors, in my view, manufactured. I couldn't believe it at first. I knew they had actors there, clearly, but I thought they killed some real kids. And it just shows how bold they are that they clearly used actors. I mean they even ended up using photos of kids killed in mass shootings here in a fake mass shooting in Turkey, or Pakistan. The sky is now the limit."* (January 2015)







# EXHIBIT E

# Alex Jones, Infowars, and the Sandy Hook Defamation Suits



Alex Jones and his website *Infowars* have been the subject of multiple defamation lawsuits over his repeated claims that the 2012 shooting at the Sandy Hook Elementary School in Newtown, Connecticut was a "giant hoax." Jones and *Infowars* continued to make these claims on broadcasts and in articles published on his website over the course of many years. Jones' followers have harassed the families of the victims and many, in turn, filed suit against him for making defamatory statements that were knowingly false, or made with a disregard for the truth.

*For news, analysis & additional materials read on.*

*First Amendment Watch Teaching Guide:* Can First Amendment Defenses Save Provocateur Alex Jones From The Sandy Hook Libel? (https://firstamendmentwatch.org/first-amendment-watch-teacher-guide-can-first-amendment-defenses-save-provocateur-alex-jones-from-the-sandy-hook-libel-suits/)

News & Updates  Analysis & Opinion  Documents & Resources

News & Updates

## April 5, 2021: U.S. Supreme Court Turns Down Appeal from Alex Jones

The U.S. Supreme Court rejected hearing an appeal from Alex Jones on April 5th. Jones was appealing a court sanction imposed by Connecticut Trial Court Judge Barbara Bellis after he made alarming comments on his radio show, Infowars, about an attorney for the families of the Sandy Hook victims. The Court announced its decision without a written explanation.

In July 2020, the Connecticut Supreme Court characterized Jones' comments as an "imminent and likely threat to the administration of justice," and therefore the sanctions were not inconsistent with the First Amendment.

The sanctions include a prohibition on Jones filing a motion to dismiss the ongoing defamation lawsuit against him.

Jones' attorney said that the decision of the U.S. Supreme Court was "a disappointment."

Associated Press (https://apnews.com/article/connecticut-shootings-lawsuits-alex-jones-school-shootings-59360449ed878c5cdfcbb550291c90a2)

## January 25, 2021: Texas Supreme Court Says Defamation Suits Against Alex Jones Can Continue (https://firstamendmentwatch.org/texas-supreme-court-says-defamation-suits-against-alex-jones-can-continue/)

On January 22nd, the Texas Supreme Court rejected conspiracy theorist Alex Jones' request to toss four defamation lawsuits filed by parents whose children died in the 2012 mass shooting at Sandy Hook Elementary School.

The parents filed the suits in Travis County, Texas, where Jones and his media company, InfoWars, are based. The suits claim that Jones' statements calling the mass shooting a "giant hoax," and accusing the parents of faking their children's death were defamatory and caused the families emotional distress.

Defamatory statements are one of the few categories of speech that the First Amendment does not protect. For private persons, (https://firstamendmentwatch.org/libel-new-york-times-v-sullivan-sets-standard/) such as the victims' parents, to prove that another person's speech defamed them, they need to show that the defendant's statements were false and harmful, and that they published them carelessly.

See also: Can First Amendment Defenses Save Provocateur Alex Jones From The Sandy Hook Libel? (https://firstamendmentwatch.org/first-amendment-watch-teacher-guide-can-first-amendment-defenses-save-provocateur-alex-jones-from-the-sandy-hook-libel-suits/)

In their appeal to the Supreme Court, Jones' lawyers claimed that his statements were protected under the Texas Citizens Participation Act (https://texaslawhelp.org/article/slapp-lawsuits-and-texas-citizens-participation-act-introduction) because he was speaking on a matter of public concern.

"The pursuit of so-called 'conspiracy theories' concerning controversial government activities has been a part and parcel of American political discourse since our Founding, and it is protected by the First Amendment," the lawyers wrote in a brief for one of the lawsuits.

Mark Bankston, the attorney representing the parents, dismissed this notion in a response (https://infowarslawsuit.com/wp-content/uploads/2018/06/april-16-2018-heslin-original-petition-file-stamped.pdf) filed on behalf of Neil Heslin. "[A]ccusing Mr. Heslin of lying about holding the body of his dead son does not amount to a matter of public concern," Bankston wrote.

