**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**

| | |
|---|---|
| DR. JEROME CORSI, et al | |
| Plaintiffs | |
| v. | **Case Number:   1:20-cv-298-LY** |
| INFOWARS, LLC, et al | |
| Defendants. | |

**PLAINTIFFS JEROME CORSI'S AND LARRY KLAYMAN'S  OBJECTIONS TO REPORT AND RECOMMENDATION OF MAGISTRATE ANDREW W. AUSTIN**

Plaintiffs Dr. Jerome Corsi and Larry Klayman ("Plaintiffs"), pursuant to Fed. R. Civ. P. 72(b)(2), hereby submits the following written objections to Magistrate Andrew W. Austin's ("Magistrate Austin") Report and Recommendation of May 25, 2021. ECF No. 108. (the "Report")

**I.      INTRODUCTION**

As set forth in detail previously in Plaintiffs' Motion to Have Presiding Judge Decide Outstanding Motions to Dismiss, at the hearing of March 23, 2021 before Magistrate Austin, and related pleadings he demonstrated a virtual complete lack of understanding about the allegations of the Amended Complaint, and in so doing appeared to have prejudged the case without a valid basis. ECF No's 108, 112, 114. This lack of understanding combined with prejudgment has, regrettably, carried over to his fatally flawed Report, which contains numerous factual and legal errors which must be rejected and thus corrected.

Indeed, Magistrate Austin's Report, which appears to have been hastily written on the eve of his retirement, after an enormously prejudicial nearly (8) month delay after  this matter

1

had been fully briefed, in the face of the presiding judge's strong direction issued at the outset of this case, where he told the parties to move this case along to trial:

> You're going to have to figure how much time you want because once I get it set, once I fill in after a subsequent conference your trial month and final pretrial conference date and time, you're not likely to get a continuance or a postponement.

> I like to try lawsuits. If I had my way and could pass one law, I would do away with motion practice altogether, and you would either settle your case or try your case, the way it was in the olden days.

This necessitated the filing of Plaintiffs' Motion to Vacate Report and Recommendation of Magistrate Austin, which was not a personal attack on Magistrate Austin whatsoever, as Defendants disingenuously assert, but simply a necessary pleading to point out the numerous errors contained out in the Report and to argue that this case must now move quickly to discovery and trial.  These legal and factual errors are set forth fully, in detail below.

## II.     LEGAL STANDARD

The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions. As Magistrate Austin is now retired, the latter option is not viable in any event. Fed. R. Civ. P. 72(b)(3).

## III.    LEGAL ARGUMENT

As set forth above, Magistrate Austin's Report contains numerous legal and factual errors that are addressed in turn below.

### a.     Magistrate Austin's Report Contains Numerous Legal Errors

As a threshold matter, Magistrate Austin gravely erred when he ignored the sworn affidavits submitted by both Plaintiff Klayman, Dr. Corsi, Kelly Morales (formerly Mrs. Alex

2

Jones), which show that Plaintiffs went far beyond the necessary pleading requirements set forth under Fed. R. Civ. P. 8(a) and under Supreme Court precedent.  <u>Exhibits 1, 2, and 4</u> *attached hereto*. ECF No. 73, 74. The standard for a Rule 12(b)(6) motion is that a complaint "does not require detailed factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (U.S. 2009) (internal quotations omitted). To survive a motion to dismiss, a complaint need only "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id*. Plaintiffs' Amended Complaint more than meets this low pleading standard, and they have buttressed their claims even further with sworn affidavits from themselves as well as Defendant Alex Jones' ex-wife Kelly Morales, while Defendants have provided no affidavits. <u>Exhibits 1, 2, and 4</u> *attached hereto*. ECF No 73, 74.

What Magistrate Austin has done here is he has usurped the role of the jury, which is especially egregious at the motion to dismiss stage. In situations where resolution is necessarily fact intensive, like defamation, the U.S. Supreme Court has held that "[m]aintenance of the jury as a fact-finding body is of such  importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care." *Dimick v. Schiedt*, 293 U.S. 474, 486 (U.S. 1935). If a statement is capable of more than one meaning, it requires a jury to decide whether that statement is defamatory. "If, however, the court finds the statement is capable of at least one defamatory meaning and at least one  non-defamatory meaning,  a jury must  determine  whether  the  defamatory meaning was conveyed." *Tu Nguyen v. Duy Tu Hoang*, 318 F. Supp. 3d 983, 1007 (S.D. Tex. 2018). Magistrate Austin's error here is underscored by in the Report where he writes at page 8, that "[w]hen a defamation suit is brought against a media defendant over a matter of public concern, the plaintiff bears the burden of proving falsity." Of course this is true if the matter were given to

3

a jury, but at the motion to dismiss stage, there is no burden to "prove" falsity on Plaintiffs. This is a clear error that resulted from Magistrate Austin improperly appointing himself as the entire jury.

      **i.**      **Magistrate Austin Ignored the Allegations in the Complaint that Defendants Were Working Together in Concert**

Magistrate Austin recommended dismissal of claims against Defendants Shroyer and David Jones because Plaintiffs have not made any factual allegations supporting the assertion that these Defendants have conspired with their co-Defendants to defame them. This is simply not true, and a subversion of the pleading standard set forth in *Iqbal*.

The Amended Complaint specifically and expressly alleges that the Infowars Defendants were at all material times "working together in concert with and as agents of Stone…." Am. Comp. ¶ 36. Furthermore, "Plaintiffs have demanded retraction and correction of the defamatory videos and publications…but Defendant shave arrogantly refused, thereby ratifying any and all defamatory statements contained therein…." Am. Comp. ¶ 38.

These assertions are supported by detailed factual allegations:

Defendant InfoWars and Defendant Free Speech Systems are both owned, controlled, and operated by Defendant Alex Jones and David Jones. Defendant Free Speech Systems owns www.infowars.com, where content created by Defendants Alex Jones, Shroyer and Stone were at all material times posted and broadcast into this district, nationally and internationally. Am. Comp. ¶ 11.

Defendant David Jones is Defendant Alex Jones's father and holds the official title of Director of Human Relations for Defendant Free Speech Systems. On information and belief, Defendant David Jones is the owner of Defendant InfoWars and Free Speech Systems and he manages and controls the business and related activities for Defendants InfoWars and Free Speech Systems, as well as Defendant Alex Jones' other companies. Am. Comp. ¶ 8.

Thus, given the fact that each of every one of the Infowars Defendants are intricately bound together by virtue of the fact that they all directly participate in creating and publishing the

4

content on the Infowars site, it is more than merely plausible that they are working together in concert. This is more than enough at the pleading stage, where again, to survive a motion to dismiss, a complaint need only "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678.

However, Plaintiffs have taken this a step further and submitted sworn affidavits of themselves as well as Ms. Morales, Defendant Alex Jones' ex-wife who swears under oath:

> Based on my personal knowledge and experience, David Jones runs Infowars with Alex Jones and helps him with his activities, including fixing media stories and endorsing and/or aiding his slanderous and/or fraudulent behaviors, all for profit.
>
> Alex Jones could not function without David Jones, and has conspired with him on the past to commit this breach of fiduciary duty and fraud on my business/estate with Alex Jones. While David Jones did this, he slandered and/or defamed me to experts and assisted Alex Jones and his attorneys to do the same, so as to steal/hide my estate and his grandchildren's inheritance.
>
> Alex Jones is quasi-illiterate, and cannot use technology or apps such as email with any fluency, and he cannot function without assistance from those around him, including David Jones. Exhibit 2.

This was in addition to an affidavit submitted by David Jones himself on behalf of Alex Jones in his bankruptcy case, where he states, "I have been involved with Alex Jones' personal and business finances for many years…." Exhibit 3.

Notwithstanding the affidavits incorporated into a well pled Amended Complaint and related pleadings, and the hard fact that all of the Defendants all closely work together as part of Infowars and appeared together in concert on the same defamatory broadcasts, the law, which was presented to the Magistrate, shows otherwise:

> Civil conspiracy is used to extend tort liability beyond the wrongdoer to those who merely planned, assisted, or encouraged his acts. *See Carroll v. Timmers Chevrolet, Inc.*, 592 S.W.2d 922, 925-26 (Tex. 1979); *Helping Hands Home Care, Inc. v. Home Health of Tarrant County, Inc.*, 393 S.W.3d 492, 506 (Tex. App.-Dallas 2013, pet. denied). Once a civil conspiracy is proved, each conspirator is responsible for all acts done by any of the conspirators in

5

furtherance of the conspiracy. *Bentley v. Bunton*, 94 S.W.3d 561, 619 (Tex. 2002); *Carroll*, 592 S.W.2d at 926 (Tex. 1979); *Helping Hands*, 393 S.W.3d at 506. A finding of civil conspiracy imposes joint and several liability on all conspirators for actual damages resulting from the acts in furtherance of the conspiracy. *Carroll*, 592 S.W.2d at 925; *Helping Hands*, 393 S.W.3d at 506. When a jury finds that liability for a civil conspiracy exists, this finding requires the legal conclusion to impose joint and several liability on the co-conspirators. *LandAmerica Commonwealth Title Co. v. Wido*, No. 05-14-00036-CV, 2015 Tex. App. LEXIS 11201, at *29 (Tex. App. Oct. 29, 2015).

Additionally, under Restatement (Second) of Torts, § 577, comment f, "One is liable for defamation by a third person whom as his servant, agent, or otherwise he directs or procures to publish defamatory matter." *See also Universal Commun. Sys. v. Turner Broad. Sys.*, 2005 U.S. Dist. LEXIS 58575, at *8 (S.D. Fla. Mar. 17, 2005) ("One is liable for defamation by a third person whom as his servant, agent, or otherwise he directs or procures to publish defamatory matter.")

Thus, given all of this, it was a grave error for Magistrate Austin to recommend dismissal of Defendant Shroyer and Defendant David Jones on the basis of lack of personal involvement, especially at the pleading stage, where it has been expressly alleged that (1) all of the Defendants were working together in concert, and (2) each of the Infowars Defendants were acting at the direction of Defendant Stone. Am. Comp. ¶ 36. Plaintiffs have more than adequately pled, if not proved, all of the Defendants specific, personal involvement as set forth in the allegations of the Amended Complaint. And if the Magistrate wanted more, he should not have stayed discovery, creating a heads I win, tails you lose scenario.

### ii.     Magistrate Austin Erred By Recommending Dismissal of Defamation Claims

This defamatory statements at issue in this case are so outrageous that they are clearly defamatory on their faces, and they are defamatory *per se*, as they harm Plaintiffs in their trade and profession, and as such damages are presumed, as set forth in detail below. Statements that

injure a person in her office, profession, or occupation are typically classified as defamatory per

se. *Hancock v. Variyam*, 400 S.W.3d 59, 63–64 (Tex. 2013). These published statements are:

(1) "He (Klayman) was ousted at Judicial Watch. Ask Tom Fitton [the current president of Judicial Watch] why he left. He was 'ousted' because of a 'sexual harassment complaint.'" Am. Comp. ¶ 56.

(2) "He's (Klayman) never actually won a courtroom victory in his life." Am. Comp. ¶ 55

(3) "For those people out there who think...that Larry Klayman's IQ is higher than 70, you're wrong..." Am. Comp. ¶ 62.

