**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**

DR. JEROME CORSI, et al

Plaintiffs

v.

INFOWARS, LLC, et al

Defendants.

Case Number:    1:20-cv-298-LY

**ORAL ARGUMENT**
**REQUESTED**

**PLAINTIFFS JEROME CORSI'S AND LARRY KLAYMAN'S  MOTION FOR RECONSIDERATION AND REPLY TO THE INFOWARS DEFENDANTS' RESPONSE TO OBJECTIONS TO REPORT AND RECOMMENDATION OF MAGISTRATE ANDREW W. AUSTIN**

Plaintiffs Dr. Jerome Corsi and Larry Klayman ("Plaintiffs") hereby move the Court for reconsideration of its June 25, 2021 Order adopting the Report and Recommendation of the U.S. Magistrate and Granting Defendants' Motions to Dismiss and Judgment. ECF No. 122, 123 (the "Order"). Plaintiffs respectfully request expedited oral argument on this motion.

Plaintiffs also, for the record, submit the following in reply to Defendants Infowars LLC, Free Speech Systems LLC, Alex Jones, and Owen Shroyer's (the "Infowars Defendants") response to Plaintiffs' written objections to Magistrate Andrew W. Austin's ("Magistrate Austin") Report and Recommendation of May 25, 2021. ECF No. 108. (the "Report").

**MOTION FOR RECONSIDERATION**

Plaintiffs hereby move for reconsideration of the Court's Order of June 25, 2021 pursuant to Fed. R. Civ. P 59(e). Generally, a Motion for Reconsideration may be granted under Rule 59(e) if the movant shows: (1) the motion is necessary to correct a manifest error of fact or law; (2) the movant presents newly discovered or previously unavailable evidence; (3) the motion is

1

necessary in order to prevent manifest injustice; or (4) the motion is justified by an intervening change in the controlling law." *Ramos v. Lucio*, No. B-08-122, 2009 U.S. Dist. LEXIS 146718, at *9 (S.D. Tex. May 19, 2009). Here, reconsideration is necessary in order to prevent manifest injustice and to correct a manifest error of fact or law.

## I.        At A Minimum, Plaintiffs Should Have Been Granted Leave to Amend

Based on the Court's Order, the primary reason that it chose to grant dismissal was the fact that the extremely fact-oriented affidavits were not attached to the Amended Complaint, and therefore could not be considered on a Rule 12(b)(6) motion. For instance, the Court wrote, "The affidavits referenced in Corsi and Klayman's objections were attached to Corsi and Klayman's opposition briefs and not included with the amended complaint. The magistrate judge is correct to focus on the actual pleadings and the application of the Rule 12(b)(6) legal standard." ECF No. 122 at 3. Nowhere in the Court's Order does it make the finding that the affidavits, if properly considered, would still not be adequate to survive a motion to dismiss. Thus, notwithstanding that Plaintiffs properly and in detail pled the actionable causes of action against all Defendants, they at a minimum should have been afforded leave to amend their Amended Complaint to incorporate their affidavits, along with Ms. Kelly Morales' affidavit, and moot out any other concerns that the Court might have had.

Under Rule 15, leave to amend is to be freely granted. *Patric v. City of Austin & Joshua Visi*, 2005 U.S. Dist. LEXIS 58488, at *6 (W.D. Tex. June 29, 2005); *see also Smith v. EMC Corp.*, 393 F.3d 590, 595 (5th Cir. 2004). "Although the decision concerning a motion to amend is entrusted to the sound discretion of the district court, a district court must possess a substantial reason to deny a request for leave to amend. *Id*. In determining whether to grant a party leave to amend a complaint, courts consider the following factors: (1) undue delay, (2) bad faith or

dilatory motive, (3) repeated failure to cure deficiencies by previous amendments, (4) undue prejudice to the opposing party, and (5) futility of the amendment." *Id*.

It is clear here that amendment would not be futile, as there is no possible argument that the affidavits of Plaintiffs and Ms. Morales bolster the allegations to a level that far exceeds ordinary pleading standards and  any motion to dismiss. There is clearly no undue delay, bad faith or dilatory motive, or undue prejudice to the Defendants as well, as Plaintiffs are making the motion immediately after the issuance of the June 25 Order. Any delay in this case is through no fault of the Plaintiffs, as there was simply a 8-month delay before the Magistrate even issued its Report and Recommendation. This case is therefore still only in its beginning stages, with no discovery even having taken place, as the Magistrate stayed discovery. There is also no "repeated failure" to cure deficiencies, as Plaintiffs were unable to obtain the affidavit of Ms. Morales until after their had first amended their complaint, and to that point, Plaintiffs have only amended their Complaint only one time so far.

