## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| JEROME CORSI, et al<br>*Plaintiff*,<br><br>           v.<br><br>INFOWARS LLC, et al<br>*Defendants* | Civil Action No.  1:20-cv-298-LY<br><br>REQUEST FOR HEARING |

### PLAINTIFF'S SECOND SUPPLEMENT TO MOTION FOR RECONSIDERATION AND REPLY TO THE INFOWARS DEFENDANTS' RESPONSE TO THE REPORT AND RECOMMENDATION OF MAGISTRATE ANDREW W. AUSTIN AND  MOTION FOR LEAVE FILE SECOND AMENDED COMPLAINT

Pursuant to Federal Rule of Procedure ("FRCP") 15(a), Plaintiffs Larry Klayman and Jerome Corsi ("Plaintiffs") move for leave to file the attached Second Amended Complaint. Exhibit A, which notwithstanding the actionable merits of Plaintiffs' prior Amended Complaint, clearly and conclusively moots out the issues in the Magistrate's Report and Recommendation, which was adopted, respectfully in error, by this honorable Court.

### I.   LEGAL STANDARD

FRCP Rule 15(a) provides that leave to amend shall be freely given when justice requires. "Leave to amend a complaint should be freely given in the absence of undue delay, bad faith, undue prejudice to the opposing party, repeated failure to cure deficiencies, or futility." *Richardson v. United States*, 193 F.3d 545, 548-49 (D.C. Cir. 1999). The U.S. Supreme Court has declared that "this mandate is to be heeded." *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Davis v. Liberty Mut. Ins. Co*., 871 F.2d 1134, 1136 (D.C. Cir. 1989). The U.S. Supreme Court explained that "if the underlying facts or circumstances relied upon by a plaintiff may be a proper source of relief, he ought to be afforded an opportunity to test his claim on the merits." *Foman*, 371 at 182. A plaintiff may even amend a complaint during or after trial, if justice so

requires. "A party may move – at any time, even after judgment – to amend the pleadings to conform them to the evidence and to raise an unpleaded issue. But failure to amend does not affect the result of the trial of that issue." Fed. R. Civ. P. 15(b)(2). Indeed, "cases should, as far as possible, be determined on their merits and not on technicalities . . ." *Copeland Motor Co. v. General Motors Corp.*, 199 F.2d 566, 567-68 (5th Cir. 1952).

## II. ARGUMENT

The proposed Second Amended Complaint cures any perceived pleading deficiencies of the Magistrate and attaches and incorporates the affidavits of Mr. Klayman and Dr. Corsi, as well as the affidavits of Ms. Morales and Defendant David Jones himself. These affidavits were already in the judicial court record, as they were previously attached to Plaintiffs' opposition to Defendants motions to dismiss. While Plaintiffs respectfully maintain that these affidavits should have been considered by Magistrate Austin and this honorable Court in rendering rulings on Defendants' dismissal motions, the fact that they are now attached and incorporated into the proposed Second Amended Complaint moots out any possible Fed R. Civ. P. 12(b)(6) issues with regard to the "four corners of the Amended Complaint."

Indeed, in adopting Magistrate Austin's Report and Recommendation, this honorable Court specifically found that "[t]he affidavits referenced in Corsi and Klayman's objections were attached to Corsi and Klayman's opposition briefs and not included with the Amended Complaint. The Magistrate is correct to focus on the actual pleadings and the application of the Rule 12(b)(6) legal standard." ECF No. 122 at 3. Nowhere in the Court's Order does it make the finding that the sworn affidavits, if properly considered, would still not be adequate to survive a motion to dismiss. Thus, notwithstanding that Plaintiffs properly and in detail pled the actionable causes of action against all Defendants, they at a minimum should have been afforded leave to

amend their Amended Complaint to incorporate their affidavits, along with Ms. Kelly Morales' sworn affidavit, and moot out any other concerns that the Court might have had. Importantly, Defendants offered no affidavits in response, effectively conceding the merits and truthfulness of the facts set forth therein.

Now, in the proposed Second Amended Complaint, which is sworn to and verified under oath by Plaintiffs Klayman and Corsi, any perceived pleading deficiencies have been cured even more – although the Amended Complaint was sufficient as well --  and the affidavits, which were already part of the record, are included and incorporated by reference. This means that there is no longer any possible contention that a motion to dismiss would be proper.

For instance, with regard to actual malice, the proposed Second Amended Complaint makes it abundantly clear that each and every Defendant was intricately familiar with each of the Plaintiffs, their work, successes and prominence, and had actual knowledge that the false and defamatory statements that they were making were, indeed, false. With regard to Dr. Corsi:

> Dr. Corsi personally knows Defendant Stone he personally knows Dr. Corsi's numerous qualifications. Dr. Corsi has even ghostwritten books for Defendant Stone and they used to be friends and colleagues. Defendant Stone is thus intimately familiar with Dr. Corsi's personal and professional history.
>
> In 2016, after the presidential election, Dr. Corsi worked very closely with Alex Jones and his father David Jones, as well as with the Infowars staff, including Owen Shroyer. Dr. Corsi made multiple trips to Austin, Texas, to appear live in-studio on Infowars broadcasts.  Dr. Corsi even accepted an assignment from Alex Jones to create for Infowars a news bureau in Washington, D.C.
>
> At all material times, books written by Dr. Corsi were available for sale on the Infowars website, which shows that Defendants had actual knowledge that Dr. Corsi was not a perjurer, liar, fraud, and alcoholic. SAC ¶¶ 95 – 97.

With regard to Mr. Klayman:

> Defendant Stone was a "political consultant" who claimed to help get presidents and other politicians elected. The firm made money by then lobbying the very men they put in office.

Because Defendant Stone knew of Mr. Klayman's successes and capabilities as a private lawyer, he told him that he had recommended Mr. Klayman for U.S. Attorney when George Bush was President in 1992.

Because he was aware of my prior successes at Judicial Watch and before, Defendant Stone wanted to work with Mr. Klayman as his U.S. Senate campaign manager. During this time, the spring, summer, and fall of 2003, and in preparation for Mr. Klayman's U.S. Senate run, Defendant Stone researched and kept books and records of many of his accomplishments. He had several binders (2-3 feet) full of information about Mr. Klayman and the victories that he had obtained at Judicial Watch and elsewhere. Again, because Defendant Stone knew of Mr. Klayman's successes and legal political acumen, Defendant Stone wanted to be on his team and help him run for the U.S. Senate. SAC ¶¶ 86, 87, 93.

The same is true with regard to Plaintiffs' claims under the Lanham Act, where the Magistrate recommended dismissal because he found that the parties merely "may compete in the marketplace of ideas." ECF No. 108 at 6. The proposed Second Amended Complaint firmly establishes "commercial speech" at issue by buttressing the allegations that Plaintiffs and Defendants are direct competitors in the marketplace:

The Infowars Defendants, each and every one of them, in concert, do substantial business and promote and sell various goods in this judicial district and nationwide, including medicine, supplements, and "tchotchkes" with their branding. SAC ¶ 19

Defendant Stone also does business promotes and sells various goods in this judicial district and nationwide, including medicine, supplements, books, and "tchotchkes" with his own branding, and he also fundraises by direct mail and the internet in this district. SAC ¶ 20.

Plaintiffs Klayman and Corsi are direct competitors with the Defendants and also sell products, souvenirs, books, and tchotchkes with their own branding in their broadcasts, as they too are conservative talk show hosts, commentators and members of the media. SAC ¶ 21

Plaintiff Corsi, like the Defendants, also sells non-prescription pharmaceuticals and health products like supplements. SAC. ¶ 22.

Furthermore:

Both Plaintiffs derive financial benefit from appearing on radio and internet programs as a conservative political analysist and media personalities, as well as from their other endeavors as pled herein.

The Infowars Defendants and Stone also derive financial benefit from appearing on radio and internet programs as conservative political analysts and media personalities.

Both Plaintiffs are therefore a direct competitor of the Infowars Defendants and Stone, as they all derive income from appearing on radio and internet programs and through writings as political analysts, and as media pundits.

By way of example, Stone, in a recent interview with Real Clear Politics, admitted that he intends to host a weekly syndicated radio show and a daily podcast in 2021.

Mr. Klayman also hosts a weekly syndicated radio show and does daily podcasts.

Dr. Corsi is an investigative journalist and New York Times bestselling author.

Dr. Corsi, like Plaintiff Klayman, and the Infowars Defendants and Defendant Stone all sell books and other tangible goods on their respective websites that carry their personal branding for their fans and followers to purchase.

Defendants have directed, made, adopted, and or ratified numerous false or misleading statements of fact of and concerning Plaintiffs during their various subject programs and media postings and publications as pled herein, which all contain significant advertisement or promotions.

These statements by the Defendants directly reference Plaintiffs' products and services, and deliberately denigrate the quality of Plaintiffs' products and services in order to drive sales, contributions, and money to their own products and services instead.  SAC ¶¶ 100 – 108.

Furthermore, it is important to note that the original Amended Complaint was not filed to cure any perceived deficiencies, only to add Defendant Stone because Plaintiffs thought that this honorable Court might want to see him added as a party, and to prevent any claims by Defendants that he was a necessary party under Fed. R. Civ. P. 19. This would be the first amendment to cure any perceived deficiencies by the Magistrate.

Lastly, in writing his Report and Recommendation, the Magistrate  even referenced that amendment could be proper: "Given the lack of any allegations that David Jones personally engaged in defamatory conduct, or allegations supporting a basis to pierce the corporate veil or to hold David Jones liable on a theory of conspiracy, Plaintiffs' defamation claims against David Jones should be dismissed **without prejudice**." ECF No. 108 at 10.

Thus, given that "[l]eave to amend a complaint should be freely given in the absence of undue delay, bad faith, undue prejudice to the opposing party, repeated failure to cure deficiencies, or futility, " *Richardson* 193 F.3d at 548-49, and Plaintiffs having shown good cause as to why amendment would not be futile, Plaintiffs respectfully request leave to file the attached Second Amended Complaint. This will conclusively moot out any issues now before this honorable Court and in the interests of fundamental fairness and justice, allow this case to proceed to discovery, which had been denied by the Magistrate.  Discovery, like the previously submitted sworn affidavits, and this verified Second Amended Complaint, would have provided and provides further conclusive support for Plaintiffs' otherwise well-pled and actionable allegations.

Dated: August 5, 2021                                        Respectfully Submitted,

*/s/Sanjay Biswas*
SANJAY BISWAS, Esq.
#24061235—Texas
#24966--Louisiana
11720 Duxbury Dr.
Frisco, Texas 75035
Telephone: (972)-866-5879
Email:sanjaybiswas41@gmail.com
Fax: 1-800-506-6804

*Counsel for Dr. Jerome Corsi*

*/s/Larry Klayman*

Larry Klayman, Esq.
7050 W. Palmetto Park Rd
Boca Raton FL, 33433
Email:leklayman@gmail.com
Tel: 561-558-5336

*Plaintiff Pro Se*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 5, 2021 a true copy of the foregoing was filed via

ECF and served to all counsel of record though the Court's ECF system.

*/s/ Sanjay Biswas*

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS

DR. JEROME CORSI, Individually
Denville, NJ, 07834

And

LARRY KLAYMAN, Individually
7050 W. Palmetto Park Rd. #15-287
Boca Raton, FL, 33433

        Plaintiffs

     v.

INFOWARS, LLC
100 Congress Ave., 22nd Floor
Austin, TX 78701

And

FREE SPEECH SYSTEMS, LLC
100 Congress Ave., 22nd Floor
Austin, TX 78701

And

ALEX E. JONES, Individually
3019 Alvin Devane Blvd., Suite 300-350
Austin, TX 78741

And

DAVID JONES, Individually
3019 Alvin Devane Blvd., Suite 300-350
Austin, TX 78741

And

OWEN SHROYER, Individually
3019 Alvin Devane Blvd., Suite 300-350
Austin, TX 78741

And

**Case Number:   1:20-cv-298-LY**

**VERIFIED SECOND
AMENDED   COMPLAINT**

ROGER STONE, Individually
447 Coral Way
Fort Lauderdale, FL 33301

             Defendants.

## INTRODUCTION

Plaintiffs DR. JEROME CORSI ("Plaintiff Corsi or Dr. Corsi") and LARRY KLAYMAN ("Klayman") hereby files this action against INFOWARS, LLC ("Defendant InfoWars"), FREE SPEECH SYSTEMS, LLC ("Defendant Free Speech Systems"), ALEX E. JONES ("Defendant Alex Jones"), DAVID JONES ("Defendant David Jones"), OWEN SHROYER ("Defendant Shroyer") (collectively the "Infowars Defendants"), and ROGER STONE ("Defendant Stone") for Defamation, Intentional Infliction of Emotional Distress, and Assault, and violation of the Lanham Act.

## JURISDICTION AND VENUE

1.      This Court has federal question jurisdiction over this case pursuant to 28 U.S.C § 1331.

2.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(2), (3) in that a substantial part of the events or omissions giving rise to Plaintiffs' claims arose in this district. The U.S. District Court in the Southern District of Florida transferred this action to this Court. Defendants actions were targeted to influence Special Counsel Robert Mueller's Russian collusion investigation and prosecution of Defendant Stone, a colleague of the other Defendants, which and who are centralized in this judicial district and the defamatory and other illegal acts occurred herein as well as throughout the United States and worldwide.

## THE PARTIES

3.     Plaintiff Corsi is an author and political commentator who publishes works in this judicial district and nationwide. Plaintiff Corsi is a citizen of New Jersey.

4.     Plaintiff Klayman is a public interest legal advocate, private practitioner and litigator who represented Plaintiff Corsi with regard to Special Counsel Robert Mueller's ("Mueller") Russian collusion investigation.  Plaintiff Klayman is also a media personality and author, columnist and syndicated radio talk show host. Plaintiff Klayman is a citizen of Florida.

5.     Defendant InfoWars is a Texas limited liability company with principal offices located in Austin, TX.

6.     Defendant Free Speech Systems is a Texas limited liability company with principal offices located in Austin, TX.

7.     Defendant Alex  Jones is a well-known extreme fabricator of false stories and conspiracies, who has been sued numerous times for alleged defamation. He is  media personality and in effect "shock jock" who creates frequently false and defamatory content for profit that is broadcasted on the radio and posted on the internet at www.infowars.com and elsewhere on the internet and other social media sites in this district, nationally and internationally. Defendant Alex Jones is a citizen of Texas.

8.     Defendant David Jones is Defendant Alex Jones's father and holds the official title of Director of Human Relations for Defendant Free Speech Systems. Defendant David Jones runs, operates, and manages Infowars and Free Speech Systems in conjunction with Alex Jones and he manages the business activities for Defendants Infowars and Free Speech Systems, as well as Defendant Alex Jones' other companies.  At all material times he worked in concert with the other Defendants and Roger Stone and furthered and ratified and furthered the illegal acts set forth in this

Complaint. Exhibit 1, an attached affidavit of Kelly Morales, which is incorporated substantively into this Second Amended Complaint, attests under oath to David Smith's direct and substantial involvement in the acts and practices alleged to be illegal in this Second Amended Complaint. In another affidavit made by David Jones, he admits, "I have been involved with Alex Jones' personal and business finances for many years…." Exhibit 1.

9.     Defendant Shroyer is a newscaster for Defendant InfoWars. Defendant Shroyer is a citizen of Texas.

10.     Defendant Stone is an individual and a citizen of Florida and a resident of Fort Lauderdale, Florida. Defendant Stone was indicted by Special Counsel Robert Mueller as part of the alleged "Russian Collusion' investigation and subsequently convicted on seven felony counts of perjury, witness tampering and obstruction of justice. While his 40 month sentence to serve time federal prison was commuted by President Donald J. Trump on specious claims he would die in prison during Covid-19.  He was later pardoned for his felony convictions for perjury, witness tampering and obstruction of justice stand. He is a self-proclaimed "Dirty Trickster" who admires and frequently extols the "virtues" of Mafia figures and other unsavory persons, who he professes to pattern himself after. *See* Exhibit 2 – Mueller Indictment.

11.     All of the Defendants, each and every one of them, as well as Stone, do substantial commercial and other business in this district, not only broadcasting daily into this district for profit, but also selling products and services for profit continuously in this district, nationally and internationally.

## GENERAL ALLEGATIONS

12.     Defendant InfoWars and Defendant Free Speech Systems are both owned, controlled, and operated by Defendant Alex Jones and David Jones. Defendant Free Speech

Systems owns www.infowars.com, where content created by Defendants Alex Jones, Shroyer and Stone were at all material times posted and broadcast into this district, nationally and internationally.

13.    Defendant Alex Jones hosts *The Alex Jones Show*, which is broadcast on radio and internet social media networks throughout the United States of America and internationally, including this judicial district, and online.

14.    Defendant David Jones "runs Infowars with Alex Jones and directs, assists and helps him with his activities, including fixing media stores and endorsing and/or aiding his slanderous and/or fraudulent behaviors, all for profit. This is set forth in the Sworn Declaration of Kelly Morales, Alex Jones' ex-wife. Exhibit 1. Ms. Morales' affidavit is hereby incorporated substantively by reference.

15.    Ms. Morales swears under oath:

I am the former wife of Defendant Alex Jones. I was married to Alex Jones for 12 years and with him for 15 years and we have 3 children together. During our time together, I was involved in the activities of Alex, his father David and Infowars and am intimately knowledgeable about their activities and business structure.

Based on my personal knowledge and experience, David Jones runs Infowars with Alex Jones and helps him with his activities, including fixing media stories and endorsing and/or aiding his slanderous and/or fraudulent behaviors, all for profit.

Infowars, LLC is a sub-entity of Free Speech Systems, LLC ("FSS"), and David Jones is an employee of FSS, or he has been.

David Jones is additionally a managing member of multiple entities that are closely held businesses, constituting financial holding companies or financial distribution centered around Infowars/Alex Jones' supplement line, which are quintessential to funding and running Infowars.

Alex Jones could not function without David Jones, and has conspired with him on the past to commit this breach of fiduciary duty and fraud on my business with Alex Jones. While David Jones did this, he slandered and/or defamed me to experts and assisted Alex Jones and his attorneys to do the same, so as to steal/hide my estate and his grandchildren's inheritance.