The ruling, first reported by the _Austin American-Statesman_ (https://www.statesman.com/story/news/2021/01/22/alex-jones-sandy-hook-parents-texas-supreme-court/6670360002/), also gave a fifth plaintiff permission to continue with his defamation lawsuit against InfoWars and reporter Kit Daniels for mistakenly labeling him as a suspect in the 2018 mass shooting at Parkland High School.

## July 23rd, 2020: Connecticut Supreme Court Upholds Sanctions Against Alex Jones

The Connecticut Supreme Court upheld a lower courts' sanctions against conspiracy theorist Alex Jones for threatening the attorney and law firm representing Sandy Hook families in a defamation case against Jones.

"[T]he sanctions did not run afoul of the First Amendment because they addressed speech that was an imminent and likely threat to the administration of justice. Accordingly, it was not an abuse of the trial court's discretion to sanction the defendants for their discovery violations and Jones' vituperative speech," the Connecticut Supreme Court ruled on July 23rd.

In 2019, Jones accused Charles Mattei, and his law firm, Koskoff Koskoff & Bieder, of planting images of child pornography on his computer to discredit him. In an angry outburst during a live broadcast, Jones appeared to ask his fans to target Mattei.

"I pray for divine intervention against the powers of Satan. I literally would never have sex with children. I don't like having sex with children. I would never have sex with children. I am not a Democrat. I am not a liberal. I do not cut children's genitals off like the left does. And so, if they want war — you know, it's not a threat. It's like an AC/DC song. If you want blood, you've got it. Blood on the streets, man," Jones said in a televised broadcast.

On the same broadcast, Jones pounded a picture of Mattei and shouted, "I'm gonna kill … Anyway I'm done. Total war. You want it, you got it."

The ruling allows the defamation suit to move towards a jury trial in the fall.

News Times (https://www.newstimes.com/local/article/Supreme-Court-upholds-sanctions-for-Alex-Jones-15429879.php)

**March 27, 2020: Texas Appeals Court Rejects Alex Jones' Motion to Dismiss Heslin Defamation Suit**
(https://firstamendmentwatch.org/texas-appeals-court-rejects-alex-jones-motion-to-dismiss-heslin-defamation-suit/)

On March 25th, the Texas Court of Appeals rejected Infowars founder Alex Jones' motion to dismiss a defamation lawsuit brought by Neil Heslin, whose son was killed in the 2012 mass shooting at Sandy Hook Elementary School. The judge has ordered Jones to pay Heslin $22,250 in attorney fees, making the total amount Jones now owes Heslin just under $150,000.

Heslin sued Jones in April 2018 over false statements he made on his site, claiming that the mass shooting in Sandy Hook was a government hoax and the victims' parents were "crisis actors". A number of Jones' readers went on to harass families of Sandy Hook victims, including the Heslins, causing them significant emotional distress.

Jones has tried on multiple occasions to have the lawsuit dismissed on free speech grounds, albeit with little success.

In October 2018, Jones was ordered to pay $25,000 for failing to comply with a discovery order. Then, in December 2019 (https://firstamendmentwatch.org/alex-jones-ordered-to-pay-100000-in-legal-fees-in-defamation-lawsuit/), a Texas district court judge ruled against Jones' motion to dismiss Heslin's lawsuit, finding that Heslin had met the standard for defamation under state law. The district judge ordered Jones to pay an additional $100,000 in legal costs to the attorneys representing Heslin.

In his opinion (https://www.courthousenews.com/wp-content/uploads/2020/03/Infowars.pdf), Judge Scott H. Jenkins affirmed the district court's denial of Jones' motion to dismiss.

"We affirm the district court's dismissal of Appellants' motion to dismiss, and we grant Heslin's motion for sanctions and award him $22,250 for attorney's fees," Jenkins opinion reads.

Huffington Post (https://www.huffingtonpost.co.uk/entry/alex-jones-loses-another-sandy-hook-court-battle-must-now-pay-150000-in-court-costs_n_5e7cf82dc5b6cb9dc19cadf0?ri18n=true&utm_source=CJR+Daily+News&utm_campaign=23284480cc-EMAIL_CAMPAIGN_2018_10_31_05_02_COPY_01&utm_medium=email&utm_term=0_9c93f57676-23284480cc-174753011&mc_cid=23284480cc&mc_eid=e4edaef73b&guccounter=2) Opinion (https://www.courthousenews.com/wp-content/uploads/2020/03/Infowars.pdf)

**December 20, 2019: Alex Jones Ordered to Pay $100,000 in Legal Fees in Defamation Lawsuit**
(https://firstamendmentwatch.org/alex-jones-ordered-to-pay-100000-in-legal-fees-in-defamation-lawsuit/)

On December 20th, a Texas district court judge ordered Alex Jones to pay more than $100,000 in legal fees in a defamation suit brought by the father of one of the victims of the Sandy Hook Elementary School mass shooting.