(4) "He's (Klayman) incompetent, he's a numbskull, he's an idiot, he's an egomaniac, and he could be the single worst lawyer in America. With him as Jerry Corsi's lawyer, Corsi may get the electric chair. So your idea that he's a good guy is entirely wrong" Am. Comp. ¶ 59

(5) Plaintiff Klayman is a "piece of garbage." Am. Comp. ¶ 61

With regard to Plaintiff Dr. Corsi, Defendants have falsely and maliciously published

that:

(1) "Plaintiff Corsi "seemed to be extremely mentally degraded to the point of what I would call dementia." Am. Comp. ¶ 42

(2) Defendant Alex Jones purportedly saw Plaintiff Corsi at a steakhouse "on the ground at another table" and that his security staff "thought he was dead in the elevator." Am. Comp. ¶ 43

(3) Accusing Plaintiff Corsi of having suffered a stroke, publishes maliciously that "whatever comes out of his mouth ain't the truth." Am. Comp. ¶ 44

(4) that Plaintiff Corsi was "fired from World Net Daily." Am. Comp. ¶ 49

(5) "He (Corsi) was perfectly willing to lie, to perjure himself saying that a memo that he had wrote me was written on the 30th for the purposes of cover-up.... which is further proof that Jerry lied under oath." Am. Comp. ¶ 50

(6) "and then states that I knew about John Podesta's emails being stolen in advance, the only proof of that is Jerry's feeble alcohol affected memory – it's a lie...." Am. Comp. ¶ 51

(7) **"Jerry was prepared to stab a principle Trump supporter in the back, he was perfectly prepared to bear false witness against me, even though I had done nothing in my entire life other than help him." Am. Comp. ¶ 52**

(8) **"all I ever did was show Jerry Corsi friendship and support and try to help him and his family and what I get is Judas Iscariot, the willingness to testify against me and help the deep state bury me....and then he makes up this story about helping me formulate a cover story." Am. Comp. ¶ 53**

(9) **"… you can always tell when Jerry Corsi is lying because his lips are moving...." Am. Comp. ¶ 54**

(10) **"He [Corsi] was perfectly willing to bear false witness against me on multiple points that are complete fabrications." Am. Comp. ¶ 64**

(11) **"the good doctor [Corsi] has told a number of lies. In fact, he's starting to conflate his lies.... he was perfectly willing to lie about me.... but now lying about Alex Jones, lying about InfoWars, lying about Dr. (David) Jones, who's one of the nicest, gentlest, sweetest, most honest men I have ever met, it's beyond the pale.... Jerry Corsi can no longer be believed." Am. Comp. ¶ 65**

(12) **"I think you've [Corsi] been deep state from the beginning. Your whole birther thing is used as a club to destroy conservatives....I look forward to our confrontation. I will demolish you. You're a fraudster, out of your alcoholic haze you have made up lies about David Jones and Alex Jones and Roger Stone and now I suspect they want you to lie about the President." Am. Comp. ¶ 66**

(13) **Plaintiff Corsi of being a "spook, back and forth with different agencies," Am. Comp. ¶ 67**

(14) **Falsely publishing a false statement of Plaintiff Corsi "not being able to walk." Am. Comp. ¶ 68**

### 1.    Magistrate Austin Erred In Finding that Plaintiffs Did Not Allege Actual Malice

Magistrate Austin simply arbitrarily writes that "Corsi has failed to adequately allege that Alex Jones knowingly made false statements or acted with reckless disregard for the truth in making the complained of statements about Corsi, and has failed to adequately plead that Jones acted with malice in making the statements." ECF No. 108 at 14. This conclusion is reached with zero

analysis, supporting Plaintiffs' assertion that the Report was written hastily and with prejudgment in mind.

Indeed, a review of the record shows that Magistrate Austin's finding here was clearly erroneous. First, and foremost, the Amended Complaint expressly sets forth that the Defendants acted with actual malice, as they knew that the defamatory statements were false given their long history, relationship, and familiarity with Plaintiffs: "Defendants, each and every one of them, as set forth herein, acted with actual malice, in concert, as joint tortfeasors, as they knew that the statements which they published were false…. Am. Comp. ¶ 36.

The Amended Complaint sets forth the fact that Defendants "have known Plaintiff Corsi for a long time and even worked with him… so they were well aware that the statements made by the co- Defendant Stone, and their own false, misleading, malicious and defamatory statements were, indeed, false, as well as their acting as agents of, much less their ratification of the malicious false statements published by Defendant Stone on their networks and media sites." Am. Comp. ¶ 39. This is further buttressed by Dr. Corsi's affidavit, Exhibit 1, which details his long-standing relationships with the Defendants:

> I personally know Defendant Roger Stone ("Defendant Stone") and he personally knows my qualifications and me. I have even ghostwritten books for Defendant Stone and we used to be friends and colleagues. Defendant Stone is thus intimately familiar with my personal and professional history.
>
> In 2016, after the presidential election, I worked very closely with Alex Jones and his father David Jones, as well as with the Infowars staff, including Owen Shroyer. I made multiple trips to Austin, Texas, to appear live in-studio on Infowars broadcasts. I accepted an assignment from Alex Jones to create for Infowars a news bureau in Washington, D.C. From the beginning, I found Alex Jones to be erratic, subjects to emotional outbursts, even reacting that I was trying to "steal his company" when with his father's assistance, I brought a multi-million dollar legitimate investment offer from highly credible sources to the table to discuss the proposal with Alex and his father.

Several times, concerned that I might quit over how badly Alex Jones was treating me, Dr. Jones met with me privately, often over breakfast. In those breakfasts, I counseled Dr. Jones over my concerns that Alex should seek professional psychological help. While in my work under various contracts with federal government agencies to consult over anti-terrorism tactics, I had the opportunity to work with very experienced psychiatrists and psychologists. Still, I am not medically trained, and I cautioned Dr. Jones that the problems I perceived with Alex's behavior should be professionally evaluated by qualified medical professionals. Exhibit 1.

Indeed, as conclusive evidence that Defendants were acting with actual malice, as set forth in Dr. Corsi's affidavit, Indeed, Dr. Corsi's book, "*Killing the Deep State,*" was at all material times, still available for sale on the Infowars website! Exhibit 1. This shows that the Infowars Defendants at all times knew that Dr. Corsi was neither an alcoholic nor a liar, yet still willingly participated in branding him as such. This is textbook actual malice.

With regard to Plaintiff Klayman, "At 1:30 in the January 18 Video, Stone maliciously falsely published, "He (Klayman) was ousted at Judicial Watch. Ask Tom Fitton [the current president of Judicial Watch] why he left. He was 'ousted' because of a 'sexual harassment complaint.'" Defendant Stone had no basis to make these false, malicious, and defamatory claims. As pled in the Amended Complaint, Mr. Klayman "left Judicial Watch voluntarily on his own accord in order to run for U.S. Senate in Florida in 2003-2004." Am. Comp. ¶57. This is a fact. Defendant Stone's false revisionist history is a malicious and false statement of fact.

Furthermore, as the final "nail in the coffin" to Defendant Stone's assertions, Thomas Fitton ("Fitton"), under oath, at a deposition in another matter testified that **"[y]ou [Mr. Klayman] weren't ousted as a result of a sexual harassment complaint**." Exhibit 5. This conclusively shows that Defendant Stone, in concert with the Infowars Defendants, published an objectively verifiable false statement. Indeed, at the same deposition, Fitton admits to never have

10

spoken to Stone, which shows that Stone simply made this lie up. Exhibit 5. Stone admitted under oath in a deposition that he did not speak to Fitton about this either, so it's clear that Stone made this up to defame Mr. Klayman. Exhibit 5. This evidences the fact that Defendant Stone, in concert with the other Defendants, acted with actual malice.

Furthermore, Mr. Klayman's affidavit further shows that Defendant Stone and the other Defendants, acting in concert, with actual malice and at a minimum acted with reckless disregard for the truth.

> Defendant Stone was a "political consultant" who claimed to help get presidents and other politicians elected. The firm made money by then lobbying the very men they put in office.

> Defendant Stone backed Republican candidate Jack Kemp for President and he recommended that I be put on the executive finance committee, which also included Donald J. Trump.

> Because Defendant Stone knew of my successes and capabilities as a private lawyer, he told me that he had recommended me for U.S. Attorney when George Bush was President in 1992.

> In 1996, at a Republican Convention in San Diego, California, Defendant Stone was filmed at a "toga party" with his wife at a "swingers party."

> The media at the time went after Defendant Stone because of his alleged participation in the "sex party" and created a scandal.

> The media alleged at the time that Defendant Stone solicited sex half-naked, and that there was a picture of Defendant Stone in a compromising position to back up the story.

> Defendant Stone contacted me and, because he knew my capabilities and acumen as a lawyer, retained me to represent him to get the media to cease what he claimed then was a smear campaign.

> I successfully got the media to back off Defendant Stone through my skill as a lawyer and Defendant Stone was grateful.

> Because he was aware of my prior successes at Judicial Watch and before, Defendant Stone wanted to work with me as my U.S. Senate campaign manager.

11

> During this time, the spring, summer, and fall of 2003, and in preparation for my U.S. Senate run, Defendant Stone researched and kept books and records of many of my accomplishments. He had several binders (2-3 feet) full of information about me and the victories that I had obtained at Judicial Watch and elsewhere. Again, because Defendant Stone knew of my successes and legal political acumen, Defendant Stone wanted to be on my team and help me run for the U.S. Senate.
>
> Defendant Stone thus knew of many cases I had won in courtrooms and other legal accomplishments and in fact had kept records of successes in a book of my accomplishments. Exhibit 4.

Accordingly, this shows that Defendant Stone had actual knowledge that his statement regarding Mr. Klayman's abilities as a lawyer were flat out false, including but not limited to the "fact" that Mr. Klayman had "never won a courtroom victory in his life." Thus, Mr. Klayman has also far exceeded any requisite showing of actual malice. Thus, Magistrate Austin's finding that Plaintiffs failed to show actual malice was a clear error.

### 2. Magistrate Austin Erred By Finding Defendants' Statements Unactionable as Defamation

Magistrate Austin' Report is limited to statements made by Defendant Alex Jones of and concerning Dr. Corsi. Because he makes no finding that Defendant Stone's statements were not defamatory, to the extent that the Court adopts any part of Magistrate Austin's Report, this finding concerning Defendant Stone must also be adopted. Magistrate Austin only found that the defamation claims against Defendant Stone fall outside of the statute of limitations.

The elements that a defamation plaintiff must prove are that (a) the defendant published a false statement of fact; (b) the statement defamed the plaintiff; (c) the defendant acted with actual malice, if the plaintiff is a public figure or a public official, or negligently, if the plaintiff is a private individual; and (d) the statement proximately caused damages." *Rodriguez v. Gonzales*, 566 S.W.3d 844, 848 (Tex. App. 2018). Furthermore, in a claim for defamation *per se*, damages are presumed, as the "statements are so obviously harmful that damages, such as mental

anguish and loss of reputation, are presumed." *Van Der Linden v. Khan*, 535 S.W.3d 179, 198 (Tex. App. 2017). Statements that injure a person in her office, profession, or occupation are typically classified as defamatory per se. *Hancock v. Variyam*, 400 S.W.3d 59, 63–64 (Tex. 2013). A defamation by implication claim arises when a "when discrete facts, literally or substantially true, are published in such a way that they create a substantially false and defamatory impression by omitting material facts or juxtaposing facts in a misleading way." *Dall. Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 627 (Tex. 2018).

Furthermore, the Supreme Court of Texas has found that a defendant may not escape liability for his defamatory conduct simply by couching his defamatory statement as an "opinion." *Bentley v. Bunton*, 94 S.W.3d 561 (Tex. 2002). The *Bentley* court gave an example:

> If a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, "In my opinion Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar." As Judge Friendly aptly stated: be destructive of the law of libel if a writer could escape liability for accusations of [defamatory conduct] simply by using, explicitly or implicitly, the words 'I think.'" See *Cianci* [*v. New Times Publishing Co*., 639 F.2d 54, 64 (2d Cir., 1980)]. It is worthy of note that at common law, even the privilege of fair comment did not extend to "a false statement of fact, whether it was expressly stated or implied from an expression of opinion." Restatement (Second) of Torts, § 566, Comment *a* (1977). *Id*. at 583-84.

Magistrate Austin committed a grave error in ignoring the black letter law of the *Bentley* Court and recommending that the Defendants escape liability simply by couching their factual defamatory statements as opinion.