Thus, Plaintiffs respectfully request that the Court grant them leave to amend, as such leave is  required under these facts pursuant to Fed. R. Civ. P. 15.

## II.      Alternatively, The Court's Order Should Be Stayed Pending Discovery

In the alternative, Plaintiffs respectfully request that the Court stay its June 25, 2021 Order and allow for full discovery of the Defendants.

Magistrate Austin denied Plaintiffs any discovery, yet proceeded to usurp the fact-finding role of the jury to override the allegations of the Amended Complaint and make factual determinations concerning the allegations of the Amended Complaint. This is not proper, but for whatever reason, Magistrate Austin decided to make his Report in this manner.

In doing so, Magistrate Austin essentially converted Defendants' motions to dismiss into a motion for summary judgment under Fed. R. Civ. P. 56, as he ruled upon factual evidence in rendering his Report. In this regard, the affidavits that Plaintiffs submitted into the record should have been properly considered. In other words, Magistrate Austin cannot have it both ways. Either he should not have looked past the Amended Complaint by ruling upon factual evidence, in which case the affidavits were not necessary, or if he was going to weigh evidence, then the affidavits should have been considered and discovery should have been granted in the first place. Ironically, of course, Defendants presented no factual evidence, so to reach his conclusions the Magistrate had to glean his own factual evidence, which went far beyond the four corners of the Amended Complaint and which was improper.

Indeed, it is clear, just from the affidavits provided to the Court, that the allegations of the Amended Complaint would be borne out in discovery. That is why leave to amend should be granted, as it is clearly not futile and would obviously moot out any concerns the Court may have, as set forth above. However, if the Court is not inclined to grant such leave, it must at a minimum, stay its June 25 Order pending discovery—something that the Magistrate should have done in the first place.

**III.    Plaintiffs Motion Must be Granted to Correct  Manifest Errors of Fact and Law**

Lastly, Plaintiffs' Motion must be granted to correct manifest errors of fact and law, as set forth in detail in Plaintiffs' Objections to Magistrate Austin's Report, ECF No. 115, Reply to Defendant Roger Stone's Response to Objections, ECF No. 120, Reply to Defendant David Jones' Response to Objections, ECF No. 121, and the Reply to the Infowars Defendants Response to Objections, set forth below.

These pleadings set forth in great detail the litany of highly prejudicial errors of fact and law contained in Magistrate Austin's Report, which this Court subsequently adopted in full, with little to no demonstrated analysis. These errors, such as the Magistrate first dismissing Defendant David Jones without prejudice and then dismissing him with prejudice, underscores just how flawed his Report is and why the multitude of other errors must be considered and corrected on the record.

### REPLY TO INFOWARS DEFENDANTS' RESPONSE TO PLAINTIFFS' OBJECTIONS TO REPORT

**I.     Plaintiffs' Motion For Status Conference and to Vacate Report and Recommendation of the United States Magistrate Andrew W. Austin Does Not Constitute Plaintiffs' Objections**

The Infowars Defendants make the truly bizarre argument that Plaintiffs' Motion for Status Conference and to Vacate Report and Recommendation (the "Motion"), ECF No. 109, somehow constitutes their actual objections, which were timely filed. ECF No. 115. Plaintiffs' Motion seeks specific relief—namely for a status conference, and to vacate the Report—that is entirely unrelated to the purpose of filing objections to a Report and Recommendation pursuant to Fed. R. Civ. P. 72(b)(2), which does not contain any type of motion for relief. The mere fact that there is some overlap in the reasoning set forth in Plaintiffs' Motion and Plaintiffs' Objections does not render this "two bites at the apple" as the Infowars Defendants disingenuously assert. These are two separate, distinct pleadings properly filed by Plaintiffs. Tellingly, none of the Infowars Defendants' co-Defendants have adopted this truly strange and bizarre argument.