16.     David Jones is additionally a managing member of multiple entities that are closely held businesses, constituting financial holding companies or financial distribution centered around Infowars/Alex Jones' supplement line, which are quintessential to funding and running Infowars.

17.     At all material times Defendant Shroyer hosted *The War Room* along with Defendant Stone and Alex Jones, which is broadcast on radio and internet social media networks in this district and throughout the United States of America and nationally, and internationally, and online.

18.     Defendants' reach and influence are enormous. On information and belief, Defendant Alex Jones and InfoWars has a radio audience of over two million people. Before it was banned from YouTube, Defendant Alex Jones' and InfoWars' channel had more than 2.4 million subscribers.[1]

19.     The Infowars Defendants, each and every one of them, in concert, do substantial business and promote and sell various goods in this judicial district and nationwide, including medicine, supplements, and "tchotchkes" with their branding. The money earned from these sales funded the conspiracy and concerted acts between amongst Defendants to defame, intimidate, coerce and threaten Plaintiffs by then attempting to improperly influence the Mueller Russian collusion investigation and subsequently try to coerce false testimony from Plaintiff Corsi at Stone's criminal prosecution favorable to Defendant Stone once he had been indicted.

20.     Defendant Stone also does business promotes and sells various goods in this

---

[1] Casey Newton, *YouTube deletes Alex Jones' channel for violating its community guidelines*, The Verge, Aug. 6, 2018, available at: https://www.theverge.com/2018/8/6/17656708/youtube-alex-jones-infowars-account-deleted-facebook-apple-spotify

judicial district and nationwide, including medicine, supplements, books, and "tchotchkes" with his own branding, and he also fundraises by direct mail and the internet in this district. He claims to have raised millions of dollars with his fundraising, wherein he falsely claims to have been persecuted by a federal judge and the jury, despite not having presented one witness, including himself, at his criminal trial, obviously because he was guilty as charged. In fact, he was convicted on seven felony counts in this own words, as the undersigned pro se counsel, Mr. Klayman, who sat in on the trial for his client Plaintiff Corsi, can attest. The money earned from these sales funds Defendant Stone's legal defense fund and the conspiracy between Defendants and Stone to defame, intimidate, coerce and threaten Plaintiffs in order to first try to improperly influence the Mueller Russian collusion investigation and subsequently try to coerce false testimony from Plaintiff Corsi, Plaintiff Klayman's client, favorable to Defendant Stone once he had been indicted.

21.     Plaintiffs Klayman and Corsi are direct competitors with the Defendants and also sell products, souvenirs, books, and tchotchkes with their own branding in their broadcasts, as they too are conservative talk show hosts, commentators and members of the media.

22.     Plaintiff Corsi, like the Defendants, also sells non-prescription pharmaceuticals and health products like supplements.

23.     The Defendants related to Infowars in particular have a long and sordid history of publishing and broadcasting defamatory material, including falsely, recklessly and baselessly accusing the families of the schoolchildren who lost their lives during the 2012 Sandy Hook Elementary School massacre of staging the massacre and faking the deaths of their children.[2]

_____

[2] Aaron Katersky, *Families of Sandy Hook shooting victims win legal victory in lawsuit against InfoWars, Alex Jones*, ABC News, Jan. 11, 2019, available at:
https://abcnews.go.com/US/families-sandy-hook-shooting-victims-win-legal-

24.     The Sandy Hook families had to endure years of abuse and torture from Defendants before finally filing suit against numerous parties involved with InfoWars, including Defendant Alex Jones and Shroyer, for defamation.

25.     As just one example, a Florida woman was arrested for making  death threats to a parent of a Sandy Hook victim.[3] According to the U.S. Department of Justice, the motivation behind the threats was the lies propagated by these Defendants that the Sandy Hook massacre was a hoax.[4]

26.     Furthermore, Defendant Alex Jones in concert with the other Defendants propagated and promoted the "Pizzagate" conspiracy on his show, accusing a restaurant called Comet Ping Pong in the Washington D.C. area of operating a child sex ring in its non-existent basement that purportedly involved Hillary Clinton and John Podesta. This caused one of his listeners to shoot up the restaurant after being told by Defendant Jones to "self-investigate" the "Pizzagate" conspiracy theory.[5]

27.     Defendants, acting in concert, propagated these outrageous lies with no regard for the grief of their victims in order to gain notoriety, fame, and profit.

28.     The Defendants, acting in concert, as part of their latest scheme for notoriety, fame, and profit,  worked in concert with and on information and belief continue to work in concert with Defendant Stone, who was  at all material times an integral host on Infowars, and

---

victory/story?id=60314174
[3] Daniella Silva, *Conspiracy Theorist Arrested for Death Threats Against Sandy Hook Parent*, NBC News, Dec. 7, 2016, available at: https://www.nbcnews.com/news/us-news/conspiracy-theorist-arrested-death-threats-against-sandy-hook-parent-n693396
[4] *Id.*
[5] James Doubek, *Conspiracy Theorist Alex Jones Apologizes For Promoting 'Pizzagate'*, NPR, Mar. 26, 2017, available at: https://www.npr.org/sections/thetwo-way/2017/03/26/521545788/conspiracy-theorist-alex-jones-apologizes-for-promoting-pizzagate

handsomely compensated by it, to defame, intimidate, and threaten Plaintiffs.

29.     Defendant Stone - who was indicted and later convicted on seven counts of perjury, witness tampering and obstruction of justice by Special Counsel Robert Mueller and then placed under a total gag order by the jurist, the Honorable Amy Berman Jackson, presiding over his prosecution for, in part, even threatening her by posting, among other coercive and threatening acts, an Instagram meme of a crosshairs, that is a gun, to her head, and subsequently convicted on all seven felony counts - has appeared numerous times on shows broadcasted by Defendant InfoWars, and hosted by Defendants Alex Jones and Shroyer, where Defendants at the direction of Stone and Stone himself have published malicious false, misleading, and defamatory statements concerning Plaintiffs.

30.     Specifically, the seven count Mueller Indictment against Stone involved lying under oath to the federal government - that is, perjury - witness tampering and obstruction of justice by threatening to kill a material witness, Randy Credico ("Credico") and his service dog, if Credico did not lie or invoke the Fifth Amendment to government authorities concerning his involvement with Roger Stone. Credico is Person 2 in the Mueller Indictment of Stone. *Id*. Person 1 in this Mueller Indictment is Dr. Corsi.

31.     Even before Defendant Stone was indicted, he began a public relations campaign in this district, nationally and internationally to maliciously defame, smear, intimidate and threaten Dr. Corsi and Plaintiff Klayman, Plaintiff Corsi's lawyer and defense counsel.

32.     As just one example, in an article from The New Yorker, Defendant Stone was quoted as saying about Plaintiff Corsi, "He's certifiably insane, and he has told multiple provable lies."[6] This malicious defamatory statement, among others, was published in concert with

---

[6] Jeffrey Toobin, *Roger Stone's and Jerome Corsi's Time in the Barrel*, The New Yorker, Feb.

Defendants.

33.     Defendant Stone knew that he was going to be indicted, and therefore began this public relations campaign to maliciously defame smear, intimidate and threaten Plaintiff Corsi and Plaintiff Klayman, Corsi's legal counsel, even before his actual indictment on January 25, 2019, in order to try to influence public opinion and Special Counsel Robert Mueller – by trying to attribute guilt to Plaintiff Corsi and not him - as well as to try to raise money for his legal defense.

34.     This defamatory public relations campaign was calculated to coerce Plaintiff Corsi to testify falsely at Defendant Stone's criminal trial before Judge Jackson.

35.     Defendant Stone likes to portray himself as Mafia, and indeed on information and belief has Mafia connections, frequently making reference to Mafia figures who he admires, as well as other unsavory types who have been alleged to have engaged in unethical and/or illegal behavior.  For example, he frequently makes reference to his heroes being Hyman Roth in the 'Godfather," who was the movie version of Meyer Lansky, and Roy Cohn, not to mention, Richard Nixon, for his role in Watergate. In this regard, after Stone was indicted he held a press conference on the courthouse steps of the federal courthouse in Ft. Lauderdale, where he was booked, with his arms defiantly in the air in the "victory' pose used by Nixon after he resigned in disgrace as a result of the Watergate scandal. At the time, Stone had been employed by a Nixon group called CREEP, or the Committee to Reelect the President.  Defendant Stone even has a large tattoo of Richard Nixon affixed to his back. Thus, given his admiration for persons such as these, particularly Mafia figures, his actions as pled herein must be taken as threats, as well as being defamatory. And, Plaintiff Corsi is 72 years old and thus very vulnerable emotionally,

18 & 25 Issue, available at: https://www.newyorker.com/magazine/2019/02/18/roger-stones-and-jerome-corsis-time-in-the-barrel

physically and financially to these threats. Stone's intentional infliction of emotional distress and coercion and threats were intended to try even cause Plaintiff Corsi to have heart attacks and strokes, in order that Plaintiff Corsi would be unable to testify at Stone's criminal trial. Tellingly, Stone threatened kill a material witness and his service dog, Credico, Person 2 in the Mueller Indictment, "Mafia style." During his criminal trial, testimony was elicited by the government prosecutors in proving their witness and obstruction of justice felony charges, that Defendant Stone had told material witness Credico to do a Frank Pentangeli, a Mafia character in the film The Godfather, that is not testify to the truth. Stone also fashions himself and indeed has the reputation, at a minimum, as being the preeminent "dirty trickster," of which he is proud. *See* "Get Me Roger Stone" on Netflix.

36.     By defaming Plaintiffs, Defendant Stone had hoped to not only intimidate Plaintiffs to severely harm and damage their reputations, but also to coerce and threaten Plaintiff Corsi to testify falsely if subpoenaed to be called as a material witness in Stone's criminal trial. He was also trying divert funds away from Dr. Corsi's legal defense fund and Klayman's legal practice who defended Dr. Corsi in the Mueller Russian Collusion investigation, while boosting his own legal defense fund.

37.     Stone has also used and continues to employ surrogates and agents, either out in the open or secretly, to defame Plaintiffs, such as Defendants herein, and his "friend" Michael Caputo, Cassandra Fairbanks, reporter Chuck Ross of The Daily Caller, and Tom Fitton of Judicial Watch, to name just a few.

38.     Tellingly, in a video published by The Daily Caller, Defendant Shroyer appearing with Stone, admits that he will serve as a surrogate, that is an agent for Stone if Stone receives a

gag order, which he did.[7]  The other Defendants, like Shroyer, are also surrogates and agents of Stone, including but not limited to agent and Defendant David Jones, who controls and approves of and ratifies the conduct at all material times all of the Defendants.

39.     Defendant Stone's illegal and improper attempts to influence the Russian collusion investigation was even recognized by the presiding judge, the Honorable Amy Berman Jackson ("Judge Jackson"), who was forced to issue a complete "gag" order on Stone after Stone attempted to incite violence against Judge Jackson by putting a picture of her face and gun crosshairs up on his Instagram account.[8]

40.     In her minute order of February 21, 2019 imposing the total "gag" order on Stone, Judge Jackson directly cited and referenced his use of surrogates, such as all of the other Defendants herein :

> Furthermore, the defendant may not comment publicly about the case indirectly by having statements made publicly on his behalf by surrogates, family members, spokespersons, representatives, or volunteers.

41.     Defendants have, by working in concert with and as agents of Stone, therefore engaged in illegal witness tampering, intimidation and threats in violation of 18 U.S.C. § 1512 by virtue of the defamatory and threatening acts and practices as alleged herein. Not coincidentally, this was what largely Stone was indicted and convicted  for by Special Counsel Robert Mueller, for which he was sentenced to 40 months of incarceration a federal penitentiary, before he was given clemency and then a pardon for political reasons.

<u>DEFENDANTS' DEFAMATORY CONDUCT</u>

---

[7] https://www.youtube.com/watch?v=SSDkh5RYtGo
[8] *Judge in Roger Stone case orders hearing after he appeared to threaten her on Instagram*, Washington Post, Feb. 19, 2019, available at:
https://www.washingtonpost.com/politics/2019/02/18/roger-stone-deletes-photo-judge-presiding-over-his-case-says-he-didnt-mean-threaten-her/?utm_term=.2d3c5afa6326

42.     Defendant Stone has appeared numerous times on programs of the Defendants, *The Alex Jones Show* and *The War Room (and has been a compensated Infowars host in his own right)*. These shows are hosted by Defendant Alex Jones and Shroyer and Stone where numerous false, misleading, malicious and defamatory statements of and concerning Plaintiffs were made, published, and or ratified by all of the Defendants, each and every one of them, as surrogates and agents of Defendant Stone.

43.     At all material times Defendants Shroyer and Stone hosted *The War Room* together as co-hosts, and therefore planned, coordinated, and worked together in concert to produce and create each episode of *The War Room*, including the episodes at issue which contain defamatory material about the Plaintiffs.

44.     Defendants Shroyer and Stone also necessarily worked together in concert with Defendants Alex Jones and David Jones to plan, coordinate, and execute each and every episode of *The War Room*, with Alex Jones and David Jones being the individuals who manage and operate Infowars.

45.     As set forth in the affidavit of Ms. Morales, Exhibit 1, Defendant Alex Jones works together in concert with Defendant David Jones to plan, coordinate, and execute his defamatory attacks, including those made on Plaintiffs.

46.     Thus, each and every one of the Defendants get together to plan, coordinate, and execute each of the episodes of *The War Room* and *The Alex Jones Show*. Each Defendant knows of and ratifies the defamatory material that will be spewed on each and every episode, as they are planned as a group effort.

47.     Plaintiffs have demanded retraction and correction of the defamatory videos and publications set forth below and generally in this Complaint, but Defendants have arrogantly

refused, thereby ratifying any and all defamatory statements contained therein, and compounding the damage alleged herein.

48.     Defendants, at a minimum, acted recklessly with disregard for the truth, as they have known Plaintiff Corsi for a long time, and even worked with him and are also intimately familiar with Plaintiff Klayman, so they were well aware that the statements made by the co-Defendant Stone, and their own false, misleading, malicious and defamatory statements were, indeed, false, as well as their acting as agents of, much less their ratification of the malicious false statements published by Defendant Stone on their networks and media sites.

49.     In this regard, Plaintiffs have each prepared sworn affidavits, attached hereto as Exhibit 3 and Exhibit 4, which sets from their long history with the Defendants and how each of the Defendants acted with actual malice. These affidavits are incorporated herein to the Second Amended Complaint by reference, as well as what is set forth herein under oath by the Plaintiffs.

50.     Mr. Klayman has worked closely with the Infowars Defendants and Stone in the past and therefore they are all aware of his legal victories and his capabilities as an attorney and his standing and expertise as a columnist, author and syndicated media personality and syndicated radio talk show host.   Exhibit 3; *Affidavit of Larry Klayman* attached hereto and incorporated by reference.

51.     As the content containing the malicious false, misleading, and defamatory statements were published on the internet and elsewhere, it is proliferated like a "cancerous virus," and is was and remains available for viewing from countless sources, thereby exponentially increasing the prejudicial and defamatory impact and severe damage inflicted on Plaintiffs.  Judge Jackson, in issuing her two gag orders against Stone, herself recognized how postings calling for physical harm to her and other threatening postings on the internet proliferate

14

widely and once made cannot be taken back.

    *I.*      *The October 26, 2018 Video*

    52.     In a video from October 26, 2018, Defendant Alex Jones, acting in concert with the other Defendants and at their direction, particularly Defendant Stone, makes several false, misleading, malicious and defamatory statements about Plaintiff Corsi.[9]

    53.     At 0:45, Defendant Alex Jones maliciously and falsely published at the direction of Defendant Stone and the other Defendants that Plaintiff Corsi "seemed to be extremely mentally degraded to the point of what I would call dementia."

    54.     In the same video, Defendant Alex Jones, acting in concert with and at the direction of Defendant Stone and the other Defendants, maliciously fabricates a story where he purportedly saw Plaintiff Corsi at a steakhouse "on the ground at another table" and that his security staff "thought he was dead in the elevator."

    55.     Dr. Corsi was never "on the ground at another table," and there was no one that "throught [Dr. Corsi] was dead in the elevator." This is made up by Alex Jones.

    56.     At 5:08, Defendant Alex Jones, acting in concert with and at the direction of Defendant Stone and the other Defendants, after accusing Plaintiff Corsi of having suffered a stroke, publishes maliciously that "whatever comes out of his mouth ain't the truth."

    57.     Tellingly and not at all coincidentally, Stone appeared as a guest on the same video, as evidence of Defendants working in concert with and as agents of Stone.

    58.     These malicious false, misleading, and defamatory statements were published by Defendants acting in concert and at the direction of Defendant Stone as Stone's agents to discredit and coerce into false testimony from Plaintiff Corsi in order to preserve the reputation

---

[9] https://www.youtube.com/watch?v=UuXPAn0nZo8

of and assist their co-conspirator Stone before Mueller's Russian collusion investigation and later prosecution, as Stone had been indicted and Plaintiff Corsi named a material witness. Importantly, Plaintiff Corsi was not indicted. Plaintiff Klayman was known by all of the Defendants to be Dr. Corsi's legal counsel.

### II.     The January 18, 2019 Video

59.     Before Defendant Stone was indicted, on or about January 18, 2019, he appeared on *The War Room* with Defendant Shroyer, where he made several malicious false, misleading, and defamatory statements in this district,  nationally and internationally  regarding Plaintiffs (the "January 18 Video").[10] The same video was published on Stone's YouTube channel, "*Stone Cold Truth*," on January 18, 2019.[11]

60.     These malicious false, misleading, and defamatory statements were at the direction of all of the Defendants and adopted and published by each and every one of the Defendants, rendering them joint tortfeasors and jointly and severally liable.

61.     At 2:09 in the January 18 Video, Stone and the other Defendants working in concert and at the direction of Defendant Stone as his agents maliciously and falsely published that Plaintiff Corsi was "fired from World Net Daily."