The defamation suit brought by Neil Heslin is one of several suits filed against Jones by the families who lost children in the school shooting on December 14, 2012. Following the massacre, Jones repeatedly stated on his website, Infowars, that the shooting was a hoax and had been staged by the U.S. government in an attempt to confiscate Americans' guns.

The order by Travis County District Judge Scott Jenkins comes after Jones ignored a court order to provide documents and witnesses. Jenkins also ruled against a motion from Jones's attorneys to dismiss the suit, adding additional legal fees that brought the amount that Jones has had to pay to $126,024. (Jones was ordered to pay $25,875 last October for failing to comply with another ruling.) A trial date for the Heslin case has not yet been scheduled.

In an email to the *Daily Beast*, Heslin's lawyer, Mark Bankston, said that the suit could have been avoided if Jones had accepted responsibility for his lies and his harassment of Heslin and other Sandy Hook parents. "Instead, Mr. Jones seems to prefer exiting into the dustbin of history in the most expensive and embarrassing way possible," Bankston wrote.

Daily Beast (https://www.thedailybeast.com/alex-jones-and-infowars-ordered-to-pay-dollar100k-in-court-costs-for-sandy-hook-case) Hartford Courant (https://www.courant.com/breaking-news/hc-br-alex-jones-sandy-hook-legal-fees-20191231-wrj2xzoporh6lbk76bv7sdniue-story.html) CNN (https://www.cnn.com/2019/12/31/media/alex-jones-sandy-

**December 12, 2019: Lawyer files motion in *Heslin v Jones* case to hold Jones and *Infowars* liable without trial**

Mark Bankston, the attorney representing Neil Heslin in his defamation lawsuit against Alex Jones, filed a motion on December 12th, 2019 asking that the judge hold Jones and *Infowars* liable without trial.

In his motion, Bankston argues that the defendants committed "willful and flagrant discovery abuse." This behavior allegedly includes refusing to make good faith efforts to answer written discovery or respond at deposition, withholding tens of thousands of emails relating to Sandy Hook, and erasing many of the computers prior to collection efforts.

"Defendants have been given ample opportunity to take these lawsuits seriously and obey the rule of law," the filing said. "Yet despite a rotating cast of counsel, Defendants have remained stubborn in their refusal to respect the integrity of the proceedings."

The jury wouldn't decide whether Jones' was guilty, it would only be used to determine the amount of damages Jones. The motion is scheduled to be heard by the court on Wednesday, December 18th.

The Hill (https://thehill.com/regulation/court-battles/474335-lawyer-seeks-judgement-without-a-trial-for-alex-jones-in-sandy-hook)

**July 10, 2019: Connecticut Supreme Court Agrees to Hear Alex Jones' Appeal to Review Trial Court's Sanctions**

The Connecticut Supreme Court has agreed to review Alex Jones appeal regarding sanctions imposed by a trial court judge over alleged threats to lawyers in Sandy Hook case.

On June 17, 2019, trial Court Judge Barbara Bellis denied Jone's lawyers requests to pursue a special motion to dismiss the lawsuit by the Sandy Hook families. She also ordered Jones to pay for all legal fees associated with an incident that occurred during the discovery process when dozens of emails from Jones and Infowars were found to contain child pornography. An investigation cleared Jones of any wrongdoing, and revealed that none of the emails had ever been opened.

In his 10-page appeal to the Supreme Court, Jones' lawyer, Norm Pattis, argues that the penalties imposed on his client are too harsh, and threaten his First Amendment rights to speak on a matter of public interest.

According to the Hartford Courant, the Connecticut Supreme Court will now hold "a full hearing on Pattis' appeal" in which they "could overturn Bellis' ruling" and "restore Jones' right to possibly have the case dismissed."

The hearing will likely take place in September.

Hartford Courant (https://www.courant.com/news/connecticut/hc-news-sandy-hook-lawsuit-reversed-20190710-2jqandrmmrgn5okxfhaugoxkwm-story.html)

**June 24, 2019: Alex Jones Hit With Sanctions, His Attorney Requests Connecticut Supreme Court to Review**

The lawyer defending Alex Jones in the defamation suit brought the parents of some of the Sandy Hook victims has asked the Connecticut Supreme Court to review sanctions imposed on Jones by a trial judge.