### a.  Statements Concerning Dr. Corsi

There are numerous defamatory statements at issue in this matter, each of which are defamatory *per se*, as they directly involve Plaintiffs' trades and professions and therefore

damages are presumed. This also evidences the fact that these statements qualify as commercial speech under the Lanham Act, since Defendants are disparaging and discrediting Plaintiffs in their trades and professions, as Plaintiffs and Defendants are commercial competitors. This is set forth in detail in the following section.

The first statement at issue appears in paragraph 42 of the Amended Complaint, where Defendant Alex Jones stated that Dr. Corsi "seemed to be extremely mentally degraded to the point of what I would call dementia." Magistrate Austin found that this was Alex Jones "offering his opinion regarding how he perceived Corsi's cognitive state based on seeing him in person." However, this is an erroneous conclusion under *Bentley*. Whether a person is "mentally degraded" is a medical question of fact. One either is, or is not. Defendant Alex Jones takes it a step further, making a diagnosis of "dementia." Again, this is an objective medical diagnosis that is a statement of fact. One either has dementia or he doesn't. Dr. Corsi is neither "mentally degraded" not does he have "dementia." Thus, the statements of "fact" spewed by Defendant Alex Jones are objectively and provably false. It should make no difference under well-established precent that Alex Jones cleverly couched this as opinion. Thus, Magistrate Austin's finding was erroneous.

The second statement at issue appears in paragraph 43 of the Amended Complaint, where "Defendant Alex Jones, acting in concert with the other Defendants, maliciously fabricates a story where he purportedly saw Plaintiff Corsi at a steakhouse "on the ground at another table" and that his security staff "thought he was dead in the elevator." Magistrate Austin's prejudice and haste in writing his Report truly comes through with regard to these false and defamatory statements, which Alex Jones did not even attempt to couch as opinion. These are two statements of objectively verifiable fact. Either Dr. Corsi collapsed or he didn't, and either his security staff

14

thought he "was dead in the elevator" or they didn't. This is not a question of what Alex Jones perceived, as Magistrate Austin erroneously writes. It is a question of (1) whether Dr. Corsi collapsed at a steakhouse, and (2) whether his security staff thought Dr. Corsi was dead in the elevator. This finding was clearly erroneous.

The third statement at issue appears in paragraph 44 of the Amended Complaint, where "after accusing Plaintiff Corsi of having suffered a stroke, publishes maliciously that "whatever comes out of his mouth ain't the truth." This is textbook defamation, especially in the context of Defendant Alex Jones' previous attempts to cast Dr. Corsi as a liar or, at a minimum, someone mentally incapable of telling the truth. As set forth above, falsely accusing someone of having suffered a stroke is not only reprehensible, but it is also stating a false, objectively verifiable fact. Magistrate Austin admits as much, expressly finding that the statement that "[Corsi] had a stroke," however, is a straightforward factual statement, which, if false could support a defamation claim." ECF No. 108 at 12. However, he then strains to still find this statement as non-actionable, despite clearly making the opposite finding, based on supposed "context" in the form of Alex Jones saying, "I think he's got dementia or a stroke I mean I don't know," and his description of Corsi having "a really sharp brain until about a year ago." There is absolutely nothing about this supposed "context" that lessens the defamatory impact of this statement. If anything, it amplifies the defamatory nature, as he falsely accuses Dr. Corsi of having suffered a stroke more than once! Whether indicative of strong bias and prejudice, or simple hasty carelessness, this is a clear error in Magistrate Austin's Report.

The fourth statement at issue is that "Defendant Alex Jones maliciously and falsely accuses Plaintiff Corsi of being a 'spook, back and forth with different agencies,' falsely saying that Dr. Corsi had worked with different government agencies." Am. Comp. ¶ 67. This is an

15

actual statement where the context is important, but tellingly, Magistrate Austin here refuses to consider said context. However, the defamatory nature of this false statement of fact is apparent when considering the context in which it was made. This statement was made to advance the false notion that Dr. Corsi was cooperating with Special Counsel Mueller to try to take down Stone, and by extension, President Trump. By publishing the false statement that Dr. Corsi is now working with Mueller to take down Trump, the Infowars Defendants has severely harmed Plaintiff Corsi professional image and reputation. This has negatively impacted Plaintiff Corsi's ability to garner support and make a living in the conservative community. Falsely accusing Dr. Corsi of working with Mueller to take down President Trump is tantamount to an accusation of "treason" in the conservative community. Indeed, conservatives who support Trump and believed Defendants' false statements would understandably be turned off to Dr. Corsi's work.

Lastly, Magistrate Austin does not even address Alex Jones' falsely accusing Dr. Corsi sometimes "sometimes "not being able to walk," creating the false and defamatory implication that he is an alcoholic." Am. Comp. ¶ 68. There is no possible "context" where this is not defamatory. Merely falsely asserting that at some point, Dr. Corsi had been, or continues to be unable to even walk, especially when trying to accuse Dr. Corsi of alcoholism, clearly tends to injure reputation in the popular sense; to diminish the esteem, respect, goodwill or confidence in which the plaintiff is held, or to excite adverse, derogatory or unpleasant feelings or opinions against him.

### b.  Statements Concerning Mr. Klayman

As with Dr. Corsi, Defendants' defamation of Mr. Klayman is *per se* defamatory as they are specifically targeting Mr. Klayman's trade and profession.

For instance: "At 1:30 in the January 18 Video, Stone maliciously falsely published, "He (Klayman) was ousted at Judicial Watch. Ask Tom Fitton [the current president of Judicial Watch] why he left. He was 'ousted' because of a 'sexual harassment complaint.'" Defendant Stone had no basis to make these false, malicious, and defamatory claims. As pled in the Amended Complaint, Mr. Klayman "left Judicial Watch voluntarily on his own accord in order to run for U.S. Senate in Florida in 2003-2004." Am. Comp.   ¶57. This is a fact. Defendant Stone's false revisionist history evidences actual malice and is clearly a false statement of fact.

Furthermore, as the final "nail in the coffin" to Defendant Stone's assertions, Thomas Fitton ("Fitton"), under oath, at a deposition in another matter testified that "**[y]ou [Mr. Klayman] weren't ousted as a result of a sexual harassment complaint**." Exhibit 5. This conclusively shows that Defendant Stone, in concert with the Infowars Defendants, published an objectively verifiable false statement. Indeed, at the same deposition, Fitton admits to never have spoken to Stone, which shows that Stone simply made this lie up. Exhibit 5. Stone admitted under oath in a deposition that he did not speak to Fitton about this either, so it's clear that Stone made this up to defame Mr. Klayman. Exhibit 5.

Furthermore, Defendant Stone, in concert with the Infowars Defendants made the false statement that Mr. Klayman had "never actually won a courtroom victory in his life." Am. Comp. ¶ 55. To the contrary:

> Klayman has been a practicing attorney for over four decades and has won numerous cases on behalf of his clients and also against the government for constitutional and other violations. He is the founder of both Judicial Watch and Freedom Watch, a former candidate for the U.S. Senate in Florida, a former trial attorney and prosecutor of the Antitrust Division of the U.S. Department of Justice, where he was a member of the trial team that successfully broke up the AT&T monopoly and created competition in the telecommunications industry. Among many other legal victories, Plaintiff Klayman also won landmark decisions at the chairman and general counsel of Freedom Watch enjoining the

17

illegal mass surveillance by the National Security Agency. *Klayman v. Obama*, 1:13-cv-851 (D.D.C). Am. Comp. ¶ 60.

This is further disproved in Mr. Klayman's affidavit. Exhibit 4.

> Later, with my law firm, I won Section 337 unfair trade practice cases at the U.S. International Trade Commission ("USITC") concerning tennis rackets from Belgium, power tools from Taiwan, luggage from Taiwan, mass spectrometers from France, jam from Belgium, and machine tools from Brazil. I won a landmark case concerning recloseable plastic bags, which broke the patents of Minigrip and Dow Corning, Minigrip's licensee. That case victory opened up competition for zip lock bags, a multi-trillion dollar industry. Exhibit 4.

> I won a jury trial against Makita over power tools, another jury trial against domestic manufacture of removable swimming pools for my client Remove Pool Fence Co., and yet another jury trial for my client, Maccaferri, on a contract dispute. Exhibit 4.

> I brought a case for Jose Basulto of Brothers to the Rescue in a Florida court, which resulted in a $1.8 million judgment against the Republic of Cuba for shooting down Brothers to the Rescue planes, and I represented the Miami family of Elian Gonzales and other victims of Fidel Castro, such as journalists who were jailed by Castro for their political beliefs. In this regard, I not only filed criminal complaints for these victims against Fidel Castro in Belgium courts, but also lobbied and testified in both Italian and French in Italy and France, as I am fluent in both languages, before various European parliaments to increase economic sanctions on Cuba for abuse of human rights. I also lobbied the European Union in Brussels, Belgium for increased sanctions on Cuba. Exhibit 4. ECF No. 73.

Thus, despite Magistrate Austin choosing not to address it in his Report, there are clearly actionable defamatory statements as to Mr. Klayman.

### iii.     Magistrate Austin Erred in Finding that Plaintiffs Lacked Standing Under the Lanham Act

The Lanham Act protects consumers from being misled by the use of "unfair practices by an imitating competitor." *ADT, LLC v. Capital Connect, Inc*., 145 F. Supp. 3d 671, 686 (N.D. Tex. 2015).  Under Section 43(a) of the Lanham Act:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact,

which— (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act. 15 U.S.C. 1125.

Here, Mr. Klayman is "a media personality and author, columnist, and syndicated radio talk show host." Am. Comp. ¶ 4. Dr. Corsi is an "author and political commentator…." Am. Comp. ¶ 3. "Plaintiffs Corsi and Plaintiff Klayman are both competitors to Defendants as conservative media personalities, broadcasters, authors and columnists on social media and elsewhere." Am. Comp. ¶ 70. Thus, both Mr. Klayman and Dr. Corsi are media personalities who derive income from their appearances on radio and the internet. Defendant Stone clearly also appears on radio and internet in order to derive income, as evidenced by the allegations against him in paragraphs 47-63 of the Amended Complaint, where he appeared on *The War Room* with Defendant Owen Shroyer. The same is true of the Infowars Defendants, who derive their income from their internet and radio broadcasts of their programming through the Infowars network and website.

The Amended Complaint clearly and expressly alleges that:

Plaintiffs, like Defendants, rely on viewer and listener financial and other support and sales and their reputations and good will in order to continue their work. Defendants' false and/or misleading statements concerning Plaintiffs is meant to, and has, diverted financial and other support, referrals and sales away from Plaintiffs and to Defendants instead, and severely harmed Plaintiffs' personal and professional reputations. Am. Comp. ¶ 74.

This is further buttressed in Dr. Corsi's affidavit. Exhibit 1. Dr. Corsi declared:

In 2016, after the presidential election, I worked very closely with Alex Jones and his father David Jones, as well as with the Infowars staff, including Owen Shroyer. I made multiple trips to Austin, Texas, to appear live in-studio

on Infowars broadcasts. I accepted an assignment from Alex Jones to create for Infowars a news bureau in Washington, D.C. From the beginning, I found Alex Jones to be erratic, subjects to emotional outbursts, even reacting that I was trying to "steal his company" when with his father's assistance, I brought a multi-million dollar legitimate investment offer from highly credible sources to the table to discuss the proposal with Alex and his father. Exhibit 1.

Given the fact that Dr. Corsi used to "work…very closely" with the Infowars Defendants, as well as the other pled factual allegations, it is clear that they are all in the same commercial field, and are therefore competitors. Exhibit 1

Thus, the Amended Complaint clearly alleges that each of the Defendants were all direct competitors to Plaintiffs as media personalities and commentators who derive income from the internet and radio. Am. Comp. ¶ 70.