**II.     The Statements At Issue Are Per Se Defamatory Statements of Pure Fact**

The defamatory statements at issue in this case are so outrageous that they are clearly defamatory and demonstrably false on their faces, and they are defamatory *per se*, as they harm

Plaintiffs in their trade and profession, and as such damages are presumed, as set forth in detail below. Statements that injure a person in her office, profession, or occupation are typically classified as defamatory per se. *Hancock v. Variyam*, 400 S.W.3d 59, 63–64 (Tex. 2013). These published statements are:

(1) **"He (Klayman) was ousted at Judicial Watch. Ask Tom Fitton [the current president of Judicial Watch] why he left. He was 'ousted' because of a 'sexual harassment complaint.'" Am. Comp. ¶ 56.**

(2) **"He's (Klayman) never actually won a courtroom victory in his life." Am. Comp. ¶ 55**

(3) **"For those people out there who think...that Larry Klayman's IQ is higher than 70, you're wrong..." Am. Comp. ¶ 62.**

(4) **"He's (Klayman) incompetent, he's a numbskull, he's an idiot, he's an egomaniac, and he could be the single worst lawyer in America. With him as Jerry Corsi's lawyer, Corsi may get the electric chair. So your idea that he's a good guy is entirely wrong" Am. Comp. ¶ 59**

(5) **Plaintiff Klayman is a "piece of garbage." Am. Comp. ¶ 61**

With regard to Plaintiff Dr. Corsi, Defendants have falsely and maliciously published that:

(1) **"Plaintiff Corsi "seemed to be extremely mentally degraded to the point of what I would call dementia." Am. Comp. ¶ 42**

(2) **Defendant Alex Jones purportedly saw Plaintiff Corsi at a steakhouse "on the ground at another table" and that his security staff "thought he was dead in the elevator." Am. Comp. ¶ 43**

(3) **Accusing Plaintiff Corsi of having suffered a stroke, publishes maliciously that "whatever comes out of his mouth ain't the truth." Am. Comp. ¶ 44**

(4) **that Plaintiff Corsi was "fired from World Net Daily." Am. Comp. ¶ 49**

(5) **"He (Corsi) was perfectly willing to lie, to perjure himself saying that a memo that he had wrote me was written on the 30th for the purposes of cover-up.... which is further proof that Jerry lied under oath." Am. Comp. ¶ 50**

(6) "and then states that I knew about John Podesta's emails being stolen in advance, the only proof of that is Jerry's feeble alcohol affected memory – it's a lie...." Am. Comp. ¶ 51

(7) "Jerry was prepared to stab a principle Trump supporter in the back, he was perfectly prepared to bear false witness against me, even though I had done nothing in my entire life other than help him." Am. Comp. ¶ 52

(8) "all I ever did was show Jerry Corsi friendship and support and try to help him and his family and what I get is Judas Iscariot, the willingness to testify against me and help the deep state bury me....and then he makes up this story about helping me formulate a cover story." Am. Comp. ¶ 53

(9) "… you can always tell when Jerry Corsi is lying because his lips are moving...." Am. Comp. ¶ 54

(10)  "He [Corsi] was perfectly willing to bear false witness against me on multiple points that are complete fabrications." Am. Comp. ¶ 64

(11)  "the good doctor [Corsi] has told a number of lies. In fact, he's starting to conflate his lies.... he was perfectly willing to lie about me.... but now lying about Alex Jones, lying about InfoWars, lying about Dr. (David) Jones, who's one of the nicest, gentlest, sweetest, most honest men I have ever met, it's beyond the pale.... Jerry Corsi can no longer be believed." Am. Comp. ¶ 65

(12)  "I think you've [Corsi] been deep state from the beginning. Your whole birther thing is used as a club to destroy conservatives....I look forward to our confrontation. I will demolish you. You're a fraudster, out of your alcoholic haze you have made up lies about David Jones and Alex Jones and Roger Stone and now I suspect they want you to lie about the President." Am. Comp. ¶ 66

(13)  Plaintiff Corsi of being a "spook, back and forth with different agencies," Am. Comp. ¶ 67

(14)  Falsely publishing a false statement of Plaintiff Corsi "not being able to walk." Am. Comp. ¶ 68

These statements are clearly defamatory on their face, and importantly, they are clearly statements of fact, not opinion. This is patently obvious to even a first-year law student, or anyone using even a modicum of common sense. As just one example—the false statement that Mr. Klayman was ousted from Judicial Watch due to a sexual harassment complaint, Am. Comp.

¶ 56, does not contain even a smidge of opinion. It is purely a false statement of fact that is clearly very damaging to Mr. Klayman in his trade and profession as a public interest advocate and litigator, as well as private practitioner, as well as personally as it connotes moral turpitude, which also amounts to defamation per se. Magistrate Austin's factual findings that these statements were not defamatory were clearly made in error, and especially so, since he denied Plaintiffs' discovery and then usurped the role of the jury to make (erroneous) factual findings.