62.     Dr. Corsi was never fired from World Net Daily.

63.     At 2:27 in the January 18 Video, Stone and the other Defendants working in concert and at the direction of Defendant Stone as his agents maliciously falsely and misleadingly published that, "He (Corsi) was perfectly willing to lie, to perjure himself saying that a memo that he had wrote me was written on the 30th for the purposes of cover-up…. which is further proof that Jerry lied under oath."

---

[10] https://www.infowars.com/watch/?video=5c3fbf24fe49383dcf6996e4
[11] https://www.youtube.com/watch?v=cJyfgdvtFx8

64.    At 2:55 in the January 18 Video, Stone and the other Defendants working in concert with at the direction of and as agents of Defendant Stone maliciously falsely and misleadingly published, "and then states that I knew about John Podesta's emails being stolen in advance, the only proof of that is Jerry's feeble alcohol affected memory – it's a lie…."

65.    Dr. Corsi is not an alcoholic, and has never had a single alcohol-related offense on his record.

66.    At 3:35 in the January 18 Video, Stone and the other Defendants working in concert at the direction of and as agents of Defendant Stone maliciously falsely and misleadingly published that "Jerry was prepared to stab a principle Trump supporter in the back, he was perfectly prepared to bear false witness against me, even though I had done nothing in my entire life other than help him."

67.    At 4:20 in the January 18 Video, Stone and the other Defendants working in concert with and at the direction and as agents of Defendant Stone  maliciously falsely and misleadingly published that "all I ever did was show Jerry Corsi friendship and support and try to help him and his family and what I get is Judas Iscariot, the willingness to testify against me and help the deep state bury me….and then he makes up this story about helping me formulate a cover story."

68.    At 6:26 in the January 18 Video, Stone and the other Defendants working in concert with and as agents at the direction of Defendant Stone  maliciously falsely published that "you can always tell when Jerry Corsi is lying because his lips are moving…."

69.    At 1:25 in the January 18 Video, Stone and the other Defendants working in concert with and as agents at the direction of Defendant Stone maliciously falsely published that "He's (Klayman) never actually won a courtroom victory in his life."

70.     This is false, and Defendant Stone knows that this is false. Just a small sampling of Mr. Klayman's numerous courtroom victories is set forth in Mr. Klayman's affidavit. Exhibit 3.

71.     At 1:30 in the January 18 Video, Stone and the other Defendants working in concert and as agents at the direction of Defendant Stone maliciously  falsely published, "He (Klayman) was ousted at Judicial Watch. Ask Tom Fitton [the current president of Judicial Watch] why he left. He was 'ousted' because of a 'sexual harassment complaint.'"

72.     In actuality and truth, Plaintiff Klayman left Judicial Watch voluntarily on his own accord in order to run for U.S. Senate in Florida in 2003-2004.

73.     Indeed, at a deposition in another matter, Thomas Fitton was forced to admit "[n]o, because that's not true. You weren't ousted as a result of a sexual harassment complaint." Exhibit 5. Thus, Defendant Stone's assertion is patently false, and completely fabricated by Defendant Stone, evidencing actual malice.

74.     Defendant Stone cannot even credibly assert that he lacked actual malice and simply misunderstood Fitton. At his deposition, he was forced to admit that he never actually spoke to Fitton:

    Q. You've spoken to Tom Fitton, haven't you?
    A. One time in my entire life. I saw him backstage at a conference in -- at Dural,
    maybe a couple months ago, and we -- we shook hands in passing. Beyond that,
    I've never spoken to the man. Exhibit 5.

75.     This shows that Defendant Stone simply made this up, with obvious knowledge of its falsity, because he had absolutely no basis to make this false statement.

76.     At 1:37 in the January 18 Video, Stone acting in concert with the other Defendants maliciously working in concert with the other Defendants falsely published, "He's (Klayman) incompetent, he's a numbskull, he's an idiot, he's an egomaniac, and he could be the

single worst lawyer in America. With him as Jerry Corsi's lawyer, Corsi may get the electric chair. So your idea that he's a good guy is entirely wrong"

77.     In actuality, Plaintiff Klayman has been a practicing attorney for over four decades and has won numerous cases on behalf of his clients and also against the government for constitutional and other violations.  He is the founder of both Judicial Watch and Freedom Watch, a former candidate for the U.S. Senate in Florida, a former trial attorney and prosecutor of the Antitrust Division of the U.S. Department of Justice, where he was a member of the trial team that successfully broke up the AT&T monopoly and created competition in the telecommunications industry. Among many other legal victories, Plaintiff Klayman also won landmark decisions at the chairman and general counsel of Freedom Watch enjoining the illegal mass surveillance by the National Security Agency. *Klayman v. Obama*, 1:13-cv-851 (D.D.C). Stone knew this when working in concert with the other Defendants he published acting in concert with the other Defendants the malicious false and misleading statements about Klayman and thus willfully and maliciously defamed Plaintiff Klayman.

78.     At 2:01 in the January 18 Video, Stone maliciously working in concert with the other Defendants falsely and misleadingly published that Plaintiff Klayman is a "piece of garbage."

79.     At 4:11 in the January 18 Video, Stone maliciously working in concert with the other Defendants falsely and misleadingly published, "For those people out there who think…that Larry Klayman's IQ is higher than 70, you're wrong…"

80.     Defendants, all of them working in concert and as agents of Defendant Stone, published these malicious false, misleading, and defamatory statements with actual malice and with full knowledge that they were false and misleading, and/or at a minimum, with a reckless

disregard for its truthfulness. These statements falsely and misleadingly state that Plaintiff Corsi was fired from World Net Daily, that he committed perjury (a federal offense), and that he is an untruthful person. They also create the false and misleading implication that Plaintiff Klayman is unqualified to be an attorney, public advocate and is a bad and loathsome person, unfit for his trades and professions. Plaintiff Klayman is also an author, columnist and  nationally syndicated radio and internet talk show host on Radio America, his show titled "Special Prosecutor with Larry Klayman." See www.radioamerica.com. The malicious false and misleading published statements as alleged herein also severely damaged Plaintiff Klayman personally and professionally in this regard, particularly since he and his show compete with Defendant InfoWars and and the other Defendants in media markets in this district, nationally and internationally. Plaintiff Corsi also competes with Defendant InfoWars and the other Defendants in media markets in this district, nationally and internationally.

### III.    Other Malicious Defamatory Publications

81.    In another appearance on InfoWars which was posted to YouTube[12] on January 17, 2019, Defendant Stone working in concert with the other Defendants at 6:22 maliciously falsely and misleadingly published that "He [Corsi] was perfectly willing to bear false witness against me on multiple points that are complete fabrications."

82.    In another appearance on InfoWars, this time on *The Alex Jones Show* from January 21, 2019, Defendant Stone maliciously working in concert with the other Defendants falsely and misleadingly published that "the good doctor [Corsi] has told a number of lies. In fact, he's starting to conflate his lies…. he was perfectly willing to lie about me…. but now lying about Alex Jones, lying about InfoWars, lying about Dr. (David) Jones, who's one of the nicest,

---

[12] https://www.youtube.com/watch?v=GJd8YBDvm1Q

gentlest, sweetest, most honest men I have ever met, it's beyond the pale…. Jerry Corsi can no longer be believed."[13]

83.     In the same appearance, Stone maliciously working in concert with the other Defendants falsely and misleadingly published that, "I think you've [Corsi] been deep state from the beginning. Your whole birther thing is used as a club to destroy conservatives….I look forward to our confrontation. I will demolish you. You're a fraudster, out of your alcoholic haze you have made up lies about David Jones and Alex Jones and Roger Stone and now I suspect they want you to lie about the President." This is clearly a threat, as well as being maliciously defamatory. It is akin to the threats against Person 2 in the Mueller Indictment, Randy Credico, who Defendant Stone, as set forth in the Mueller Indictment, based on Stone's own words contained in his own documentary evidence, threatened to kill along with Credico's service dog. Later Stone threatened the judge presiding over his criminal prosecution, the Honorable Amy Berman Jackson.

84.     In the same January 21, 2019 video, at 43:40, Defendant Alex Jones maliciously acting in concert with the other Defendants and as an agent at the direction of Defendant Stone falsely accuses Plaintiff Corsi of being a "spook, back and forth with different agencies," falsely saying that Dr. Corsi had worked with different government agencies.

85.     Defendant Alex Jones further maliciously acting in concert with the other Defendants and at the direction as an agent of Defendant Stone falsely accuses Plaintiff Corsi of sometimes "not being able to walk," creating the false and defamatory implication that he is an alcoholic.

86.     Defendants acting in concert as an agent at the direction of Stone published these

---

[13] https://www.youtube.com/watch?v=ANfe9d7YzL0 (Beginning at 38:00)

false, misleading, and defamatory statements at the direction and agent of and in concert with Stone with actual malice and with full knowledge that they were false and misleading, and/or at a minimum, with a reckless disregard for their truthfulness. These statements falsely and misleadingly published that Plaintiff Corsi committed perjury (a federal offense), is an untruthful person, and is an alcoholic. They also contain threats, amplified by Defendants facial expressions and hostile demeanor against Plaintiff Corsi and his legal counsel Larry Klayman.

87.     The actual malice of the Defendants is evidenced by the fact that at all material times, books written by Dr. Corsi were available for sale on the Infowars website, which shows that Defendants had actual knowledge that Dr. Corsi was not a perjurer, liar, fraud, and alcoholic. Otherwise, if the Defendants thought that these false statements concerning Dr. Corsi were actually true, they obviously would not carry his books for sale on their website.

88.     Defendants, acting at the direction and working in concert with Stone, obviously believed that in order to advance their interests and improper if not criminal motivations, they also had to destroy and severely harm the legal counsel of Plaintiff Corsi, who had been at all material times representing Plaintiff Corsi before Special Counsel Robert Mueller, congressional committees and generally and counseled Plaintiff Corsi when he was subpoenaed to testify truthfully in Stone's criminal trial for perjury, witness tampering, threatening to kill a material witness and his service dog, as well as obstruction of justice. Corsi, despite all of this, was never called as a witness by Defendant Stone, since Stone and his legal counsel must have concluded that his truthful testimony would not have benefited Stone.

## FACTS PERTAINING TO ACTUAL MALICE

89.     Each and every Defendant is intricately familiar with both Mr. Klayman and Dr. Corsi, having worked closely with them in the past. Thus, each and every Defendant had actual

knowledge that the statements at issue in this action were false.

90.     Mr. Klayman met Defendant Stone at the Old Ebbitt Grill in Washington, D.C. in 1988 while he was a partner with Paul Manafort and others and Mr. Klayman was working as a lobbyist for the firm Black, Manafort, Stone, & Kelly.

91.     Defendant Stone was a "political consultant" who claimed to help get presidents and other politicians elected. The firm made money by then lobbying the very men they put in office.

92.     Because Defendant Stone knew of Mr. Klayman's  successes and capabilities as a private lawyer, he told him that he had recommended Mr. Klayman  for U.S. Attorney when George Bush was President in 1992.

93.     In 1996, at a Republican Convention in San Diego, California, Defendant Stone was filmed at a "toga party" with his wife at a "swingers party."

94.     The media at the time went after Defendant Stone because of his alleged participation in the "sex party" and created a scandal.

95.     The media alleged at the time that Defendant Stone solicited sex half-naked, and that there was a picture of Defendant Stone in a compromising position to back up the story.

96.     Defendant Stone contacted Mr. Klayman and, because he knew Mr. Klayman's capabilities and acumen as a lawyer, retained him to get the media to cease what he claimed then was a smear campaign.

97.     Mr. Klayman maintained sporadic contact with Defendant Stone until 2003 when he told Defendant Stone of his plans to voluntarily leave Judicial Watch and run for the U.S. Senate.

98.     Because he was aware of my prior successes at Judicial Watch and before,

Defendant Stone wanted to work with Mr. Klayman as his U.S. Senate campaign manager. During this time, the spring, summer, and fall of 2003, and in preparation for Mr. Klayman's U.S. Senate run, Defendant Stone researched and kept books and records of many of his accomplishments. He had several binders (2-3 feet) full of information about Mr. Klayman and the victories that he had obtained at Judicial Watch and elsewhere. Again, because Defendant Stone knew of Mr. Klayman's successes and legal political acumen, Defendant Stone wanted to be on his team and help him run for the U.S. Senate.

99.     Mr. Klayman also has a long history and working relationship with the Infowars Defendants, with Each of the Infowars Defendants, Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars, being intimately familiar with his background, qualifications and successes as a public interest and private attorney. For this reason, Mr. Klayman was previously invited to appear on Infowars on many occasions before the Infowars Defendants decided – at the direction of Defendant Stone – to defame Plaintiffs.

100.    Dr. Corsi personally knows Defendant Stone he personally knows Dr. Corsi's numerous qualifications. Dr. Corsi has even ghostwritten books for Defendant Stone and they used to be friends and colleagues. Defendant Stone is thus intimately familiar with Dr. Corsi's personal and professional history.

101.    In 2016, after the presidential election, Dr. Corsi worked very closely with Alex Jones and his father David Jones, as well as with the Infowars staff, including Owen Shroyer. Dr. Corsi made multiple trips to Austin, Texas, to appear live in-studio on Infowars broadcasts.  Dr. Corsi even accepted an assignment from Alex Jones to create for Infowars a news bureau in Washington, D.C.

102.    At all material times, books written by Dr. Corsi were available for sale on the

Infowars website, which shows that Defendants had actual knowledge that Dr. Corsi was not a perjurer, liar, fraud, and alcoholic.

FACTS PERTAINING TO DEFENDANTS' UNFAIR COMPETITION

103.    In addition to being an investigative journalist/author and a public interest litigator/advocate, respectively, Plaintiffs Corsi and Plaintiff Klayman are both competitors to each and every one of the Defendants as conservative media personalities, broadcasters, authors and columnists and salesmen on social media and elsewhere. *See* Exhibits 3 and 4.

104.    Mr. Klayman is the founder, Chairman and General Counsel of Freedom Watch, Inc., which has the mission of investigating and prosecuting government corruption and abuse through legal advocacy. He also is in private practice with The Klayman Law Group, P.A. He is unique as a public interest advocate. He is at all material times a columnist for World Net Daily and has had about 600+ columns published over the last 10 years. He has also been a columnist for Newsmax through a blog titled "Klayman' Court" and in addition to his book "Whores: How and Why I Came to Fight the Establishment", he also published three other books. He also has his own syndicated radio show and daily podcasts with Radio America called "Special Prosecutor with Larry Klayman." *See* Exhibit 3.

105.    Both Plaintiffs derive financial benefit from appearing on radio and internet programs as a conservative political analysist and media personalities, as well as from their other endeavors as pled herein.

106.    The Infowars Defendants and Stone also derive financial benefit from appearing on radio and internet programs as conservative political analysts and media personalities. *See* Exhibit 3.

107.    Both Plaintiffs are therefore a direct competitor of the Infowars Defendants and

Stone, as they all derive income from appearing on radio and internet programs and through writings as political analysts, and as media pundits. *See* Exhibit 3.

108.    By way of example, Stone, in a recent interview with Real Clear Politics, admitted that he intends to host a weekly syndicated radio show and a daily podcast in 2021. *See* Exhibit 3.

109.    Mr. Klayman also hosts a weekly syndicated radio show and does daily podcasts. *See* Exhibit 3.

110.    Dr. Corsi is an investigative journalist and New York Times bestselling author. Exhibit 4.

111.    As also plead previously, Dr. Corsi, like Plaintiff Klayman, and the Infowars Defendants and Defendant Stone all sell books and other tangible goods on their respective websites that carry their personal branding for their fans and followers to purchase.

112.    Defendants have directed, made, adopted, and or ratified numerous false or misleading statements of fact of and concerning Plaintiffs during their various subject programs and media postings and publications as pled herein, which all contain significant advertisement or promotions.

113.    These statements by the Defendants directly reference Plaintiffs' products and services, and deliberately denigrate the quality of Plaintiffs' products and services in order to drive sales, contributions, and money to their own products and services instead.

114.    These false and/or misleading facts materially prejudice the viewers and/or listeners as to the quality, nature, and contents of Plaintiffs' services and goods for sale, which has caused significant competitive and commercial injury to Plaintiffs, as well as loss of good will and reputation.

115.    These false and/or misleading facts in effect refer specifically to Plaintiffs' products and services by falsely advertising about Plaintiffs.

116.    Plaintiffs, like Defendants, rely on viewer and listener financial and other support and sales and their reputations and good will in order to continue their work. Defendants' false and/or misleading statements concerning Plaintiffs is meant to, and has, diverted financial and other  support, referrals and sales away from Plaintiffs and to Defendants instead, and severely harmed Plaintiffs' personal and professional reputations.

117.    Thus, Defendants had a strong economic motivation to make these false and/or misleading statements concerning Plaintiffs' goods and services.

## FIRST CAUSE OF ACTION
### *Defamation*

118.    Plaintiffs re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

119.    Acting in concert Defendants and as an agent at the direction of Defendant Stone published the aforementioned malicious, false, misleading and defamatory statements of and concerning Plaintiffs in this judicial district, nationwide, and worldwide.

120.    These false and misleading statements were published with actual malice, as Defendants knew that they were false and misleading, or at a minimum acted with a reckless disregard for the truth.

121.    Plaintiffs have been severely harmed and damaged by these false and misleading statements because they subjected him to hatred, distrust, ridicule, contempt, and disgrace.

122.    Plaintiffs have been damaged by these false and misleading statements because they severely injured Plaintiff Corsi and Plaintiff Klayman in their profession and businesses, as

well as severely injured and damaged them personally and professionally, financially, emotionally, and in terms of their good will and reputations.

## SECOND CAUSE OF ACTION
### *Defamation Per Se*

123.     Plaintiffs re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

124.     Acting in concert, Defendants as alleged herein, published the aforementioned numerous false, misleading and defamatory statements to severely harm and damage Plaintiffs, which were republished elsewhere and widely in this district, nationally and internationally, and through surrogates, which and wo published the falsities that Plaintiffs have committed crimes, including perjury, and engaged in moral turpitude in the form of alcoholism, and committed sexual misconduct, as set forth in the preceding paragraphs. These malicious and false statements defamed Plaintiffs in their trades and professions.