On June 18, Bridgeport Superior Court Judge Barbara Bellis imposed the sanctions during an emergency hearing after Jones threatened the Sandy Hook families' attorney, Christopher Mattei, on Jones' webcast.

Jones' rant was triggered by a recent revelation that a dozen emails retrieved from him and his Infowars website during the discovery process had images of child pornography attached. The FBI investigated, and determined that they were sent to Jones from outside of his organization, and no one ever opened the files to view the images.

On his televised webcast, however, Jones accused Mattei and his law firm, Koskoff Koskoff & Bieder, of planting the images, and made threatening comments towards Mattei and his firm.

Norm Pattis, Jones' lawyer, is arguing that his client was only exercising his First Amendment right to speak on a matter of public interest.

Hartford Courant (https://www.courant.com/news/connecticut/hc-alex-jones-sandyhook-lawsuit-appeal-0625-20190624-5rslpozzkvaf7mgyqd2yidjfze-story.html)

## May 2, 2019: Alex Jones and InfoWars Banned on Facebook

Facebook is banning some controversial, well-known figures for violating the social media giant's policies on hate speech and promoting violence.

The list includes Sandy Hook-denier Alex Jones, right-wing provocateur Milo Yiannopoulos, conspiracy theorists Laura Loomer and Paul John Watson, Louis Farrakhan, who promotes anti-Semitic views, and Paul Nehlen, a white nationalist who ran for Congress in 2018.

"We've always banned individuals or organizations that promote or engage in violence and hate, regardless of ideology," a Facebook representative said Thursday in a statement. "The process for evaluating potential violators is extensive and it is what led us to our decision to remove these accounts today."

The ban includes their individual Facebook accounts, fan pages, and groups affiliated with them. These individuals are also banned from Instagram, the photo-sharing app owned by Facebook.

Jones, who has spread his conspiracy theories about the Sandy Hook school mass shooting on his InfoWars site, was temporarily banned on Facebook last year. His official fan page was also banned, but Jones was allowed to keep his personal account.

The new prohibition makes all of Jones' temporary bans permanent, bans Jones from having a personal Facebook account, and extends more broadly to fan pages and videos that promote InfoWars.

According to Angelo Carusone, the president of Media Matters, nonprofit that monitors conservative misinformation online, says that recent mass shootings and other acts of violence caused by online hate speech prompted Facebook to finally take action.

"The reality is, people are getting killed. There are mass shootings and mass murders that are clearly being connected to ideas like white genocide, which are fueling radicalization," Carusone told *The Washington Post*. "The conditions have changed. When you have these massive catalyzing moments that are connected to real-life consequences, it puts pressure on Facebook and others to look in the mirror."

Facebook isn't the first social media platform to ban some of these polarizing figures. In recent years, Twitter has temporarily or permanently banned Jones, Loomer, Nehlen, and Yiannopoulos for their inflammatory content.

Los Angeles Times (https://www.latimes.com/business/technology/la-fi-tn-facebook-ban-alex-jones-milo-yiannopoulos-20190502-story.html) The Washington Post (https://www.washingtonpost.com/technology/2019/05/02/facebook-bans-extremist-leaders-including-louis-farrakhan-alex-jones-milo-yiannopoulos-being-dangerous/?utm_term=.66811cd057dd)

## April 1, 2019: Under Oath, Jones Admitted His Opinion Was Wrong But Blamed "Psychosis"

During a three-hour long taped deposition as part of a defamation case brought by some of the families of the Sandy Hook victims, Alex Jones claimed he had a "form of psychosis" that caused him to question whether certain events like the Sandy Hook mass shootings were staged.

"And I, myself, have almost had like a form of psychosis back in the past where I basically thought everything was staged, even though I'm now learning a lot of times things aren't staged," Jones said in a video released by Kaster Lynch Farrar & Ball LLP, a Texas law firm representing some of the families.

Jones blamed the the media for leading him to distrust everything.

"So long before these lawsuits I said that in the past I thought everything was a conspiracy and I would kind of get into that mass group think of the communities that were out saying that," he said. "And so now I see that it's more in the middle… so that's where I stand."

Jones also acknowledged that some of his reporting was based off of Internet sources like YouTube and 4Chan.