Furthermore, the Lanham Act prescribes liability for "commercial advertising or promotion." 15 U.S.C. § 1125(a)(1)(B). One of the factors that the Supreme Court has set forth in determining "commercial speech" is whether the speaker had an economic motivation for distributing the material. *Bolger v. Youngs Drug Prods*. Corp., 463 U.S. 60, 67 (1983). Defendant Stone's and the other Defendants' economic strong economic motivation is expressly pled in the Amended Complaint. For instance, "Defendants' false and/or misleading statements concerning Plaintiffs is meant to, and has, diverted financial and other support, referrals and sales away from Plaintiffs and to Defendants instead, and severely harmed Plaintiffs' personal and professional reputations." Am. Comp. ¶ 74.

Accordingly, the Amended Complaint clearly sets forth (1) the Plaintiffs and Defendants are all competitors and (2) that Defendants engaged in commercial speech. Magistrate Austin erred in minimizing Plaintiff's claims as alleging "[t]he mere fact that the parties may compete in the marketplace of ideas…." As set forth in Am. Comp. ¶ 74, "Defendants' false and/or misleading statements concerning Plaintiffs is meant to, and has, diverted financial and other

20

support, referrals and sales away from Plaintiffs and to Defendants instead, and severely harmed Plaintiffs' personal and professional reputations." This is textbook commercial speech, meant to degrade the nature of Plaintiffs' services and divert business to Defendants instead.

Lastly, and Magistrate Austin does not find otherwise, each of the Defendants are clearly within the statute of limitations for Plaintiffs' claims under the Lanham Act.

### iv.      Magistrate Austin Erred in Finding That Plaintiffs Did Not Adequately Plead Intentional Infliction of Emotional Distress

To succeed on a claim of intentional infliction of emotional distress, a plaintiff must show that "1) the defendant acted intentionally or recklessly, 2) the conduct was extreme and outrageous, 3) the actions of the defendant caused the plaintiff emotional distress, and 4) the emotional distress suffered by the plaintiff was severe." *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex. 1993). Texas Courts have held that a single threat of physical harm or death can sustain a claim for intentional infliction of emotional distress. "With the possible exceptions of the bomb and death threats, no single action…rises to the level of intentional infliction of emotional distress." *Household Credit Servs., Inc. v. Driscol*, 989 S.W.2d 72, 82 (Tex. App. El Paso 1998).

Here, Defendant Stone directly threatens Dr. Corsi, after maliciously defaming him, saying "I think you've [Corsi] been deep state from the beginning. Your whole birther thing is used as a club to destroy conservatives.… ***I look forward to our confrontation. I will demolish you***. You're a fraudster, out of your alcoholic haze you have made up lies about David Jones and Alex Jones and Roger Stone and now I suspect they want you to lie about the President." Am. Comp. ¶ 66. (emphasis added). This is a direct, credible threat to Dr. Corsi's life and the lives of those around him.

21

Magistrate Austin errs in finding that this claim was derivative of the defamation claims. Plaintiffs' IIED claims are apart from any claim for defamation, as Defendant Stone's intent was to specifically cause Dr. Corsi emotional distress and physical harm, which would have removed Dr. Corsi as a witness who could by Stone's paranoid thinking testified against him at his criminal prosecution.  Lastly, it is indisputable that Texas has a two year statute of limitations for Intentional Infliction of Emotional Distress, so Defendant Stone's actions fall squarely within that period.

> **v.       Magistrate Austin Erred in Finding That Plaintiffs Did Not Adequately Plead Assault**

In order to sustain a claim for assault, a Plaintiff need only plead that the Defendant "intentionally or knowingly threatens another with imminent bodily injury." *Moore v. City of Wylie*, 319 S.W.3d 778, 782 (Tex. App. 2010).

Defendant Stone made direct threats to Dr. Corsi's life, saying "**I look forward to our confrontation. I will demolish you**." Am. Comp ¶ 66. These threats are more than credible, as Stone also threatened to kill Randy Credico and his service dog. Am. Comp. ¶ 66. Thus, it was more than perfectly reasonable for Plaintiffs to take this as a credible threat on their lives.

> **vi.       Defendant Stone's Statute of Limitations**

It is telling that the Defendants argued that Florida law should apply, in an attempt to have this Court apply the Florida Anti-SLAPP statute. Plaintiffs  would welcome Florida law being applied to this case as to Stone, who resides in South Florida and is a citizen of Florida, along with its two-year statute of limitations for defamation.

> **b.       Magistrate Austin's Report Contains Numerous Factual Errors**

In addition to the numerous legal errors set forth above, Magistrate Austin's Report contains a litany of factual errors that evidence that his Report was given "short shrift," and was simply hastily written on the eve of his retirement.

First, Magistrate Austin's Report recommended dismissal of the Amended Complaint against Defendant David Jones without prejudice on page 10, but then, deciding on his own that even leave to amend would be futile, writes at page 17 "…the undersigned recommends that the Court not permit Corsi or Klayman leave to amend, and dismiss (all) the claims with prejudice." It is clear that, in haste, the Magistrate Austin right hand had no idea what his left hand was doing. Errors like this strongly evidence the fact that Magistrate Austin gave Plaintiffs' submissions little to no consideration.

Second, the Magistrate, relying on a *sua sponte* order of another judge in another case which did not even involve Plaintiff Corsi, states in his Report that he and Mr. Klayman had an obligation to amend a complaint which Mr. Klayman voluntarily dismissed. *Klayman v. Infowars*, Case No. 20-cv-80614 (S.D. Fla. Apr. 8, 2020). However, the cold hard fact remains that this case was not dismissed by the judge, but voluntarily dismissed by Mr. Klayman alone, when he concluded based on objective facts that the judge had a personal relationship with Roger Stone and had likely been recommended for appointment by President Trump to the federal bench by Stone, one of the Defendants. Indeed, Mr. Klayman inquired about this with the 38 year old newly appointed and confirmed judge and he refused to respond, necessitating a complaint, asking for an investigation, with the Judicial Council of the Eleventh Circuit, which remains pending. Tellingly, the Infowars Defendants picked up on this error and even falsely tried to use this to their advantage, falsely writing in their opposition Plaintiffs' Motion to Vacate

the Report and Recommendation that this case had been dismissed by the judge instead of voluntarily dismissed by Mr. Klayman.

These errors are indicative of the prejudice and hastiness that is readily evident in Magistrate Austin's fatally flawed report.

## IV.    CONCLUSION

As shown above, Magistrate Austin's Report is filled with both legal and factual errors that must not be adopted but instead put aside by this Honorable Court. These errors strongly indicate that Magistrate Austin gave Plaintiffs' submissions little to no consideration, and that he hastily crafted the Report on the eve of his retirement. Accordingly, the Report should be given no weight, and the Honorable Lee Yeakel should now rule that this case must go to discovery and then trial.  This is underscored by the "heads I win, tails you lose" approach used by Magistrate Austin where be made up his own facts, taking the matter away from a jury,  that he pulled out of thin air, then unjustifiably stayed discovery contrary to the directive of Judge Yeakel  to move this case along to trial at the outset of this case being transferred to this Court.

Plaintiffs Corsi and Klayman have been seriously damaged—which continues to this day –by  the tortious actions of all of the Defendants, acting in concert, and they at least deserve their day in court before a jury of their peers.

Dated: June 8, 2021                                        Respectfully Submitted,

/s/Sanjay Biswas
SANJAY BISWAS, Esq.
#24061235—Texas
#24966--Louisiana
11720 Duxbury Dr.
Frisco, Texas 75035
Telephone: (972)-866-5879
Email:sanjaybiswas41@gmail.com
Fax: 1-800-506-6804

*Counsel for Dr. Jerome Corsi*

*/s/Larry Klayman* _____
Larry Klayman, Esq.
7050 W. Palmetto Park Rd
Boca Raton FL, 33433
Email:leklayman@gmail.com
Tel: 561-558-5336

*Plaintiff Pro Se*

### <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on June 8, 2021, a true copy of the foregoing was filed via

ECF and served to all counsel of record though the Court's ECF system.

*/s/ Sanjay Biswas*

EXHIBIT 1

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| **DR. JEROME CORSI** and **LARRY KLAYMAN**, | § § § § § | CIVIL ACTION NO. 1:20-CV-00298-LY |
| Plaintiffs, | § § | |
| vs. | § § | |
| **INFOWARS, LLC, FREE SPEECH SYSTEMS, LLC, ALEX E. JONES, DAVID JONES, OWEN SHROYER**, and **ROGER STONE** | § § § § § | |
| Defendants. | § § | |

## SWORN DECLARATION OF DR. JEROME CORSI

I, Dr. Jerome Corsi, being over eighteen years of age and duly competent to testify, hereby swear and affirm as follows:

1.      I have personal knowledge of the following facts and if called upon as a witness, could testify competently thereto.

2.      I graduated magna cum laude with a B.A. in Political Science and Economics from Case Western Reserve University in 1968.

3.      I received a Ph.D. in Political Science from Harvard University in 1972.

4.      For over twenty-five (25) years, I worked in banking and finance, establishing investment programs for banks in the United States and worldwide to create financial planning services for their retail customers.

5.      From 1968 to 1981, I worked at various universities where I conducted research on federally funded grants.

6.     In 1981, I published "Terrorism as a Desperate Game: Fear, Bargaining, and Communication in the Terrorist Event" in *Journal of Conflict Resolution*, a mathematical game-theoretical model for predicting the outcome of terrorist events.

7.     The content of my publication resulted in a top-secret clearance by the U.S. Department of State's ("State Department") Agency for International Development, where I joined a team of psychiatrists and psychologists to develop a hostage-survival training program for State Department's officials overseas.

8.     Since 2004, I have published over twenty-five (25) books, seven (7) of which were *New York Times* Bestsellers, including two (2) #1 *New York Times* Best-sellers.

9.     In addition to being a New York Times Bestselling author, I am also an investigative journalist and political analyst.

10.     I currently hold active Life & Health insurance licenses, as well as Property & Casualty insurance licenses in New Jersey.

11.     For over twenty (20) years, I have been a licensed National Association of Security Dealers registered representative, currently holding FINRA-registered licenses as a Registered Principal, Financial Principal, Options Principal and Municipals Principal.

12.     I have been a frequent guest on radio and television shows, including but not limited to appearances on CNN, Fox News, Fox Business, MSNBC, and on Infowars, before having been defamed by Defendants.

13.     I personally know Defendant Roger Stone ("Defendant Stone") and he personally knows my qualifications and me. I have even ghostwritten books for Defendant Stone and we used to be friends and colleagues. Defendant Stone is thus intimately familiar with my personal and professional history.

14.     In 2016, after the presidential election, I worked very closely with Alex Jones and his father David Jones, as well as with the Infowars staff, including Owen Shroyer. I made multiple trips to Austin, Texas, to appear live in-studio on Infowars broadcasts.  I accepted an assignment from Alex Jones to create for Infowars a news bureau in Washington, D.C.  From the beginning, I found Alex Jones to be erratic, subjects to emotional outbursts, even reacting that I was trying to "steal his company" when with his father's assistance, I brought a multi-million dollar legitimate investment offer from highly credible sources to the table to discuss the proposal with Alex and his father.

15.     Several times, concerned that I might quit over how badly Alex Jones was treating me, Dr. Jones met with me privately, often over breakfast.  In those breakfasts, I counseled Dr. Jones over my concerns that Alex should seek professional psychological help.  While in my work under various contracts with federal government agencies to consult over anti-terrorism tactics, I had the opportunity to work with very experienced psychiatrists and psychologists.  Still, I am not medically trained, and I cautioned Dr. Jones that the problems I perceived with Alex's behavior should be professionally evaluated by qualified medical professionals.

16.     My efforts to create a news bureau in the nation's capital failed because Alex Jones insisted that staff I wanted to hire must work for free as "interns."  Throughout my 12 years at World Net Daily, I frequently had White House press credentials.  In 2012, the Secret Service cleared me to work as "traveling press," riding on the Romney campaign airplane for the last 3 weeks of the presidential campaign.  At no time was I ever denied press credentials at the highest levels was alcohol ever raised as an issue in the many extensive background checks I underwent.  In the early 1980s, I received Top Secret clearance from the federal government to

work on anti-terrorism contracts with the Agency for International Development at the State Department in Washington, D.C.