### III.     Plaintiffs Properly Alleged Actual Malice

Indeed, a simple review of the record shows that Magistrate Austin's finding that Plaintiffs had failed to allege actual malice was in clear error. First, and foremost, it is indisputable that the Amended Complaint expressly sets forth that the Defendants acted with actual malice, as they knew that the defamatory statements were false given their long history, relationship, and familiarity with Plaintiffs: "Defendants, each and every one of them, as set forth herein, acted with actual malice, in concert, as joint tortfeasors, as they knew that the statements which they published were false…. Am. Comp. ¶ 36.

Magistrate Austin overrides the allegations of the Amended Complaint, again after improperly denying discovery, to make the erroneous factual finding that Plaintiffs allegation above was false and therefore no actual malice was alleged. This "heads I win, tails you lose" approach created by Magistrate Austin is exemplary of the grossly prejudicial errors permeating his Report.

In fact, the Amended Complaint goes even much further than simply alleging actual malice, and sets forth in painstaking detail exactly how and why. This includes the fact that Defendants "have known Plaintiff Corsi for a long time and even worked with him… so they were well aware that the statements made by the co- Defendant Stone, and their own false,

misleading, malicious and defamatory statements were, indeed, false, as well as their acting as

agents of, much less their ratification of the malicious false statements published by Defendant

Stone on their networks and media sites." Am. Comp. ¶ 39. This is further buttressed by Dr.

Corsi's affidavit, ECF No. 115, Ex. 1, which details his long-standing relationships with the

Defendants:

> I personally know Defendant Roger Stone ("Defendant Stone") and he personally knows my qualifications and me. I have even ghostwritten books for Defendant Stone and we used to be friends and colleagues. Defendant Stone is thus intimately familiar with my personal and professional history.
>
> In 2016, after the presidential election, I worked very closely with Alex Jones and his father David Jones, as well as with the Infowars staff, including Owen Shroyer. I made multiple trips to Austin, Texas, to appear live in-studio on Infowars broadcasts. I accepted an assignment from Alex Jones to create for Infowars a news bureau in Washington, D.C. From the beginning, I found Alex Jones to be erratic, subjects to emotional outbursts, even reacting that I was trying to "steal his company" when with his father's assistance, I brought a multi-million dollar legitimate investment offer from highly credible sources to the table to discuss the proposal with Alex and his father.
>
> Several times, concerned that I might quit over how badly Alex Jones was treating me, Dr. Jones met with me privately, often over breakfast. In those breakfasts, I counseled Dr. Jones over my concerns that Alex should seek professional psychological help. While in my work under various contracts with federal government agencies to consult over anti-terrorism tactics, I had the opportunity to work with very experienced psychiatrists and psychologists. Still, I am not medically trained, and I cautioned Dr. Jones that the problems I perceived with Alex's behavior should be professionally evaluated by qualified medical professionals. ECF No. 115, Ex. 1.

Indeed, as conclusive evidence that Defendants were acting with actual malice, as set

forth in Dr. Corsi's affidavit, Indeed, Dr. Corsi's book, "*Killing the Deep State,*" was at all

material times, still available for sale on the Infowars website! This shows that the Infowars

Defendants at all times knew that Dr. Corsi was neither an alcoholic nor a liar, yet still willingly

participated in branding him as such. This is textbook actual malice.

9

With regard to Plaintiff Klayman, "At 1:30 in the January 18 Video, Stone and the other Defendants maliciously falsely published, "He (Klayman) was ousted at Judicial Watch. Ask Tom Fitton [the current president of Judicial Watch] why he left. He was 'ousted' because of a 'sexual harassment complaint.'" Defendant Stone and the other Defendants had no basis to make these false, malicious, and defamatory claims. As pled in the Amended Complaint, Mr. Klayman "left Judicial Watch voluntarily on his own accord in order to run for U.S. Senate in Florida in 2003-2004." Am. Comp. ¶57. This is a fact. Defendant Stone's false revisionist history is a malicious and false statement of fact.

Furthermore, as the final "nail in the coffin" to Defendant Stone's assertions, Thomas Fitton ("Fitton"), under oath, at a deposition in another matter testified that **"[y]ou [Mr. Klayman] weren't ousted as a result of a sexual harassment complaint**." ECF No. 115, Ex. 5. This conclusively shows that Defendant Stone, in concert with the Infowars Defendants, published an objectively verifiable false statement. Indeed, at the same deposition, Fitton admits to never have spoken to Stone, which shows that Stone simply made this lie up. ECF No. 115, Ex. 5. Stone admitted under oath in a deposition that he did not speak to Fitton about this either, so it's clear that Stone made this up to defame Mr. Klayman. ECF No. 115, Ex. 5. This evidences the fact that Defendant Stone, in concert with the other Defendants, acted with actual malice.