125.     These false, misleading and defamatory statements were published in this district and on the internet and elsewhere, domestically and internationally for the entire world to see and hear and in so doing Defendants published false and misleading facts, *inter alia*, that Plaintiffs' conduct, characteristics or a condition are incompatible with the proper exercise of their lawful business, trades, professions or offices, as well as personally.

126.     These false and misleading statements were published with actual malice, as Defendants knew that they were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

127.     This statements are *per se* defamatory because they falsely and misleadingly published that Plaintiff Corsi committed perjury and Plaintiff Klayman had committed sexual misconduct which are federal offense and felony, as well as defamed Plaintiffs in their trades and

professions. Defamation *per se* gives rise to the presumption that severe harm and damage has arisen by virtue of the malicious false and misleading statements.

128.    These malicious false, misleading, and defamatory statements are defamatory *per se* and these false and misleading statements severely harmed and damaged Plaintiff Corsi in this profession and business as a journalist, author and political commentator, whose credibility is the most important trait, as well as personally and Plaintiff Klayman in his professions as a public interest and private advocate and litigator and as an author, columnist and radio and internet radio talk show and syndicated host, as well as personally.

## THIRD CAUSE OF ACTION
### *Defamation by Implication*

129.    Plaintiffs re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

130.    Acting in concert, Defendants published the aforementioned numerous false, misleading and defamatory statements about Plaintiffs, as set forth in the preceding paragraphs.

131.    These false, misleading and defamatory statements were published on the internet and published and republished elsewhere in this district, domestically and internationally for the entire world to see and hear.

132.    These false and misleading statements were published with actual malice, as Defendants knew that they were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

133.    These statements created the false and misleading implication that Plaintiff Corsi is dishonest, committed perjury and is an alcoholic, and that Plaintiff Klayman committed sexual misconduct and is incompetent, among other false and misleading statements as pled in the preceding paragraphs.  These malicious false statements also defamed Plaintiffs in their trades

and professions.

134.    Plaintiffs have been severely harmed and damaged by these false and misleading statements because they subject him to hatred, distrust, ridicule, contempt, and disgrace.

135.    Plaintiffs has been damaged by these malicious false and misleading statements because the statements severely harmed and damaged Plaintiffs in their trades and professions as journalists, authors, columnists, pubic interest and private practitioner lawyers and syndicated radio talk show hosts, whose credibility is the most important trait, as well as personally.

**FOURTH CAUSE OF ACTION**
*Intentional Infliction of Emotional Distress*

136.    Plaintiffs re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

137.    Acting in concert, Defendants engaged in extreme and outrageous conduct by threatening Plaintiffs, acting as agents in concert with Stone, who has made death threats to at least one witness involved in Special Counsel Mueller's Russian collusion investigation, Person 2 Randy Credico, as well as incited violence against Judge Amy Berman Jackson by posting a meme on Instagram with a crosshairs and gun pointed at the jurist's head, for which Stone was sanctioned with a total gag order and threat of incarceration if this type of violative conduct of the Court's gag order occurred again, which it apparently has.

138.    Defendants knowingly and intentionally threatened Plaintiffs, in a manner similar to other death threats co-conspirator and Defendant Stone made to at least one material witness, involved in Special Counsel Mueller's Russian collusion investigation, such as Randy Credico, Person 2 in the Mueller Indictment, as well as Judge Amy Berman Jackson.

139.    Defendants' extreme and outrageous conduct directly caused Plaintiffs severe emotional distress and resulting severe harm and damage.

## FIFTH CAUSE OF ACTION
### *Assault*

140.     Plaintiffs re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

141.     Acting in concert, Defendants placed Plaintiffs in apprehension of an imminent harmful or offensive contact and physical harm and death, by coercing and threatening Plaintiffs, in a similar manner that co-conspirator Stone has used to make death threats to at least one material witness involved in Special Counsel Mueller's Russian collusion investigation, such as Person 2 in the Mueller Indictment, Randy Credico and Judge Amy Berman Jackson.

142.     The threats issued by Defendants are credible, as co-conspirator Stone portrays and sees himself as a "Mafia" figure, as set forth above.

143.     Furthermore, as set forth above, acting in concert Defendants have a pattern and practice of calling their followers "to arms," which has resulted in deadly violence against their victims.

144.     Plaintiffs did not consent to Defendants' conduct.

145.     As a direct and proximate result of Defendants' wrongful conduct, acting in concert and as an agent at the direction of Defendant Stone, Plaintiffs suffered conscious pain, suffering, severe emotional distress and the fear of imminent serious bodily injury or death, and other mental and physical injuries, and Plaintiffs were severely harmed and damaged thereby.

## SIXTH CAUSE OF ACTION
### *Unfair Competition – Lanham Act 15 U.S.C. § 1125(a)*

146.     Plaintiffs re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

147.     Defendants have and are engaged in acts of unfair competition in violation of the

Lanham Act, 15 U.S.C. § 1125(a) and common law

148.    Defendants have made false and/or misleading statements that have deceived and/or had the tendency to deceive a substantial segment of the receiving audience.

149.    Defendants' false and/or misleading statements misrepresent the nature, characteristics, and qualities of Plaintiff Klayman and Plaintiff Corsi's goods or services.

150.    Defendants false and/or misleading statements are material because that were highly likely to mislead and influence supporters' decisions to provide financial support and sales to Defendants instead of Plaintiffs, in order to harm Plaintiffs and cut off their financial support such that Dr. Corsi could adequately defend himself in the Mueller Russian collusion investigation and also testify, as Defendants believed he would, against Stone in the ensuing criminal trial.

151.    These false and misleading statements were made in interstate commerce, as they were widely broadcast on radio, on the internet, in social media, and elsewhere in this district, nationally and internationally.

152.    Plaintiffs have suffered significant damages, which are ongoing, due to Defendants' false and/or misleading statements. By law these damages are calculated based on Defendants' gross sales and receipts, which are trebled, plus an award of attorneys fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

a.    Awarding Plaintiffs compensatory including actual, consequential, incidental and punitive damages for malicious tortious concerted conduct, jointly and severally in an amount to be determined at trial and in excess of $75,000,000 U.S. Dollars

for each Plaintiff.

b.      Awarding Treble Damages Under the Lanham Act, 15 U.S.C. 1125(a).

b.      Awarding Plaintiffs attorney fees and costs

c.      Granting such other   relief as the Court deems appropriate and necessary

        including preliminary and permanent injunctive relief.

**PLAINTIFFS DEMAND TRIAL BY JURY ON ALL CLAIMS SO TRIABLE**.

Dated: August 5, 2021                          Respectfully Submitted,


                                               /s/*Sanjay Biswas*_____
                                               SANJAY BISWAS, Esq.
                                               #24061235—Texas
                                               #24966--Louisiana
                                               11720 Duxbury Dr.
                                               Frisco, Texas 75035
                                               Telephone: (972)-866-5879
                                               Email:sanjaybiswas41@gmail.com
                                               Fax: 1-800-506-6804

                                               *Counsel for Dr. Jerome Corsi*

                                               /s/*Larry Klayman*_____
                                               Larry Klayman, Esq.
                                               7050 W. Palmetto Park Rd
                                               Boca Raton FL, 33433
                                               Email:leklayman@gmail.com
                                               Tel: 561-558-5336

                                               *Plaintiff Pro Se*

## **<u>VERIFICATION</u>**

I, Larry Klayman declare as follows:

1.       I am a Plaintiff in the present case.

2.       I verify under penalty of perjury under the laws of the United States of America that the factual statements in this Second Amended Complaint  are true and correct to the best of my personal knowledge and belief.

Executed on August 5, 2021

                                                    __ */s/ Larry Klayman*_____
                                                    Larry Klayman

## <u>VERIFICATION</u>

I, Jerome Corsi declare as follows:

1.      I am a Plaintiff in the present case.

2.      I verify under penalty of perjury under the laws of the United States of America that the factual statements in this Second Amended Complaint are true and correct to  the best of my personal knowledge and belief.

Executed on August 5, 2021

_____ */s/ Dr. Jerome Corsi* _____
Dr. Jerome Corsi

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**

DR. JEROME CORSI, ET AL

Plaintiffs

        v.

INFOWARS, LLC, et al

        Defendants.

**Case Number:  1:20-cv-298-LY**

## SWORN DECLARATION OF KELLY MORALES

1. I, Kelly Morales, hereby declare under penalty of perjury that the following is true and correct and based on my personal knowledge and belief.

2. I am over the age of 18 and mentally and legally competent to make this affidavit, sworn under oath.

3. I am the former wife of Defendant Alex Jones.  I was married to Alex Jones for 12 years and with him for 15 years and we have 3 children together. During our time together, I was involved in the activities of Alex, his father David and Infowars and am intimately knowledgeable about their activities and business structure.

4. Based on my personal knowledge and experience, David Jones runs Infowars with Alex Jones and helps him with his activities, including fixing media stories and endorsing and/or aiding his slanderous and/or fraudulent behaviors, all for profit.

5. Infowars, LLC is a sub-entity of Free Speech Systems, LLC ("FSS"), and David Jones is an employee of FSS, or he has been.

6. David Jones is additionally a managing member of multiple entities that are closely held businesses, constituting financial holding companies or financial distribution centered around Infowars/Alex Jones' supplement line, which are quintessential to funding and running Infowars.

7. Alex Jones could not function without David Jones, and has conspired with him on the past to commit this breach of fiduciary duty and fraud on my business/estate with Alex Jones. While David Jones did this, he slandered and/or defamed me to experts and assisted Alex Jones and his attorneys to do the same, so as to steal/hide my estate and his grandchildren's inheritance.

8. Alex Jones is quasi-illiterate, and cannot use technology or apps such as email with any fluency, and he cannot function without assistance from those around him, including David Jones.

I hereby swear under oath and penalty of perjury that the foregoing facts are true and correct to the best of my knowledge and belief.

Executed on September 30, 2020

Kelly Morales

2

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| Alexander E. Jones, | § | CASE NO. 20-10118-hcm |
| | § | |
| Alleged Debtor. | § | Chapter 11 |
| | § | |

### Affidavit of David Jones in Support of Alleged Debtor's Motion to Dismiss

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF TRAVIS | § |

BEFORE ME, the undersigned authority, on this day personally appeared David Jones, who after being sworn did state upon his oath, as follows:

1.     "My name is David Jones. I am over 18 years of age and otherwise competent and capable of making this Affidavit. I have personal knowledge of the facts set forth herein and they are true and correct.

2.     "I have been involved with Alex Jones' personal and business finances for many years and have personal knowledge of the matters set forth herein, and they are true and correct.

3.     "I have personally reviewed the Real Estate Lien Note from Alexander Jones to Kelly R. Jones dated March 19, 2015 (the "*Note*"), which is attached to the Involuntary Bankruptcy Petition filed in the above referenced case and have reviewed the record of payments made by Alexander Jones to Kelly R. Jones under the Note. I have personally calculated the remaining balance of the Note. The balance of the Note is $596,267.16 as of the date hereof.

"Further Affiant sayeth not."

SIGNED on this 1⟋1 day of February, 2020.

_____
David Jones

Sworn to and subscribed before me, the undersigned authority, on this 13th day of February, 2020.

_____
Notary Public for the State of Texas
EXP  09-24-2022

PATRICK RILEY
Notary Public, State of Texas
Comm. Expires 09-24-2022
Notary ID 131734177

4837-5475-576

1

EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. |
| | * | |
| v. | * | Grand Jury Original |
| | * | |
| ROGER JASON STONE, JR., | * | 18 U.S.C. §§ 1001, 1505, 1512, 2 |
| | * | |
| Defendant. | * | |
| | * | |
| | * | |
| | * | |
| | ******* | |

## **INDICTMENT**

The Grand Jury for the District of Columbia charges:

### **Introduction**

1.     By in or around May 2016, the Democratic National Committee ("DNC") and the Democratic Congressional Campaign Committee ("DCCC") became aware that their computer systems had been compromised by unauthorized intrusions and hired a security company ("Company 1") to identify the extent of the intrusions.

2.     On or about June 14, 2016, the DNC—through Company 1—publicly announced that it had been hacked by Russian government actors.

3.     From in or around July 2016 through in or around November 2016, an organization ("Organization 1"), which had previously posted documents stolen by others from U.S. persons, entities, and the U.S. government, released tens of thousands of documents stolen from the DNC and the personal email account of the chairman of the U.S. presidential campaign of Hillary Clinton ("Clinton Campaign").

a. On or about July 22, 2016, Organization 1 released documents stolen from the DNC.

b. Between on or about October 7, 2016 and on or about November 7, 2016, Organization 1 released approximately 33 tranches of documents that had been stolen from the personal email account of the Clinton Campaign chairman, totaling over 50,000 stolen documents.

4. ROGER JASON STONE, JR. was a political consultant who worked for decades in U.S. politics and on U.S. political campaigns. STONE was an official on the U.S. presidential campaign of Donald J. Trump ("Trump Campaign") until in or around August 2015, and maintained regular contact with and publicly supported the Trump Campaign through the 2016 election.

5. During the summer of 2016, STONE spoke to senior Trump Campaign officials about Organization 1 and information it might have had that would be damaging to the Clinton Campaign. STONE was contacted by senior Trump Campaign officials to inquire about future releases by Organization 1.

6. By in or around early August 2016, STONE was claiming both publicly and privately to have communicated with Organization 1. By in or around mid-August 2016, Organization 1 made a public statement denying direct communication with STONE. Thereafter, STONE said that his communication with Organization 1 had occurred through a person STONE described as a "mutual friend," "go-between," and "intermediary." STONE also continued to communicate with members of the Trump Campaign about Organization 1 and its intended future releases.

7. After the 2016 U.S. presidential election, the U.S. House of Representatives Permanent Select Committee on Intelligence ("HPSCI"), the U.S. Senate Select Committee on Intelligence ("SSCI"), and the Federal Bureau of Investigation ("FBI") opened or announced their respective

investigations into Russian interference in the 2016 U.S. presidential election, which included investigating STONE's claims of contact with Organization 1.

8.      In response, STONE took steps to obstruct these investigations.  Among other steps to obstruct the investigations, STONE:

      a.      Made multiple false statements to HPSCI about his interactions regarding Organization 1, and falsely denied possessing records that contained evidence of these interactions; and

      b.      Attempted to persuade a witness to provide false testimony to and withhold pertinent information from the investigations.

## Other Relevant Individuals

9.      Person 1 was a political commentator who worked with an online media publication during the 2016 U.S. presidential campaign.  Person 1 spoke regularly with STONE throughout the campaign, including about the release of stolen documents by Organization 1.

10.      Person 2 was a radio host who had known STONE for more than a decade.  In testimony before HPSCI on or about September 26, 2017, STONE described Person 2 (without naming him) as an "intermediary," "go-between," and "mutual friend" to the head of Organization 1.  In a follow-up letter to HPSCI dated October 13, 2017, STONE identified Person 2 by name and claimed Person 2 was the "gentleman who confirmed for Mr. Stone" that the head of Organization 1 had "'[e]mails related to Hillary Clinton which are pending publication.'"

## Background

### STONE's Communications About Organization 1 During the Campaign

11.      By in or around June and July 2016, STONE informed senior Trump Campaign officials that he had information indicating Organization 1 had documents whose release would be

damaging to the Clinton Campaign. The head of Organization 1 was located at all relevant times at the Ecuadorian Embassy in London, United Kingdom.

12.    After the July 22, 2016 release of stolen DNC emails by Organization 1, a senior Trump Campaign official was directed to contact STONE about any additional releases and what other damaging information Organization 1 had regarding the Clinton Campaign. STONE thereafter told the Trump Campaign about potential future releases of damaging material by Organization 1.

13.    STONE also corresponded with associates about contacting Organization 1 in order to obtain additional emails damaging to the Clinton Campaign.

    a.    On or about July 25, 2016, STONE sent an email to Person 1 with the subject line, "Get to [the head of Organization 1]." The body of the message read, "Get to [the head of Organization 1] [a]t Ecuadorian Embassy in London and get the pending [Organization 1] emails . . . they deal with Foundation, allegedly." On or about the same day, Person 1 forwarded STONE's email to an associate who lived in the United Kingdom and was a supporter of the Trump Campaign.

    b.    On or about July 31, 2016, STONE emailed Person 1 with the subject line, "Call me MON." The body of the email read in part that Person 1's associate in the United Kingdom "should see [the head of Organization 1]."

    c.    On or about August 2, 2016, Person 1 emailed STONE. Person 1 wrote that he was currently in Europe and planned to return in or around mid-August. Person 1 stated in part, "Word is friend in embassy plans 2 more dumps. One shortly after I'm back. 2nd in Oct. Impact planned to be very damaging." The phrase "friend in embassy" referred to the head of Organization 1. Person 1 added in the same email, "Time to let more than [the Clinton Campaign chairman] to be exposed as in bed w

4

enemy if they are not ready to drop HRC. That appears to be the game hackers are now about. Would not hurt to start suggesting HRC old, memory bad, has stroke – neither he nor she well. I expect that much of next dump focus, setting stage for Foundation debacle."

14. Starting in early August 2016, after receiving the August 2, 2016 email from Person 1, STONE made repeated statements about information he claimed to have learned from the head of Organization 1.

    a.    On or about August 8, 2016, STONE attended a public event at which he stated, "I actually have communicated with [the head of Organization 1]. I believe the next tranche of his documents pertain to the Clinton Foundation, but there's no telling what the October surprise may be."

    b.    On or about August 12, 2016, STONE stated during an interview that he was "in communication with [the head of Organization 1]" but was "not at liberty to discuss what I have."

    c.    On or about August 16, 2016, STONE stated during an interview that "it became known on this program that I have had some back-channel communication with [Organization 1] and [the head of Organization 1]." In a second interview on or about the same day, STONE stated that he "communicated with [the head of Organization 1]" and that they had a "mutual acquaintance who is a fine gentleman."

    d.    On or about August 18, 2016, STONE stated during a television interview that he had communicated with the head of Organization 1 through an "intermediary, somebody who is a mutual friend."

e.     On or about August 23, 2016, Person 2 asked STONE during a radio interview, "You've been in touch indirectly with [the head of Organization 1]. . . . Can you give us any kind of insight? Is there an October surprise happening?" STONE responded, "Well, first of all, I don't want to intimate in any way that I control or have influence with [the head of Organization 1] because I do not. . . . We have a mutual friend, somebody we both trust and therefore I am a recipient of pretty good information."