Regardless, Jones would not admit that his conspiratorial claims caused the families pain, and described the lawsuits as an attack on him and on the First Amendment.

"I was stating that I was reporting on the general questioning when others were questioning. And, you know, it's painful that we have to question big public events. I think that's an essential part of the First Amendment in America. And I do not take responsibility for the entire train of things that lawyers and the media have said I've done."

CNN (https://www.cnn.com/2019/03/30/us/alex-jones-psychosis-sandy-hook/index.html) NBC (https://www.nbcnews.com/news/us-news/infowars-alex-jones-claims-psychosis-caused-him-question-sandy-hook-n989091) Deposition Videos (https://www.youtube.com/channel/UCeeCy2sW9BRXjlfsIOA5DgA)

## February 7, 2019: Judges Have Advanced The Cases In Favor Of The Sandy Hook Families In The Past Few Weeks

*The New York Times* reports on a series of legal victories in favor of the Sandy Hook families in three lawsuits against Alex Jones and Infowars.

In Texas, a judge ordered Jones and Infowars representatives to submit to questioning by the lawyers of one Sandy Hook mother, and also granted access to the company's business records against the wishes of Jones' lawyers, who wanted them to remain sealed.

In Connecticut, a judge ordered Infowars' business associates and partners to testify, and will soon rule on the deposition of Jones himself and other Infowars associates, as per the families' request.

The New York Times (https://www.nytimes.com/2019/02/07/us/politics/alex-jones-sandy-hook.html)

## January 11, 2019: CT Superior Court Judge Grants Sandy Hook Families' Discovery Request To Access Infowars' Internal Documents And Communications

The six families suing Alex Jones and *Infowars* in Connecticut over repeated defamatory comments about the Sandy Hook Elementary School massacre were granted a legal victory in their case. The judge ruled that the families can gain access to *Infowars'* financial and marketing documents, contracts between *Infowars* and platforms like Facebook and Twitter, and any communications including letters, emails, and text messages related to Sandy Hook, Adam Lanza, crisis actors, or mass shootings. According to an attorney for the families, this documentation is meant to corroborate the claims made in the lawsuit to prove that Alex Jones is a "conspiracy profiteer." The judge will decide whether to let the plaintiffs' legal team depose Jones at a hearing scheduled for this week.

The New York Times (https://www.nytimes.com/2019/01/12/us/alex-jones-infowars-lawsuit.html) ABC News (https://abcnews.go.com/US/families-sandy-hook-shooting-victims-win-legal-victory/story?id=60314174) Hartford Courant (https://www.courant.com/news/connecticut/hc-news-sandy-hook-jones-lawsuit-20190111-xao67zxhmnbrfm2wjnz5xjchcu-story.html)

## August 17, 2018: Motion Accuses Jones Of Intentionally Destroying Evidence Related to Suits

Lawyers representing the families of two Sandy Hook shooting victims accused Alex Jones of intentionally destroying evidence related to the lawsuit. According to the motion filed, Jones said on his broadcast that he instructed his staffers to delete select content like social media messages and videos, some of which was considered evidence in the Sandy Hook case.

The New York Times (https://www.nytimes.com/2018/08/07/us/politics/alex-jones-evidence-infowars.html?
hp&action=click&pgtype=Homepage&clickSource=story-heading&module=first-column-region&region=top-
news&WT.nav=top-news) Motion (https://int.nyt.com/data/documenthelper/171-alex-jones-sandy-hook-
evidence/283173e237c0c133f158/optimized/full.pdf#page=1)

**August 1, 2018: First Of 3 Defamation Suits Against Jones Reaches Courtroom**

Lawyers for Alex Jones are fighting to dismiss a defamation case brought against him and his site Infowars by parents
of victims of the Sandy Hook shooting under the Texas Citizens Participation Act. His attorneys are arguing that what
Jones says on his show is not fact, but rather his opinion. According to Reuters, an attorney for Jones told the judge,
"Maybe it's fringe speech. Maybe it's dangerous speech, but it is not defamation."

The judge has 30 days to rule on a motion to dismiss the case.