17.    Throughout the time I spent with Infowars, Dr. Jones would typically pick me up at the Austin Airport to transport me to the downtown hotel where Dr. Jones had made my room reservations.  At various times, we had breakfast together, often on trips when he was returning me to the airport to depart Austin.

18.    I am today 74 years-old.  I have no alcohol-related offenses on my record.  Since the mid-1980s, I have held securities licenses, first with the NASD and now with FINRA, agencies that conduct licensing in the securities industry for the federal government.  My securities records over that time, contain no customer complaints and no reports of behavior problems of any kind, including no alcohol-related problems.  I also have held for decades property and casualty as well as life and health insurance licenses in New Jersey.  I have created two broker/dealers in my financial services career.

19.    On my website, CorsiNation.com — a website I founded and managed as CEO — I conduct a daily hour-long podcast, live-streamed on multiple Internet channels simultaneously. I hold a Ph.D. from Harvard University's Department of Political Science, dating back to 1972.  I appear regularly on various news programs, including those broadcast by the major networks.  I have conducted thousands of radio interviews going back to 2004, when I entered the third phase of my career, currently working full-time as an investigative journalist and political commentator.

20.    Charges of alcoholism by the Defendants including broadcast charges made by Alex Jones and Defendant Roger Stone, have no basis in fact or substantiation in the extensive public record that exists of my life and professional career.

21.     Special Counsel Robert Mueller indicted Defendant Stone on seven counts of perjury, witness tampering and obstruction of justice.

22.     The Honorable Amy Berman Jackson who presided over Defendant Stone's prosecution, placed a gag order on him in part for threatening the judge herself by posing an Instagram meme of a crosshairs (gun) to her head.

23.     The seven-count indictment against Defendant Stone included lying under oath, witness tampering and obstruction of justice by threatening to kill a material witness, Randy Credico ("Credico") and his service dog if Credico did not lie or invoke the Fifth Amendment to government authorities concerning his involvement with Defendant Stone. Credico is Person 2 in the indictment. I am Person 1. Defendant Stone was later convicted of all seven (7) felony counts.

24.     Based on my personal knowledge of the interactions of Defendant Stone and the other Defendants, I assert that Defendant Stone, acting in concert with the other Defendants including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars, began a calculated and premeditated public relations campaign against my lawyer, Mr. Larry Klayman ("Mr. Klayman") and myself.

25.     Defendant Stone knew of his imminent indictment and therefore began his malicious crusade against Mr. Klayman and myself in order to influence public opinion and Special Counsel Robert Mueller by trying to attribute guilt to me.

26.     It is apparent that the malicious crusade against me by Defendants, who acted in concert, was calculated to coerce me to testify falsely at Defendant Stone's criminal trial.

27.     Defendant Stone, acting in concert with the other Defendants, also sought to divert funds away from my legal defense fund, while boosting his own.

28.     Contrary to Defendant Stone's false publication, I am not "certifiably insane and I have not "told multiple provable lies." Compl. at ¶ 26. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

29.     Contrary to Defendant Stone's false publication, I am not "mentally degraded to the point of [] dementia." Compl. at ¶ 42. I do not have dementia and have never been diagnosed with any mental illness. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

30.     Importantly, I was under contract with Infowars until the relationship ended and Defendants would not have retained me if I was "mentally degraded to the point of [] dementia." Compl. at ¶ 42.

31.     Contrary to Defendant Stone's false publication, he never saw me at a steakhouse where I was "on the ground at another table" where security staff "thought that [I] was dead in the elevator." Compl. at ¶ 43. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

32.     Contrary to Defendant Stone's false publication, I never suffered a stroke and it is a false statement of fact that "whatever comes out of [my] mouth ain't the truth." Compl. at ¶ 44. In publishing this false statement that Defendants knew to be false or published recklessly

because they are intimately familiar with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

33. Contrary to Defendant Stone's false publication, I was not "fired from World Net Daily." Compl. at ¶ 49. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

34. Contrary to Defendant Stone's false publication, I was not "perfectly willing to lie, to perjure [myself] saying that a memp that [I] had [written] [Defendant Stone] on the 30th for the purposes of cover-up . . . which is further proof that [I] lied under oath." Compl. at ¶ 50. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

35. Contrary to Defendant Stone's false publication, I do not have a "feeble alcohol affected memory." Compl. at ¶ 51. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

36. Contrary to Defendant Stone's publication, I was not "prepared to stab a principle Trump supported in the back" nor was I "perfectly prepared to bear false witness against [Defendant Stone]." Compl. at ¶ 52. In publishing this false statement that Defendants knew to

be false or published recklessly because they are intimately familiar with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

37.     Contrary to Defendant Stone's publication, it is a false statement of fact that "all [Defendant Stone] ever did was show [me] friendship and support and try to help [me] and [my] family and what [Defendant Stone] got was Judas Iscariot, the willingness to testify against [Defendant Stone] and help the deep state bury [Defendant Stone] . . . and then [I] make[] up this story about helping [Defendant Stone] formulate a cover story." Compl. at ¶ 53. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

38.     Contrary to Defendant Stone's false publication, it is a false statement of fact that "you can always tell when [I] [am] lying because [my] lips are moving . . ." Compl. at ¶ 54. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

39.     Contrary to Defendant Stone's false publication, it is a false statement of fact that Mr. Klayman "never actually won a courtroom victory in his life." Compl. at ¶ 55. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

40.     Contrary to Defendant Stone's false publication, it is a false statement of fact that Mr. Klayman "was ousted at Judicial Watch. Ask Tom Fitton why he left .he was 'ousted' because of a sexual harassment complaint." Compl. at ¶ 56. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar Mr. Klayman and with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

41.     Contrary to Defendant Stone's false publication, it is a false statement of fact that Mr. Klayman is "incompetent, he's a numbskull, he's an idiot, he's an egomaniac, and he could be the worst single lawyer in America. With him as [my] lawyer, [I] may get the electric chair. So [the] idea that he's a good guy is entirely wrong." Compl. at ¶ 59. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with Mr. Klayman and me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

42.     Contrary to Defendant Stone's false publication, it is a false statement of fact that Mr. Klayman is "a piece of garbage." Compl. at ¶ 61. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with Mr. Klayman and me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

43.     Contrary to Defendant Stone's false publication, Mr. Klayman's IQ is higher than 70. Compl. at ¶ 62. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

44.     Contrary to Defendant Stone's false publication, it is a false statement of fact that "[I] was perfectly willing to bear false witness against [Defendant Stone] on multiple points that are complete fabrications." Compl. at ¶ 64. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

45.     Contrary to Defendant Stone's false publication, it is a false statement of fact that "[I] had told a number of lies. In fact, [I] [am] starting to conflate [my] lies . . . [I] was perfectly willing to lie about [Defendant Stone] . . . but now lying about Alex Jones, lying about Infowars, lying about Dr. [David] Jones . . . [I] can no longer be believed." Compl. at ¶ 65.

46.     Defendant Stone falsely published: "I think you've [Corsi] been deep state from the beginning. Your whole birther thing is used as a club to destroy conservatives . . . **I look forward to our confrontation. I will demolish you.** You're a fraudster, out of your alcoholic haze you have made up lies about David Jones and Alex Jones and Roger Stone and now I suspect they want you to lie about the President." Compl. at ¶ 66 (emphasis added). Not only does Defendant Stone know this to be false but this malicious rant is also a threat. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with me,, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

47.     Contrary to Defendant Stone's false publication, I am not a "spook, back and forth with different agencies[.]" Compl. at ¶ 67. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with me,

as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

48.     Contrary to Defendant Stone's false publication, it is a false statement of fact that sometimes I am "not being able to walk" which creates the false and defamatory implication that I am an alcoholic. Compl. at ¶ 68. I am not an alcoholic. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

49.     As an investigative journalist, as well as my other professions and hobbies, I rely on my virtue and integrity.

50.     My reputation determines everything from the amount of books I sell to the frequency of my radio and television appearances.

51.     I have ghostwritten books for Defendant Stone and he intimately knows my qualifications and me. Thus, Defendant Stone and the other Defendants falsely published these statements when they knew them to be false or at least with a reckless disregard for their truth.

52.     Defendant Stone, acting in concert with Defendants Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars, has caused severe harm to my reputation, good will and well-being, financially and otherwise. They also caused my family and me severe emotional distress for which I have had to seek medical care.

SWORN TO UNDER OATH THIS 30TH DAY OF SEPTEMBER OF 2020.

Dr. Jerome Corsi

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**

DR. JEROME CORSI, ET AL

Plaintiffs

          v.

INFOWARS, LLC, et al

          Defendants.

**Case Number:   1:20-cv-298-LY**

**SWORN DECLARATION OF KELLY MORALES**

      1. I, Kelly Morales, hereby declare under penalty of perjury that the following is true and correct and based on my personal knowledge and belief.

      2. I am over the age of 18 and mentally and legally competent to make this affidavit, sworn under oath.

      3. I am the former wife of Defendant Alex Jones.  I was married to Alex Jones for 12 years and with him for 15 years and we have 3 children together. During our time together, I was involved in the activities of Alex, his father David and Infowars and am intimately knowledgeable about their activities and business structure.

      4. Based on my personal knowledge and experience, David Jones runs Infowars with Alex Jones and helps him with his activities, including fixing media stories and endorsing and/or aiding his slanderous and/or fraudulent behaviors, all for profit.

      5. Infowars, LLC is a sub-entity of Free Speech Systems, LLC ("FSS"), and David Jones is an employee of FSS, or he has been.

      6. David Jones is additionally a managing member of multiple entities that are closely held businesses, constituting financial holding companies or financial distribution centered around Infowars/Alex Jones' supplement line, which are quintessential to funding and running Infowars.

      7. Alex Jones could not function without David Jones, and has conspired with him on the past to commit this breach of fiduciary duty and fraud on my business/estate with Alex Jones. While David Jones did this, he slandered and/or defamed me to experts and assisted Alex Jones and his attorneys to do the same, so as to steal/hide my estate and his grandchildren's inheritance.

      8. Alex Jones is quasi-illiterate, and cannot use technology or apps such as email with any fluency, and he cannot function without assistance from those around him, including David Jones.

      I hereby swear under oath and penalty of perjury that the foregoing facts are true and correct to the best of my knowledge and belief.

      Executed on September 30, 2020

Kelly Morales

2

# EXHIBIT 3

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| Alexander E. Jones, | § | CASE NO. 20-10118-hcm |
| | § | |
| Alleged Debtor. | § | Chapter 11 |
| | § | |

**Affidavit of David Jones in Support of Alleged Debtor's Motion to Dismiss**

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF TRAVIS | § |

BEFORE ME, the undersigned authority, on this day personally appeared David Jones, who after being sworn did state upon his oath, as follows:

1.      "My name is David Jones. I am over 18 years of age and otherwise competent and capable of making this Affidavit. I have personal knowledge of the facts set forth herein and they are true and correct.

2.      "I have been involved with Alex Jones' personal and business finances for many years and have personal knowledge of the matters set forth herein, and they are true and correct.

3.      "I have personally reviewed the Real Estate Lien Note from Alexander Jones to Kelly R. Jones dated March 19, 2015 (the "*Note*"), which is attached to the Involuntary Bankruptcy Petition filed in the above referenced case and have reviewed the record of payments made by Alexander Jones to Kelly R. Jones under the Note. I have personally calculated the remaining balance of the Note. The balance of the Note is $596,267.16 as of the date hereof.

"Further Affiant sayeth not."

SIGNED on this ___ day of February, 2020.

_____
David Jones

Sworn to and subscribed before me, the undersigned authority, on this 13th day of February, 2020.