Furthermore, Mr. Klayman's affidavit further shows that Defendant Stone and the other Defendants, acting in concert, with actual malice and at a minimum acted with reckless disregard for the truth.

> Defendant Stone was a "political consultant" who claimed to help get presidents and other politicians elected. The firm made money by then lobbying the very men they put in office.

Defendant Stone backed Republican candidate Jack Kemp for President and he recommended that I be put on the executive finance committee, which also included Donald J. Trump.

Because Defendant Stone knew of my successes and capabilities as a private lawyer, he told me that he had recommended me for U.S. Attorney when George Bush was President in 1992.

In 1996, at a Republican Convention in San Diego, California, Defendant Stone was filmed at a "toga party" with his wife at a "swingers party.

The media at the time went after Defendant Stone because of his alleged participation in the "sex party" and created a scandal.

The media alleged at the time that Defendant Stone solicited sex half-naked, and that there was a picture of Defendant Stone in a compromising position to back up the story.

Defendant Stone contacted me and, because he knew my capabilities and acumen as a lawyer, retained me to represent him to get the media to cease what he claimed then was a smear campaign.

I successfully got the media to back off Defendant Stone through my skill as a lawyer and Defendant Stone was grateful.

Because he was aware of my prior successes at Judicial Watch and before, Defendant Stone wanted to work with me as my U.S. Senate campaign manager.

During this time, the spring, summer, and fall of 2003, and in preparation for my U.S. Senate run, Defendant Stone researched and kept books and records of many of my accomplishments. He had several binders (2-3 feet) full of information about me and the victories that I had obtained at Judicial Watch and elsewhere. Again, because Defendant Stone knew of my successes and legal political acumen, Defendant Stone wanted to be on my team and help me run for the U.S. Senate.

Defendant Stone thus knew of many cases I had won in courtrooms and other legal accomplishments and in fact had kept records of successes in a book of my accomplishments. ECF No. 115, Ex. 4

Accordingly, this shows that Defendant Stone and the other Defendants had <u>actual</u>

<u>knowledge</u> that his statement regarding Mr. Klayman's abilities as a lawyer were flat out false,

11

including but not limited to the "fact" that Mr. Klayman had "never won a courtroom victory in

his life." Thus, Mr. Klayman has also far exceeded any requisite showing of actual malice.

Given all of this, it is indisputable that Magistrate Austin's decision to usurp the fact

finding role of the jury, after improperly denying Plaintiffs discovery, and then erroneously find

that the Defendants did not act with actual malice was a clear error.

**IV.    Plaintiffs Properly Alleged that the Infowars Defendants Were Acting Together in Concert As Agents of Defendant Stone**

The Amended Complaint specifically and expressly alleges that the Infowars Defendants

were at all material times "working together in concert with and as agents of Stone…." Am.

Comp. ¶ 36. Furthermore, "Plaintiffs have demanded retraction and correction of the defamatory

videos and publications…but Defendant shave arrogantly refused, thereby ratifying any and all

defamatory statements contained therein…." Am. Comp. ¶ 38.

These assertions are supported by detailed factual allegations:

Defendant InfoWars and Defendant Free Speech Systems are both owned, controlled, and operated by Defendant Alex Jones and David Jones. Defendant Free Speech Systems owns www.infowars.com, where content created by Defendants Alex Jones, Shroyer and Stone were at all material times posted and broadcast into this district, nationally and internationally. Am. Comp. ¶ 11.

Defendant David Jones is Defendant Alex Jones's father and holds the official title of Director of Human Relations for Defendant Free Speech Systems. On information and belief, Defendant David Jones is the owner of Defendant InfoWars and Free Speech Systems and he manages and controls the business and related activities for Defendants InfoWars and Free Speech Systems, as well as Defendant Alex Jones' other companies. Am. Comp. ¶ 8.

The Defendants, acting in concert, as part of their latest scheme for notoriety, fame, and profit, worked in concert with and on information and belief continue to work in concert with Defendant Stone, who was at all material times an integral host on Infowars, and handsomely compensated by it, to defame, intimidate, and threaten Plaintiffs. Am. Comp. ¶ 22.

Defendants have, by working in concert with and as agents of Stone, therefore engaged in illegal witness tampering, intimidation and threats in violation of 18

U.S.C. § 1512 by virtue of the defamatory and threatening acts and practices as alleged herein. Not coincidentally, this was what largely Stone was indicted and convicted for by Special Counsel Robert Mueller, for which he was sentenced to 40 months of incarceration a federal penitentiary. Am. Comp. ¶ 36.