15.     Beginning on or about August 19, 2016, STONE exchanged written communications, including by text message and email, with Person 2 about Organization 1 and what the head of Organization 1 planned to do.

a.     On or about August 19, 2016, Person 2 sent a text message to STONE that read in part, "I'm going to have [the head of Organization 1] on my show next Thursday." On or about August 21, 2016, Person 2 sent another text message to STONE, writing in part, "I have [the head of Organization 1] on Thursday so I'm completely tied up on that day."

b.     On or about August 25, 2016, the head of Organization 1 was a guest on Person 2's radio show for the first time. On or about August 26, 2016, Person 2 sent a text message to STONE that stated, "[the head of Organization 1] talk[ed] about you last night." STONE asked what the head of Organization 1 said, to which Person 2 responded, "He didn't say anything bad we were talking about how the Press is trying to make it look like you and he are in cahoots."

c.     On or about August 27, 2016, Person 2 sent text messages to STONE that said, "We are working on a [head of Organization 1] radio show," and that he (Person 2) was

"in charge" of the project.  In a text message sent later that day, Person 2 added, "[The head of Organization 1] has kryptonite on Hillary."

d.  On or about September 18, 2016, STONE sent a text message to Person 2 that said, "I am e-mailing u a request to pass on to [the head of Organization 1]."  Person 2 responded "Ok," and added in a later text message, "[j]ust remember do not name me as your connection to [the head of Organization 1] you had one before that you referred to."

   i.  On or about the same day, September 18, 2016, STONE emailed Person 2 an article with allegations against then-candidate Clinton related to her service as Secretary of State.  STONE stated, "Please ask [the head of Organization 1] for any State or HRC e-mail from August 10 to August 30—particularly on August 20, 2011 that mention [the subject of the article] or confirm this narrative."

   ii.  On or about September 19, 2016, STONE texted Person 2 again, writing, "Pass my message . . . to [the head of Organization 1]."  Person 2 responded, "I did."  On or about September 20, 2016, Person 2 forwarded the request to a friend who was an attorney with the ability to contact the head of Organization 1.  Person 2 blind-copied STONE on the forwarded email.

e.  On or about September 30, 2016, Person 2 sent STONE via text message a photograph of Person 2 standing outside the Ecuadorian Embassy in London where the head of Organization 1 was located.

7

f.    On or about October 1, 2016, which was a Saturday, Person 2 sent STONE text messages that stated, "big news Wednesday . . . now pretend u don't know me . . . Hillary's campaign will die this week."  In the days preceding these messages, the press had reported that the head of Organization 1 planned to make a public announcement on or about Tuesday, October 4, 2016, which was reported to be the ten-year anniversary of the founding of Organization 1.

g.    On or about October 2, 2016, STONE emailed Person 2, with the subject line "WTF?," a link to an article reporting that Organization 1 was canceling its "highly anticipated Tuesday announcement due to security concerns."  Person 2 responded to STONE, "head fake."

h.    On or about the same day, October 2, 2016, STONE texted Person 2 and asked, "Did [the head of Organization 1] back off."  On or about October 3, 2016, Person 2 initially responded, "I can't tal[k] about it."  After further exchanges with STONE, Person 2 said, "I think it[']s on for tomorrow."  Person 2 added later that day, "Off the Record Hillary and her people are doing a full-court press they [*sic*] keep [the head of Organization 1] from making the next dump . . . That's all I can tell you on this line . . . Please leave my name out of it."

16.    In or around October 2016, STONE made statements about Organization 1's future releases, including statements similar to those that Person 2 made to him.  For example:

a.    On or about October 3, 2016, STONE wrote to a supporter involved with the Trump Campaign, "Spoke to my friend in London last night.  The payload is still coming."

b.    Also on or about October 3, 2016, STONE received an email from a reporter who had connections to a high-ranking Trump Campaign official that asked, "[the head

of Organization 1] – what's he got?  Hope it's good."  STONE responded in part, "It is.  I'd tell [the high-ranking Trump Campaign official] but he doesn't call me back."

c.  On or about October 4, 2016, the head of Organization 1 held a press conference but did not release any new materials pertaining to the Clinton Campaign.  Shortly afterwards, STONE received an email from the high-ranking Trump Campaign official asking about the status of future releases by Organization 1.  STONE answered that the head of Organization 1 had a "[s]erious security concern" but that Organization 1 would release "a load every week going forward."

d.  Later that day, on or about October 4, 2016, the supporter involved with the Trump Campaign asked STONE via text message if he had "hear[d] anymore from London."  STONE replied, "Yes - want to talk on a secure line - got Whatsapp?"  STONE subsequently told the supporter that more material would be released and that it would be damaging to the Clinton Campaign.

17.  On or about October 7, 2016, Organization 1 released the first set of emails stolen from the Clinton Campaign chairman.  Shortly after Organization 1's release, an associate of the high-ranking Trump Campaign official sent a text message to STONE that read "well done."  In subsequent conversations with senior Trump Campaign officials, STONE claimed credit for having correctly predicted the October 7, 2016 release.

<u>The Investigations</u>

18.  In or around 2017, government officials publicly disclosed investigations into Russian interference in the 2016 U.S. presidential election and possible links to individuals associated with the campaigns.

9

a.   On or about January 13, 2017, the chairman and vice chairman of SSCI announced the committee would conduct an inquiry that would investigate, among other things, any intelligence regarding links between Russia and individuals associated with political campaigns, as well as Russian cyber activity and other "active measures" directed against the United States in connection with the 2016 election.

b.   On or about January 25, 2017, the chairman and ranking member of HPSCI announced that HPSCI had been conducting an inquiry similar to SSCI's.

c.   On or about March 20, 2017, the then-director of the FBI testified at a HPSCI hearing and publicly disclosed that the FBI was investigating Russian interference in the 2016 election and possible links and coordination between the Trump Campaign and the Russian government.

d.   By in or around August 2017, news reports stated that a federal grand jury had opened an investigation into matters relating to Russian government efforts to interfere in the 2016 election, including possible links and coordination between the Trump Campaign and the Russian government.

**STONE's False Testimony to HPSCI**

19.   In or around May 2017, HPSCI sent a letter requesting that STONE voluntarily appear before the committee and produce:

> Any documents, records, electronically stored information including e-mail, communication, recordings, data and tangible things (including, but not limited to, graphs, charts, photographs, images and other documents) regardless of form, other than those widely available (e.g., newspaper articles) that reasonably could lead to the discovery of any facts within the investigation's publicly-announced parameters.

On or about May 22, 2017, STONE caused a letter to be submitted to HPSCI stating that "Mr.

Stone has no documents, records, or electronically stored information, regardless of form, other than those widely available that reasonably could lead to the discovery of any facts within the investigation's publicly-announced parameters."

20.     On or about September 26, 2017, STONE testified before HPSCI in Washington, D.C. as part of the committee's ongoing investigation.  In his opening statement, STONE stated, "These hearings are largely based on a yet unproven allegation that the Russian state is responsible for the hacking of the DNC and [the Clinton Campaign chairman] and the transfer of that information to [Organization 1]."  STONE further stated that  "[m]embers of this Committee" had made certain "assertions against me which must be rebutted here today," which included "[t]he charge that I knew in advance about, and predicted, the hacking of Clinton campaign chairman['s] email, [and] that I had advanced knowledge of the source or actual content of the [Organization 1] disclosures regarding Hillary Clinton."

21.     In the course of his HPSCI testimony, STONE made deliberately false and misleading statements to the committee concerning, among other things, his possession of documents pertinent to HPSCI's investigation; the source for his early August 2016 statements about Organization 1; requests he made for information from the head of Organization 1; his communications with his identified intermediary; and his communications with the Trump Campaign about Organization 1.

<u>STONE's False and Misleading Testimony About His Possession of Documents Pertinent to HPSCI's Investigation</u>

22.     During his HPSCI testimony, STONE was asked, "So you have no emails to anyone concerning the allegations of hacked documents . . . or any discussions you have had with third parties about [the head of Organization 1]?  You have no emails, no texts, no documents whatsoever, any kind of that nature?"  STONE falsely and misleadingly answered, "That is correct.

11

Not to my knowledge."

23.     In truth and in fact, STONE had sent and received numerous emails and text messages during the 2016 campaign in which he discussed Organization 1, its head, and its possession of hacked emails.  At the time of his false testimony, STONE was still in possession of many of these emails and text messages, including:

a.     The email from STONE to Person 1 on or about July 25, 2016 that read in part, "Get to [the head of Organization 1] [a]t Ecuadorian Embassy in London and get the pending [Organization 1] emails . . . they deal with Foundation, allegedly.";

b.     The email from STONE to Person 1 on or about July 31, 2016 that said an associate of Person 1 "should see [the head of Organization 1].";

c.     The email from Person 1 to STONE on or about August 2, 2016 that stated in part, "Word is friend in embassy plans 2 more dumps.  One shortly after I'm back.  2nd in Oct.  Impact planned to be very damaging.";

d.     Dozens of text messages and emails, beginning on or about August 19, 2016 and continuing through the election, between STONE and Person 2 in which they discussed Organization 1 and the head of Organization 1;

e.     The email from STONE on or about October 3, 2016 to the supporter involved with the Trump Campaign, which read in part, "Spoke to my friend in London last night.  The payload is still coming."; and

f.     The emails on or about October 4, 2016 between STONE and the high-ranking member of the Trump Campaign, including STONE's statement that Organization 1 would release "a load every week going forward."

24.     By falsely claiming that he had no emails or text messages in his possession that referred to the head of Organization 1, STONE avoided providing a basis for HPSCI to subpoena records in his possession that could have shown that other aspects of his testimony were false and misleading.

<u>STONE's False and Misleading Testimony About His Early August 2016 Statements</u>

25.     During his HPSCI testimony on or about September 26, 2017, STONE was asked to explain his statements in early August 2016 about being in contact with the head of Organization 1. STONE was specifically asked about his statement on or about August 8, 2016 that "I've actually communicated with [the head of Organization 1]," as well as his statement on or about August 12, 2016 that he was "in communication with [the head of Organization 1]" but was "not at liberty to discuss what I have."

26.     STONE responded that his public references to having a means of contacting Organization 1 referred exclusively to his contact with a journalist, who STONE described as a "go-between, as an intermediary, as a mutual friend" of the head of Organization 1. STONE stated that he asked this individual, his intermediary, "to confirm what [the head of Organization 1] ha[d] tweeted, himself, on July 21st, that he ha[d] the Clinton emails and that he [would] publish them." STONE further stated that the intermediary "was someone I knew had interviewed [the head of Organization 1]. And I merely wanted confirmation of what he had tweeted on the 21st." STONE declined to tell HPSCI the name of this "intermediary" but provided a description in his testimony that was consistent with Person 2.

27.     On or about October 13, 2017, STONE caused a letter to be submitted to HPSCI that identified Person 2 by name as the "gentleman who confirmed for Mr. Stone" that the head of Organization 1 had "'[e]mails related to Hillary Clinton which are pending publication.'"

28.     STONE's explanation of his August 2016 statements about communicating with the head of Organization 1 was false and misleading.  In truth and in fact, the first time Person 2 interviewed the head of Organization 1 was on or about August 25, 2016, after STONE made his August 8 and August 12, 2016 public statements.   Similarly, at the time STONE made his August 2016 statements, STONE had directed Person 1—not Person 2—to contact the head of Organization 1.  And Person 1—not Person 2—had told STONE in advance of STONE's August 8 and August 12, 2016 public statements that "[w]ord is friend in embassy plans 2 more dumps," including one in October.  At no time did STONE identify Person 1 to HPSCI as another individual STONE contacted to serve as a "go-between," "intermediary," or other source of information from Organization 1.  STONE also never disclosed his exchanges with Person 1 when answering HPSCI's questioning about STONE's August 8 and August 12, 2016 statements.

STONE's False and Misleading Testimony About Requests He Made for Information from the Head of Organization 1

29.     During his HPSCI testimony, STONE was asked, "[W]hat was the extent of the communication with [the intermediary]?"  STONE replied, "I asked him to confirm . . . that the tweet of [the head of Organization 1] of the 21st was accurate, that they did in fact have . . . Hillary Clinton emails and that they would release them."  STONE was then asked, "Did you ask [the intermediary] to communicate anything else to [the head of Organization 1]?"  STONE falsely and misleadingly responded, "I did not."  STONE was then asked, "Did you ask [the intermediary] to do anything on your own behalf?"  STONE falsely and misleadingly responded, "I did not."

30.     In truth and in fact, STONE directed both Person 1 and Person 2 to pass on requests to the head of Organization 1 for documents that STONE believed would be damaging to the Clinton Campaign.  For example:

        a.     As described above, on or about July 25, 2016, STONE sent Person 1 an email that

read, "Get to [the head of Organization 1] [a]t Ecuadorian Embassy in London and

get the pending [Organization 1] emails . . . they deal with Foundation, allegedly."

b.     On or about September 18, 2016, STONE sent a text message to Person 2 that said,

"I am e-mailing u a request to pass on to [the head of Organization 1]," and then

emailed Person 2 an article with allegations against then-candidate Clinton related

to her service as Secretary of State.  STONE added, "Please ask [the head of

Organization 1] for any State or HRC e-mail from August 10 to August 30—

particularly on August 20, 2011 that mention [the subject of the article] or confirm

this narrative."

c.     On or about September 19, 2016, STONE texted Person 2 again, writing "Pass my

message . . . to [the head of Organization 1]."  Person 2 responded, "I did," and the

next day Person 2, on an email blind-copied to STONE, forwarded the request to

an attorney who had the ability to contact the head of Organization 1.

<u>STONE's False and Misleading Testimony About Communications with His Identified
Intermediary</u>

31.     During his HPSCI testimony, STONE was asked repeatedly about his communications

with the person he identified as his intermediary.  STONE falsely and misleadingly stated that he

had never communicated with his intermediary in writing in any way.  During one exchange,

STONE falsely and misleadingly claimed only to have spoken with the intermediary

telephonically:

Q:     [H]ow did you communicate with the intermediary?

A:     Over the phone.

Q:     And did you have any other means of communicating with
the intermediary?

A:     No.

Q:     No text messages, no – none of the list, right?

> A:    No.

Later during his testimony, STONE again falsely denied ever communicating with his intermediary in writing:

> Q:    So you never communicated with your intermediary in writing in any way?
>
> A:    No.
>
> Q:    Never emailed him or texted him?
>
> A:    He's not an email guy.
>
> Q:    So all your conversations with him were in person or over the phone.
>
> A:    Correct.

32.    In truth and in fact, as described above, STONE and Person 2 (who STONE identified to HPSCI as his intermediary) engaged in frequent written communication by email and text message. STONE also engaged in frequent written communication by email and text message with Person 1, who also provided STONE with information regarding Organization 1.

33.    Written communications between STONE and Person 1 and between STONE and Person 2 continued through STONE's HPSCI testimony. Indeed, on or about September 26, 2017—the day that STONE testified before HPSCI and denied having ever sent or received emails or text messages from Person 2—STONE and Person 2 exchanged over thirty text messages.

34.    Certain electronic messages between STONE and Person 1 and between STONE and Person 2 would have been material to HPSCI. For example:

> a.    In or around July 2016, STONE emailed Person 1 to "get to" the head of Organization 1 and obtain the pending emails.
>
> b.    In or around September 2016, STONE sent messages directing Person 2 to pass a request to the head of Organization 1.
>
> c.    On or about January 6, 2017, Person 2 sent STONE an email that had the subject

line "Back channel bs." In the email, Person 2 wrote, "Well I have put together timelines[] and you [] said you have a back-channel way back a month before I had [the head of Organization 1] on my show . . . I have never had a conversation with [the head of Organization 1] other than my radio show . . . I have pieced it all together . . . so you may as well tell the truth that you had no back-channel or there's the guy you were talking about early August."

<u>STONE's False and Misleading Testimony About Communications with the Trump Campaign</u>

35.     During his HPSCI testimony, STONE was asked, "did you discuss your conversations with the intermediary with anyone involved in the Trump campaign?" STONE falsely and misleadingly answered, "I did not." In truth and in fact, and as described above, STONE spoke to multiple individuals involved in the Trump Campaign about what he claimed to have learned from his intermediary to Organization 1, including the following:

  a.     On multiple occasions, STONE told senior Trump Campaign officials about materials possessed by Organization 1 and the timing of future releases.

  b.     On or about October 3, 2016, STONE wrote to a supporter involved with the Trump Campaign, "Spoke to my friend in London last night. The payload is still coming."

  c.     On or about October 4, 2016, STONE told a high-ranking Trump Campaign official that the head of Organization 1 had a "[s]erious security concern" but would release "a load every week going forward."

**Attempts to Prevent Person 2 from Contradicting STONE's False Statements to HPSCI**

36.     On or about October 19, 2017, STONE sent Person 2 an excerpt of his letter to HPSCI that identified Person 2 as his "intermediary" to Organization 1. STONE urged Person 2, if asked by HPSCI, to falsely confirm what STONE had previously testified to, including that it was Person 2

17

who provided STONE with the basis for STONE's early August 2016 statements about contact with Organization 1. Person 2 repeatedly told STONE that his testimony was false and told him to correct his testimony to HPSCI. STONE did not do so. STONE then engaged in a prolonged effort to prevent Person 2 from contradicting STONE's false statements to HPSCI.