The New York Times (https://www.nytimes.com/2018/08/01/us/politics/infowars-sandy-hook-alex-jones.html) Reuters
(https://www.reuters.com/article/us-usa-lawsuit-alexjones/conspiracy-theorist-jones-seeks-halt-of-sandy-hook-
defamation-suit-idUSKBN1KM4GI) Buzzfeed News (https://www.buzzfeednews.com/article/briannasacks/alex-jones-
infowars-defamation-lawsuit)

**July 24, 2018: Alex Jones Compares Himself To Storied Watergate Journalists In Effort To Dismiss Lawsuit**

In an attempt to dismiss a defamation lawsuit, Alex Jones of Infowars compared himself to Carl Bernstein and Bob
Woodward, *The Washington Post* journalists who helped uncover the Watergate scandal, saying he acted like a
journalist when he questioned the narrative of the Sandy Hook school shooting in 2012.

Lawyers for Jones wrote in his filing for dismissal: "Such journalism, questioning official narratives, would be chilled
if reporters were subject to liability if they turned out to be wrong….To stifle the press (by making them liable for
merely interviewing people who have strange theories) will simply turn this human tragedy into a Constitutional one."

Bill Bloss, an attorney for the families said in many news reports that, "The First Amendment simply does not protect
false statements about the parents of one of the worst tragedies in our nation's history. Any effort by any of the
defendants to avoid responsibility for the harm that they have inflicted will be unsuccessful."

CBS News (https://www.cbsnews.com/news/alex-jones-compares-himself-bob-woodward-carlbernstein-sandy-hook-
lawsuit/) The Associated Press (https://apnews.com/ce04388309ee44249a0f9461d34bef5f) Motion to Dismiss
(https://drive.google.com/file/d/1kxMDBH1QVV_tlceTsvrF1Jw_QVd14xAr/view)

**May 24, 2018: More Sandy Hook Families File Defamation Lawsuit Against Alex Jones For False Stories
Promoted on Infowars**

Six families of Sandy Hook victims and an FBI agent filed a third lawsuit Wednesday against Alex Jones and his
businesses for repeated claims he made on his *Infowars* show that the 2012 massacre was a hoax. The families are
suing on defamation, invasion of privacy by false light, intentional infliction of emotional distress, and negligent
infliction of emotional distress. The suit, filed in Superior Court in Bridgeport, Connecticut, comes after two other suits
that were filed last month in Texas by two other Sandy Hook victim families. The complaints from all eight families
allege that Jones used his internet and radio platforms to push the conspiracy theory that the shooting in Newtown was
a staged event. It lists a campaign of abuse starting from December 19, 2012 through June 26, 2017. On a complaint
listed for January 13, 2015, the parents allege that during the broadcast of The Alex Jones Radio Show, Jones said, "…
Sandy Hook is a synthetic completely fake with actors, in my view, manufactured. I couldn't believe it at first. I knew
they had actors there, clearly, but I though they killed some real kids. And it just shows how bold they are, that they
clearly used actors." The complaint says that "a reasonable person would understand these statements to assert that the
Sandy Hook massacre was staged, and that the plaintiffs fabricated the deaths of their loved ones."

The lawsuit claims that while Jones' false accusation brought him attention and business, the plaintiffs suffered
personal pain and abuse from the radio and internet personality and his fans.

*The New York Times* reporter Elizabeth Williamson writes that Jones claims First Amendment protection for his work and that the most recent lawsuit filed challenges that defense. "The First Amendment has never protected demonstrably false, malicious statements like the defendants'," it reads.

New York Times (https://www.nytimes.com/2018/05/23/us/politics/alex-jones-trump-sandy-hook.html) The Daily by The New York Times (https://www.nytimes.com/2018/05/24/podcasts/the-daily/sandy-hook-alex-jones-infowars-lawsuit.html) NBC News (https://www.nbcnews.com/business/business-news/six-more-families-sue-alex-jones-over-sandy-hook-conspiracy-n876881)

Connecticut Law Tribune (https://www.law.com/ctlawtribune/2018/05/23/connecticut-lawyers-sue-conspiracy-theorist-alex-jones-for-sandy-hook-families-fbi-agent/)

### April 17, 2018: Sandy Hook Parents Take on False Stories Promoted by Alex Jones in Defamation Suit

The 2012 Sandy Hook school massacre which killed 20 children and 6 adults galvanized parents and relatives of those murdered to promote gun reform. One conservative commentator who responded negatively to their efforts: Alex Jones and his *Infowars* which ran segments claiming the massacre at Sandy Hook was "a giant hoax." Jones' followers have continued to harass Sandy Hook families. Now Leonard Pozner and his former wife, Veronique De La Rosa, parents of Noah Pozner, and Neil Heslin, the father of Jesse Lewis, have responded by filing two defamation suits against Alex Jones stating "defendants' defamatory statements were knowingly false or made with reckless disregard for the truth." They are seeking at least $1 million in damages. This is the second time this year Alex Jones has been sued for defamation. In March, Brennan Gilmore sued Jones for stories that led to threats against him.