_____
Notary Public for the State of Texas

EXP    09-24-2022

PATRICK RILEY
Notary Public, State of Texas
Comm. Expires 09-24-2022
Notary ID 131734177

4837-5475-576

1

EXHIBIT 4

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| DR. JEROME CORSI and<br>LARRY KLAYMAN, | §<br>§<br>§ | CIVIL ACTION NO. 1:20-CV-00298-LY |
| Plaintiffs, | §<br>§ | |
| vs. | §<br>§ | |
| INFOWARS, LLC, FREE SPEECH<br>SYSTEMS, LLC, ALEX E. JONES,<br>DAVID JONES, OWEN SHROYER, and<br>ROGER STONE | §<br>§<br>§<br>§ | |
| Defendants. | §<br>§ | |

## SWORN AFFIDAVIT OF LARRY KLAYMAN

I, Larry Klayman, being over eighteen years of age and duly competent to testify, hereby swear and affirm as follows:

### A BRIEF HISTORY OF MY BACKGROUND

1.　　I have personal knowledge of the following facts and if called upon as a witness, could testify competently thereto.

2.　　In 1973, I graduated from Duke University where I majored in political science and French literature. I excelled academically and graduated with honors.

3.　　I then matriculated at Emory Law School where I excelled academically and graduated in 1977. While in law school, I worked as an intern at the U.S. International Trade Commission, the Georgia Attorney General and the U.S. Attorney for the Northern District of Georgia.

4.　　I passed The Florida Bar the first time I took the exam.

5.　　I passed all bar exams on my first attempt, including the District of Columbia Bar.

6.      I began my legal career in this circuit in Miami, Florida as an associate for Blackwell, Walker, Gray, Roberts, Flick & Hoehl (. Blackwell") which was then the largest and most prestigious law firm in Florida. I was admitted into The Florida Bar having been sworn in on December 7, 1977. I have practiced law in this circuit continuously and extensively throughout my forty-two-year career and have active cases pending in this circuit and elsewhere in Florida, including during the period that I was a trial attorney for the U.S. Department of Justice's ("DOJ") Antitrust Division, from 1980 to 1982, where I was assigned litigation in this circuit.

7.      I conceived of and founded Judicial Watch, Inc. ("Judicial Watch") in 1994, a public interest group that's mission was to investigate and prosecute government corruption and abuse. I was the Chairman, General Counsel, and Corporate Treasurer of Judicial Watch until I voluntarily departed in 2003 to run as a candidate for the U.S. Senate in Florida in the Republican primary election.

8.      In 1998, during the time I ran Judicial Watch, I hired Thomas J. Fitton ("Fitton") as my contract assistant. I later appointed him president of the organization I founded.

9.      In September of 2003, I voluntarily departed from Judicial Watch to run for the U.S. Senate in Florida. At the time I left Judicial Watch, I learned that Fitton had never graduated from college, which he had told me he had when I initially hired him.

10.      Contrary to Defendant Roger Stone's ("Defendant Stone") false and defamatory publications, I have enjoyed many successes in my career as a lawyer, many of which have been brought to the attention of the public by complimentary newspapers, magazines, editorials and journals.

11.      For example, I practiced law at Blackwell with my supervising partners Paul Larkin and Layton Mank and participating in winning product liability cases as defense counsel for Blackwell including cases involving Raleigh bicycles, pharmaceutical drugs manufactured by

Burroughs-Wellcome, and allegedly misdiagnosed cancer victims, and other personal injury and medical malpractice cases. Additionally, I handled lawsuits in admiralty.

12.     I left Blackwell to join the DOJ as a trial lawyer, prosecutor and defense lawyer in late 1979. During my time at the DOJ, I had many victories in the courtroom as well as favorable settlements for the government, i.e., such as for the Consumer Affairs Section of the Antitrust Division over misbranded, adulterated food and drug products including fruit drinks and prophylactics for the Food & Drug Administration ("FDA") and successful seizures and criminal prosecutions of dangerous products on behalf of the Consumer Product Safety Commission ("CPSC") such as slant-sided refuse bins, flammable children's sleepwear, and intraocular lens implants for cataract patients.

13.     Importantly, I was also on the trial team that successfully broke up the AT&T monopoly – creating competition in the telecommunications industry. I left the DOJ in late 1981.

14.     Then, working as an international trade lawyer for Busby, Rehm & Leonard and after a few years having founded my own firm The Law Offices of Larry E. Klayman, later named Klayman & Associates, P.C., I won countervailing duty and antidumping duty cases concerning steel from South Africa, garden furniture from Italy, musical instrument pads from Italy, coffee filters from Brazil, key limes from Peru, fireworks from China and a host of other product imports. I represented both importers and exporters. (While at Busby, Rehm & Leonard, I also took some months on hiatus and worked in the Competition Directorate (DG-4) of the Commission of the European Communities Section ("E.C.").

15.     Later, with my law firm, I won Section 337 unfair trade practice cases at the U.S. International Trade Commission ("USITC") concerning tennis rackets from Belgium, power tools from Taiwan, luggage from Taiwan, mass spectrometers from France, jam from Belgium, and machine tools from Brazil. I won a landmark case concerning recloseable plastic bags, which

broke the patents of Minigrip and Dow Corning, Minigrip's licensee. That case victory opened up competition for zip lock bags, a multi-trillion dollar industry.

16.    There was also an USITC patent case, pursuant to Section 337, which I litigated and won involving motorcycle helmets and another antidumping and countervailing duty cases before the Commerce Department and USITC concerning fire protection products and scuba diving neoprene body suits.

17.    I also won a Section 302 case involving paper from Brazil.

18.    All of the Section 337 cases were judge-tried and I won every one of them.

19.    I won a jury trial against Makita over power tools, another jury trial against a domestic manufacture of removable swimming pools for my client Remove Pool Fence Co., and yet another jury trial for my client, Maccaferri, on a contract dispute. These are only some of the jury trials I won during my early career.

20.    Because of my work during the time I ran Judicial Watch, a court ruled that President William Clinton committed a crime during the Filegate litigation. I also triggered the famous Chinagate scandal in a Freedom of Information Act, 5 U.S.C. § 552 et seq., which gave rise to Judicial Watch ultimately being awarded almost a million dollars. I filed cases which ended Bill and Hillary Clinton's attempted illegal purchase at below market rates for their mortgage of their home at Chappaqua, New York and ended the illegal payment of legal fees to the Clintons by State Farm, which was a form of bribery. I also participated in the famous *Gore v. Bush* litigation in Tallahassee, Florida that settled the 2000 presidential elections by the U.S Supreme Court. I also brought a case under the Foreign Agents Registration Act ("FARA") over the Cheney Energy Task Force that made its way to the U.S. Supreme Court.

21.    I brought a case for Jose Basulto of Brothers to the Rescue in a Florida court, which resulted in a $1.8 million judgment against the Republic of Cuba for shooting down Brothers to

4

the Rescue planes, and I represented the Miami family of Elian Gonzales and other victims of Fidel Castro, such as journalists who were jailed by Castro for their political beliefs. In this regard, I not only filed criminal complaints for these victims against Fidel Castro in Belgium courts, but also lobbied and testified in both Italian and French in Italy and France, as I am fluent in both languages, before various European parliaments to increase economic sanctions on Cuba for abuse of human rights. I also lobbied the European Union in Brussels, Belgium for increased sanctions on Cuba.

22.     On December 16, 2013, Judge Richard J. Leon granted my request for a preliminary injunction in my case against the National Security Agency ("NSA") and the Obama administration, when Judge Leon found for the first time in history that the collection of metadata telephony records by the NSA was likely unconstitutional.

23.     Because of that ruling, Congress enacted the USA Freedom Act, which sought to end illegal and unconstitutional mass surveillance by government intelligence agencies and the Federal Bureau of Investigation ("FBI").

24.     I obtained a jury verdict in the U.S. District Court for the Southern District of Florida against my former public interest group Judicial Watch, which was then run by Fitton, for maliciously defaming me in the amount of $181,000, which included punitive damages.

25.     My client Sheriff Joe Arpaio and I were the first to challenge former President Obama's unconstitutional executive amnesty for over 5 million illegal aliens and were ultimately successful, along with 25 other attorneys general, in front of the U.S. Supreme Court.

26.     It was my efforts that prevented Dr. Jerome Corsi ("Dr. Corsi") from getting indicted, first because he told the truth and did not engage in witness tampering and threaten to kill a witness such as Randy Credico, as Defendant Stone did, and second because of my legal skill and acumen. Dr. Corsi is a material witness in the Russian Collusion investigation by Special

Counsel Robert Mueller ("Mueller") and is listed as a material witness as Person 1 in Defendant

Stone's Mueller indictment.

27.     I have had many other successes in addition to the above-listed victories.

28.     I myself authored a book titled "Whores: Why and How I Came to Fight the

Establishment" published in 2009. In it, I wrote about my unfortunate experience with Defendant

Stone. *See* Exhibit A. I authored this book myself without a ghostwriter and I came runner-up at

an International Book Fair. It also still has a review on www.Barnesandnoble.com of 4.5 stars out

of the maximum 5 stars.

29.     Upon its publication, Jack Cashill, the author of "Ron Brown's Body" had this to

say about me: "That *Time* magazine has yet to name Larry Klayman 'Man of the Year' is a failure

of *Time*, not Klayman's. The work he and Judicial Watch did on the Brown case is stunning." *See*

Exhibit B.

30.     Joseph Farah, the founder of WorldNetDaily.com, had this to say about me: "Larry

Klayman is my hero because he has integrity – enough to prevent him from blind loyalty to party

or ideology . . . That's because he is fearless and relentless in the pursuit of justice . . . There were

other men like Larry early in American history. Their names were Washington, Jefferson,

Madison and Henry. *See* Exhibit B.

31.     Louis Jacobson of the National Journal said this of me: " . . . through his challenge

of secrecy rules, Larry Klayman has become a force in Washington. *See* Exhibit B.

32.     Bill Moyers, of "Now" PBS, said this: ". . . his idea of fun is trying to kick down a

door some public official has marked secret . . . Larry Klayman is himself a conservative, but

there's nothing partisan bout his indignation."

33.     Frank Rich, famed columnist for "The New York Times" said this: "Larry . . . I

appreciate your own maverick – if we can still use that word! – thinking and stands."

34.     These are just a few of the accolades I have received over the years from conservatives and liberals alike, who appreciate and admire my work. *See* my biography attached as Exhibit C and incorporated herein by reference; *see also* Exhibit D, "Larry Klayman, the One Man Tea Party" which attributes the genesis of the Tea Party to me.

35.     I am now the founder, Chairman and General Counsel of Freedom Watch, Inc., which has the mission of investigating and prosecuting government corruption and abuse through legal advocacy. I also am in private practice with The Klayman Law Group, P.A. I am unique as a public interest advocate. I am a columnist for World Net Daily and have had about 500+ columns published over the last 10 years. I have also been a columnist for Newsmax through a blog titled "Klayman' Court" and in addition to my book "Whores: How and Why I Came to Fight the Establishment", I also published two other books: "Fatal Neglect" and "Essays of a Mad Man." I also have my own syndicated radio show with Radio America called "Special Prosecutor with Larry Klayman."

## MY EXPERIENCES WITH DEFENDANT ROGER STONE

36.     I met Defendant Stone at the Old Ebbitt Grill in Washington, D.C. in 1988 while he was a partner with Paul Manafort and others and was working as a lobbyist for the firm Black, Manafort, Stone, & Kelly.

37.     Defendant Stone was a "political consultant" who claimed to help get presidents and other politicians elected. The firm made money by then lobbying the very men they put in office.

38.     Defendant Stone backed Republican candidate Jack Kemp for President and he recommended that I be put on the executive finance committee, which also included Donald J. Trump.

39.     Because Defendant Stone knew of my successes and capabilities as a private lawyer, he told me that he had recommended me for U.S. Attorney when George Bush was President in 1992.