In a video from October 26, 2018, Defendant Alex Jones, acting in concert with the other Defendants and at their direction, particularly Defendant Stone, makes several false, misleading, malicious and defamatory statements about Plaintiff Corsi. Am. Comp. ¶ 41.

Thus, given the fact that each of every one of the Infowars Defendants are intricately bound together by virtue of the fact that they all directly participate in creating and publishing the content on the Infowars site, it is more than merely plausible that they are working together in concert. This is more than enough at the pleading stage, where again, to survive a motion to dismiss, a complaint need only "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678.

Plaintiffs took it even a step further and provided the Court with affidavits in addition to a well pled Amended Complaint and related pleadings, all of which show the hard fact that all of the Defendants all closely work together as part of Infowars and appeared together in concert on the same defamatory broadcasts, the law, which was presented to the Magistrate, shows otherwise:

Civil conspiracy is used to extend tort liability beyond the wrongdoer to those who merely planned, assisted, or encouraged his acts. *See Carroll v. Timmers Chevrolet, Inc.*, 592 S.W.2d 922, 925-26 (Tex. 1979); *Helping Hands Home Care, Inc. v. Home Health of Tarrant County, Inc.*, 393 S.W.3d 492, 506 (Tex. App.-Dallas 2013, pet. denied). Once a civil conspiracy is proved, each conspirator is responsible for all acts done by any of the conspirators in furtherance of the conspiracy. *Bentley v. Bunton*, 94 S.W.3d 561, 619 (Tex. 2002); *Carroll*, 592 S.W.2d at 926 (Tex. 1979); *Helping Hands*, 393 S.W.3d at 506. A finding of civil conspiracy imposes joint and several liability on all conspirators for actual damages resulting from the acts in furtherance of the conspiracy. *Carroll*, 592 S.W.2d at 925; *Helping Hands*, 393 S.W.3d at 506. When a jury finds that liability for a civil conspiracy exists, this finding requires the legal conclusion to impose joint and several liability on the co-

conspirators. *LandAmerica Commonwealth Title Co. v. Wido,* No. 05-14-00036-CV, 2015 Tex. App. LEXIS 11201, at *29 (Tex. App. Oct. 29, 2015).

Additionally, under Restatement (Second) of Torts, § 577, comment f, "One is liable for defamation by a third person whom as his servant, agent, or otherwise he directs or procures to publish defamatory matter." *See also Universal Commun. Sys. v. Turner Broad. Sys.,* 2005 U.S. Dist. LEXIS 58575, at *8 (S.D. Fla. Mar. 17, 2005) ("One is liable for defamation by a third person whom as his servant, agent, or otherwise he directs or procures to publish defamatory matter.")

Plaintiffs have more than adequately pled, if not proved, all of the Defendants specific, personal involvement as set forth in the allegations of the Amended Complaint. Magistrate Austin's decision to ignore the allegations of the Amended Complaint, and make the factual determination that Defendants were not acting in concert, after improperly denying discovery, is a gross, prejudicial appealable error.

**V.      Plaintiffs Properly Alleged a Claim Under the Lanham Act**

The Infowars Defendants misapply *Farah v. Esquire Magazine,* 736 F.3d 528 (D.C. Cir. 2013), which is a non-binding D.C. Circuit case in any event. *Farah* involved a claim under the Lanham Act arising out of a parody/satire article titled "BREAKING: Jerome Corsi's Birther Book Pulled from Shelves!" This parody/satire article was published one day after Dr. Corsi had released his book,  "*Where's the Birth Certificate? The Case that Barack  Obama is not Eligible to Be President*," written by Jerome Corsi and published by Joseph Farah's WND Books. Farah's website, WorldNetDaily, announced the book launch with the headline, "It's out! The book that proves Obama's ineligible: Today's the day Corsi is unleashed to tell all about that 'birth certificate'" *Id.* at 530. Under these facts—which are clearly very different from the facts of this instant case—the D.C. Circuit found that the Plaintiffs had failed to state a claim under the Lanham Act. Importantly,

however, there is zero (0) support for the Infowars Defendants' proposition that a radio talk show does not qualify as "commercial advertising or promotion" in *Farah*.

Indeed, what well-established case law <u>does</u> show is that Plaintiffs, in fact, do have proper Lanham Act claims. The crux of the Infowars Defendants' argument is that they did not engage in commercial speech. This is not so. In *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60 (1983) the Supreme Court set forth a three-factor test for determining whether speech is commercial. These factors are (i) whether the communication is an advertisement, (ii) whether it refers to a specific product or service, and (iii) whether the speaker has an economic motivation for the speech.