37.    In or around November 2017, Person 2 received a request from HPSCI to testify voluntarily before the committee. After being contacted by HPSCI, Person 2 spoke and texted repeatedly with STONE. In these discussions, STONE sought to have Person 2 testify falsely either that Person 2 was the identified intermediary or that Person 2 could not remember what he had told STONE. Alternatively, STONE sought to have Person 2 invoke his Fifth Amendment right against self-incrimination. For example:

a.    On or about November 19, 2017, in a text message to STONE, Person 2 said that his lawyer wanted to see him (Person 2). STONE responded, "'Stonewall it. Plead the fifth. Anything to save the plan' . . . Richard Nixon." On or about November 20, 2017, Person 2 informed HPSCI that he declined HPSCI's request for a voluntary interview.

b.    On or about November 21, 2017, Person 2 texted STONE, "I was told that the house committee lawyer told my lawyer that I will be getting a subpoena." STONE responded, "That was the point at which your lawyers should have told them you would assert your 5th Amendment rights if compelled to appear."

c.    On or about November 28, 2017, Person 2 received a subpoena compelling his testimony before HPSCI. Person 2 informed STONE of the subpoena.

d.    On or about November 30, 2017, STONE asked Person 1 to write publicly about Person 2. Person 1 responded, "Are you sure you want to make something out of

this now?  Why not wait to see what [Person 2] does.  You may be defending yourself too much—raising new questions that will fuel new inquiries.  This may be a time to say less, not more."  STONE responded by telling Person 1 that Person 2 "will take the 5th—but let's hold a day."

e.   On multiple occasions, including on or about December 1, 2017, STONE told Person 2 that Person 2 should do a "Frank Pentangeli" before HPSCI in order to avoid contradicting STONE's testimony.  Frank Pentangeli is a character in the film *The Godfather: Part II*, which both STONE and Person 2 had discussed, who testifies before a congressional committee and in that testimony claims not to know critical information that he does in fact know.

f.   On or about December 1, 2017, STONE texted Person 2, "And if you turned over anything to the FBI you're a fool."  Later that day, Person 2 texted STONE, "You need to amend your testimony before I testify on the 15th."  STONE responded, "If you testify you're a fool.  Because of tromp I could never get away with a certain [*sic*] my Fifth Amendment rights but you can.  I guarantee you you are the one who gets indicted for perjury if you're stupid enough to testify."

38.   On or about December 12, 2017, Person 2 informed HPSCI that he intended to assert his Fifth Amendment privilege against self-incrimination if required to appear by subpoena.  Person 2 invoked his Fifth Amendment privilege in part to avoid providing evidence that would show STONE's previous testimony to Congress was false.

39.   Following Person 2's invocation of his Fifth Amendment privilege not to testify before HPSCI, STONE and Person 2 continued to have discussions about the various investigations into Russian interference in the 2016 election and what information Person 2 would provide to

investigators.   During these conversations, STONE repeatedly made statements intended to prevent Person 2 from cooperating with the investigations.  For example:

a.  On or about December 24, 2017, Person 2 texted STONE, "I met [the head of Organization 1] for f[i]rst time this yea[r] sept 7 . . . docs prove that. . . .  You should be honest w fbi . . . there was no back channel . . . be honest."  STONE replied approximately two minutes later, "I'm not talking to the FBI and if your smart you won't either."

b.  On or about April 9, 2018, STONE wrote in an email to Person 2, "You are a rat. A stoolie.  You backstab your friends-run your mouth my lawyers are dying Rip you to shreds."  STONE also said he would "take that dog away from you," referring to Person 2's dog.  On or about the same day, STONE wrote to Person 2, "I am so ready.  Let's get it on.  Prepare to die [expletive]."

c.  On or about May 21, 2018, Person 2 wrote in an email to STONE, "You should have just been honest with the house Intel committee . . . you've opened yourself up to perjury charges like an idiot."  STONE responded, "You are so full of [expletive].  You got nothing.  Keep running your mouth and I'll file a bar complaint against your friend [the attorney who had the ability to contact the head of Organization 1]."

## COUNT ONE
### (Obstruction of Proceeding)

40.     Paragraphs 1 through 39 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

41.     From in or around May 2017 through at least December 2017, within the District of Columbia and elsewhere, the defendant ROGER JASON STONE, JR., corruptly influenced, obstructed, impeded, and endeavored to influence, obstruct, and impede the due and proper exercise of the power of inquiry under which any inquiry and investigation is being had by either House, and any committee of either House and any joint committee of the Congress, to wit: STONE testified falsely and misleadingly at a HPSCI hearing in or around September 2017; STONE failed to turn over and lied about the existence of responsive records to HPSCI's requests about documents; STONE submitted and caused to be submitted a letter to HPSCI falsely and misleadingly describing communications with Person 2; and STONE attempted to have Person 2 testify falsely before HPSCI or prevent him from testifying.

All in violation of Title 18, United States Code, Sections 1505 and 2.

## COUNTS TWO THROUGH SIX
### (False Statements)

42.     Paragraphs 1 through 39 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

43.     On or about September 26, 2017, within the District of Columbia and elsewhere, in a matter within the jurisdiction of the legislative branch of the Government of the United States, the defendant ROGER JASON STONE, JR., knowingly and willfully made and caused to be made materially false, fictitious, and fraudulent statements and representations, to wit:

| Count | False Statement |
|---|---|
| 2 | STONE testified falsely that he did not have emails with third parties about the head of Organization 1, and that he did not have any documents, emails, or text messages that refer to the head of Organization 1. |
| 3 | STONE testified falsely that his August 2016 references to being in contact with the head of Organization 1 were references to communications with a single "go-between," "mutual friend," and "intermediary," who STONE identified as Person 2. |
| 4 | STONE testified falsely that he did not ask the person he referred to as his "go-between," "mutual friend," and "intermediary," to communicate anything to the head of Organization 1 and did not ask the intermediary to do anything on STONE's behalf. |
| 5 | STONE testified falsely that he and the person he referred to as his "go-between," "mutual friend," and "intermediary" did not communicate via text message or email about Organization 1. |
| 6 | STONE testified falsely that he had never discussed his conversations with the person he referred to as his "go-between," "mutual |

| Count | False Statement |
|-------|-----------------|
|       | friend," and "intermediary" with anyone involved in the Trump Campaign. |

All in violation of Title 18, United States Code, Sections 1001(a)(2) and 2.

## COUNT SEVEN
### (Witness Tampering)

44.     Paragraphs 1 through 39 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

45.     Between in or around September 2017 and present, within the District of Columbia and elsewhere, the defendant ROGER JASON STONE, JR., knowingly and intentionally corruptly persuaded and attempted to corruptly persuade another person, to wit: Person 2, with intent to influence, delay, and prevent the testimony of any person in an official proceeding.

All in violation of Title 18, United States Code, Section 1512(b)(1).


 

 

_____

Robert S. Mueller, III
Special Counsel
U.S. Department of Justice


A TRUE BILL:



_____

Foreperson

Date:  January 24, 2019

EXHIBIT 3

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | | |
|---|---|---|
| **DR. JEROME CORSI** and<br>**LARRY KLAYMAN**,<br><br>Plaintiffs,<br><br>vs.<br><br>**INFOWARS, LLC, FREE SPEECH**<br>**SYSTEMS, LLC, ALEX E. JONES,**<br>**DAVID JONES, OWEN SHROYER**, and<br>**ROGER STONE**<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. 1:20-CV-00298-LY |

## SWORN AFFIDAVIT OF LARRY KLAYMAN

I, Larry Klayman, being over eighteen years of age and duly competent to testify, hereby swear and affirm as follows:

## A BRIEF HISTORY OF MY BACKGROUND

1.      I have personal knowledge of the following facts and if called upon as a witness, could testify competently thereto.

2.      In 1973, I graduated from Duke University where I majored in political science and French literature. I excelled academically and graduated with honors.

3.      I then matriculated at Emory Law School where I excelled academically and graduated in 1977. While in law school, I worked as an intern at the U.S. International Trade Commission, the Georgia Attorney General and the U.S. Attorney for the Northern District of Georgia.

4.      I passed The Florida Bar the first time I took the exam.

5.      I passed all bar exams on my first attempt, including the District of Columbia Bar.

1

6.      I began my legal career in this circuit in Miami, Florida as an associate for Blackwell, Walker, Gray, Roberts, Flick & Hoehl (. Blackwell") which was then the largest and most prestigious law firm in Florida. I was admitted into The Florida Bar having been sworn in on December 7, 1977. I have practiced law in this circuit continuously and extensively throughout my forty-two-year career and have active cases pending in this circuit and elsewhere in Florida, including during the period that I was a trial attorney for the U.S. Department of Justice's ("DOJ") Antitrust Division, from 1980 to 1982, where I was assigned litigation in this circuit.

7.      I conceived of and founded Judicial Watch, Inc. ("Judicial Watch") in 1994, a public interest group that's mission was to investigate and prosecute government corruption and abuse. I was the Chairman, General Counsel, and Corporate Treasurer of Judicial Watch until I voluntarily departed in 2003 to run as a candidate for the U.S. Senate in Florida in the Republican primary election.

8.      In 1998, during the time I ran Judicial Watch, I hired Thomas J. Fitton ("Fitton") as my contract assistant. I later appointed him president of the organization I founded.

9.      In September of 2003, I voluntarily departed from Judicial Watch to run for the U.S. Senate in Florida. At the time I left Judicial Watch, I learned that Fitton had never graduated from college, which he had told me he had when I initially hired him.

10.     Contrary to Defendant Roger Stone's ("Defendant Stone") false and defamatory publications, I have enjoyed many successes in my career as a lawyer, many of which have been brought to the attention of the public by complimentary newspapers, magazines, editorials and journals.

11.     For example, I practiced law at Blackwell with my supervising partners Paul Larkin and Layton Mank and participating in winning product liability cases as defense counsel for Blackwell including cases involving Raleigh bicycles, pharmaceutical drugs manufactured by

2

Burroughs-Wellcome, and allegedly misdiagnosed cancer victims, and other personal injury and medical malpractice cases. Additionally, I handled lawsuits in admiralty.

12.     I left Blackwell to join the DOJ as a trial lawyer, prosecutor and defense lawyer in late 1979. During my time at the DOJ, I had many victories in the courtroom as well as favorable settlements for the government, i.e., such as for the Consumer Affairs Section of the Antitrust Division over misbranded, adulterated food and drug products including fruit drinks and prophylactics for the Food & Drug Administration ("FDA") and successful seizures and criminal prosecutions of dangerous products on behalf of the Consumer Product Safety Commission ("CPSC") such as slant-sided refuse bins, flammable children's sleepwear, and intraocular lens implants for cataract patients.

13.     Importantly, I was also on the trial team that successfully broke up the AT&T monopoly – creating competition in the telecommunications industry. I left the DOJ in late 1981.

14.     Then, working as an international trade lawyer for Busby, Rehm & Leonard and after a few years having founded my own firm The Law Offices of Larry E. Klayman, later named Klayman & Associates, P.C., I won countervailing duty and antidumping duty cases concerning steel from South Africa, garden furniture from Italy, musical instrument pads from Italy, coffee filters from Brazil, key limes from Peru, fireworks from China and a host of other product imports. I represented both importers and exporters. (While at Busby, Rehm & Leonard, I also took some months on hiatus and worked in the Competition Directorate (DG-4) of the Commission of the European Communities Section ("E.C.").

15.     Later, with my law firm, I won Section 337 unfair trade practice cases at the U.S. International Trade Commission ("USITC") concerning tennis rackets from Belgium, power tools from Taiwan, luggage from Taiwan, mass spectrometers from France, jam from Belgium, and machine tools from Brazil. I won a landmark case concerning recloseable plastic bags, which

broke the patents of Minigrip and Dow Corning, Minigrip's licensee. That case victory opened up competition for zip lock bags, a multi-trillion dollar industry.

16.     There was also an USITC patent case, pursuant to Section 337, which I litigated and won involving motorcycle helmets and another antidumping and countervailing duty cases before the Commerce Department and USITC concerning fire protection products and scuba diving neoprene body suits.

17.     I also won a Section 302 case involving paper from Brazil.

18.     All of the Section 337 cases were judge-tried and I won every one of them.

19.     I won a jury trial against Makita over power tools, another jury trial against a domestic manufacture of removable swimming pools for my client Remove Pool Fence Co., and yet another jury trial for my client, Maccaferri, on a contract dispute. These are only some of the jury trials I won during my early career.

20.     Because of my work during the time I ran Judicial Watch, a court ruled that President William Clinton committed a crime during the Filegate litigation. I also triggered the famous Chinagate scandal in a Freedom of Information Act, 5 U.S.C. § 552 et seq., which gave rise to Judicial Watch ultimately being awarded almost a million dollars. I filed cases which ended Bill and Hillary Clinton's attempted illegal purchase at below market rates for their mortgage of their home at Chappaqua, New York and ended the illegal payment of legal fees to the Clintons by State Farm, which was a form of bribery. I also participated in the famous *Gore v. Bush* litigation in Tallahassee, Florida that settled the 2000 presidential elections by the U.S Supreme Court. I also brought a case under the Foreign Agents Registration Act ("FARA") over the Cheney Energy Task Force that made its way to the U.S. Supreme Court.

21.     I brought a case for Jose Basulto of Brothers to the Rescue in a Florida court, which resulted in a $1.8 million judgment against the Republic of Cuba for shooting down Brothers to

the Rescue planes, and I represented the Miami family of Elian Gonzales and other victims of Fidel Castro, such as journalists who were jailed by Castro for their political beliefs. In this regard, I not only filed criminal complaints for these victims against Fidel Castro in Belgium courts, but also lobbied and testified in both Italian and French in Italy and France, as I am fluent in both languages, before various European parliaments to increase economic sanctions on Cuba for abuse of human rights. I also lobbied the European Union in Brussels, Belgium for increased sanctions on Cuba.

22.    On December 16, 2013, Judge Richard J. Leon granted my request for a preliminary injunction in my case against the National Security Agency ("NSA") and the Obama administration, when Judge Leon found for the first time in history that the collection of metadata telephony records by the NSA was likely unconstitutional.

23.    Because of that ruling, Congress enacted the USA Freedom Act, which sought to end illegal and unconstitutional mass surveillance by government intelligence agencies and the Federal Bureau of Investigation ("FBI").

24.    I obtained a jury verdict in the U.S. District Court for the Southern District of Florida against my former public interest group Judicial Watch, which was then run by Fitton, for maliciously defaming me in the amount of $181,000, which included punitive damages.

25.    My client Sheriff Joe Arpaio and I were the first to challenge former President Obama's unconstitutional executive amnesty for over 5 million illegal aliens and were ultimately successful, along with 25 other attorneys general, in front of the U.S. Supreme Court.

26.    It was my efforts that prevented Dr. Jerome Corsi ("Dr. Corsi") from getting indicted, first because he told the truth and did not engage in witness tampering and threaten to kill a witness such as Randy Credico, as Defendant Stone did, and second because of my legal skill and acumen. Dr. Corsi is a material witness in the Russian Collusion investigation by Special

Counsel Robert Mueller ("Mueller") and is listed as a material witness as Person 1 in Defendant Stone's Mueller indictment.

27.     I have had many other successes in addition to the above-listed victories.

28.     I myself authored a book titled "Whores: Why and How I Came to Fight the Establishment" published in 2009. In it, I wrote about my unfortunate experience with Defendant Stone. *See* Exhibit A. I authored this book myself without a ghostwriter and I came runner-up at an International Book Fair. It also still has a review on www.Barnesandnoble.com of 4.5 stars out of the maximum 5 stars.

29.     Upon its publication, Jack Cashill, the author of "Ron Brown's Body" had this to say about me: "That *Time* magazine has yet to name Larry Klayman 'Man of the Year' is a failure of *Time*, not Klayman's. The work he and Judicial Watch did on the Brown case is stunning." *See* Exhibit B.

30.     Joseph Farah, the founder of WorldNetDaily.com, had this to say about me: "Larry Klayman is my hero because he has integrity – enough to prevent him from blind loyalty to party or ideology . . . That's because he is fearless and relentless in the pursuit of justice . . . There were other men like Larry early in American history. Their names were Washington, Jefferson, Madison and Henry. *See* Exhibit B.

31.     Louis Jacobson of the National Journal said this of me: " . . . through his challenge of secrecy rules, Larry Klayman has become a force in Washington. *See* Exhibit B.

32.     Bill Moyers, of "Now" PBS, said this: ". . . his idea of fun is trying to kick down a door some public official has marked secret . . . Larry Klayman is himself a conservative, but there's nothing partisan bout his indignation."

33.     Frank Rich, famed columnist for "The New York Times" said this: "Larry . . . I appreciate your own maverick – if we can still use that word! – thinking and stands."

34. These are just a few of the accolades I have received over the years from conservatives and liberals alike, who appreciate and admire my work. *See* my biography attached as Exhibit C and incorporated herein by reference; *see also* Exhibit D, "Larry Klayman, the One Man Tea Party" which attributes the genesis of the Tea Party to me.

35. I am now the founder, Chairman and General Counsel of Freedom Watch, Inc., which has the mission of investigating and prosecuting government corruption and abuse through legal advocacy. I also am in private practice with The Klayman Law Group, P.A. I am unique as a public interest advocate. I am a columnist for World Net Daily and have had about 500+ columns published over the last 10 years. I have also been a columnist for Newsmax through a blog titled "Klayman' Court" and in addition to my book "Whores: How and Why I Came to Fight the Establishment", I also published two other books: "Fatal Neglect" and "Essays of a Mad Man." I also have my own syndicated radio show with Radio America called "Special Prosecutor with Larry Klayman."

## MY EXPERIENCES WITH DEFENDANT ROGER STONE

36. I met Defendant Stone at the Old Ebbitt Grill in Washington, D.C. in 1988 while he was a partner with Paul Manafort and others and was working as a lobbyist for the firm Black, Manafort, Stone, & Kelly.

37. Defendant Stone was a "political consultant" who claimed to help get presidents and other politicians elected. The firm made money by then lobbying the very men they put in office.

38. Defendant Stone backed Republican candidate Jack Kemp for President and he recommended that I be put on the executive finance committee, which also included Donald J. Trump.

7

39.     Because Defendant Stone knew of my successes and capabilities as a private lawyer, he told me that he had recommended me for U.S. Attorney when George Bush was President in 1992.

40.     In 1996, at a Republican Convention in San Diego, California, Defendant Stone was filmed at a "toga party" with his wife at a "swingers party."

41.     The media at the time went after Defendant Stone because of his alleged participation in the "sex party" and created a scandal.

42.     The media alleged at the time that Defendant Stone solicited sex half-naked, and that there was a picture of Defendant Stone in a compromising position to back up the story.