New York Times (https://www.nytimes.com/2018/04/17/business/media/alex-jones-sandy-hook.html) Reuters TV (https://www.reuters.tv/v/u5t/2018/04/17/sandy-hook-parents-sue-infowars-alex-jones-for-defamation) Reuters (https://www.reuters.com/article/us-texas-lawsuit-alexjones/sandy-hook-parents-sue-conspiracy-theorist-alex-jones-for-defamation-idUSKBN1HO2FU)

Analysis & Opinion

### February 5, 2020: The Professor of Denial  (https://www.chronicle.com/article/the-professor-of-denial/)

Amanda J. Crawford writes about James H. Fetzer, a retired philosophy professor who has promoted conspiracy theories since the 1990s. Among the theories he has promoted are that the Apollo moon landing was fake and that the Holocaust where 11 million Jews and others were killed, never occurred.

In 2015, Fetzer published a book *Sandy Hook: It Was a FEMA Drill to Promote Gun Control*, and began a movement of Sandy Hook "truthers." Though it was Alex Jones who, using Infowars, helped the lies spread more quickly, much of the theory itself was invented by Fetzer. In October 2019, a Wisconsin jury awarded Leonard Pozner $450,000 for accusing him of falsifying his son's death certificate. Pozner's son, Noah Pozner, was 6-year-old when he was killed in the Sandy Hook Elementary School shooting.

Unlike Jones, Fetzer says he still believes that the massacre was staged.

### December 5, 2019: I worked for Alex Jones. I Regret It.  (https://www.nytimes.com/2019/12/05/magazine/alex-jones-infowars.html)

 Josh Owens, a former writer for Infowars, gives a close-up view of what it was like to work with Alex Jones. Lured by Jones' combative personality, Owen's account may help explain why so many are attracted to Jones ' style of broadcasting.

"He railed against government corruption and secrecy, the militarization of police. He confronted those in power, traipsed through the California redwoods to expose the secretive all-male meeting of elites at Bohemian Grove and even appeared in two Richard Linklater films as himself, screaming into a megaphone."

But once he began working with Jones, Owens learned how many of the stories were made up and used to exploit the "prejudices and fears" of Jones's audiences.

**July 8, 2019: Newton Parents Fight Back (https://www.washingtonpost.com/local/education/first-they-lost-their-children-then-the-conspiracies-started-now-the-parents-of-newtown-are-fighting-back/2019/07/08/f167b880-9cef-11e9-9ed4-c9089972ad5a_story.html)**

Susan Svrluga writes in *The Washington Post* about the parents of Newtown and their experience battling conspiracy theorists in court. Using a number of interviews with the parents, she highlights the psychological and emotional toll of "unimpeded conspiracy theories" as well as the way in which social media enables their quick spread.

"Story by story, site by site, year after year," Svrluga writes," Pozner has been working to restore the truth about his son."

**March 31, 2019: Legal System Will Force Jones To Tell The Truth (https://www.nytimes.com/2019/03/31/opinion/alex-jones-sandy-hook.html)**

Charlie Warzel writes in the *New York Times* that the deposition of Alex Jones in one of the defamation lawsuits he is faced with "highlights a troubling reality: The legal system may be the only way to defang a well-known conspiracy theorist at the height of his powers."

**August 6, 2018: Alex Jones Lawsuit Will Change The Way We Think About Free Speech On The Internet (https://www.wired.com/story/alex-jones-lawsuit-will-help-redefine-free-speech/)**

Emma Grey Ellis asserts in *Wired* that the legal questions of free speech on the internet brought up in the defamation cases against Alex Jones will have formative implications. Are the victims' parents public figures? Is what Alex Jones says the truth, or is it trolling? Is Infowars a media institution? "This push and pull between internet and legal norms is a good thing—as long as it continues to evolve," she writes. "That's important is we learn to negotiate the balance between speaking safely, and freely, on the web."

**July 24, 2018: Are There Actual Constitutional Concerns In Jones' Lawsuit? (https://www.esquire.com/news-politics/politics/a22538181/alex-jones-sandy-hook-trial/)**

Charles P. Pierce writes in *Esquire* that the case contains may test the constitutional limits of talk radio, punditry, and extreme internet broadcasting. He also makes note of the other fringe figures that have been represented by Jones' legal team in the past.