40.     In 1996, at a Republican Convention in San Diego, California, Defendant Stone was filmed at a "toga party" with his wife at a "swingers party."

41.     The media at the time went after Defendant Stone because of his alleged participation in the "sex party" and created a scandal.

42.     The media alleged at the time that Defendant Stone solicited sex half-naked, and that there was a picture of Defendant Stone in a compromising position to back up the story.

43.     Defendant Stone contacted me and, because he knew my capabilities and acumen as a lawyer, retained me to represent him to get the media to cease what he claimed then was a smear campaign.

44.     I successfully got the media to back off Defendant Stone through my skill as a lawyer and Defendant Stone was grateful.

45.     I maintained in sporadic contact with Defendant Stone until 2003 when I told him of my plans to voluntarily leave Judicial Watch and run for the U.S. Senate.

46.     There were confirmed rumors that Senator Bob Graham would retire from the U.S Senate well before he announced his retirement in November 2003. Defendant Stone traveled in Republican and political circles and knew that the Senator would be retiring in early to mid 2003.

47.     Thus, I was in contact with Defendant Stone in early to mid 2003, having been put in contact with him by Scott Reed, then Chief of Staff to Jack Kemp, who then was Secretary of Housing and Urban Development, and Defendant Stone was made aware by Scott Reed that I intended to run for the U.S. Senate to fill Bob Graham's seat.

48.     As I was a newcomer to politics, it would have been virtually impossible for me to beat Bob Graham, the incumbent, given the privileges and name recognition an incumbent receives, unless he or she is enmeshed in a major scandal. Senator Bob Graham was never enmeshed in such scandal.

49.     Because he was aware of my prior successes at Judicial Watch and before, Defendant Stone wanted to work with me as my U.S. Senate campaign manager. During this time, the spring, summer, and fall of 2003, and in preparation for my U.S. Senate run, Defendant Stone researched and kept books and records of many of my accomplishments. He had several binders (2-3 feet) full of information about me and the victories that I had obtained at Judicial Watch and elsewhere. Again, because Defendant Stone knew of my successes and legal political acumen, Defendant Stone wanted to be on my team and help me run for the U.S. Senate.

50.     Defendant Stone thus knew of many cases I had won in courtrooms and other legal accomplishments and in fact had kept records of successes in a book of my accomplishments.

51.     Soon after I hired him and during the height of my U.S. Senate campaign, I discovered that Defendant Stone had a conflict of interest and was working with Al Sharpton, while simultaneously working with me. He had agreed to represent me exclusively and I considered Al Sharpton to be an unsavory character. He also was not competently running my campaign with a staff of his friends which he had hired at great expense to me.

52.     I let Defendant Stone go roughly after about one month of his working with me on my U.S. Senate campaign. Shortly after his being let go, Defendant Stone and his sidekick Mike Caputo, whom he hired on my behalf as the campaign's press secretary, along with other staff Defendant Stone had hired, stole thousands of dollars of campaign cell phones and laptops, which I had purchased with my personal funds for the campaign.

53.    I have not spoken to Defendant Stone since I parted ways with him in 2003 given this experience.

54.    Defendant Stone is an individual and citizen of Florida. Special Counsel Robert Mueller ("Mueller") indicted Stone as part of the alleged "Russian Collusion" investigation with seven different felony counts, including lying under oath, witness tampering and obstruction of justice by threatening to kill a material witness and his service dog.

55.    The January 18, 2019 InfoWars video, published in this circuit, contained several false, misleading and defamatory statements concerning me. These false and defamatory statements include but are not limited to:

> A` **1:25, Defe. dant Stone says, "He's (Klayman) never actually won a courtroom victory in his life."**
>
> **At 1:30, Defendant Stone says, "He (Klayman) was ousted at Judicial Watch. Ask Tom Fitton why he left. He was 'ousted' because of a 'sexual harassment complaint.'"**
>
> **At 1:37, Defendant Stone says, "He's (Klayman) incompetent, he's a numbskull, he's an idiot, he's an egomaniac, and he could be the single worst lawyer in America. With him as Jerry Cori's lawyer, Corsi may get the electric chair. So your idea that he's a good guy is entirely wrong."**
>
> **At 2:01, Defendant Stone published that Plaintiff is "a piece of garbage."**
>
> **At 4:11, Defendant Stone says, "For those people out there who think . . . that Larry Klayman's IQ is higher than 70, you're wrong . . ."**

Am. Compl. at ¶¶ 55, 56, 59, 61, 62.

56.    Defendant Stone acted with actual when he published the false, misleading and defamatory statements concerning me because he knew they were false or acted with a reckless disregard to their truth, as set forth herein.

57.    Defendant Stone not only acted with actual malice when he published the false, misleading and defamatory statements concerning me, but he also had motives to maliciously

defame me. He published the false and misleading statements knowing that they were false or with a reckless disregard for their truth. Defendant Stone had reason to know that his statements were false.

58.  Defendant Stone is aware of *many, many* victories of mine as he was in charge of putting together the book of my accomplishments for fundraising purposes for my U.S. Senate campaign, among other reasons.

59.  Since the time I let Defendant Stone go as my campaign manager in late 2003, Defendant Stone has tried to trade off my clients like a "scavenger." I have warned my clients not to become involved with him as, in my opinion and through my experience, Defendant Stone is not an honorable, ethical or honest person. He has been widely and rightly called a self-styled "dirty trickster" In my opinion, this characterization is accurate based on my experience dealing with him. *See* "Get me Roger Stone" on Netflix,

https://www.netflix.com/title/80114666. He tried to trade off my clients for his own profit and purposes.

60.  When the National Enquirer contacted me in 2018 to get a comment on a story it was writing about President Donald Trump and to get my legal opinion on the Mueller investigation, I told the reporter not to quote me in the same article as Defendant Stone, or any article in which he wrote, as Defendant Stone wrote for the National Enquirer at the time. The National Enquirer is located in South Florida and is apparently close with Defendant Stone, a South Florida citizen. I did not want to be quoted or associated at all with Defendant Stone because I consider him – like others do – to be a self-styled dirty trickster who was likely going to be indicted for alleged criminal behavior by Mueller and in fact was indicted by Mueller.

61.  In 2018, I also told Alex Jones and his show producers on InfoWars that I did not want to appear on any show which included Defendant Stone or had ties to Defendant Stone,

either as a guest or as a host, because I strongly felt at the time that Mueller may indict Defendant Stone. Defendant Stone was at the time a host on InfoWars.

62. I also warned Alex Jones not to release any information – that was potentially under seal in the contempt case of *Melendrez v. Arpaio*, 07-cv-02513 (D. Ariz. 2007) – which he may have improperly obtained from Defendant Stone or others concerning Dennis Montgomery, another whistleblower client of mine who contracted with the U.S. government so it could use his software capabilities for intelligence gathering.

63. During the criminal trial of my client Cliven Bundy, again to try to scavenge off my clients, Defendant Stone flew to Las Vegas, Nevada where the Bundys lived and boasted that he could get a pardon for Cliven Bundy and his sons. I told Carol Bundy, Cliven's wife and the sons' mother, to stay away from Defendant Stone and she did.

64. I also warned my then client at the time, Dennis Montgomery, to stay away from Defendant Stone.

65. Defendant Stone wanted to – and did – intimate and threaten my client Dr. Corsi since he is a material witness in the Mueller investigation as Defendant Stone obviously feared that he would testify against him to Mueller. Defendant Stone feared me as Dr. Corsi's lawyer as he knew that I know what type of person he is and must have thought falsely that my representation of Dr. Corsi was my revenge for him having harmed me during my U.S. Senate campaign.

66. In sum, Defendant Stone tried to trade off my clients and I shut this down every time in order to protect my clients from Defendant Stone. He also knew that I wanted nothing to do with him and I predicted early on in the Russian collusion investigation that Mueller would most likely indict Defendant Stone because of – in my experience with him – his rank dishonesty and dirty tricks.

67.    This, in addition to other information that will be meted out in discovery, supplies the motive to maliciously defame me. That he attacks my acumen and ability as a lawyer and defamed me personally with false sexual harassment complaint claims is directly related to my having kept him away from my clients.

68.    This vindictive, malicious retaliation by Defendant Stone had a logical purpose. He tried to intimate and threaten Dr. Corsi and me in order for us not to collaborate with Mueller. We obviously did not collaborate with Mueller but Defendant Stone is both unstable and unhinged (*See* CDs containing videos of defamatory statements and publications) and apparently paranoid and he tried to prevent collaboration at all costs in order to save his own skin. His conduct toward us is similar to his conduct toward Material Witness 2 in the Mueller investigation, Randy Credico, who he allegedly threatened "Mafioso style" to kill. He even allegedly threatened to kill Credico's service dog, for which he was in part indicted.

## DAMAGES

69.    As an attorney, I rely on my virtue and integrity, as my reputation and good will determines the amount of clients that come to me to earn a living for their legal matters in the public interest and privately.

70.    Any damage done to my reputation harms my ability to practice law as a lawyer, particularly in this circuit, which is my community. This also harms my work as an author, columnist and syndicated radio talk show host, all of which depend on reputation and good will.

71.    Defendant Stone's statements in this instance have caused harm to my reputation, good will and well being in this circuit, the United States, and globally, as I am also an international lawyer as previously set forth in this affidavit.

72.     There was never any single instance of someone making a sexual harassment complaint against me during my almost ten years at Judicial Watch. Defendant Stone's statements to the contrary are false and defamatory and made with actual malice.

73.     Defendant Stone acted with actual malice when he published that I was "ousted" because of a sexual harassment complaint because he knew that was false. Am. Compl. at ¶ 56. Defendant Stone knew or had reason to know that this was false, as he was my campaign manager when I left Judicial Watch.

74.     As set forth in my opposition to Defendants' motions to dismiss, which attaches the testimony of Fitton of Judicial Watch, this also proves the falsity of this statement. Indeed, both Fitton and Defendant Stone have been forced to testify under oath that they never spoke about my being "ousted." Defendant Stone thus fabricated this falsity, according to Fitton's sworn testimony.

75.     The damage done to me and my clients Dr. Corsi, Cliven Bundy, and the Gold Star parents of Extortion 17 whose sons died in combat in Afghanistan, because of Defendant Stone is continuing. As just one example, a person approached me in an elevator and told me that I was "ousted" at Judicial Watch.

76.     Defendant Stone acted with actual malice when he published all of the defamatory statements. He knew the statements were false or had a reckless disregard for their truth. He had reason to know his false and misleading statements were false.

77.     I was damaged financially, as well as to my reputation and good will, and emotionally, by the defamatory and other tortious acts of Defendant Stone.

78.     Each of the Defendants, Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars, is intimately familiar with my background, qualifications and successes as a public interest and private attorney. For this reason, I was previously invited to appear on Infowars on

many occasions before Defendants decided – at the direction of Defendant Stone – to defame my

client, Dr. Corsi and me.

Affiant Sayeth Not

SWORN TO UNDER OATH THIS 30TH DAY OF SEPTEMBER OF 2020.