In *Bolger*, the Supreme Court found that "informational pamphlets discussing the desirability and availability of prophylactics in general or Youngs' products in particular" constituted commercial speech despite the fact that they contained "discussions of important public issues such as venereal disease and family planning." *Id*.at 67. In doing so, the Supreme Court reasoned:

> We have made clear that advertising which "links a product to a current public debate" is not thereby entitled to the constitutional protection afforded noncommercial speech. *Central Hudson Gas & Electric Corp*. v. *Public Service Comm'n of New York*, 447 U.S., at 563, n. 5. A company has the full panoply of protections available to its direct comments on public issues, so there is no reason for providing similar constitutional protection when such statements are made in the context of commercial transactions. See *ibid*. Advertisers should not be permitted to immunize false or misleading product information from government regulation simply by including references to public issues. *Id*. at 68.

The *Bolger* case definitively rebuts the Infowars Defendants' strategy of attempting to mischaracterize the issue as competition in the "marketplace of ideas." A Defendant cannot escape liability under the Lanham Act simply by disguising their commercial speech as public discourse.

Other circuits have reached the same conclusion. In *Procter & Gamble Co. v. Haugen*, 222 F.3d 1262 (10th Cir. 2000), the Tenth Circuit found that the following was commercial speech:

> I wanna run something by you real quick that I think you will find pretty interesting. Just talking to a guy the other night about this very subject and it just so happens that a guy brings information in and lays it on my desk this morning, so here it goes.
>
> It says the president of Procter & Gamble appeared on the Phil Donahue Show on March 1, '95. He announced that due to the openness of our society, he was coming out of the closet about his association with the church of satan. He stated that a large portion of the profits from [P&G] products go to support his satanic church. When asked by Donahue if stating this on television would hurt his business, his reply was, "There are not enough Christians in the United States to make a difference." And below it has a list of the [P&G] products which I'll read: [the subject message then lists 43 P&G products].
>
> It says if you are not sure about a product, look for the symbol of the ram's horn that will appear on each product beginning in April. The ram's horn will form the 666 which is known as satan's number. I'll tell you it really makes you count your blessings to have available to all of us a business that allows us to buy all the products that we want from our own shelf and I guess my real question is, if people aren't being loyal to themselves and buying from their own business, then whose business are they supporting and who are they buying from. Love you. Talk to you later. Bye.

In doing so, the Tenth Circuit reasoned:

> In the present case, we are likewise dealing with a message containing both a noncommercial, "theological" component and a commercial component. As *Bolger* and *Fox* indicate, however, the bare fact that the subject message contains a "theological" component is insufficient to transform it into noncommercial speech.
>
> Furthermore, we reject appellees' assertion that the subject message does not promote "commercial transactions." On the contrary, the message unambiguously urges recipients to eschew purchasing P&G products in favor of Amway products. While economic motivation or reference to a specific brand name and products, when viewed in isolation, might not render a message commercial speech, we conclude that those factors taken together with the instant message's promotion of Amway products at the expense of P&G products support the characterization of the subject message as commercial speech.

16

Similarly, in *Porous Media Corp. v. Pall Corp.*, 173 F.3d 1109 (8th Cir. 1999), the Eighth

Circuit found that the following was commercial speech:

> *ALERT* Please be advised that a filter has been introduced to the marketplace that
> in *appearance* seems to be a "clone" of the Pall Breathing Circuit Filter (BB-
> 50T). Be advised that the similarity *ends* with appearance. The attached [set of
> reports] notes a serious *hydrophobic deficiency* as to the competitive product. The
> "clone" device is offered by a company called Porous Media. If your particular
> application for the Pall BB-50T operates in *any* moist, wet, high-humidity
> (condensation) environment, then you will run into "product occurrence"
> situations routinely should you utilize the Porous Media device instead of the Pall
> BB-50T. I urge you or your engineering staff to consider the enclosed, and
> conduct your own tests for verification if necessary. Please contact me with any
> questions or comments.

In doing so, the Eighth Circuit reasoned, "**Whatever nobler concerns may have driven Pall to**

**inform the market of the public health dangers allegedly posed by Porous's non-**

**hydrophobic filter, "commercial speech" need not originate *solely* from economic**

**motives**." (emphasis added).

Both *Porous Media* and *Haugen* involved one competitor denigrating the quality of

another competitor's goods and/or services for their financial gain, which is exactly what is

alleged here:

> Plaintiffs, like Defendants, rely on viewer and listener financial and other support
> and sales and their reputations and good will in order to continue their work.
> Defendants' false and/or misleading statements concerning Plaintiffs is meant to,
> and has, diverted financial and other support, referrals and sales away from
> Plaintiffs and to Defendants instead, and severely harmed Plaintiffs' personal and
> professional reputations. Am. Comp. ¶ 74.