43.     Defendant Stone contacted me and, because he knew my capabilities and acumen as a lawyer, retained me to represent him to get the media to cease what he claimed then was a smear campaign.

44.     I successfully got the media to back off Defendant Stone through my skill as a lawyer and Defendant Stone was grateful.

45.     I maintained in sporadic contact with Defendant Stone until 2003 when I told him of my plans to voluntarily leave Judicial Watch and run for the U.S. Senate.

46.     There were confirmed rumors that Senator Bob Graham would retire from the U.S Senate well before he announced his retirement in November 2003. Defendant Stone traveled in Republican and political circles and knew that the Senator would be retiring in early to mid 2003.

47.     Thus, I was in contact with Defendant Stone in early to mid 2003, having been put in contact with him by Scott Reed, then Chief of Staff to Jack Kemp, who then was Secretary of Housing and Urban Development, and Defendant Stone was made aware by Scott Reed that I intended to run for the U.S. Senate to fill Bob Graham's seat.

8

48.     As I was a newcomer to politics, it would have been virtually impossible for me to beat Bob Graham, the incumbent, given the privileges and name recognition an incumbent receives, unless he or she is enmeshed in a major scandal. Senator Bob Graham was never enmeshed in such scandal.

49.     Because he was aware of my prior successes at Judicial Watch and before, Defendant Stone wanted to work with me as my U.S. Senate campaign manager. During this time, the spring, summer, and fall of 2003, and in preparation for my U.S. Senate run, Defendant Stone researched and kept books and records of many of my accomplishments. He had several binders (2-3 feet) full of information about me and the victories that I had obtained at Judicial Watch and elsewhere. Again, because Defendant Stone knew of my successes and legal political acumen, Defendant Stone wanted to be on my team and help me run for the U.S. Senate.

50.     Defendant Stone thus knew of many cases I had won in courtrooms and other legal accomplishments and in fact had kept records of successes in a book of my accomplishments.

51.     Soon after I hired him and during the height of my U.S. Senate campaign, I discovered that Defendant Stone had a conflict of interest and was working with Al Sharpton, while simultaneously working with me. He had agreed to represent me exclusively and I considered Al Sharpton to be an unsavory character. He also was not competently running my campaign with a staff of his friends which he had hired at great expense to me.

52.     I let Defendant Stone go roughly after about one month of his working with me on my U.S. Senate campaign. Shortly after his being let go, Defendant Stone and his sidekick Mike Caputo, whom he hired on my behalf as the campaign's press secretary, along with other staff Defendant Stone had hired, stole thousands of dollars of campaign cell phones and laptops, which I had purchased with my personal funds for the campaign.

53.     I have not spoken to Defendant Stone since I parted ways with him in 2003 given this experience.

54.     Defendant Stone is an individual and citizen of Florida. Special Counsel Robert Mueller ("Mueller") indicted Stone as part of the alleged "Russian Collusion" investigation with seven different felony counts, including lying under oath, witness tampering and obstruction of justice by threatening to kill a material witness and his service dog.

55.     The January 18, 2019 InfoWars video, published in this circuit, contained several false, misleading and defamatory statements concerning me. These false and defamatory statements include but are not limited to:

> A` 1:25, Defe. dant Stone says, "He's (Klayman) never actually won a courtroom victory in his life."
>
> At 1:30, Defendant Stone says, "He (Klayman) was ousted at Judicial Watch. Ask Tom Fitton why he left. He was 'ousted' because of a 'sexual harassment complaint.'"
>
> At 1:37, Defendant Stone says, "He's (Klayman) incompetent, he's a numbskull, he's an idiot, he's an egomaniac, and he could be the single worst lawyer in America. With him as Jerry Cori's lawyer, Corsi may get the electric chair. So your idea that he's a good guy is entirely wrong."
>
> At 2:01, Defendant Stone published that Plaintiff is "a piece of garbage."
>
> At 4:11, Defendant Stone says, "For those people out there who think . . . that Larry Klayman's IQ is higher than 70, you're wrong . . ."

Am. Compl. at ¶¶ 55, 56, 59, 61, 62.

56.     Defendant Stone acted with actual when he published the false, misleading and defamatory statements concerning me because he knew they were false or acted with a reckless disregard to their truth, as set forth herein.

57.     Defendant Stone not only acted with actual malice when he published the false, misleading and defamatory statements concerning me, but he also had motives to maliciously

defame me. He published the false and misleading statements knowing that they were false or with a reckless disregard for their truth. Defendant Stone had reason to know that his statements were false.

58.     Defendant Stone is aware of *many, many* victories of mine as he was in charge of putting together the book of my accomplishments for fundraising purposes for my U.S. Senate campaign, among other reasons.

59.     Since the time I let Defendant Stone go as my campaign manager in late 2003, Defendant Stone has tried to trade off my clients like a "scavenger." I have warned my clients not to become involved with him as, in my opinion and through my experience, Defendant Stone is not an honorable, ethical or honest person. He has been widely and rightly called a self-styled "dirty trickster" In my opinion, this characterization is accurate based on my experience dealing with him. *See* "Get me Roger Stone" on Netflix, https://www.netflix.com/title/80114666. He tried to trade off my clients for his own profit and purposes.

60.     When the National Enquirer contacted me in 2018 to get a comment on a story it was writing about President Donald Trump and to get my legal opinion on the Mueller investigation, I told the reporter not to quote me in the same article as Defendant Stone, or any article in which he wrote, as Defendant Stone wrote for the National Enquirer at the time. The National Enquirer is located in South Florida and is apparently close with Defendant Stone, a South Florida citizen. I did not want to be quoted or associated at all with Defendant Stone because I consider him – like others do – to be a self-styled dirty trickster who was likely going to be indicted for alleged criminal behavior by Mueller and in fact was indicted by Mueller.

61.     In 2018, I also told Alex Jones and his show producers on InfoWars that I did not want to appear on any show which included Defendant Stone or had ties to Defendant Stone,

either as a guest or as a host, because I strongly felt at the time that Mueller may indict Defendant Stone. Defendant Stone was at the time a host on InfoWars.

62.     I also warned Alex Jones not to release any information – that was potentially under seal in the contempt case of *Melendrez v. Arpaio*, 07-cv-02513 (D. Ariz. 2007) – which he may have improperly obtained from Defendant Stone or others concerning Dennis Montgomery, another whistleblower client of mine who contracted with the U.S. government so it could use his software capabilities for intelligence gathering.

63.     During the criminal trial of my client Cliven Bundy, again to try to scavenge off my clients, Defendant Stone flew to Las Vegas, Nevada where the Bundys lived and boasted that he could get a pardon for Cliven Bundy and his sons. I told Carol Bundy, Cliven's wife and the sons' mother, to stay away from Defendant Stone and she did.

64.     I also warned my then client at the time, Dennis Montgomery, to stay away from Defendant Stone.

65.     Defendant Stone wanted to – and did – intimate and threaten my client Dr. Corsi since he is a material witness in the Mueller investigation as Defendant Stone obviously feared that he would testify against him to Mueller. Defendant Stone feared me as Dr. Corsi's lawyer as he knew that I know what type of person he is and must have thought falsely that my representation of Dr. Corsi was my revenge for him having harmed me during my U.S. Senate campaign.

66.     In sum, Defendant Stone tried to trade off my clients and I shut this down every time in order to protect my clients from Defendant Stone. He also knew that I wanted nothing to do with him and I predicted early on in the Russian collusion investigation that Mueller would most likely indict Defendant Stone because of – in my experience with him – his rank dishonesty and dirty tricks.

67.     This, in addition to other information that will be meted out in discovery, supplies the motive to maliciously defame me. That he attacks my acumen and ability as a lawyer and defamed me personally with false sexual harassment complaint claims is directly related to my having kept him away from my clients.

68.     This vindictive, malicious retaliation by Defendant Stone had a logical purpose. He tried to intimate and threaten Dr. Corsi and me in order for us not to collaborate with Mueller. We obviously did not collaborate with Mueller but Defendant Stone is both unstable and unhinged (*See* CDs containing videos of defamatory statements and publications) and apparently paranoid and he tried to prevent collaboration at all costs in order to save his own skin. His conduct toward us is similar to his conduct toward Material Witness 2 in the Mueller investigation, Randy Credico, who he allegedly threatened "Mafioso style" to kill. He even allegedly threatened to kill Credico's service dog, for which he was in part indicted.

## DAMAGES

69.     As an attorney, I rely on my virtue and integrity, as my reputation and good will determines the amount of clients that come to me to earn a living for their legal matters in the public interest and privately.

70.     Any damage done to my reputation harms my ability to practice law as a lawyer, particularly in this circuit, which is my community. This also harms my work as an author, columnist and syndicated radio talk show host, all of which depend on reputation and good will.

71.     Defendant Stone's statements in this instance have caused harm to my reputation, good will and well being in this circuit, the United States, and globally, as I am also an international lawyer as previously set forth in this affidavit.

13

72.     There was never any single instance of someone making a sexual harassment complaint against me during my almost ten years at Judicial Watch. Defendant Stone's statements to the contrary are false and defamatory and made with actual malice.

73.     Defendant Stone acted with actual malice when he published that I was "ousted" because of a sexual harassment complaint because he knew that was false. Am. Compl. at ¶ 56. Defendant Stone knew or had reason to know that this was false, as he was my campaign manager when I left Judicial Watch.

74.     As set forth in my opposition to Defendants' motions to dismiss, which attaches the testimony of Fitton of Judicial Watch, this also proves the falsity of this statement. Indeed, both Fitton and Defendant Stone have been forced to testify under oath that they never spoke about my being "ousted." Defendant Stone thus fabricated this falsity, according to Fitton's sworn testimony.

75.     The damage done to me and my clients Dr. Corsi, Cliven Bundy, and the Gold Star parents of Extortion 17 whose sons died in combat in Afghanistan, because of Defendant Stone is continuing. As just one example, a person approached me in an elevator and told me that I was "ousted" at Judicial Watch.

76.     Defendant Stone acted with actual malice when he published all of the defamatory statements. He knew the statements were false or had a reckless disregard for their truth. He had reason to know his false and misleading statements were false.

77.     I was damaged financially, as well as to my reputation and good will, and emotionally, by the defamatory and other tortious acts of Defendant Stone.

78.     Each of the Defendants, Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars, is intimately familiar with my background, qualifications and successes as a public interest and private attorney. For this reason, I was previously invited to appear on Infowars on

14

many occasions before Defendants decided – at the direction of Defendant Stone – to defame my client, Dr. Corsi and me.

Affiant Sayeth Not

SWORN TO UNDER OATH THIS 30TH DAY OF SEPTEMBER OF 2020.

Larry Klayman

EXHIBIT 4

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| **DR. JEROME CORSI** and<br>**LARRY KLAYMAN**, | § <br> § <br> § | CIVIL ACTION NO. 1:20-CV-00298-LY |
| Plaintiffs, | § <br> § | |
| vs. | § <br> § | |
| **INFOWARS, LLC, FREE SPEECH<br>SYSTEMS, LLC, ALEX E. JONES,<br>DAVID JONES, OWEN SHROYER**, and<br>**ROGER STONE** | § <br> § <br> § <br> § | |
| Defendants. | § <br> § | |

## SWORN DECLARATION OF DR. JEROME CORSI

I, Dr. Jerome Corsi, being over eighteen years of age and duly competent to testify, hereby swear and affirm as follows:

1.      I have personal knowledge of the following facts and if called upon as a witness, could testify competently thereto.

2.      I graduated magna cum laude with a B.A. in Political Science and Economics from Case Western Reserve University in 1968.

3.      I received a Ph.D. in Political Science from Harvard University in 1972.

4.      For over twenty-five (25) years, I worked in banking and finance, establishing investment programs for banks in the United States and worldwide to create financial planning services for their retail customers.

5.      From 1968 to 1981, I worked at various universities where I conducted research on federally funded grants.

6.     In 1981, I published "Terrorism as a Desperate Game: Fear, Bargaining, and Communication in the Terrorist Event" in *Journal of Conflict Resolution*, a mathematical game-theoretical model for predicting the outcome of terrorist events.

7.     The content of my publication resulted in a top-secret clearance by the U.S. Department of State's ("State Department") Agency for International Development, where I joined a team of psychiatrists and psychologists to develop a hostage-survival training program for State Department's officials overseas.

8.     Since 2004, I have published over twenty-five (25) books, seven (7) of which were *New York Times* Bestsellers, including two (2) #1 *New York Times* Best-sellers.

9.     In addition to being a New York Times Bestselling author, I am also an investigative journalist and political analyst.

10.    I currently hold active Life & Health insurance licenses, as well as Property & Casualty insurance licenses in New Jersey.

11.    For over twenty (20) years, I have been a licensed National Association of Security Dealers registered representative, currently holding FINRA-registered licenses as a Registered Principal, Financial Principal, Options Principal and Municipals Principal.

12.    I have been a frequent guest on radio and television shows, including but not limited to appearances on CNN, Fox News, Fox Business, MSNBC, and on Infowars, before having been defamed by Defendants.

13.    I personally know Defendant Roger Stone ("Defendant Stone") and he personally knows my qualifications and me. I have even ghostwritten books for Defendant Stone and we used to be friends and colleagues. Defendant Stone is thus intimately familiar with my personal and professional history.

14.     In 2016, after the presidential election, I worked very closely with Alex Jones and his father David Jones, as well as with the Infowars staff, including Owen Shroyer. I made multiple trips to Austin, Texas, to appear live in-studio on Infowars broadcasts. I accepted an assignment from Alex Jones to create for Infowars a news bureau in Washington, D.C. From the beginning, I found Alex Jones to be erratic, subjects to emotional outbursts, even reacting that I was trying to "steal his company" when with his father's assistance, I brought a multi-million dollar legitimate investment offer from highly credible sources to the table to discuss the proposal with Alex and his father.

15.     Several times, concerned that I might quit over how badly Alex Jones was treating me, Dr. Jones met with me privately, often over breakfast. In those breakfasts, I counseled Dr. Jones over my concerns that Alex should seek professional psychological help. While in my work under various contracts with federal government agencies to consult over anti-terrorism tactics, I had the opportunity to work with very experienced psychiatrists and psychologists. Still, I am not medically trained, and I cautioned Dr. Jones that the problems I perceived with Alex's behavior should be professionally evaluated by qualified medical professionals.

16.     My efforts to create a news bureau in the nation's capital failed because Alex Jones insisted that staff I wanted to hire must work for free as "interns." Throughout my 12 years at World Net Daily, I frequently had White House press credentials. In 2012, the Secret Service cleared me to work as "traveling press," riding on the Romney campaign airplane for the last 3 weeks of the presidential campaign. At no time was I ever denied press credentials at the highest levels was alcohol ever raised as an issue in the many extensive background checks I underwent. In the early 1980s, I received Top Secret clearance from the federal government to

work on anti-terrorism contracts with the Agency for International Development at the State Department in Washington, D.C.

17.     Throughout the time I spent with Infowars, Dr. Jones would typically pick me up at the Austin Airport to transport me to the downtown hotel where Dr. Jones had made my room reservations.  At various times, we had breakfast together, often on trips when he was returning me to the airport to depart Austin.

18.     I am today 74 years-old.  I have no alcohol-related offenses on my record.  Since the mid-1980s, I have held securities licenses, first with the NASD and now with FINRA, agencies that conduct licensing in the securities industry for the federal government.  My securities records over that time, contain no customer complaints and no reports of behavior problems of any kind, including no alcohol-related problems.  I also have held for decades property and casualty as well as life and health insurance licenses in New Jersey.  I have created two broker/dealers in my financial services career.

19.     On my website, CorsiNation.com — a website I founded and managed as CEO — I conduct a daily hour-long podcast, live-streamed on multiple Internet channels simultaneously. I hold a Ph.D. from Harvard University's Department of Political Science, dating back to 1972.  I appear regularly on various news programs, including those broadcast by the major networks.  I have conducted thousands of radio interviews going back to 2004, when I entered the third phase of my career, currently working full-time as an investigative journalist and political commentator.

20.     Charges of alcoholism by the Defendants including broadcast charges made by Alex Jones and Defendant Roger Stone, have no basis in fact or substantiation in the extensive public record that exists of my life and professional career.

4

21.     Special Counsel Robert Mueller indicted Defendant Stone on seven counts of perjury, witness tampering and obstruction of justice.

22.     The Honorable Amy Berman Jackson who presided over Defendant Stone's prosecution, placed a gag order on him in part for threatening the judge herself by posing an Instagram meme of a crosshairs (gun) to her head.

23.     The seven-count indictment against Defendant Stone included lying under oath, witness tampering and obstruction of justice by threatening to kill a material witness, Randy Credico ("Credico") and his service dog if Credico did not lie or invoke the Fifth Amendment to government authorities concerning his involvement with Defendant Stone. Credico is Person 2 in the indictment. I am Person 1. Defendant Stone was later convicted of all seven (7) felony counts.

24.     Based on my personal knowledge of the interactions of Defendant Stone and the other Defendants, I assert that Defendant Stone, acting in concert with the other Defendants including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars, began a calculated and premeditated public relations campaign against my lawyer, Mr. Larry Klayman ("Mr. Klayman") and myself.

25.     Defendant Stone knew of his imminent indictment and therefore began his malicious crusade against Mr. Klayman and myself in order to influence public opinion and Special Counsel Robert Mueller by trying to attribute guilt to me.

26.     It is apparent that the malicious crusade against me by Defendants, who acted in concert, was calculated to coerce me to testify falsely at Defendant Stone's criminal trial.

27.     Defendant Stone, acting in concert with the other Defendants, also sought to divert funds away from my legal defense fund, while boosting his own.

28.      Contrary to Defendant Stone's false publication, I am not "certifiably insane and I have not "told multiple provable lies." Compl. at ¶ 26. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

29.      Contrary to Defendant Stone's false publication, I am not "mentally degraded to the point of [] dementia." Compl. at ¶ 42. I do not have dementia and have never been diagnosed with any mental illness. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

30.      Importantly, I was under contract with Infowars until the relationship ended and Defendants would not have retained me if I was "mentally degraded to the point of [] dementia." Compl. at ¶ 42.