-

Documents & Resources

*Pozner v. Jones*: Lawsuit against Alex Jones and Infowars and others by Sandy Hook shooting victim Noah Pozner's parents Leonard Pozner and Veronique De La Rosa in Texas.

Pozner Complaint (https://drive.google.com/file/d/1SnPMj3h2sdlCfL1e4nwm7d0jSCercoV1/view) Alex Jones Motion to Dismiss (https://www.courthousenews.com/wp-content/uploads/2018/08/Alex-Jones-Motion-to-Dismiss.pdf)

*Lafferty v. Jones:* Lawsuit against Alex Jones and Infowars and others by six families of Sandy Hook shooting victims in Connecticut.

Complaint (https://drive.google.com/file/d/12mHNXnFQo2nH555yJxC5JIEEeAoxi_Fj/view) Motion to Dismiss Plaintiffs' Complaint (https://drive.google.com/file/d/1kxMDBH1QVV_tlceTsvrF1Jw_QVd14xAr/view)

*Heslin v. Jones*: Lawsuit against Alex Jones and Infowars and others by father of Sandy Hook shooting victim Neil Heslin in Texas.

Complaint (https://drive.google.com/file/d/1opX6d3Bycbl4sWGo8o37SuPcjxDanzjL/view)

***Sherlach v. Jones*** is a lawsuit against Alex Jones and Infowars and others by husband of Sandy Hook shooting victim William Sherlach spouse of Mary Sherlach in Connecticut.

Complaint (https://drive.google.com/file/d/1iNhsZCYo6ifS9M0JHBiLO1-x2KmjuLhT/view)

Allegations made by Alex Jones and Infowars that created the foundation for the complaints detailed in the lawsuit.

Below are a select few instances in which Jones and Infowars contributors made claims to support the Sandy Hook shooting conspiracy theory on broadcasts and in published articles over the course of many years.

In 2013, Jones called the shooting *"staged"* and said, *"It's got inside job written all over it."*

In March 2014, Alex Jones began stating his allegation regarding a "fake" interview between Anderson Cooper and Noah Pozner's mother, Veronique De La Rosa. The allegation that the interview took place in front of a "blue screen" became central to Jones' assertion that the Sandy Hook school shooting was manipulated by the government and performed by crisis actors.

*"Folks, we've got video of Anderson Cooper with clear blue-screen out there. [Shaking head]. He's not there in the town square. We got people clearly coming up and laughing and then doing the fake crying. We've clearly got people where it's actors playing different parts for different people, the building bulldozed, covering up everything. Adam Lanza trying to get guns five times we're told. The witnesses not saying it was him...I've looked at it and undoubtedly, there's a cover-up, there's actors, they're manipulating, they've been caught lying, and they were pre-planning before it and rolled out with it."*

In May 2014, InfoWars published an article titled: "CONNECTICUT TRIES TO HIDE SANDY HOOK TRUTH." (https://www.infowars.com/connecticut-tries-to-hide-sandy-hook-truth/)

In September 2014, Infowars published an article titled: "FBI SAYS NO ONE KILLED AT SANDY HOOK." (https://www.infowars.com/fbi-says-no-one-killed-at-sandy-hook/)

*"The whole thing is a giant hoax. How do you deal with a total hoax? It took me about a year, with Sandy Hook, to come to grips with the fact that the whole thing was fake. I did deep Research."* (December 2014)

*"The general public doesn't know the school was actually closed the year before. They don't know they've sealed it all, demolished the building. They don't know that they had the kids going in circles in and out of the building as a photo-op. Blue-screen, green-screens, they got caught using."* (December 2014)

*"You learn the school had been closed and re-opened. And you've got video of the kids going in circles, in and out of the building, and they don't call the rescue choppers for two hours, and then they tear the building down, and seal it. And they get caught using blue-screens, and an email by Bloomberg comes out in a lawsuit, where he's telling his people get ready in the next 24 hours to capitalize on a shooting. Yeah, so Sandy Hook is a synthetic, completely fake with actors, in my view, manufactured. I couldn't believe it at first. I knew they had actors there, clearly, but I thought they killed some real kids. And it just shows how bold they are that they clearly used actors. I mean they even ended up using photos of kids killed in mass shootings here in a fake mass shooting in Turkey, or Pakistan. The sky is now the limit."* (January 2015)