_____

Larry Klayman

EXHIBIT 5



# Transcript of Thomas J. Fitton

**Date:** June 6, 2019
**Case:** Klayman -v- Fitton

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING | INTERPRETATION | TRIAL SERVICES

**1**

```
1          IN THE UNITED STATES DISTRICT COURT
2          FOR THE SOUTHERN DISTRICT OF FLORIDA
3
4   LARRY KLAYMAN,            *
5          Plaintiff,         *
6     vs.                     *  Civil Action
7   THOMAS FITTON,            *  No. 1:19-cv-20544
8          Defendant.         *
9
10
11
12      Videotaped Deposition of THOMAS J. FITTON
13                  Washington, D.C.
14              Thursday, June 6, 2019
15                    3:06 p.m.
16
17
18
19  Job No.: 247643
20  Pages 1 - 92
21  Reported by:  Vicki L. Forman
22
23
24
25
```

**2**

```
1          Videotaped Deposition of THOMAS J. FITTON,
2   held at the offices of:
3
4       Planet Depos
5       Suite 950
6       1100 Connecticut Avenue, Northwest
7       Washington, D.C.  20036
8       (888) 433-3767
9
10
11
12          Pursuant to agreement, before Vicki L.
13  Forman, Court Reporter and Notary Public in and
14  for the District of Columbia.
15
16
17
18
19
20
21
22
23
24
25
```

**3**

```
1              A P P E A R A N C E S
2
3   ON BEHALF OF THE PLAINTIFF PRO SE:
4       LARRY KLAYMAN, ESQUIRE
5       Klayman Law Group, P.A.
6       Suite 345
7       2020 Pennsylvania Avenue, Northwest
8       Washington, D.C.  20006
9       (310) 595-8088
10
11
12
13  ON BEHALF OF THE DEFENDANT:
14      RICHARD W. DRISCOLL, ESQUIRE
15      Driscoll & Seltzer
16      Suite 610
17      300 North Washington Street
18      Alexandria, Virginia  22314
19      (703) 822-5001
20
21
22
23
24
25
```

**4**

```
1   ON BEHALF OF THE DEFENDANT:
2       KATIE M. MERWIN, ESQUIRE
3       Cole, Scott & Kissane, P.A.
4       Suite 120
5       222 Lakeview Avenue
6       West Palm Beach, Florida  33401
7       (561) 383-9206
8       (Present via Telephone.)
9
10
11
12  ALSO PRESENT:  Joannis Arsenis, Videographer
13
14
15
16
17
18
19
20
21
22
23
24
25
```

41

1      MR. KLAYMAN: Certify it.
2      Q So as President of Judicial Watch you
3  would have known for sure that this Complaint had
4  been filed, correct?
5      MR. DRISCOLL: Objection to form.
6      **A Well, the press release indicates it was**
7  **filed and I recall we sued about the raid, yes.**
8      Q And you gave interviews about suing in the
9  raid, correct, in the media?
10     **A I don't remember.**
11     Q Turn to the last page, page five.
12     The Complaint is signed by James F
13  Peterson, correct?
14     **A His name is on the last page of the**
15  **Complaint as a signatory.**
16     Q He is an attorney at Judicial Watch,
17  correct?
18     **A Yes.**
19     Q Now, Mr. Peterson had contact with Roger
20  Stone over the issue of the raid on his house, did
21  he not?
22     **A Not that I'm aware of.**
23     MR. DRISCOLL: Objection to form.
24     Q You're saying you don't know one way or
25  the other?

42

1      **A I don't believe he has. I said I would**
2  **know if he had.**
3      Q How would you know if you couldn't even
4  identify the Complaint?
5      **A Another abusive harassing question.**
6      MR. DRISCOLL: It's a foundation question.
7  You can go ahead and answer it.
8      How would you know if he had contacted
9  Roger Stone?
10     MR. KLAYMAN: Or if Roger Stone contacted
11  him.
12     **A Is it privileged?**
13     MR. DRISCOLL: That's an interesting
14  question. The fact of the communication would not
15  be. The contents of it would be.
16     **A How I would know is my question of whether**
17  **it's privileged or not.**
18     MR. DRISCOLL: No, I'm going to allow you
19  to answer that one.
20     **A How I would know about what my attorneys**
21  **are doing or Judicial Watch's attorneys are doing?**
22     MR. DRISCOLL: Yeah, and you're not
23  disclosing a communication. You're just
24  describing a process.
25     **A Typically that type of communication would**

43

1  **have been disclosed to me.**
2      Q But you don't know for sure that
3  Mr. Peterson didn't have contact with Roger Stone?
4      MR. DRISCOLL: Objection to form.
5      **A I'm confident there was no such contact.**
6      Q You have told Mr. Peterson in the past,
7  have you not, that I was ousted from Judicial
8  Watch because of a sexual harassment complaint?
9      MR. DRISCOLL: Objection to form.
10  Mr. Peterson is an in-house counsel and I'm going
11  to direct the witness not to answer. That's an
12  attorney-client privilege.
13     MR. KLAYMAN: Certify it.
14     Q So you don't know whether or not
15  Mr. Peterson repeating what you had told him then
16  republished that to Roger Stone?
17     MR. DRISCOLL: The communications between
18  an in-house counsel and the President of the
19  corporation relating to legal advice and
20  assistance are privileged. He can't answer the
21  question about the contents of the communication
22  or derivative questions that would disclose the
23  content of the communication.
24     MR. KLAYMAN: That's the crux of the
25  lawsuit. That does not apply in this context.

44

1      MR. DRISCOLL: That doesn't waive the
2  privilege.
3      Q Are you saying that you never told anyone
4  at Judicial Watch that I was ousted because of a
5  sexual harassment complaint?
6      MR. DRISCOLL: Anyone other than the
7  attorneys?
8      MR. KLAYMAN: Anyone.
9      MR. DRISCOLL: No, I can't allow him to
10  answer that question.
11     Q Are you saying that you never told anyone
12  that I was -- regardless -- let's take attorneys
13  out of it.
14     Have you ever -- you have told other
15  people in addition to -- strike that.
16     You have told other people excluding
17  attorneys that I was ousted from Judicial Watch
18  because of a sexual harassment complaint?
19     **A You have to ask the question again.**
20     MR. KLAYMAN: Read it back, please.
21     **A Please.**
22     MR. KLAYMAN: Let me rephrase it.
23     Q I'm taking attorneys out of this question.
24  I'm saying you have told others who aren't
25  attorneys over the course of the last 16 years

45

1  since I left Judicial Watch that I was ousted
2  because of a sexual harassment complaint?
3      A No, because that's not true. You weren't
4  ousted as a result of a sexual harassment
5  complaint.
6      Q After I sued you in this particular case
7  has anyone -- have you or anyone at Judicial Watch
8  or your counsel tried to contact Roger Stone?
9      MR. DRISCOLL: Objection to form. The
10 question invades the attorney-client privilege and
11 the attorney work product. I direct the witness
12 not to answer.
13     MR. KLAYMAN: Certify it.
14     Madam court reporter, have a page in the
15 front where you have all the certified questions
16 and where you can find them to make it easy for
17 the Magistrate Judge. Thank you.
18     Q Now, I turn your attention back to your
19 affidavit which is --
20     A Exhibit 3.
21     Q Exhibit 3. Turn your attention to
22 paragraph seven where it says "I have no
23 recollection of ever having any communication with
24 Roger Stone," do you see that?
25     A Uh-huh.

46

1      Q Now, it doesn't say you didn't have a
2  communication with Roger Stone. It just says that
3  you have no recollection of having one, correct?
4      A That's correct.
5      Q Do you remember during the Clinton years
6  that witnesses would always come in and say we
7  have no specific recollection and we would contest
8  that?
9      MR. DRISCOLL: Just ask your question,
10 Larry.
11     Q So you can't say categorically that you
12 haven't had communications with Roger Stone?
13 You're just saying you don't have a recollection
14 of ever having it, correct?
15     A I think the statement speaks for itself.
16     Q You could have said I have never
17 communicated with Roger Stone, correct, if that's
18 what you were trying to say, that you never had
19 any contact?
20     A The statement speaks for itself.
21     Q Then you state in the next sentence "I
22 have never published, uttered or implied to Roger
23 Stone that Klayman was the subject of a sexual
24 harassment complaint during his employment by
25 Judicial Watch or that his resignation from

47

1  Judicial Watch was motivated by an employee's
2  sexual harassment complaint," do you see that?
3      A Yeah.
4      Q Again, that statement does not say that
5  you never spoke with Roger Stone, just that you've
6  never published that particular issue, correct?
7      A It says what it says.
8      Q And then it states "Any statement by Roger
9  Stone regarding Klayman was made without my
10 knowledge or information and therefore I did not
11 intend and could not intend to harm Klayman or his
12 reputation," do you see that?
13     A Yes.
14     Q Now, you're not saying in that statement
15 that you didn't communicate with Roger Stone.
16 You're saying that you didn't know that he was
17 going to republish anything about me, correct?
18     MR. DRISCOLL: Objection to form. The
19 document speaks for itself.
20     A The document speaks for itself.
21     Q If you don't want to explain it that's
22 fine.
23     A You're mischaracterizing it.
24     Q I do agree. It speaks for itself and
25 there's a lot of loopholes in it.

48

1      MR. DRISCOLL: Why don't you just ask him
2  the question. Did he ever --
3      MR. KLAYMAN: I will ask the questions
4  that I want to ask, Mr. --
5      MR. DRISCOLL: All right.
6      Q I want to turn to paragraph eight.
7      Do you see the statements in the last
8  sentence of paragraph eight where it says "To
9  support his claim Judicial Watch submitted
10 evidence demonstrating that Klayman was forced to
11 resign due to inappropriate conduct" and you list
12 three examples of your alleged inappropriate
13 conduct, do you see that?
14     A Yeah.
15     Q Now, you have in the last 16 years told
16 many people, and I'm excluding any attorneys,
17 exactly what is written in this affidavit and
18 which you swore to under oath?
19     MR. DRISCOLL: I'm going to object to the
20 question and direct the witness not to answer that
21 question to the extent it's related to the other
22 lawsuit that is currently pending in the U.S.
23 District Court for the District of Columbia, Case
24 Number 06-cv-670.
25     MR. KLAYMAN: That's not a basis to tell

```
 1            IN THE CIRCUIT COURT OF THE SEVENTEENTH CIRCUIT
         IN AND FOR BROWARD COUNTY AND THE FIFTEENTH JUDICIAL
 2            CIRCUIT FOR PALM BEACH COUNTY, FLORIDA, FLORIDA

 3

 4   LARRY KLAYMAN,
                                    CASE NO. 19-011394
 5            Plaintiff,

 6       -vs-

 7   ROGER STONE,

 8            Defendant.
     _____/
 9
     JEROME CORSI, et al
10
                  Plaintiff
11

12   vs.                     CASE NO. 50-2019-CA-013711

13

     ROGER STONE, et al
14
                  Defendant
15   _____/

16
                VIDEOTAPED DEPOSITION OF ROGER STONE
17
                        VOLUME I OF II
18
                 Wednesday, February 12, 2020
19                 9:42 a.m. - 4:28 p.m.

20
             110 Southeast 6th Street, Suite 1700
21               Fort Lauderdale, Florida 33301

22
     Stenographically Reported By:
23   PATRICIA BAILEY-ENTIN, FPR
     Notary Public, State of Florida
24   BAILEY & ASSOCIATES REPORTING, INC.
     Fort Lauderdale Office
25   Phone - 954-358-9090
```

1           **But let's start with my sworn affidavit on top,**

2     **and I'll ask that that be marked.  It -- it entails --**

3           MR. KLAYMAN:  And you can just mark it right in

4       the book --

5           THE REPORTER:  Sure.

6           MR. KLAYMAN:  -- to make it easy.

7           That's Exhibit 2 to the Stone deposition and it

8       entails 59 pages.

9           (Plaintiffs' No. 2, Affidavit of Larry Klayman,

10    was marked for Identification.)

11  BY MR. KLAYMAN:

12      **Q.  You are aware, Mr. Stone, that I'm the founder**

13    **of Judicial Watch?**

14      A.  I am.

15      **Q.  ==You've spoken to Tom Fitton, haven't you?==**

16      A.  One time in my entire life.  I saw him

17  backstage at a conference in -- at Dural, maybe a couple

18  months ago, and we -- we shook hands in passing.  Beyond

19  that, I've never spoken to the man.

20      **Q.  You've spoken to others at Judicial Watch,**

21  **though, haven't you?**

22      A.  No, actually, I haven't.  Not that I recall.

23      **Q.  You -- you may have, but you just don't recall?**

24      A.  I don't recall ever speaking to anyone at -- at

25  Judicial Watch.  I couldn't name anybody else at