Each of the courts found this to be commercial speech. *Haugen* is particularly instructive.

The Tenth Circuit found that an email from an Amway provider accusing the president of

Proctor & Gamble of being affiliated with the church of satan to be commercial speech. There

was no reference the quality of any of Proctor & Gamble's products, but nonetheless, the Tenth

Circuit correctly found this to be commercial speech despite the clear "noncommercial theological" component.

Here, as set forth in the Amended Complaint, the Infowars Defendants clearly engaged in commercial speech, as everything that he stated was intended to "and has, diverted financial and other support, referrals and sales away from Plaintiffs and to Defendants instead." Am. Comp. ¶ 74. This is far more compelling than even the facts in *Haugen* or *Porous Media*.

In fact, the Amended Complaint sets forth that the Infowars Defendants "do substantial business and promote and sell various goods in this judicial district and nationwide, including medicine, supplements, and "tchotchkes" with InfoWars branding. The money earned from these sales funded the conspiracy and concerted acts between amongst Defendants to defame, intimidate, coerce and threaten Plaintiffs…." Am. Comp. ¶ 15. During the Infowars Defendants' broadcasts, advertisements for these various goods are interwoven into the broadcast, in between and even during periods where they are making defamatory statements, rendering the Infowars Defendants' trade and profession as "defamation for profit." Additionally, both Plaintiffs also sell books and various goods in this judicial district and nationwide.[1] This means that they are in direct competition not only for fundraising, but also for the sale of goods as well.

Thus, it is indisputable that the Infowars Defendants engaged in commercial speech and therefore Plaintiffs have properly alleged a cause of action under the Lanham Act.  They are all competitors with Plaintiffs and use their published transmission to sell their products and reap large profits, here to the detriment of Plaintiffs, who they trashed with their concerted defamation and false statements, tantamount to false advertising under the Lanham Act.

## VI.    Magistrate Austin's Denial of Discovery Was Clearly Erroneous

---

[1] https://www.simonandschuster.com/authors/Jerome-R-Corsi/48217651;
https://www.simonandschuster.com/authors/Larry-Klayman/177669336.

Furthermore, Magistrate Austin grossly erred by recommending dismissal of all claims against the Infowars Defendants—as well as all of the other Defendants—after having denied Plaintiffs leave to conduct any discovery. All of the detailed, fact specific allegations in the Amended Complaint pertaining to the Infowars Defendants' personal involvement in the defamation of Plaintiffs—as well as those pertaining to the other Defendants—would have been confirmed in discovery, as evidenced by Plaintiffs' affidavits, for starters. By denying discovery, and then usurping the fact-finding role of the jury to make the factual determinations that what the Infowars Defendants said was not defamatory or malicious, Magistrate Austin has created a no-win situation for Plaintiffs and has essentially taken the case into his own hands. With all due respect, this was not Magistrate Austin's role, and him doing so was a grave error that has severely prejudiced Plaintiffs.

## **CONCLUSION**

It is clear that Magistrate Austin did not do his job, and that his Report was simply rushed out the door on the eve of his retirement. Plaintiffs making this argument is not attacking Magistrate Austin personally, but simply protecting their own rights. Plaintiffs are entitled to a fair, unbiased, and thorough judicial process, and Magistrate Austin simply did not do that.

Plaintiffs respectfully request expedited oral argument on their Motion for Reconsideration to address this not just the errors in the Magistrate's Report but to seek to prevent a manifest injustice.

Dated: June 25, 2021                                     Respectfully Submitted,


                                                         /s/Sanjay Biswas
                                                         SANJAY BISWAS, Esq.
                                                         #24061235—Texas
                                                         #24966--Louisiana
                                                         11720 Duxbury Dr.

Frisco, Texas 75035
Telephone: (972)-866-5879
Email:sanjaybiswas41@gmail.com
Fax: 1-800-506-6804

*Counsel for Dr. Jerome Corsi*

/s/*Larry Klayman*
Larry Klayman, Esq.
7050 W. Palmetto Park Rd
Boca Raton FL, 33433
Email:leklayman@gmail.com
Tel: 561-558-5336

*Plaintiff Pro Se*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on June 25, 2021, a true copy of the foregoing was filed via

ECF and served to all counsel of record though the Court's ECF system.

/s/ *Sanjay Biswas*