31.      Contrary to Defendant Stone's false publication, he never saw me at a steakhouse where I was "on the ground at another table" where security staff "thought that [I] was dead in the elevator." Compl. at ¶ 43. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

32.      Contrary to Defendant Stone's false publication, I never suffered a stroke and it is a false statement of fact that "whatever comes out of [my] mouth ain't the truth." Compl. at ¶ 44. In publishing this false statement that Defendants knew to be false or published recklessly

because they are intimately familiar with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

33. Contrary to Defendant Stone's false publication, I was not "fired from World Net Daily." Compl. at ¶ 49. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

34. Contrary to Defendant Stone's false publication, I was not "perfectly willing to lie, to perjure [myself] saying that a memp that [I] had [written] [Defendant Stone] on the 30th for the purposes of cover-up . . . which is further proof that [I] lied under oath." Compl. at ¶ 50. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

35. Contrary to Defendant Stone's false publication, I do not have a "feeble alcohol affected memory." Compl. at ¶ 51. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

36. Contrary to Defendant Stone's publication, I was not "prepared to stab a principle Trump supported in the back" nor was I "perfectly prepared to bear false witness against [Defendant Stone]." Compl. at ¶ 52. In publishing this false statement that Defendants knew to

be false or published recklessly because they are intimately familiar with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

37. Contrary to Defendant Stone's publication, it is a false statement of fact that "all [Defendant Stone] ever did was show [me] friendship and support and try to help [me] and [my] family and what [Defendant Stone] got was Judas Iscariot, the willingness to testify against [Defendant Stone] and help the deep state bury [Defendant Stone] . . . and then [I] make[] up this story about helping [Defendant Stone] formulate a cover story." Compl. at ¶ 53. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

38. Contrary to Defendant Stone's false publication, it is a false statement of fact that "you can always tell when [I] [am] lying because [my] lips are moving . . ." Compl. at ¶ 54. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

39. Contrary to Defendant Stone's false publication, it is a false statement of fact that Mr. Klayman "never actually won a courtroom victory in his life." Compl. at ¶ 55. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

40. Contrary to Defendant Stone's false publication, it is a false statement of fact that Mr. Klayman "was ousted at Judicial Watch. Ask Tom Fitton why he left .he was 'ousted' because of a sexual harassment complaint." Compl. at ¶ 56. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar Mr. Klayman and with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

41. Contrary to Defendant Stone's false publication, it is a false statement of fact that Mr. Klayman is "incompetent, he's a numbskull, he's an idiot, he's an egomaniac, and he could be the worst single lawyer in America. With him as [my] lawyer, [I] may get the electric chair. So [the] idea that he's a good guy is entirely wrong." Compl. at ¶ 59. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with Mr. Klayman and me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

42. Contrary to Defendant Stone's false publication, it is a false statement of fact that Mr. Klayman is "a piece of garbage." Compl. at ¶ 61. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with Mr. Klayman and me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

43. Contrary to Defendant Stone's false publication, Mr. Klayman's IQ is higher than 70. Compl. at ¶ 62. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

44.     Contrary to Defendant Stone's false publication, it is a false statement of fact that "[I] was perfectly willing to bear false witness against [Defendant Stone] on multiple points that are complete fabrications." Compl. at ¶ 64. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

45.     Contrary to Defendant Stone's false publication, it is a false statement of fact that "[I] had told a number of lies. In fact, [I] [am] starting to conflate [my] lies . . . [I] was perfectly willing to lie about [Defendant Stone] . . . but now lying about Alex Jones, lying about Infowars, lying about Dr. [David] Jones . . . [I] can no longer be believed." Compl. at ¶ 65.

46.     Defendant Stone falsely published: "I think you've [Corsi] been deep state from the beginning. Your whole birther thing is used as a club to destroy conservatives . . . **I look forward to our confrontation. I will demolish you.** You're a fraudster, out of your alcoholic haze you have made up lies about David Jones and Alex Jones and Roger Stone and now I suspect they want you to lie about the President." Compl. at ¶ 66 (emphasis added). Not only does Defendant Stone know this to be false but this malicious rant is also a threat. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with me,, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

47.     Contrary to Defendant Stone's false publication, I am not a "spook, back and forth with different agencies[.]" Compl. at ¶ 67. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with me,

10

as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

48.     Contrary to Defendant Stone's false publication, it is a false statement of fact that sometimes I am "not being able to walk" which creates the false and defamatory implication that I am an alcoholic. Compl. at ¶ 68. I am not an alcoholic. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

49.     As an investigative journalist, as well as my other professions and hobbies, I rely on my virtue and integrity.

50.     My reputation determines everything from the amount of books I sell to the frequency of my radio and television appearances.

51.     I have ghostwritten books for Defendant Stone and he intimately knows my qualifications and me. Thus, Defendant Stone and the other Defendants falsely published these statements when they knew them to be false or at least with a reckless disregard for their truth.

52.     Defendant Stone, acting in concert with Defendants Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars, has caused severe harm to my reputation, good will and well-being, financially and otherwise. They also caused my family and me severe emotional distress for which I have had to seek medical care.

SWORN TO UNDER OATH THIS 30TH DAY OF SEPTEMBER OF 2020.

Dr. Jerome Corsi

11

EXHIBIT 5



# Transcript of Thomas J. Fitton

**Date:** June 6, 2019
**Case:** Klayman -v- Fitton

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
www.planetdepos.com

WORLDWIDE COURT REPORTING | INTERPRETATION | TRIAL SERVICES

Transcript of Thomas J. Fitton
Conducted on June 6, 2019

---

**1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE SOUTHERN DISTRICT OF FLORIDA
 3
 4  LARRY KLAYMAN,            *
 5        Plaintiff,          *
 6     vs.                    * Civil Action
 7  THOMAS FITTON,            * No. 1:19-cv-20544
 8        Defendant.          *
 9
10
11
12      Videotaped Deposition of THOMAS J. FITTON
13               Washington, D.C.
14           Thursday, June 6, 2019
15                  3:06 p.m.
16
17
18
19  Job No.: 247643
20  Pages 1 - 92
21  Reported by:  Vicki L. Forman
22
23
24
25
```

---

**2**

```
 1        Videotaped Deposition of THOMAS J. FITTON,
 2  held at the offices of:
 3
 4      Planet Depos
 5      Suite 950
 6      1100 Connecticut Avenue, Northwest
 7      Washington, D.C.  20036
 8      (888) 433-3767
 9
10
11
12          Pursuant to agreement, before Vicki L.
13  Forman, Court Reporter and Notary Public in and
14  for the District of Columbia.
15
16
17
18
19
20
21
22
23
24
25
```

---

**3**

```
 1              A P P E A R A N C E S
 2
 3  ON BEHALF OF THE PLAINTIFF PRO SE:
 4      LARRY KLAYMAN, ESQUIRE
 5      Klayman Law Group, P.A.
 6      Suite 345
 7      2020 Pennsylvania Avenue, Northwest
 8      Washington, D.C.  20006
 9      (310) 595-8088
10
11
12
13  ON BEHALF OF THE DEFENDANT:
14      RICHARD W. DRISCOLL, ESQUIRE
15      Driscoll & Seltzer
16      Suite 610
17      300 North Washington Street
18      Alexandria, Virginia  22314
19      (703) 822-5001
20
21
22
23
24
25
```

---

**4**

```
 1  ON BEHALF OF THE DEFENDANT:
 2      KATIE M. MERWIN, ESQUIRE
 3      Cole, Scott & Kissane, P.A.
 4      Suite 120
 5      222 Lakeview Avenue
 6      West Palm Beach, Florida  33401
 7      (561) 383-9206
 8      (Present via Telephone.)
 9
10
11
12  ALSO PRESENT:  Joannis Arsenis, Videographer
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Transcript of Thomas J. Fitton
Conducted on June 6, 2019

---

41

1    MR. KLAYMAN:  Certify it.
2    Q So as President of Judicial Watch you
3 would have known for sure that this Complaint had
4 been filed, correct?
5    MR. DRISCOLL:  Objection to form.
6    **A Well, the press release indicates it was**
7 **filed and I recall we sued about the raid, yes.**
8    Q And you gave interviews about suing in the
9 raid, correct, in the media?
10    **A I don't remember.**
11    Q Turn to the last page, page five.
12    The Complaint is signed by James F
13 Peterson, correct?
14    **A His name is on the last page of the**
15 **Complaint as a signatory.**
16    Q He is an attorney at Judicial Watch,
17 correct?
18    **A Yes.**
19    Q Now, Mr. Peterson had contact with Roger
20 Stone over the issue of the raid on his house, did
21 he not?
22    **A Not that I'm aware of.**
23    MR. DRISCOLL:  Objection to form.
24    Q You're saying you don't know one way or
25 the other?

---

42

1    **A I don't believe he has.  I said I would**
2 **know if he had.**
3    Q How would you know if you couldn't even
4 identify the Complaint?
5    **A Another abusive harassing question.**
6    MR. DRISCOLL:  It's a foundation question.
7 You can go ahead and answer it.
8    How would you know if he had contacted
9 Roger Stone?
10    MR. KLAYMAN:  Or if Roger Stone contacted
11 him.
12    **A Is it privileged?**
13    MR. DRISCOLL:  That's an interesting
14 question.  The fact of the communication would not
15 be.  The contents of it would be.
16    **A How I would know is my question of whether**
17 **it's privileged or not.**
18    MR. DRISCOLL:  No, I'm going to allow you
19 to answer that one.
20    **A How I would know about what my attorneys**
21 **are doing or Judicial Watch's attorneys are doing?**
22    MR. DRISCOLL:  Yeah, and you're not
23 disclosing a communication.  You're just
24 describing a process.
25    **A Typically that type of communication would**

---

43

1 **have been disclosed to me.**
2    Q But you don't know for sure that
3 Mr. Peterson didn't have contact with Roger Stone?
4    MR. DRISCOLL:  Objection to form.
5    **A I'm confident there was no such contact.**
6    Q You have told Mr. Peterson in the past,
7 have you not, that I was ousted from Judicial
8 Watch because of a sexual harassment complaint?
9    MR. DRISCOLL:  Objection to form.
10 Mr. Peterson is an in-house counsel and I'm going
11 to direct the witness not to answer.  That's an
12 attorney-client privilege.
13    MR. KLAYMAN:  Certify it.
14    Q So you don't know whether or not
15 Mr. Peterson repeating what you had told him then
16 republished that to Roger Stone?
17    MR. DRISCOLL:  The communications between
18 an in-house counsel and the President of the
19 corporation relating to legal advice and
20 assistance are privileged.  He can't answer the
21 question about the contents of the communication
22 or derivative questions that would disclose the
23 content of the communication.
24    MR. KLAYMAN:  That's the crux of the
25 lawsuit.  That does not apply in this context.

---

44

1    MR. DRISCOLL:  That doesn't waive the
2 privilege.
3    Q Are you saying that you never told anyone
4 at Judicial Watch that I was ousted because of a
5 sexual harassment complaint?
6    MR. DRISCOLL:  Anyone other than the
7 attorneys?
8    MR. KLAYMAN:  Anyone.
9    MR. DRISCOLL:  No, I can't allow him to
10 answer that question.
11    Q Are you saying that you never told anyone
12 that I was -- regardless -- let's take attorneys
13 out of it.
14    Have you ever -- you have told other
15 people in addition to -- strike that.
16    You have told other people excluding
17 attorneys that I was ousted from Judicial Watch
18 because of a sexual harassment complaint?
19    **A You have to ask the question again.**
20    MR. KLAYMAN:  Read it back, please.
21    **A Please.**
22    MR. KLAYMAN:  Let me rephrase it.
23    Q I'm taking attorneys out of this question.
24 I'm saying you have told others who aren't
25 attorneys over the course of the last 16 years

---

45

1  since I left Judicial Watch that I was ousted
2  because of a sexual harassment complaint?
3      A  No, because that's not true.  You weren't
4  ousted as a result of a sexual harassment
5  complaint.
6      Q  After I sued you in this particular case
7  has anyone -- have you or anyone at Judicial Watch
8  or your counsel tried to contact Roger Stone?
9      MR. DRISCOLL:  Objection to form.  The
10 question invades the attorney-client privilege and
11 the attorney work product.  I direct the witness
12 not to answer.
13     MR. KLAYMAN:  Certify it.
14     Madam court reporter, have a page in the
15 front where you have all the certified questions
16 and where you can find them to make it easy for
17 the Magistrate Judge.  Thank you.
18     Q  Now, I turn your attention back to your
19 affidavit which is --
20     A  Exhibit 3.
21     Q  Exhibit 3.  Turn your attention to
22 paragraph seven where it says "I have no
23 recollection of ever having any communication with
24 Roger Stone," do you see that?
25     A  Uh-huh.

46

1      Q  Now, it doesn't say you didn't have a
2  communication with Roger Stone.  It just says that
3  you have no recollection of having one, correct?
4      A  That's correct.
5      Q  Do you remember during the Clinton years
6  that witnesses would always come in and say we
7  have no specific recollection and we would contest
8  that?
9      MR. DRISCOLL:  Just ask your question,
10 Larry.
11     Q  So you can't say categorically that you
12 haven't had communications with Roger Stone?
13 You're just saying you don't have a recollection
14 of ever having it, correct?
15     A  I think the statement speaks for itself.
16     Q  You could have said I have never
17 communicated with Roger Stone, correct, if that's
18 what you were trying to say, that you never had
19 any contact?
20     A  The statement speaks for itself.
21     Q  Then you state in the next sentence "I
22 have never published, uttered or implied to Roger
23 Stone that Klayman was the subject of a sexual
24 harassment complaint during his employment by
25 Judicial Watch or that his resignation from

47

1  Judicial Watch was motivated by an employee's
2  sexual harassment complaint," do you see that?
3      A  Yeah.
4      Q  Again, that statement does not say that
5  you never spoke with Roger Stone, just that you've
6  never published that particular issue, correct?
7      A  It says what it says.
8      Q  And then it states "Any statement by Roger
9  Stone regarding Klayman was made without my
10 knowledge or information and therefore I did not
11 intend and could not intend to harm Klayman or his
12 reputation," do you see that?
13     A  Yes.
14     Q  Now, you're not saying in that statement
15 that you didn't communicate with Roger Stone.
16 You're saying that you didn't know that he was
17 going to republish anything about me, correct?
18     MR. DRISCOLL:  Objection to form.  The
19 document speaks for itself.
20     A  The document speaks for itself.
21     Q  If you don't want to explain it that's
22 fine.
23     A  You're mischaracterizing it.
24     Q  I do agree.  It speaks for itself and
25 there's a lot of loopholes in it.

48

1      MR. DRISCOLL:  Why don't you just ask him
2  the question.  Did he ever --
3      MR. KLAYMAN:  I will ask the questions
4  that I want to ask, Mr. --
5      MR. DRISCOLL:  All right.
6      Q  I want to turn to paragraph eight.
7      Do you see the statements in the last
8  sentence of paragraph eight where it says "To
9  support his claim Judicial Watch submitted
10 evidence demonstrating that Klayman was forced to
11 resign due to inappropriate conduct" and you list
12 three examples of your alleged inappropriate
13 conduct, do you see that?
14     A  Yeah.
15     Q  Now, you have in the last 16 years told
16 many people, and I'm excluding any attorneys,
17 exactly what is written in this affidavit and
18 which you swore to under oath?
19     MR. DRISCOLL:  I'm going to object to the
20 question and direct the witness not to answer that
21 question to the extent it's related to the other
22 lawsuit that is currently pending in the U.S.
23 District Court for the District of Columbia, Case
24 Number 06-cv-670.
25     MR. KLAYMAN:  That's not a basis to tell

1          IN THE CIRCUIT COURT OF THE SEVENTEENTH CIRCUIT
2       IN AND FOR BROWARD COUNTY AND THE FIFTEENTH JUDICIAL
         CIRCUIT FOR PALM BEACH COUNTY, FLORIDA, FLORIDA

3

4   LARRY KLAYMAN,
                                    CASE NO. 19-011394
5              Plaintiff,

6      -vs-

7   ROGER STONE,

8              Defendant.
    _____/
9

    JEROME CORSI, et al
10
                    Plaintiff
11

12     vs.                    CASE NO. 50-2019-CA-013711

13

    ROGER STONE, et al
14
                    Defendant
15  _____/

16

17            VIDEOTAPED DEPOSITION OF ROGER STONE

                        VOLUME I OF II
18

                  Wednesday, February 12, 2020
19                   9:42 a.m. - 4:28 p.m.

20

             110 Southeast 6th Street, Suite 1700
21               Fort Lauderdale, Florida 33301

22

    Stenographically Reported By:
23  PATRICIA BAILEY-ENTIN, FPR
    Notary Public, State of Florida
24  BAILEY & ASSOCIATES REPORTING, INC.
    Fort Lauderdale Office
25  Phone - 954-358-9090

```
 1            But let's start with my sworn affidavit on top,

 2      and I'll ask that that be marked.  It -- it entails --

 3            MR. KLAYMAN:  And you can just mark it right in

 4         the book --

 5            THE REPORTER:  Sure.

 6            MR. KLAYMAN:  -- to make it easy.

 7            That's Exhibit 2 to the Stone deposition and it

 8         entails 59 pages.

 9            (Plaintiffs' No. 2, Affidavit of Larry Klayman,

10      was marked for Identification.)

11      BY MR. KLAYMAN:

12         Q.   You are aware, Mr. Stone, that I'm the founder

13      of Judicial Watch?

14         A.   I am.

15         Q.   You've spoken to Tom Fitton, haven't you?

16         A.   One time in my entire life.  I saw him

17      backstage at a conference in -- at Dural, maybe a couple

18      months ago, and we -- we shook hands in passing.  Beyond

19      that, I've never spoken to the man.

20         Q.   You've spoken to others at Judicial Watch,

21      though, haven't you?

22         A.   No, actually, I haven't.  Not that I recall.

23         Q.   You -- you may have, but you just don't recall?

24         A.   I don't recall ever speaking to anyone at -- at

25      Judicial Watch.  I couldn't name anybody else at
```