# KLAYMAN LAW GROUP

## A PROFESSIONAL ASSOCIATION

Larry Klayman, Esq.

7050 W. Palmetto Park Rd
Boca Raton FL 33433.

Tel: 561-558-5336
Leklayman@gmail.com

# URGENT

October 10, 2021

Via Federal Express

Honorable Orlando L. Garcia
Chief Judge
U.S. District Court for the Western District of Texas
655 E. Cesar E. Chavez Blvd
San Antonio, TX 78206

**Re: <u>REQUEST FOR INVESTIGATION IN *CORSI V. INFOWARS LLC, ET AL*, 1:20-CV-298 (W.D. TX.)</u>**

Dear Chief Judge Garcia:

Mr. Sanjay Biswas and I, as counsel for the Plaintiffs in the above styled case, hereby respectfully request an investigation by you and other appropriate persons and entities of otherwise inexplicable, strange, injudicious, if not suspicious conduct by former Magistrate Judge Andrew Austin and Judge Lee Yeakel, which resulted in not just an egregious miscarriage of justice in this case but belies the administration of justice in general.

Underscoring this are the repeated simple requests by Mr. Biswas and me for both jurists to conduct a hearing on dispositive motions filed by Defendants Infowars, LLC, Free Speech Systems, LLC, Alex Jones, David Jones, and Owen Shroyer. However, rather than providing us with full due process, or even responding to our requests for a hearing, they then issued outrageous rulings which are both factually and legally flawed and in error to the extreme. Attached in this regard is a sampling of relevant pleadings which set this out.

At the outset of this case which was transferred by the U.S. District Court for the District of Columbia to your honorable Court, Judge Yeakel boasted about how he likes to move cases along and disfavors all but the most compelling dispositive pre-trial motions. He, however, did not take charge but instead then assigned substantive case dispositive motions to Magistrate Judge Austin. Here is what Judge Yeakel said at a status conference on May 21, 2020:

> You're going to have to figure how much time you want because once I get it set,
> once I fill in after a subsequent conference your trial month and final pretrial

conference date and time, you're not likely to get a continuance or a postponement.

I like to try lawsuits. If I had my way and could pass one law, I would do away with motion practice altogether, and you would either settle your case or try your case, the way it was in the olden days.

After the referral to Magistrate Judge Austin, Austin, showing no understanding of the issues, refused to have a substantive hearing on the Defendants' dispositive motions and then after eight (8) months of unconscionable delay, on the eve of his retirement, issued a Report and Recommendation which strangely made no sense, factually or legally. Then, when an objection was filed, Judge Yeakel, also strangely refused to hold a hearing on the objection and later a motion for reconsideration and to amend the complaint. Instead Judge Yeakel simply rubber stamped the gross errors in Magistrate Judge Austin's Report and Recommendation. These contrived findings are grossly flawed in the following respects:

(1) Magistrate Judge Austin and the Judge Yeakel usurped the role of the jury, which is especially egregious at the motion to dismiss stage.

(2) Magistrate Judge Austin and the Judge Yeakel ignored the allegations in the complaint that Defendants were working together in concert.

(3) Magistrate Judge Austin falsely found that Plaintiffs did not allege actual malice.

(4) Magistrate Judge Austin and then Judge Yeakel falsely found that the Defendants' false statements were just opinion and not unactionable as defamation.

(5) Magistrate Austin made other false factual and legal findings which showed that he did not thoroughly review the record or did review it but ruled the way he did for other improper reasons. For instance, he recommended dismissal of the Amended Complaint against Defendant David Jones without prejudice on page 10, but then, deciding on his own that even leave to amend would be futile, writes at page 17 "…the undersigned recommends that the Court not permit Corsi or Klayman leave to amend, and dismiss (all) the claims with prejudice."

(6) Magistrate Judge Austin and then Judge Yeakel falsely dismissed valid Lanham Act claims which were properly pleaded.

(7) For good measure, Magistrate Austin also suggested that Plaintiffs should be sanctioned, when ironically, he is the one who should be held to account for what appear to be an intentional effort to deprive parties of their constitutional and other rights.

Then, when we asked for a hearing again along with a Motion for Reconsideration, Judge Yeakel again gave our arguments short shrift, refusing over and over again to allow for a hearing, which would have aided the Court in sorting out it's gross errors. A review of the record will show multiple requests for a hearing, which were ignored to this day.

The bottom line is this; for whatever reason the proper and honest administration of justice has not occurred, and this has resulted in a miscarriage of justice and harm to the Plaintiffs. And it is hard to understand why Plaintiffs have never even been granted a substantive hearing before these prejudicial, "cooked" and fatally flawed rulings were issued.

Just last Wednesday, in another case in Florida, an understandably confused state judge, mistakenly giving *res judicata* effect to Judge Yeakel's ultimate rulings, dismissed as parallel action, which had been filed before the case in your honorable Court, causing great prejudice to Plaintiff Larry Klayman.

Your Honor, these is something not right here. A review of the enclosed pleadings will bear this out conclusively.

For these reasons, we are also requesting that the U.S. Attorney and the Austin Field Office of the Federal Bureau of Investigation also investigate the strange events that have occurred in this case involving Infowars, Alex Jones, their Las Vegas counsel Marc Randazza,[1] and Roger Stone, a self-styled, proud and notorious dirty trickster, and worse a seven-count convicted felon who, at a minimum,  claims admiration for the Mafia, for making false statements to the government, witness tampering through threatening witnesses and obstruction of justice. *See* Enclosure.

A review of the record will support our more than great concerns about how and why this case has been administered to contrary to fact and law, and why Mr. Biswas and I cannot even get a simple hearing. The bottom line: something improper may have occurred, and Mr. Biswas and I do not say this lightly. There seems to be no other explanation.

Thank you in advance for your prompt consideration. We look forward to hearing from you with all due speed, since justice delayed is justice denied. The ethical and legal integrity of your honorable Court is seriously at issue, which must be addressed and dealt with by you and others regardless of our right to appeal to the U.S. Court of Appeals for the Fifth Circuit.

Sincerely,

Larry Klayman, Esq.

Sanjay Biswas, Esq.

---

[1] See Luke O' Brien, "Alex Jones Lawyer Violated Legal Ethics By Soliciting Porn Bribes. Just How Dirty is Marc Randazza?," Huffington Post (Dec. 27, 2018). Enclosed.

cc: Ashley Chapman Hoff, Esq.
   United States Attorney
   903 San Jacinto Boulevard
   Suite 334
   Austin, Tx. 78701


   Special Agent-In-Charge
   Federal Bureau of Investigation
   12515-7 Research Boulevard
   Suite 400
   Austin, Texas 78759

   Via Federal Express


cc: Jay Marshall Wolman, Esq., jmw@randazza.com
   Bradley Reeves, Esq., brad@brtx.law
   Marc J. Randazza, Esq., mjr@randazza.com
   David S. Wachen, Esq., david@wachenlaw.com
   Robert Buschel, Esq., buschel@bglaw-pa.com
   Grant Smith, Esq., gsmith@strategysmith.com
   Counsel for Defendants

   *Via Email*

# KLAYMAN LAW GROUP

### A PROFESSIONAL ASSOCIATION
#### 7050 W. Palmetto Park Rd
#### Boca Raton FL 33433.

Larry Klayman, Esq.

Tel: 561-558-5336
Leklayman@gmail.com

# URGENT

October 11, 2021

Via Federal Express and Via Email

Honorable Orlando L. Garcia
Chief Judge
U.S. District Court for the Western District of Texas
655 E. Cesar E. Chavez Blvd
San Antonio, TX 78206

## Re: Supplement to Request for Investigation in Corsi et. al v. Infowars LLC et. al, 1:20-CV-298 (W. D. Tx)

Dear Chief Judge Garcia:

On October 10, 2021, Mr. Biswas and I sent to you the enclosed Request *FOR INVESTIGATION IN CORSI V. INFOWARS LLC, ET AL, 1:20-CV-298 (W.D. TX.)*, which I am attaching without the exhibit s which was sent with this prior communication.

One very important point was not stressed in this communication, although it was set forth and briefed in the enclosed pleadings.

Telling in terms of the seriousness of this matter is that Magistrate Judge Andrew Austin and later Judge Lee Yeakel refused to allow discovery, creating a presumption that their rulings were subject to extra-judicial bias and prejudice, or worse. It would appear that, for whatever improper reason, there was a predetermined mindset, which generated the bizarre and non-sensical rulings -- made in a total vacuum -- that resulted in the unjust dismissal of this case with prejudice.

To further the integrity of the administration of justice and your otherwise honorable Court an expedited investigation is respectfully requested, quite apart from any appeal to the U.S. Court of Appeals for the Fifth Circuit.

Thank you for your immediate consideration and action.

Sincerely,

Larry Klayman, Esq.

Sanjay Biswas, Esq.

cc: Ashley Chapman Hoff, Esq.
 United States Attorney
 903 San Jacinto Boulevard
 Suite 334
 Austin, Tx. 78701


 Special Agent-In-Charge
 Federal Bureau of Investigation
 12515-7 Research Boulevard
 Suite 400
 Austin, Texas 78759

 Via Federal Express


cc: Jay Marshall Wolman, Esq., jmw@randazza.com
 Bradley Reeves, Esq., brad@brtx.law
 Marc J. Randazza, Esq., mjr@randazza.com
 David S. Wachen, Esq., david@wachenlaw.com
 Robert Buschel, Esq., buschel@bglaw-pa.com
 Grant Smith, Esq., gsmith@strategysmith.com
 Counsel for Defendants

 *Via Email*



HuffPost image

# Alex Jones' Lawyer Violated Legal Ethics By Soliciting Porn Bribes. Just How Dirty Is Marc Randazza?

America's foremost attorney for far-right extremists wanted "a little gravy," then lied to cover it up. That's just part of his twisted journey through a lax legal system.

By Luke O'Brien  |  12/27/2018 03:09 pm ET  |  **Updated** Dec 27, 2018



One morning this June, a group of lawyers filed into the office of the State Bar of Nevada and closed the door. It was summer in Las Vegas, the morning temperature already nearing 100 degrees, but inside the low-slung tan building, the lawyers had a chilly question to address: what to do about one of their own.

Marc Randazza had been a problem for years.

Randazza, who represents conspiracy theorist Alex Jones and many other far-right extremists, had long relied on lawyer buddies to pump his public image. By their telling and his own, Randazza was a First Amendment "badass." But he was a combative badass, even vicious, and he'd left a trail of bad blood and trampled ethics behind him.

Randazza had made enemies. Plenty of them. But he was cunning. He'd sidestepped previous bar complaints and once avoided paying $600,000 in damages to his former employer by filing for bankruptcy and having his malpractice insurance kick in. Randazza was lucky, too. When an appeals court assigned a panel of judges to look into his misrepresentations in court under oath, the underlying case settled before the panel could meet. So off Randazza went, scuttling along through the Mojave as unaccountable as a scorpion.




Bar had been aware of allegations that Randazza violated ethics rules in 2011 and 2012 while working for pornographers. By the time the lawyers met in Vegas to decide his fate, Randazza had attained a new level of notoriety.

Since Donald Trump's election, he had become, as much as any attorney in America, a legal crowbar for far-right grifters and goons to leverage the protections of democracy in an effort to undermine them. And although Randazza had taken on legitimate free speech cases in the past, he'd grown curiously chummy with fascists and racists who use defamation, harassment and threats to silence others.

Aside from Jones, Randazza and his firm represented neo-Nazi publisher Andrew Anglin; white nationalist Republican congressional candidate Paul Nehlen; white supremacist patriarch Jared Taylor; Holocaust-denying slanderer Chuck Johnson; Pizzagate peddler Mike Cernovich; pro-rape misogynist Daryush "Roosh" Valizadeh; an alt-right member who helped organize the deadly white supremacist rally in Charlottesville, Virginia; the booking agent for white nationalist Richard Spencer; 8chan, an online message board teeming with neo-Nazis; and Gab, the alt-right social media platform where Robert Bowers, who allegedly killed 11 people at a synagogue in Pittsburgh in October, appears to have radicalized himself.

In Randazza, these extremists had found their own bush league Roy Cohn, the attorney who in a pre-internet era served as the "legal executioner" for right-wing thugs such as Trump and Joseph McCarthy and repped mafia bosses like Carmine "Lilo" Galante and "Fat Tony" Salerno. (Cohn was disbarred for "dishonesty, fraud, deceit and misrepresentation" shortly before he died in 1986.)

Like Cohn, Randazza was willing to go on the offensive for authoritarians. And like Cohn, Randazza's legal license and bunco man's talent for beguilement made him as problematic as some of the people he represented. This summer, a former federal judge who'd scrutinized Randazza's unethical behavior in an arbitration proceeding described the attorney as nothing short of a danger to the public.

Certainly, Randazza's misbehavior had *happened* in public — it was all there in the court records for anyone who cared to slog through them, a testament to how easily a bad actor with the right credentials can abuse a system that assumes candor from its professional class, not to mention an illustration of how white-collar privilege can abet white-collar wrongdoing in America. Like a Wall Street banker selling bad debt or a well-connected U.S. Supreme Court nominee fibbing under oath, Randazza had been given a pass. Until now.

The backstory to what he'd done was complicated, the details sordid. The short of it is this: While working as the in-house general counsel for gay pornographers a few years ago, he solicited bribes, embraced conflicts of interest, relied on ill-gotten privileged information to gain a legal advantage, made misrepresentations about his fees to various courts and despoiled evidence of his treachery, according to an arbitrator's


Randazza's own admissions and thousands of pages of court records.

But what was the Nevada Bar prepared to do about it?

## A Troll Is Born

Randazza grew up in Gloucester, Massachusetts, where his Sicilian family immigrated, worked as fishermen and gained repute as champion traversers of greased poles during the town's annual St. Peter's Fiesta. Randazza chose a different path. In high school, he was voted "most likely to be dead or in jail" by 25. He claims to have failed out of the University of Massachusetts three times.

Twenty-year-old Randazza enlisted in the U.S. Army during one hiatus from college with the goal of becoming a psychological operations soldier, according to military records obtained by HuffPost. He lasted less than five months in the Army. Randazza completed boot camp and airborne "jump school" training but appears to have washed out of psy-ops training and was discharged for undisclosed reasons during the Gulf War.

He returned to the University of Massachusetts and plunged into controversy. A school administrator at the time remembers Randazza as "an oppositional personality" who was "just interested in burning stuff down." Randazza lived in Butterfield Hall, a dorm known for its drug-fueled parties, and took to flying a Jolly Roger flag from an antenna on the building's slate roof — an early, if misguided, free speech stand. Randazza, the former administrator said, egged on other students to climb on the steep roof. The school removed the flag several times because of safety concerns, only to have someone put it back up, at one point by allegedly using explosives to blast off metal bars the school had installed over windows to prevent students from accessing the roof. Randazza claimed the bars "rusted and fell out."

When one female student complained that the flag resembled the logo of White Aryan Resistance, a prominent neo-Nazi organization, Randazza mocked her concerns and covered a letter she'd written in crude sexual insults, according to the student newspaper. The insults, he said, were his "trademark."

## Butterfield once more

By MICHELLE ROBBINS
Collegian Staff

When Housing Services took down Butterfield residents' Jolly Roger flag last Wednesday and installed metal bars on stairwell windows, many residents were outraged and confused with Housing's behavior.

"The flag is a symbol of free thinking for Butterfield residents," said Marc Randazza, a junior journalism major.

A new Jolly Roger flag is now waving triumphantly on top of Butterfield Residential Hall's roof, defying all of Housing's attempts to keep residents off the roof.

There are discrepancies as to how the metal bars have since been removed. Brian O'Neil, a first year microbiology major, said the bars were removed by explosives. Another student, Randazza, said the bars rusted and fell out.

Residents said when Housing took away their flag they also took away Butterfield residents' individuality. "Housing is forcing the residents to obey and conform to their rules," said Georgina Grigson, a junior journalism major.

Residents said they couldn't understand why Housing focused so much attention and spent money to remove the flag and install bars when there are more

6/28/2021　　Alex Jones Lawyer Marc Randazza Leads a Career Built on Bankruptcies Divorce and Celebrity Scandals | HuffPost

Case 1:20-cv-00298-LY-DH　Document 170-8　Filed 11/16/21　Page 10 of 290



MASSACHUSETTS DAILY COLLEGIAN

It took Randazza seven years to graduate from UMass with a journalism degree in 1994. After college, he drifted for a few years — a period he vaguely refers to as his time as a "former news reporter," although scant evidence of his journalism career exists. Randazza filed at least two dispatches from Italy, where he now has dual citizenship, for the newsletter of the Order Sons of Italy in America, a national organization for people of Italian heritage.

In 1997, Randazza managed to get into Georgetown law school; he said he finished a "dead last" in his class. He caused a furor when he ran for the Student Bar Association using campaign posters that referenced penile implants. When the Women's Legal Association tore down the posters, Randazza protested to the dean that his political speech was being censored. He got to put his posters back up. "And then," Randazza gloated on one legal blog, "the WLA cow had to apologize to *me*."

Randazza completed his third year of law school at the University of Florida because, as he put it, he never fit in at Georgetown: "I found it to be too conformist and oppressive. I'm a hardcore left-wing guy, but at Georgetown, there was no room to dissent." (Georgetown is a large law school that graduates students from all walks of life and political backgrounds. Among them: Atlantic Media owner David Bradley, Federal Reserve Chairman Jerome Powell, House Majority Leader-elect Steny Hoyer, criminal Republican lobbyist Jack Abramoff, and criminal Republican lobbyist and former Trump campaign manager Paul Manafort.)

In almost every interview, Randazza describes himself as a "leftist" or a "libtard" or "so liberal" that he's "practically a communist," which might have been accurate in 1996, when he listed his party affiliation as the Socialist Workers Party, according to Florida voter registration records. But it wasn't in 2000, when Randazza volunteered for John McCain's presidential campaign. Since at least 2002, Randazza has been a registered and active Republican voter, according to both Florida and Nevada records.

> ❝
> ## He went out of his way to take advantage of us. With him, there's always an end game that occurs at the expense of somebody else. And he has no remorse.
>
> —Brian Dunlap, vice president of Liberty's sister company, Excelsior

He began his legal practice in earnest around that time and, with his bad grades, struggled at first to find a job. He claimed to shun the idea of working at a big firm because "it's all about being a billing machine and ethics aren't important." Instead, his



industries I have ever dealt with.

In 2004, he landed a junior position at a small firm that specialized in First Amendment and intellectual property cases. His career received an immediate and major boost when Fox News made him a talking head after an academic paper he wrote about online vote swapping garnered national attention. From the start, though, smut was Randazza's primary focus. In Florida, the porn lawyer tooled around in a yellow Porsche with U.S. paratrooper plates.

In 2009, he took a nearly $250,000-a-year job in San Diego as in-house general counsel for Excelsior Media, a gay porn company, and Excelsior's production and distribution arms Liberty Media Holdings and Corbin Fisher. (Because all of the cases Randazza worked on involve Liberty as a party, we will refer to his employer as Liberty throughout this article.) Liberty later relocated to Las Vegas, and Randazza moved with the company.

On his first attempt at passing the Nevada Bar exam, Randazza failed the ethics portion of the test.

## The Porn Lawyer Ascendant

Randazza staggered naked down the stairs, clutching a bottle of red wine. It was January 2010, and the attorney was boozing it up at the villa Liberty had rented for a location-scouting trip to Costa Rica. Around 9 a.m. that day, according to court records, Randazza stopped studying for the California Bar exam and started guzzling vodka and peach soda. He kept drinking over lunch at a nearby hillside restaurant, tossing back so many cocktails that he had to be helped outside to vomit in the parking lot. Brian Dunlap, vice president of Liberty's sister company, Excelsior, drove Randazza back to the villa in a rental Jeep, the vehicle bouncing over small cobblestone roads as Randazza puked violently out the window, his heaving taking on a staccato rhythm with the bumps.

Back at the villa, Dunlap got the attorney into his bedroom and went to hose down the Jeep. But Randazza was soon back on his feet and making for the pool with a wine bottle. Now, he was naked. The Liberty executives looked on, laughing. One of them filmed the glassy-eyed Randazza wobbling into the pool.

"As your attorney," Randazza said, turning full-frontal to the camera as he held his wine bottle aloft, "I advise you to drink this."



Marc Randazza getting drunk and naked on a trip to scout porn shoot locations in Costa Rica.

HUFFPOST IMAGE

Initially, Randazza's antics seemed harmlessly incorrigible. And his raffish demeanor was hardly out of place in the freewheeling porn industry. Randazza didn't just party with his bosses. He procured concealed carry permits for them, helped them with legal name changes and sorted out their messy personal affairs. On one occasion, he acted as a cooler after a Liberty performer who was in a sexual relationship with the company's CEO allegedly attacked the executive. Randazza bundled the porn actor into a cab bound for the airport and a flight out of Las Vegas.

"[Your] 702 area code privileges have been revoked," he told the man.

Above all, though, Randazza served as Liberty's attack dog. His main duty was to go after copyright infringers, earning a 25 percent bonus on any settlement funds he brought in. Some of the infringers were companies, but Randazza also shook down gay kids and small-time pirates, even unemployed ones.

But Randazza was two-timing Liberty. He was secretly doing work for Liberty competitors such as Bang Bros, Titan Media and Kink.com, sometimes billing his outside clients almost 100 hours a month. He also worked for companies accused of infringing Liberty's copyrights, including XVideos. Most attorneys would shun these conflicts of interest. Randazza barreled into them. He played clients off each other and cited "fair use" to dissuade Liberty from suing infringers.

"The big targets that we kept asking him to go after for months were his clients," Dunlap said. "We kept saying, 'What about XVideos? What about XVideos? They're the worst.'"

Only years later did Liberty executives realize that when they sent takedown notices to XVideos, the lawyer handling them sat down the hall. Randazza invoiced XVideos for

 

"He went out of his way to take advantage of us," Dunlap said. "With him, there's always an end game that occurs at the expense of somebody else. And he has no remorse."

Randazza misled people on multiple fronts. When he started his Liberty job, he accurately described himself in court as the "in-house counsel for Liberty Media Holdings." But a year later, he was giving judges, journalists and potential clients the impression that he was an outside attorney, rather than a Liberty employee. He swapped out his Liberty email address and letterhead for a personal email address and the letterhead of the "Randazza Legal Group," a firm he'd set up in Florida. He handed out personal business cards that made no reference to his Liberty job.

In court filings, Randazza referred to himself as "counsel for Plaintiff" or "an attorney for the Plaintiff." He told courts that Liberty had "incurred" his fees or that he'd "charged" the company at billing rates of $425 to $500 per hour. To support those rates, he sometimes filed affidavits from a paralegal who stated under oath that he was Liberty's "Vice President for Intellectual Property Management," a position Dunlap said the paralegal never held. Randazza also submitted affidavits from lawyer friends of his, along with time sheets showing his rates, even though he was a salaried employee.

It's not clear why he did this. He may have thought it would make it easier for him to recover fees, which juiced his 25 percent bonus on settlement money and allowed him to hike up his rate ceiling. (He now charges some clients $700 per hour.)

In the U.S. legal system, each party typically pays its own legal bills. There are, however, provisions in some types of litigation — federal copyright cases, for example — that allow for the winning party to collect its fees from the losing party. Judges would probably scrutinize an in-house counsel's request to recover fees more closely, according to several ethics experts and law professors. But an in-house counsel has just as good a chance at recovering fees, the experts added — a fact Randazza might not have been aware of at the time.

"All the stuff that is misleading is tailored for him to win that fee award," said Adam Springel, a Las Vegas attorney and expert in commercial and business law who examined a number of Randazza's fee filings at HuffPost's request. "He was clearly trying to get the judge to rubber-stamp his fee requests."

By creating the impression that he was an outside hired gun, Randazza may have also been trying to build name recognition and drum up business for the Randazza Legal Group, whose growth Liberty was subsidizing. Randazza didn't tell his employer about some of the fee awards he won — "the substantial ones, in particular," Dunlap said — and later refused to let Liberty audit the account where he deposited litigation payouts. He said it would look better in court to use the Randazza Legal Group on filings, as "insulation" for his employers.



had no idea to what extent he was trying to double dip. ... But when we discovered he was trying to say he was an outside firm charging us hourly and running up huge legal bills, that's when it became apparent he was trying to pull a fast one with the court."

## Greedhead & Fleecer, LLP

Randazza's dirty pool went beyond duping his employer and the courts. He was also soliciting illicit payoffs from parties that Liberty wanted him to sue. Records that surfaced during the arbitration proceeding and that were later made public in U.S. Bankruptcy Court in Nevada reveal the grimy particulars. In December 2010, while negotiating a settlement for Liberty with the website TNAFlix, Randazza went after his first bribe. He wanted TNA to pay to "conflict [him] out" of being able to sue the website again. A $5,000 "contract" figure came up. Randazza's opposing counsel, Val Gurvits, had no idea that Randazza was working in-house for Liberty at the time.

"Not a single communication from him ever came on Liberty letterhead," Gurvits told HuffPost.

Randazza concealed his job while hunting for money from other companies. But he didn't hide his avarice.

"There needs to be a little gravy for me," he emailed Gurvits. "And it has to be more than the $5K you were talking about before. I'm looking at the cost of at least a new Carrera in retainer deposits after circulating around the adult entertainment expo this week. I'm gonna want at least used BMW money."

Randazza asked for $30,000 and raised the possibility of teaming up with Gurvits to broker a sale of TNA to one of Randazza's outside clients, which could have earned him a $375,000 commission. He pushed hard to secure both deals. When Gurvits hesitated, Randazza claimed another company wanted to hire him to sue TNA.

"I can't hold these guys back any longer," he warned.



OWEN FREEMAN FOR HUFFPOST

Randazza's first known solicitation of a bribe was an apparent violation of the Nevada Rules of Professional Conduct, which forbid lawyers from "offering or making" agreements like these that could restrict them from practicing law. (The Nevada rules mirror the model rules of the American Bar Association, a baseline version of which has been adopted in every jurisdiction except California.) Randazza later tried to wring a bribe out of Megaupload, a file-sharing site that had allegedly infringed Liberty's copyright, according to arbitration records.

"Once you take a financial stake in the outcome of your client's case, then you have a conflict of interest. It compromises the independent professional judgment of the lawyer. It's not even a close call," said Russell McClain, an associate professor at the University of Maryland School of Law and an expert in professional responsibility.

The extent of Randazza's web of deception became apparent in Liberty's 2012 federal lawsuit against Oron, a file-sharing site. When Randazza tried to recover fees in the case, he not only failed to identify himself as Liberty's in-house counsel but also bundled his own "charged" fees with the fees of outside attorneys he'd brought on at his firm. He claimed the Randazza Legal Group had billed Liberty almost 366 hours, causing the porn company to "incur" $214,964 in attorneys' fees and costs. Of that total, Randazza told the court, $90,833.98 resulted from his nearly 182 hours of work at $500 per hour.

He also reported that his employees billed Liberty at their "standard hourly rates." For his partner, Ronald Green, that meant $400 per hour. For paralegals, it was $125 per hour. In reality, the Randazza Legal Group gave Liberty a massive discount, sometimes 75 percent off market rates, on work done by its lawyers — a fact that Randazza withheld from the court.

These were material misrepresentations, according to multiple fee experts interviewed by HuffPost. And Randazza got away with them: U.S. District Judge Gloria Navarro eventually ordered Oron to pay an extra $131,797.50 to cover Randazza's claimed fees.

Randazza had crossed the line in other ways, too. While negotiating a $550,000 settlement agreement with Oron, he'd chased another bribe. If the file-sharing company paid him $75,000, Randazza would "never be able to sue [Oron and its sister companies] forever and ever," he promised Oron's counsel. For that price, Randazza said he'd "provide some really great value" — including a "plan that you'll drool over" to make it harder for other companies like Liberty to sue Oron.

Randazza had an unfair advantage. He'd acquired information about Oron's privileged legal communications and its Hong Kong bank account from a softcore porn photographer named James Grady who also wanted to take down the file-sharing company. Grady had paid "a guy — call him a forensic investigator — to dig past

Case 1:20-cv-00298-LY-DH   Document 170-8   Filed 11/16/21   Page 16 of 290




making it clear that his source "didn't get the info at Walmart in the course of normal commerce."

According to Val Gurvits, whom Oron brought in to help with its case because of his experience dealing with Randazza, the only way to know about Oron's overseas bank account would be if someone "broke into Oron's gmail."

It certainly looked that way. Grady sent Randazza a receipt showing that Oron had released money from its PayPal account to its Hong Kong bank account. He sent information about the personal email account of Oron's owner.

He sent the owner's Skype call logs, which Grady said came from one of Oron's email accounts. He supplied Randazza with detailed descriptions of internal emails sent by Oron's lawyer. The intel helped Randazza get a temporary restraining order in Nevada federal court and freeze Oron's assets.

Randazza invited Grady to Las Vegas to be a "star witness" in the case, urging the photographer to be careful about what he might tell the judge about the Oron material. "You [need] to consider what happens if the judge wants to know where you got your information," Randazza wrote. "As far as I know, it was lawfully obtained. You certainly got it lawfully. If the source is a disgruntled Oron employee, great. Jilted lover, great. Hacker, problematic."

Randazza was forbidden from collecting evidence this way. He also wasn't allowed to engage in "conduct involving dishonesty, fraud, deceit or misrepresentation," according to multiple ethics experts. In fact, state bars across the country have determined that it is wrong for a lawyer to fail to inform opposing counsel about inadvertently received privileged material. The mere act of reading such material is unethical.

"We would file a brief, and they would have a response the next day," said Stevan Lieberman, one of Oron's lawyers. "It's very clear that [Randazza] used the privileged attorney-client communications to his advantage."

Randazza also shared his "entire Oron file" with one of his porn attorney friends, telling a paralegal to let the attorney "lift anything he wants," according to internal Randazza Legal Group emails. That attorney, who'd later become a partner at Randazza's firm, and a different company would soon file a copycat suit in California that ratcheted up pressure on Oron and kept the company's assets frozen.

In a bind, Gurvits agreed to pay Randazza the $75,000 but insisted that the payment be part of the settlement agreement between Liberty and Oron. "If it wasn't for me insisting, we would have had a separate agreement," Gurvits told HuffPost. "But I felt that was improper. That's how Randazza offered to do it. I said, 'I'm not going to do an end-run around your client.'"

And that's how Randazza got caught.




When his boss at Liberty, Jason Gibson, thumbed through a draft of the proposed settlement with Oron, he spotted a curious one-line item for $75,000: Randazza's gravy.

"My stomach is churning after reading the proposed agreement," he emailed Randazza.

Their relationship quickly unraveled. Within days, Randazza left his job. He and a paralegal covered their tracks by repeatedly running data-wiping software on their company computers that prevented Liberty from recovering evidence, according to court documents and forensic investigator testimony. He refused to release the $550,000 Oron settlement award to Liberty from his trust account.

Randazza laid siege to the company.

"Murum aries attigit" is a war doctrine attributed to Julius Caesar that translates to "the [battering] ram has touched the wall." The phrase has a baleful meaning: If your enemies refuse to surrender before hostilities commence, destroy them without mercy. This is Randazza's motto as a lawyer.

"Once the ram touches the wall, you have to commit to ending the other party as a going concern," he explained on his blog. "You must leave the other party with nothing left with which to fight. Because, if a party is fool enough to refuse the favorable terms, that party is fool enough (and poorly advised enough) to keep being a pain in your ass until you finally put them down like a diseased animal."

Randazza filed a complaint with the Nevada Equal Rights Commission, alleging that he'd been sexually harassed at work as a straight man because Liberty, which mainly makes gay porn, once filmed a sex scene — a straight scene, it turned out — in his office. It was a peculiar claim. In the Liberty workplace, Randazza had been exuberantly lewd. He'd talked about wanting to "snap a nasty metal bar across [a man's] wiener" and purchased a couch used for porn shoots for his home, then emailed around a picture of his scantily clad wife posing on it. But the free speech crusader who called political correctness a "disease" and casually, if jokingly, threw around words like "nigger" and "cunt" now was saying he'd suffered ethnic harassment as an Italian-American because Liberty executives had sarcastically called him a "guinea" and a "wop," usually in response to his own off-color instigations.

Randazza's harassment complaint was an obvious farce, and it went nowhere.

6/28/2021 Alex Jones' Lawyer Violated Legal Ethics By Leaking Porn From His Ex-Client's Marriage, Bar Ruling Is Messaging.com | HuffPost

Case 1:20-cv-00298-LY-DH Document 170-8 Filed 11/16/21 Page 18 of 290



Randazza would bring all his legal firepower to bear in trying to destroy his former client.

HUFFPOST IMAGE

In December 2012, he sued Liberty's parent company in Nevada state court on allegations of fraud, breach of contract and unjust enrichment. Four months later, Liberty filed a complaint against Randazza with the Nevada Bar, reporting his solicitation of bribes, conflicts of interest, misleading fee motions and warning that Randazza had on multiple occasions threatened to "drown anyone who attempts to challenge him in legal bills and debt." But the bar dismissed the complaint, citing the ongoing state lawsuit.

"The bar's approach was like, 'Hey, we can't really do anything because there's a civil matter going on now,'" Dunlap said. "But that policy is what allows people to get away with this because private citizens have to assume the burden and the expense of having to prove all this themselves. That means Randazza can drown us in legal fees,




a grievance with an attorney, all the attorney has to do is sue you.

Even when Liberty found a way to hold Randazza accountable, the attorney wriggled away. Not long after Randazza sued Liberty, the porn company reported his self-dealing in his fee recovery efforts to an appeals court where the dispute between Oron and Liberty was still playing out. The appeals court asked a panel of judges to look into Randazza's fees, but Liberty and Oron settled their differences and the case was dismissed before the panel could meet. Unfortunately for Oron, the copycat suit that Randazza helped his friend bring against the file-sharing firm kept Oron's assets on ice. Unable to pay its hosting provider, Oron went out of business, according to the company's statements in court filings.

Randazza, on the other hand, stayed in business. And he wasn't done with Liberty. Not long after he left the company, he crossed paths with Dunlap at a porn conference in Arizona and invited his former co-worker to step outside and fight.

"I wonder how much it would cost me to punch you in the face right now," Randazza said, according to sworn testimony by Dunlap in a subsequent legal dispute.

Randazza's next move was to file an arbitration claim against the porn company in which he claimed wrongful termination, breach of contract, back pay and damages from the sexual and ethnic harassment Randazza said he'd suffered. He demanded over $4 million in damages.

The arbitration dragged on for three years and cost Liberty over $1 million. But it backfired spectacularly on Randazza. Liberty brought counterclaims for, among other things, legal malpractice and unjust enrichment. The evidence quickly piled up against Randazza. Billing records proved he'd been getting paid by XVideos every month. Many of the damning emails he thought he'd destroyed were produced and showed him soliciting bribes. Under oath, one of his own expert witnesses was forced to concede that Randazza had likely misled him and violated ethical rules.

Randazza tried to explain away the bribes as a ruse to squeeze extra money for Liberty out of infringers. He'd described his dishonesty in one court filing as "mere puffery."




From: "Marc John Randazza"
Date: Tue, Jan 11, 2011 8:08 pm
To: Val Gurvits <
Cc:

The number was transmitted on the condition that it was done before a certain date. That date passed.

Also, while at the Adult Entertainment Expo, I heard a rumor that TNAflix is installing Vobile.

1) You confirm the rumor,
2) TNA pays $50K,
3) TNA agrees that we get the IPs for each infringement we DMCA,
4) Any work product produced for corbin fisher in this litigation remains confidential, and will not be shared with other companies.

Keeping me completely out of the TNA game is a little more complicated.

If your client wants to keep me personally out of the TNA game, then I think that there needs to be a little gravy for me. And it has to be more than the $5K you were talking about before. I'm looking at the cost of at least a new Carrera in retainer deposits after circulating around the adult entertainment expo this week. I'm gonna want at least used BMW money.

In order to conflict me out of future matters, I suggest this:

Your firm retains me as "of counsel" to you. I'd get $5K per month (for six months) paid to me, from you (TNA will reimburse you, I presume). I will render advice on TNA and TNA only, and I'll be chinese walled from your other clients so that other conflicts are not created.

If TNA is sold, and we're the brokers, the payments stop.

Also, I get a conflict waiver so that I can represent the buyer in the sale, and I'm not conflicted out of it.

That way, I'm adequately compensated for my loss of major potential work, and I'm conflicted out of acting adversely to TNA.

In emails to opposing counsel that later surfaced during arbitration, Randazza brazenly pursued bribes to conflict himself out of future litigation.

HUFFPOST IMAGE/ARBITRATION RECORDS

His battering ram had splintered. During arbitration hearings, the normally cocksure Randazza wouldn't even look at Liberty's attorney, Wendy Krincek. He turned his seat away from the arbitration table and put his back to his own attorney, Ken White, a longtime Randazza confederate who runs the Popehat legal blog. Randazza also refused to look at the arbitrator, a former federal judge and assistant Watergate special prosecutor. Instead, the attorney stared at the floor, his body hunched over, hand pressed to the side of his face as he answered Krincek's questions.

"You wouldn't lie to opposing counsel, would you?" Krincek asked Randazza during one hearing while confronting him over a misrepresentation about his fees.

"Yes, I would," Randazza replied.

"I've never seen anything like it before," Krincek said. "He's a litigator. He knows how to present as a witness. He was physically incapable of doing that. … It was a tell that he was uncomfortable answering the questions. He's a smart guy and he's pretty charismatic. I think he can generally talk his way out of anything, but he was getting nowhere."

## Subscribe to the Politics email.

From Washington to the campaign trail, get the latest politics news.

SUBSCRIBE

6/28/2021  Alex Jones' Lawyer Viciously Defended Larry Flynt. Now He's Born Again and Working Against Porn 

Case 1:20-cv-00298-LY-DH Document 170-8 Filed 11/16/21 Page 21 of 290

Randazza was so rattled after the hearing that he appeared to stick a large wad of used chewing gum on the rear window of Krincek's Saab station wagon in the parking lot, according to Dunlap. (Randazza denied being the gum-sticker.)

In June 2015, the arbitrator ruled against Randazza on every point, finding that the attorney had "been involved in and successfully concluded negotiations for a bribe," among a litany of other wrongdoing. The arbitrator ordered Randazza to pay Liberty more than $600,000 in damages.

But Randazza had one more card to play. Claiming to be almost $14 million in debt, he filed for bankruptcy and froze the arbitration award. A few months earlier, he'd taken steps to shield many of his assets by moving them into college funds for his children, transferring his BMW and his 80 percent share of his legal practice into a "self-settled spendthrift" trust and lending $300,000 to his in-laws for them to buy a property in Las Vegas, according to Clark County public records. Oddly, the loan came at a time when Randazza's marriage was falling apart. About two weeks after the arbitration ruling, his wife filed for divorce.

"Conceptually, it's not OK to do all sorts of pre-bankruptcy planning and move your assets around," said Bob Keach, one of the country's top bankruptcy lawyers. "This is clearly a guy who has spent some time playing the system."

But the U.S. trustee overseeing Randazza's bankruptcy "didn't seem to care" when the issue was raised at a creditors' meeting, according to Dunlap.

Now, it was Liberty's turn to go on the offensive. With the arbitration decision in hand and binders of evidence proving its case, Liberty filed a second complaint against Randazza with the Nevada Bar. This time, the bar moved forward.

Publicly, Randazza blasted the arbitration as a "miscarriage of justice," but the arbitrator's determinations became the bedrock of the disciplinary proceeding against him. In private, Randazza worried. Liberty had also filed bar complaints against him in Florida, California, Arizona and Massachusetts — every other jurisdiction that licenses him — and Randazza quietly made the porn company an unusual offer: He'd pay Liberty $20,000 for each of his bar licenses that wasn't suspended or revoked. He was, in other words, proposing a bribe.

"He offered us a bounty on his bar licenses — we'd get more of the award if we did not cooperate with bar investigators or send follow-up complaints," Dunlap said. "We refused this offer because it was insulting [and] unethical."

Only in Florida did Randazza fail to offer a bounty — he felt he'd be suspended or disbarred there anyway, according to an email his legal team sent Liberty. Randazza had already made misrepresentations in a letter to The Florida Bar about the Oron bribe and his work for XVideos. When he was busted for them during arbitration, he blamed



declined to pursue its own investigation.)

And Liberty wasn't the only party upset with Randazza in Florida. In federal court there, Paul Berger, Randazza's opposing counsel in an unrelated case, submitted a copy of a bar complaint he said he'd filed against Randazza over a 2015 episode in which Randazza screamed curses at Berger and his client after a mediation session. Randazza threatened to assault them both and send the client, who happened to be Jewish, to the Gaza Strip, according to Berger's complaint.

"It appears that Mr. Randazza knows no ethical boundaries," Berger told The Florida Bar, which apparently either declined to pursue an investigation or found nothing in Berger's complaint that merited disciplinary action. Pursuant to its policy, the bar then deleted all records of the complaint and, when contacted by HuffPost, was unable to acknowledge the document's prior existence.

In June 2016, Randazza settled his state lawsuit in Nevada against Liberty. He'd been the one to sue, but now his malpractice insurer was the one to pay, shelling out $205,000 to make a counterclaim Liberty filed against Randazza for malpractice go away.

In February of this year, Randazza settled in bankruptcy court with Liberty, where the porn company had also filed a claim. This time, Randazza paid only $40,000. After nearly six years of grueling lawfare, he'd managed to dodge almost all the damages from the arbitration award, which the parties agreed to vacate as part of the bankruptcy settlement.

Vacating the award did not sit well with the arbitrator, who warned in a court filing this July that an "attempted erasure" of his findings might conceal Randazza's "proven serious ethical violations" and weaken protections for "future victims and the public."

The former judge was right to worry.

## Nazi Punks, Jump In

Randazza has scrubbed his Liberty job from his resume. The attorney-to-the-trolls now spends most of his days wringing his hands over the "marketplace of ideas" as he tries to game the system for racists and fascists — as if Nazism deserves another spin through the public square.



Marc J. Randazza
@marcorandazza

Replying to @Megg_Ellis
The number of people "affected" by Naziism since 1945 is probably less than the number of people who have been crushed by vending machines. The philosophy lost in the marketplace of ideas until recently, where those who try to suppress it are driving new recruits to it in droves



Case 1:20-cv-00298-LY-DH   Document 170-8   Filed 11/16/21   Page 23 of 290

♡ 1    💬 2    🔗 Copy link to Tweet

He openly lauds the "alt-right" movement:



His reputation as a First Amendment attorney has frayed. Even his capstone free speech victory in 2011 over Righthaven, a copyright troll, carries a hoggish taint in hindsight. At the time, Randazza was employed by Liberty, which permitted him, pending the company's approval, to take on pro bono free speech cases to offset any bad press from Liberty's own copyright enforcement lawsuits. But Randazza concealed his work on Righthaven from his employer and kept a $60,000 payout — money Liberty only found out about during arbitration.

"Mr. Randazza was unjustly enriched," wrote the arbitrator, who ruled that the payout should have gone to Liberty.



**If you want to represent detestable clients, fine. But when you go out into the media and don't just defend them but actually adopt their logic and moral arguments, that's different. Then, it looks like you agree with them.**

—Elie Mystal, executive editor of the Above the Law blog

Some of Randazza's troubles are behind him — in June, he settled another malpractice claim brought by a former client for $50,000 — but others lie ahead. He remains in Chapter 11 bankruptcy and had only $15,652 in two bank accounts at the end of October, according to court records. In the sloppy monthly reports he is required to file with the bankruptcy court, he lists a sad series of expenses that include his daily coffee at Caffe Sicilia in Gloucester, shopping sprees at Men's Wearhouse and over $4,000 per month in payments to cover alimony to his ex-wife and and child support for their two children.




riding high, he was really well-known, and then all of a sudden — disgrace. So who's going to hire him now?"

The answer is the disgraced. Lawyers trying to make their bones as free speech attorneys often take on one extremist client. Maybe two. Randazza has assembled a panzer squad of them, a career choice that is generating new problems for him. When he signed on this year to represent the Satanic Temple in a complaint against Twitter, dozens of members of the organization revolted, describing Randazza as an "agent of the alt-right" and an "ally to Nazis."

They aren't wrong. In January, he partied with rape apologist Mike Cernovich and Gavin McInnes, the founder of the Proud Boys, a fascist gang that commits political violence throughout the country. Other pro-Trump racists and "free speech advocates" were there, yukking it up about "brown people" and "faggots" and the genitalia of transgender women. Randazza also appears routinely on Infowars to lend a legal imprimatur to the lies of hate-spewing, violence-stoking propagandist Alex Jones. In an August appearance, Randazza likened Jones, a key gateway to white nationalism, to black civil rights leaders in the South during the 1960s.



Randazza advocates for far-right extremists outside the courtroom as well as inside.

HUFFPOST IMAGE

"If you want to represent detestable clients, fine," Elie Mystal, the executive editor of the Above the Law blog, wrote in a recent column about Randazza. "But when you go out into the media and don't just defend them but actually adopt their logic and moral arguments, that's different. Then, it looks like you agree with them. And if you agree with them, you can no longer avail yourself of the lawyerly presumption that you are just doing your job. Instead of being a mere part of the process, you become part of the problem."




produced both of Cernovich's films. The most recent one, "Hoaxed," is a propaganda reel that appears to demonize the free press and relies on figures such as Jones and Stefan Molyneux, another important conduit to white nationalism.

In a Daily Beast profile, Randazza described the Vladimir Putin-loving, Pizzagate-pushing Cernovich as "an A-plus level friend, and the kind of rare soul now where you can really trust his word as his bond."

And Randazza doesn't just play defense for Cernovich and his other far-right pals. Unlike most First Amendment lawyers, he's willing to brandish the plaintiff's knives for them and carve out space in the legal system for their political agenda.

Since 2016, for example, Randazza and the Holocaust-denying MAGA troll Chuck Johnson have been trying to scavenge coins off the corpse of Gawker after libertarian billionaire Peter Thiel sued the publication into bankruptcy — a legal outcome widely celebrated by fascists that has had a chilling effect on press freedom. Of Gawker and its former CEO, Nick Denton, Johnson said, "In a just world, I'd have them killed. But we are not there yet."

From 2016 to 2017, Randazza represented professional misogynist and rape advocate Daryush Valizadeh in an attempt to sue one of Valizadeh's alleged victims. She lives in Iceland and told her story of sexual assault to Jane Gari, a book author and blogger. Gari gave the alleged victim a pseudonym and published her account of Valizadeh following the woman home, talking his way into her apartment with the pretext of using the bathroom — a ruse another woman who has accused Valizadeh of sexual assault told HuffPost he has used for at least a decade — then raping her. Valizadeh had written a guidebook to having sex with women years before in which he described a similar encounter:

> While walking to my place, I realized how drunk she was. In America, having sex with her would have been rape, since she couldn't legally give her consent. … I can't say I cared or even hesitated.

Randazza apparently didn't care either. He sent a letter to Gari, who has written a book about being sexually abused as a child, and accused her of fabricating the rape account and "causing harm" to "real victims" of sexual assault. He demanded she take down the post and confess on her blog.

"Simply admit that you lied, and all can be forgiven," Randazza wrote.

When Gari refused, Randazza subpoenaed her in South Carolina federal court in an effort to get the alleged victim's name for Valizadeh, whose followers were already menacing Gari.

"Listen you dumb cunt, you hideous skank," one Valizadeh fan emailed her, "making false rape accusations is a great disservice against real victims of sex assaults, you




The case was an about-face from Randazza's earlier work defending small bloggers. Now he was looking to pierce South Carolina's shield law for reporters and muscle a sex abuse survivor on behalf of his pro-rape client. But Gari managed to fend off Valizadeh and Randazza in court and protect her source. When the judge granted her the right to depose Valizadeh and examine his claim that he'd been defamed, Randazza moved to dismiss the case. His own case.

"I don't think a true First Amendment advocate would have taken this case," said Wallace Lightsey, Gari's attorney. "We saw it as an attempt to find the source so the source could be harassed."

Randazza has been equally unscrupulous in his lawyering for Paul Nehlen, Alex Jones and others. When Chuck Johnson was sued for defamation earlier this year after smearing the wrong man as the driver of the car that killed Heather Heyer in Charlottesville last summer, Randazza told a Michigan court that Johnson had simply repurposed information from 4chan — a website Randazza described as a "wire service" and a "reliable source." But 4chan's /pol/ forum, where the libel circulated, is neither a wire service nor a reliable source. It is a place where neo-Nazis congregate to spread hate and disinformation.

But nothing compares to Randazza's advocacy for neo-Nazi Daily Stormer publisher Andrew Anglin, who is being sued in Montana by Tanya Gersh, a Jewish woman Anglin targeted in a vicious anti-Semitic harassment campaign he launched from his site.

"Fuck Nazis, but fuck Tanya Gersh too," Randazza tweeted while neo-Nazis were threatening Gersh's life. Anglin soon hired Randazza, paying him out of a more than $155,000 legal defense fund raised by Johnson, who took a 15 percent cut, the scum forming a closed loop.

In court, Randazza has played childish games about Anglin's location and sinister ones by advancing Holocaust denial as a legal defense. While trying to reduce the case to a debate in the "marketplace of ideas," Randazza essentially has argued that a neo-Nazi's call to action to terrorize a Jewish woman and her family is protected speech, a position one local paper called a "desperate attempt by a lawyer who should have a better understanding of the First Amendment."

In November, a judge shot down Randazza's argument and allowed the case to move forward, finding that Anglin "drew heavily on his readers' hatred and fear of ethnic Jews" to incite them to harass Gersh.

Even a free speech absolutist might struggle to defend some of Anglin's rhetoric. The neo-Nazi has said he "would absolutely and unequivocally endorse" violence to achieve his goals, and Daily Stormer fans — including Dylann Roof, a white supremacist who killed nine black churchgoers in Charleston, South Carolina — have committed at least a dozen racist or politically motivated murders since 2015. In October, Anglin cheered the stabbing of a reporter in Germany by neo-Nazi youths, writing:

Case 1:20-cv-00298-LY-DH   Document 170-8   Filed 11/16/21   Page 27 of 290



*up, lined up and shot execution style and tossed in a mass grave. ... It makes me warm and fuzzy inside to know that journalists are seeing this story and wondering if they'll be next.*

Randazza has increasingly shown himself susceptible to fledgling far-right views. He openly agrees, for example, with Trump's description of the press as Americans' "enemy." Earlier this year, Randazza tried to intimidate a reporter and his publication over a harmless tweet that vexed Cernovich. On Twitter, Randazza proclaimed his willingness to support the white nationalist Faith Goldy in her Toronto mayoral campaign. He promoted a white nationalist lie about the Democratic Party deploying anti-fascists as its foot soldiers. (Antifa almost universally despise the Democratic Party.)

He also tweeted this:



The difference between patriotism (love of country) and nationalism (blind devotion to country, usually with a chauvinistic assertion of superiority) should be obvious to a lawyer who represents nationalists. And as someone who represents white nationalists, Randazza would know that in the U.S. the word "nationalism" is linked to a violent and racist anti-democratic ideology.

He just doesn't care.

6/28/2021  Alex Jones' Lawyer Is A Rising Legal Figure On The Right. He Has A Long History Of Racist, Misogynistic Attacks. | HuffPost

Case 1:20-cv-00298-LY-DH Document 170-8 Filed 11/16/21 Page 28 of 290

The rise of Trump has brought a common arc of radicalization on the political right into sharper relief — that of the contrarian troll who gets lost in his provocations and mutates into something dangerous. Just as some snarky libertarians turned into neo-Nazis and Tucker Carlson was a conservative snot before morphing into a megaphone for white nationalist talking points, Randazza, too, appears to have transformed on his trollish journey through the legal system.

And like Carlson, who gets to spout hate on Fox News because he's a millionaire who once wore a bowtie on CNN, Randazza benefits from the trappings of privilege. His Georgetown law degree and admission to five state bars offer him what people targeted by his clients rarely receive: the benefit of the doubt. Consider a recent front-page Wall Street Journal story that focused on Gab and quoted Randazza as a First Amendment expert. Incredibly, the story failed to mention that Randazza has served as Gab's attorney. Consider, too, that Fox News, CNN, Vice News and others have credulously given Randazza a platform to polish his brand.

But his own profession has shown the least skepticism. Less than a week after the confirmation of Brett Kavanaugh to the Supreme Court, the journal of the American Bar Association ran a short column by Randazza lamenting how easy it is for "vindictive lying women" to ruin the lives of innocent men. Randazza neglected to tell his ABA editors he'd already run the column on a right-wing legal blog. He also failed to offer any proof for his claim in the column that he currently represents ("at a deep discount") multiple women who have survived sexual assault.

He did, however, have a message for sexual assault victims.

"I believe in their right to tell their story without being sued for it," he wrote.

Last year, Randazza was suing a woman for telling her story about being raped.

Randazza gets away with those sorts of moves because many people assume basic honesty from lawyers. The legal system does too.

"It would take too much time and energy to second-guess and check up on everybody all the time," said Bernie Burk, a legal ethics expert and former professor at the University of North Carolina School of Law. "Generally speaking, if you're reasonably clever and selective about your dishonesty, you can get away with a great deal before the system catches you."

Randazza's duplicity, whether clever or selective, has been constant. Even in recent cases that do not involve porn or Nazis, he has made a mockery of the truth. In Utah federal court, he was — until a few weeks ago — defending a man named Ryan Monahan who ran a website called Honest Mattress Reviews and had been sued by Purple, a mattress manufacturer, after Monahan allegedly lied on his site about Purple's products being covered with a cancer-causing white powder. Purple declared that Monahan had a business relationship with one of its main competitors, GhostBed.

 

entitled to full protection under the First Amendment. He dismissed the GhostBed connection as a "conspiracy" that "even Alexander Dumas could not have imagined when he wrote the Count of Monte Cristo."

The conspiracy turned out to be real. A witness came forward with evidence proving that Monahan "effectively acted as [GhostBed's] head of marketing" and was being paid $10,000 a month by GhostBed. Randazza and Monahan had misled both the U.S. Court of Appeals for the 10th Circuit and, repeatedly, the Utah federal court.

"Interference with the judicial process here was substantial," U.S. District Judge Dee Benson wrote, adding that Monahan's violations were "sufficiently egregious that perjury prosecutions would, and perhaps should be, an appropriate consideration."

In February, Benson ordered sanctions be imposed on Monahan and his business, Honest Reviews LLC. A few weeks later, Monahan sold his website to Brooklyn Bedding, another mattress company, and had it wire the money directly to Randazza to pay Monahan's "legal debt." In July, Benson awarded Purple approximately $92,000 in sanctions from Monahan. When Purple's lawyers contacted Randazza to collect, he told them Monahan didn't have the money. Randazza had drained his client dry.

"So do what you gotta do," he told Purple's lawyers.

A desperate Monahan sent a letter to the judge saying he wanted to settle with Purple. Randazza then filed a motion to withdraw from the case "as a matter of professional ethics," leaving Monahan to scramble to find replacement counsel.

"Everything that has exploded in this thing has been because of what [Randazza] has done," Monahan told HuffPost.

Yet Monahan, who said he has a limited grasp of the law, is the one on the hook for sanctions. He is the only one whom the judge suggested should face perjury charges, despite the judge's ruling that Randazza had also "vigorously asserted" misrepresentations in court.

"You know what I like about my life?" Randazza once told a legal blog. "There's not a motherfucker in this world who ever says, 'I'm ambivalent about Marc Randazza.' That is what scares me … people being ambivalent about me."



Where Randazza winds up next on his journey through the sewers of the legal system is anyone's guess. "I did not get where I am by having a reputation for being someone who would stab others in the back," he once said.

OWEN FREEMAN FOR HUFFPOST

## Lowering The Bar

Randazza had escaped sanctions in Utah. But in Nevada, his long disciplinary proceeding was nearing its end. It had been half a decade since Liberty alerted the Nevada Bar to Randazza's misbehavior. The porn company had given the bar thousands of pages of evidence about its former in-house counsel's conflicts of interest and solicitation of bribes, his misrepresentations about fees and use of privileged and confidential material.

The bar treats multiple offenses and a "pattern of misconduct" as aggravating circumstances that can justify harsher discipline, so Dunlap, the Excelsior vice president who wrote the company's bar complaints, made a deliberate point of including that phrase. "We felt that would be the kicker, that once they had seen that that pattern had been demonstrated that it would leave no room for being wishy-washy or letting him off easy," Dunlap said.

Randazza, in an effort to hang on to his law license, conceded as little as possible. He submitted a conditional guilty plea to the bar confessing to two of the nine ethical violations the bar alleged that he'd committed. The first forbids certain conflicts of interest and concerned a shady loan Randazza made Liberty; the second prohibits a lawyer from restricting his right to practice and was related to the Oron bribe.

In exchange for this plea, Randazza asked the bar for a stayed suspension and probation — a slap on the wrist. But the bar was under no obligation to give it to him. The baseline sanction for the violations Randazza admitted is suspension.

On Oct. 10, the order came down in Nevada Supreme Court.

"We hereby suspend Marc J. Randazza for 12 months, stayed for 18 months," it read.




and 20 hours of education in legal ethics. He will avoid actual suspension if he "stays out of trouble" during his probation, according to the order.

The system had finally caught him. And the system didn't seem to much care. The bar didn't pursue Randazza's solicitation of other bribes or his other conflicts of interest. Nor did it investigate whether Randazza despoiled evidence, lied to courts in fee motions or used privileged information that might have been obtained illegally.

What the bar did find were "mitigating circumstances" to allow for lighter punishment. Randazza, for instance, had no prior discipline in Nevada. Another factor was the "time delay" between his ethical violations and the disciplinary hearing — a delay the bar helped cause by dismissing Liberty's initial complaint.

"We had … to essentially lay out everything for the [Nevada] Bar and then once we handed it to them on a silver platter, they weren't willing to go the distance," Dunlap said.

Here was Randazza's privileged white-collar tribe, policing itself, barely, behind closed doors. The bar refused multiple requests to discuss the Randazza matter or its own arcane rules. For two months, the bar also rebuffed HuffPost's attempts to view records of Randazza's disciplinary proceeding, despite their high public-interest value. At one point, a lawyer for the bar insisted the records were confidential and could only be obtained through a subpoena or a court order — a stance that clashed with that of the Nevada Supreme Court. When asked for the bar's policy on sealing disciplinary records, the lawyer insisted it was an "internal" and unpublished policy. The next day, he said the bar was "implementing a new policy" and handed over the records.

Among them is a transcript of the June hearing when the bar accepted Randazza's guilty plea. During the hearing, Matthew Carlyon, another bar lawyer, applauded Randazza for reforming his conduct and cited as evidence of the metamorphosis several phone calls Randazza had placed to the bar's ethics hotline seeking advice.

"He is showing that he's willing to change and not be out there endangering the public," Carlyon said. "That's important because … ultimately our job here is to provide protection to the public. We're not here to discipline attorneys. That's not why we exist. We want to protect the public."

Since then, Randazza has stayed true to form. In Montana federal court, he disobeyed rules requiring him to keep the court informed about his disciplinary proceedings. The judge, clearly upset, ordered Randazza in November to update the court. When Randazza did, he mentioned his stayed suspension but said nothing about his probation, despite describing it in detail to several other federal courts.

Randazza may soon face "reciprocal discipline" in other states where he is licensed. Following his discipline in Nevada, the bars in Arizona, California and Florida have opened or will open their own reviews of his ethical violations. But other bars tend to


more deeply.

In a disciplinary proceeding against Randazza in Massachusetts federal court, he has shown no remorse for his sleazy behavior and has already distorted reality in an attempt to avoid a suspension. In one filing, he blamed Oron for his solicitation of a bribe. He also audaciously told the court he didn't "cause his clients to suffer any actual harm or financial losses."

"At every step of the way, that has proven to be untrue," Dunlap countered.

Randazza pilfered the $60,000 Righthaven settlement from Liberty, according to the arbitrator's ruling. He caused Liberty to possibly miss out on another settlement by not pursuing XVideos, one of his secret clients, for copyright infringement. Randazza also violated the terms of the $550,000 settlement he'd negotiated with Oron — most significantly by helping his friend file a copycat suit — causing Liberty to pay back $275,000 of the award.

This week, however, the Massachusetts court let Randazza off the hook. The court declined to put the rogue attorney on probation and deferred a decision about further reciprocal discipline until his Nevada probation ends in April 2020. At that point, it's unclear what further discipline the court could even impose, especially if Randazza stays out of new trouble. And, so, the lawyer of choice for far-right extremists will continue to lawyer, at least for now — an example not so much of what America prohibits these days but rather what it permits, provided you belong to the right caste.

When reached by email, Randazza refused to comment for this story. He referred HuffPost to his attorney, who also did not comment. Randazza's attorney, it turned out, was his expert witness from the Liberty arbitration — the one forced under oath to essentially acknowledge Randazza's dishonesty. Last year, the same attorney submitted an affidavit supporting a Randazza fee motion and, on an attached resume, listed his expert witness experience. The records of the Liberty arbitration were by then public, but the man referred to the matter only as Confidential v. Confidential. His online biography revealed more: Randazza's attorney is a former chair and current member of the ethics committee of the Nevada Bar.

Somewhere in Gloucester, looking out at his hometown and dreaming of zealotry, the troll began to laugh.

*Top illustration: Owen Freeman.*


**A few of the documents referenced in this story:**

1.) Nevada Supreme Court order approving Randazza's conditional guilty plea:
https://www.scribd.com/document/396164843/18-39837


Alex Jones' Lawyer Violated Legal Ethics By Soliciting Porn Industry Workers | HuffPost

https://www.scribd.com/document/396164997/Bar-Amended-Complaint

3.) Emails between Randazza and TNA counsel:
https://www.scribd.com/document/396166781/Randazza-TNA-Bribe

4.) Emails between Randazza and Oron counsel:
https://www.scribd.com/document/396166992/Randazza-Oron-Bribe

5.) Emails between Randazza and James Grady about Oron:
https://www.scribd.com/document/396166226/144-10-Grady

6.) Example of Randazza's fee misrepresentations:
https://www.scribd.com/document/396167552/Fee-misrepresentations

7.) Randazza's sham discrimination claim that was dismissed:
https://www.scribd.com/document/396166288/NERC-Claim

8.) Arbitration ruling against Randazza:
https://www.scribd.com/document/396166322/Interim-Arbitration-Award

9.) Randazza's disclosure of liabilities and assets in Chapter 11 bankruptcy:
https://www.scribd.com/document/396282036/15

10.) Complaint about Randazza to The Florida Bar:
https://www.scribd.com/document/396166039/149-2

11.) Arbitrator's opposition to vacating arbitration award:
https://www.scribd.com/document/396167710/Arbitrator-Vacatur-Brief

12.) Randazza's military records:
https://www.scribd.com/document/396174634/Randazza-Military-Records

13.) Randazza's letter to Jane Gari on behalf of Roosh Valizadeh:
https://www.scribd.com/document/396165595/10-5

14.) Utah federal court order addressing Randazza's dishonesty:
https://www.scribd.com/document/396165707/292-pdf

15.) Randazza's response in Massachusetts disciplinary action:
https://www.scribd.com/document/396167771/8

16.) Massachusetts court order deferring reciprocal discipline:
https://www.scribd.com/document/396167819/10



*Do you have information you want to share with HuffPost? Here's how.*





Senior Reporter, HuffPost

correction

**MORE:**

Pornography   Alex Jones   Bribes   Marc Randazza

## Popular in the Community



AdChoices                    Sponsored

## You May Like

### She's the Largest Athlete in the World & Gorgeous
Fresh Edit · Ad

### Talk Show Moments Everybody Rewinds Over and Over
Freshedits Daily · Ad

### The World's Most Dangerous Airport Is In California
MoneyWise.com · Ad

### Nature Photos Revealed- Not For Weak Stomachs
HD · Ad

### Leaked Backstage Photos Kept From The Public
hd · Ad



   

### 'You Can't F**king Talk To Me That Way!' Trump Yelled At Gen. Milley Amid Protests, Book Says

HuffPost

### Nancy Pelosi Unveils Legislation Creating Select Committee On U.S. Capitol Riot

HuffPost

### These Simpsons Jokes Were Too Smart For Most Of Us

Ranker · Ad

### Reeves Was the Love of Her Life and She Killed Him

History ByDay · Ad

### 16-Year-Old Students Sentenced to Life Behind Bars

Freshedits.com · Ad

### 'Worthless' Antique Makes Appraiser Break Down

Money Versed · Ad

### Stevie Nicks: "He Was the Love of My Life"

Musicoholics Stories · Ad

### Trump Rips Mitch McConnell For Not Being Loyal Enough To Keep Him President

HuffPost

### YouTube Says It Accidentally Deleted Right-Wing Extremism Watchdog's Channel

HuffPost

### NCAA Leaders Recommend Letting College Players Make Money From Their Fame

HuffPost



   

## MOST SHARED

**Pope Francis Meets 'Super-hero' In Spider-Man Costume At Vatican**

**37 Most Horrific Theme Park Accidents Of All Time**
Advertisement by Reference

**Almost 900 Secret Service Employees Were Infected With COVID**

**COVID-19 Rescue Plans Sent Personal Income Spiking Nationally**

**Trump Rips Mitch McConnell For Not Being Loyal Enough To Keep Him President**

## WHAT'S HOT

**Donald Trump Reportedly Hoped COVID-19 Would Take Out John Bolton**

**In Departure From Trump World, Pence Says He's 'Proud' Of Role Certifying 2020 Election**

**Parents Are Already Budgeting For New Child Tax Payments**

**Teachers Say GOP's Critical Race Theory Bills 'Whitewash American History'**

**Bruce Springsteen Marks The Return Of Live Shows On Broadway**

**Stephen Colbert Goes Silent For 20 Seconds When Audience Can't Stop Jeering Trump**

**The 16 Oldest Known Photographs In History**
Advertisement by Ranker

**Justin Timberlake Passionately Asks Court To Free Britney Spears**

NEWS

ENTERTAINMENT

COMMUNITIES

VIDEO

HUFFPOST

ADVERTISE

RSS

POLITICS

LIFE

HUFFPOST PERSONAL

NEWSLETTERS

ABOUT US

CONTACT US

FAQ

Case 1:20-cv-00298-LY-DH  Document 170-8  Filed 11/16/21  Page 37 of 290



HUFFPOST PRESS ROOM

DMCA POLICY

DO NOT SELL MY
PERSONAL
INFORMATION

PRIVACY POLICY

---

Part of HuffPost Politics. ©2021 BuzzFeed, Inc. All rights reserved.

**The Huffington Post**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **DR. JEROME CORSI and** | § | |
| **LARRY KLAYMAN** | § | |
| | § | |
| **v.** | § | **A-20-CV-298-LY** |
| | § | |
| **INFOWARS, LLC, FREE SPEECH** | § | |
| **SYSTEMS, LLC, ALEX E. JONES,** | § | |
| **DAVID JONES, OWEN SHROYER,** | § | |
| **AND ROGER STONE** | § | |

**REPORT AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

TO:    THE HONORABLE LEE YEAKEL
       UNITED STATES DISTRICT JUDGE

Before the Court are Defendants Owen Shroyer's Motion to Dismiss (Dkt. No. 55); Shroyer's

Motion for Sanctions (Dkt. No. 56); David Jones' Motion to Dismiss (Dkt. No. 57); Defendants

Infowars, LLC, Free Speech Systems, LLC, and Alex E. Jones' Motions to Dismiss (Dkt. Nos. 58

and 59); Roger Stone's Motion to Dismiss (Dkt. No. 70); Stone's Motion for Sanctions (Dkt. No.

84); and the related response and reply briefs.  The District Court referred these Motions to the

undersigned for report and recommendation pursuant to 28 U.S.C. §636(b) and Rule 1(c) of

Appendix C of the Local Rules.

### I.  FACTUAL BACKGROUND

This is a defamation case.  On March 7, 2019, Plaintiffs Dr. Jerome Corsi and Larry Klayman

filed the instant suit against Defendants Infowars, LLC, Free Speech Systems, LLC, Alex E. Jones,

David Jones, and Owen Shroyer, alleging claims for defamation, intentional infliction of emotional

distress, assault, and unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a).  Dkt.

No. 1.[1]  The suit was originally filed in the District of Columbia and after a finding of improper venue, was transferred to the Western District of Texas on March 20, 2020.  Dkt. No. 22.  On July 29, 2020, Plaintiffs filed their Amended Complaint, adding Roger Stone as a defendant.  Dkt. No. 47.

Plaintiff's Amended Complaint describes Jerome Corsi as an "author and political commentator," and Larry Klayman as a "public interest legal advocate" and "media personality and author, columnist and syndicated radio talk show host."  Dkt. No. 47 at ¶¶ 3-4.  Defendant Alex Jones is a "media personality" who owns the media outlet company InfoWars, LLC, and a related entity Free Speech Systems, LLC.  *Id.* at ¶¶ 7, 11.  David Jones is Alex Jones' father, and allegedly a co-owner of InfoWars and Free Speech Systems, though Defendants deny this assertion.  *Id.* at ¶ 11; Dkt. No. 57 at 2, n. 1.  Defendant Owen Shroyer is a newscaster for InfoWars, and a co-host of a political news show along with Defendant Roger Stone, who is also a political commentator and media personality.  Dkt. No. 47 at ¶¶ 9-10, 13.

The Plaintiffs' case revolves around allegedly defamatory statements made by Stone and Alex Jones in several InfoWars videos.  Specifically, Plaintiffs point to InfoWars videos featuring Stone, Alex Jones, and Shroyer from October 2018 and January 2019.  Dkt. No. 47 at ¶¶ 41-69. They allege that during the shows, Alex Jones falsely stated that Corsi "seemed to be extremely

---

[1] This case is one of several nearly identical suits filed by Corsi and Klayman against Stone and various other defendants in several district courts.  *See Klayman v. Infowars*, Case No. 20-cv-80614 (S.D. Fla. Apr. 8, 2020); *Corsi v. Stone*, Case No. 1:19-cv-00324; *Corsi v. Caputo*, Case No. 1:19-cv-01573-TJK (D.D.C.).  Plaintiffs have also filed similar suits in state courts.  *See Corsi v. Stone*, Case No. 50-2019-CA-013711-MB (15th Jud. Cir., Fla. 2019); *Klayman v. Stone*, Case No. 50-2019-CA-015104-MB (15th Jud. Cir., Fla. 2019); *Klayman v. Stone*, Case No. CACE 19-002672 (17th Jud. Cir., Fla. 2019); *Klayman v. Infowars, Stone*, Case No. CACE-20-007120 (17th Jud. Cir., Fla. filed Apr. 28, 2020); *Corsi v. InfoWars, LLC & Stone*, CACE 20-004473 (17th Jud. Cir., Fla. filed Mar. 11, 2020).

mentally degraded to the point of . . . dementia," had a stroke, and does not tell the truth, and that Stone falsely stated that Corsi was fired from a prior job, is an alcoholic, often lies, is willing to perjure himself, and is a "deep state" operative and a "fraud" who seeks to make political conservatives look bad. *Id.* at ¶¶ 42-45, 50-53, 55-56, 90. Plaintiffs further allege that in one of the videos, Stone attacked Klayman's reputation, stating that Klayman "could be the single worst lawyer in America," has "never actually won a courtroom victory in his life," and is an "idiot" and an "egomaniac." *Id.* at ¶¶ 55, 59.

In their Amended Complaint, Plaintiffs acknowledge that the sole speakers of the allegedly defamatory statements at issue are Stone and Alex Jones. Dkt. No. 47 at ¶¶ 37-39. Nonetheless, Plaintiffs contend that Stone has "used and continues to employ surrogates and agents, either out in the open or secretly, to defame Plaintiffs," alleging that the Defendants have "acted in concert" at Stone's direction to defame them. *Id.* at ¶¶ 31-32, 76. Plaintiffs further allege that they are competitors to Defendants "as conservative media personalities, broadcasters, authors and columnists on social media and elsewhere," and that Defendants' actions thus constitute unfair competition in violation of the Lanham Act. *Id.* at ¶¶ 70-74, 104-109. Their Amended Complaint also states causes of action for intentional infliction of emotional distress and assault, alleging that Defendants threatened Plaintiffs, causing them severe emotional distress and has placed them "in apprehension of an imminent harmful or offensive contact and physical harm and death, by coercing and threatening Plaintiffs." *Id.* at ¶¶ 93-103. In five separately filed motions to dismiss, Defendants seek dismissal of Plaintiffs' suit in its entirety. *See* Dkt. Nos. 55, 57, 58, 59, 70.

## II. LEGAL STANDARDS

Federal Rule of Civil Procedure 12(b)(1) allows a party to assert lack of subject matter jurisdiction as a defense to suit. FED. R. CIV. P. 12(b)(1). Federal district courts are courts of limited

jurisdiction and may only exercise such jurisdiction as is expressly conferred by the Constitution and federal statutes. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). A federal court properly dismisses a case for lack of subject matter jurisdiction when it lacks the statutory or constitutional power to adjudicate the case. *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). In ruling on a Rule 12(b)(1) motion, the court may consider any one of the following: (1) the complaint alone; (2) the complaint plus undisputed facts evidenced in the record; or (3) the complaint, undisputed facts, and the court's resolution of disputed facts. *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008). "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). "Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Id.*

Federal Rule of Civil Procedure 12(b)(6) allows a party to move to dismiss an action for failure to state a claim on which relief can be granted. In deciding a Rule 12(b)(6) motion to dismiss for failure to state a claim, the court "accepts all well-pleaded facts as true, viewing them in the light most favorable to the [nonmovant]." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (internal quotation marks omitted). The Supreme Court has explained that a complaint must contain sufficient factual matter "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the [nonmovant] pleads factual content that allows the court to draw the reasonable inference that the [movant] is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678. "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the

elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotations and citations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.* "The court's review is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Ironshore Europe DAC v. Schiff Hardin, L.L.P.*, 912 F.3d 759, 763 (5th Cir. 2019) (quoting *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010)). "A statute of limitations may support dismissal under Rule 12(b)(6) where it is evident from the plaintiff's pleadings that the action is barred and the pleadings fail to raise some basis for tolling or the like." *Jones v. Alcoa, Inc.*, 339 F.3d 359, 366 (5th Cir. 2003).

## III.  ANALYSIS

### A.  Lanham Act Claims

The Lanham (Trademark) Act, 15 U.S.C. § 1051 et seq., prohibits deceptive trade practices such as false advertising and trademark infringement. Section 1125 provides for civil liability in the case of:

> any person who on or in connection with any goods or services, ... uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any ... false or misleading description of fact, or false or misleading representation of fact, which—
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the ... sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or another person's goods, services, or commercial activities[.]

15 U.S.C. § 1125(a)(1)(A) & (B).

5

Plaintiffs argue that because Defendants are their competitors "as conservative media personalities, broadcasters, authors and columnists on social media and elsewhere," that Defendants' allegedly defamatory and misleading statements during the InfoWars videos thus constitute unfair competition in violation of the Act. Dkt. No. 47 at ¶¶ 104-109. Defendants argue that Plaintiffs have failed to establish their standing under the Lanham Act. Dkt. No. 55 at 7; Dkt. No. 57 at 16; Dkt. No. 70 at 4-9.

To establish standing under the Lanham Act, "the Plaintiff's injuries must fall within the 'zone of interests' the statute was intended to protect." *Lexmark Int'l v. Static Control Comps*., 572 U.S. 118, 130 (2014). In *Lexmark Int'l*, the Supreme Court explained that a "plaintiff suing under § 1125(a) ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that occurs when deception of consumers causes them to withhold trade from the plaintiff." *Id.* In other words, to proceed with their Lanham Act claim, Plaintiffs must plead an injury to some commercial interest in sales or business reputation that was proximately caused by the Defendants' misrepresentations.

Plaintiffs have not met their burden to establish standing under the Lanham Act. Specifically, Plaintiffs fail to show that their alleged injuries fall within the zone of interests of the Act. Here, the Plaintiffs allege that they compete with Defendants as media personalities who derive income from the internet and radio. Dkt. No. 47 at ¶ 74. According to Plaintiffs, the Defendants' allegedly defamatory remarks were made to harm their reputations and eliminate them as competition for potential listeners or donors. Dkt. No. 79 at 6. However, "[t]he mere fact that the parties may compete in the marketplace of ideas is not sufficient to invoke the Lanham Act." *Farah v. Esquire Magazine*, 736 F.3d 528, 541 (D.C. Cir. 2013).

6

It is well established that Section 1125(a) applies only to commercial speech, which is not at issue here. *Alliance for Good Government v. Coalition for Better Government*, 901 F.3d 498, 506 n.8 (5th Cir. 2018) (noting Section 1125(a) applies only to "commercial advertising and promotion"); *Nichols v. Club for Growth Action*, 235 F. Supp. 3d 289, 295 (D.D.C. 2017) ("The Lanham Act only restricts commercial speech, or speech connected with a good or service."). The allegedly defamatory comments made by Defendants during the InfoWars video are not commercial speech or advertisements, but rather expressions of opinions as commentary during a radio show. *See Farah*, 736 F.3d at 541. The complained of conduct at issue does not fall within the zone of interest that the Lanham Act was intended to protect. *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1383 n. 6 (5th Cir. 1996). Because Plaintiffs do not have standing under the Lanham Act,[2] the claims under that statute should be dismissed with prejudice.

## B.    Defamation Claims

Plaintiffs' Amended Complaint alleges claims for defamation, defamation *per se*, and defamation by implication against each of the Defendants. Dkt. No. 47 at ¶¶ 75-92. Under Texas law, a plaintiff seeking to state a defamation claim must plead the following elements: (1) publication of a false statement of fact to a third party, (2) the statement must concern the plaintiff and be defamatory, (3) the publication must be made with the requisite degree of fault, and (4) the publication must cause damages. *In re Lipsky*, 460 S.W.3d 579, 593 (Tex. 2015). A statement is

---

[2] Notably, in April 2020, Plaintiff Klayman filed a nearly identical suit filed in the Southern District of Florida. *See Klayman v. Infowars*, Case No. 20-cv-80614 (S.D. Fla. Apr. 13, 2020). There, *sua sponte* the district judge issued an order requiring a more definite statement, directing Klayman that if he were to replead his Lanham Act unfair competition claim, he needed to show that he had standing to do so. *Id.* Rather than replead, Klayman voluntarily dismissed that action, Dkt. Nos. 34-3, and instead has pursued the claim here, without alleging any additional facts to address the standing deficiencies the Florida court noted.

defamatory "if it tends to injure a person's reputation and thereby expose the person to public hatred, contempt, ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation." *Lipsky*, 460 S.W.3d at 593. Damages must be shown unless the statements are defamatory *per se*, meaning that the statements are so clearly harmful that general damages may be presumed. *Id.*

When a defamation suit is brought against a media defendant over a matter of public concern, the plaintiff bears the burden of proving falsity. *Klentzman v. Brady*, 312 S.W.3d 886, 898 (Tex. App. – Houston [1st Dist.] 2009). Texas Courts employ the "substantial truth doctrine" to determine the truth or falsity of a broadcast or publication: "if a broadcast taken as a whole is more damaging to the plaintiff's reputation than a truthful broadcast would have been, the broadcast is not substantially true and is actionable." *Neely v. Wilson*, 418 S.W.3d 52, 63 (Tex. 2013).

Claims of defamation by implication cover both "gist" and implication. *Dallas Morning News, Inc. v. Tatum*, 2018 WL 2182625, at *8 (Tex. 2018). To determine defamation by implication, the court must "determine whether the implication the plaintiff alleges is among the implications that the objectively reasonable reader would draw." *Id.* at *9. The court must "not place 'overwhelming emphasis on a[ny] single term' or 'focus on individual statements' to the exclusion of the entire publication." *Id.* at *10. It must "consider[ ] inferential meaning carefully, but not exhaustively." *Id.* Further, in order to curtail a chilling effect on freedom of speech, the plaintiff "must point to 'additional, affirmative evidence' within the publication itself that suggests the defendant 'intends or endorses the defamatory inference.'" *Id.*

### 1. Owen Shroyer

Defendant Shroyer's motion to dismiss asserts that Plaintiffs have not pled sufficient facts to maintain a defamation claim against him. Dkt. No. 55. The Court agrees. Plaintiffs' Amended

Complaint contains no allegations that Shroyer himself engaged in defamatory conduct, but instead seeks to hold Shroyer liable for the alleged defamatory conduct of other defendants by arguing Shroyer was acting "in concert" with them. Dkt. No. 47 at ¶¶ 8, 76, 81, 87. Plaintiffs provide no facts in support of their conclusory allegations of conspiracy to defame with other defendants or that Shroyer "ratified" the allegedly defamatory statements complained of by Plaintiffs. Rather, the only facts alleged against Shroyer in the Amended Complaint are that he appeared in InfoWars videos with his co-host Stone when Stone made the allegedly defamatory comments about Corsi and Klayman. Dkt. No. 47 at ¶¶ 49-54, 59-62. Plaintiffs' attempt to equate Shroyer's presence in these videos with a conspiracy to defame is entirely conclusory and insufficient to support their claims. *Walker v. Beaumont Ind. School Dist.*, 938 F.3d 724, 734 (5th Cir. 2019); *Hourani v. Mirtchev*, 796 F.3d 1, 16 (D.C. Cir. 2015); *King v. Jarrett*, 2016 WL 11581949, at *6 (W.D. Tex. June 17, 2016). Given the lack of any factual allegations supporting Plaintiffs' assertion that Shroyer conspired with other defendants to defame Corsi or Klayman, Plaintiffs have failed to state a defamation claim against him.

### 2. David Jones

The defamation claims against David Jones fail for the same reason. Plaintiffs' Amended Complaint does not make any specific allegations of defamatory conduct by David Jones. As with Shroyer, Plaintiffs attempt to hold David Jones liable for alleged defamatory remarks made by other defendants by asserting that David Jones was "acting in concert" with the other defendants. Dkt. No. 47 at ¶¶ 8, 76, 81, 87. The Amended Complaint's only factual allegations regarding David Jones are that he is the father of Defendant Alex Jones, that he is the alleged co-owner of Defendant entities InfoWars and Free Speech Systems,[3] and that he allegedly held the position of Director of Human

---

[3] In his motion to dismiss, David Jones denies the allegation that he is an owner of either InfoWars or Free Speech Systems. Dkt. No. 57 at 5.

Relations for Free Speech Systems. *Id.* at ¶ 8. Based on these assertions alone, Plaintiffs contend that David Jones "worked in concert with and as an agent for the other Defendants," "participated in and ratified the illegal acts set forth in this Complaint," and "profited … from the tortious acts of the other Defendants." *Id.* These assertions are wholly conclusory and unsupported by facts, and thus insufficient to survive a Rule 12(b)(6) motion. *Hershey v. Energy Transfer Partners*, 610 F.3d 239, 245-46 (5th Cir. 2010); *Walker*, 938 F.3d at 734.

To the extent Plaintiffs attempt to hold David Jones liable for any alleged defamatory actions of other defendants as an alleged owner of the limited liability companies InfoWars and Free Speech Systems, this argument also fails. Under Texas law, owners of limited liability companies are not liable for the torts of the entity, unless the plaintiff can allege some basis for piercing the corporate veil. *See Hong v. Havey*, 551 S.W.3d 875, 885 (Tex. App.—Houston [14th Dist.] 2018, no pet.); *Bates Energy Oil & Gas v. Complete Oilfield Svcs.*, 361 F.Supp. 3d 633, 665 (W.D. Tex. 2019). Here, Plaintiffs include no allegations that indicate an intention to proceed against David Jones as an owner on an alter-ego theory of liability. Given the lack of any allegations that David Jones personally engaged in defamatory conduct, or allegations supporting a basis to pierce the corporate veil or to hold David Jones liable on a theory of conspiracy, Plaintiffs' defamation claims against David Jones should be dismissed without prejudice.

### 3. Alex Jones, InfoWars, and Free Speech Systems

Defendants Alex Jones, InfoWars, and Free Speech Systems ("Moving Defendants") jointly move to dismiss the claims filed by Corsi (Dkt. No. 58) and Klayman (Dkt No. 59), arguing that their defamation claims fail to allege facts sufficient to state a claim against them. Dkt. Nos. 58, 59. Klayman does not allege Alex Jones himself made any defamatory remarks about Klayman. Nevertheless, as with Shroyer and David Jones, he seeks to hold Alex Jones and the Moving

Defendants liable for Stone's allegedly defamatory remarks about Klayman, based on a conspiracy theory. Dkt. No. 47 at ¶¶ 8, 76, 81, 87. The Moving Defendants assert that these claims fail because Plaintiffs fail to connect the Moving Defendants to the remarks. Dkt. No. 59 at 15-16. For the reasons discussed above with regard to Shroyer and David Jones, the Court agrees. Plaintiffs fail to allege any facts that give credence to any of the Defendants acting "in concert" such that the Moving Defendants could be held liable for any alleged defamatory remarks of other defendants. Accordingly, the undersigned recommends these claims be dismissed.

Plaintiffs' Amended Complaint does, however, contain allegations that Alex Jones himself made several defamatory statements about Corsi during the October 2018 and January 2019 InfoWars videos. Dkt. No. 47 at 41-44. The statements Corsi alleges Jones made are these:

- "[W]hen I was in DC about six months ago with dr. [sic] Corsi he seemed to mentally be extremely degraded to the point of what I would call dementia." Dkt. 47 ¶ 42.

- "[Corsi]'s on the ground at another table we had to help him out of there man they thought he was dead in the elevator." *Id.* ¶ 43.

- "[Corsi] had a stroke or whatever's going on with Corsi that whatever comes out of his mouth ain't the truth." *Id.* ¶ 44

- Corsi is a "spook, back and forth with different agencies." *Id.* ¶ 67

The Moving Defendants assert that none of these remarks are actionable because they are all expressions of opinion, rhetorical hyperbole, or substantially true statements. Dkt. No. 58 at 15-17. They argue that none of the remarks are actionable defamation because they are the type of imaginative expression, rhetorical hyperbole, and opinion statements that "cannot reasonably be interpreted as stating actual facts about an individual." *Milkovich v. Lorain Journal Co.*, 491 U.S. 1, 2 (1990).

11

Defendants allege that Jones' statement that "when I was in DC about six months ago with dr. [sic] Corsi he seemed to mentally be extremely degraded to the point of what I would call dementia," is a statement of Alex Jones' opinion, and is thus not actionable as defamation. Dkt. No. 58 at 15-16.  The Court agrees.  Jones in this statement is offering his opinion regarding how he perceived Corsi's cognitive state based on seeing him in person.  This is not a fact statement, but rather a statement of opinion and is thus not actionable.  The same is the case with the related statement that "[Corsi]'s on the ground at another table we had to help him out of there man they thought he was dead in the elevator."  Corsi does not contend that Jones did not see him on the floor, nor does he challenge that others were concerned about his medical state.  Again, this is a statement of what Jones perceived.  Further,  Corsi fails to demonstrate how the statement has a defamatory meaning.

With regard to the statement that "[Corsi] had a stroke or whatever's going on with Corsi that whatever comes out of his mouth ain't the truth,"(Dkt. No. 47 ¶ 44), the motion asserts the statement was rhetorical hyperbole, and cannot be the basis of a defamation action.  Dkt. No. 58 at 16.  They contend that, reviewed in context, "a person of ordinary intelligence would perceive these words as nothing more than rhetorical hyperbole." *Id.* (citing *Rehak Creative Servs. v. Witt*, 404 S.W.3d 716, 729 (Tex. App. 2013)).  The Court agrees that the second half of this statement, that "whatever's going on with Corsi that whatever comes out of his mouth ain't the truth," would be considered by the ordinary person, particularly in the context of an InfoWars video, to be rhetorical hyperbole.  The statement that "[Corsi] had a stroke," however, is a straightforward factual statement, which, if false could support a defamation claim.  Jones concedes this, noting that, "in isolation, these might sound like false statements of fact."  Dkt. 80 at 5.  He notes, however, that when read in the full context of Jones' commentary, the statement is not defamatory, and instead is a statement of Jones' speculation

on Corsi's medical state. This context includes Jones' earlier statement that "I think he's got dementia or a stroke I mean I don't know," and his description of Corsi having "a really sharp brain until about a year ago." *See* Dkt. No. 7-2. Jones contends that in this context, the statement is Jones' view that Corsi was prone to error based on Jones' observations of Corsi's health. Though this is a closer call than the other statements, the Court agrees.

With regard to Jones' statement calling Corsi a "spook, back and forth with different agencies," (Dkt. No. 47 at ¶ 67), Jones contends the statement is not defamatory, but rather "most reasonable people would find such facts to be flattering." Dkt. No. 58 at 17. Indeed, a "spook" is a colloquial term for a person employed in the intelligence community,[4] and is generally not taken as a derogatory term. It is akin to referring to a police officer as a "cop." Further, Corsi's own affidavit establishes that the statement is literally true, in that Corsi worked with several intelligence agencies and had a top secret security clearance. Dkt. 74 at 24-26; ¶¶ 7, 15. To the extent Corsi contends that the implication of the statement was that he had assisted the Mueller investigation in an attempt to harm Roger Stone and Donald Trump, that implication is not apparent from anything alleged in the Amended Complaint, and Corsi fails to demonstrate how, even assuming the implication was made, the statement is defamatory.

In addition to the above arguments, the Moving Defendants also argue that the defamation claims fail because Plaintiffs have failed to allege any facts establishing the Defendants made these statements with actual malice. Because Corsi and Klayman's own pleadings demonstrate they are public figures, the Moving Defendants contend Corsi and Klayman must meet a heightened pleading standard requiring that they allege facts showing the Defendants made the defamatory remarks with

---

[4]The Merriam Webster Dictionary defines "spook" as "an undercover agent: SPY." *See* https://www.merriam-webster.com/dictionary/spook (visited 5/24/21).

actual malice. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974) (holding that private individuals become public figures when they have "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved."). The Moving Defendants' contend Corsi's and Klayman's defamation claims fail because they make no plausible allegations that Defendants acted with actual malice. Dkt. No. 58 at 18. The Court agrees. Actual malice is a high burden. *See Peter Scalamandre & Sons, Inc. v. Kaufman*, 113 F.3d 556, 561 (5th Cir. 1997). A public figure suing for defamation must show the defendant knowingly made false statements, or made false statements with reckless disregard for the truth. *Id.* In this regard, the Amended Complaint is lacking. There are no allegations that lead to a reasonable inference that the Defendants acted with malice or a reckless disregard for the truth with regard to the remarks above. This is an alternative reason that dismissal is appropriate on these claims.

Corsi has failed to adequately allege that Alex Jones knowingly made false statements or acted with reckless disregard for the truth in making the complained of statements about Corsi, and has failed to adequately plead that Jones acted with malice in making the statements. As a result he has failed to state a claim against Jones or the Moving Defendants.

### 4.    Roger Stone

Lastly, Defendant Stone asserts that the defamation claims against him should be dismissed because they are time-barred. Dkt. No. 70 at 11-13. Under Texas law, defamation claims generally are subject to a one-year statute of limitations. TEX. CIV. PRAC. & REM. CODE, § § 16.002(a), 16.003(a); *Jackson v. W. Telemarketing Corp*., 245 F. 3d 518, 523 (5th Cir. 2001); *Hamad v. Center for Jewish Cmty. Studies*, 265 F. App'x 414, 417 (5th Cir. 2008). To determine whether a defamation claim is timely, courts in Texas have adopted the "single publication rule." *Forbes Inc. v. Granada Biosciences, Inc*., 124 S.W.3d 167, 173 (Tex. 2003). Under the single publication rule, defamation

claims must be brought within one year from the first date of publication, whether that be traditional print publication or publication on the internet. *Id.*; *Glassdoor, Inc. v. Andra Group, LP*, 575 S.W.3d 523, 529 (Tex. 2019).

Here, the allegedly defamatory statements on which the Plaintiffs' claims are premised were published when the InfoWars videos were made available online in October 2018 and January 2019, respectively. Dkt. No. 47 at ¶¶ 41-69. Corsi and Klayman sued Shroyer, Alex Jones, David Jones, InfoWars, and Free Speech Systems on March 7, 2019, are thus the claims against these defendants are timely under the statute of limitations. *See* Dkt. No. 1. However, Stone was not added as a defendant until the filing of the Amended Complaint on July 29, 2020. Dkt. No. 47. Because the claims against Stone were filed after the one year statute of limitations expired, the claims are time-barred. *See, e.g. Jones v. Alcoa, Inc.*, 339 F.3d 359, 366 (5th Cir. 2003) ("A statute of limitations may support dismissal under Rule 12(b)(6) where it is evident from the plaintiff's pleadings that the action is barred and the pleadings fail to raise some basis for tolling or the like."). Accordingly, the Plaintiffs' defamation claims against Stone should be dismissed with prejudice.

## C. Intentional Infliction of Emotional Distress Claims

Next, Plaintiffs assert common law claims of intentional infliction of emotional distress ("IIED"). To recover for IIED under Texas law, "a plaintiff must prove that 1) the defendant acted intentionally or recklessly, 2) the conduct was 'extreme and outrageous,' 3) the actions of the defendant caused the plaintiff emotional distress, and 4) the resulting emotional distress was severe." *Standard Fruit & Veg. Co. v. Johnson*, 985 S.W.2d 62, 65 (Tex. 1998). Plaintiffs assert IIED claims against each Defendant for "knowingly and intentionally threatening Plaintiffs, in a manner similar to other death threats co-conspirator and Defendant Stone made to at least one material witness, involved in Special Counsel Mueller's Russian collusion investigation … as well as Judge Amy

Berman Jackson." Dkt. No. 47 at ¶ 95. The Amended Complaint otherwise fails to allege facts to support any of the elements of their IIED claims, and further, includes no specific allegations as to any defendant except for Stone. *Id.*

In addition to this lack of factual allegations necessary support the claim, IIED is a "gap-filler tort" designed to "supplement existing forms of recovery by providing a cause of action for egregious conduct 'that its more established neighbors in tort doctrine would technically fence out.'" *Standard Fruit*, 985 S.W.2d at 65. Thus, "[w]here the gravamen of a plaintiff's complaint is really another tort, intentional infliction of emotional distress should not be available." *Hoffmann-La Roche, Inc. v. Zeltwanger*, 144 S.W.3d 438, 447-48 (Tex. 2004). Here, the "gravamen" of Plaintiffs' IIED claim is defamation. Their IIED claim is "merely incidental to the commission of some other tort," and thus should be dismissed. *Standard Fruit*, 985 S.W.2d at 68.

## D. Assault Claims

Plaintiffs also assert common law claims of assault against all Defendants. Texas law defines assault as "threaten[ing] another with imminent bodily injury." Texas Penal Code § 22.01(a).[5] The Amended Complaint vaguely alleges that "Defendants placed Plaintiffs in apprehension of an imminent harmful or offensive contact and physical harm and death. . ." Dkt. No. 47 at ¶ 98. It further alleges, without any factual support, that Defendants call their followers "to arms" against unspecified victims. *Id.* at ¶¶ 99-100. With the exception of a vague comparison of Defendant Stone to the "Mafia," the Complaint provides no specific allegations that the Defendants threatened Corsi or Klayman with imminent bodily injury. *Id.* at ¶¶ 99-100. Plaintiffs' assault claims thus fail to survive Defendants' Rule 12(b)(6) motions and should be dismissed.

---

[5] Under Texas law, the elements for assault are the same in the civil and criminal context. *Sanders v. Schulze*, 2015 WL 5547630, at *9 (N.D. Tex. Aug. 31, 2015).

### E.   Leave to Amend

Generally, a court should not dismiss an action for failure to state a claim under Rule 12(b)(6) without giving plaintiff "at least one chance to amend." *Hernandez v. Ikon Ofc. Solutions, Inc.*, 306 Fed. Appx. 180, 182 (5th Cir. 2009). "Although leave to amend under Rule 15(a) is to be freely given, that generous standard is tempered by the necessary power of a district court to manage a case." *Yumilicious Franchise, L.L.C. v. Barrie*, 819 F.3d 170, 177 (5th Cir. 2016) (quoting *United States ex rel. Willard v. Humana Health Plan of Tex., Inc.*, 336 F.3d 375, 387 (5th Cir. 2003)). The Fifth Circuit has previously stated that "[a] bare request in an opposition to a motion to dismiss—without any indication of the particular grounds on which the amendment is sought—does not constitute a motion [within] the contemplation of Rule 15(a)." *Id.* (quoting *Confederate Mem'l Ass'n, Inc. v. Hines*, 995 F.2d 295, 299 (D.C. Cir. 1993)). As noted earlier, this is one of several lawsuits Corsi and Klayman have filed raising these very same claims. Moreover, they have already amended their complaint in this case once. Further, a nearly identical version of this suit was filed in the Southern District of Florida, and the judge there issued an order that pointed out many of the same problems that are addressed above, and ordered Corsi and Klayman to file a more definite statement to address the problems. Instead of doing so, they chose to withdraw that suit and file this one. Thus, if they had more facts to plead to cure the identified problems, they have certainly already had the opportunity to do so. For these reasons, the undersigned recommends that the Court not permit Corsi or Klayman leave to amend, and dismiss the claims with prejudice.

### IV. MOTIONS FOR SANCTIONS

In addition to the motions to dismiss, Defendants Shroyer and Stone have both filed motions seeking sanctions against Corsi and Klayman under Rule 11. Dkt. Nos. 56, 84. Should the district judge adopt the recommendations made herein, it is possible that sanctions could be appropriate as

the defendants who made no challenged statements, and as to Stone, given that the statute of limitations had run on the claim against him when the suit was filed. It would, however, be premature for the Court to address that issue before the district judge has acted on this Report and Recommendation. Accordingly, the undersigned **ORDERS** that Defendants Shroyer and Stone's Motions for Sanctions (Dkt. Nos. 56 & 84) be **DENIED WITHOUT PREJUDICE** to being refiled once the district judge acts on this Report and Recommendation.

## V. RECOMMENDATIONS

For the reasons set forth above, the undersigned **RECOMMENDS** that the Court **GRANT** the Defendants' motions to dismiss (Dkt. Nos. 55, 57, 58, 59, 70), and **DISMISS** the Plaintiffs' claims **WITH PREJUDICE**, for failure to state a claim, and **DENY** Defendants Shroyer and Stone's Motions for Sanctions (Dkt. Nos. 56 & 84) **WITHOUT PREJUDICE** to being refiled once the district judge acts on this Report and Recommendation.

## VI. WARNINGS

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987). A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from *de novo* review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474

U.S. 140, 150-53, 106 S. Ct. 466, 472-74 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

SIGNED this 24th day of May, 2021.

_____

ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**

DR. JEROME CORSI, et al

               Plaintiffs

      v.

INFOWARS, LLC, et al

            Defendants.

**Case Number:   1:20-cv-298-LY**

**PLAINTIFFS JEROME CORSI'S AND LARRY KLAYMAN'S  OBJECTIONS TO REPORT AND RECOMMENDATION OF MAGISTRATE ANDREW W. AUSTIN**

Plaintiffs Dr. Jerome Corsi and Larry Klayman ("Plaintiffs"), pursuant to Fed. R. Civ. P. 72(b)(2), hereby submits the following written objections to Magistrate Andrew W. Austin's ("Magistrate Austin") Report and Recommendation of May 25, 2021. ECF No. 108. (the "Report")

**I.      INTRODUCTION**

As set forth in detail previously in Plaintiffs' Motion to Have Presiding Judge Decide Outstanding Motions to Dismiss, at the hearing of March 23, 2021 before Magistrate Austin, and related pleadings he demonstrated a virtual complete lack of understanding about the allegations of the Amended Complaint, and in so doing appeared to have prejudged the case without a valid basis. ECF No's 108, 112, 114. This lack of understanding combined with prejudgment has, regrettably, carried over to his fatally flawed Report, which contains numerous factual and legal errors which must be rejected and thus corrected.

Indeed, Magistrate Austin's Report, which appears to have been hastily written on the eve of his retirement, after an enormously prejudicial nearly (8) month delay after  this matter

1

had been fully briefed, in the face of the presiding judge's strong direction issued at the outset of this case, where he told the parties to move this case along to trial:

> You're going to have to figure how much time you want because once I get it set, once I fill in after a subsequent conference your trial month and final pretrial conference date and time, you're not likely to get a continuance or a postponement.
>
> I like to try lawsuits. If I had my way and could pass one law, I would do away with motion practice altogether, and you would either settle your case or try your case, the way it was in the olden days.

This necessitated the filing of Plaintiffs' Motion to Vacate Report and Recommendation of Magistrate Austin, which was not a personal attack on Magistrate Austin whatsoever, as Defendants disingenuously assert, but simply a necessary pleading to point out the numerous errors contained out in the Report and to argue that this case must now move quickly to discovery and trial. These legal and factual errors are set forth fully, in detail below.

## II.      LEGAL STANDARD

The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions. As Magistrate Austin is now retired, the latter option is not viable in any event. Fed. R. Civ. P. 72(b)(3).

## III.     LEGAL ARGUMENT

As set forth above, Magistrate Austin's Report contains numerous legal and factual errors that are addressed in turn below.

### a.       Magistrate Austin's Report Contains Numerous Legal Errors

As a threshold matter, Magistrate Austin gravely erred when he ignored the sworn affidavits submitted by both Plaintiff Klayman, Dr. Corsi, Kelly Morales (formerly Mrs. Alex

2

Jones), which show that Plaintiffs went far beyond the necessary pleading requirements set forth under Fed. R. Civ. P. 8(a) and under Supreme Court precedent. <u>Exhibits 1, 2, and 4</u> *attached hereto*. ECF No. 73, 74. The standard for a Rule 12(b)(6) motion is that a complaint "does not require detailed factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (U.S. 2009) (internal quotations omitted). To survive a motion to dismiss, a complaint need only "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id*. Plaintiffs' Amended Complaint more than meets this low pleading standard, and they have buttressed their claims even further with sworn affidavits from themselves as well as Defendant Alex Jones' ex-wife Kelly Morales, while Defendants have provided no affidavits. <u>Exhibits 1, 2, and 4</u> *attached hereto*. ECF No 73, 74.

What Magistrate Austin has done here is he has usurped the role of the jury, which is especially egregious at the motion to dismiss stage. In situations where resolution is necessarily fact intensive, like defamation, the U.S. Supreme Court has held that "[m]aintenance of the jury as a fact-finding body is of such  importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care." *Dimick v. Schiedt*, 293 U.S. 474, 486 (U.S. 1935). If a statement is capable of more than one meaning, it requires a jury to decide whether that statement is defamatory. "If, however, the court finds the statement is capable of at least one defamatory meaning and at least one  non-defamatory meaning,  a jury must  determine  whether  the  defamatory meaning was conveyed." *Tu Nguyen v. Duy Tu Hoang*, 318 F. Supp. 3d 983, 1007 (S.D. Tex. 2018). Magistrate Austin's error here is underscored by in the Report where he writes at page 8, that "[w]hen a defamation suit is brought against a media defendant over a matter of public concern, the plaintiff bears the burden of proving falsity." Of course this is true if the matter were given to

3

a jury, but at the motion to dismiss stage, there is no burden to "prove" falsity on Plaintiffs. This is a clear error that resulted from Magistrate Austin improperly appointing himself as the entire jury.

        i.        **Magistrate Austin Ignored the Allegations in the Complaint that Defendants Were Working Together in Concert**

Magistrate Austin recommended dismissal of claims against Defendants Shroyer and David Jones because Plaintiffs have not made any factual allegations supporting the assertion that these Defendants have conspired with their co-Defendants to defame them. This is simply not true, and a subversion of the pleading standard set forth in *Iqbal*.

The Amended Complaint specifically and expressly alleges that the Infowars Defendants were at all material times "working together in concert with and as agents of Stone…." Am. Comp. ¶ 36. Furthermore, "Plaintiffs have demanded retraction and correction of the defamatory videos and publications…but Defendant shave arrogantly refused, thereby ratifying any and all defamatory statements contained therein…." Am. Comp. ¶ 38.

These assertions are supported by detailed factual allegations:

Defendant InfoWars and Defendant Free Speech Systems are both owned, controlled, and operated by Defendant Alex Jones and David Jones. Defendant Free Speech Systems owns www.infowars.com, where content created by Defendants Alex Jones, Shroyer and Stone were at all material times posted and broadcast into this district, nationally and internationally. Am. Comp. ¶ 11.

Defendant David Jones is Defendant Alex Jones's father and holds the official title of Director of Human Relations for Defendant Free Speech Systems. On information and belief, Defendant David Jones is the owner of Defendant InfoWars and Free Speech Systems and he manages and controls the business and related activities for Defendants InfoWars and Free Speech Systems, as well as Defendant Alex Jones' other companies. Am. Comp. ¶ 8.

Thus, given the fact that each of every one of the Infowars Defendants are intricately bound together by virtue of the fact that they all directly participate in creating and publishing the

content on the Infowars site, it is more than merely plausible that they are working together in concert. This is more than enough at the pleading stage, where again, to survive a motion to dismiss, a complaint need only "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678.

However, Plaintiffs have taken this a step further and submitted sworn affidavits of themselves as well as Ms. Morales, Defendant Alex Jones' ex-wife who swears under oath:

> Based on my personal knowledge and experience, David Jones runs Infowars with Alex Jones and helps him with his activities, including fixing media stories and endorsing and/or aiding his slanderous and/or fraudulent behaviors, all for profit.
>
> Alex Jones could not function without David Jones, and has conspired with him on the past to commit this breach of fiduciary duty and fraud on my business/estate with Alex Jones. While David Jones did this, he slandered and/or defamed me to experts and assisted Alex Jones and his attorneys to do the same, so as to steal/hide my estate and his grandchildren's inheritance.
>
> Alex Jones is quasi-illiterate, and cannot use technology or apps such as email with any fluency, and he cannot function without assistance from those around him, including David Jones. Exhibit 2.

This was in addition to an affidavit submitted by David Jones himself on behalf of Alex Jones in his bankruptcy case, where he states, "I have been involved with Alex Jones' personal and business finances for many years…." Exhibit 3.

Notwithstanding the affidavits incorporated into a well pled Amended Complaint and related pleadings, and the hard fact that all of the Defendants all closely work together as part of Infowars and appeared together in concert on the same defamatory broadcasts, the law, which was presented to the Magistrate, shows otherwise:

> Civil conspiracy is used to extend tort liability beyond the wrongdoer to those who merely planned, assisted, or encouraged his acts. *See Carroll v. Timmers Chevrolet, Inc.*, 592 S.W.2d 922, 925-26 (Tex. 1979); *Helping Hands Home Care, Inc. v. Home Health of Tarrant County, Inc.*, 393 S.W.3d 492, 506 (Tex. App.-Dallas 2013, pet. denied). Once a civil conspiracy is proved, each conspirator is responsible for all acts done by any of the conspirators in

5

furtherance of the conspiracy. *Bentley v. Bunton*, 94 S.W.3d 561, 619 (Tex. 2002); *Carroll*, 592 S.W.2d at 926 (Tex. 1979); *Helping Hands*, 393 S.W.3d at 506. A finding of civil conspiracy imposes joint and several liability on all conspirators for actual damages resulting from the acts in furtherance of the conspiracy. *Carrol*l, 592 S.W.2d at 925; *Helping Hands*, 393 S.W.3d at 506. When a jury finds that liability for a civil conspiracy exists, this finding requires the legal conclusion to impose joint and several liability on the co-conspirators. *LandAmerica Commonwealth Title Co. v. Wido*, No. 05-14-00036-CV, 2015 Tex. App. LEXIS 11201, at *29 (Tex. App. Oct. 29, 2015).

Additionally, under Restatement (Second) of Torts, § 577, comment f, "One is liable for defamation by a third person whom as his servant, agent, or otherwise he directs or procures to publish defamatory matter." *See also Universal Commun. Sys. v. Turner Broad. Sys.*, 2005 U.S. Dist. LEXIS 58575, at *8 (S.D. Fla. Mar. 17, 2005) ("One is liable for defamation by a third person whom as his servant, agent, or otherwise he directs or procures to publish defamatory matter.")

Thus, given all of this, it was a grave error for Magistrate Austin to recommend dismissal of Defendant Shroyer and Defendant David Jones on the basis of lack of personal involvement, especially at the pleading stage, where it has been expressly alleged that (1) all of the Defendants were working together in concert, and (2) each of the Infowars Defendants were acting at the direction of Defendant Stone. Am. Comp. ¶ 36. Plaintiffs have more than adequately pled, if not proved, all of the Defendants specific, personal involvement as set forth in the allegations of the Amended Complaint. And if the Magistrate wanted more, he should not have stayed discovery, creating a heads I win, tails you lose scenario.

> ## ii.    Magistrate Austin Erred By Recommending Dismissal of Defamation Claims

This defamatory statements at issue in this case are so outrageous that they are clearly defamatory on their faces, and they are defamatory *per se*, as they harm Plaintiffs in their trade and profession, and as such damages are presumed, as set forth in detail below. Statements that

6

injure a person in her office, profession, or occupation are typically classified as defamatory per se. *Hancock v. Variyam*, 400 S.W.3d 59, 63–64 (Tex. 2013). These published statements are:

(1) "He (Klayman) was ousted at Judicial Watch. Ask Tom Fitton [the current president of Judicial Watch] why he left. He was 'ousted' because of a 'sexual harassment complaint.'" Am. Comp. ¶ 56.

(2) "He's (Klayman) never actually won a courtroom victory in his life." Am. Comp. ¶ 55

(3) "For those people out there who think...that Larry Klayman's IQ is higher than 70, you're wrong..." Am. Comp. ¶ 62.

(4) "He's (Klayman) incompetent, he's a numbskull, he's an idiot, he's an egomaniac, and he could be the single worst lawyer in America. With him as Jerry Corsi's lawyer, Corsi may get the electric chair. So your idea that he's a good guy is entirely wrong" Am. Comp. ¶ 59

(5) Plaintiff Klayman is a "piece of garbage." Am. Comp. ¶ 61

With regard to Plaintiff Dr. Corsi, Defendants have falsely and maliciously published that:

(1) "Plaintiff Corsi "seemed to be extremely mentally degraded to the point of what I would call dementia." Am. Comp. ¶ 42

(2) Defendant Alex Jones purportedly saw Plaintiff Corsi at a steakhouse "on the ground at another table" and that his security staff "thought he was dead in the elevator." Am. Comp. ¶ 43

(3) Accusing Plaintiff Corsi of having suffered a stroke, publishes maliciously that "whatever comes out of his mouth ain't the truth." Am. Comp. ¶ 44

(4) that Plaintiff Corsi was "fired from World Net Daily." Am. Comp. ¶ 49

(5) "He (Corsi) was perfectly willing to lie, to perjure himself saying that a memo that he had wrote me was written on the 30th for the purposes of cover-up.... which is further proof that Jerry lied under oath." Am. Comp. ¶ 50

(6) "and then states that I knew about John Podesta's emails being stolen in advance, the only proof of that is Jerry's feeble alcohol affected memory – it's a lie...." Am. Comp. ¶ 51

(7) "Jerry was prepared to stab a principle Trump supporter in the back, he was perfectly prepared to bear false witness against me, even though I had done nothing in my entire life other than help him." Am. Comp. ¶ 52

(8) "all I ever did was show Jerry Corsi friendship and support and try to help him and his family and what I get is Judas Iscariot, the willingness to testify against me and help the deep state bury me....and then he makes up this story about helping me formulate a cover story." Am. Comp. ¶ 53

(9) "… you can always tell when Jerry Corsi is lying because his lips are moving...." Am. Comp. ¶ 54

(10)   "He [Corsi] was perfectly willing to bear false witness against me on multiple points that are complete fabrications." Am. Comp. ¶ 64

(11)   "the good doctor [Corsi] has told a number of lies. In fact, he's starting to conflate his lies.... he was perfectly willing to lie about me.... but now lying about Alex Jones, lying about InfoWars, lying about Dr. (David) Jones, who's one of the nicest, gentlest, sweetest, most honest men I have ever met, it's beyond the pale.... Jerry Corsi can no longer be believed." Am. Comp. ¶ 65

(12)   "I think you've [Corsi] been deep state from the beginning. Your whole birther thing is used as a club to destroy conservatives....I look forward to our confrontation. I will demolish you. You're a fraudster, out of your alcoholic haze you have made up lies about David Jones and Alex Jones and Roger Stone and now I suspect they want you to lie about the President." Am. Comp. ¶ 66

(13)   Plaintiff Corsi of being a "spook, back and forth with different agencies," Am. Comp. ¶ 67

(14)   Falsely publishing a false statement of Plaintiff Corsi "not being able to walk." Am. Comp. ¶ 68

### 1.   Magistrate Austin Erred In Finding that Plaintiffs Did Not Allege Actual Malice

Magistrate Austin simply arbitrarily writes that "Corsi has failed to adequately allege that Alex Jones knowingly made false statements or acted with reckless disregard for the truth in making the complained of statements about Corsi, and has failed to adequately plead that Jones acted with malice in making the statements." ECF No. 108 at 14. This conclusion is reached with zero

8

analysis, supporting Plaintiffs' assertion that the Report was written hastily and with prejudgment in mind.

Indeed, a review of the record shows that Magistrate Austin's finding here was clearly erroneous. First, and foremost, the Amended Complaint expressly sets forth that the Defendants acted with actual malice, as they knew that the defamatory statements were false given their long history, relationship, and familiarity with Plaintiffs: "Defendants, each and every one of them, as set forth herein, acted with actual malice, in concert, as joint tortfeasors, as they knew that the statements which they published were false…. Am. Comp. ¶ 36.

The Amended Complaint sets forth the fact that Defendants "have known Plaintiff Corsi for a long time and even worked with him… so they were well aware that the statements made by the co- Defendant Stone, and their own false, misleading, malicious and defamatory statements were, indeed, false, as well as their acting as agents of, much less their ratification of the malicious false statements published by Defendant Stone on their networks and media sites." Am. Comp. ¶ 39. This is further buttressed by Dr. Corsi's affidavit, Exhibit 1, which details his long-standing relationships with the Defendants:

> I personally know Defendant Roger Stone ("Defendant Stone") and he personally knows my qualifications and me. I have even ghostwritten books for Defendant Stone and we used to be friends and colleagues. Defendant Stone is thus intimately familiar with my personal and professional history.
>
> In 2016, after the presidential election, I worked very closely with Alex Jones and his father David Jones, as well as with the Infowars staff, including Owen Shroyer. I made multiple trips to Austin, Texas, to appear live in-studio on Infowars broadcasts. I accepted an assignment from Alex Jones to create for Infowars a news bureau in Washington, D.C. From the beginning, I found Alex Jones to be erratic, subjects to emotional outbursts, even reacting that I was trying to "steal his company" when with his father's assistance, I brought a multi-million dollar legitimate investment offer from highly credible sources to the table to discuss the proposal with Alex and his father.

> Several times, concerned that I might quit over how badly Alex Jones was treating me, Dr. Jones met with me privately, often over breakfast. In those breakfasts, I counseled Dr. Jones over my concerns that Alex should seek professional psychological help. While in my work under various contracts with federal government agencies to consult over anti-terrorism tactics, I had the opportunity to work with very experienced psychiatrists and psychologists. Still, I am not medically trained, and I cautioned Dr. Jones that the problems I perceived with Alex's behavior should be professionally evaluated by qualified medical professionals. Exhibit 1.

Indeed, as conclusive evidence that Defendants were acting with actual malice, as set forth in Dr. Corsi's affidavit, Indeed, Dr. Corsi's book, "*Killing the Deep State,"* was at all material times, still available for sale on the Infowars website! Exhibit 1. This shows that the Infowars Defendants at all times knew that Dr. Corsi was neither an alcoholic nor a liar, yet still willingly participated in branding him as such. This is textbook actual malice.

With regard to Plaintiff Klayman, "At 1:30 in the January 18 Video, Stone maliciously falsely published, "He (Klayman) was ousted at Judicial Watch. Ask Tom Fitton [the current president of Judicial Watch] why he left. He was 'ousted' because of a 'sexual harassment complaint.'" Defendant Stone had no basis to make these false, malicious, and defamatory claims. As pled in the Amended Complaint, Mr. Klayman "left Judicial Watch voluntarily on his own accord in order to run for U.S. Senate in Florida in 2003-2004." Am. Comp.   ¶57. This is a fact. Defendant Stone's false revisionist history is a malicious and false statement of fact.

Furthermore, as the final "nail in the coffin" to Defendant Stone's assertions, Thomas Fitton ("Fitton"), under oath, at a deposition in another matter testified that **"[y]ou [Mr. Klayman] weren't ousted as a result of a sexual harassment complaint**." Exhibit 5. This conclusively shows that Defendant Stone, in concert with the Infowars Defendants, published an objectively verifiable false statement. Indeed, at the same deposition, Fitton admits to never have

spoken to Stone, which shows that Stone simply made this lie up. <u>Exhibit 5</u>. Stone admitted

under oath in a deposition that he did not speak to Fitton about this either, so it's clear that Stone

made this up to defame Mr. Klayman. <u>Exhibit 5</u>. This evidences the fact that Defendant Stone, in

concert with the other Defendants, acted with actual malice.

Furthermore, Mr. Klayman's affidavit further shows that Defendant Stone and the other

Defendants, acting in concert, with actual malice and at a minimum acted with reckless disregard

for the truth.

> Defendant Stone was a "political consultant" who claimed to help get presidents and other politicians elected. The firm made money by then lobbying the very men they put in office.

> Defendant Stone backed Republican candidate Jack Kemp for President and he recommended that I be put on the executive finance committee, which also included Donald J. Trump.

> Because Defendant Stone knew of my successes and capabilities as a private lawyer, he told me that he had recommended me for U.S. Attorney when George Bush was President in 1992.

> In 1996, at a Republican Convention in San Diego, California, Defendant Stone was filmed at a "toga party" with his wife at a "swingers party."

> The media at the time went after Defendant Stone because of his alleged participation in the "sex party" and created a scandal.

> The media alleged at the time that Defendant Stone solicited sex half-naked, and that there was a picture of Defendant Stone in a compromising position to back up the story.

> Defendant Stone contacted me and, because he knew my capabilities and acumen as a lawyer, retained me to represent him to get the media to cease what he claimed then was a smear campaign.

> I successfully got the media to back off Defendant Stone through my skill as a lawyer and Defendant Stone was grateful.

> Because he was aware of my prior successes at Judicial Watch and before, Defendant Stone wanted to work with me as my U.S. Senate campaign manager.

During this time, the spring, summer, and fall of 2003, and in preparation for my U.S. Senate run, Defendant Stone researched and kept books and records of many of my accomplishments. He had several binders (2-3 feet) full of information about me and the victories that I had obtained at Judicial Watch and elsewhere. Again, because Defendant Stone knew of my successes and legal political acumen, Defendant Stone wanted to be on my team and help me run for the U.S. Senate.

Defendant Stone thus knew of many cases I had won in courtrooms and other legal accomplishments and in fact had kept records of successes in a book of my accomplishments. Exhibit 4.

Accordingly, this shows that Defendant Stone had actual knowledge that his statement regarding Mr. Klayman's abilities as a lawyer were flat out false, including but not limited to the "fact" that Mr. Klayman had "never won a courtroom victory in his life." Thus, Mr. Klayman has also far exceeded any requisite showing of actual malice. Thus, Magistrate Austin's finding that Plaintiffs failed to show actual malice was a clear error.

## 2.   Magistrate Austin Erred By Finding Defendants' Statements Unactionable as Defamation

Magistrate Austin' Report is limited to statements made by Defendant Alex Jones of and concerning Dr. Corsi. Because he makes no finding that Defendant Stone's statements were not defamatory, to the extent that the Court adopts any part of Magistrate Austin's Report, this finding concerning Defendant Stone must also be adopted. Magistrate Austin only found that the defamation claims against Defendant Stone fall outside of the statute of limitations.

The elements that a defamation plaintiff must prove are that (a) the defendant published a false statement of fact; (b) the statement defamed the plaintiff; (c) the defendant acted with actual malice, if the plaintiff is a public figure or a public official, or negligently, if the plaintiff is a private individual; and (d) the statement proximately caused damages." *Rodriguez v. Gonzales*, 566 S.W.3d 844, 848 (Tex. App. 2018). Furthermore, in a claim for defamation *per se,* damages are presumed, as the "statements are so obviously harmful that damages, such as mental

anguish and loss of reputation, are presumed." *Van Der Linden v. Khan*, 535 S.W.3d 179, 198 (Tex. App. 2017). Statements that injure a person in her office, profession, or occupation are typically classified as defamatory per se. *Hancock v. Variyam*, 400 S.W.3d 59, 63–64 (Tex. 2013). A defamation by implication claim arises when a "when discrete facts, literally or substantially true, are published in such a way that they create a substantially false and defamatory impression by omitting material facts or juxtaposing facts in a misleading way." *Dall. Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 627 (Tex. 2018).

Furthermore, the Supreme Court of Texas has found that a defendant may not escape liability for his defamatory conduct simply by couching his defamatory statement as an "opinion." *Bentley v. Bunton*, 94 S.W.3d 561 (Tex. 2002). The *Bentley* court gave an example:

> If a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, "In my opinion Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar." As Judge Friendly aptly stated: be destructive of the law of libel if a writer could escape liability for accusations of [defamatory conduct] simply by using, explicitly or implicitly, the words 'I think.'" See *Cianci* [*v. New Times Publishing Co.*, 639 F.2d 54, 64 (2d Cir., 1980)]. It is worthy of note that at common law, even the privilege of fair comment did not extend to "a false statement of fact, whether it was expressly stated or implied from an expression of opinion." Restatement (Second) of Torts, § 566, Comment *a* (1977). *Id*. at 583-84.

Magistrate Austin committed a grave error in ignoring the black letter law of the *Bentley* Court and recommending that the Defendants escape liability simply by couching their factual defamatory statements as opinion.

### a. Statements Concerning Dr. Corsi

There are numerous defamatory statements at issue in this matter, each of which are defamatory *per se*, as they directly involve Plaintiffs' trades and professions and therefore

damages are presumed. This also evidences the fact that these statements qualify as commercial speech under the Lanham Act, since Defendants are disparaging and discrediting Plaintiffs in their trades and professions, as Plaintiffs and Defendants are commercial competitors. This is set forth in detail in the following section.

The first statement at issue appears in paragraph 42 of the Amended Complaint, where Defendant Alex Jones stated that Dr. Corsi "seemed to be extremely mentally degraded to the point of what I would call dementia." Magistrate Austin found that this was Alex Jones "offering his opinion regarding how he perceived Corsi's cognitive state based on seeing him in person." However, this is an erroneous conclusion under *Bentley*. Whether a person is "mentally degraded" is a medical question of fact. One either is, or is not. Defendant Alex Jones takes it a step further, making a diagnosis of "dementia." Again, this is an objective medical diagnosis that is a statement of fact. One either has dementia or he doesn't. Dr. Corsi is neither "mentally degraded" not does he have "dementia." Thus, the statements of "fact" spewed by Defendant Alex Jones are objectively and provably false. It should make no difference under well-established precent that Alex Jones cleverly couched this as opinion. Thus, Magistrate Austin's finding was erroneous.

The second statement at issue appears in paragraph 43 of the Amended Complaint, where "Defendant Alex Jones, acting in concert with the other Defendants, maliciously fabricates a story where he purportedly saw Plaintiff Corsi at a steakhouse "on the ground at another table" and that his security staff "thought he was dead in the elevator." Magistrate Austin's prejudice and haste in writing his Report truly comes through with regard to these false and defamatory statements, which Alex Jones did not even attempt to couch as opinion. These are two statements of objectively verifiable fact. Either Dr. Corsi collapsed or he didn't, and either his security staff

14

thought he "was dead in the elevator" or they didn't. This is not a question of what Alex Jones perceived, as Magistrate Austin erroneously writes. It is a question of (1) whether Dr. Corsi collapsed at a steakhouse, and (2) whether his security staff thought Dr. Corsi was dead in the elevator. This finding was clearly erroneous.

The third statement at issue appears in paragraph 44 of the Amended Complaint, where "after accusing Plaintiff Corsi of having suffered a stroke, publishes maliciously that "whatever comes out of his mouth ain't the truth." This is textbook defamation, especially in the context of Defendant Alex Jones' previous attempts to cast Dr. Corsi as a liar or, at a minimum, someone mentally incapable of telling the truth. As set forth above, falsely accusing someone of having suffered a stroke is not only reprehensible, but it is also stating a false, objectively verifiable fact. Magistrate Austin admits as much, expressly finding that the statement that "[Corsi] had a stroke," however, is a straightforward factual statement, which, if false could support a defamation claim." ECF No. 108 at 12. However, he then strains to still find this statement as non-actionable, despite clearly making the opposite finding, based on supposed "context" in the form of Alex Jones saying, "I think he's got dementia or a stroke I mean I don't know," and his description of Corsi having "a really sharp brain until about a year ago." There is absolutely nothing about this supposed "context" that lessens the defamatory impact of this statement. If anything, it amplifies the defamatory nature, as he falsely accuses Dr. Corsi of having suffered a stroke more than once! Whether indicative of strong bias and prejudice, or simple hasty carelessness, this is a clear error in Magistrate Austin's Report.

The fourth statement at issue is that "Defendant Alex Jones maliciously and falsely accuses Plaintiff Corsi of being a 'spook, back and forth with different agencies,' falsely saying that Dr. Corsi had worked with different government agencies." Am. Comp. ¶ 67. This is an

15

actual statement where the context is important, but tellingly, Magistrate Austin here refuses to consider said context. However, the defamatory nature of this false statement of fact is apparent when considering the context in which it was made. This statement was made to advance the false notion that Dr. Corsi was cooperating with Special Counsel Mueller to try to take down Stone, and by extension, President Trump. By publishing the false statement that Dr. Corsi is now working with Mueller to take down Trump, the Infowars Defendants has severely harmed Plaintiff Corsi professional image and reputation. This has negatively impacted Plaintiff Corsi's ability to garner support and make a living in the conservative community. Falsely accusing Dr. Corsi of working with Mueller to take down President Trump is tantamount to an accusation of "treason" in the conservative community. Indeed, conservatives who support Trump and believed Defendants' false statements would understandably be turned off to Dr. Corsi's work.

Lastly, Magistrate Austin does not even address Alex Jones' falsely accusing Dr. Corsi sometimes "sometimes "not being able to walk," creating the false and defamatory implication that he is an alcoholic." Am. Comp. ¶ 68. There is no possible "context" where this is not defamatory. Merely falsely asserting that at some point, Dr. Corsi had been, or continues to be unable to even walk, especially when trying to accuse Dr. Corsi of alcoholism, clearly tends to injure reputation in the popular sense; to diminish the esteem, respect, goodwill or confidence in which the plaintiff is held, or to excite adverse, derogatory or unpleasant feelings or opinions against him.

### b. Statements Concerning Mr. Klayman

As with Dr. Corsi, Defendants' defamation of Mr. Klayman is *per se* defamatory as they are specifically targeting Mr. Klayman's trade and profession.

For instance: "At 1:30 in the January 18 Video, Stone maliciously falsely published, "He (Klayman) was ousted at Judicial Watch. Ask Tom Fitton [the current president of Judicial Watch] why he left. He was 'ousted' because of a 'sexual harassment complaint.'" Defendant Stone had no basis to make these false, malicious, and defamatory claims. As pled in the Amended Complaint, Mr. Klayman "left Judicial Watch voluntarily on his own accord in order to run for U.S. Senate in Florida in 2003-2004." Am. Comp.   ¶57. This is a fact. Defendant Stone's false revisionist history evidences actual malice and is clearly a false statement of fact.

Furthermore, as the final "nail in the coffin" to Defendant Stone's assertions, Thomas Fitton ("Fitton"), under oath, at a deposition in another matter testified that "**[y]ou [Mr. Klayman] weren't ousted as a result of a sexual harassment complaint**." Exhibit 5. This conclusively shows that Defendant Stone, in concert with the Infowars Defendants, published an objectively verifiable false statement. Indeed, at the same deposition, Fitton admits to never have spoken to Stone, which shows that Stone simply made this lie up. Exhibit 5. Stone admitted under oath in a deposition that he did not speak to Fitton about this either, so it's clear that Stone made this up to defame Mr. Klayman. Exhibit 5.

Furthermore, Defendant Stone, in concert with the Infowars Defendants made the false statement that Mr. Klayman had "never actually won a courtroom victory in his life." Am. Comp. ¶ 55. To the contrary:

> Klayman has been a practicing attorney for over four decades and has won numerous cases on behalf of his clients and also against the government for constitutional and other violations. He is the founder of both Judicial Watch and Freedom Watch, a former candidate for the U.S. Senate in Florida, a former trial attorney and prosecutor of the Antitrust Division of the U.S. Department of Justice, where he was a member of the trial team that successfully broke up the AT&T monopoly and created competition in the telecommunications industry. Among many other legal victories, Plaintiff Klayman also won landmark decisions at the chairman and general counsel of Freedom Watch enjoining the

17

illegal mass surveillance by the National Security Agency. *Klayman v. Obama*, 1:13-cv-851 (D.D.C). Am. Comp. ¶ 60.

This is further disproved in Mr. Klayman's affidavit. Exhibit 4.

> Later, with my law firm, I won Section 337 unfair trade practice cases at the U.S. International Trade Commission ("USITC") concerning tennis rackets from Belgium, power tools from Taiwan, luggage from Taiwan, mass spectrometers from France, jam from Belgium, and machine tools from Brazil. I won a landmark case concerning recloseable plastic bags, which broke the patents of Minigrip and Dow Corning, Minigrip's licensee. That case victory opened up competition for zip lock bags, a multi-trillion dollar industry. Exhibit 4.

> I won a jury trial against Makita over power tools, another jury trial against domestic manufacture of removable swimming pools for my client Remove Pool Fence Co., and yet another jury trial for my client, Maccaferri, on a contract dispute. Exhibit 4.

> I brought a case for Jose Basulto of Brothers to the Rescue in a Florida court, which resulted in a $1.8 million judgment against the Republic of Cuba for shooting down Brothers to the Rescue planes, and I represented the Miami family of Elian Gonzales and other victims of Fidel Castro, such as journalists who were jailed by Castro for their political beliefs. In this regard, I not only filed criminal complaints for these victims against Fidel Castro in Belgium courts, but also lobbied and testified in both Italian and French in Italy and France, as I am fluent in both languages, before various European parliaments to increase economic sanctions on Cuba for abuse of human rights. I also lobbied the European Union in Brussels, Belgium for increased sanctions on Cuba. Exhibit 4. ECF No. 73.

Thus, despite Magistrate Austin choosing not to address it in his Report, there are clearly actionable defamatory statements as to Mr. Klayman.

### iii.        Magistrate Austin Erred in Finding that Plaintiffs Lacked Standing Under the Lanham Act

The Lanham Act protects consumers from being misled by the use of "unfair practices by an imitating competitor." *ADT, LLC v. Capital Connect, Inc*., 145 F. Supp. 3d 671, 686 (N.D. Tex. 2015). Under Section 43(a) of the Lanham Act:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact,

18

> which— (A) is likely to cause confusion, or to cause mistake, or to deceive as
> to the affiliation, connection, or association of such person with another person,
> or as to the origin, sponsorship, or approval of his or her goods, services, or
> commercial activities by another person, or (B) in commercial advertising or
> promotion, misrepresents the nature, characteristics, qualities, or geographic
> origin of his or her or another person's goods, services, or commercial
> activities, shall be liable in a civil action by any person who believes that he or
> she is or is likely to be damaged by such act. 15 U.S.C. 1125.

Here, Mr. Klayman is "a media personality and author, columnist, and syndicated radio talk show host." Am. Comp. ¶ 4. Dr. Corsi is an "author and political commentator…." Am. Comp. ¶ 3. "Plaintiffs Corsi and Plaintiff Klayman are both competitors to Defendants as conservative media personalities, broadcasters, authors and columnists on social media and elsewhere." Am. Comp. ¶ 70. Thus, both Mr. Klayman and Dr. Corsi are media personalities who derive income from their appearances on radio and the internet. Defendant Stone clearly also appears on radio and internet in order to derive income, as evidenced by the allegations against him in paragraphs 47-63 of the Amended Complaint, where he appeared on *The War Room* with Defendant Owen Shroyer. The same is true of the Infowars Defendants, who derive their income from their internet and radio broadcasts of their programming through the Infowars network and website.

The Amended Complaint clearly and expressly alleges that:

> Plaintiffs, like Defendants, rely on viewer and listener financial and other support
> and sales and their reputations and good will in order to continue their work.
> Defendants' false and/or misleading statements concerning Plaintiffs is meant to,
> and has, diverted financial and other support, referrals and sales away from
> Plaintiffs and to Defendants instead, and severely harmed Plaintiffs' personal and
> professional reputations. Am. Comp. ¶ 74.

This is further buttressed in Dr. Corsi's affidavit. Exhibit 1. Dr. Corsi declared:

> In 2016, after the presidential election, I worked very closely with Alex Jones
> and his father David Jones, as well as with the Infowars staff, including
> Owen Shroyer. I made multiple trips to Austin, Texas, to appear live in-studio

19

on Infowars broadcasts. I accepted an assignment from Alex Jones to create for Infowars a news bureau in Washington, D.C. From the beginning, I found Alex Jones to be erratic, subjects to emotional outbursts, even reacting that I was trying to "steal his company" when with his father's assistance, I brought a multi-million dollar legitimate investment offer from highly credible sources to the table to discuss the proposal with Alex and his father. Exhibit 1.

Given the fact that Dr. Corsi used to "work…very closely" with the Infowars Defendants, as well as the other pled factual allegations, it is clear that they are all in the same commercial field, and are therefore competitors. Exhibit 1

Thus, the Amended Complaint clearly alleges that each of the Defendants were all direct competitors to Plaintiffs as media personalities and commentators who derive income from the internet and radio. Am. Comp. ¶ 70.

Furthermore, the Lanham Act prescribes liability for "commercial advertising or promotion." 15 U.S.C. § 1125(a)(1)(B). One of the factors that the Supreme Court has set forth in determining "commercial speech" is whether the speaker had an economic motivation for distributing the material. *Bolger v. Youngs Drug Prods*. Corp., 463 U.S. 60, 67 (1983). Defendant Stone's and the other Defendants' economic strong economic motivation is expressly pled in the Amended Complaint. For instance, "Defendants' false and/or misleading statements concerning Plaintiffs is meant to, and has, diverted financial and other support, referrals and sales away from Plaintiffs and to Defendants instead, and severely harmed Plaintiffs' personal and professional reputations." Am. Comp. ¶ 74.

Accordingly, the Amended Complaint clearly sets forth (1) the Plaintiffs and Defendants are all competitors and (2) that Defendants engaged in commercial speech. Magistrate Austin erred in minimizing Plaintiff's claims as alleging "[t]he mere fact that the parties may compete in the marketplace of ideas…." As set forth in Am. Comp. ¶ 74, "Defendants' false and/or misleading statements concerning Plaintiffs is meant to, and has, diverted financial and other

support, referrals and sales away from Plaintiffs and to Defendants instead, and severely harmed Plaintiffs' personal and professional reputations." This is textbook commercial speech, meant to degrade the nature of Plaintiffs' services and divert business to Defendants instead.

Lastly, and Magistrate Austin does not find otherwise, each of the Defendants are clearly within the statute of limitations for Plaintiffs' claims under the Lanham Act.

### iv.   Magistrate Austin Erred in Finding That Plaintiffs Did Not Adequately Plead Intentional Infliction of Emotional Distress

To succeed on a claim of intentional infliction of emotional distress, a plaintiff must show that "1) the defendant acted intentionally or recklessly, 2) the conduct was extreme and outrageous, 3) the actions of the defendant caused the plaintiff emotional distress, and 4) the emotional distress suffered by the plaintiff was severe." *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex. 1993). Texas Courts have held that a single threat of physical harm or death can sustain a claim for intentional infliction of emotional distress. "With the possible exceptions of the bomb and death threats, no single action…rises to the level of intentional infliction of emotional distress." *Household Credit Servs., Inc. v. Driscol*, 989 S.W.2d 72, 82 (Tex. App. El Paso 1998).

Here, Defendant Stone directly threatens Dr. Corsi, after maliciously defaming him, saying "I think you've [Corsi] been deep state from the beginning. Your whole birther thing is used as a club to destroy conservatives…. ***I look forward to our confrontation. I will demolish you***. You're a fraudster, out of your alcoholic haze you have made up lies about David Jones and Alex Jones and Roger Stone and now I suspect they want you to lie about the President." Am. Comp. ¶ 66. (emphasis added). This is a direct, credible threat to Dr. Corsi's life and the lives of those around him.

21

Magistrate Austin errs in finding that this claim was derivative of the defamation claims. Plaintiffs' IIED claims are apart from any claim for defamation, as Defendant Stone's intent was to specifically cause Dr. Corsi emotional distress and physical harm, which would have removed Dr. Corsi as a witness who could by Stone's paranoid thinking testified against him at his criminal prosecution. Lastly, it is indisputable that Texas has a two year statute of limitations for Intentional Infliction of Emotional Distress, so Defendant Stone's actions fall squarely within that period.

> **v.**      **Magistrate Austin Erred in Finding That Plaintiffs Did Not Adequately Plead Assault**

In order to sustain a claim for assault, a Plaintiff need only plead that the Defendant "intentionally or knowingly threatens another with imminent bodily injury." *Moore v. City of Wylie*, 319 S.W.3d 778, 782 (Tex. App. 2010).

Defendant Stone made direct threats to Dr. Corsi's life, saying "**I look forward to our confrontation. I will demolish you**." Am. Comp ¶ 66. These threats are more than credible, as Stone also threatened to kill Randy Credico and his service dog. Am. Comp. ¶ 66. Thus, it was more than perfectly reasonable for Plaintiffs to take this as a credible threat on their lives.

> **vi.**      **Defendant Stone's Statute of Limitations**

It is telling that the Defendants argued that Florida law should apply, in an attempt to have this Court apply the Florida Anti-SLAPP statute. Plaintiffs would welcome Florida law being applied to this case as to Stone, who resides in South Florida and is a citizen of Florida, along with its two-year statute of limitations for defamation.

> **b.**      **Magistrate Austin's Report Contains Numerous Factual Errors**

In addition to the numerous legal errors set forth above, Magistrate Austin's Report contains a litany of factual errors that evidence that his Report was given "short shrift," and was simply hastily written on the eve of his retirement.

First, Magistrate Austin's Report recommended dismissal of the Amended Complaint against Defendant David Jones without prejudice on page 10, but then, deciding on his own that even leave to amend would be futile, writes at page 17 "...the undersigned recommends that the Court not permit Corsi or Klayman leave to amend, and dismiss (all) the claims with prejudice." It is clear that, in haste, the Magistrate Austin right hand had no idea what his left hand was doing. Errors like this strongly evidence the fact that Magistrate Austin gave Plaintiffs' submissions little to no consideration.

Second, the Magistrate, relying on a *sua sponte* order of another judge in another case which did not even involve Plaintiff Corsi, states in his Report that he and Mr. Klayman had an obligation to amend a complaint which Mr. Klayman voluntarily dismissed. *Klayman v. Infowars*, Case No. 20-cv-80614 (S.D. Fla. Apr. 8, 2020). However, the cold hard fact remains that this case was not dismissed by the judge, but voluntarily dismissed by Mr. Klayman alone, when he concluded based on objective facts that the judge had a personal relationship with Roger Stone and had likely been recommended for appointment by President Trump to the federal bench by Stone, one of the Defendants. Indeed, Mr. Klayman inquired about this with the 38 year old newly appointed and confirmed judge and he refused to respond, necessitating a complaint, asking for an investigation,  with the Judicial Council of the Eleventh Circuit, which remains pending. Tellingly, the Infowars Defendants picked up on this error and even falsely tried to use this to their advantage, falsely writing in their opposition Plaintiffs' Motion to Vacate

23

the Report and Recommendation that this case had been dismissed by the judge instead of voluntarily dismissed by Mr. Klayman.

These errors are indicative of the prejudice and hastiness that is readily evident in Magistrate Austin's fatally flawed report.

## IV.    CONCLUSION

As shown above, Magistrate Austin's Report is filled with both legal and factual errors that must not be adopted but instead put aside by this Honorable Court. These errors strongly indicate that Magistrate Austin gave Plaintiffs' submissions little to no consideration, and that he hastily crafted the Report on the eve of his retirement. Accordingly, the Report should be given no weight, and the Honorable Lee Yeakel should now rule that this case must go to discovery and then trial.  This is underscored by the "heads I win, tails you lose" approach used by Magistrate Austin where be made up his own facts, taking the matter away from a jury,  that he pulled out of thin air, then unjustifiably stayed discovery contrary to the directive of Judge Yeakel  to move this case along to trial at the outset of this case being transferred to this Court.

Plaintiffs Corsi and Klayman have been seriously damaged—which continues to this day –by  the tortious actions of all of the Defendants, acting in concert, and they at least deserve their day in court before a jury of their peers.

Dated: June 8, 2021                                        Respectfully Submitted,


                                                          /s/Sanjay Biswas
                                                          SANJAY BISWAS, Esq.
                                                          #24061235—Texas
                                                          #24966--Louisiana
                                                          11720 Duxbury Dr.
                                                          Frisco, Texas 75035
                                                          Telephone: (972)-866-5879
                                                          Email:sanjaybiswas41@gmail.com
                                                          Fax: 1-800-506-6804

*Counsel for Dr. Jerome Corsi*

*/s/Larry Klayman*
Larry Klayman, Esq.
7050 W. Palmetto Park Rd
Boca Raton FL, 33433
Email:leklayman@gmail.com
Tel: 561-558-5336

*Plaintiff Pro Se*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on June 8, 2021, a true copy of the foregoing was filed via ECF and served to all counsel of record though the Court's ECF system.

*/s/ Sanjay Biswas*

25

EXHIBIT 1

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| **DR. JEROME CORSI** and<br>**LARRY KLAYMAN**,<br><br>Plaintiffs,<br><br>vs.<br><br>**INFOWARS, LLC, FREE SPEECH<br>SYSTEMS, LLC, ALEX E. JONES,<br>DAVID JONES, OWEN SHROYER**, and<br>**ROGER STONE**<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. 1:20-CV-00298-LY |

## SWORN DECLARATION OF DR. JEROME CORSI

I, Dr. Jerome Corsi, being over eighteen years of age and duly competent to testify, hereby swear and affirm as follows:

1.      I have personal knowledge of the following facts and if called upon as a witness, could testify competently thereto.

2.      I graduated magna cum laude with a B.A. in Political Science and Economics from Case Western Reserve University in 1968.

3.      I received a Ph.D. in Political Science from Harvard University in 1972.

4.      For over twenty-five (25) years, I worked in banking and finance, establishing investment programs for banks in the United States and worldwide to create financial planning services for their retail customers.

5.      From 1968 to 1981, I worked at various universities where I conducted research on federally funded grants.

6.     In 1981, I published "Terrorism as a Desperate Game: Fear, Bargaining, and Communication in the Terrorist Event" in *Journal of Conflict Resolution*, a mathematical game-theoretical model for predicting the outcome of terrorist events.

7.     The content of my publication resulted in a top-secret clearance by the U.S. Department of State's ("State Department") Agency for International Development, where I joined a team of psychiatrists and psychologists to develop a hostage-survival training program for State Department's officials overseas.

8.     Since 2004, I have published over twenty-five (25) books, seven (7) of which were *New York Times* Bestsellers, including two (2) #1 *New York Times* Best-sellers.

9.     In addition to being a New York Times Bestselling author, I am also an investigative journalist and political analyst.

10.     I currently hold active Life & Health insurance licenses, as well as Property & Casualty insurance licenses in New Jersey.

11.     For over twenty (20) years, I have been a licensed National Association of Security Dealers registered representative, currently holding FINRA-registered licenses as a Registered Principal, Financial Principal, Options Principal and Municipals Principal.

12.     I have been a frequent guest on radio and television shows, including but not limited to appearances on CNN, Fox News, Fox Business, MSNBC, and on Infowars, before having been defamed by Defendants.

13.     I personally know Defendant Roger Stone ("Defendant Stone") and he personally knows my qualifications and me. I have even ghostwritten books for Defendant Stone and we used to be friends and colleagues. Defendant Stone is thus intimately familiar with my personal and professional history.

14.     In 2016, after the presidential election, I worked very closely with Alex Jones and his father David Jones, as well as with the Infowars staff, including Owen Shroyer. I made multiple trips to Austin, Texas, to appear live in-studio on Infowars broadcasts. I accepted an assignment from Alex Jones to create for Infowars a news bureau in Washington, D.C. From the beginning, I found Alex Jones to be erratic, subjects to emotional outbursts, even reacting that I was trying to "steal his company" when with his father's assistance, I brought a multi-million dollar legitimate investment offer from highly credible sources to the table to discuss the proposal with Alex and his father.

15.     Several times, concerned that I might quit over how badly Alex Jones was treating me, Dr. Jones met with me privately, often over breakfast. In those breakfasts, I counseled Dr. Jones over my concerns that Alex should seek professional psychological help. While in my work under various contracts with federal government agencies to consult over anti-terrorism tactics, I had the opportunity to work with very experienced psychiatrists and psychologists. Still, I am not medically trained, and I cautioned Dr. Jones that the problems I perceived with Alex's behavior should be professionally evaluated by qualified medical professionals.

16.     My efforts to create a news bureau in the nation's capital failed because Alex Jones insisted that staff I wanted to hire must work for free as "interns." Throughout my 12 years at World Net Daily, I frequently had White House press credentials. In 2012, the Secret Service cleared me to work as "traveling press," riding on the Romney campaign airplane for the last 3 weeks of the presidential campaign. At no time was I ever denied press credentials at the highest levels was alcohol ever raised as an issue in the many extensive background checks I underwent. In the early 1980s, I received Top Secret clearance from the federal government to

work on anti-terrorism contracts with the Agency for International Development at the State Department in Washington, D.C.

17.     Throughout the time I spent with Infowars, Dr. Jones would typically pick me up at the Austin Airport to transport me to the downtown hotel where Dr. Jones had made my room reservations.  At various times, we had breakfast together, often on trips when he was returning me to the airport to depart Austin.

18.     I am today 74 years-old.  I have no alcohol-related offenses on my record.  Since the mid-1980s, I have held securities licenses, first with the NASD and now with FINRA, agencies that conduct licensing in the securities industry for the federal government.  My securities records over that time, contain no customer complaints and no reports of behavior problems of any kind, including no alcohol-related problems.  I also have held for decades property and casualty as well as life and health insurance licenses in New Jersey.  I have created two broker/dealers in my financial services career.

19.     On my website, CorsiNation.com — a website I founded and managed as CEO — I conduct a daily hour-long podcast, live-streamed on multiple Internet channels simultaneously. I hold a Ph.D. from Harvard University's Department of Political Science, dating back to 1972.  I appear regularly on various news programs, including those broadcast by the major networks.  I have conducted thousands of radio interviews going back to 2004, when I entered the third phase of my career, currently working full-time as an investigative journalist and political commentator.

20.     Charges of alcoholism by the Defendants including broadcast charges made by Alex Jones and Defendant Roger Stone, have no basis in fact or substantiation in the extensive public record that exists of my life and professional career.

21.     Special Counsel Robert Mueller indicted Defendant Stone on seven counts of perjury, witness tampering and obstruction of justice.

22.     The Honorable Amy Berman Jackson who presided over Defendant Stone's prosecution, placed a gag order on him in part for threatening the judge herself by posing an Instagram meme of a crosshairs (gun) to her head.

23.     The seven-count indictment against Defendant Stone included lying under oath, witness tampering and obstruction of justice by threatening to kill a material witness, Randy Credico ("Credico") and his service dog if Credico did not lie or invoke the Fifth Amendment to government authorities concerning his involvement with Defendant Stone. Credico is Person 2 in the indictment. I am Person 1. Defendant Stone was later convicted of all seven (7) felony counts.

24.     Based on my personal knowledge of the interactions of Defendant Stone and the other Defendants, I assert that Defendant Stone, acting in concert with the other Defendants including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars, began a calculated and premeditated public relations campaign against my lawyer, Mr. Larry Klayman ("Mr. Klayman") and myself.

25.     Defendant Stone knew of his imminent indictment and therefore began his malicious crusade against Mr. Klayman and myself in order to influence public opinion and Special Counsel Robert Mueller by trying to attribute guilt to me.

26.     It is apparent that the malicious crusade against me by Defendants, who acted in concert, was calculated to coerce me to testify falsely at Defendant Stone's criminal trial.

27.     Defendant Stone, acting in concert with the other Defendants, also sought to divert funds away from my legal defense fund, while boosting his own.

28.     Contrary to Defendant Stone's false publication, I am not "certifiably insane and I have not "told multiple provable lies." Compl. at ¶ 26. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

29.     Contrary to Defendant Stone's false publication, I am not "mentally degraded to the point of [] dementia." Compl. at ¶ 42. I do not have dementia and have never been diagnosed with any mental illness. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

30.     Importantly, I was under contract with Infowars until the relationship ended and Defendants would not have retained me if I was "mentally degraded to the point of [] dementia." Compl. at ¶ 42.

31.     Contrary to Defendant Stone's false publication, he never saw me at a steakhouse where I was "on the ground at another table" where security staff "thought that [I] was dead in the elevator." Compl. at ¶ 43. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

32.     Contrary to Defendant Stone's false publication, I never suffered a stroke and it is a false statement of fact that "whatever comes out of [my] mouth ain't the truth." Compl. at ¶ 44. In publishing this false statement that Defendants knew to be false or published recklessly

because they are intimately familiar with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

33. Contrary to Defendant Stone's false publication, I was not "fired from World Net Daily." Compl. at ¶ 49. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

34. Contrary to Defendant Stone's false publication, I was not "perfectly willing to lie, to perjure [myself] saying that a memp that [I] had [written] [Defendant Stone] on the 30th for the purposes of cover-up . . . which is further proof that [I] lied under oath." Compl. at ¶ 50. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

35. Contrary to Defendant Stone's false publication, I do not have a "feeble alcohol affected memory." Compl. at ¶ 51. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

36. Contrary to Defendant Stone's publication, I was not "prepared to stab a principle Trump supported in the back" nor was I "perfectly prepared to bear false witness against [Defendant Stone]." Compl. at ¶ 52. In publishing this false statement that Defendants knew to

be false or published recklessly because they are intimately familiar with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

37.     Contrary to Defendant Stone's publication, it is a false statement of fact that "all [Defendant Stone] ever did was show [me] friendship and support and try to help [me] and [my] family and what [Defendant Stone] got was Judas Iscariot, the willingness to testify against [Defendant Stone] and help the deep state bury [Defendant Stone] . . . and then [I] make[] up this story about helping [Defendant Stone] formulate a cover story." Compl. at ¶ 53. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

38.     Contrary to Defendant Stone's false publication, it is a false statement of fact that "you can always tell when [I] [am] lying because [my] lips are moving . . ." Compl. at ¶ 54. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

39.     Contrary to Defendant Stone's false publication, it is a false statement of fact that Mr. Klayman "never actually won a courtroom victory in his life." Compl. at ¶ 55. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

40.     Contrary to Defendant Stone's false publication, it is a false statement of fact that Mr. Klayman "was ousted at Judicial Watch. Ask Tom Fitton why he left .he was 'ousted' because of a sexual harassment complaint." Compl. at ¶ 56. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar Mr. Klayman and with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

41.     Contrary to Defendant Stone's false publication, it is a false statement of fact that Mr. Klayman is "incompetent, he's a numbskull, he's an idiot, he's an egomaniac, and he could be the worst single lawyer in America. With him as [my] lawyer, [I] may get the electric chair. So [the] idea that he's a good guy is entirely wrong." Compl. at ¶ 59. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with Mr. Klayman and me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

42.     Contrary to Defendant Stone's false publication, it is a false statement of fact that Mr. Klayman is "a piece of garbage." Compl. at ¶ 61. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with Mr. Klayman and me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

43.     Contrary to Defendant Stone's false publication, Mr. Klayman's IQ is higher than 70. Compl. at ¶ 62. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

44.     Contrary to Defendant Stone's false publication, it is a false statement of fact that "[I] was perfectly willing to bear false witness against [Defendant Stone] on multiple points that are complete fabrications." Compl. at ¶ 64. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

45.     Contrary to Defendant Stone's false publication, it is a false statement of fact that "[I] had told a number of lies. In fact, [I] [am] starting to conflate [my] lies . . . [I] was perfectly willing to lie about [Defendant Stone] . . . but now lying about Alex Jones, lying about Infowars, lying about Dr. [David] Jones . . . [I] can no longer be believed." Compl. at ¶ 65.

46.     Defendant Stone falsely published: "I think you've [Corsi] been deep state from the beginning. Your whole birther thing is used as a club to destroy conservatives . . . **I look forward to our confrontation. I will demolish you.** You're a fraudster, out of your alcoholic haze you have made up lies about David Jones and Alex Jones and Roger Stone and now I suspect they want you to lie about the President." Compl. at ¶ 66 (emphasis added). Not only does Defendant Stone know this to be false but this malicious rant is also a threat. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with me,, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

47.     Contrary to Defendant Stone's false publication, I am not a "spook, back and forth with different agencies[.]" Compl. at ¶ 67. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with me,

as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

48.     Contrary to Defendant Stone's false publication, it is a false statement of fact that sometimes I am "not being able to walk" which creates the false and defamatory implication that I am an alcoholic. Compl. at ¶ 68. I am not an alcoholic. In publishing this false statement that Defendants knew to be false or published recklessly because they are intimately familiar with me, as set forth above, Defendant Stone acted in concert with the other Defendants, including Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars.

49.     As an investigative journalist, as well as my other professions and hobbies, I rely on my virtue and integrity.

50.     My reputation determines everything from the amount of books I sell to the frequency of my radio and television appearances.

51.     I have ghostwritten books for Defendant Stone and he intimately knows my qualifications and me. Thus, Defendant Stone and the other Defendants falsely published these statements when they knew them to be false or at least with a reckless disregard for their truth.

52.     Defendant Stone, acting in concert with Defendants Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars, has caused severe harm to my reputation, good will and well-being, financially and otherwise. They also caused my family and me severe emotional distress for which I have had to seek medical care.

SWORN TO UNDER OATH THIS 30TH DAY OF SEPTEMBER OF 2020.

Dr. Jerome Corsi

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**

DR. JEROME CORSI, ET AL

Plaintiffs

        v.

INFOWARS, LLC, et al

        Defendants.

**Case Number:   1:20-cv-298-LY**

## SWORN DECLARATION OF KELLY MORALES

    1. I, Kelly Morales, hereby declare under penalty of perjury that the following is true and correct and based on my personal knowledge and belief.

    2. I am over the age of 18 and mentally and legally competent to make this affidavit, sworn under oath.

    3. I am the former wife of Defendant Alex Jones.  I was married to Alex Jones for 12 years and with him for 15 years and we have 3 children together. During our time together, I was involved in the activities of Alex, his father David and Infowars and am intimately knowledgeable about their activities and business structure.

    4. Based on my personal knowledge and experience, David Jones runs Infowars with Alex Jones and helps him with his activities, including fixing media stories and endorsing and/or aiding his slanderous and/or fraudulent behaviors, all for profit.

    5. Infowars, LLC is a sub-entity of Free Speech Systems, LLC ("FSS"), and David Jones is an employee of FSS, or he has been.

    6. David Jones is additionally a managing member of multiple entities that are closely held businesses, constituting financial holding companies or financial distribution centered around Infowars/Alex Jones' supplement line, which are quintessential to funding and running Infowars.

    7. Alex Jones could not function without David Jones, and has conspired with him on the past to commit this breach of fiduciary duty and fraud on my business/estate with Alex Jones. While David Jones did this, he slandered and/or defamed me to experts and assisted Alex Jones and his attorneys to do the same, so as to steal/hide my estate and his grandchildren's inheritance.

    8. Alex Jones is quasi-illiterate, and cannot use technology or apps such as email with any fluency, and he cannot function without assistance from those around him, including David Jones.

    I hereby swear under oath and penalty of perjury that the foregoing facts are true and correct to the best of my knowledge and belief.

    Executed on September 30, 2020

Kelly Morales

2

# EXHIBIT 3

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| Alexander E. Jones, | § | CASE NO. 20-10118-hcm |
| | § | |
| Alleged Debtor. | § | Chapter 11 |
| | § | |

### Affidavit of David Jones in Support of Alleged Debtor's Motion to Dismiss

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF TRAVIS | § |

BEFORE ME, the undersigned authority, on this day personally appeared David Jones, who after being sworn did state upon his oath, as follows:

1. "My name is David Jones. I am over 18 years of age and otherwise competent and capable of making this Affidavit. I have personal knowledge of the facts set forth herein and they are true and correct.

2. "I have been involved with Alex Jones' personal and business finances for many years and have personal knowledge of the matters set forth herein, and they are true and correct.

3. "I have personally reviewed the Real Estate Lien Note from Alexander Jones to Kelly R. Jones dated March 19, 2015 (the "*Note*"), which is attached to the Involuntary Bankruptcy Petition filed in the above referenced case and have reviewed the record of payments made by Alexander Jones to Kelly R. Jones under the Note. I have personally calculated the remaining balance of the Note. The balance of the Note is $596,267.16 as of the date hereof.

"Further Affiant sayeth not."

SIGNED on this 12 day of February, 2020.

_____
David Jones

Sworn to and subscribed before me, the undersigned authority, on this 13th day of February, 2020.

_____
Notary Public for the State of Texas
EXP 09-24-2022

PATRICK RILEY
Notary Public, State of Texas
Comm. Expires 09-24-2022
Notary ID 131734177

4837-5475-576

1

# EXHIBIT 4

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

|  |  |  |
|---|---|---|
| **DR. JEROME CORSI** and **LARRY KLAYMAN**, | § § § | CIVIL ACTION NO. 1:20-CV-00298-LY |
| Plaintiffs, | § § | |
| vs. | § § | |
| **INFOWARS, LLC, FREE SPEECH SYSTEMS, LLC, ALEX E. JONES, DAVID JONES, OWEN SHROYER**, and **ROGER STONE** | § § § § § | |
| Defendants. | § | |

## SWORN AFFIDAVIT OF LARRY KLAYMAN

I, Larry Klayman, being over eighteen years of age and duly competent to testify, hereby swear and affirm as follows:

## A BRIEF HISTORY OF MY BACKGROUND

1.      I have personal knowledge of the following facts and if called upon as a witness, could testify competently thereto.

2.      In 1973, I graduated from Duke University where I majored in political science and French literature. I excelled academically and graduated with honors.

3.      I then matriculated at Emory Law School where I excelled academically and graduated in 1977. While in law school, I worked as an intern at the U.S. International Trade Commission, the Georgia Attorney General and the U.S. Attorney for the Northern District of Georgia.

4.      I passed The Florida Bar the first time I took the exam.

5.      I passed all bar exams on my first attempt, including the District of Columbia Bar.

1

6. I began my legal career in this circuit in Miami, Florida as an associate for Blackwell, Walker, Gray, Roberts, Flick & Hoehl (. Blackwell"), which was then the largest and most prestigious law firm in Florida. I was admitted into The Florida Bar having been sworn in on December 7, 1977. I have practiced law in this circuit continuously and extensively throughout my forty-two-year career and have active cases pending in this circuit and elsewhere in Florida, including during the period that I was a trial attorney for the U.S. Department of Justice's ("DOJ") Antitrust Division, from 1980 to 1982, where I was assigned litigation in this circuit.

7. I conceived of and founded Judicial Watch, Inc. ("Judicial Watch") in 1994, a public interest group that's mission was to investigate and prosecute government corruption and abuse. I was the Chairman, General Counsel, and Corporate Treasurer of Judicial Watch until I voluntarily departed in 2003 to run as a candidate for the U.S. Senate in Florida in the Republican primary election.

8. In 1998, during the time I ran Judicial Watch, I hired Thomas J. Fitton ("Fitton") as my contract assistant. I later appointed him president of the organization I founded.

9. In September of 2003, I voluntarily departed from Judicial Watch to run for the U.S. Senate in Florida. At the time I left Judicial Watch, I learned that Fitton had never graduated from college, which he had told me he had when I initially hired him.

10. Contrary to Defendant Roger Stone's ("Defendant Stone") false and defamatory publications, I have enjoyed many successes in my career as a lawyer, many of which have been brought to the attention of the public by complimentary newspapers, magazines, editorials and journals.

11. For example, I practiced law at Blackwell with my supervising partners Paul Larkin and Layton Mank and participating in winning product liability cases as defense counsel for Blackwell including cases involving Raleigh bicycles, pharmaceutical drugs manufactured by

2

Burroughs-Wellcome, and allegedly misdiagnosed cancer victims, and other personal injury and medical malpractice cases. Additionally, I handled lawsuits in admiralty.

12.    I left Blackwell to join the DOJ as a trial lawyer, prosecutor and defense lawyer in late 1979. During my time at the DOJ, I had many victories in the courtroom as well as favorable settlements for the government, i.e., such as for the Consumer Affairs Section of the Antitrust Division over misbranded, adulterated food and drug products including fruit drinks and prophylactics for the Food & Drug Administration ("FDA") and successful seizures and criminal prosecutions of dangerous products on behalf of the Consumer Product Safety Commission ("CPSC") such as slant-sided refuse bins, flammable children's sleepwear, and intraocular lens implants for cataract patients.

13.    Importantly, I was also on the trial team that successfully broke up the AT&T monopoly – creating competition in the telecommunications industry. I left the DOJ in late 1981.

14.    Then, working as an international trade lawyer for Busby, Rehm & Leonard and after a few years having founded my own firm The Law Offices of Larry E. Klayman, later named Klayman & Associates, P.C., I won countervailing duty and antidumping duty cases concerning steel from South Africa, garden furniture from Italy, musical instrument pads from Italy, coffee filters from Brazil, key limes from Peru, fireworks from China and a host of other product imports. I represented both importers and exporters. (While at Busby, Rehm & Leonard, I also took some months on hiatus and worked in the Competition Directorate (DG-4) of the Commission of the European Communities Section ("E.C.").

15.    Later, with my law firm, I won Section 337 unfair trade practice cases at the U.S. International Trade Commission ("USITC") concerning tennis rackets from Belgium, power tools from Taiwan, luggage from Taiwan, mass spectrometers from France, jam from Belgium, and machine tools from Brazil. I won a landmark case concerning recloseable plastic bags, which

broke the patents of Minigrip and Dow Corning, Minigrip's licensee. That case victory opened up competition for zip lock bags, a multi-trillion dollar industry.

16.     There was also an USITC patent case, pursuant to Section 337, which I litigated and won involving motorcycle helmets and another antidumping and countervailing duty cases before the Commerce Department and USITC concerning fire protection products and scuba diving neoprene body suits.

17.     I also won a Section 302 case involving paper from Brazil.

18.     All of the Section 337 cases were judge-tried and I won every one of them.

19.     I won a jury trial against Makita over power tools, another jury trial against a domestic manufacture of removable swimming pools for my client Remove Pool Fence Co., and yet another jury trial for my client, Maccaferri, on a contract dispute. These are only some of the jury trials I won during my early career.

20.     Because of my work during the time I ran Judicial Watch, a court ruled that President William Clinton committed a crime during the Filegate litigation. I also triggered the famous Chinagate scandal in a Freedom of Information Act, 5 U.S.C. § 552 et seq., which gave rise to Judicial Watch ultimately being awarded almost a million dollars. I filed cases which ended Bill and Hillary Clinton's attempted illegal purchase at below market rates for their mortgage of their home at Chappaqua, New York and ended the illegal payment of legal fees to the Clintons by State Farm, which was a form of bribery. I also participated in the famous *Gore v. Bush* litigation in Tallahassee, Florida that settled the 2000 presidential elections by the U.S Supreme Court. I also brought a case under the Foreign Agents Registration Act ("FARA") over the Cheney Energy Task Force that made its way to the U.S. Supreme Court.

21.     I brought a case for Jose Basulto of Brothers to the Rescue in a Florida court, which resulted in a $1.8 million judgment against the Republic of Cuba for shooting down Brothers to

the Rescue planes, and I represented the Miami family of Elian Gonzales and other victims of Fidel Castro, such as journalists who were jailed by Castro for their political beliefs. In this regard, I not only filed criminal complaints for these victims against Fidel Castro in Belgium courts, but also lobbied and testified in both Italian and French in Italy and France, as I am fluent in both languages, before various European parliaments to increase economic sanctions on Cuba for abuse of human rights. I also lobbied the European Union in Brussels, Belgium for increased sanctions on Cuba.

22.     On December 16, 2013, Judge Richard J. Leon granted my request for a preliminary injunction in my case against the National Security Agency ("NSA") and the Obama administration, when Judge Leon found for the first time in history that the collection of metadata telephony records by the NSA was likely unconstitutional.

23.     Because of that ruling, Congress enacted the USA Freedom Act, which sought to end illegal and unconstitutional mass surveillance by government intelligence agencies and the Federal Bureau of Investigation ("FBI").

24.     I obtained a jury verdict in the U.S. District Court for the Southern District of Florida against my former public interest group Judicial Watch, which was then run by Fitton, for maliciously defaming me in the amount of $181,000, which included punitive damages.

25.     My client Sheriff Joe Arpaio and I were the first to challenge former President Obama's unconstitutional executive amnesty for over 5 million illegal aliens and were ultimately successful, along with 25 other attorneys general, in front of the U.S. Supreme Court.

26.     It was my efforts that prevented Dr. Jerome Corsi ("Dr. Corsi") from getting indicted, first because he told the truth and did not engage in witness tampering and threaten to kill a witness such as Randy Credico, as Defendant Stone did, and second because of my legal skill and acumen. Dr. Corsi is a material witness in the Russian Collusion investigation by Special

Counsel Robert Mueller ("Mueller") and is listed as a material witness as Person 1 in Defendant Stone's Mueller indictment.

27. I have had many other successes in addition to the above-listed victories.

28. I myself authored a book titled "Whores: Why and How I Came to Fight the Establishment" published in 2009. In it, I wrote about my unfortunate experience with Defendant Stone. *See* Exhibit A. I authored this book myself without a ghostwriter and I came runner-up at an International Book Fair. It also still has a review on www.Barnesandnoble.com of 4.5 stars out of the maximum 5 stars.

29. Upon its publication, Jack Cashill, the author of "Ron Brown's Body" had this to say about me: "That *Time* magazine has yet to name Larry Klayman 'Man of the Year' is a failure of *Time*, not Klayman's. The work he and Judicial Watch did on the Brown case is stunning." *See* Exhibit B.

30. Joseph Farah, the founder of WorldNetDaily.com, had this to say about me: "Larry Klayman is my hero because he has integrity – enough to prevent him from blind loyalty to party or ideology . . . That's because he is fearless and relentless in the pursuit of justice . . . There were other men like Larry early in American history. Their names were Washington, Jefferson, Madison and Henry. *See* Exhibit B.

31. Louis Jacobson of the National Journal said this of me: " . . . through his challenge of secrecy rules, Larry Klayman has become a force in Washington. *See* Exhibit B.

32. Bill Moyers, of "Now" PBS, said this: ". . . his idea of fun is trying to kick down a door some public official has marked secret . . . Larry Klayman is himself a conservative, but there's nothing partisan bout his indignation."

33. Frank Rich, famed columnist for "The New York Times" said this: "Larry . . . I appreciate your own maverick – if we can still use that word! – thinking and stands."

6

34.     These are just a few of the accolades I have received over the years from conservatives and liberals alike, who appreciate and admire my work. *See* my biography attached as Exhibit C and incorporated herein by reference; *see also* Exhibit D, "Larry Klayman, the One Man Tea Party" which attributes the genesis of the Tea Party to me.

35.     I am now the founder, Chairman and General Counsel of Freedom Watch, Inc., which has the mission of investigating and prosecuting government corruption and abuse through legal advocacy. I also am in private practice with The Klayman Law Group, P.A. I am unique as a public interest advocate. I am a columnist for World Net Daily and have had about 500+ columns published over the last 10 years. I have also been a columnist for Newsmax through a blog titled "Klayman' Court" and in addition to my book "Whores: How and Why I Came to Fight the Establishment", I also published two other books: "Fatal Neglect" and "Essays of a Mad Man." I also have my own syndicated radio show with Radio America called "Special Prosecutor with Larry Klayman."

## MY EXPERIENCES WITH DEFENDANT ROGER STONE

36.     I met Defendant Stone at the Old Ebbitt Grill in Washington, D.C. in 1988 while he was a partner with Paul Manafort and others and was working as a lobbyist for the firm Black, Manafort, Stone, & Kelly.

37.     Defendant Stone was a "political consultant" who claimed to help get presidents and other politicians elected. The firm made money by then lobbying the very men they put in office.

38.     Defendant Stone backed Republican candidate Jack Kemp for President and he recommended that I be put on the executive finance committee, which also included Donald J. Trump.

7

39.     Because Defendant Stone knew of my successes and capabilities as a private lawyer, he told me that he had recommended me for U.S. Attorney when George Bush was President in 1992.

40.     In 1996, at a Republican Convention in San Diego, California, Defendant Stone was filmed at a "toga party" with his wife at a "swingers party."

41.     The media at the time went after Defendant Stone because of his alleged participation in the "sex party" and created a scandal.

42.     The media alleged at the time that Defendant Stone solicited sex half-naked, and that there was a picture of Defendant Stone in a compromising position to back up the story.

43.     Defendant Stone contacted me and, because he knew my capabilities and acumen as a lawyer, retained me to represent him to get the media to cease what he claimed then was a smear campaign.

44.     I successfully got the media to back off Defendant Stone through my skill as a lawyer and Defendant Stone was grateful.

45.     I maintained in sporadic contact with Defendant Stone until 2003 when I told him of my plans to voluntarily leave Judicial Watch and run for the U.S. Senate.

46.     There were confirmed rumors that Senator Bob Graham would retire from the U.S Senate well before he announced his retirement in November 2003. Defendant Stone traveled in Republican and political circles and knew that the Senator would be retiring in early to mid 2003.

47.     Thus, I was in contact with Defendant Stone in early to mid 2003, having been put in contact with him by Scott Reed, then Chief of Staff to Jack Kemp, who then was Secretary of Housing and Urban Development, and Defendant Stone was made aware by Scott Reed that I intended to run for the U.S. Senate to fill Bob Graham's seat.

48.     As I was a newcomer to politics, it would have been virtually impossible for me to beat Bob Graham, the incumbent, given the privileges and name recognition an incumbent receives, unless he or she is enmeshed in a major scandal. Senator Bob Graham was never enmeshed in such scandal.

49.     Because he was aware of my prior successes at Judicial Watch and before, Defendant Stone wanted to work with me as my U.S. Senate campaign manager. During this time, the spring, summer, and fall of 2003, and in preparation for my U.S. Senate run, Defendant Stone researched and kept books and records of many of my accomplishments. He had several binders (2-3 feet) full of information about me and the victories that I had obtained at Judicial Watch and elsewhere. Again, because Defendant Stone knew of my successes and legal political acumen, Defendant Stone wanted to be on my team and help me run for the U.S. Senate.

50.     Defendant Stone thus knew of many cases I had won in courtrooms and other legal accomplishments and in fact had kept records of successes in a book of my accomplishments.

51.     Soon after I hired him and during the height of my U.S. Senate campaign, I discovered that Defendant Stone had a conflict of interest and was working with Al Sharpton, while simultaneously working with me. He had agreed to represent me exclusively and I considered Al Sharpton to be an unsavory character. He also was not competently running my campaign with a staff of his friends which he had hired at great expense to me.

52.     I let Defendant Stone go roughly after about one month of his working with me on my U.S. Senate campaign. Shortly after his being let go, Defendant Stone and his sidekick Mike Caputo, whom he hired on my behalf as the campaign's press secretary, along with other staff Defendant Stone had hired, stole thousands of dollars of campaign cell phones and laptops, which I had purchased with my personal funds for the campaign.

53.     I have not spoken to Defendant Stone since I parted ways with him in 2003 given this experience.

54.     Defendant Stone is an individual and citizen of Florida. Special Counsel Robert Mueller ("Mueller") indicted Stone as part of the alleged "Russian Collusion" investigation with seven different felony counts, including lying under oath, witness tampering and obstruction of justice by threatening to kill a material witness and his service dog.

55.     The January 18, 2019 InfoWars video, published in this circuit, contained several false, misleading and defamatory statements concerning me. These false and defamatory statements include but are not limited to:

> **A` 1:25, Defe. dant Stone says, "He's (Klayman) never actually won a courtroom victory in his life."**
>
> **At 1:30, Defendant Stone says, "He (Klayman) was ousted at Judicial Watch. Ask Tom Fitton why he left. He was 'ousted' because of a 'sexual harassment complaint.'"**
>
> **At 1:37, Defendant Stone says, "He's (Klayman) incompetent, he's a numbskull, he's an idiot, he's an egomaniac, and he could be the single worst lawyer in America. With him as Jerry Cori's lawyer, Corsi may get the electric chair. So your idea that he's a good guy is entirely wrong."**
>
> **At 2:01, Defendant Stone published that Plaintiff is "a piece of garbage."**
>
> **At 4:11, Defendant Stone says, "For those people out there who think . . . that Larry Klayman's IQ is higher than 70, you're wrong . . ."**

Am. Compl. at ¶¶ 55, 56, 59, 61, 62.

56.     Defendant Stone acted with actual when he published the false, misleading and defamatory statements concerning me because he knew they were false or acted with a reckless disregard to their truth, as set forth herein.

57.     Defendant Stone not only acted with actual malice when he published the false, misleading and defamatory statements concerning me, but he also had motives to maliciously

defame me. He published the false and misleading statements knowing that they were false or with a reckless disregard for their truth. Defendant Stone had reason to know that his statements were false.

58. Defendant Stone is aware of *many, many* victories of mine as he was in charge of putting together the book of my accomplishments for fundraising purposes for my U.S. Senate campaign, among other reasons.

59. Since the time I let Defendant Stone go as my campaign manager in late 2003, Defendant Stone has tried to trade off my clients like a "scavenger." I have warned my clients not to become involved with him as, in my opinion and through my experience, Defendant Stone is not an honorable, ethical or honest person. He has been widely and rightly called a self-styled "dirty trickster" In my opinion, this characterization is accurate based on my experience dealing with him. *See* "Get me Roger Stone" on Netflix,

https://www.netflix.com/title/80114666. He tried to trade off my clients for his own profit and purposes.

60. When the National Enquirer contacted me in 2018 to get a comment on a story it was writing about President Donald Trump and to get my legal opinion on the Mueller investigation, I told the reporter not to quote me in the same article as Defendant Stone, or any article in which he wrote, as Defendant Stone wrote for the National Enquirer at the time. The National Enquirer is located in South Florida and is apparently close with Defendant Stone, a South Florida citizen. I did not want to be quoted or associated at all with Defendant Stone because I consider him – like others do – to be a self-styled dirty trickster who was likely going to be indicted for alleged criminal behavior by Mueller and in fact was indicted by Mueller.

61. In 2018, I also told Alex Jones and his show producers on InfoWars that I did not want to appear on any show which included Defendant Stone or had ties to Defendant Stone,

either as a guest or as a host, because I strongly felt at the time that Mueller may indict Defendant Stone. Defendant Stone was at the time a host on InfoWars.

62. I also warned Alex Jones not to release any information – that was potentially under seal in the contempt case of *Melendrez v. Arpaio*, 07-cv-02513 (D. Ariz. 2007) – which he may have improperly obtained from Defendant Stone or others concerning Dennis Montgomery, another whistleblower client of mine who contracted with the U.S. government so it could use his software capabilities for intelligence gathering.

63. During the criminal trial of my client Cliven Bundy, again to try to scavenge off my clients, Defendant Stone flew to Las Vegas, Nevada where the Bundys lived and boasted that he could get a pardon for Cliven Bundy and his sons. I told Carol Bundy, Cliven's wife and the sons' mother, to stay away from Defendant Stone and she did.

64. I also warned my then client at the time, Dennis Montgomery, to stay away from Defendant Stone.

65. Defendant Stone wanted to – and did – intimate and threaten my client Dr. Corsi since he is a material witness in the Mueller investigation as Defendant Stone obviously feared that he would testify against him to Mueller. Defendant Stone feared me as Dr. Corsi's lawyer as he knew that I know what type of person he is and must have thought falsely that my representation of Dr. Corsi was my revenge for him having harmed me during my U.S. Senate campaign.

66. In sum, Defendant Stone tried to trade off my clients and I shut this down every time in order to protect my clients from Defendant Stone. He also knew that I wanted nothing to do with him and I predicted early on in the Russian collusion investigation that Mueller would most likely indict Defendant Stone because of – in my experience with him – his rank dishonesty and dirty tricks.

67.     This, in addition to other information that will be meted out in discovery, supplies the motive to maliciously defame me. That he attacks my acumen and ability as a lawyer and defamed me personally with false sexual harassment complaint claims is directly related to my having kept him away from my clients.

68.     This vindictive, malicious retaliation by Defendant Stone had a logical purpose. He tried to intimate and threaten Dr. Corsi and me in order for us not to collaborate with Mueller. We obviously did not collaborate with Mueller but Defendant Stone is both unstable and unhinged (*See* CDs containing videos of defamatory statements and publications) and apparently paranoid and he tried to prevent collaboration at all costs in order to save his own skin. His conduct toward us is similar to his conduct toward Material Witness 2 in the Mueller investigation, Randy Credico, who he allegedly threatened "Mafioso style" to kill. He even allegedly threatened to kill Credico's service dog, for which he was in part indicted.

## DAMAGES

69.     As an attorney, I rely on my virtue and integrity, as my reputation and good will determines the amount of clients that come to me to earn a living for their legal matters in the public interest and privately.

70.     Any damage done to my reputation harms my ability to practice law as a lawyer, particularly in this circuit, which is my community. This also harms my work as an author, columnist and syndicated radio talk show host, all of which depend on reputation and good will.

71.     Defendant Stone's statements in this instance have caused harm to my reputation, good will and well being in this circuit, the United States, and globally, as I am also an international lawyer as previously set forth in this affidavit.

72.     There was never any single instance of someone making a sexual harassment complaint against me during my almost ten years at Judicial Watch. Defendant Stone's statements to the contrary are false and defamatory and made with actual malice.

73.     Defendant Stone acted with actual malice when he published that I was "ousted" because of a sexual harassment complaint because he knew that was false. Am. Compl. at ¶ 56. Defendant Stone knew or had reason to know that this was false, as he was my campaign manager when I left Judicial Watch.

74.     As set forth in my opposition to Defendants' motions to dismiss, which attaches the testimony of Fitton of Judicial Watch, this also proves the falsity of this statement. Indeed, both Fitton and Defendant Stone have been forced to testify under oath that they never spoke about my being "ousted." Defendant Stone thus fabricated this falsity, according to Fitton's sworn testimony.

75.     The damage done to me and my clients Dr. Corsi, Cliven Bundy, and the Gold Star parents of Extortion 17 whose sons died in combat in Afghanistan, because of Defendant Stone is continuing. As just one example, a person approached me in an elevator and told me that I was "ousted" at Judicial Watch.

76.     Defendant Stone acted with actual malice when he published all of the defamatory statements. He knew the statements were false or had a reckless disregard for their truth. He had reason to know his false and misleading statements were false.

77.     I was damaged financially, as well as to my reputation and good will, and emotionally, by the defamatory and other tortious acts of Defendant Stone.

78.     Each of the Defendants, Alex Jones, David Jones, Owen Shroyer, Free Speech and Infowars, is intimately familiar with my background, qualifications and successes as a public interest and private attorney. For this reason, I was previously invited to appear on Infowars on

many occasions before Defendants decided – at the direction of Defendant Stone – to defame my client, Dr. Corsi and me.

Affiant Sayeth Not

SWORN TO UNDER OATH THIS 30TH DAY OF SEPTEMBER OF 2020.

_____
Larry Klayman

EXHIBIT 5



# Transcript of Thomas J. Fitton

**Date:** June 6, 2019
**Case:** Klayman -v- Fitton

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING | INTERPRETATION | TRIAL SERVICES

**Page 1**

```
1        IN THE UNITED STATES DISTRICT COURT
2        FOR THE SOUTHERN DISTRICT OF FLORIDA
3
4  LARRY KLAYMAN,            *
5        Plaintiff,          *
6      vs.                   * Civil Action
7  THOMAS FITTON,            * No. 1:19-cv-20544
8        Defendant.          *
9
10
11
12     Videotaped Deposition of THOMAS J. FITTON
13                Washington, D.C.
14            Thursday, June 6, 2019
15                  3:06 p.m.
16
17
18
19  Job No.: 247643
20  Pages 1 - 92
21  Reported by:  Vicki L. Forman
22
23
24
25
```

**Page 2**

```
1        Videotaped Deposition of THOMAS J. FITTON,
2  held at the offices of:
3
4      Planet Depos
5      Suite 950
6      1100 Connecticut Avenue, Northwest
7      Washington, D.C.  20036
8      (888) 433-3767
9
10
11
12        Pursuant to agreement, before Vicki L.
13  Forman, Court Reporter and Notary Public in and
14  for the District of Columbia.
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1              A P P E A R A N C E S
2
3  ON BEHALF OF THE PLAINTIFF PRO SE:
4      LARRY KLAYMAN, ESQUIRE
5      Klayman Law Group, P.A.
6      Suite 345
7      2020 Pennsylvania Avenue, Northwest
8      Washington, D.C.  20006
9      (310) 595-8088
10
11
12
13  ON BEHALF OF THE DEFENDANT:
14      RICHARD W. DRISCOLL, ESQUIRE
15      Driscoll & Seltzer
16      Suite 610
17      300 North Washington Street
18      Alexandria, Virginia  22314
19      (703) 822-5001
20
21
22
23
24
25
```

**Page 4**

```
1  ON BEHALF OF THE DEFENDANT:
2      KATIE M. MERWIN, ESQUIRE
3      Cole, Scott & Kissane, P.A.
4      Suite 120
5      222 Lakeview Avenue
6      West Palm Beach, Florida  33401
7      (561) 383-9206
8      (Present via Telephone.)
9
10
11
12  ALSO PRESENT:  Joannis Arsenis, Videographer
13
14
15
16
17
18
19
20
21
22
23
24
25
```

41

1      MR. KLAYMAN:  Certify it.
2      Q So as President of Judicial Watch you
3  would have known for sure that this Complaint had
4  been filed, correct?
5      MR. DRISCOLL:  Objection to form.
6      **A Well, the press release indicates it was**
7  **filed and I recall we sued about the raid, yes.**
8      Q And you gave interviews about suing in the
9  raid, correct, in the media?
10     **A I don't remember.**
11     Q Turn to the last page, page five.
12      The Complaint is signed by James F
13  Peterson, correct?
14     **A His name is on the last page of the**
15  **Complaint as a signatory.**
16     Q He is an attorney at Judicial Watch,
17  correct?
18     **A Yes.**
19     Q Now, Mr. Peterson had contact with Roger
20  Stone over the issue of the raid on his house, did
21  he not?
22     **A Not that I'm aware of.**
23     MR. DRISCOLL:  Objection to form.
24     Q You're saying you don't know one way or
25  the other?

42

1      **A I don't believe he has.  I said I would**
2  **know if he had.**
3      Q How would you know if you couldn't even
4  identify the Complaint?
5      **A Another abusive harassing question.**
6      MR. DRISCOLL:  It's a foundation question.
7  You can go ahead and answer it.
8       How would you know if he had contacted
9  Roger Stone?
10     MR. KLAYMAN:  Or if Roger Stone contacted
11  him.
12     **A Is it privileged?**
13     MR. DRISCOLL:  That's an interesting
14  question.  The fact of the communication would not
15  be.  The contents of it would be.
16     **A How I would know is my question of whether**
17  **it's privileged or not.**
18     MR. DRISCOLL:  No, I'm going to allow you
19  to answer that one.
20     **A How I would know about what my attorneys**
21  **are doing or Judicial Watch's attorneys are doing?**
22     MR. DRISCOLL:  Yeah, and you're not
23  disclosing a communication.  You're just
24  describing a process.
25     **A Typically that type of communication would**

43

1  **have been disclosed to me.**
2      Q But you don't know for sure that
3  Mr. Peterson didn't have contact with Roger Stone?
4      MR. DRISCOLL:  Objection to form.
5      **A I'm confident there was no such contact.**
6      Q You have told Mr. Peterson in the past,
7  have you not, that I was ousted from Judicial
8  Watch because of a sexual harassment complaint?
9      MR. DRISCOLL:  Objection to form.
10  Mr. Peterson is an in-house counsel and I'm going
11  to direct the witness not to answer.  That's an
12  attorney-client privilege.
13     MR. KLAYMAN:  Certify it.
14     Q So you don't know whether or not
15  Mr. Peterson repeating what you had told him then
16  republished that to Roger Stone?
17     MR. DRISCOLL:  The communications between
18  an in-house counsel and the President of the
19  corporation relating to legal advice and
20  assistance are privileged.  He can't answer the
21  question about the contents of the communication
22  or derivative questions that would disclose the
23  content of the communication.
24     MR. KLAYMAN:  That's the crux of the
25  lawsuit.  That does not apply in this context.

44

1      MR. DRISCOLL:  That doesn't waive the
2  privilege.
3      Q Are you saying that you never told anyone
4  at Judicial Watch that I was ousted because of a
5  sexual harassment complaint?
6      MR. DRISCOLL:  Anyone other than the
7  attorneys?
8      MR. KLAYMAN:  Anyone.
9      MR. DRISCOLL:  No, I can't allow him to
10  answer that question.
11     Q Are you saying that you never told anyone
12  that I was -- regardless -- let's take attorneys
13  out of it.
14      Have you ever -- you have told other
15  people in addition to -- strike that.
16      You have told other people excluding
17  attorneys that I was ousted from Judicial Watch
18  because of a sexual harassment complaint?
19     **A You have to ask the question again.**
20     MR. KLAYMAN:  Read it back, please.
21     **A Please.**
22     MR. KLAYMAN:  Let me rephrase it.
23     Q I'm taking attorneys out of this question.
24  I'm saying you have told others who aren't
25  attorneys over the course of the last 16 years

Case 1:20-cv-00292-Y-DAW-2 Document 170-3 Filed 01/06/21 Page 179 of 290
Transcript of Thomas J. Fitton
Conducted on June 6, 2019

12 (45 to 48)

45

1  since I left Judicial Watch that I was ousted
2  because of a sexual harassment complaint?
3      A  No, because that's not true. You weren't
4  ousted as a result of a sexual harassment
5  complaint.
6      Q  After I sued you in this particular case
7  has anyone -- have you or anyone at Judicial Watch
8  or your counsel tried to contact Roger Stone?
9      MR. DRISCOLL:  Objection to form. The
10  question invades the attorney-client privilege and
11  the attorney work product. I direct the witness
12  not to answer.
13      MR. KLAYMAN:  Certify it.
14      Madam court reporter, have a page in the
15  front where you have all the certified questions
16  and where you can find them to make it easy for
17  the Magistrate Judge. Thank you.
18      Q  Now, I turn your attention back to your
19  affidavit which is --
20      A  Exhibit 3.
21      Q  Exhibit 3. Turn your attention to
22  paragraph seven where it says "I have no
23  recollection of ever having any communication with
24  Roger Stone," do you see that?
25      A  Uh-huh.

46

1      Q  Now, it doesn't say you didn't have a
2  communication with Roger Stone. It just says that
3  you have no recollection of having one, correct?
4      A  That's correct.
5      Q  Do you remember during the Clinton years
6  that witnesses would always come in and say we
7  have no specific recollection and we would contest
8  that?
9      MR. DRISCOLL:  Just ask your question,
10  Larry.
11      Q  So you can't say categorically that you
12  haven't had communications with Roger Stone?
13  You're just saying you don't have a recollection
14  of ever having it, correct?
15      A  I think the statement speaks for itself.
16      Q  You could have said I have never
17  communicated with Roger Stone, correct, if that's
18  what you were trying to say, that you never had
19  any contact?
20      A  The statement speaks for itself.
21      Q  Then you state in the next sentence "I
22  have never published, uttered or implied to Roger
23  Stone that Klayman was the subject of a sexual
24  harassment complaint during his employment by
25  Judicial Watch or that his resignation from

47

1  Judicial Watch was motivated by an employee's
2  sexual harassment complaint," do you see that?
3      A  Yeah.
4      Q  Again, that statement does not say that
5  you never spoke with Roger Stone, just that you've
6  never published that particular issue, correct?
7      A  It says what it says.
8      Q  And then it states "Any statement by Roger
9  Stone regarding Klayman was made without my
10  knowledge or information and therefore I did not
11  intend and could not intend to harm Klayman or his
12  reputation," do you see that?
13      A  Yes.
14      Q  Now, you're not saying in that statement
15  that you didn't communicate with Roger Stone.
16  You're saying that you didn't know that he was
17  going to republish anything about me, correct?
18      MR. DRISCOLL:  Objection to form. The
19  document speaks for itself.
20      A  The document speaks for itself.
21      Q  If you don't want to explain it that's
22  fine.
23      A  You're mischaracterizing it.
24      Q  I do agree. It speaks for itself and
25  there's a lot of loopholes in it.

48

1      MR. DRISCOLL:  Why don't you just ask him
2  the question. Did he ever --
3      MR. KLAYMAN:  I will ask the questions
4  that I want to ask, Mr. --
5      MR. DRISCOLL:  All right.
6      Q  I want to turn to paragraph eight.
7      Do you see the statements in the last
8  sentence of paragraph eight where it says "To
9  support his claim Judicial Watch submitted
10  evidence demonstrating that Klayman was forced to
11  resign due to inappropriate conduct" and you list
12  three examples of your alleged inappropriate
13  conduct, do you see that?
14      A  Yeah.
15      Q  Now, you have in the last 16 years told
16  many people, and I'm excluding any attorneys,
17  exactly what is written in this affidavit and
18  which you swore to under oath?
19      MR. DRISCOLL:  I'm going to object to the
20  question and direct the witness not to answer that
21  question to the extent it's related to the other
22  lawsuit that is currently pending in the U.S.
23  District Court for the District of Columbia, Case
24  Number 06-cv-670.
25      MR. KLAYMAN:  That's not a basis to tell

```
 1          IN THE CIRCUIT COURT OF THE SEVENTEENTH CIRCUIT
        IN AND FOR BROWARD COUNTY AND THE FIFTEENTH JUDICIAL
 2          CIRCUIT FOR PALM BEACH COUNTY, FLORIDA, FLORIDA

 3

 4   LARRY KLAYMAN,
                              CASE NO. 19-011394
 5           Plaintiff,

 6      -vs-

 7   ROGER STONE,

 8           Defendant.
     _____/
 9

     JEROME CORSI, et al
10
               Plaintiff
11

12   vs.                  CASE NO. 50-2019-CA-013711

13

     ROGER STONE, et al
14
               Defendant
15   _____/

16

              VIDEOTAPED DEPOSITION OF ROGER STONE
17
                     VOLUME I OF II
18
              Wednesday, February 12, 2020
19             9:42 a.m. - 4:28 p.m.

20

         110 Southeast 6th Street, Suite 1700
21           Fort Lauderdale, Florida 33301

22

     Stenographically Reported By:
23   PATRICIA BAILEY-ENTIN, FPR
     Notary Public, State of Florida
24   BAILEY & ASSOCIATES REPORTING, INC.
     Fort Lauderdale Office
25   Phone - 954-358-9090
```

1      But let's start with my sworn affidavit on top,

2    and I'll ask that that be marked.  It -- it entails --

3        MR. KLAYMAN:  And you can just mark it right in

4      the book --

5        THE REPORTER:  Sure.

6        MR. KLAYMAN:  -- to make it easy.

7        That's Exhibit 2 to the Stone deposition and it

8      entails 59 pages.

9        (Plaintiffs' No. 2, Affidavit of Larry Klayman,

10    was marked for Identification.)

11   BY MR. KLAYMAN:

12      Q.   You are aware, Mr. Stone, that I'm the founder

13   of Judicial Watch?

14      A.   I am.

15      Q.   You've spoken to Tom Fitton, haven't you?

16      A.   One time in my entire life.  I saw him

17   backstage at a conference in -- at Dural, maybe a couple

18   months ago, and we -- we shook hands in passing.  Beyond

19   that, I've never spoken to the man.

20      Q.   You've spoken to others at Judicial Watch,

21   though, haven't you?

22      A.   No, actually, I haven't.  Not that I recall.

23      Q.   You -- you may have, but you just don't recall?

24      A.   I don't recall ever speaking to anyone at -- at

25   Judicial Watch.  I couldn't name anybody else at

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION



| | | |
|---|---|---|
| JEROME CORSI AND LARRY KLAYMAN | § | |
| PLAINTIFFS, | § | |
| | § | |
| V. | § | CAUSE NO. 1:20-CV-298-LY |
| | § | |
| INFOWARS, LLC, FREE SPEECH SYSTEMS, LLC, ALEX E. JONES, DAVID JONES, OWEN SHROYER, AND ROGER STONE, | § | |
| DEFENDANTS. | § | |

## ORDER ADOPTING REPORT AND RECOMMENDATION OF
## THE UNITED STATES MAGISTRATE JUDGE

Before the court in the above-styled and numbered cause of action are Defendant Owen

Shroyer's Motion to Dismiss for Failure to State a Claim and for Attorneys' Fees and Costs Under

Fla. Stat. § 768.295 filed August 26, 2020 (Doc. #55), Shroyer's Motion for Sanctions Against Dr.

Jerome Corsi Pursuant to Fed. R. Civ. P. 11 filed August 26, 2020 (Doc. #56), Defendant David

Jones's Motion to Dismiss Amended Complaint for Failure to State a Claim filed September 2,

2020 (Doc. #57), Defendants Infowars, LLC, Alex E. Jones, and Free Speech Systems, LLC's

(collectively referred to as "Infowars") Motion to Dismiss Plaintiff Jerome Corsi's Portion of the

Amended Complaint for Failure to State a Claim filed September 2, 2020 (Doc. #58), Infowars's

Motion to Dismiss Plaintiff Larry Klayman's Portion of the Amended Complaint for Failure to

State a Claim filed September 2, 2020 (Doc. #59), Defendant Roger Stone's Motion to Dismiss

filed September 16, 2020 (Doc. #70), Stone's Motion for Sanctions filed October 13, 2020 (Doc.

#84), and associated response and reply briefs.

On October 29, 2020, the district court referred all pending and future motions in this case

to a United States Magistrate Judge for resolution and report and recommendation. *See* 28 U.S.C.

§ 636(b); Fed. R. Civ. P. 72; Loc. R. W.D. Tex. App'x C, R. 1. The magistrate judge signed a report and recommendation on May 24, 2021 (Doc. #108), recommending that this court grant Infowars, David Jones, Shroyer, and Stone's motions to dismiss, dismiss Corsi and Klayman's claims with prejudice for failure to state a claim, and deny Shroyer and Stone's motions for sanctions without prejudice to being refiled.

A party may serve and file specific written objections to the proposed findings and recommendations of a magistrate judge within 14 days after being served with a copy of the report and recommendation and thereby secure *de novo* review by the district court. *See* 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b). A party's failure to timely file written objections to the proposed findings, conclusions, and recommendation in a report and recommendation bars that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. *See Douglass v. United Services Auto Ass'n*, 79 F.3d 1415 (5th Cir. 1996) (en banc).

Corsi and Klayman filed objections to the report and recommendation on June 8, 2021 (Doc. #115). Stone responded to Corsi and Klayman's objections to the report and recommendation on June 15, 2021 (Doc. #117), David Jones responded to the objections to the report and recommendation on June 21, 2021 (Doc. #118), and Infowars and Shroyer responded to the objections to the report and recommendation on June 22, 2021 (Doc. #119). Corsi and Klayman replied to Stone's response to the objections on June 22, 2021 (Doc. #120) and replied to David Jones's response to the objections on June 24, 2021 (Doc. #121). In light of the objections, the court undertakes a *de novo* review of the record and applicable law.

Corsi and Klayman's Motion for Status Conference and to Vacate Report and Recommendation of the United States Magistrate Andrew W. Austin was filed May 27, 2021 (Doc.

#109). David Jones responded to Corsi and Klayman's motion for status conference and to vacate report and recommendation on June 10, 2021 (Doc. #116). In light of the court overruling Corsi and Klayman's objections and adopting the magistrate judge's report and recommendation, the court will deny Corsi and Klayman's motion for a status conference and to vacate the report and recommendation.

Corsi and Klayman first argue that the magistrate judge erred when ignoring affidavits submitted by Corsi, Klayman, and Kelly Morales. The magistrate judge correctly pointed out that the inquiry on a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss is "limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Ironshore Eur. DAC v. Schiff Hardin, L.L.P.*, 912 F.3d 759, 763 (5th Cir. 2019). The affidavits referenced in Corsi and Klayman's objections were attached to Corsi and Klayman's opposition briefs and not included with the amended complaint. The magistrate judge is correct to focus on the actual pleadings and the application of the Rule 12(b)(6) legal standard.

Corsi and Klayman next argue that the magistrate judge erroneously recommended dismissing the defamation claims against Shroyer and David Jones based on a lack of personal involvement because allegations in the complaint that defendants were working "in concert" to defame Corsi and Klayman were ignored. The court disagrees. In reviewing the pleadings, the magistrate judge determined that Corsi and Klayman's claims of alleged concerted action or conspiracy were insufficient to survive dismissal because the assertions were wholly conclusory and unsupported by any facts. In their objections, Corsi and Klayman provide no basis to sustain this objection and merely reassert the same insufficient, conclusory claims while referencing affidavits outside of the scope of a Rule 12(b)(6) inquiry.

Corsi and Klayman also assert that the magistrate judge erred in finding they did not allege actual malice, an alternative reason provided in the report and recommendation that dismissal of the defamation claims is appropriate. Specifically, Corsi and Klayman argue that Infowars, David Jones, Shroyer, and Stone acted with actual malice since they knew that the alleged defamatory statements were false because of their long histories and familiarity with Corsi and Klayman. The court disagrees. Again, Corsi and Klayman base this objection on affidavits outside of the scope of a Rule 12(b)(6) inquiry and offer no evidence from the pleadings that plausibly supports the claim that Infowars, David Jones, Shroyer, and Stone knew the complained-of statements were falsely made or with reckless disregard for the truth.

Next, Corsi and Klayman object to the magistrate judge's determination that they did not adequately plead Intentional Infliction of Emotional Distress ("IIED"). Corsi and Klayman rely on a comment directed at Corsi by Stone, saying, "I look forward to our confrontation. I will demolish you." However, Corsi and Klayman provide no argument to counter the magistrate judge's determination that the IIED is not "merely incidental to the commission of some other tort," and is thus appropriate for dismissal. Even if the referenced comment by Stone were enough of a factual allegation to necessarily support an IIED claim, the magistrate judge's determination that the "gravamen" of Corsi and Klayman's IIED claim is defamation would still warrant dismissal in this case.

The court is of the opinion that the remaining objections do not raise issues that were not adequately addressed in the report and recommendation. Therefore, finding no error, the court accepts and adopts the report and recommendation filed in this case for substantially the reasons stated therein. Accordingly,

**IT IS ORDERED** that Corsi and Klayman's motion for status conference and to vacate the report and recommendation (Doc. #109) is **DENIED**.

**IT IS FURTHER ORDERED** that Corsi and Klayman's objections (Doc. #115) to the report and recommendation of the United States Magistrate Judge are **OVERRULED**.

**IT IS FURTHER ORDERED** that the report and recommendation of the United States Magistrate Judge (Doc. #108) is **ACCEPTED AND ADOPTED** by the court.

**IT IS FURTHER ORDERED** that Shroyer and Stone's motions for sanctions (Docs. #56, 84) are **DENIED** without prejudice to refiling.

**IT IS FURTHER ORDERED** that Infowars, David Jones, Shroyer, and Stone's motions to dismiss (Docs. #55, 57, 58, 59, 70) are **GRANTED**.

**IT IS FINALLY ORDERED** that all of Corsi and Klayman's claims against Infowars, David Jones, Shroyer, and Stone are **DISMISSED WITH PREJUDICE.**

A final judgment shall be rendered subsequently.

SIGNED this _____ day of June, 2021.

_____

LEE YEAKEL
UNITED STATES DISTRICT JUDGE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**

DR. JEROME CORSI, et al

               Plaintiffs

       v.

INFOWARS, LLC, et al

              Defendants.

**Case Number:   1:20-cv-298-LY**

**ORAL ARGUMENT**
**REQUESTED**

---

**PLAINTIFFS JEROME CORSI'S AND LARRY KLAYMAN'S  MOTION FOR**
**RECONSIDERATION AND REPLY TO THE INFOWARS DEFENDANTS' RESPONSE**
**TO OBJECTIONS TO REPORT AND RECOMMENDATION OF MAGISTRATE**
**ANDREW W. AUSTIN**

Plaintiffs Dr. Jerome Corsi and Larry Klayman ("Plaintiffs") hereby move the Court for reconsideration of its June 25, 2021 Order adopting the Report and Recommendation of the U.S. Magistrate and Granting Defendants' Motions to Dismiss and Judgment. ECF No. 122, 123 (the "Order"). Plaintiffs respectfully request expedited oral argument on this motion.

Plaintiffs also, for the record, submit the following in reply to Defendants Infowars LLC, Free Speech Systems LLC, Alex Jones, and Owen Shroyer's (the "Infowars Defendants") response to Plaintiffs' written objections to Magistrate Andrew W. Austin's ("Magistrate Austin") Report and Recommendation of May 25, 2021. ECF No. 108. (the "Report").

**MOTION FOR RECONSIDERATION**

Plaintiffs hereby move for reconsideration of the Court's Order of June 25, 2021 pursuant to Fed. R. Civ. P 59(e). Generally, a Motion for Reconsideration may be granted under Rule 59(e) if the movant shows: (1) the motion is necessary to correct a manifest error of fact or law; (2) the movant presents newly discovered or previously unavailable evidence; (3) the motion is

1

necessary in order to prevent manifest injustice; or (4) the motion is justified by an intervening change in the controlling law." *Ramos v. Lucio*, No. B-08-122, 2009 U.S. Dist. LEXIS 146718, at *9 (S.D. Tex. May 19, 2009). Here, reconsideration is necessary in order to prevent manifest injustice and to correct a manifest error of fact or law.

## I.     At A Minimum, Plaintiffs Should Have Been Granted Leave to Amend

Based on the Court's Order, the primary reason that it chose to grant dismissal was the fact that the extremely fact-oriented affidavits were not attached to the Amended Complaint, and therefore could not be considered on a Rule 12(b)(6) motion. For instance, the Court wrote, "The affidavits referenced in Corsi and Klayman's objections were attached to Corsi and Klayman's opposition briefs and not included with the amended complaint. The magistrate judge is correct to focus on the actual pleadings and the application of the Rule 12(b)(6) legal standard." ECF No. 122 at 3. Nowhere in the Court's Order does it make the finding that the affidavits, if properly considered, would still not be adequate to survive a motion to dismiss. Thus, notwithstanding that Plaintiffs properly and in detail pled the actionable causes of action against all Defendants, they at a minimum should have been afforded leave to amend their Amended Complaint to incorporate their affidavits, along with Ms. Kelly Morales' affidavit, and moot out any other concerns that the Court might have had.

Under Rule 15, leave to amend is to be freely granted. *Patric v. City of Austin & Joshua Visi*, 2005 U.S. Dist. LEXIS 58488, at *6 (W.D. Tex. June 29, 2005); *see also Smith v. EMC Corp.*, 393 F.3d 590, 595 (5th Cir. 2004). "Although the decision concerning a motion to amend is entrusted to the sound discretion of the district court, a district court must possess a substantial reason to deny a request for leave to amend. *Id*. In determining whether to grant a party leave to amend a complaint, courts consider the following factors: (1) undue delay, (2) bad faith or

dilatory motive, (3) repeated failure to cure deficiencies by previous amendments, (4) undue prejudice to the opposing party, and (5) futility of the amendment." *Id*.

It is clear here that amendment would not be futile, as there is no possible argument that the affidavits of Plaintiffs and Ms. Morales bolster the allegations to a level that far exceeds ordinary pleading standards and  any motion to dismiss. There is clearly no undue delay, bad faith or dilatory motive, or undue prejudice to the Defendants as well, as Plaintiffs are making the motion immediately after the issuance of the June 25 Order. Any delay in this case is through no fault of the Plaintiffs, as there was simply a 8-month delay before the Magistrate even issued its Report and Recommendation. This case is therefore still only in its beginning stages, with no discovery even having taken place, as the Magistrate stayed discovery. There is also no "repeated failure" to cure deficiencies, as Plaintiffs were unable to obtain the affidavit of Ms. Morales until after their had first amended their complaint, and to that point, Plaintiffs have only amended their Complaint only one time so far.

Thus, Plaintiffs respectfully request that the Court grant them leave to amend, as such leave is  required under these facts pursuant to Fed. R. Civ. P. 15.

## II.   Alternatively, The Court's Order Should Be Stayed Pending Discovery

In the alternative, Plaintiffs respectfully request that the Court stay its June 25, 2021 Order and allow for full discovery of the Defendants.

Magistrate Austin denied Plaintiffs any discovery, yet proceeded to usurp the fact-finding role of the jury to override the allegations of the Amended Complaint and make factual determinations concerning the allegations of the Amended Complaint. This is not proper, but for whatever reason, Magistrate Austin decided to make his Report in this manner.

In doing so, Magistrate Austin essentially converted Defendants' motions to dismiss into a motion for summary judgment under Fed. R. Civ. P. 56, as he ruled upon factual evidence in rendering his Report. In this regard, the affidavits that Plaintiffs submitted into the record should have been properly considered. In other words, Magistrate Austin cannot have it both ways. Either he should not have looked past the Amended Complaint by ruling upon factual evidence, in which case the affidavits were not necessary, or if he was going to weigh evidence, then the affidavits should have been considered and discovery should have been granted in the first place. Ironically, of course, Defendants presented no factual evidence, so to reach his conclusions the Magistrate had to glean his own factual evidence, which went far beyond the four corners of the Amended Complaint and which was improper.

Indeed, it is clear, just from the affidavits provided to the Court, that the allegations of the Amended Complaint would be borne out in discovery. That is why leave to amend should be granted, as it is clearly not futile and would obviously moot out any concerns the Court may have, as set forth above. However, if the Court is not inclined to grant such leave, it must at a minimum, stay its June 25 Order pending discovery—something that the Magistrate should have done in the first place.

## III.    Plaintiffs Motion Must be Granted to Correct  Manifest Errors of Fact and Law

Lastly, Plaintiffs' Motion must be granted to correct manifest errors of fact and law, as set forth in detail in Plaintiffs' Objections to Magistrate Austin's Report, ECF No. 115, Reply to Defendant Roger Stone's Response to Objections, ECF No. 120, Reply to Defendant David Jones' Response to Objections, ECF No. 121, and the Reply to the Infowars Defendants Response to Objections, set forth below.

These pleadings set forth in great detail the litany of highly prejudicial errors of fact and law contained in Magistrate Austin's Report, which this Court subsequently adopted in full, with little to no demonstrated analysis. These errors, such as the Magistrate first dismissing Defendant David Jones without prejudice and then dismissing him with prejudice, underscores just how flawed his Report is and why the multitude of other errors must be considered and corrected on the record.

## REPLY TO INFOWARS DEFENDANTS' RESPONSE TO PLAINTIFFS' OBJECTIONS TO REPORT

**I.     Plaintiffs' Motion For Status Conference and to Vacate Report and Recommendation of the United States Magistrate Andrew W. Austin Does Not Constitute Plaintiffs' Objections**

The Infowars Defendants make the truly bizarre argument that Plaintiffs' Motion for Status Conference and to Vacate Report and Recommendation (the "Motion"), ECF No. 109, somehow constitutes their actual objections, which were timely filed. ECF No. 115. Plaintiffs' Motion seeks specific relief—namely for a status conference, and to vacate the Report—that is entirely unrelated to the purpose of filing objections to a Report and Recommendation pursuant to Fed. R. Civ. P. 72(b)(2), which does not contain any type of motion for relief. The mere fact that there is some overlap in the reasoning set forth in Plaintiffs' Motion and Plaintiffs' Objections does not render this "two bites at the apple" as the Infowars Defendants disingenuously assert. These are two separate, distinct pleadings properly filed by Plaintiffs. Tellingly, none of the Infowars Defendants' co-Defendants have adopted this truly strange and bizarre argument.

**II.    The Statements At Issue Are Per Se Defamatory Statements of Pure Fact**

The defamatory statements at issue in this case are so outrageous that they are clearly defamatory and demonstrably false on their faces, and they are defamatory *per se*, as they harm

5

Plaintiffs in their trade and profession, and as such damages are presumed, as set forth in detail below. Statements that injure a person in her office, profession, or occupation are typically classified as defamatory per se. *Hancock v. Variyam*, 400 S.W.3d 59, 63–64 (Tex. 2013). These published statements are:

> (1) **"He (Klayman) was ousted at Judicial Watch. Ask Tom Fitton [the current president of Judicial Watch] why he left. He was 'ousted' because of a 'sexual harassment complaint.'" Am. Comp. ¶ 56.**

> (2) **"He's (Klayman) never actually won a courtroom victory in his life." Am. Comp. ¶ 55**

> (3) **"For those people out there who think...that Larry Klayman's IQ is higher than 70, you're wrong..." Am. Comp. ¶ 62.**

> (4) **"He's (Klayman) incompetent, he's a numbskull, he's an idiot, he's an egomaniac, and he could be the single worst lawyer in America. With him as Jerry Corsi's lawyer, Corsi may get the electric chair. So your idea that he's a good guy is entirely wrong" Am. Comp. ¶ 59**

> (5) **Plaintiff Klayman is a "piece of garbage." Am. Comp. ¶ 61**

With regard to Plaintiff Dr. Corsi, Defendants have falsely and maliciously published that:

> (1) **"Plaintiff Corsi "seemed to be extremely mentally degraded to the point of what I would call dementia." Am. Comp. ¶ 42**

> (2) **Defendant Alex Jones purportedly saw Plaintiff Corsi at a steakhouse "on the ground at another table" and that his security staff "thought he was dead in the elevator." Am. Comp. ¶ 43**

> (3) **Accusing Plaintiff Corsi of having suffered a stroke, publishes maliciously that "whatever comes out of his mouth ain't the truth." Am. Comp. ¶ 44**

> (4) **that Plaintiff Corsi was "fired from World Net Daily." Am. Comp. ¶ 49**

> (5) **"He (Corsi) was perfectly willing to lie, to perjure himself saying that a memo that he had wrote me was written on the 30th for the purposes of cover-up.... which is further proof that Jerry lied under oath." Am. Comp. ¶ 50**

6

(6) "and then states that I knew about John Podesta's emails being stolen in advance, the only proof of that is Jerry's feeble alcohol affected memory – it's a lie...." Am. Comp. ¶ 51

(7) "Jerry was prepared to stab a principle Trump supporter in the back, he was perfectly prepared to bear false witness against me, even though I had done nothing in my entire life other than help him." Am. Comp. ¶ 52

(8) "all I ever did was show Jerry Corsi friendship and support and try to help him and his family and what I get is Judas Iscariot, the willingness to testify against me and help the deep state bury me....and then he makes up this story about helping me formulate a cover story." Am. Comp. ¶ 53

(9) "… you can always tell when Jerry Corsi is lying because his lips are moving...." Am. Comp. ¶ 54

(10) "He [Corsi] was perfectly willing to bear false witness against me on multiple points that are complete fabrications." Am. Comp. ¶ 64

(11) "the good doctor [Corsi] has told a number of lies. In fact, he's starting to conflate his lies.... he was perfectly willing to lie about me.... but now lying about Alex Jones, lying about InfoWars, lying about Dr. (David) Jones, who's one of the nicest, gentlest, sweetest, most honest men I have ever met, it's beyond the pale.... Jerry Corsi can no longer be believed." Am. Comp. ¶ 65

(12) "I think you've [Corsi] been deep state from the beginning. Your whole birther thing is used as a club to destroy conservatives....I look forward to our confrontation. I will demolish you. You're a fraudster, out of your alcoholic haze you have made up lies about David Jones and Alex Jones and Roger Stone and now I suspect they want you to lie about the President." Am. Comp. ¶ 66

(13) Plaintiff Corsi of being a "spook, back and forth with different agencies," Am. Comp. ¶ 67

(14) Falsely publishing a false statement of Plaintiff Corsi "not being able to walk." Am. Comp. ¶ 68

These statements are clearly defamatory on their face, and importantly, they are clearly statements of fact, not opinion. This is patently obvious to even a first-year law student, or anyone using even a modicum of common sense. As just one example—the false statement that Mr. Klayman was ousted from Judicial Watch due to a sexual harassment complaint, Am. Comp.

7

¶ 56, does not contain even a smidge of opinion. It is purely a false statement of fact that is clearly very damaging to Mr. Klayman in his trade and profession as a public interest advocate and litigator, as well as private practitioner, as well as personally as it connotes moral turpitude, which also amounts to defamation per se. Magistrate Austin's factual findings that these statements were not defamatory were clearly made in error, and especially so, since he denied Plaintiffs' discovery and then usurped the role of the jury to make (erroneous) factual findings.

### III.     Plaintiffs Properly Alleged Actual Malice

Indeed, a simple review of the record shows that Magistrate Austin's finding that Plaintiffs had failed to allege actual malice was in clear error. First, and foremost, it is indisputable that the Amended Complaint expressly sets forth that the Defendants acted with actual malice, as they knew that the defamatory statements were false given their long history, relationship, and familiarity with Plaintiffs: "Defendants, each and every one of them, as set forth herein, acted with actual malice, in concert, as joint tortfeasors, as they knew that the statements which they published were false…. Am. Comp. ¶ 36.

Magistrate Austin overrides the allegations of the Amended Complaint, again after improperly denying discovery, to make the erroneous factual finding that Plaintiffs allegation above was false and therefore no actual malice was alleged. This "heads I win, tails you lose" approach created by Magistrate Austin is exemplary of the grossly prejudicial errors permeating his Report.

In fact, the Amended Complaint goes even much further than simply alleging actual malice, and sets forth in painstaking detail exactly how and why. This includes the fact that Defendants "have known Plaintiff Corsi for a long time and even worked with him… so they were well aware that the statements made by the co- Defendant Stone, and their own false,

misleading, malicious and defamatory statements were, indeed, false, as well as their acting as agents of, much less their ratification of the malicious false statements published by Defendant Stone on their networks and media sites." Am. Comp. ¶ 39. This is further buttressed by Dr. Corsi's affidavit, ECF No. 115, Ex. 1, which details his long-standing relationships with the Defendants:

> I personally know Defendant Roger Stone ("Defendant Stone") and he personally knows my qualifications and me. I have even ghostwritten books for Defendant Stone and we used to be friends and colleagues. Defendant Stone is thus intimately familiar with my personal and professional history.

> In 2016, after the presidential election, I worked very closely with Alex Jones and his father David Jones, as well as with the Infowars staff, including Owen Shroyer. I made multiple trips to Austin, Texas, to appear live in-studio on Infowars broadcasts. I accepted an assignment from Alex Jones to create for Infowars a news bureau in Washington, D.C. From the beginning, I found Alex Jones to be erratic, subjects to emotional outbursts, even reacting that I was trying to "steal his company" when with his father's assistance, I brought a multi-million dollar legitimate investment offer from highly credible sources to the table to discuss the proposal with Alex and his father.

> Several times, concerned that I might quit over how badly Alex Jones was treating me, Dr. Jones met with me privately, often over breakfast. In those breakfasts, I counseled Dr. Jones over my concerns that Alex should seek professional psychological help. While in my work under various contracts with federal government agencies to consult over anti-terrorism tactics, I had the opportunity to work with very experienced psychiatrists and psychologists. Still, I am not medically trained, and I cautioned Dr. Jones that the problems I perceived with Alex's behavior should be professionally evaluated by qualified medical professionals. ECF No. 115, Ex. 1.

Indeed, as conclusive evidence that Defendants were acting with actual malice, as set forth in Dr. Corsi's affidavit, Indeed, Dr. Corsi's book, "*Killing the Deep State,*" was at all material times, still available for sale on the Infowars website! This shows that the Infowars Defendants at all times knew that Dr. Corsi was neither an alcoholic nor a liar, yet still willingly participated in branding him as such. This is textbook actual malice.

With regard to Plaintiff Klayman, "At 1:30 in the January 18 Video, Stone and the other Defendants maliciously falsely published, "He (Klayman) was ousted at Judicial Watch. Ask Tom Fitton [the current president of Judicial Watch] why he left. He was 'ousted' because of a 'sexual harassment complaint.'" Defendant Stone and the other Defendants had no basis to make these false, malicious, and defamatory claims. As pled in the Amended Complaint, Mr. Klayman "left Judicial Watch voluntarily on his own accord in order to run for U.S. Senate in Florida in 2003-2004." Am. Comp. ¶57. This is a fact. Defendant Stone's false revisionist history is a malicious and false statement of fact.

Furthermore, as the final "nail in the coffin" to Defendant Stone's assertions, Thomas Fitton ("Fitton"), under oath, at a deposition in another matter testified that **"[y]ou [Mr. Klayman] weren't ousted as a result of a sexual harassment complaint**." ECF No. 115, Ex. 5. This conclusively shows that Defendant Stone, in concert with the Infowars Defendants, published an objectively verifiable false statement. Indeed, at the same deposition, Fitton admits to never have spoken to Stone, which shows that Stone simply made this lie up. ECF No. 115, Ex. 5. Stone admitted under oath in a deposition that he did not speak to Fitton about this either, so it's clear that Stone made this up to defame Mr. Klayman. ECF No. 115, Ex. 5. This evidences the fact that Defendant Stone, in concert with the other Defendants, acted with actual malice.

Furthermore, Mr. Klayman's affidavit further shows that Defendant Stone and the other Defendants, acting in concert, with actual malice and at a minimum acted with reckless disregard for the truth.

> Defendant Stone was a "political consultant" who claimed to help get presidents and other politicians elected. The firm made money by then lobbying the very men they put in office.

Defendant Stone backed Republican candidate Jack Kemp for President and he recommended that I be put on the executive finance committee, which also included Donald J. Trump.

Because Defendant Stone knew of my successes and capabilities as a private lawyer, he told me that he had recommended me for U.S. Attorney when George Bush was President in 1992.

In 1996, at a Republican Convention in San Diego, California, Defendant Stone was filmed at a "toga party" with his wife at a "swingers party."

The media at the time went after Defendant Stone because of his alleged participation in the "sex party" and created a scandal.

The media alleged at the time that Defendant Stone solicited sex half-naked, and that there was a picture of Defendant Stone in a compromising position to back up the story.

Defendant Stone contacted me and, because he knew my capabilities and acumen as a lawyer, retained me to represent him to get the media to cease what he claimed then was a smear campaign.

I successfully got the media to back off Defendant Stone through my skill as a lawyer and Defendant Stone was grateful.

Because he was aware of my prior successes at Judicial Watch and before, Defendant Stone wanted to work with me as my U.S. Senate campaign manager.

During this time, the spring, summer, and fall of 2003, and in preparation for my U.S. Senate run, Defendant Stone researched and kept books and records of many of my accomplishments. He had several binders (2-3 feet) full of information about me and the victories that I had obtained at Judicial Watch and elsewhere. Again, because Defendant Stone knew of my successes and legal political acumen, Defendant Stone wanted to be on my team and help me run for the U.S. Senate.

Defendant Stone thus knew of many cases I had won in courtrooms and other legal accomplishments and in fact had kept records of successes in a book of my accomplishments. ECF No. 115, Ex. 4

Accordingly, this shows that Defendant Stone and the other Defendants had <u>actual knowledge</u> that his statement regarding Mr. Klayman's abilities as a lawyer were flat out false,

including but not limited to the "fact" that Mr. Klayman had "never won a courtroom victory in his life." Thus, Mr. Klayman has also far  exceeded any  requisite  showing  of actual malice.

Given all of this, it is indisputable that Magistrate Austin's decision to usurp the fact finding role of the jury, after improperly denying Plaintiffs discovery, and then erroneously find that the Defendants did not act with actual malice was a clear error.

## IV.   Plaintiffs Properly Alleged that the Infowars Defendants Were Acting Together in Concert As Agents of Defendant Stone

The Amended Complaint specifically and expressly alleges that the Infowars Defendants were at all material times "working together in concert with and as agents of Stone…." Am. Comp. ¶ 36. Furthermore, "Plaintiffs have demanded retraction and correction of the defamatory videos and publications…but Defendant shave arrogantly refused, thereby ratifying any and all defamatory statements contained therein…." Am. Comp. ¶ 38.

These assertions are supported by detailed factual allegations:

Defendant InfoWars and Defendant Free Speech Systems are both owned, controlled, and operated by Defendant Alex Jones and David Jones. Defendant Free Speech Systems owns www.infowars.com, where content created by Defendants Alex Jones, Shroyer and Stone were at all material times posted and broadcast into this district, nationally and internationally. Am. Comp. ¶ 11.

Defendant David Jones is Defendant Alex Jones's father and holds the official title of Director of Human Relations for Defendant Free Speech Systems. On information and belief, Defendant David Jones is the owner of Defendant InfoWars and Free Speech Systems and he manages and controls the business and related activities for Defendants InfoWars and Free Speech Systems, as well as Defendant Alex Jones' other companies. Am. Comp. ¶ 8.

The Defendants, acting in concert, as part of their latest scheme for notoriety, fame, and profit, worked in concert with and on information and belief continue to work in concert with Defendant Stone, who was at all material times an integral host on Infowars, and handsomely compensated by it, to defame, intimidate, and threaten Plaintiffs. Am. Comp. ¶ 22.

Defendants have, by working in concert with and as agents of Stone, therefore engaged in illegal witness tampering, intimidation and threats in violation of 18

12

U.S.C. § 1512 by virtue of the defamatory and threatening acts and practices as alleged herein. Not coincidentally, this was what largely Stone was indicted and convicted for by Special Counsel Robert Mueller, for which he was sentenced to 40 months of incarceration a federal penitentiary. Am. Comp. ¶ 36.

In a video from October 26, 2018, Defendant Alex Jones, acting in concert with the other Defendants and at their direction, particularly Defendant Stone, makes several false, misleading, malicious and defamatory statements about Plaintiff Corsi. Am. Comp. ¶ 41.

Thus, given the fact that each of every one of the Infowars Defendants are intricately bound together by virtue of the fact that they all directly participate in creating and publishing the content on the Infowars site, it is more than merely plausible that they are working together in concert. This is more than enough at the pleading stage, where again, to survive a motion to dismiss, a complaint need only "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678.

Plaintiffs took it even a step further and provided the Court with affidavits in addition to a well pled Amended Complaint and related pleadings, all of which show the hard fact that all of the Defendants all closely work together as part of Infowars and appeared together in concert on the same defamatory broadcasts, the law, which was presented to the Magistrate, shows otherwise:

Civil conspiracy is used to extend tort liability beyond the wrongdoer to those who merely planned, assisted, or encouraged his acts. *See Carroll v. Timmers Chevrolet, Inc.*, 592 S.W.2d 922, 925-26 (Tex. 1979); *Helping Hands Home Care, Inc. v. Home Health of Tarrant County, Inc.*, 393 S.W.3d 492, 506 (Tex. App.-Dallas 2013, pet. denied). Once a civil conspiracy is proved, each conspirator is responsible for all acts done by any of the conspirators in furtherance of the conspiracy. *Bentley v. Bunton*, 94 S.W.3d 561, 619 (Tex. 2002); *Carroll*, 592 S.W.2d at 926 (Tex. 1979); *Helping Hands*, 393 S.W.3d at 506. A finding of civil conspiracy imposes joint and several liability on all conspirators for actual damages resulting from the acts in furtherance of the conspiracy. *Carroll*, 592 S.W.2d at 925; *Helping Hands*, 393 S.W.3d at 506. When a jury finds that liability for a civil conspiracy exists, this finding requires the legal conclusion to impose joint and several liability on the co-

13

conspirators. *LandAmerica Commonwealth Title Co. v. Wido*, No. 05-14-00036-CV, 2015 Tex. App. LEXIS 11201, at *29 (Tex. App. Oct. 29, 2015).

Additionally, under Restatement (Second) of Torts, § 577, comment f, "One is liable for defamation by a third person whom as his servant, agent, or otherwise he directs or procures to publish defamatory matter." *See also Universal Commun. Sys. v. Turner Broad. Sys.*, 2005 U.S. Dist. LEXIS 58575, at *8 (S.D. Fla. Mar. 17, 2005) ("One is liable for defamation by a third person whom as his servant, agent, or otherwise he directs or procures to publish defamatory matter.")

Plaintiffs have more than adequately pled, if not proved, all of the Defendants specific, personal involvement as set forth in the allegations of the Amended Complaint. Magistrate Austin's decision to ignore the allegations of the Amended Complaint, and make the factual determination that Defendants were not acting in concert, after improperly denying discovery, is a gross, prejudicial appealable error.

## V.     Plaintiffs Properly Alleged a Claim Under the Lanham Act

The Infowars Defendants misapply *Farah v. Esquire Magazine,* 736 F.3d 528 (D.C. Cir. 2013), which is a non-binding D.C. Circuit case in any event. *Farah* involved a claim under the Lanham Act arising out of a parody/satire article titled "BREAKING: Jerome Corsi's Birther Book Pulled from Shelves!" This parody/satire article was published one day after Dr. Corsi had released his book,  "*Where's the Birth Certificate? The Case that Barack Obama is not Eligible to Be President*," written by Jerome Corsi and published by Joseph Farah's WND Books. Farah's website, WorldNetDaily, announced the book launch with the headline, "It's out! The book that proves Obama's ineligible: Today's the day Corsi is unleashed to tell all about that 'birth certificate'" *Id.* at 530. Under these facts—which are clearly very different from the facts of this instant case—the D.C. Circuit found that the Plaintiffs had failed to state a claim under the Lanham Act. Importantly,

14

however, there is zero (0) support for the Infowars Defendants' proposition that a radio talk show does not qualify as "commercial advertising or promotion" in *Farah*.

Indeed, what well-established case law <u>does</u> show is that Plaintiffs, in fact, do have proper Lanham Act claims. The crux of the Infowars Defendants' argument is that they did not engage in commercial speech. This is not so. In *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60 (1983) the Supreme Court set forth a three-factor test for determining whether speech is commercial. These factors are (i) whether the communication is an advertisement, (ii) whether it refers to a specific product or service, and (iii) whether the speaker has an economic motivation for the speech.

In *Bolger*, the Supreme Court found that "informational pamphlets discussing the desirability and availability of prophylactics in general or Youngs' products in particular" constituted commercial speech despite the fact that they contained "discussions of important public issues such as venereal disease and family planning." *Id.* at 67. In doing so, the Supreme Court reasoned:

> We have made clear that advertising which "links a product to a current public debate" is not thereby entitled to the constitutional protection afforded noncommercial speech. *Central Hudson Gas & Electric Corp.* v. *Public Service Comm'n of New York*, 447 U.S., at 563, n. 5. A company has the full panoply of protections available to its direct comments on public issues, so there is no reason for providing similar constitutional protection when such statements are made in the context of commercial transactions. See *ibid*. Advertisers should not be permitted to immunize false or misleading product information from government regulation simply by including references to public issues. *Id*. at 68.

The *Bolger* case definitively rebuts the Infowars Defendants' strategy of attempting to mischaracterize the issue as competition in the "marketplace of ideas." A Defendant cannot escape liability under the Lanham Act simply by disguising their commercial speech as public discourse.

Other circuits have reached the same conclusion. In *Procter & Gamble Co. v. Haugen*, 222 F.3d 1262 (10th Cir. 2000), the Tenth Circuit found that the following was commercial speech:

> I wanna run something by you real quick that I think you will find pretty interesting. Just talking to a guy the other night about this very subject and it just so happens that a guy brings information in and lays it on my desk this morning, so here it goes.
>
> It says the president of Procter & Gamble appeared on the Phil Donahue Show on March 1, '95. He announced that due to the openness of our society, he was coming out of the closet about his association with the church of satan. He stated that a large portion of the profits from [P&G] products go to support his satanic church. When asked by Donahue if stating this on television would hurt his business, his reply was, "There are not enough Christians in the United States to make a difference." And below it has a list of the [P&G] products which I'll read: [the subject message then lists 43 P&G products].
>
> It says if you are not sure about a product, look for the symbol of the ram's horn that will appear on each product beginning in April. The ram's horn will form the 666 which is known as satan's number. I'll tell you it really makes you count your blessings to have available to all of us a business that allows us to buy all the products that we want from our own shelf and I guess my real question is, if people aren't being loyal to themselves and buying from their own business, then whose business are they supporting and who are they buying from. Love you. Talk to you later. Bye.

In doing so, the Tenth Circuit reasoned:

> In the present case, we are likewise dealing with a message containing both a noncommercial, "theological" component and a commercial component. As *Bolger* and *Fox* indicate, however, the bare fact that the subject message contains a "theological" component is insufficient to transform it into noncommercial speech.
>
> Furthermore, we reject appellees' assertion that the subject message does not promote "commercial transactions." On the contrary, the message unambiguously urges recipients to eschew purchasing P&G products in favor of Amway products. While economic motivation or reference to a specific brand name and products, when viewed in isolation, might not render a message commercial speech, we conclude that those factors taken together with the instant message's promotion of Amway products at the expense of P&G products support the characterization of the subject message as commercial speech.

16

Similarly, in *Porous Media Corp. v. Pall Corp.*, 173 F.3d 1109 (8th Cir. 1999), the Eighth

Circuit found that the following was commercial speech:

> *ALERT* Please be advised that a filter has been introduced to the marketplace that in *appearance* seems to be a "clone" of the Pall Breathing Circuit Filter (BB-50T). Be advised that the similarity *ends* with appearance. The attached [set of reports] notes a serious *hydrophobic deficiency* as to the competitive product. The "clone" device is offered by a company called Porous Media. If your particular application for the Pall BB-50T operates in *any* moist, wet, high-humidity (condensation) environment, then you will run into "product occurrence" situations routinely should you utilize the Porous Media device instead of the Pall BB-50T. I urge you or your engineering staff to consider the enclosed, and conduct your own tests for verification if necessary. Please contact me with any questions or comments.

In doing so, the Eighth Circuit reasoned, "**Whatever nobler concerns may have driven Pall to inform the market of the public health dangers allegedly posed by Porous's non-hydrophobic filter, "commercial speech" need not originate *solely* from economic motives**." (emphasis added).

Both *Porous Media* and *Haugen* involved one competitor denigrating the quality of

another competitor's goods and/or services for their financial gain, which is exactly what is

alleged here:

> Plaintiffs, like Defendants, rely on viewer and listener financial and other support and sales and their reputations and good will in order to continue their work. Defendants' false and/or misleading statements concerning Plaintiffs is meant to, and has, diverted financial and other support, referrals and sales away from Plaintiffs and to Defendants instead, and severely harmed Plaintiffs' personal and professional reputations. Am. Comp. ¶ 74.

Each of the courts found this to be commercial speech. *Haugen* is particularly instructive.

The Tenth Circuit found that an email from an Amway provider accusing the president of

Proctor & Gamble of being affiliated with the church of satan to be commercial speech. There

was no reference the quality of any of Proctor & Gamble's products, but nonetheless, the Tenth

Circuit correctly found this to be commercial speech despite the clear "noncommercial theological" component.

Here, as set forth in the Amended Complaint, the Infowars Defendants clearly engaged in commercial speech, as everything that he stated was intended to "and has, diverted financial and other support, referrals and sales away from Plaintiffs and to Defendants instead." Am. Comp. ¶ 74. This is far more compelling than even the facts in *Haugen* or *Porous Media*.

In fact, the Amended Complaint sets forth that the Infowars Defendants "do substantial business and promote and sell various goods in this judicial district and nationwide, including medicine, supplements, and "tchotchkes" with InfoWars branding. The money earned from these sales funded the conspiracy and concerted acts between amongst Defendants to defame, intimidate, coerce and threaten Plaintiffs…." Am. Comp. ¶ 15. During the Infowars Defendants' broadcasts, advertisements for these various goods are interwoven into the broadcast, in between and even during periods where they are making defamatory statements, rendering the Infowars Defendants' trade and profession as "defamation for profit." Additionally, both Plaintiffs also sell books and various goods in this judicial district and nationwide.[1] This means that they are in direct competition not only for fundraising, but also for the sale of goods as well.

Thus, it is indisputable that the Infowars Defendants engaged in commercial speech and therefore Plaintiffs have properly alleged a cause of action under the Lanham Act. They are all competitors with Plaintiffs and use their published transmission to sell their products and reap large profits, here to the detriment of Plaintiffs, who they trashed with their concerted defamation and false statements, tantamount to false advertising under the Lanham Act.

## VI.   Magistrate Austin's Denial of Discovery Was Clearly Erroneous

---

[1] https://www.simonandschuster.com/authors/Jerome-R-Corsi/48217651;
https://www.simonandschuster.com/authors/Larry-Klayman/177669336.

Furthermore, Magistrate Austin grossly erred by recommending dismissal of all claims against the Infowars Defendants—as well as all of the other Defendants—after having denied Plaintiffs leave to conduct any discovery. All of the detailed, fact specific allegations in the Amended Complaint pertaining to the Infowars Defendants' personal involvement in the defamation of Plaintiffs—as well as those pertaining to the other Defendants—would have been confirmed in discovery, as evidenced by Plaintiffs' affidavits, for starters. By denying discovery, and then usurping the fact-finding role of the jury to make the factual determinations that what the Infowars Defendants said was not defamatory or malicious, Magistrate Austin has created a no-win situation for Plaintiffs and has essentially taken the case into his own hands. With all due respect, this was not Magistrate Austin's role, and him doing so was a grave error that has severely prejudiced Plaintiffs.

## CONCLUSION

It is clear that Magistrate Austin did not do his job, and that his Report was simply rushed out the door on the eve of his retirement. Plaintiffs making this argument is not attacking Magistrate Austin personally, but simply protecting their own rights. Plaintiffs are entitled to a fair, unbiased, and thorough judicial process, and Magistrate Austin simply did not do that.

Plaintiffs respectfully request expedited oral argument on their Motion for Reconsideration to address this not just the errors in the Magistrate's Report but to seek to prevent a manifest injustice.

Dated: June 28, 2021                                    Respectfully Submitted,


                                                       /s/Sanjay Biswas
                                                       SANJAY BISWAS, Esq.
                                                       #24061235—Texas
                                                       #24966--Louisiana
                                                       11720 Duxbury Dr.

Frisco, Texas 75035
Telephone: (972)-866-5879
Email:sanjaybiswas41@gmail.com
Fax: 1-800-506-6804

*Counsel for Dr. Jerome Corsi*

/s/Larry Klayman
Larry Klayman, Esq.
7050 W. Palmetto Park Rd
Boca Raton FL, 33433
Email:leklayman@gmail.com
Tel: 561-558-5336

*Plaintiff Pro Se*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 28, 2021, a true copy of the foregoing was filed via ECF and served to all counsel of record though the Court's ECF system.

/s/ Sanjay Biswas

Case 1:20-cv-00298-Y-DH Document 170-3 Filed 11/16/21 Page 147 of 290



HuffPost image

# Alex Jones' Lawyer Violated Legal Ethics By Soliciting Porn Bribes. Just How Dirty Is Marc Randazza?

America's foremost attorney for far-right extremists wanted "a little gravy," then lied to cover it up. That's just part of his twisted journey through a lax legal system.

**By Luke O'Brien** | 12/27/2018 03:09 pm ET | **Updated** Dec 27, 2018



One morning this June, a group of lawyers filed into the office of the State Bar of Nevada and closed the door. It was summer in Las Vegas, the morning temperature already nearing 100 degrees, but inside the low-slung tan building, the lawyers had a chilly question to address: what to do about one of their own.

Marc Randazza had been a problem for years.

Randazza, who represents conspiracy theorist Alex Jones and many other far-right extremists, had long relied on lawyer buddies to pump his public image. By their telling and his own, Randazza was a First Amendment "badass." But he was a combative badass, even vicious, and he'd left a trail of bad blood and trampled ethics behind him.

Randazza had made enemies. Plenty of them. But he was cunning. He'd sidestepped previous bar complaints and once avoided paying $600,000 in damages to his former employer by filing for bankruptcy and having his malpractice insurance kick in. Randazza was lucky, too. When an appeals court assigned a panel of judges to look into his misrepresentations in court under oath, the underlying case settled before the panel could meet. So off Randazza went, scuttling along through the Mojave as unaccountable as a scorpion.




Bar had been aware of allegations that Randazza violated ethics rules in 2011 and 2012 while working for pornographers. By the time the lawyers met in Vegas to decide his fate, Randazza had attained a new level of notoriety.

Since Donald Trump's election, he had become, as much as any attorney in America, a legal crowbar for far-right grifters and goons to leverage the protections of democracy in an effort to undermine them. And although Randazza had taken on legitimate free speech cases in the past, he'd grown curiously chummy with fascists and racists who use defamation, harassment and threats to silence others.

Aside from Jones, Randazza and his firm represented neo-Nazi publisher Andrew Anglin; white nationalist Republican congressional candidate Paul Nehlen; white supremacist patriarch Jared Taylor; Holocaust-denying slanderer Chuck Johnson; Pizzagate peddler Mike Cernovich; pro-rape misogynist Daryush "Roosh" Valizadeh; an alt-right member who helped organize the deadly white supremacist rally in Charlottesville, Virginia; the booking agent for white nationalist Richard Spencer; 8chan, an online message board teeming with neo-Nazis; and Gab, the alt-right social media platform where Robert Bowers, who allegedly killed 11 people at a synagogue in Pittsburgh in October, appears to have radicalized himself.

In Randazza, these extremists had found their own bush league Roy Cohn, the attorney who in a pre-internet era served as the "legal executioner" for right-wing thugs such as Trump and Joseph McCarthy and repped mafia bosses like Carmine "Lilo" Galante and "Fat Tony" Salerno. (Cohn was disbarred for "dishonesty, fraud, deceit and misrepresentation" shortly before he died in 1986.)

Like Cohn, Randazza was willing to go on the offensive for authoritarians. And like Cohn, Randazza's legal license and bunco man's talent for beguilement made him as problematic as some of the people he represented. This summer, a former federal judge who'd scrutinized Randazza's unethical behavior in an arbitration proceeding described the attorney as nothing short of a danger to the public.

Certainly, Randazza's misbehavior had *happened* in public — it was all there in the court records for anyone who cared to slog through them, a testament to how easily a bad actor with the right credentials can abuse a system that assumes candor from its professional class, not to mention an illustration of how white-collar privilege can abet white-collar wrongdoing in America. Like a Wall Street banker selling bad debt or a well-connected U.S. Supreme Court nominee fibbing under oath, Randazza had been given a pass. Until now.

The backstory to what he'd done was complicated, the details sordid. The short of it is this: While working as the in-house general counsel for gay pornographers a few years ago, he solicited bribes, embraced conflicts of interest, relied on ill-gotten privileged information to gain a legal advantage, made misrepresentations about his fees to various courts and despoiled evidence of his treachery, according to an arbitrator's




Randazza's own admissions and thousands of pages of court records.

But what was the Nevada Bar prepared to do about it?

## A Troll Is Born

Randazza grew up in Gloucester, Massachusetts, where his Sicilian family immigrated, worked as fishermen and gained repute as champion traversers of greased poles during the town's annual St. Peter's Fiesta. Randazza chose a different path. In high school, he was voted "most likely to be dead or in jail" by 25. He claims to have failed out of the University of Massachusetts three times.

Twenty-year-old Randazza enlisted in the U.S. Army during one hiatus from college with the goal of becoming a psychological operations soldier, according to military records obtained by HuffPost. He lasted less than five months in the Army. Randazza completed boot camp and airborne "jump school" training but appears to have washed out of psy-ops training and was discharged for undisclosed reasons during the Gulf War.

He returned to the University of Massachusetts and plunged into controversy. A school administrator at the time remembers Randazza as "an oppositional personality" who was "just interested in burning stuff down." Randazza lived in Butterfield Hall, a dorm known for its drug-fueled parties, and took to flying a Jolly Roger flag from an antenna on the building's slate roof — an early, if misguided, free speech stand. Randazza, the former administrator said, egged on other students to climb on the steep roof. The school removed the flag several times because of safety concerns, only to have someone put it back up, at one point by allegedly using explosives to blast off metal bars the school had installed over windows to prevent students from accessing the roof. Randazza claimed the bars "rusted and fell out."

When one female student complained that the flag resembled the logo of White Aryan Resistance, a prominent neo-Nazi organization, Randazza mocked her concerns and covered a letter she'd written in crude sexual insults, according to the student newspaper. The insults, he said, were his "trademark."

### Butterfield once more

By MICHELLE ROBBINS
Collegian Staff

When Housing Services took down Butterfield residents' Jolly Roger flag last Wednesday and installed metal bars on stairwell windows, many residents were outraged and confused with Housing's behavior.

"The flag is a symbol of free thinking for Butterfield residents," said Marc Randazza, a junior journalism major.

A new Jolly Roger flag is now waving triumphantly on top of Butterfield Residential Hall's roof, defying all of Housing's attempts to keep residents off the roof.

There are discrepancies as to how the metal bars have since been removed. Brian O'Neil, a first year microbiology major, said the bars were removed by explosives. Another student, Randazza, said the bars rusted and fell out.

Residents said when Housing took away their flag they also took away Butterfield residents' individuality. "Housing is forcing the residents to obey and conform to their rules," said Georgina Grigson, a junior journalism major.

Residents said they couldn't understand why Housing focused so much attention and spent money to remove the flag and install bars when there are more



MASSACHUSETTS DAILY COLLEGIAN

It took Randazza seven years to graduate from UMass with a journalism degree in 1994. After college, he drifted for a few years — a period he vaguely refers to as his time as a "former news reporter," although scant evidence of his journalism career exists. Randazza filed at least two dispatches from Italy, where he now has dual citizenship, for the newsletter of the Order Sons of Italy in America, a national organization for people of Italian heritage.

In 1997, Randazza managed to get into Georgetown law school; he said he finished a "dead last" in his class. He caused a furor when he ran for the Student Bar Association using campaign posters that referenced penile implants. When the Women's Legal Association tore down the posters, Randazza protested to the dean that his political speech was being censored. He got to put his posters back up. "And then," Randazza gloated on one legal blog, "the WLA cow had to apologize to *me*."

Randazza completed his third year of law school at the University of Florida because, as he put it, he never fit in at Georgetown: "I found it to be too conformist and oppressive. I'm a hardcore left-wing guy, but at Georgetown, there was no room to dissent." (Georgetown is a large law school that graduates students from all walks of life and political backgrounds. Among them: Atlantic Media owner David Bradley, Federal Reserve Chairman Jerome Powell, House Majority Leader-elect Steny Hoyer, criminal Republican lobbyist Jack Abramoff, and criminal Republican lobbyist and former Trump campaign manager Paul Manafort.)

In almost every interview, Randazza describes himself as a "leftist" or a "libtard" or "so liberal" that he's "practically a communist," which might have been accurate in 1996, when he listed his party affiliation as the Socialist Workers Party, according to Florida voter registration records. But it wasn't in 2000, when Randazza volunteered for John McCain's presidential campaign. Since at least 2002, Randazza has been a registered and active Republican voter, according to both Florida and Nevada records.



## He went out of his way to take advantage of us. With him, there's always an end game that occurs at the expense of somebody else. And he has no remorse.

—Brian Dunlap, vice president of Liberty's sister company, Excelsior

He began his legal practice in earnest around that time and, with his bad grades, struggled at first to find a job. He claimed to shun the idea of working at a big firm because "it's all about being a billing machine and ethics aren't important." Instead, his



industries I have ever dealt with.

In 2004, he landed a junior position at a small firm that specialized in First Amendment and intellectual property cases. His career received an immediate and major boost when Fox News made him a talking head after an academic paper he wrote about online vote swapping garnered national attention. From the start, though, smut was Randazza's primary focus. In Florida, the porn lawyer tooled around in a yellow Porsche with U.S. paratrooper plates.

In 2009, he took a nearly $250,000-a-year job in San Diego as in-house general counsel for Excelsior Media, a gay porn company, and Excelsior's production and distribution arms Liberty Media Holdings and Corbin Fisher. (Because all of the cases Randazza worked on involve Liberty as a party, we will refer to his employer as Liberty throughout this article.) Liberty later relocated to Las Vegas, and Randazza moved with the company.

On his first attempt at passing the Nevada Bar exam, Randazza failed the ethics portion of the test.

## The Porn Lawyer Ascendant

Randazza staggered naked down the stairs, clutching a bottle of red wine. It was January 2010, and the attorney was boozing it up at the villa Liberty had rented for a location-scouting trip to Costa Rica. Around 9 a.m. that day, according to court records, Randazza stopped studying for the California Bar exam and started guzzling vodka and peach soda. He kept drinking over lunch at a nearby hillside restaurant, tossing back so many cocktails that he had to be helped outside to vomit in the parking lot. Brian Dunlap, vice president of Liberty's sister company, Excelsior, drove Randazza back to the villa in a rental Jeep, the vehicle bouncing over small cobblestone roads as Randazza puked violently out the window, his heaving taking on a staccato rhythm with the bumps.

Back at the villa, Dunlap got the attorney into his bedroom and went to hose down the Jeep. But Randazza was soon back on his feet and making for the pool with a wine bottle. Now, he was naked. The Liberty executives looked on, laughing. One of them filmed the glassy-eyed Randazza wobbling into the pool.

"As your attorney," Randazza said, turning full-frontal to the camera as he held his wine bottle aloft, "I advise you to drink this."



Case 1:20-cv-00298-YDH Document 170-3 Filed 11/16/21 Page 152 of 290



Marc Randazza getting drunk and naked on a trip to scout porn shoot locations in Costa Rica.
HUFFPOST IMAGE

Initially, Randazza's antics seemed harmlessly incorrigible. And his raffish demeanor was hardly out of place in the freewheeling porn industry. Randazza didn't just party with his bosses. He procured concealed carry permits for them, helped them with legal name changes and sorted out their messy personal affairs. On one occasion, he acted as a cooler after a Liberty performer who was in a sexual relationship with the company's CEO allegedly attacked the executive. Randazza bundled the porn actor into a cab bound for the airport and a flight out of Las Vegas.

"[Your] 702 area code privileges have been revoked," he told the man.

Above all, though, Randazza served as Liberty's attack dog. His main duty was to go after copyright infringers, earning a 25 percent bonus on any settlement funds he brought in. Some of the infringers were companies, but Randazza also shook down gay kids and small-time pirates, even unemployed ones.

But Randazza was two-timing Liberty. He was secretly doing work for Liberty competitors such as Bang Bros, Titan Media and Kink.com, sometimes billing his outside clients almost 100 hours a month. He also worked for companies accused of infringing Liberty's copyrights, including XVideos. Most attorneys would shun these conflicts of interest. Randazza barreled into them. He played clients off each other and cited "fair use" to dissuade Liberty from suing infringers.

"The big targets that we kept asking him to go after for months were his clients," Dunlap said. "We kept saying, 'What about XVideos? What about XVideos? They're the worst.'"

Only years later did Liberty executives realize that when they sent takedown notices to XVideos, the lawyer handling them sat down the hall. Randazza invoiced XVideos for




"He went out of his way to take advantage of us," Dunlap said. "With him, there's always an end game that occurs at the expense of somebody else. And he has no remorse."

Randazza misled people on multiple fronts. When he started his Liberty job, he accurately described himself in court as the "in-house counsel for Liberty Media Holdings." But a year later, he was giving judges, journalists and potential clients the impression that he was an outside attorney, rather than a Liberty employee. He swapped out his Liberty email address and letterhead for a personal email address and the letterhead of the "Randazza Legal Group," a firm he'd set up in Florida. He handed out personal business cards that made no reference to his Liberty job.

In court filings, Randazza referred to himself as "counsel for Plaintiff" or "an attorney for the Plaintiff." He told courts that Liberty had "incurred" his fees or that he'd "charged" the company at billing rates of $425 to $500 per hour. To support those rates, he sometimes filed affidavits from a paralegal who stated under oath that he was Liberty's "Vice President for Intellectual Property Management," a position Dunlap said the paralegal never held. Randazza also submitted affidavits from lawyer friends of his, along with time sheets showing his rates, even though he was a salaried employee.

It's not clear why he did this. He may have thought it would make it easier for him to recover fees, which juiced his 25 percent bonus on settlement money and allowed him to hike up his rate ceiling. (He now charges some clients $700 per hour.)

In the U.S. legal system, each party typically pays its own legal bills. There are, however, provisions in some types of litigation — federal copyright cases, for example — that allow for the winning party to collect its fees from the losing party. Judges would probably scrutinize an in-house counsel's request to recover fees more closely, according to several ethics experts and law professors. But an in-house counsel has just as good a chance at recovering fees, the experts added — a fact Randazza might not have been aware of at the time.

"All the stuff that is misleading is tailored for him to win that fee award," said Adam Springel, a Las Vegas attorney and expert in commercial and business law who examined a number of Randazza's fee filings at HuffPost's request. "He was clearly trying to get the judge to rubber-stamp his fee requests."

By creating the impression that he was an outside hired gun, Randazza may have also been trying to build name recognition and drum up business for the Randazza Legal Group, whose growth Liberty was subsidizing. Randazza didn't tell his employer about some of the fee awards he won — "the substantial ones, in particular," Dunlap said — and later refused to let Liberty audit the account where he deposited litigation payouts. He said it would look better in court to use the Randazza Legal Group on filings, as "insulation" for his employers.

had no idea to what extent he was trying to double dip. ... But when we discovered he was trying to say he was an outside firm charging us hourly and running up huge legal bills, that's when it became apparent he was trying to pull a fast one with the court."

## Greedhead & Fleecer, LLP

Randazza's dirty pool went beyond duping his employer and the courts. He was also soliciting illicit payoffs from parties that Liberty wanted him to sue. Records that surfaced during the arbitration proceeding and that were later made public in U.S. Bankruptcy Court in Nevada reveal the grimy particulars. In December 2010, while negotiating a settlement for Liberty with the website TNAFlix, Randazza went after his first bribe. He wanted TNA to pay to "conflict [him] out" of being able to sue the website again. A $5,000 "contract" figure came up. Randazza's opposing counsel, Val Gurvits, had no idea that Randazza was working in-house for Liberty at the time.

"Not a single communication from him ever came on Liberty letterhead," Gurvits told HuffPost.

Randazza concealed his job while hunting for money from other companies. But he didn't hide his avarice.

"There needs to be a little gravy for me," he emailed Gurvits. "And it has to be more than the $5K you were talking about before. I'm looking at the cost of at least a new Carrera in retainer deposits after circulating around the adult entertainment expo this week. I'm gonna want at least used BMW money."

Randazza asked for $30,000 and raised the possibility of teaming up with Gurvits to broker a sale of TNA to one of Randazza's outside clients, which could have earned him a $375,000 commission. He pushed hard to secure both deals. When Gurvits hesitated, Randazza claimed another company wanted to hire him to sue TNA.

"I can't hold these guys back any longer," he warned.





OWEN FREEMAN FOR HUFFPOST

Randazza's first known solicitation of a bribe was an apparent violation of the Nevada Rules of Professional Conduct, which forbid lawyers from "offering or making" agreements like these that could restrict them from practicing law. (The Nevada rules mirror the model rules of the American Bar Association, a baseline version of which has been adopted in every jurisdiction except California.) Randazza later tried to wring a bribe out of Megaupload, a file-sharing site that had allegedly infringed Liberty's copyright, according to arbitration records.

"Once you take a financial stake in the outcome of your client's case, then you have a conflict of interest. It compromises the independent professional judgment of the lawyer. It's not even a close call," said Russell McClain, an associate professor at the University of Maryland School of Law and an expert in professional responsibility.

The extent of Randazza's web of deception became apparent in Liberty's 2012 federal lawsuit against Oron, a file-sharing site. When Randazza tried to recover fees in the case, he not only failed to identify himself as Liberty's in-house counsel but also bundled his own "charged" fees with the fees of outside attorneys he'd brought on at his firm. He claimed the Randazza Legal Group had billed Liberty almost 366 hours, causing the porn company to "incur" $214,964 in attorneys' fees and costs. Of that total, Randazza told the court, $90,833.98 resulted from his nearly 182 hours of work at $500 per hour.

He also reported that his employees billed Liberty at their "standard hourly rates." For his partner, Ronald Green, that meant $400 per hour. For paralegals, it was $125 per hour. In reality, the Randazza Legal Group gave Liberty a massive discount, sometimes 75 percent off market rates, on work done by its lawyers — a fact that Randazza withheld from the court.

These were material misrepresentations, according to multiple fee experts interviewed by HuffPost. And Randazza got away with them: U.S. District Judge Gloria Navarro eventually ordered Oron to pay an extra $131,797.50 to cover Randazza's claimed fees.

Randazza had crossed the line in other ways, too. While negotiating a $550,000 settlement agreement with Oron, he'd chased another bribe. If the file-sharing company paid him $75,000, Randazza would "never be able to sue [Oron and its sister companies] forever and ever," he promised Oron's counsel. For that price, Randazza said he'd "provide some really great value" — including a "plan that you'll drool over" to make it harder for other companies like Liberty to sue Oron.

Randazza had an unfair advantage. He'd acquired information about Oron's privileged legal communications and its Hong Kong bank account from a softcore porn photographer named James Grady who also wanted to take down the file-sharing company. Grady had paid "a guy — call him a forensic investigator — to dig past

 

making it clear that his source "didn't get the info at Walmart in the course of normal commerce."

According to Val Gurvits, whom Oron brought in to help with its case because of his experience dealing with Randazza, the only way to know about Oron's overseas bank account would be if someone "broke into Oron's gmail."

It certainly looked that way. Grady sent Randazza a receipt showing that Oron had released money from its PayPal account to its Hong Kong bank account. He sent information about the personal email account of Oron's owner.

He sent the owner's Skype call logs, which Grady said came from one of Oron's email accounts. He supplied Randazza with detailed descriptions of internal emails sent by Oron's lawyer. The intel helped Randazza get a temporary restraining order in Nevada federal court and freeze Oron's assets.

Randazza invited Grady to Las Vegas to be a "star witness" in the case, urging the photographer to be careful about what he might tell the judge about the Oron material. "You [need] to consider what happens if the judge wants to know where you got your information," Randazza wrote. "As far as I know, it was lawfully obtained. You certainly got it lawfully. If the source is a disgruntled Oron employee, great. Jilted lover, great. Hacker, problematic."

Randazza was forbidden from collecting evidence this way. He also wasn't allowed to engage in "conduct involving dishonesty, fraud, deceit or misrepresentation," according to multiple ethics experts. In fact, state bars across the country have determined that it is wrong for a lawyer to fail to inform opposing counsel about inadvertently received privileged material. The mere act of reading such material is unethical.

"We would file a brief, and they would have a response the next day," said Stevan Lieberman, one of Oron's lawyers. "It's very clear that [Randazza] used the privileged attorney-client communications to his advantage."

Randazza also shared his "entire Oron file" with one of his porn attorney friends, telling a paralegal to let the attorney "lift anything he wants," according to internal Randazza Legal Group emails. That attorney, who'd later become a partner at Randazza's firm, and a different company would soon file a copycat suit in California that ratcheted up pressure on Oron and kept the company's assets frozen.

In a bind, Gurvits agreed to pay Randazza the $75,000 but insisted that the payment be part of the settlement agreement between Liberty and Oron. "If it wasn't for me insisting, we would have had a separate agreement," Gurvits told HuffPost. "But I felt that was improper. That's how Randazza offered to do it. I said, 'I'm not going to do an end-run around your client.'"

And that's how Randazza got caught.

 

When his boss at Liberty, Jason Gibson, thumbed through a draft of the proposed settlement with Oron, he spotted a curious one-line item for $75,000: Randazza's gravy.

"My stomach is churning after reading the proposed agreement," he emailed Randazza.

Their relationship quickly unraveled. Within days, Randazza left his job. He and a paralegal covered their tracks by repeatedly running data-wiping software on their company computers that prevented Liberty from recovering evidence, according to court documents and forensic investigator testimony. He refused to release the $550,000 Oron settlement award to Liberty from his trust account.

Randazza laid siege to the company.

"Murum aries attigit" is a war doctrine attributed to Julius Caesar that translates to "the [battering] ram has touched the wall." The phrase has a baleful meaning: If your enemies refuse to surrender before hostilities commence, destroy them without mercy. This is Randazza's motto as a lawyer.

"Once the ram touches the wall, you have to commit to ending the other party as a going concern," he explained on his blog. "You must leave the other party with nothing left with which to fight. Because, if a party is fool enough to refuse the favorable terms, that party is fool enough (and poorly advised enough) to keep being a pain in your ass until you finally put them down like a diseased animal."

Randazza filed a complaint with the Nevada Equal Rights Commission, alleging that he'd been sexually harassed at work as a straight man because Liberty, which mainly makes gay porn, once filmed a sex scene — a straight scene, it turned out — in his office. It was a peculiar claim. In the Liberty workplace, Randazza had been exuberantly lewd. He'd talked about wanting to "snap a nasty metal bar across [a man's] wiener" and purchased a couch used for porn shoots for his home, then emailed around a picture of his scantily clad wife posing on it. But the free speech crusader who called political correctness a "disease" and casually, if jokingly, threw around words like "nigger" and "cunt" now was saying he'd suffered ethnic harassment as an Italian-American because Liberty executives had sarcastically called him a "guinea" and a "wop," usually in response to his own off-color instigations.

Randazza's harassment complaint was an obvious farce, and it went nowhere.



Randazza would bring all his legal firepower to bear in trying to destroy his former client.

HUFFPOST IMAGE

In December 2012, he sued Liberty's parent company in Nevada state court on allegations of fraud, breach of contract and unjust enrichment. Four months later, Liberty filed a complaint against Randazza with the Nevada Bar, reporting his solicitation of bribes, conflicts of interest, misleading fee motions and warning that Randazza had on multiple occasions threatened to "drown anyone who attempts to challenge him in legal bills and debt." But the bar dismissed the complaint, citing the ongoing state lawsuit.

"The bar's approach was like, 'Hey, we can't really do anything because there's a civil matter going on now,'" Dunlap said. "But that policy is what allows people to get away with this because private citizens have to assume the burden and the expense of having to prove all this themselves. That means Randazza can drown us in legal fees,

6/28/2021  Alex Jones' Lawyer Marc Randazza Is Building An Empire On Free Speech And Solicitng Porn Piracy, Slander Lawsuits, And Libel Claims Is He A Hypocrite? Or Just A ? | HuffPost

Case 1:20-cv-00298-Y-DH Document 170-3 Filed 11/16/21 Page 159 of 290

a grievance with an attorney, all the attorney has to do is sue you.

Even when Liberty found a way to hold Randazza accountable, the attorney wriggled away. Not long after Randazza sued Liberty, the porn company reported his self-dealing in his fee recovery efforts to an appeals court where the dispute between Oron and Liberty was still playing out. The appeals court asked a panel of judges to look into Randazza's fees, but Liberty and Oron settled their differences and the case was dismissed before the panel could meet. Unfortunately for Oron, the copycat suit that Randazza helped his friend bring against the file-sharing firm kept Oron's assets on ice. Unable to pay its hosting provider, Oron went out of business, according to the company's statements in court filings.

Randazza, on the other hand, stayed in business. And he wasn't done with Liberty. Not long after he left the company, he crossed paths with Dunlap at a porn conference in Arizona and invited his former co-worker to step outside and fight.

"I wonder how much it would cost me to punch you in the face right now," Randazza said, according to sworn testimony by Dunlap in a subsequent legal dispute.

Randazza's next move was to file an arbitration claim against the porn company in which he claimed wrongful termination, breach of contract, back pay and damages from the sexual and ethnic harassment Randazza said he'd suffered. He demanded over $4 million in damages.

The arbitration dragged on for three years and cost Liberty over $1 million. But it backfired spectacularly on Randazza. Liberty brought counterclaims for, among other things, legal malpractice and unjust enrichment. The evidence quickly piled up against Randazza. Billing records proved he'd been getting paid by XVideos every month. Many of the damning emails he thought he'd destroyed were produced and showed him soliciting bribes. Under oath, one of his own expert witnesses was forced to concede that Randazza had likely misled him and violated ethical rules.

Randazza tried to explain away the bribes as a ruse to squeeze extra money for Liberty out of infringers. He'd described his dishonesty in one court filing as "mere puffery."



The number was transmitted on the condition that it was done before a certain date. That date passed.

Also, while at the Adult Entertainment Expo, I heard a rumor that TNAflix is installing Vobile.

1) You confirm the rumor,
2) TNA pays $50K,
3) TNA agrees that we get the IPs for each infringement we DMCA,
4) Any work product produced for corbin fisher in this litigation remains confidential, and will not be shared with other companies.

Keeping me completely out of the TNA game is a little more complicated.

If your client wants to keep me personally out of the TNA game, then I think that there needs to be a little gravy for me. And it has to be more than the $5K you were talking about before. I'm looking at the cost of at least a new Carrera in retainer deposits after circulating around the adult entertainment expo this week. I'm gonna want at least used BMW money.

In order to conflict me out of future matters, I suggest this:

Your firm retains me as "of counsel" to you. I'd get $5K per month (for six months) paid to me, from you (TNA will reimburse you, I presume). I will render advice on TNA and TNA only, and I'll be chinese walled from your other clients so that other conflicts are not created.

If TNA is sold, and we're the brokers, the payments stop.

Also, I get a conflict waiver so that I can represent the buyer in the sale, and I'm not conflicted out of it.

That way, I'm adequately compensated for my loss of major potential work, and I'm conflicted out of acting adversely to TNA.

In emails to opposing counsel that later surfaced during arbitration, Randazza brazenly pursued bribes to conflict himself out of future litigation.

HUFFPOST IMAGE/ARBITRATION RECORDS

His battering ram had splintered. During arbitration hearings, the normally cocksure Randazza wouldn't even look at Liberty's attorney, Wendy Krincek. He turned his seat away from the arbitration table and put his back to his own attorney, Ken White, a longtime Randazza confederate who runs the Popehat legal blog. Randazza also refused to look at the arbitrator, a former federal judge and assistant Watergate special prosecutor. Instead, the attorney stared at the floor, his body hunched over, hand pressed to the side of his face as he answered Krincek's questions.

"You wouldn't lie to opposing counsel, would you?" Krincek asked Randazza during one hearing while confronting him over a misrepresentation about his fees.

"Yes, I would," Randazza replied.

"I've never seen anything like it before," Krincek said. "He's a litigator. He knows how to present as a witness. He was physically incapable of doing that. … It was a tell that he was uncomfortable answering the questions. He's a smart guy and he's pretty charismatic. I think he can generally talk his way out of anything, but he was getting nowhere."

## Subscribe to the Politics email.

From Washington to the campaign trail, get the latest politics news.

SUBSCRIBE




Randazza was so rattled after the hearing that he appeared to stick a large wad of used chewing gum on the rear window of Krincek's Saab station wagon in the parking lot, according to Dunlap. (Randazza denied being the gum-sticker.)

In June 2015, the arbitrator ruled against Randazza on every point, finding that the attorney had "been involved in and successfully concluded negotiations for a bribe," among a litany of other wrongdoing. The arbitrator ordered Randazza to pay Liberty more than $600,000 in damages.

But Randazza had one more card to play. Claiming to be almost $14 million in debt, he filed for bankruptcy and froze the arbitration award. A few months earlier, he'd taken steps to shield many of his assets by moving them into college funds for his children, transferring his BMW and his 80 percent share of his legal practice into a "self-settled spendthrift" trust and lending $300,000 to his in-laws for them to buy a property in Las Vegas, according to Clark County public records. Oddly, the loan came at a time when Randazza's marriage was falling apart. About two weeks after the arbitration ruling, his wife filed for divorce.

"Conceptually, it's not OK to do all sorts of pre-bankruptcy planning and move your assets around," said Bob Keach, one of the country's top bankruptcy lawyers. "This is clearly a guy who has spent some time playing the system."

But the U.S. trustee overseeing Randazza's bankruptcy "didn't seem to care" when the issue was raised at a creditors' meeting, according to Dunlap.

Now, it was Liberty's turn to go on the offensive. With the arbitration decision in hand and binders of evidence proving its case, Liberty filed a second complaint against Randazza with the Nevada Bar. This time, the bar moved forward.

Publicly, Randazza blasted the arbitration as a "miscarriage of justice," but the arbitrator's determinations became the bedrock of the disciplinary proceeding against him. In private, Randazza worried. Liberty had also filed bar complaints against him in Florida, California, Arizona and Massachusetts — every other jurisdiction that licenses him — and Randazza quietly made the porn company an unusual offer: He'd pay Liberty $20,000 for each of his bar licenses that wasn't suspended or revoked. He was, in other words, proposing a bribe.

"He offered us a bounty on his bar licenses — we'd get more of the award if we did not cooperate with bar investigators or send follow-up complaints," Dunlap said. "We refused this offer because it was insulting [and] unethical."

Only in Florida did Randazza fail to offer a bounty — he felt he'd be suspended or disbarred there anyway, according to an email his legal team sent Liberty. Randazza had already made misrepresentations in a letter to The Florida Bar about the Oron bribe and his work for XVideos. When he was busted for them during arbitration, he blamed



declined to pursue its own investigation.)

And Liberty wasn't the only party upset with Randazza in Florida. In federal court there, Paul Berger, Randazza's opposing counsel in an unrelated case, submitted a copy of a bar complaint he said he'd filed against Randazza over a 2015 episode in which Randazza screamed curses at Berger and his client after a mediation session. Randazza threatened to assault them both and send the client, who happened to be Jewish, to the Gaza Strip, according to Berger's complaint.

"It appears that Mr. Randazza knows no ethical boundaries," Berger told The Florida Bar, which apparently either declined to pursue an investigation or found nothing in Berger's complaint that merited disciplinary action. Pursuant to its policy, the bar then deleted all records of the complaint and, when contacted by HuffPost, was unable to acknowledge the document's prior existence.

In June 2016, Randazza settled his state lawsuit in Nevada against Liberty. He'd been the one to sue, but now his malpractice insurer was the one to pay, shelling out $205,000 to make a counterclaim Liberty filed against Randazza for malpractice go away.

In February of this year, Randazza settled in bankruptcy court with Liberty, where the porn company had also filed a claim. This time, Randazza paid only $40,000. After nearly six years of grueling lawfare, he'd managed to dodge almost all the damages from the arbitration award, which the parties agreed to vacate as part of the bankruptcy settlement.

Vacating the award did not sit well with the arbitrator, who warned in a court filing this July that an "attempted erasure" of his findings might conceal Randazza's "proven serious ethical violations" and weaken protections for "future victims and the public."

The former judge was right to worry.

## Nazi Punks, Jump In

Randazza has scrubbed his Liberty job from his resume. The attorney-to-the-trolls now spends most of his days wringing his hands over the "marketplace of ideas" as he tries to game the system for racists and fascists — as if Nazism deserves another spin through the public square.



Marc J. Randazza
@marcorandazza

Replying to @Megg_Ellis

The number of people "affected" by Naziism since 1945 is probably less than the number of people who have been crushed by vending machines. The philosophy lost in the marketplace of ideas until recently, where those who try to suppress it are driving new recruits to it in droves



♡ 1    💬 2    🔗 Copy link to Tweet

He openly lauds the "alt-right" movement:



**Marc J. Randazza**
@marcorandazza

Replying to @njcarbonaro @phloob and @ali

Yes. The Right used to act that way. Those who are sometimes called "alt right" are some of the most open and accepting of diverse views people I've met in politics.

9:15 AM · Jan 24, 2018

♡ 3    💬    🔗 Copy link to Tweet

His reputation as a First Amendment attorney has frayed. Even his capstone free speech victory in 2011 over Righthaven, a copyright troll, carries a hoggish taint in hindsight. At the time, Randazza was employed by Liberty, which permitted him, pending the company's approval, to take on pro bono free speech cases to offset any bad press from Liberty's own copyright enforcement lawsuits. But Randazza concealed his work on Righthaven from his employer and kept a $60,000 payout — money Liberty only found out about during arbitration.

"Mr. Randazza was unjustly enriched," wrote the arbitrator, who ruled that the payout should have gone to Liberty.



### If you want to represent detestable clients, fine. But when you go out into the media and don't just defend them but actually adopt their logic and moral arguments, that's different. Then, it looks like you agree with them.

—Elie Mystal, executive editor of the Above the Law blog

Some of Randazza's troubles are behind him — in June, he settled another malpractice claim brought by a former client for $50,000 — but others lie ahead. He remains in Chapter 11 bankruptcy and had only $15,652 in two bank accounts at the end of October, according to court records. In the sloppy monthly reports he is required to file with the bankruptcy court, he lists a sad series of expenses that include his daily coffee at Caffe Sicilia in Gloucester, shopping sprees at Men's Wearhouse and over $4,000 per month in payments to cover alimony to his ex-wife and and child support for their two children.

 riding high, he was really well-known, and then all of a sudden — disgrace. So who's going to hire him now?"

The answer is the disgraced. Lawyers trying to make their bones as free speech attorneys often take on one extremist client. Maybe two. Randazza has assembled a panzer squad of them, a career choice that is generating new problems for him. When he signed on this year to represent the Satanic Temple in a complaint against Twitter, dozens of members of the organization revolted, describing Randazza as an "agent of the alt-right" and an "ally to Nazis."

They aren't wrong. In January, he partied with rape apologist Mike Cernovich and Gavin McInnes, the founder of the Proud Boys, a fascist gang that commits political violence throughout the country. Other pro-Trump racists and "free speech advocates" were there, yukking it up about "brown people" and "faggots" and the genitalia of transgender women. Randazza also appears routinely on Infowars to lend a legal imprimatur to the lies of hate-spewing, violence-stoking propagandist Alex Jones. In an August appearance, Randazza likened Jones, a key gateway to white nationalism, to black civil rights leaders in the South during the 1960s.



Randazza advocates for far-right extremists outside the courtroom as well as inside.

HUFFPOST IMAGE

"If you want to represent detestable clients, fine," Elie Mystal, the executive editor of the Above the Law blog, wrote in a recent column about Randazza. "But when you go out into the media and don't just defend them but actually adopt their logic and moral arguments, that's different. Then, it looks like you agree with them. And if you agree with them, you can no longer avail yourself of the lawyerly presumption that you are just doing your job. Instead of being a mere part of the process, you become part of the problem."

 
Case 1:20-cv-00298-YDH Document 170-3 Filed 11/6/21 Page 165 of 290

produced both of Cernovich's films. The most recent one, "Hoaxed," is a propaganda reel that appears to demonize the free press and relies on figures such as Jones and Stefan Molyneux, another important conduit to white nationalism.

In a Daily Beast profile, Randazza described the Vladimir Putin-loving, Pizzagate-pushing Cernovich as "an A-plus level friend, and the kind of rare soul now where you can really trust his word as his bond."

And Randazza doesn't just play defense for Cernovich and his other far-right pals. Unlike most First Amendment lawyers, he's willing to brandish the plaintiff's knives for them and carve out space in the legal system for their political agenda.

Since 2016, for example, Randazza and the Holocaust-denying MAGA troll Chuck Johnson have been trying to scavenge coins off the corpse of Gawker after libertarian billionaire Peter Thiel sued the publication into bankruptcy — a legal outcome widely celebrated by fascists that has had a chilling effect on press freedom. Of Gawker and its former CEO, Nick Denton, Johnson said, "In a just world, I'd have them killed. But we are not there yet."

From 2016 to 2017, Randazza represented professional misogynist and rape advocate Daryush Valizadeh in an attempt to sue one of Valizadeh's alleged victims. She lives in Iceland and told her story of sexual assault to Jane Gari, a book author and blogger. Gari gave the alleged victim a pseudonym and published her account of Valizadeh following the woman home, talking his way into her apartment with the pretext of using the bathroom — a ruse another woman who has accused Valizadeh of sexual assault told HuffPost he has used for at least a decade — then raping her. Valizadeh had written a guidebook to having sex with women years before in which he described a similar encounter:

> While walking to my place, I realized how drunk she was. In America, having sex with her would have been rape, since she couldn't legally give her consent. ... I can't say I cared or even hesitated.

Randazza apparently didn't care either. He sent a letter to Gari, who has written a book about being sexually abused as a child, and accused her of fabricating the rape account and "causing harm" to "real victims" of sexual assault. He demanded she take down the post and confess on her blog.

"Simply admit that you lied, and all can be forgiven," Randazza wrote.

When Gari refused, Randazza subpoenaed her in South Carolina federal court in an effort to get the alleged victim's name for Valizadeh, whose followers were already menacing Gari.

"Listen you dumb cunt, you hideous skank," one Valizadeh fan emailed her, "making false rape accusations is a great disservice against real victims of sex assaults, you




The case was an about-face from Randazza's earlier work defending small bloggers. Now he was looking to pierce South Carolina's shield law for reporters and muscle a sex abuse survivor on behalf of his pro-rape client. But Gari managed to fend off Valizadeh and Randazza in court and protect her source. When the judge granted her the right to depose Valizadeh and examine his claim that he'd been defamed, Randazza moved to dismiss the case. His own case.

"I don't think a true First Amendment advocate would have taken this case," said Wallace Lightsey, Gari's attorney. "We saw it as an attempt to find the source so the source could be harassed."

Randazza has been equally unscrupulous in his lawyering for Paul Nehlen, Alex Jones and others. When Chuck Johnson was sued for defamation earlier this year after smearing the wrong man as the driver of the car that killed Heather Heyer in Charlottesville last summer, Randazza told a Michigan court that Johnson had simply repurposed information from 4chan — a website Randazza described as a "wire service" and a "reliable source." But 4chan's /pol/ forum, where the libel circulated, is neither a wire service nor a reliable source. It is a place where neo-Nazis congregate to spread hate and disinformation.

But nothing compares to Randazza's advocacy for neo-Nazi Daily Stormer publisher Andrew Anglin, who is being sued in Montana by Tanya Gersh, a Jewish woman Anglin targeted in a vicious anti-Semitic harassment campaign he launched from his site.

"Fuck Nazis, but fuck Tanya Gersh too," Randazza tweeted while neo-Nazis were threatening Gersh's life. Anglin soon hired Randazza, paying him out of a more than $155,000 legal defense fund raised by Johnson, who took a 15 percent cut, the scum forming a closed loop.

In court, Randazza has played childish games about Anglin's location and sinister ones by advancing Holocaust denial as a legal defense. While trying to reduce the case to a debate in the "marketplace of ideas," Randazza essentially has argued that a neo-Nazi's call to action to terrorize a Jewish woman and her family is protected speech, a position one local paper called a "desperate attempt by a lawyer who should have a better understanding of the First Amendment."

In November, a judge shot down Randazza's argument and allowed the case to move forward, finding that Anglin "drew heavily on his readers' hatred and fear of ethnic Jews" to incite them to harass Gersh.

Even a free speech absolutist might struggle to defend some of Anglin's rhetoric. The neo-Nazi has said he "would absolutely and unequivocally endorse" violence to achieve his goals, and Daily Stormer fans — including Dylann Roof, a white supremacist who killed nine black churchgoers in Charleston, South Carolina — have committed at least a dozen racist or politically motivated murders since 2015. In October, Anglin cheered the stabbing of a reporter in Germany by neo-Nazi youths, writing:

 

*up, lined up and shot execution style and tossed in a mass grave. ... It makes me warm and fuzzy inside to know that journalists are seeing this story and wondering if they'll be next.*

Randazza has increasingly shown himself susceptible to fledgling far-right views. He openly agrees, for example, with Trump's description of the press as Americans' "enemy." Earlier this year, Randazza tried to intimidate a reporter and his publication over a harmless tweet that vexed Cernovich. On Twitter, Randazza proclaimed his willingness to support the white nationalist Faith Goldy in her Toronto mayoral campaign. He promoted a white nationalist lie about the Democratic Party deploying anti-fascists as its foot soldiers. (Antifa almost universally despise the Democratic Party.)

He also tweeted this:



The difference between patriotism (love of country) and nationalism (blind devotion to country, usually with a chauvinistic assertion of superiority) should be obvious to a lawyer who represents nationalists. And as someone who represents white nationalists, Randazza would know that in the U.S. the word "nationalism" is linked to a violent and racist anti-democratic ideology.

He just doesn't care.



The rise of Trump has brought a common arc of radicalization on the political right into sharper relief — that of the contrarian troll who gets lost in his provocations and mutates into something dangerous. Just as some snarky libertarians turned into neo-Nazis and Tucker Carlson was a conservative snot before morphing into a megaphone for white nationalist talking points, Randazza, too, appears to have transformed on his trollish journey through the legal system.

And like Carlson, who gets to spout hate on Fox News because he's a millionaire who once wore a bowtie on CNN, Randazza benefits from the trappings of privilege. His Georgetown law degree and admission to five state bars offer him what people targeted by his clients rarely receive: the benefit of the doubt. Consider a recent front-page Wall Street Journal story that focused on Gab and quoted Randazza as a First Amendment expert. Incredibly, the story failed to mention that Randazza has served as Gab's attorney. Consider, too, that Fox News, CNN, Vice News and others have credulously given Randazza a platform to polish his brand.

But his own profession has shown the least skepticism. Less than a week after the confirmation of Brett Kavanaugh to the Supreme Court, the journal of the American Bar Association ran a short column by Randazza lamenting how easy it is for "vindictive lying women" to ruin the lives of innocent men. Randazza neglected to tell his ABA editors he'd already run the column on a right-wing legal blog. He also failed to offer any proof for his claim in the column that he currently represents ("at a deep discount") multiple women who have survived sexual assault.

He did, however, have a message for sexual assault victims.

"I believe in their right to tell their story without being sued for it," he wrote.

Last year, Randazza was suing a woman for telling her story about being raped.

Randazza gets away with those sorts of moves because many people assume basic honesty from lawyers. The legal system does too.

"It would take too much time and energy to second-guess and check up on everybody all the time," said Bernie Burk, a legal ethics expert and former professor at the University of North Carolina School of Law. "Generally speaking, if you're reasonably clever and selective about your dishonesty, you can get away with a great deal before the system catches you."

Randazza's duplicity, whether clever or selective, has been constant. Even in recent cases that do not involve porn or Nazis, he has made a mockery of the truth. In Utah federal court, he was — until a few weeks ago — defending a man named Ryan Monahan who ran a website called Honest Mattress Reviews and had been sued by Purple, a mattress manufacturer, after Monahan allegedly lied on his site about Purple's products being covered with a cancer-causing white powder. Purple declared that Monahan had a business relationship with one of its main competitors, GhostBed.




entitled to full protection under the First Amendment. He dismissed the GhostBed connection as a "conspiracy" that "even Alexander Dumas could not have imagined when he wrote the Count of Monte Cristo."

The conspiracy turned out to be real. A witness came forward with evidence proving that Monahan "effectively acted as [GhostBed's] head of marketing" and was being paid $10,000 a month by GhostBed. Randazza and Monahan had misled both the U.S. Court of Appeals for the 10th Circuit and, repeatedly, the Utah federal court.

"Interference with the judicial process here was substantial," U.S. District Judge Dee Benson wrote, adding that Monahan's violations were "sufficiently egregious that perjury prosecutions would, and perhaps should be, an appropriate consideration."

In February, Benson ordered sanctions be imposed on Monahan and his business, Honest Reviews LLC. A few weeks later, Monahan sold his website to Brooklyn Bedding, another mattress company, and had it wire the money directly to Randazza to pay Monahan's "legal debt." In July, Benson awarded Purple approximately $92,000 in sanctions from Monahan. When Purple's lawyers contacted Randazza to collect, he told them Monahan didn't have the money. Randazza had drained his client dry.

"So do what you gotta do," he told Purple's lawyers.

A desperate Monahan sent a letter to the judge saying he wanted to settle with Purple. Randazza then filed a motion to withdraw from the case "as a matter of professional ethics," leaving Monahan to scramble to find replacement counsel.

"Everything that has exploded in this thing has been because of what [Randazza] has done," Monahan told HuffPost.

Yet Monahan, who said he has a limited grasp of the law, is the one on the hook for sanctions. He is the only one whom the judge suggested should face perjury charges, despite the judge's ruling that Randazza had also "vigorously asserted" misrepresentations in court.

"You know what I like about my life?" Randazza once told a legal blog. "There's not a motherfucker in this world who ever says, 'I'm ambivalent about Marc Randazza.' That is what scares me … people being ambivalent about me."







Where Randazza winds up next on his journey through the sewers of the legal system is anyone's guess. "I did not get where I am
by having a reputation for being someone who would stab others in the back," he once said.

OWEN FREEMAN FOR HUFFPOST

## Lowering The Bar

Randazza had escaped sanctions in Utah. But in Nevada, his long disciplinary
proceeding was nearing its end. It had been half a decade since Liberty alerted the
Nevada Bar to Randazza's misbehavior. The porn company had given the bar
thousands of pages of evidence about its former in-house counsel's conflicts of interest
and solicitation of bribes, his misrepresentations about fees and use of privileged and
confidential material.

The bar treats multiple offenses and a "pattern of misconduct" as aggravating
circumstances that can justify harsher discipline, so Dunlap, the Excelsior vice
president who wrote the company's bar complaints, made a deliberate point of
including that phrase. "We felt that would be the kicker, that once they had seen that
that pattern had been demonstrated that it would leave no room for being wishy-washy
or letting him off easy," Dunlap said.

Randazza, in an effort to hang on to his law license, conceded as little as possible. He
submitted a conditional guilty plea to the bar confessing to two of the nine ethical
violations the bar alleged that he'd committed. The first forbids certain conflicts of
interest and concerned a shady loan Randazza made Liberty; the second prohibits a
lawyer from restricting his right to practice and was related to the Oron bribe.

In exchange for this plea, Randazza asked the bar for a stayed suspension and
probation — a slap on the wrist. But the bar was under no obligation to give it to him.
The baseline sanction for the violations Randazza admitted is suspension.

On Oct. 10, the order came down in Nevada Supreme Court.

"We hereby suspend Marc J. Randazza for 12 months, stayed for 18 months," it read.




and 20 hours of education in legal ethics. He will avoid actual suspension if he "stays out of trouble" during his probation, according to the order.

The system had finally caught him. And the system didn't seem to much care. The bar didn't pursue Randazza's solicitation of other bribes or his other conflicts of interest. Nor did it investigate whether Randazza despoiled evidence, lied to courts in fee motions or used privileged information that might have been obtained illegally.

What the bar did find were "mitigating circumstances" to allow for lighter punishment. Randazza, for instance, had no prior discipline in Nevada. Another factor was the "time delay" between his ethical violations and the disciplinary hearing — a delay the bar helped cause by dismissing Liberty's initial complaint.

"We had … to essentially lay out everything for the [Nevada] Bar and then once we handed it to them on a silver platter, they weren't willing to go the distance," Dunlap said.

Here was Randazza's privileged white-collar tribe, policing itself, barely, behind closed doors. The bar refused multiple requests to discuss the Randazza matter or its own arcane rules. For two months, the bar also rebuffed HuffPost's attempts to view records of Randazza's disciplinary proceeding, despite their high public-interest value. At one point, a lawyer for the bar insisted the records were confidential and could only be obtained through a subpoena or a court order — a stance that clashed with that of the Nevada Supreme Court. When asked for the bar's policy on sealing disciplinary records, the lawyer insisted it was an "internal" and unpublished policy. The next day, he said the bar was "implementing a new policy" and handed over the records.

Among them is a transcript of the June hearing when the bar accepted Randazza's guilty plea. During the hearing, Matthew Carlyon, another bar lawyer, applauded Randazza for reforming his conduct and cited as evidence of the metamorphosis several phone calls Randazza had placed to the bar's ethics hotline seeking advice.

"He is showing that he's willing to change and not be out there endangering the public," Carlyon said. "That's important because … ultimately our job here is to provide protection to the public. We're not here to discipline attorneys. That's not why we exist. We want to protect the public."

Since then, Randazza has stayed true to form. In Montana federal court, he disobeyed rules requiring him to keep the court informed about his disciplinary proceedings. The judge, clearly upset, ordered Randazza in November to update the court. When Randazza did, he mentioned his stayed suspension but said nothing about his probation, despite describing it in detail to several other federal courts.

Randazza may soon face "reciprocal discipline" in other states where he is licensed. Following his discipline in Nevada, the bars in Arizona, California and Florida have opened or will open their own reviews of his ethical violations. But other bars tend to



more deeply.

In a disciplinary proceeding against Randazza in Massachusetts federal court, he has shown no remorse for his sleazy behavior and has already distorted reality in an attempt to avoid a suspension. In one filing, he blamed Oron for his solicitation of a bribe. He also audaciously told the court he didn't "cause his clients to suffer any actual harm or financial losses."

"At every step of the way, that has proven to be untrue," Dunlap countered.

Randazza pilfered the $60,000 Righthaven settlement from Liberty, according to the arbitrator's ruling. He caused Liberty to possibly miss out on another settlement by not pursuing XVideos, one of his secret clients, for copyright infringement. Randazza also violated the terms of the $550,000 settlement he'd negotiated with Oron — most significantly by helping his friend file a copycat suit — causing Liberty to pay back $275,000 of the award.

This week, however, the Massachusetts court let Randazza off the hook. The court declined to put the rogue attorney on probation and deferred a decision about further reciprocal discipline until his Nevada probation ends in April 2020. At that point, it's unclear what further discipline the court could even impose, especially if Randazza stays out of new trouble. And, so, the lawyer of choice for far-right extremists will continue to lawyer, at least for now — an example not so much of what America prohibits these days but rather what it permits, provided you belong to the right caste.

When reached by email, Randazza refused to comment for this story. He referred HuffPost to his attorney, who also did not comment. Randazza's attorney, it turned out, was his expert witness from the Liberty arbitration — the one forced under oath to essentially acknowledge Randazza's dishonesty. Last year, the same attorney submitted an affidavit supporting a Randazza fee motion and, on an attached resume, listed his expert witness experience. The records of the Liberty arbitration were by then public, but the man referred to the matter only as Confidential v. Confidential. His online biography revealed more: Randazza's attorney is a former chair and current member of the ethics committee of the Nevada Bar.

Somewhere in Gloucester, looking out at his hometown and dreaming of zealotry, the troll began to laugh.

*Top illustration: Owen Freeman.*

**A few of the documents referenced in this story:**

1.) Nevada Supreme Court order approving Randazza's conditional guilty plea: https://www.scribd.com/document/396164843/18-39837

 

https://www.scribd.com/document/396164997/Bar-Amended-Complaint

3.) Emails between Randazza and TNA counsel:
https://www.scribd.com/document/396166781/Randazza-TNA-Bribe

4.) Emails between Randazza and Oron counsel:
https://www.scribd.com/document/396166992/Randazza-Oron-Bribe

5.) Emails between Randazza and James Grady about Oron:
https://www.scribd.com/document/396166226/144-10-Grady

6.) Example of Randazza's fee misrepresentations:
https://www.scribd.com/document/396167552/Fee-misrepresentations

7.) Randazza's sham discrimination claim that was dismissed:
https://www.scribd.com/document/396166288/NERC-Claim

8.) Arbitration ruling against Randazza:
https://www.scribd.com/document/396166322/Interim-Arbitration-Award

9.) Randazza's disclosure of liabilities and assets in Chapter 11 bankruptcy:
https://www.scribd.com/document/396282036/15

10.) Complaint about Randazza to The Florida Bar:
https://www.scribd.com/document/396166039/149-2

11.) Arbitrator's opposition to vacating arbitration award:
https://www.scribd.com/document/396167710/Arbitrator-Vacatur-Brief

12.) Randazza's military records:
https://www.scribd.com/document/396174634/Randazza-Military-Records

13.) Randazza's letter to Jane Gari on behalf of Roosh Valizadeh:
https://www.scribd.com/document/396165595/10-5

14.) Utah federal court order addressing Randazza's dishonesty:
https://www.scribd.com/document/396165707/292-pdf

15.) Randazza's response in Massachusetts disciplinary action:
https://www.scribd.com/document/396167771/8

16.) Massachusetts court order deferring reciprocal discipline:
https://www.scribd.com/document/396167819/10



*Do you have information you want to share with HuffPost?* <u>Here's how.</u>

6/28/2021   Alex Jones' Lawyer Marc Randazza Allegedly Solicited Bribes. His History Is Problematic. | HuffPost

Case 1:20-cv-00298-YDH Document 170-3 Filed 11/16/21 Page 174 of 290



correction

Senior Reporter, HuffPost

**MORE:**

Pornography   Alex Jones   Bribes   Marc Randazza

## Popular in the Community



AdChoices ▷       Sponsored

## You May Like

**She's the Largest Athlete in the World & Gorgeous**

Fresh Edit · Ad

**Talk Show Moments Everybody Rewinds Over and Over**

Freshedits Daily · Ad

**The World's Most Dangerous Airport Is In California**

MoneyWise.com · Ad

**Nature Photos Revealed- Not For Weak Stomachs**

HD · Ad

**Leaked Backstage Photos Kept From The Public**

hd · Ad



### 'You Can't F**king Talk To Me That Way!' Trump Yelled At Gen. Milley Amid Protests, Book Says

HuffPost

### Nancy Pelosi Unveils Legislation Creating Select Committee On U.S. Capitol Riot

HuffPost

### These Simpsons Jokes Were Too Smart For Most Of Us

Ranker · Ad

### Reeves Was the Love of Her Life and She Killed Him

History ByDay · Ad

### 16-Year-Old Students Sentenced to Life Behind Bars

Freshedits.com · Ad

### 'Worthless' Antique Makes Appraiser Break Down

Money Versed · Ad

### Stevie Nicks: "He Was the Love of My Life"

Musicoholics Stories · Ad

### Trump Rips Mitch McConnell For Not Being Loyal Enough To Keep Him President

HuffPost

### YouTube Says It Accidentally Deleted Right-Wing Extremism Watchdog's Channel

HuffPost

### NCAA Leaders Recommend Letting College Players Make Money From Their Fame

HuffPost

Alex Jones' Lawyer Marc Randazza Is Suing A Former Client Who He Allegedly Is Magically "Dope Off" On Him... | HuffPost



   

## MOST SHARED

**Pope Francis Meets 'Super-hero' In Spider-Man Costume At Vatican**

**37 Most Horrific Theme Park Accidents Of All Time**
Advertisement by Reference

**Almost 900 Secret Service Employees Were Infected With COVID**

**COVID-19 Rescue Plans Sent Personal Income Spiking Nationally**

**Trump Rips Mitch McConnell For Not Being Loyal Enough To Keep Him President**

## WHAT'S HOT

**Donald Trump Reportedly Hoped COVID-19 Would Take Out John Bolton**

**In Departure From Trump World, Pence Says He's 'Proud' Of Role Certifying 2020 Election**

**Parents Are Already Budgeting For New Child Tax Payments**

**Teachers Say GOP's Critical Race Theory Bills 'Whitewash American History'**

**Bruce Springsteen Marks The Return Of Live Shows On Broadway**

**Stephen Colbert Goes Silent For 20 Seconds When Audience Can't Stop Jeering Trump**

**The 16 Oldest Known Photographs In History**
Advertisement by Ranker

**Justin Timberlake Passionately Asks Court To Free Britney Spears**

NEWS

ENTERTAINMENT

COMMUNITIES

VIDEO

HUFFPOST

ADVERTISE

RSS

POLITICS

LIFE

HUFFPOST PERSONAL

NEWSLETTERS

ABOUT US

CONTACT US

FAQ






HUFFPOST PRESS ROOM                    PRIVACY POLICY

DMCA POLICY

DO NOT SELL MY
PERSONAL
INFORMATION 

---

Part of HuffPost Politics. ©2021 BuzzFeed, Inc. All rights reserved.

**The Huffington Post**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS

DR. JEROME CORSI, Individually
Denville, NJ, 07834

And

LARRY KLAYMAN, Individually
7050 W. Palmetto Park Rd. #15-287
Boca Raton, FL, 33433

                       Plaintiffs

                v.

INFOWARS, LLC
100 Congress Ave., 22nd Floor
Austin, TX 78701

And

FREE SPEECH SYSTEMS, LLC
100 Congress Ave., 22nd Floor
Austin, TX 78701

And

ALEX E. JONES, Individually
3019 Alvin Devane Blvd., Suite 300-350
Austin, TX 78741

And

DAVID JONES, Individually
3019 Alvin Devane Blvd., Suite 300-350
Austin, TX 78741

And

OWEN SHROYER, Individually
3019 Alvin Devane Blvd., Suite 300-350
Austin, TX 78741

And

**Case Number:   1:20-cv-298-LY**

**AMENDED COMPLAINT**

ROGER STONE, Individually
447 Coral Way
Fort Lauderdale, FL 33301

     Defendants.

## INTRODUCTION

  Plaintiffs DR. JEROME CORSI ("Plaintiff Corsi or Dr. Corsi") and LARRY KLAYMAN ("Klayman") hereby files this action against INFOWARS, LLC ("Defendant InfoWars"), FREE SPEECH SYSTEMS, LLC ("Defendant Free Speech Systems"), ALEX E. JONES ("Defendant Alex Jones"), DAVID JONES ("Defendant David Jones"), OWEN SHROYER ("Defendant Shroyer") (collectively the "Infowars Defendants"), and ROGER STONE ("Defendant Stone") for Defamation, Intentional Infliction of Emotional Distress, and Assault, and violation of the Lanham Act.

## JURISDICTION AND VENUE

  1. This Court has federal question jurisdiction over this case pursuant to 28 U.S.C § 1331.

  2. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2), (3) in that a substantial part of the events or omissions giving rise to Plaintiffs' claims arose in this district. The U.S. District Court in the Southern District of Florida transferred this action to this Court. Defendants actions were targeted to influence Special Counsel Robert Mueller's Russian collusion investigation and prosecution of Defendant Stone, a colleague of the other Defendants, which and who are centralized in this judicial district and the defamatory and other illegal acts occurred herein as well as throughout the United States and worldwide.

## THE PARTIES

3.      Plaintiff Corsi is an author and political commentator who publishes works in this judicial district and nationwide. Plaintiff Corsi is a citizen of New Jersey.

4.      Plaintiff Klayman is a public interest legal advocate, private practitioner and litigator who represented Plaintiff Corsi with regard to Special Counsel Robert Mueller's ("Mueller") Russian collusion investigation.  Plaintiff Klayman is also a media personality and author, columnist and syndicated radio talk show host. Plaintiff Klayman is a citizen of Florida.

5.      Defendant InfoWars is a Texas limited liability company with principal offices located in Austin, TX.

6.      Defendant Free Speech Systems is a Texas limited liability company with principal offices located in Austin, TX.

7.      Defendant Alex  Jones is a well-known extreme fabricator of false stories and conspiracies, who has been sued numerous times for alleged defamation. He is  media personality who creates frequently false and defamatory content that is broadcasted on the radio and posted on the internet at www.infowars.com and elsewhere on the internet and other social media sites in this district, nationally and internationally. Defendant Alex Jones is a citizen of Texas.

8.      Defendant David Jones is Defendant Alex Jones's father and holds the official title of Director of Human Relations for Defendant Free Speech Systems. On information and belief, Defendant David Jones is the owner of Defendant InfoWars and Free Speech Systems and he manages and controls the business and related activities for Defendants InfoWars and Free Speech Systems, as well as Defendant Alex Jones' other companies. Defendant David Jones is a citizen of Texas. At all material times he worked in concert with and as an agent for the other Defendants and Defendant Roger Stone and furthered, participated in  and ratified  the illegal acts set forth in this

Complaint. He profits and profited at all material times financially and otherwise from the tortious acts of the other Defendants.

9.      Defendant Shroyer is a newscaster for Defendant InfoWars. Defendant Shroyer is a citizen of Texas.

10.     Defendant Stone is an individual and a citizen of Florida and a resident of Fort Lauderdale, Florida. Defendant Stone was indicted by Special Counsel Robert Mueller as part of the alleged "Russian Collusion' investigation and subsequently convicted on seven felony counts of perjury, witness tampering and obstruction of justice. While his 40 month sentence to serve time federal prison was commuted by President Donald J. Trump, notably he was not pardoned and his felony convictions for perjury, witness tampering and obstruction of justice stand. He is a self-proclaimed "Dirty Trickster" who admires and frequently extols the "virtues" of Mafia figures and other unsavory persons, who he professes to pattern himself after. *See* Exhibit 1 – Mueller Indictment.

## GENERAL ALLEGATIONS

11.     Defendant InfoWars and Defendant Free Speech Systems are both owned, controlled, and operated by Defendant Alex Jones and David Jones. Defendant Free Speech Systems owns www.infowars.com, where content created by Defendants Alex Jones, Shroyer and Stone were at all material times posted and broadcast into this district, nationally and internationally.

12.     Defendant Alex Jones hosts *The Alex Jones Show*, which is broadcast on radio and internet social media networks throughout the United States of America and internationally, including this judicial district, and online.

13.     Defendant Shroyer hosts *The War Room* at all material times along with

Defendant Stone which is broadcast on radio and internet social media networks throughout the United States of America and internationally, including this judicial district, and online.

14.     Defendants' reach and influence are enormous. On information and belief, Defendant Alex Jones and InfoWars has a radio audience of over two million people. Before it was banned from YouTube, Defendant Alex Jones' and InfoWars' channel had more than 2.4 million subscribers.[1]

15.     Defendants, each and every one of them, in concert, do substantial business and promote and sell various goods in this judicial district and nationwide, including medicine, supplements, and "tchotchkes" with InfoWars branding. The money earned from these sales funded the conspiracy and concerted acts between amongst Defendants to defame, intimidate, coerce and threaten Plaintiffs in order to first try to improperly influence the Mueller Russian collusion investigation and subsequently try to coerce false testimony from Plaintiff Corsi at Stone's criminal prosecution favorable to Defendant Stone once he had been indicted.

16.     Defendant Stone also does business promotes and sells various goods in this judicial district and nationwide, including medicine, supplements, books, and "tchotchkes" with his own branding, and he also fundraises by direct mail and the internet in this district. He claims to have raised millions of dollars with his fundraising, wherein he falsely claims to have been persecuted by a federal judge and the jury, despite not having presented one witness, including himself, at his criminal trial, obviously because he was guilty as charged. In fact, he was convicted on seven felony counts in this own words, as the undersigned pro se counsel, Mr. Klayman, who sat in on the trial for his client Plaintiff Corsi, can attest. The money earned from

---

[1] Casey Newton, *YouTube deletes Alex Jones' channel for violating its community guidelines*, The Verge, Aug. 6, 2018, available at: https://www.theverge.com/2018/8/6/17656708/youtube-alex-jones-infowars-account-deleted-facebook-apple-spotify

these sales funds Defendant Stone's legal defense fund and the conspiracy between Defendants and Stone to defame, intimidate, coerce and threaten Plaintiffs in order to first try to improperly influence the Mueller Russian collusion investigation and subsequently try to coerce false testimony from Plaintiff Corsi, Plaintiff Klayman's client, favorable to Defendant Stone once he had been indicted.

17.     The Defendants related to Infowars in particular have a long and sordid history of publishing and broadcasting defamatory material, including falsely, recklessly and baselessly accusing the families of the schoolchildren who lost their lives during the 2012 Sandy Hook Elementary School massacre of staging the massacre and faking the deaths of their children.[2]

18.     The Sandy Hook families had to endure years of abuse and torture from Defendants before finally filing suit against numerous parties involved with InfoWars, including Defendant Alex Jones and Shroyer, for defamation.

19.     As just one example, a Florida woman was arrested for making  death threats to a parent of a Sandy Hook victim.[3] According to the U.S. Department of Justice, the motivation behind the threats was the lies propagated by these Defendants that the Sandy Hook massacre was a hoax.[4]

20.     Furthermore, Defendant Alex Jones in concert with the other Defendants propagated and promoted the "Pizzagate" conspiracy on his show, accusing a restaurant called Comet Ping Pong in the Washington D.C. area of operating a child sex ring in its non-existent

[2] Aaron Katersky, *Families of Sandy Hook shooting victims win legal victory in lawsuit against InfoWars, Alex Jones*, ABC News, Jan. 11, 2019, available at: https://abcnews.go.com/US/families-sandy-hook-shooting-victims-win-legal-victory/story?id=60314174
[3] Daniella Silva, *Conspiracy Theorist Arrested for Death Threats Against Sandy Hook Parent*, NBC News, Dec. 7, 2016, available at: https://www.nbcnews.com/news/us-news/conspiracy-theorist-arrested-death-threats-against-sandy-hook-parent-n693396
[4] *Id.*

basement that purportedly involved Hillary Clinton and John Podesta. This caused one of his listeners to shoot up the restaurant after being told by Defendant Jones to "self-investigate" the "Pizzagate" conspiracy theory.[5]

21.     Defendants, acting in concert, propagated these outrageous lies with no regard for the grief of their victims in order to gain notoriety, fame, and profit.

22.     The Defendants, acting in concert, as part of their latest scheme for notoriety, fame, and profit,  worked in concert with and on information and belief continue to work in concert with Defendant Stone, who was  at all material times an integral host on Infowars, and handsomely compensated by it,  to defame, intimidate, and threaten Plaintiffs.

23.     Defendant Stone - who was  indicted on seven counts of perjury, witness tampering and obstruction of justice by Special Counsel Robert Mueller and then placed under a total gag order by the jurist, the Honorable Amy Berman Jackson,  presiding over his prosecution for, in part, even threatening her by posting, among other coercive and threatening acts, an Instagram meme of a crosshairs, that is a gun, to her head,  and subsequently convicted on all seven felony counts - has appeared numerous times on shows broadcasted by Defendant InfoWars, and hosted by Defendants Alex Jones and Shroyer, where  Defendants at the direction of Stone and Stone himself have published malicious false, misleading, and defamatory statements concerning Plaintiffs.

24.     Specifically, the seven count Mueller Indictment against Stone involved lying under oath - that is, perjury - witness tampering and obstruction of justice by threatening to kill a material witness, Randy Credico ("Credico") and his service dog, if Credico did not lie or invoke

_____

[5] James Doubek, *Conspiracy Theorist Alex Jones Apologizes For Promoting 'Pizzagate'*, NPR, Mar. 26, 2017, available at: https://www.npr.org/sections/thetwo-way/2017/03/26/521545788/conspiracy-theorist-alex-jones-apologizes-for-promoting-pizzagate

the Fifth Amendment to government authorities concerning his involvement with Roger Stone. Credico is Person 2 in the Mueller Indictment of Stone. *Id.* Person 1 in this Mueller Indictment is Dr. Corsi.

25.    Even before Defendant Stone was indicted, he began a public relations campaign in this district, nationally and internationally to maliciously defame, smear, intimidate and threaten Dr. Corsi and Plaintiff Klayman, Plaintiff Corsi's lawyer and defense counsel.

26.    As just one example, in an article from The New Yorker, Defendant Stone was quoted as saying about Plaintiff Corsi, "He's certifiably insane, and he has told multiple provable lies."6 This malicious defamatory statement, among others, was published  in concert with Defendants.

27.    Defendant Stone knew that he was going to be indicted, and therefore began this public relations campaign to maliciously defame smear, intimidate and threaten Plaintiff Corsi and Plaintiff Klayman, Corsi's legal counsel, even before his actual indictment on January 25, 2019, in order to try to influence public opinion and Special Counsel Robert Mueller – by trying to attribute guilt to Plaintiff Corsi and not him - as well as to try to raise money for his legal defense.

28.    This defamatory public relations campaign was calculated to coerce Plaintiff Corsi to testify falsely at Defendant Stone's criminal trial before Judge Jackson.

29.    Defendant Stone likes to portray himself as Mafia, and indeed on information and belief has Mafia connections, frequently making reference to Mafia figures who he admires, as well as other unsavory types who have been alleged to have engaged in unethical and/or illegal

---

6 Jeffrey Toobin, *Roger Stone's and Jerome Corsi's Time in the Barrel*, The New Yorker, Feb. 18 & 25 Issue, available at: https://www.newyorker.com/magazine/2019/02/18/roger-stones-and-jerome-corsis-time-in-the-barrel

behavior.  For example, he frequently makes reference to his heroes being Hyman Roth in the 'Godfather," who was the movie version of Meyer Lansky, and Roy Cohn, not to mention, Richard Nixon, for his role in Watergate. In this regard, after Stone was indicted he held a press conference on the courthouse steps of the federal courthouse in Ft. Lauderdale, where he was booked, with his arms defiantly in the air in the "victory' pose used by Nixon after he resigned in disgrace as a result of the Watergate scandal. At the time, Stone had been employed by a Nixon group called CREEP, or the Committee to Reelect the President.  Defendant Stone even has a large tattoo of Richard Nixon affixed to his back. Thus, given his admiration for persons such as these, particularly Mafia figures, his actions as pled herein must be taken as threats, as well as being defamatory. And, Plaintiff Corsi is 72 years old and thus very vulnerable emotionally, physically and financially to these threats. Stone's intentional infliction of emotional distress and coercion and threats were intended to try even cause Plaintiff Corsi to have heart attacks and strokes, in order that Plaintiff Corsi would be unable to testify at Stone's criminal trial. Tellingly, Stone threatened kill a material witness and his service dog, Credico, Person 2 in the Mueller Indictment, "Mafia style." During his criminal trial, testimony was elicited by the government prosecutors in proving their witness and obstruction of justice felony charges, that Defendant Stone had told material witness Credico to do a Frank Pentangeli, a Mafia character in the film The Godfather, that is not testify to the truth. Stone also fashions himself and indeed has the reputation, at a minimum, as being the preeminent "dirty trickster," of which he is proud. *See* "Get Me Roger Stone" on Netflix.

30.     By defaming Plaintiffs, Defendant Stone had hoped to not only intimidate Plaintiffs to severely harm and damage their reputations, but also to coerce and threaten Plaintiff Corsi to testify falsely if subpoenaed to be called as a material witness in Stone's criminal trial.

He was also trying divert funds away from Dr. Corsi's legal defense fund, while boosting his own legal defense fund.

31.     Stone has also used and continues to employ surrogates and agents, either out in the open or secretly, to defame Plaintiffs, such as Defendants herein, and his "friend" Michael Caputo, Cassandra Fairbanks, reporter Chuck Ross of The Daily Caller, and Tom Fitton of Judicial Watch, to name just a few.

32.     Tellingly, in a video published by The Daily Caller, Defendant Shroyer appearing with Stone, admits that he will serve as a surrogate, that is an agent for Stone if Stone receives a gag order, which he did. [7]  The other Defendants, like Shroyer, are also surrogates and agents of Stone, including but not limited to agent and Defendant David Jones, who controls and approves of and ratifies the conduct at all material times all of the Defendants.

33.     Defendant Stone's illegal and improper attempts to influence the Russian collusion investigation was even recognized by the presiding judge, the Honorable Amy Berman Jackson ("Judge Jackson"), who was forced to issue a complete "gag" order on Stone after Stone attempted to incite violence against Judge Jackson by putting a picture of her face and gun crosshairs up on his Instagram account.[8]

34.     In her minute order of February 21, 2019 imposing the total "gag" order on Stone, Judge Jackson directly cited and referenced his use of surrogates, such as all of the other Defendants herein :

> Furthermore, the defendant may not comment publicly about the case indirectly by having statements made publicly on his behalf by surrogates, family members,

---

[7] https://www.youtube.com/watch?v=SSDkh5RYtGo
[8] *Judge in Roger Stone case orders hearing after he appeared to threaten her on Instagram*, Washington Post, Feb. 19, 2019, available at:
https://www.washingtonpost.com/politics/2019/02/18/roger-stone-deletes-photo-judge-presiding-over-his-case-says-he-didnt-mean-threaten-her/?utm_term=.2d3c5afa6326

spokespersons, representatives, or volunteers.

35.     Further evidence of Defendant Stone's collaboration and actions in concert as joint tortfeasors with the other Defendants, which other Defendants which and who were at all material times Stone's agents, as well as Stone's pattern and practice of defamatory, intimidating, coercive, threatening and defamatory conduct, is set forth in an *amicus curiae* brief filed by Plaintiff Klayman on behalf of Plaintiff Corsi in Defendant Stone's criminal case. Such evidence is attached hereto as Exhibit 2 and incorporated herein by reference, as well as civil complaint filed by Corsi and Klayman against Stone, and in a civil complaint filed by Klayman against Fitton. *See* Exhibits 3, 4, and 5, which are incorporated herein by reference.

36.     Defendants have, by working in concert with and as agents of Stone, therefore engaged in illegal witness tampering, intimidation and threats in violation of 18 U.S.C. § 1512 by virtue of the defamatory and threatening acts and practices as alleged herein. Not coincidentally, this was what largely Stone was indicted and convicted  for by Special Counsel Robert Mueller, for which he was sentenced to 40 months of incarceration a federal penitentiary.

<u>DEFENDANTS' DEFAMATORY CONDUCT</u>

37.     Defendant Stone has appeared numerous times on programs of the Defendants, *The Alex Jones Show* and The *War Room (and has been a compensated Infowars host in his own right)*. These shows are hosted by Defendant Alex Jones and Shroyer and Stone where numerous false, misleading, malicious and defamatory statements of and concerning Plaintiffs were made, published, and or ratified by all of the Defendants, each and every one of them, as surrogates and agents of Defendant Stone.

38.     Plaintiffs have demanded retraction and correction of the defamatory videos and publications set forth below and generally in this Complaint, but Defendants have arrogantly

refused, thereby ratifying any and all defamatory statements contained therein, and compounding the damage alleged herein.

39.     Defendants, at a minimum, acted recklessly with disregard for the truth, as they have known Plaintiff Corsi for a long time, and even worked with him and are also intimately familiar with Plaintiff Klayman, so they were well aware that the statements made by the co-Defendant Stone, and their own false, misleading, malicious and defamatory statements were, indeed, false, as well as their acting as agents of, much less their ratification of the malicious false statements published by Defendant Stone on their networks and media sites.

40.     As the content containing the malicious false, misleading,  and defamatory statements were published on the internet and elsewhere, it is proliferated like a "cancerous virus," and is was and remains available for viewing from countless sources, thereby exponentially increasing the prejudicial and defamatory impact and severe damage inflicted on Plaintiffs.  Judge Jackson, in issuing her two gag orders against Stone, herself recognized how postings calling for physical harm to her and other threatening postings on the internet proliferate widely and once made cannot be taken back.

## I.     *The October 26, 2018 Video*

41.     In a video from October 26, 2018, Defendant Alex Jones, acting in concert with the other Defendants and at their direction, particularly Defendant Stone, makes several false, misleading, malicious and defamatory statements about Plaintiff Corsi.[9]

42.     At 0:45, Defendant Alex Jones maliciously and falsely published at the direction of Defendant Stone and the other Defendants that Plaintiff Corsi "seemed to be extremely mentally degraded to the point of what I would call dementia."

43.     In the same video, Defendant Alex Jones, acting in concert with and at the

[9] https://www.youtube.com/watch?v=UuXPAn0nZo8

direction of Defendant Stone and the other Defendants, maliciously fabricates a story where he purportedly saw Plaintiff Corsi at a steakhouse "on the ground at another table" and that his security staff "thought he was dead in the elevator."

44.     At 5:08, Defendant Alex Jones, acting in concert with and at the direction of Defendant Stone and the other Defendants, after accusing Plaintiff Corsi of having suffered a stroke, publishes maliciously that "whatever comes out of his mouth ain't the truth."

45.     Tellingly and not at all coincidentally, Stone appeared as a guest on the same video, as evidence of Defendants working in concert with and as agents of Stone.

46.     These malicious false, misleading, and defamatory statements were published by Defendants acting in concert and at the direction of Defendant Stone as Stone's agents to discredit and coerce into false testimony from Plaintiff Corsi in order to preserve the reputation of and assist their co-conspirator Stone before Mueller's Russian collusion investigation and later prosecution, as Stone had been indicted and Plaintiff Corsi named a material witness. Importantly, Plaintiff Corsi was not indicted. Plaintiff Klayman was known by all of the Defendants to be Dr. Corsi's legal counsel.

## II.     *The January 18, 2019 Video*

47.     Before Defendant Stone was indicted, on or about January 18, 2019, he appeared on *The War Room* with Defendant Shroyer, where he made several malicious false, misleading, and defamatory statements in this district,  nationally and internationally  regarding Plaintiffs (the "January 18 Video").[10] The same video was published on Stone's YouTube channel, "*Stone Cold Truth*," on January 18, 2019.[11]

48.     These malicious false, misleading, and defamatory statements were at the

[10] https://www.infowars.com/watch/?video=5c3fbf24fe49383dcf6996e4
[11] https://www.youtube.com/watch?v=cJyfgdvtFx8

direction of all of the Defendants and adopted and published by each and every one of the Defendants, rendering them joint tortfeasors and jointly and severally liable.

49.     At 2:09 in the January 18 Video, Stone and the other Defendants working in concert and at the direction of Defendant Stone as his agents maliciously and falsely published that Plaintiff Corsi was "fired from World Net Daily."

50.     At 2:27 in the January 18 Video, Stone and the other Defendants working in concert and at the direction of Defendant Stone as his agents maliciously falsely and misleadingly published that, "He (Corsi) was perfectly willing to lie, to perjure himself saying that a memo that he had wrote me was written on the 30th for the purposes of cover-up…. which is further proof that Jerry lied under oath."

51.     At 2:55 in the January 18 Video, Stone and the other Defendants working in concert with at the direction of and as agents of Defendant Stone maliciously falsely and misleadingly published, "and then states that I knew about John Podesta's emails being stolen in advance, the only proof of that is Jerry's feeble alcohol affected memory – it's a lie…."

52.     At 3:35 in the January 18 Video, Stone and the other Defendants working in concert at the direction of and as agents of Defendant Stone maliciously falsely and misleadingly published that "Jerry was prepared to stab a principle Trump supporter in the back, he was perfectly prepared to bear false witness against me, even though I had done nothing in my entire life other than help him."

53.     At 4:20 in the January 18 Video, Stone and the other Defendants working in concert with and at the direction and as agents of Defendant Stone  maliciously falsely and misleadingly published that "all I ever did was show Jerry Corsi friendship and support and try to help him and his family and what I get is Judas Iscariot, the willingness to testify against me and

help the deep state bury me….and then he makes up this story about helping me formulate a cover story."

54.    At 6:26 in the January 18 Video, Stone and the other Defendants working in concert with and as agents at the direction of Defendant Stone  maliciously falsely published that "you can always tell when Jerry Corsi is lying because his lips are moving…."

55.    At 1:25 in the January 18 Video, Stone and the other Defendants working in concert with and as agents at the direction of Defendant Stone maliciously falsely published that "He's (Klayman) never actually won a courtroom victory in his life."

56.    At 1:30 in the January 18 Video, Stone and the other Defendants working in concert and as agents at the direction of Defendant Stone maliciously  falsely published, "He (Klayman) was ousted at Judicial Watch. Ask Tom Fitton [the current president of Judicial Watch] why he left. He was 'ousted' because of a 'sexual harassment complaint.'"

57.    In actuality and truth, Plaintiff Klayman left Judicial Watch voluntarily on his own accord in order to run for U.S. Senate in Florida in 2003-2004.

58.    Not coincidentally, Plaintiff Klayman has a jury verdict and judgment against Fitton's Judicial Watch for having defamed him with malice. Punitive damages were also awarded by the jury in the U.S. District Court for the Southern District of Florida. *See* Exhibit 5-1.

59.    At 1:37 in the January 18 Video, Stone acting in concert with the other Defendants maliciously working in concert with the other Defendants falsely published, "He's (Klayman) incompetent, he's a numbskull, he's an idiot, he's an egomaniac, and he could be the single worst lawyer in America. With him as Jerry Corsi's lawyer, Corsi may get the electric chair. So your idea that he's a good guy is entirely wrong"

60.     In actuality, Plaintiff Klayman has been a practicing attorney for over four decades and has won numerous cases on behalf of his clients and also against the government for constitutional and other violations.  He is the founder of both Judicial Watch and Freedom Watch, a former candidate for the U.S. Senate in Florida, a former trial attorney and prosecutor of the Antitrust Division of the U.S. Department of Justice, where he was a member of the trial team that successfully broke up the AT&T monopoly and created competition in the telecommunications industry. Among many other legal victories, Plaintiff Klayman also won landmark decisions at the chairman and general counsel of Freedom Watch enjoining the illegal mass surveillance by the National Security Agency. *Klayman v. Obama*, 1:13-cv-851 (D.D.C.). *See* Exhibit 6 --*Klayman biography*, which is incorporated herein by reference. Stone knew this when working in concert with the other Defendants he published acting in concert with the other Defedants the malicious false and misleading statements about Klayman and thus willfully and maliciously defamed Plaintiff Klayman.

61.     At 2:01 in the January 18 Video, Stone maliciously working in concert with the other Defendants falsely and misleadingly published that Plaintiff Klayman is a "piece of garbage."

62.     At 4:11 in the January 18 Video, Stone maliciously working in concert with the other Defendants falsely and misleadingly published, "For those people out there who think…that Larry Klayman's IQ is higher than 70, you're wrong…"

63.     Defendants, all of them working in concert and as agents of Defendant Stone, published these malicious false, misleading, and defamatory statements with malice and with full knowledge that they were false and misleading, and/or at a minimum, with a reckless disregard for its truthfulness. These statements falsely and misleadingly state that Plaintiff Corsi was fired

from World Net Daily, that he committed perjury (a federal offense), and that he is an untruthful person. They also create the false and misleading implication that Plaintiff Klayman is unqualified to be an attorney, public advocate and is a bad and loathsome person, unfit for his trades and professions. Plaintiff Klayman is also an author, columnist and  nationally syndicated radio and internet talk show host on Radio America, his show titled "Special Prosecutor with Larry Klayman." See www.radioamerica.com. The malicious false and misleading published statements as alleged herein also severely damaged Plaintiff Klayman personally and professionally in this regard, particularly since he and his show compete with Defendant InfoWars and and the other Defendants in media markets in this district, nationally and internationally. Plaintiff Corsi also competes with Defendant InfoWars and the other Defendants in media markets in this district, nationally and internationally.

### III.     Other Malicious Defamatory Publications

64.     In another appearance on InfoWars which was posted to YouTube[12] on January 17, 2019, Defendant Stone working in concert with the other Defendants at 6:22 maliciously falsely and misleadingly published that "He [Corsi] was perfectly willing to bear false witness against me on multiple points that are complete fabrications."

65.     In another appearance on InfoWars, this time on *The Alex Jones Show* from January 21, 2019, Defendant Stone maliciously working in concert with the other Defendants falsely and misleadingly published that "the good doctor [Corsi] has told a number of lies. In fact, he's starting to conflate his lies…. he was perfectly willing to lie about me…. but now lying about Alex Jones, lying about InfoWars, lying about Dr. (David) Jones, who's one of the nicest, gentlest, sweetest, most honest men I have ever met, it's beyond the pale…. Jerry Corsi can no

---

[12] https://www.youtube.com/watch?v=GJd8YBDvm1Q

longer be believed."[13]

66.     In the same appearance, Stone maliciously working in concert with the other Defendants falsely and misleadingly published that, "I think you've [Corsi] been deep state from the beginning. Your whole birther thing is used as a club to destroy conservatives….I look forward to our confrontation. I will demolish you. You're a fraudster, out of your alcoholic haze you have made up lies about David Jones and Alex Jones and Roger Stone and now I suspect they want you to lie about the President." This is clearly a threat, as well as being maliciously defamatory. It is akin to the threats against Person 2 in the Mueller Indictment, Randy Credico, who Defendant Stone, as set forth in the Mueller Indictment, based on Stone's own words contained in his own documentary evidence, threatened to kill along with Credico's service dog. Later Stone threatened the judge presiding over his criminal prosecution, the Honorable Amy Berman Jackson.

67.     In the same January 21, 2019 video, at 43:40, Defendant Alex Jones maliciously acting in concert with the other Defendants and as an agent at the direction of Defendant Stone falsely accuses Plaintiff Corsi of being a "spook, back and forth with different agencies," falsely saying that Dr. Corsi had worked with different government agencies.

68.     Defendant Alex Jones further maliciously acting in concert with the other Defendants and at the direction as an agent of Defendant Stone falsely accuses Plaintiff Corsi of sometimes "not being able to walk," creating the false and defamatory implication that he is an alcoholic.

69.     Defendants acting in concert as an agent at the direction of Stone published these false, misleading, and defamatory statements at the direction and agent of and  in concert with Stone with malice and with full knowledge that they were false and misleading, and/or at a

[13] https://www.youtube.com/watch?v=ANfe9d7YzL0 (Beginning at 38:00)

minimum, with a reckless disregard for their truthfulness. These statements falsely and misleadingly published that Plaintiff Corsi committed perjury (a federal offense), is an untruthful person, and is an alcoholic. They also contain threats, amplified by Defendants facial expressions and hostile demeanor against Plaintiff Corsi and his legal counsel Larry Klayman. Defendants, acting at the direction and working in concert with Stone, obviously believed that in order to advance their interests and improper if not criminal motivations, they also had to destroy and severely harm the legal counsel of Plaintiff Corsi, who had been at all material times representing Plaintiff Corsi before Special Counsel Robert Mueller, congressional committees and generally and  counseled Plaintiff Corsi when he was subpoenaed to testify truthfully in Stone's criminal trial for perjury, witness tampering, threatening to kill a material witness and his service dog, as well as  obstruction of justice. Corsi, despite all of this, was never called as a witness by Defendant Stone, since Stone and his legal counsel must have concluded that his truthful testimony would not have benefited Stone.

<u>FACTS PERTAINING TO DEFENDANTS' UNFAIR COMPETITION</u>

70.    In addition to being an investigative journalist/author and a public interest litigator/advocate, respectively, Plaintiffs Corsi and Plaintiff Klayman are both competitors to Defendants as conservative media personalities, broadcasters, authors and columnists on social media and elsewhere.

71.    For instance, Plaintiff Klayman also hosts a syndicated  broadcast and on-line radio show on about 50 networks and podcasts and produces videos that are posted on the internet, issues press releases, commentary and other publications.

72.    Defendants have directed, made, adopted, and or ratified numerous false or misleading statements of fact of and concerning Plaintiffs during their various subject programs

and media postings and publications as pled herein, which all contain significant advertisement or promotions.

73.     These false and/or misleading facts materially prejudice the viewers and/or listeners as to the quality, nature, and contents of Plaintiffs' services, which has caused significant competitive and commercial injury to Plaintiffs, as well as loss of good will and reputation.

74.     Plaintiffs, like Defendants, rely on viewer and listener financial and other support and sales and their reputations and good will in order to continue their work. Defendants' false and/or misleading statements concerning Plaintiffs is meant to, and has, diverted financial and other  support, referrals and sales away from Plaintiffs and to Defendants instead, and severely harmed Plaintiffs' personal and professional reputations.

## FIRST CAUSE OF ACTION
### *Defamation*

75.     Plaintiffs re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

76.     Acting in concert Defendants and as an agent at the direction of Defendant Stone published the aforementioned malicious, false, misleading and defamatory statements of and concerning Plaintiffs in this judicial district, nationwide, and worldwide.

77.     These false and misleading statements were published with malice, as Defendants knew that they were false and misleading, or at a minimum acted with a reckless disregard for the truth.

78.     Plaintiffs have been severely harmed and damaged by these false and misleading statements because they subjected him to hatred, distrust, ridicule, contempt, and disgrace.

79.     Plaintiffs have been damaged by these false and misleading statements because they severely injured Plaintiff Corsi and Plaintiff Klayman in their profession and businesses, as well as severely injured and damaged them personally and professionally, financially, emotionally, and in terms of their good will and reputations.

## SECOND CAUSE OF ACTION
### *Defamation Per Se*

80.     Plaintiffs re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

81.     Acting in concert, Defendants as alleged herein, published the aforementioned numerous false, misleading and defamatory statements to severely harm and damage Plaintiffs, which were republished elsewhere and widely in this district, nationally and internationally, and through surrogates, which and wo published the falsities that Plaintiffs have committed crimes, including perjury, and engaged in moral turpitude in the form of alcoholism, and committed sexual misconduct, as set forth in the preceding paragraphs. These malicious and false statements defamed Plaintiffs in their trades and professions.

82.     These false, misleading and defamatory statements were published in this district and on the internet and elsewhere, domestically and internationally for the entire world to see and hear and in so doing Defendants published false and misleading facts, *inter alia*, that Plaintiffs' conduct, characteristics or a condition are incompatible with the proper exercise of their lawful business, trades, professions or offices, as well as personally.

83.     These false and misleading statements were published with malice, as Defendants knew that they were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

84.     This statements are *per se* defamatory because they falsely and misleadingly

published that Plaintiff Corsi committed perjury and Plaintiff Klayman had committed sexual misconduct which are federal offense and felony, as well as defamed Plaintiffs in their trades and professions. Defamation *per se* gives rise to the presumption that severe harm and damage has arisen by virtue of the malicious false and misleading statements.

85.     These malicious false, misleading, and defamatory statements are defamatory *per se* and these false and misleading statements severely harmed and damaged Plaintiff Corsi in this profession and business as a journalist, author and political commentator, whose credibility is the most important trait, as well as personally and Plaintiff Klayman in his professions as a public interest and private advocate and litigator and as an author, columnist and radio and internet radio talk show and syndicated host, as well as personally.

**THIRD CAUSE OF ACTION**
***Defamation by Implication***

86.     Plaintiffs re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

87.     Acting in concert, Defendants published the aforementioned numerous false, misleading and defamatory statements about Plaintiffs, as set forth in the preceding paragraphs.

88.     These false, misleading and defamatory statements were published on the internet and published and republished elsewhere in this district, domestically and internationally for the entire world to see and hear.

89.     These false and misleading statements were published with malice, as Defendants knew that they were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

90.     These statements created the false and misleading implication that Plaintiff Corsi is dishonest, committed perjury and is an alcoholic, and that Plaintiff Klayman committed sexual

misconduct and is incompetent, among other false and misleading statements as pled in the preceding paragraphs.  These malicious false statements also defamed Plaintiffs in their trades and professions.

91.     Plaintiffs have been severely harmed and damaged by these false and misleading statements because they subject him to hatred, distrust, ridicule, contempt, and disgrace.

92.     Plaintiffs has been damaged by these malicious false and misleading statements because the statements severely harmed and damaged Plaintiffs in their trades and professions as journalists, authors, columnists, pubic interest and private practitioner lawyers and syndicated radio talk show hosts, whose credibility is the most important trait, as well as personally.

### FOURTH CAUSE OF ACTION
*Intentional Infliction of Emotional Distress*

93.     Plaintiffs re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

94.     Acting in concert, Defendants engaged in extreme and outrageous conduct by threatening Plaintiffs, acting as agents in concert with Stone, who has made death threats to at least one witness involved in Special Counsel Mueller's Russian collusion investigation, Person 2 Randy Credico, as well as incited violence against Judge Amy Berman Jackson by posting a meme on Instagram with a crosshairs and gun pointed at the jurist's head, for which Stone was sanctioned with a total gag order and threat of incarceration if this type of violative conduct of the Court's gag order occurred again, which it apparently has. *See* Exhibit 7.

95.     Defendants knowingly and intentionally threatened Plaintiffs, in a manner similar to other death threats co-conspirator and Defendant Stone made to at least one material witness, involved in Special Counsel Mueller's Russian collusion investigation, such as Randy Credico, Person 2 in the Mueller Indictment, as well as Judge Amy Berman Jackson.

96.     Defendants' extreme and outrageous conduct directly caused Plaintiffs severe emotional distress and resulting severe harm and damage.

### FIFTH CAUSE OF ACTION
*Assault*

97.     Plaintiffs re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

98.     Acting in concert, Defendants placed Plaintiffs in apprehension of an imminent harmful or offensive contact and physical harm and death, by coercing and threatening Plaintiffs, in a similar manner that co-conspirator Stone has used to make death threats to at least one material witness involved in Special Counsel Mueller's Russian collusion investigation, such as Person 2 in the Mueller Indictment, Randy Credico and Judge Amy Berman Jackson.

99.     The threats issued by Defendants are credible, as co-conspirator Stone portrays and sees himself as a "Mafia" figure, as set forth above.

100.    Furthermore, as set forth above, acting in concert Defendants have a pattern and practice of calling their followers "to arms," which has resulted in deadly violence against their victims.

101.    Plaintiffs did not consent to Defendants' conduct.

102.    As a direct and proximate result of Defendants' wrongful conduct, acting in concert and as an agent at the direction of Defendant Stone, Plaintiffs suffered conscious pain, suffering, severe emotional distress and the fear of imminent serious bodily injury or death, and other mental and physical injuries, and Plaintiffs were severely harmed and damaged thereby.

### SIXTH CAUSE OF ACTION
*Unfair Competition – Lanham Act 15 U.S.C. § 1125(a)*

103.    Plaintiffs re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

104.    Defendants have and are engaged in acts of unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a) and common law

105.    Defendants have made false and/or misleading statements that have deceived and/or had the tendency to deceive a substantial segment of the receiving audience.

106.    Defendants' false and/or misleading statements misrepresent the nature, characteristics, and qualities of Plaintiff Klayman and Plaintiff Corsi's goods or services.

107.    Defendants false and/or misleading statements are material because that were highly likely to mislead and influence supporters' decisions to provide financial support and sales to Defendants instead of Plaintiffs

108.    These false and misleading statements were made in interstate commerce, as they were widely broadcast on radio, on the internet, in social media, and elsewhere in this district, nationally and internationally.

109.    Plaintiffs have suffered significant damages, which are ongoing, due to Defendants' false and/or misleading statements. By law these damages are calculated based  on Defendants' gross  sales and receipts, which are trebled,  plus an award of attorneys fees and costs.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

a.      Awarding Plaintiffs compensatory including actual, consequential, incidental and punitive  damages for malicious tortious concerted conduct, jointly and severally in an amount to be determined at trial and in excess of $75, 000,000 U.S. Dollars

for each Plaintiff.

b.      Awarding Treble Damages Under the Lanham Act, 15 U.S.C. 1125(a).

b.      Awarding Plaintiffs attorney fees and costs

c.      Granting  such  other   relief  as  the  Court  deems  appropriate  and  necessary

including preliminary and permanent injunctive relief.


**PLAINTIFFS DEMAND TRIAL BY JURY ON ALL CLAIMS SO TRIABLE**.


Dated: July 29, 2020                                Respectfully Submitted,


                                                    *   /s/ Larry Klayman*
                                                    Larry Klayman, Esq.
                                                    KLAYMAN LAW GROUP, P.A.

                                                    2020 Pennsylvania Ave NW #800
                                                    Washington, DC, 20006
                                                    Telephone:  (310)-595-0800
                                                    Email: leklayman@gmail.com

                                                    *Counsel for Klayman Pro Se*

                                                    */s/Sanjay Biswas*
                                                    SANJAY BISWAS, Esq.
                                                    #24061235—Texas
                                                    #24966--Louisiana
                                                    11720 Duxbury Dr.
                                                    Frisco, Texas 75035
                                                    Telephone: (972)-866-5879
                                                    Email:sanjaybiswas41@gmail.com
                                                    Fax: 1-800-506-6804

                                                    *Counsel for Dr. Jerome Corsi*

## <u>CERTIFICATE OF SERVICE</u>

I, Larry Klayman, hereby certify that on this day, July 29, 2020, I electronically filed the foregoing with the Clerk of Court using the Court's ECF system. I also certify that the foregoing document is being served this day on all counsel of record through the Court's eservice procedures

*/s/ Larry Klayman*_____

EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. |
| | * | |
| v. | * | Grand Jury Original |
| | * | |
| ROGER JASON STONE, JR., | * | 18 U.S.C. §§ 1001, 1505, 1512, 2 |
| | * | |
| Defendant. | * | |
| | * | |
| | * | |
| | * | |
| | ******* | |

## **INDICTMENT**

The Grand Jury for the District of Columbia charges:

### **Introduction**

1.     By in or around May 2016, the Democratic National Committee ("DNC") and the Democratic Congressional Campaign Committee ("DCCC") became aware that their computer systems had been compromised by unauthorized intrusions and hired a security company ("Company 1") to identify the extent of the intrusions.

2.     On or about June 14, 2016, the DNC—through Company 1—publicly announced that it had been hacked by Russian government actors.

3.     From in or around July 2016 through in or around November 2016, an organization ("Organization 1"), which had previously posted documents stolen by others from U.S. persons, entities, and the U.S. government, released tens of thousands of documents stolen from the DNC and the personal email account of the chairman of the U.S. presidential campaign of Hillary Clinton ("Clinton Campaign").

a. On or about July 22, 2016, Organization 1 released documents stolen from the DNC.

b. Between on or about October 7, 2016 and on or about November 7, 2016, Organization 1 released approximately 33 tranches of documents that had been stolen from the personal email account of the Clinton Campaign chairman, totaling over 50,000 stolen documents.

4. ROGER JASON STONE, JR. was a political consultant who worked for decades in U.S. politics and on U.S. political campaigns. STONE was an official on the U.S. presidential campaign of Donald J. Trump ("Trump Campaign") until in or around August 2015, and maintained regular contact with and publicly supported the Trump Campaign through the 2016 election.

5. During the summer of 2016, STONE spoke to senior Trump Campaign officials about Organization 1 and information it might have had that would be damaging to the Clinton Campaign. STONE was contacted by senior Trump Campaign officials to inquire about future releases by Organization 1.

6. By in or around early August 2016, STONE was claiming both publicly and privately to have communicated with Organization 1. By in or around mid-August 2016, Organization 1 made a public statement denying direct communication with STONE. Thereafter, STONE said that his communication with Organization 1 had occurred through a person STONE described as a "mutual friend," "go-between," and "intermediary." STONE also continued to communicate with members of the Trump Campaign about Organization 1 and its intended future releases.

7. After the 2016 U.S. presidential election, the U.S. House of Representatives Permanent Select Committee on Intelligence ("HPSCI"), the U.S. Senate Select Committee on Intelligence ("SSCI"), and the Federal Bureau of Investigation ("FBI") opened or announced their respective

investigations into Russian interference in the 2016 U.S. presidential election, which included investigating STONE's claims of contact with Organization 1.

8.　　In response, STONE took steps to obstruct these investigations.　Among other steps to obstruct the investigations, STONE:

　　　a.　　Made multiple false statements to HPSCI about his interactions regarding Organization 1, and falsely denied possessing records that contained evidence of these interactions; and

　　　b.　　Attempted to persuade a witness to provide false testimony to and withhold pertinent information from the investigations.

**Other Relevant Individuals**

9.　　Person 1 was a political commentator who worked with an online media publication during the 2016 U.S. presidential campaign.　Person 1 spoke regularly with STONE throughout the campaign, including about the release of stolen documents by Organization 1.

10.　　Person 2 was a radio host who had known STONE for more than a decade.　In testimony before HPSCI on or about September 26, 2017, STONE described Person 2 (without naming him) as an "intermediary," "go-between," and "mutual friend" to the head of Organization 1.　In a follow-up letter to HPSCI dated October 13, 2017, STONE identified Person 2 by name and claimed Person 2 was the "gentleman who confirmed for Mr. Stone" that the head of Organization 1 had "'[e]mails related to Hillary Clinton which are pending publication.'"

**Background**

STONE's Communications About Organization 1 During the Campaign

11.　　By in or around June and July 2016, STONE informed senior Trump Campaign officials that he had information indicating Organization 1 had documents whose release would be

damaging to the Clinton Campaign.  The head of Organization 1 was located at all relevant times at the Ecuadorian Embassy in London, United Kingdom.

12.     After the July 22, 2016 release of stolen DNC emails by Organization 1, a senior Trump Campaign official was directed to contact STONE about any additional releases and what other damaging information Organization 1 had regarding the Clinton Campaign.  STONE thereafter told the Trump Campaign about potential future releases of damaging material by Organization 1.

13.     STONE also corresponded with associates about contacting Organization 1 in order to obtain additional emails damaging to the Clinton Campaign.

> a.     On or about July 25, 2016, STONE sent an email to Person 1 with the subject line, "Get to [the head of Organization 1]."  The body of the message read, "Get to [the head of Organization 1] [a]t Ecuadorian Embassy in London and get the pending [Organization 1] emails . . . they deal with Foundation, allegedly."  On or about the same day, Person 1 forwarded STONE's email to an associate who lived in the United Kingdom and was a supporter of the Trump Campaign.

> b.     On or about July 31, 2016, STONE emailed Person 1 with the subject line, "Call me MON."  The body of the email read in part that Person 1's associate in the United Kingdom "should see [the head of Organization 1]."

> c.     On or about August 2, 2016, Person 1 emailed STONE.  Person 1 wrote that he was currently in Europe and planned to return in or around mid-August.  Person 1 stated in part, "Word is friend in embassy plans 2 more dumps.  One shortly after I'm back.  2nd in Oct.  Impact planned to be very damaging."  The phrase "friend in embassy" referred to the head of Organization 1.  Person 1 added in the same email, "Time to let more than [the Clinton Campaign chairman] to be exposed as in bed w

enemy if they are not ready to drop HRC.  That appears to be the game hackers are now about.  Would not hurt to start suggesting HRC old, memory bad, has stroke – neither he nor she well.  I expect that much of next dump focus, setting stage for Foundation debacle."

14.    Starting in early August 2016, after receiving the August 2, 2016 email from Person 1, STONE made repeated statements about information he claimed to have learned from the head of Organization 1.

  a. On or about August 8, 2016, STONE attended a public event at which he stated, "I actually have communicated with [the head of Organization 1].  I believe the next tranche of his documents pertain to the Clinton Foundation, but there's no telling what the October surprise may be."

  b. On or about August 12, 2016, STONE stated during an interview that he was "in communication with [the head of Organization 1]" but was "not at liberty to discuss what I have."

  c. On or about August 16, 2016, STONE stated during an interview that "it became known on this program that I have had some back-channel communication with [Organization 1] and [the head of Organization 1]."  In a second interview on or about the same day, STONE stated that he "communicated with [the head of Organization 1]" and that they had a "mutual acquaintance who is a fine gentleman."

  d. On or about August 18, 2016, STONE stated during a television interview that he had communicated with the head of Organization 1 through an "intermediary, somebody who is a mutual friend."

e.   On or about August 23, 2016, Person 2 asked STONE during a radio interview, "You've been in touch indirectly with [the head of Organization 1]. . . . Can you give us any kind of insight?  Is there an October surprise happening?"  STONE responded, "Well, first of all, I don't want to intimate in any way that I control or have influence with [the head of Organization 1] because I do not. . . .  We have a mutual friend, somebody we both trust and therefore I am a recipient of pretty good information."

15.   Beginning on or about August 19, 2016, STONE exchanged written communications, including by text message and email, with Person 2 about Organization 1 and what the head of Organization 1 planned to do.

a.   On or about August 19, 2016, Person 2 sent a text message to STONE that read in part, "I'm going to have [the head of Organization 1] on my show next Thursday."  On or about August 21, 2016, Person 2 sent another text message to STONE, writing in part, "I have [the head of Organization 1] on Thursday so I'm completely tied up on that day."

b.   On or about August 25, 2016, the head of Organization 1 was a guest on Person 2's radio show for the first time.  On or about August 26, 2016, Person 2 sent a text message to STONE that stated, "[the head of Organization 1] talk[ed] about you last night."  STONE asked what the head of Organization 1 said, to which Person 2 responded, "He didn't say anything bad we were talking about how the Press is trying to make it look like you and he are in cahoots."

c.   On or about August 27, 2016, Person 2 sent text messages to STONE that said, "We are working on a [head of Organization 1] radio show," and that he (Person 2) was

"in charge" of the project.  In a text message sent later that day, Person 2 added, "[The head of Organization 1] has kryptonite on Hillary."

d.      On or about September 18, 2016, STONE sent a text message to Person 2 that said, "I am e-mailing u a request to pass on to [the head of Organization 1]."  Person 2 responded "Ok," and added in a later text message, "[j]ust remember do not name me as your connection to [the head of Organization 1] you had one before that you referred to."

   i.      On or about the same day, September 18, 2016, STONE emailed Person 2 an article with allegations against then-candidate Clinton related to her service as Secretary of State.  STONE stated, "Please ask [the head of Organization 1] for any State or HRC e-mail from August 10 to August 30—particularly on August 20, 2011 that mention [the subject of the article] or confirm this narrative."

   ii.     On or about September 19, 2016, STONE texted Person 2 again, writing, "Pass my message . . . to [the head of Organization 1]."  Person 2 responded, "I did."  On or about September 20, 2016, Person 2 forwarded the request to a friend who was an attorney with the ability to contact the head of Organization 1.  Person 2 blind-copied STONE on the forwarded email.

e.      On or about September 30, 2016, Person 2 sent STONE via text message a photograph of Person 2 standing outside the Ecuadorian Embassy in London where the head of Organization 1 was located.

f.    On or about October 1, 2016, which was a Saturday, Person 2 sent STONE text messages that stated, "big news Wednesday . . . now pretend u don't know me . . . Hillary's campaign will die this week."  In the days preceding these messages, the press had reported that the head of Organization 1 planned to make a public announcement on or about Tuesday, October 4, 2016, which was reported to be the ten-year anniversary of the founding of Organization 1.

g.    On or about October 2, 2016, STONE emailed Person 2, with the subject line "WTF?," a link to an article reporting that Organization 1 was canceling its "highly anticipated Tuesday announcement due to security concerns."  Person 2 responded to STONE, "head fake."

h.    On or about the same day, October 2, 2016, STONE texted Person 2 and asked, "Did [the head of Organization 1] back off."  On or about October 3, 2016, Person 2 initially responded, "I can't tal[k] about it."  After further exchanges with STONE, Person 2 said, "I think it[']s on for tomorrow."  Person 2 added later that day, "Off the Record Hillary and her people are doing a full-court press they [*sic*] keep [the head of Organization 1] from making the next dump . . . That's all I can tell you on this line . . . Please leave my name out of it."

16.    In or around October 2016, STONE made statements about Organization 1's future releases, including statements similar to those that Person 2 made to him.  For example:

a.    On or about October 3, 2016, STONE wrote to a supporter involved with the Trump Campaign, "Spoke to my friend in London last night.  The payload is still coming."

b.    Also on or about October 3, 2016, STONE received an email from a reporter who had connections to a high-ranking Trump Campaign official that asked, "[the head

of Organization 1] – what's he got?  Hope it's good."  STONE responded in part, "It is.  I'd tell [the high-ranking Trump Campaign official] but he doesn't call me back."

c.      On or about October 4, 2016, the head of Organization 1 held a press conference but did not release any new materials pertaining to the Clinton Campaign.  Shortly afterwards, STONE received an email from the high-ranking Trump Campaign official asking about the status of future releases by Organization 1.  STONE answered that the head of Organization 1 had a "[s]erious security concern" but that Organization 1 would release "a load every week going forward."

d.      Later that day, on or about October 4, 2016, the supporter involved with the Trump Campaign asked STONE via text message if he had "hear[d] anymore from London."  STONE replied, "Yes - want to talk on a secure line - got Whatsapp?"  STONE subsequently told the supporter that more material would be released and that it would be damaging to the Clinton Campaign.

17.     On or about October 7, 2016, Organization 1 released the first set of emails stolen from the Clinton Campaign chairman.  Shortly after Organization 1's release, an associate of the high-ranking Trump Campaign official sent a text message to STONE that read "well done."  In subsequent conversations with senior Trump Campaign officials, STONE claimed credit for having correctly predicted the October 7, 2016 release.

<u>The Investigations</u>

18.     In or around 2017, government officials publicly disclosed investigations into Russian interference in the 2016 U.S. presidential election and possible links to individuals associated with the campaigns.

a. On or about January 13, 2017, the chairman and vice chairman of SSCI announced the committee would conduct an inquiry that would investigate, among other things, any intelligence regarding links between Russia and individuals associated with political campaigns, as well as Russian cyber activity and other "active measures" directed against the United States in connection with the 2016 election.

b. On or about January 25, 2017, the chairman and ranking member of HPSCI announced that HPSCI had been conducting an inquiry similar to SSCI's.

c. On or about March 20, 2017, the then-director of the FBI testified at a HPSCI hearing and publicly disclosed that the FBI was investigating Russian interference in the 2016 election and possible links and coordination between the Trump Campaign and the Russian government.

d. By in or around August 2017, news reports stated that a federal grand jury had opened an investigation into matters relating to Russian government efforts to interfere in the 2016 election, including possible links and coordination between the Trump Campaign and the Russian government.

**STONE's False Testimony to HPSCI**

19. In or around May 2017, HPSCI sent a letter requesting that STONE voluntarily appear before the committee and produce:

> Any documents, records, electronically stored information including e-mail, communication, recordings, data and tangible things (including, but not limited to, graphs, charts, photographs, images and other documents) regardless of form, other than those widely available (e.g., newspaper articles) that reasonably could lead to the discovery of any facts within the investigation's publicly-announced parameters.

On or about May 22, 2017, STONE caused a letter to be submitted to HPSCI stating that "Mr.

Stone has no documents, records, or electronically stored information, regardless of form, other than those widely available that reasonably could lead to the discovery of any facts within the investigation's publicly-announced parameters."

20.    On or about September 26, 2017, STONE testified before HPSCI in Washington, D.C. as part of the committee's ongoing investigation.  In his opening statement, STONE stated, "These hearings are largely based on a yet unproven allegation that the Russian state is responsible for the hacking of the DNC and [the Clinton Campaign chairman] and the transfer of that information to [Organization 1]."  STONE further stated that  "[m]embers of this Committee" had made certain "assertions against me which must be rebutted here today," which included "[t]he charge that I knew in advance about, and predicted, the hacking of Clinton campaign chairman['s] email, [and] that I had advanced knowledge of the source or actual content of the [Organization 1] disclosures regarding Hillary Clinton."

21.    In the course of his HPSCI testimony, STONE made deliberately false and misleading statements to the committee concerning, among other things, his possession of documents pertinent to HPSCI's investigation; the source for his early August 2016 statements about Organization 1; requests he made for information from the head of Organization 1; his communications with his identified intermediary; and his communications with the Trump Campaign about Organization 1.

<u>STONE's False and Misleading Testimony About His Possession of Documents Pertinent to HPSCI's Investigation</u>

22.    During his HPSCI testimony, STONE was asked, "So you have no emails to anyone concerning the allegations of hacked documents . . . or any discussions you have had with third parties about [the head of Organization 1]?  You have no emails, no texts, no documents whatsoever, any kind of that nature?"  STONE falsely and misleadingly answered, "That is correct.

Not to my knowledge."

23.     In truth and in fact, STONE had sent and received numerous emails and text messages during the 2016 campaign in which he discussed Organization 1, its head, and its possession of hacked emails.  At the time of his false testimony, STONE was still in possession of many of these emails and text messages, including:

a.     The email from STONE to Person 1 on or about July 25, 2016 that read in part, "Get to [the head of Organization 1] [a]t Ecuadorian Embassy in London and get the pending [Organization 1] emails . . . they deal with Foundation, allegedly.";

b.     The email from STONE to Person 1 on or about July 31, 2016 that said an associate of Person 1 "should see [the head of Organization 1].";

c.     The email from Person 1 to STONE on or about August 2, 2016 that stated in part, "Word is friend in embassy plans 2 more dumps.  One shortly after I'm back.  2nd in Oct.  Impact planned to be very damaging.";

d.     Dozens of text messages and emails, beginning on or about August 19, 2016 and continuing through the election, between STONE and Person 2 in which they discussed Organization 1 and the head of Organization 1;

e.     The email from STONE on or about October 3, 2016 to the supporter involved with the Trump Campaign, which read in part, "Spoke to my friend in London last night. The payload is still coming."; and

f.     The emails on or about October 4, 2016 between STONE and the high-ranking member of the Trump Campaign, including STONE's statement that Organization 1 would release "a load every week going forward."

24.     By falsely claiming that he had no emails or text messages in his possession that referred to the head of Organization 1, STONE avoided providing a basis for HPSCI to subpoena records in his possession that could have shown that other aspects of his testimony were false and misleading.

<u>STONE's False and Misleading Testimony About His Early August 2016 Statements</u>

25.     During his HPSCI testimony on or about September 26, 2017, STONE was asked to explain his statements in early August 2016 about being in contact with the head of Organization 1. STONE was specifically asked about his statement on or about August 8, 2016 that "I've actually communicated with [the head of Organization 1]," as well as his statement on or about August 12, 2016 that he was "in communication with [the head of Organization 1]" but was "not at liberty to discuss what I have."

26.     STONE responded that his public references to having a means of contacting Organization 1 referred exclusively to his contact with a journalist, who STONE described as a "go-between, as an intermediary, as a mutual friend" of the head of Organization 1. STONE stated that he asked this individual, his intermediary, "to confirm what [the head of Organization 1] ha[d] tweeted, himself, on July 21st, that he ha[d] the Clinton emails and that he [would] publish them." STONE further stated that the intermediary "was someone I knew had interviewed [the head of Organization 1]. And I merely wanted confirmation of what he had tweeted on the 21st." STONE declined to tell HPSCI the name of this "intermediary" but provided a description in his testimony that was consistent with Person 2.

27.     On or about October 13, 2017, STONE caused a letter to be submitted to HPSCI that identified Person 2 by name as the "gentleman who confirmed for Mr. Stone" that the head of Organization 1 had "'[e]mails related to Hillary Clinton which are pending publication.'"

13

28.     STONE's explanation of his August 2016 statements about communicating with the head of Organization 1 was false and misleading.  In truth and in fact, the first time Person 2 interviewed the head of Organization 1 was on or about August 25, 2016, after STONE made his August 8 and August 12, 2016 public statements.   Similarly, at the time STONE made his August 2016 statements, STONE had directed Person 1—not Person 2—to contact the head of Organization 1.  And Person 1—not Person 2—had told STONE in advance of STONE's August 8 and August 12, 2016 public statements that "[w]ord is friend in embassy plans 2 more dumps," including one in October.  At no time did STONE identify Person 1 to HPSCI as another individual STONE contacted to serve as a "go-between," "intermediary," or other source of information from Organization 1.  STONE also never disclosed his exchanges with Person 1 when answering HPSCI's questioning about STONE's August 8 and August 12, 2016 statements.

<u>STONE's False and Misleading Testimony About Requests He Made for Information from the Head of Organization 1</u>

29.     During his HPSCI testimony, STONE was asked, "[W]hat was the extent of the communication with [the intermediary]?"  STONE replied, "I asked him to confirm . . . that the tweet of [the head of Organization 1] of the 21st was accurate, that they did in fact have . . . Hillary Clinton emails and that they would release them."  STONE was then asked, "Did you ask [the intermediary] to communicate anything else to [the head of Organization 1]?"  STONE falsely and misleadingly responded, "I did not."  STONE was then asked, "Did you ask [the intermediary] to do anything on your own behalf?"  STONE falsely and misleadingly responded, "I did not."

30.     In truth and in fact, STONE directed both Person 1 and Person 2 to pass on requests to the head of Organization 1 for documents that STONE believed would be damaging to the Clinton Campaign.  For example:

      a.     As described above, on or about July 25, 2016, STONE sent Person 1 an email that

14

read, "Get to [the head of Organization 1] [a]t Ecuadorian Embassy in London and

get the pending [Organization 1] emails . . . they deal with Foundation, allegedly."

b.      On or about September 18, 2016, STONE sent a text message to Person 2 that said,

"I am e-mailing u a request to pass on to [the head of Organization 1]," and then

emailed Person 2 an article with allegations against then-candidate Clinton related

to her service as Secretary of State.   STONE added, "Please ask [the head of

Organization 1] for any State or HRC e-mail from August 10 to August 30—

particularly on August 20, 2011 that mention [the subject of the article] or confirm

this narrative."

c.      On or about September 19, 2016, STONE texted Person 2 again, writing "Pass my

message . . . to [the head of Organization 1]."  Person 2 responded, "I did," and the

next day Person 2, on an email blind-copied to STONE, forwarded the request to

an attorney who had the ability to contact the head of Organization 1.

### STONE's False and Misleading Testimony About Communications with His Identified Intermediary

31.     During his HPSCI testimony, STONE was asked repeatedly about his communications

with the person he identified as his intermediary.  STONE falsely and misleadingly stated that he

had never communicated with his intermediary in writing in any way.  During one exchange,

STONE falsely and misleadingly claimed only to have spoken with the intermediary

telephonically:

Q:      [H]ow did you communicate with the intermediary?

A:      Over the phone.

Q:      And did you have any other means of communicating with
the intermediary?

A:      No.

Q:      No text messages, no – none of the list, right?

> A:      No.

Later during his testimony, STONE again falsely denied ever communicating with his intermediary in writing:

> Q:      So you never communicated with your intermediary in writing in any way?
>
> A:      No.
>
> Q:      Never emailed him or texted him?
>
> A:      He's not an email guy.
>
> Q:      So all your conversations with him were in person or over the phone.
>
> A:      Correct.

32.     In truth and in fact, as described above, STONE and Person 2 (who STONE identified to HPSCI as his intermediary) engaged in frequent written communication by email and text message.  STONE also engaged in frequent written communication by email and text message with Person 1, who also provided STONE with information regarding Organization 1.

33.     Written communications between STONE and Person 1 and between STONE and Person 2 continued through STONE's HPSCI testimony.  Indeed, on or about September 26, 2017—the day that STONE testified before HPSCI and denied having ever sent or received emails or text messages from Person 2—STONE and Person 2 exchanged over thirty text messages.

34.     Certain electronic messages between STONE and Person 1 and between STONE and Person 2 would have been material to HPSCI.  For example:

a.      In or around July 2016, STONE emailed Person 1 to "get to" the head of Organization 1 and obtain the pending emails.

b.      In or around September 2016, STONE sent messages directing Person 2 to pass a request to the head of Organization 1.

c.      On or about January 6, 2017, Person 2 sent STONE an email that had the subject

line "Back channel bs." In the email, Person 2 wrote, "Well I have put together timelines[] and you [] said you have a back-channel way back a month before I had [the head of Organization 1] on my show . . . I have never had a conversation with [the head of Organization 1] other than my radio show . . . I have pieced it all together . . . so you may as well tell the truth that you had no back-channel or there's the guy you were talking about early August."

<u>STONE's False and Misleading Testimony About Communications with the Trump Campaign</u>

35. During his HPSCI testimony, STONE was asked, "did you discuss your conversations with the intermediary with anyone involved in the Trump campaign?" STONE falsely and misleadingly answered, "I did not." In truth and in fact, and as described above, STONE spoke to multiple individuals involved in the Trump Campaign about what he claimed to have learned from his intermediary to Organization 1, including the following:

a. On multiple occasions, STONE told senior Trump Campaign officials about materials possessed by Organization 1 and the timing of future releases.

b. On or about October 3, 2016, STONE wrote to a supporter involved with the Trump Campaign, "Spoke to my friend in London last night. The payload is still coming."

c. On or about October 4, 2016, STONE told a high-ranking Trump Campaign official that the head of Organization 1 had a "[s]erious security concern" but would release "a load every week going forward."

**<u>Attempts to Prevent Person 2 from Contradicting STONE's False Statements to HPSCI</u>**

36. On or about October 19, 2017, STONE sent Person 2 an excerpt of his letter to HPSCI that identified Person 2 as his "intermediary" to Organization 1. STONE urged Person 2, if asked by HPSCI, to falsely confirm what STONE had previously testified to, including that it was Person 2

who provided STONE with the basis for STONE's early August 2016 statements about contact with Organization 1.  Person 2 repeatedly told STONE that his testimony was false and told him to correct his testimony to HPSCI.  STONE did not do so.  STONE then engaged in a prolonged effort to prevent Person 2 from contradicting STONE's false statements to HPSCI.

37.     In or around November 2017, Person 2 received a request from HPSCI to testify voluntarily before the committee.  After being contacted by HPSCI, Person 2 spoke and texted repeatedly with STONE.  In these discussions, STONE sought to have Person 2 testify falsely either that Person 2 was the identified intermediary or that Person 2 could not remember what he had told STONE.  Alternatively, STONE sought to have Person 2 invoke his Fifth Amendment right against self-incrimination.  For example:

   a.     On or about November 19, 2017, in a text message to STONE, Person 2 said that his lawyer wanted to see him (Person 2).  STONE responded, "'Stonewall it.  Plead the fifth.  Anything to save the plan' . . . Richard Nixon."  On or about November 20, 2017, Person 2 informed HPSCI that he declined HPSCI's request for a voluntary interview.

   b.     On or about November 21, 2017, Person 2 texted STONE, "I was told that the house committee lawyer told my lawyer that I will be getting a subpoena."  STONE responded, "That was the point at which your lawyers should have told them you would assert your 5th Amendment rights if compelled to appear."

   c.     On or about November 28, 2017, Person 2 received a subpoena compelling his testimony before HPSCI.  Person 2 informed STONE of the subpoena.

   d.     On or about November 30, 2017, STONE asked Person 1 to write publicly about Person 2.  Person 1 responded, "Are you sure you want to make something out of

this now? Why not wait to see what [Person 2] does. You may be defending yourself too much—raising new questions that will fuel new inquiries. This may be a time to say less, not more." STONE responded by telling Person 1 that Person 2 "will take the 5th—but let's hold a day."

e. On multiple occasions, including on or about December 1, 2017, STONE told Person 2 that Person 2 should do a "Frank Pentangeli" before HPSCI in order to avoid contradicting STONE's testimony. Frank Pentangeli is a character in the film *The Godfather: Part II*, which both STONE and Person 2 had discussed, who testifies before a congressional committee and in that testimony claims not to know critical information that he does in fact know.

f. On or about December 1, 2017, STONE texted Person 2, "And if you turned over anything to the FBI you're a fool." Later that day, Person 2 texted STONE, "You need to amend your testimony before I testify on the 15th." STONE responded, "If you testify you're a fool. Because of tromp I could never get away with a certain [*sic*] my Fifth Amendment rights but you can. I guarantee you you are the one who gets indicted for perjury if you're stupid enough to testify."

38. On or about December 12, 2017, Person 2 informed HPSCI that he intended to assert his Fifth Amendment privilege against self-incrimination if required to appear by subpoena. Person 2 invoked his Fifth Amendment privilege in part to avoid providing evidence that would show STONE's previous testimony to Congress was false.

39. Following Person 2's invocation of his Fifth Amendment privilege not to testify before HPSCI, STONE and Person 2 continued to have discussions about the various investigations into Russian interference in the 2016 election and what information Person 2 would provide to

investigators. During these conversations, STONE repeatedly made statements intended to prevent Person 2 from cooperating with the investigations. For example:

a.  On or about December 24, 2017, Person 2 texted STONE, "I met [the head of Organization 1] for f[i]rst time this yea[r] sept 7 . . . docs prove that. . . . You should be honest w fbi . . . there was no back channel . . . be honest." STONE replied approximately two minutes later, "I'm not talking to the FBI and if your smart you won't either."

b.  On or about April 9, 2018, STONE wrote in an email to Person 2, "You are a rat. A stoolie. You backstab your friends-run your mouth my lawyers are dying Rip you to shreds." STONE also said he would "take that dog away from you," referring to Person 2's dog. On or about the same day, STONE wrote to Person 2, "I am so ready. Let's get it on. Prepare to die [expletive]."

c.  On or about May 21, 2018, Person 2 wrote in an email to STONE, "You should have just been honest with the house Intel committee . . . you've opened yourself up to perjury charges like an idiot." STONE responded, "You are so full of [expletive]. You got nothing. Keep running your mouth and I'll file a bar complaint against your friend [the attorney who had the ability to contact the head of Organization 1]."

## COUNT ONE
### (Obstruction of Proceeding)

40.     Paragraphs 1 through 39 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

41.     From in or around May 2017 through at least December 2017, within the District of Columbia and elsewhere, the defendant ROGER JASON STONE, JR., corruptly influenced, obstructed, impeded, and endeavored to influence, obstruct, and impede the due and proper exercise of the power of inquiry under which any inquiry and investigation is being had by either House, and any committee of either House and any joint committee of the Congress, to wit: STONE testified falsely and misleadingly at a HPSCI hearing in or around September 2017; STONE failed to turn over and lied about the existence of responsive records to HPSCI's requests about documents; STONE submitted and caused to be submitted a letter to HPSCI falsely and misleadingly describing communications with Person 2; and STONE attempted to have Person 2 testify falsely before HPSCI or prevent him from testifying.

        All in violation of Title 18, United States Code, Sections 1505 and 2.

## COUNTS TWO THROUGH SIX
### (False Statements)

42.     Paragraphs 1 through 39 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

43.     On or about September 26, 2017, within the District of Columbia and elsewhere, in a matter within the jurisdiction of the legislative branch of the Government of the United States, the defendant ROGER JASON STONE, JR., knowingly and willfully made and caused to be made materially false, fictitious, and fraudulent statements and representations, to wit:

| Count | False Statement |
|---|---|
| **2** | STONE testified falsely that he did not have emails with third parties about the head of Organization 1, and that he did not have any documents, emails, or text messages that refer to the head of Organization 1. |
| **3** | STONE testified falsely that his August 2016 references to being in contact with the head of Organization 1 were references to communications with a single "go-between," "mutual friend," and "intermediary," who STONE identified as Person 2. |
| **4** | STONE testified falsely that he did not ask the person he referred to as his "go-between," "mutual friend," and "intermediary," to communicate anything to the head of Organization 1 and did not ask the intermediary to do anything on STONE's behalf. |
| **5** | STONE testified falsely that he and the person he referred to as his "go-between," "mutual friend," and "intermediary" did not communicate via text message or email about Organization 1. |
| **6** | STONE testified falsely that he had never discussed his conversations with the person he referred to as his "go-between," "mutual |

| Count | False Statement |
|-------|-----------------|
|       | friend," and "intermediary" with anyone involved in the Trump Campaign. |

All in violation of Title 18, United States Code, Sections 1001(a)(2) and 2.

## COUNT SEVEN
### (Witness Tampering)

44.    Paragraphs 1 through 39 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

45.    Between in or around September 2017 and present, within the District of Columbia and elsewhere, the defendant ROGER JASON STONE, JR., knowingly and intentionally corruptly persuaded and attempted to corruptly persuade another person, to wit: Person 2, with intent to influence, delay, and prevent the testimony of any person in an official proceeding.

All in violation of Title 18, United States Code, Section 1512(b)(1).


                   _____
                   Robert S. Mueller, III
                   Special Counsel
                   U.S. Department of Justice


A TRUE BILL:


_____
Foreperson

Date:  January 24, 2019

EXHIBIT 2

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| _____ | ) |  |
| UNITED STATES OF AMERICA, | ) |  |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) | **Case No.: 1:19-CR-00018-ABJ** |
|  | ) |  |
| ROGER J. STONE, JR., | ) |  |
|  | ) |  |
| Defendant. | ) |  |
| _____ | ) |  |

## <u>MOTION FOR LEAVE TO FILE *AMICI CURIAE* BRIEF</u>

Movant Dr. Jerome Corsi ("Dr. Corsi") through counsel,  hereby moves this Court for leave to file an *amici curiae* brief in support of entry of an order pursuant to Local Criminal Rule 57.7(c), or colloquially, a "gag order."

Dr. Corsi's *amicus* brief, attached hereto as <u>Exhibit 1</u>, sets forth the compelling reasons why a "gag order" is necessary in this case, as he is named as Person 1, a material witness, in Defendant Roger Stone's ("Defendant Stone") indictment. Defendant Stone has engaged in a public relations campaign to defame, smear, intimidate and threaten both Dr. Corsi and his counsel, Mr. Larry Klayman, which is the same conduct that he was indicted for in the first place. Because Defendant Stone's defamation, witness tampering, intimidation, and threats with regard to Dr. Corsi and his counsel Mr. Klayman are not technically part of this criminal prosecution, Dr. Corsi's interests and position are not adequately represented by any party. Dr. Corsi's *amicus* brief will aid this Court in ruling upon the entry of an order pursuant to LCrR 57.7(c)

The United States has taken no position with regard to filing of an *amicus* brief, and

1

counsel for Defendant Stone has not substantively responded to Dr. Corsi's request for consent.

Dated: February 8, 2019                    Respectfully submitted,

                                          /s/ Larry Klayman
                                          Larry Klayman, Esq.
                                          KLAYMAN LAW GROUP, PA
                                          D.C. Bar No:
                                          2020 Pennsylvania Ave NW #800
                                          Washington, DC 20006
                                          Email: leklayman@gmail.com
                                          Tel: 310-595-0800

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed electronically and served through the court's ECF system to all counsel of record or parties on February 8, 2019

                                          /s/ Larry Klayman
                                          Larry Klayman, Esq.

2

# [SUB]EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | )   **Case No.: 1:19-CR-00018-ABJ** |
|  | ) |
| ROGER J. STONE, JR., | ) |
|  | ) |
| Defendant. | ) |

_____ )

_**AMICI CURIAE** BRIEF OF DR. JEROME CORSI_

Under Local Criminal Rule 57.7(b)(1):

> [i]t is the duty of the lawyer or law firm not to release or authorize the release of information or opinion which a reasonable person would expect to be disseminated by means of public communication, in connection with pending or imminent criminal litigation with which the lawyer or the law firm is associated, if there is a reasonable likelihood that such dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice.

Furthermore, LCrR 57.7(c), which offers additional specific guidance with regard to highly publicized cases - which this instant case certainly qualifies as – grants the Court with authority to issue a "special order governing such matters as extrajudicial statements by parties, witnesses and attorneys likely to interfere with the rights of the accused to a fair trial by an impartial jury."

As set forth in _Gentile v. State Bar of Nevada_, 501 U.S. 1030, 1075 (1991):

> The limitations are aimed at two principal evils: (1) comments that are likely to influence the actual outcome of the trial, and (2) comments that are likely to prejudice the jury venire, even if an untainted panel can ultimately be found. Few, if any, interests under the Constitution are more fundamental than the right to a fair trial by "impartial" jurors, and an outcome affected by extrajudicial statements would violate that fundamental right.

Here, Defendant Roger Stone ("Defendant Stone") has _already begun_ a public relations

1

campaign meant specifically to influence the outcome of his upcoming trial and which are meant to prejudice the jury venire. Defendant Stone is doing so by engaging in witness tampering, defamation, and intimidation and coercion with regard to Dr. Corsi, who is named as Person 1 in Defendant Stone's indictment. As such, Dr. Corsi will likely subpoenaed to be called as a material witness in Defendant Stone's upcoming trial.  Again he is Person 1 in the Mueller Indictment.

Defendant Stone is attempting to smear, defame, and discredit, tamper and threaten  Dr. Corsi so that when Dr. Corsi is called as a witness, the jurors will have a false impression of Dr. Corsi as a liar, perjurer, and alcoholic. This would, obviously, improperly and unethically benefit Defendant Stone. In fact, Defendant Stone's targeted efforts to defame, coerce, intimidate and threaten Dr. Corsi have resulted in a lawsuit filed in the U.S. District Court for the District of Columbia, which is attached hereto as <u>Exhibit A</u> and incorporated by reference.

Should this Court have any doubt as to Defendant Stone's improper motivations and already implemented and continuing designs to taint the jury venire, the content and article written by Sara Murray and Sam Fossum  titled, *Roger Stone, facing gag order, launches counterattack*, should put any such doubts to bed. <u>Exhibit B</u>. It is only one of many such analyses and accounts.  It is clear that Defendant Stone's strategy will be to use the media and publicity to argue his case and to try to get public sentiment on his side, as well as to tamper with witnesses like Dr. Corsi, which is exactly the type of conduct that LCrR 57.7 was meant to preclude.

Accordingly, Movant Dr. Corsi respectfully requests that this Court issue an order pursuant to LCrR 57.7(c) ordering Defendant Stone and his counsel from making statements to the media or in public settings that pose a substantial likelihood of material prejudice to this case and which in the context of Stone himself and in their ferocity also amount to witness tampering

and obstruction of justice. See Exbibit A – Corsi Complaint.

Dated: February 8, 2019                     Respectfully submitted,


                                            /s/ Larry Klayman
                                            Larry Klayman, Esq.
                                            K L A Y M A N  L A W  G R O U P, P A
                                            D.C. Bar No:  334581
                                            2020  Pennsylvania  Ave  NW  #800
                                            Washington, DC 20006
                                            Email: leklayman@gmail.com
                                            Tel: 310-595-0800

# [SUB]EXHIBIT A
Intentionally Omitted.
*See* Main Ex. 1

EXHIBIT B

# Roger Stone, facing gag order, launches counterattack

By Sara Murray and Sam Fossum, CNN

Updated 6:30 PM ET, Thu February 7, 2019

**Washington (CNN) —** In the days since a federal judge warned Roger Stone that he could soon face a gag order, Stone has peddled conspiracy theories, claimed he can't get a fair trial and criticized the judge.

"This is a lynching. This is a legal lynching of me," Stone said in a recent interview on the fringe right-wing website Infowars.

Stone was arrested last month in a pre-dawn raid and charged with obstruction of justice, making false statements and witness tampering as part of special counsel Robert Mueller's Russia investigation. On Friday, federal prosecutors and Stone's legal team are due to submit briefs on the merits of a gag order.

But rather than toning down his rhetoric, Stone appears to be abiding by the principles he espouses in his books. For instance, Stone's Rule #81: "Admit Nothing; Deny Everything; Launch Counterattack."

It's a dubious legal strategy.

"I would say that it's a terrible idea for Stone to be doing this," said CNN legal analyst Shan Wu. "I can't imagine a worse idea."

Judge Amy Berman Jackson informed Stone last week that she was considering a gag order. She was quick to put similar restrictions on former Trump campaign chairman Paul Manafort's case, which she is also presiding over in Washington. Jackson, an appointee of President Barack Obama, said she was cognizant of Stone's First Amendment right to free speech, but she wanted to protect his right to a fair trial and ensure it was possible to select an unbiased jury.

Stone's response, delivered via an Instagram post this week: "I will continue to defend myself unless an Obama appointed judge decides to suspend my first amendment rights." In another post, Stone exclaimed, "Fair Trial in DC? Impossible."

Stone, in his public diatribes, has claimed he is being targeted because he works for Infowars and supported Trump. And he has continued his long tradition of hyping fact-free conspiracy theories.

In one Instagram post, Stone is shaking hands William Binney, a former National Security Agency official who has turned into a vocal critic of the agency. "Bill Binney explained to me why the forensic evidence shows the DNC was never hacked by anyone including the Russians," Stone wrote.

US intelligence agencies have concluded Russian intelligence hacked the DNC and other top Democrats, and used platforms like WikiLeaks to disseminate the stolen material.

Stone concluded his post with a series of hashtags including "#sethrich."

Seth Rich was a Democratic National Committee staffer who was fatally shot in Washington in 2016. Police said evidence indicates Rich was the victim of a robbery gone wrong. But far-right activists and news organizations spread a conspiracy theory -- with no evidence -- that Rich was killed for leaking a trove of DNC emails to WikiLeaks.

Both Fox News and the Washington Times ended up retracting stories based on the murder-as-leaking-retribution conspiracy plot, but the lore has lived on, to the devastation of Rich's family.

As for Stone, he recently settled a lawsuit (unrelated to the Mueller probe) in which he admitted to making false statements on Infowars about a Chinese businessman and apologized for his commentary.

Stone's attorney and Mueller's office declined to comment.

Prior legal woes aside, Stone's eagerness to discuss his case publicly -- and in colorful fashion -- could make the judge more inclined to put a gag order on the case.

Stone and his attorneys have vowed to fight any such effort and are expected to make the case that Stone's livelihood depends on his ability to speak freely.

"I make a living writing and speaking," Stone argued in a recent Infowars appearance. "So they would be depriving me of making a living if I am entirely gagged."

Jackson appears to have anticipated that defense. In court last Friday, the judge said she was only considering limiting Stone's ability to talk about the case.

"He would still be free to discuss foreign relations, immigration or Tom Brady," Jackson said.

If she does crack down on public comments on the case, Stone's legal team could also appeal the move. Last year, Stone added First Amendment and constitutional law expert Bruce Rogow to his legal team.



rogerjs...
40.2k followers

View More on Instagram

Stone may have a solid legal premise for an appeal, Wu said, although most defendants consider it a risky move.

"Most defendants don't want to do that because they don't want to run afoul of the judge," Wu said. "He doesn't care."

Indeed, Stone is still racking up appearances and using nearly all of them to hammer the tactics used in the pre-dawn raid at his Florida home.

"This was a show of force, this was something you would expect from Nazi Germany or Soviet Russia. It was chilling," Stone told Infowars.

Stone has also compared the law enforcement presence the morning of his arrest to the forces deployed against drug lord Joaquín Guzmán, known as "El Chapo," and Osama bin Laden, the former al Qaeda leader who was killed by US Special Forces in a 2011 raid.

Stone's vocal complaints even sparked a response from ex-convict and former football star O.J. Simpson, who drew on his own experience with FBI raids, according to a video posted on celebrity news website TMZ.

"The FBI can be wrong," Simpson said, "But to try to compare to El Chapo and Bin Laden? Hey man, Bin Laden was carried out in a bag, not walked out in handcuffs."

Simpson's parting words for Stone: "Man up. Stop crying."

EXHIBIT 3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DR. JEROME CORSI, Individually
Denville, NJ, 07834

                 Plaintiff

              v.

ROGER STONE, Individually
4300 Bayview Drive
Fort Lauderdale, FL, 33308

                 Defendant.

**Case Number:**

**COMPLAINT**

## INTRODUCTION

Plaintiff, DR. JEROME CORSI ("Plaintiff" or "Corsi") hereby files this action against ROGER STONE ("Defendant Stone") for Defamation, Intentional Infliction of Emotional Distress and Assault

## JURISDICTION AND VENUE

1.     This Court has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

2.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2), (3) in that a substantial part of the events or omissions giving rise to Plaintiff Corsi's claims arose herein.

## THE PARTIES

3.     Plaintiff, Dr. Jerome Corsi, is an author and political commentator who publishes works in this judicial district and nationwide. Plaintiff Corsi is a citizen of New Jersey.

4.     Defendant, Roger Stone, is an individual and a citizen of Florida and a resident of

Fort Lauderdale, Florida. Defendant Stone was recently indicted by Special Counsel Robert Mueller as part of the alleged "Russian Collusion' investigation.  His address is 4300 Bayview Drive, Fort Lauderdale, FL, 33308

## **GENERAL ALLEGATIONS**

5.     Defendant Stone was recently indicted by Special Counsel Robert Mueller ("Mueller Indictment") as part of his "Russian Collusion" investigation for the alleged crimes of perjury, witness tampering and obstruction of justice. The indictment comprises seven different felony counts. *See* Exhibit 1 – Mueller Indictment. Importantly, Plaintiff Corsi was not accused of any wrongdoing or illegality in the Mueller Indictment, in which he named as Person 1, a material witness to the alleged crimes committed by Stone.

6.     Specifically, the seven count Mueller Indictment against Defendant Stone involves alleged lying under oath - that is, perjury - witness tampering and obstruction of justice by threatening to kill a material witness, Randy Credico ("Credico") and his dog if Credico did not lie to government authorities concerning his involvement with Roger Stone. Credico is Person 2 in the Mueller Indictment of Defendant Stone. *Id.* Person 1 in this Mueller Indictment is Plaintiff Corsi.

7.     Even before Defendant Stone was indicted, he began a public relations campaign in this district, nationally and internationally to smear, intimidate and threaten Plaintiff Corsi, a material witness in the "Russian Collusion" investigation.  Plaintiff Corsi is listed as Person 1 in the Mueller Indictment and was not indicted along with Defendant Stone, as he testified truthfully to the grand jury and in interviews.

8.     To the contrary, Plaintiff Corsi has never defamed or disparaged Defendant Stone.

9.     Defendant Stone knew that he was going to be indicted, and therefore began this

public relations campaign to smear, defame, intimidate and threaten Plaintiff Corsi, even before his actual indictment on January 25, 2019, in order to try to influence public opinion and Special Counsel Robert Mueller – by trying to attribute guilt to Plaintiff Corsi and not him - as well as to try to raise money for his legal defense. This pattern and practice of defaming, intimidating and threatening Plaintiff Corsi, and his legal counsel, is ongoing, so Plaintiff Corsi reserves the right to amend this Complaint.

10.     Defendant Stone likes to portray himself as Mafia, frequently making reference to Mafia figures who he admires, as well as other unsavory types who have been alleged to have engaged in unethical and/or illegal behavior. He frequently makes reference to his heroes being Hyman Roth in the 'Godfather," who was the movie version of Meyer Lansky, and Roy Cohn, not to mention, Richard Nixon, for his role in Watergate. In this regard, after Stone was indicted he held a press conference on the courthouse steps of the federal courthouse in Ft. Lauderdale, where he was booked, with his arms defiantly in the air in the "victory' pose used by Nixon after he resigned in disgrace as a result of the Watergate scandal. At the time, Stone had been employed by a Nixon group called CREEP, or the Committee to Reelect the President. Defendant Stone even has a large tattoo of Richard Nixon affixed to his back. Thus, given his admiration for persons such as these, particularly Mafia figures, his actions as pled herein can be taken as threats, as well as being defamatory. And, Plaintiff Corsi is 72 years old. Defendant Stone's intentional infliction of emotional distress and coercion and threats are intended to try even cause Plaintiff Corsi to have heart attacks and strokes, in order that Plaintiff will be unable to testify at Stone's criminal trial. Tellingly, Defendant Stone threatened kill a material witness and his dog, Credico, Person 2 in the Mueller Indictment, "Mafia style." Defendant Stone also fashions himself and indeed has the reputation, at a minimum, as being the preeminent "dirty

trickster." *See* "Get Me Roger Stone" on Netflix.

11. Plaintiff Corsi has been named as a material witness to Defendant Stone's upcoming prosecution, which has prompted Defendant Stone to try to intimidate, coerce and threaten Plaintiff Corsi by defaming him and threatening him with physical violence, which is ironically what he was criminally indicted for, in part.

12. By defaming Plaintiff Corsi, Defendant Stone is hoping to not only intimidate Plaintiff Corsi to severely harm and damage his reputation, but also to coerce and threaten Plaintiff Corsi to testify falsely if subpoenaed to be called as a material witness in Defendant Stone's ensuing criminal trial. He is also trying divert funds away from Plaintiff Corsi's legal defense fund, while boosting his own legal defense fund.

13. Defendant Stone has also used and continues to employ surrogates, either out in the open or secretly, to defame Plaintiff Corsi, such as his "friend" Michael Caputo, Alex Jones and J. Owen Stroyer of InfoWars, Cassandra Fairbanks, and reporter Chuck Ross of The Daily Caller, to name just a few. More surrogates will be identified during discovery and they may be joined, with leave of court to amend this Complaint, as defendants herein. The use of surrogates is consistent with Defendant Stone's reputation as a "dirty trickster" who works as well under "cover of darkness" to harm and damage others who he sees for whatever reason as adversaries, political or otherwise as in the case of Plaintiff Corsi. Plaintiff Corsi is not Defendant Stone's adversary, as he simply is committed as Person 1 in the Mueller Indictment to testify truthfully if subpoenaed to testify at Stone's criminal trial.

14. Defendant Stone is no stranger to defamation lawsuits. As reported by Splinter News, Defendant Stone was forced to - as part of a settlement in another defamation suit – apologize in newspapers and on social media for lying about Chinese Businessman Guo Wengui

on InfoWars, after having falsely published that Mr. Wengui is a "turncoat criminal who is convicted of crimes here and in China."[1]

15.     Defendant Stone has therefore engaged in illegal witness tampering and intimidation, in violation of 18 U.S.C. § 1512 by virtue of the defamatory and threatening acts and practices as alleged herein. Not coincidentally, this was what largely he was indicted for by Special Counsel Robert Mueller.

<u>DEFENDANT STONE'S DEFAMATORY STATEMENTS</u>

16.     Before Defendant Stone was indicted, on or about January 18, 2019, he appeared on InfoWars, where he made several false, misleading and defamatory statements in this district, nationally and internationally  regarding Plaintiff Corsi (the "InfoWars Video").[2] The same video was published on Defendant Stone's YouTube channel, "*Stone Cold Truth*," on January 18, 2019.[3]

17.     At 2:09 in the InfoWars Video, Defendant Stone falsely publishes that Plaintiff Corsi was "fired from World Net Daily."

18.     At 2:27 in the InfoWars Video, Defendant Stone falsely and misleadingly publishes that, "He (Corsi) was perfectly willing to lie, to perjure himself saying that a memo that he had wrote me was written on the 30th for the purposes of cover-up…. which is further proof that Jerry lied under oath."

19.     At 2:55 in the InfoWars Video, Defendant Stone falsely and misleadingly publishes, "and then states that I knew about John Podesta's emails being stolen in advance, the only proof of that is Jerry's feeble alcohol affected memory – it's a lie…."

---

[1] Sophie Weiner, *Roger Stone Lied About a Chinese Businessman on InfoWars and Now He Has to Tell Everyone*, Splinter News, Dec. 17, 2018, available at: https://splinternews.com/roger-stone-lied-about-a-chinese-businessman-on-infowar-1831162926
[2] https://www.infowars.com/watch/?video=5c3fbf24fe49383dcf6996e4
[3] https://www.youtube.com/watch?v=cJyfgdvtFx8

20.     At 3:35 in the InfoWars Video, Defendant Stone falsely and misleadingly publishes that "Jerry was prepared to stab a principle Trump supporter in the back, he was perfectly prepared to bear false witness against me, even though I had done nothing in my entire life other than help him."

21.     At 4:20 in the InfoWars Video, Defendant Stone falsely and misleadingly publishes that "all I ever did was show Jerry Corsi friendship and support and try to help him and his family and what I get is Judas Iscariot, the willingness to testify against me and help the deep state bury me….and then he makes up this story about helping me formulate a cover story."

22.     At 6:26 in the InfoWars Video, Defendant Stone falsely publishes that "you can always tell when Jerry Corsi is lying because his lips are moving…."

23.     Defendant Stone made these false, misleading and defamatory statements with malice and with full knowledge that they were false and misleading, and/or at a minimum, with a reckless disregard for its truthfulness. These statements falsely and misleadingly state that Plaintiff Corsi was fired from World Net Daily, that he committed perjury (a federal offense), and that he is an untruthful person.

24.     On January 2, 2019, Defendant Stone published an article on www.infowars.com titled "*ROGER STONE BELIEVES JEROME CORSI WORKS FOR MUELLER*[4]" in which Defendant Stone falsely, misleadingly, and maliciously writes, "Before you decide that Corsi is a hero you should be well aware of the fact that the good doctor was prepared to bear false witness against others in the Trump orbit if he thought it would save his own skin."

25.     Defendant Stone made these false, misleading and defamatory statements with malice and with full knowledge that they were false and misleading, and/or at a minimum, with a reckless disregard for its truthfulness. These statements falsely and misleadingly state that

---

[4] https://www.infowars.com/roger-stone-the-treachery-of-jerome-corsi/

Plaintiff Corsi committed perjury (a federal offense), and that he is an untruthful person.

26.    In another appearance on InfoWars, which was posted to YouTube[5] on January 17, 2019, Defendant Stone at 6:22 falsely and misleadingly publishes that "He [Corsi] was perfectly willing to bear false witness against me on multiple points that are complete fabrications."

27.    In another appearance on InfoWars, which was posted to YouTube[6] on January 24, 2019, Defendant Stone at 5:58 falsely and misleadingly publishes that "the good doctor [Corsi] has told a number of lies. In fact, he's starting to conflate his lies…. he was perfectly willing to lie about me…. but now lying about Alex Jones, lying about InfoWars, lying about Dr. Jones, who's one of the nicest, gentlest, sweetest, most honest men I have ever met, it's beyond the pale…. Jerry Corsi can no longer be believed."

28.    In the same appearance, Defendant Stone at 8:34 falsely and misleadingly publishes that, "I think you've [Corsi] been deep state from the beginning. Your whole birther thing is used as a club to destroy conservatives….I look forward to our confrontation. I will demolish you. You're a fraudster, out of your alcoholic haze you have made up lies about David Jones and Alex Jones and Roger Stone and now I suspect they want you to lie about the President." This is clearly a threat, as well as being defamatory. It is akin to the threats against Person 2 in the Mueller Indictment, Randy Credico, who Defendant Stone, as set forth in the Mueller Indictment, based on Stone's own words contained in his own documentary evidence, threatened kill along with Credico's dog.

29.    Defendant Stone made these false, misleading and defamatory statements with malice and with full knowledge that they were false and misleading, and/or at a minimum, with a

---

[5] https://www.youtube.com/watch?v=GJd8YBDvm1Q
[6] https://www.youtube.com/watch?v=fXUlJZRxe6E

reckless disregard for their truthfulness. These statements falsely and misleadingly state that Plaintiff Corsi committed perjury (a federal offense), is an untruthful person, and is an alcoholic. They also contain threats against Plaintiff Corsi.

**FIRST CAUSE OF ACTION**
*Defamation*

30.     Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

31.     Defendant Stone published malicious, false, misleading and defamatory statements of and concerning Plaintiff Corsi in this judicial district, nationwide, and worldwide.

32.     These false and misleading statements were published with malice, as Defendant Stone knew that they were false and misleading, or at a minimum acted with a reckless disregard for the truth.

33.     Plaintiff Corsi has been severely harmed and damaged by these false and misleading statements because they subjected him to hatred, distrust, ridicule, contempt, and disgrace.

34.     Plaintiff Corsi has been damaged by these false and misleading statements because they injured Plaintiff Corsi in his profession and business as a journalist and author, whose credibility is the most important trait, as well as severely injured and damaged him personally.

**SECOND CAUSE OF ACTION**
*Defamation Per Se*

35.     Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

36.     Defendant Stone, as alleged herein, published numerous false, misleading and

8

defamatory statements to severely harm and damage Plaintiff Corsi, which were republished elsewhere, and through surrogates, which publish the falsity that Plaintiff Corsi has committed crimes, including perjury, and engaged in moral turpitude in the form of alcoholism, as set forth in the preceding paragraphs.

37.     These false, misleading and defamatory statements were published in this district and on the internet and elsewhere, domestically and for the entire world to see and hear and specifically Stone published false and misleading facts, *inter alia*, that Plaintiff's conduct, characteristics or a condition is incompatible with the proper exercise of his lawful business, trade, profession or office.

38.     These false and misleading statements were published with malice, as Defendant Stone knew that they were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

39.     This statements are *per se* defamatory because they falsely and misleadingly publish that Plaintiff Corsi committed perjury, which is a federal offense and felony. Defamation *per se* gives rise to the presumption that severe harm and damage has arisen by virtue of the false and misleading statements.

40.     These false, misleading, and defamatory statements are defamatory *per se* and these false and misleading statements severely harmed and damaged Plaintiff Corsi in his profession and business as a journalist and author, whose credibility is the most important trait, as well as personally.

### **THIRD CAUSE OF ACTION**
### *Defamation by Implication*

41.     Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

42.     Defendant Stone published numerous false, misleading and defamatory statements about Plaintiff Corsi, as set forth in the preceding paragraphs.

43.     These false, misleading and defamatory statements were published on the internet and published and republished elsewhere in this district, domestically and for the entire world to see and hear.

44.     These false and misleading statements were published with malice, as Defendant Stone knew that they were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

45.     These statements created the false and misleading implication that Plaintiff Corsi is dishonest, committed perjury and is an alcoholic, among other false and misleading statements as pled in the preceding paragraphs.

46.     Plaintiff Corsi has been severely harmed and damaged by these false and misleading statements because they subject him to hatred, distrust, ridicule, contempt, and disgrace.

47.     Plaintiff Corsi has been damaged by these false and misleading statements because the statements severely harmed and damaged Plaintiff Corsi in his profession as a journalist and author, whose credibility is the most important trait, as well as personally.

### FOURTH CAUSE OF ACTION
#### *Intentional Infliction of Emotional Distress*

48.     Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

49.     Defendant Stone engaged in extreme and outrageous conduct by threatening Plaintiff Corsi, in concert with Stone, who has made death threats to at least one witness involved in Special Counsel Mueller's Russian collusion investigation, Person 2 Randy Credico.

50.     Defendant Stone knowingly and intentionally threatened Plaintiff Corsi, in a manner similar to other death threats he made to at least one material witness, involved in Special Counsel Mueller's Russian collusion investigation, such as Randy Credico, Person 2 in the Mueller Indictment.

51.     Defendant Stone's extreme and outrageous conduct directly caused Plaintiff Corsi severe emotional distress and resulting severe harm and damage.

## FIFTH CAUSE OF ACTION
### *Assault*

52.     Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

53.     Defendant Stone placed Plaintiff Corsi in apprehension of an imminent harmful or offensive contact and physical harm and death, by coercing and threatening Plaintiff Corsi, in a similar manner he has used to make death threats to at least one material witness involved in Special Counsel Mueller's Russian collusion investigation, such as Person 2 in the Mueller Indictment, Randy Credico.

54.     The threats issued by Defendant Stone are credible, as he portrays himself as a "mafia" figure, as set forth above.

55.     Plaintiff Corsi did not consent to Defendant Stone' conduct.

56.     As a direct and proximate result of Defendant Stone's wrongful conduct, Plaintiff Corsi suffered conscious pain, suffering, severe emotional distress and the fear of imminent serious bodily injury or death, and other mental and physical injuries, and Plaintiff was severely harmed and damaged thereby.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Dr. Jerome Corsi prays for judgment against Defendant Stone as

follows:

a.       Awarding Plaintiff Corsi compensatory including actual, consequential, incidental and punitive damages for malicious tortious conduct in an amount to be determined at trial and in excess of $25, 000,000 U.S. Dollars. While Stone feigns being financially destitute as a result of his legal problems and uses this to raise money for his legal defense fund, on information and belief he is wealthy, perhaps hiding his wealth in overseas bank accounts.

b.       Awarding Plaintiff Corsi attorney's fees and costs.

c.       Granting any further relief as the Court deems appropriate including preliminary and permanent injunctive relief, as well as the entry of a gag order against Defendant Stone in his criminal prosecution before this Court in order that he be prevented from intimidating, coercing and threatening material witnesses, such as Plaintiff Corsi, who are likely to be subpoenaed to testify at his trial. In this regard, Plaintiff Corsi will also, with leave of court requested, file an amicus brief arguing for a gag order on Defendant Stone in the related criminal case *United States of America v. Stone*, 19-cr-18 (D.D.C).

Dated: February 7, 2019                                      Respectfully Submitted,


                                                                         */s/ Larry Klayman*
                                                                    Larry Klayman, Esq.
                                                                    KLAYMAN LAW GROUP, P.A.
                                                                    D.C.  Bar Number: 334581
                                                                    2020 Pennsylvania Ave NW #800
                                                                    Washington, DC, 20006
                                                                    Telephone:  (310)-595-0800
                                                                    Email: leklayman@gmail.com
                                                                    *Counsel for Plaintiff*

# [SUB]EXHIBIT 1
Intentionally Omitted. *See* Main Ex. 1

EXHIBIT 4

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

LARRY KLAYMAN, Individually

        Plaintiff

v.

ROGER STONE, Individually

        Defendant.

**Case Number:**

## COMPLAINT FOR DEFAMATION

Plaintiff, LARRY KLAYMAN ("Plaintiff" or "Klayman") hereby files this action against

ROGER STONE ("Defendant Stone") for Defamation, Defamation Per Se, and Defamation by

Implication.

### JURISDICTION AND VENUE

1.    This is an action for Defamation and damages in excessive of $15,000.00,

exclusive of interest, costs and attorney's fees.

2.    Venue for this action is properly in Broward County, Florida, as Defendant Stone

is a resident of this county and judicial district and a citizen of Florida and the cause of actions

arose in this country and circuit.

### THE PARTIES

3.    Plaintiff, Larry Klayman, is an attorney and public interest advocate who practices

in this circuit and nationally.

4.    Defendant, Roger Stone, is an individual and a citizen of Florida and a resident of

Fort Lauderdale, Florida. Defendant Stone was recently indicted by Special Counsel Robert Mueller

as part of the alleged "Russian Collusion' investigation.  His address is 4300 Bayview Drive, Fort

1

Lauderdale, FL, 33308

## **GENERAL ALLEGATIONS**

5.     Defendant Stone was recently indicted by Special Counsel Robert Mueller ("Mueller Indictment") as part of his "Russian Collusion" investigation for the alleged crimes of perjury, witness tampering and obstruction of justice. The indictment comprises seven different felony counts. *See* Exhibit 1 – Mueller Indictment.

6.     Specifically, the seven count Mueller Indictment against Defendant Stone involves alleged lying under oath - that is, perjury - witness tampering and obstruction of justice by threatening to kill a material witness, Randy Credico ("Credico") and his dog if Credico did not lie to government authorities concerning his involvement with Roger Stone. Credico is Person 2 in the Mueller Indictment of Defendant Stone. *Id.* Person 1 in this Mueller Indictment is Dr. Jerome Corsi, another material witness, who is Plaintiff Larry Klayman's client.

7.     Even before Defendant Stone was indicted, he began a public relations campaign in this circuit and nationally to smear and intimidate Dr. Jerome Corsi ("Dr. Corsi"), a material witness in the "Russian Collusion" investigation, and who is being represented by Plaintiff Klayman.  Dr. Corsi is listed as Person 1 in the Mueller Indictment and was not indicted along with Defendant Stone, as he testified truthfully to the grand jury.

8.     Defendant Stone knew that he was going to be indicted, and therefore began this public relations campaign to smear and defame Dr. Corsi and his lawyer, Larry Klayman, even before his actual indictment on January 25, 2019, in order to try to influence public opinion and Special Counsel Robert Mueller – by trying to attribute guilt to Dr. Corsi and not him - as well as to try to raise money for his legal defense. This pattern and practice of defaming Dr. Corsi and his lawyer Larry Klayman is ongoing, so Plaintiff reserves the right to amend this Complaint.

9.     Defendant Stone likes to portray himself as Mafia, frequently making reference to Mafia figures who he admires, as well as other unsavory types who have been alleged to have engaged in unethical and/or illegal behavior.  He frequently makes reference to his heroes being Hyman Roth in the 'Godfather," who was the movie version of Meyer Lansky, and Roy Cohn, not to mention, Richard Nixon, for his role in Watergate. In this regard, after Stone was indicted he held a press conference on the courthouse steps of the federal courthouse in Ft. Lauderdale, where he was booked, with his arms in the air in the victory pose used by Nixon after he resigned in disgrace as a result of the Watergate scandal. At the time, Stone had been employed by a Nixon group called CREEP, or the Committee to Reelect the President.  Defendant Stone even has a large tattoo of Richard Nixon affixed to his back. Thus, given his admiration for persons such as these, particularly Mafia figures, his actions as pled herein can be taken as threats, as well as being defamatory. Tellingly, Defendant Stone threatened kill a material witness and his dog, Credico, Person 2 in the Mueller Indictment, "Mafia style."  Defendant Stone also fashions himself and indeed has the reputation as being the preeminent "dirty trickster." *See* "Get Me Roger Stone" on Netflix.

10.     Dr. Corsi has been named as a material witness to Defendant Stone's upcoming prosecution, which has prompted Defendant Stone to try to intimidate, coerce and threaten Dr. Corsi by defaming him and his defense counsel, Plaintiff Klayman, which is ironically what he was criminally indicted for, in part. And, the way to also get to Dr. Corsi is for Defendant Stone to also defame his lawyer, Plaintiff Larry Klayman.

11.     By defaming Dr. Corsi and Plaintiff Klayman, he is hoping to not only intimidate Dr. Corsi and his counsel to severely harm and damage their reputations, but also to coerce and threaten Dr. Corsi to testify falsely if subpoenaed to be called as a material witness in Defendant

Stone's ensuing criminal trial. He is also trying divert funds away from Dr. Corsi's legal defense fund, while boosting his own legal defense fund.

12.     Defendant Stone has also used and continues to employ surrogates, either out in the open or secretly, to defame Plaintiff Klayman and his client Dr. Corsi, such as his "friend" Michael Caputo.

13.     Before Defendant Stone was indicted, on or about January 18, 2019, he appeared on InfoWars, where he made several false, misleading and defamatory statements in this circuit and nationally regarding Plaintiff Klayman (the "InfoWars Video").[1] The same video was published on Defendant Stone's YouTube channel, "*Stone Cold Truth*," on January 18, 2019.[2]

14.     Defendant Stone also previously published on March 22, 2017 a video on YouTube titled "Beware Larry Klayman" through his channel which defames Plaintiff Klayman (the "YouTube Video").[3]

15.     Defendant Stone is no stranger to defamation lawsuits. As reported by Splinter News, Defendant Stone was forced to - as part of a settlement in another defamation suit – apologize in newspapers and on social media for lying about Chinese Businessman Guo Wengui on InfoWars, after having falsely published that Mr. Wengui is a "turncoat criminal who is convicted of crimes here and in China."[4]

<u>FALSE STATEMENTS CONTAINED IN THE INFOWARS VIDEO</u>

16.     At 1:25, Defendant Stone says, "He's (Klayman) never actually won a courtroom victory in his life."

---

[1] https://www.infowars.com/watch/?video=5c3fbf24fe49383dcf6996e4
[2] https://www.youtube.com/watch?v=cJyfgdvtFx8
[3] https://www.youtube.com/watch?v=2K10SITy8JU&feature=youtu.be
[4] Sophie Weiner, *Roger Stone Lied About a Chinese Businessman on InfoWars and Now He Has to Tell Everyone*, Splinter News, Dec. 17, 2018, available at: https://splinternews.com/roger-stone-lied-about-a-chinese-businessman-on-infowar-1831162926

17.     Defendant Stone made this false and misleading, defamatory statement of fact with malice and/or full knowledge that it was false, or at a minimum with reckless disregard for its truth. Plaintiff Klayman has won numerous courtroom and other legal victories in his life.

18.     At 1:30, Defendant Stone publishes, "He (Klayman) was ousted at Judicial Watch. Ask Tom Fitton [the current president of Judicial Watch] why he left. He was 'ousted' because of a 'sexual harassment complaint.'"

19.     Defendant Stone made this false, misleading and defamatory statement with malice and with full knowledge that it was false and misleading, and/or at a minimum, with a reckless disregard for its truthfulness. Defendant Stone is working in concert with Thomas Fitton ("Fitton") – whose public interest organization Judicial Watch already been hit with a jury verdict and judgment for maliciously defaming Plaintiff Klayman in the U.S. District Court for the Southern District of Florida for $181,000 in compensatory and punitive damages (*Klayman v. Judicial Watch, Inc.*, 13-cv-20610 (S.D. FL.) – to defame and discredit Plaintiff Klayman and Dr. Corsi in order to falsely attempt to justify and deflect from his indictment in the "Russian Collusion" investigation, among other improper and illegal reasons and actions as alleged herein.

20.     In actuality and truth, Plaintiff Klayman left Judicial Watch on his own accord in order to run for U.S. Senate in Florida in 2003-2004.

21.     At 1:37, Defendant Stone says, "He's (Klayman) incompetent, he's a numbskull, he's an idiot, he's an egomaniac, and he could be the single worst lawyer in America. With him as Jerry Corsi's lawyer, Corsi may get the electric chair. So your idea that he's a good guy is entirely wrong"

22.     Defendant Stone made this false, misleading and defamatory statement of fact with malice with full knowledge that it was false, and/or at a minimum with reckless disregard

for its truth. This false statement of fact creates the false and misleading published factual statement and implication that Plaintiff Klayman is unqualified to be an attorney, pubic advocate and defames him personally.

23.     In actuality, Plaintiff Klayman has been a practicing attorney for nearly four decades, and has won numerous cases on behalf of his clients and also against the government for constitutional and other violations.

24.     At 2:01, Defendant Stone also published that Plaintiff Klayman is a "piece of garbage."

25.     Defendant Stone made this false and misleading defamatory statement of fact with malice and full knowledge that it was misleading and false, and/or at a minimum with reckless disregard for its truth. This false and misleading statement of fact creates the false and misleading implication that Plaintiff Klayman is unqualified to be an attorney, public advocate and is a bad and loathsome person.

26.     At 4:11. Defendant Stone says, "For those people out there who think…that Larry Klayman's IQ is higher than 70, you're wrong…"

27.     Defendant Stone made this false, misleading and defamatory statement of fact with malice and full knowledge that it was false, or at a minimum with reckless disregard for its truth. This false statement of fact creates the false implication that Plaintiff Klayman is unqualified to be an attorney, is mentally retarded and is an unintelligent, bad, and loathsome person.

FALSE STATEMENTS CONTAINED IN THE YOUTUBE VIDEO

28.     At 0:45 in the YouTube Video, Defendant Stone says, "Now comes gadfly right-wing lawyer, Larry Klayman, to say that Alex Jones and InfoWars have violated the law in their

6

release of classified documents and will be prosecuted."

29.     Defendant Stone made this false, misleading and defamatory statement of fact with malice and full knowledge that it was false, and/or at a minimum with reckless disregard for its truth. This false and misleading statement of fact creates the false implication that Plaintiff Klayman is unqualified to be an attorney and public advocate and a bad and loathsome person.

30.     At 1:00 in the YouTube Video, Defendant Stone says, "To be clear Larry Klayman is a moron. He has never won a case in court in his life. He may have won a few motions. He is a lightweight. He is a know-nothing…."

31.     Defendant Stone made this false, misleading defamatory statement of fact with malice and with full knowledge that it was false, and/or at a minimum with reckless disregard for its truth. Ironically, Plaintiff Klayman won a defamation judgment against Fitton and Judicial Watch – with whom Defendant Stone is working in concert to again defame Plaintiff - in the Southern District of Florida, as set forth above, and has had many other courtroom and other legal victories.

<u>COUNT I – DEFAMATION</u>

32.     Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

33.     Defendant Stone published numerous false, misleading and defamatory statements to severely harm and damage Plaintiff Klayman in both the InfoWars Video and the YouTube Video which include, but are not limited to, that (1) Plaintiff Klayman was ousted at Judicial Watch due to a sexual harassment complaint, and (2) Plaintiff Klayman has never won a courtroom victory in his life, as well as the other false and misleading statements set forth in this Complaint.

34.     These false, misleading and defamatory statements were published on the internet and republished elsewhere for persons in this circuit and the entire world see and hear.

35.     These false, misleading and defamatory statements were published with malice, as Defendant Stone knew that they were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

36.     Plaintiff Klayman has been severely harmed and damaged by these false and misleading statements because they subject him to hatred, distrust, ridicule, contempt, and disgrace.

37.     Plaintiff Klayman has been severely harmed and damaged by these false and misleading statements because the statements injured Plaintiff Klayman in his profession and business as a lawyer and public advocate, as well as personally.

<u>COUNT II – DEFAMATION PER SE</u>

38.     Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

39.     Defendant Stone, as alleged herein, published numerous false, misleading and defamatory statements to severely harm and damage Plaintiff Klayman in both the InfoWars Video and the YouTube Video, which were republished elsewhere, that publish the falsity that Plaintiff Klayman has committed crimes and engaged in moral turpitude, as set forth in the preceding paragraphs.

40.     Under Florida Law, "it is established…that an oral communication is actionable per se - that is, without a showing of special damage - if it imputes to another (a) a criminal offense amounting to a felony, or (b) a presently existing venereal or other loathsome and communicable disease, or (c) conduct, characteristics or a condition incompatible with the

8

proper exercise *of his lawful business*, trade, profession or office, or (d) the other being a woman, acts of unchastity." *Wolfson v. Kirk*, 273 So. 2d 774, 777 (Fla. Dist. Ct. App. 1973)

41.     These false, misleading and defamatory statements were published in this circuit and on the internet for the entire world to see and hear and specifically publish false and misleading facts, *inter alia*, that Plaintiff's conduct, characteristics or a condition is incompatible with the proper exercise of his lawful business, trade, profession or office.

42.     These false and misleading statements were published with malice, as Defendant Stone knew that they were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

43.     This statements are *per se* defamatory because they falsely accuse Plaintiff Klayman of sexual harassment and a related complaint - thereby falsely imputing a criminal offense upon Plaintiff Klayman - and him being "ousted" as the chairman and general counsel of Judicial Watch over this, as well as the other false and misleading published statements alleged herein.

44.     These false, misleading, and defamatory statements are defamatory *per se* because these false and misleading statements severely harmed and damaged Plaintiff Klayman in his profession and business as a lawyer and advocate, as they concern conduct and characteristics incompatible with being a lawyer.  Damage is presumed by law when defamation *per se* is proven.

## COUNT III – DEFAMATION BY IMPLICATION

45.     Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

46.     Defendant Stone published numerous false, misleading and defamatory

statements about Plaintiff Klayman in both the InfoWars Video and the YouTube Video, as set forth in the preceding paragraphs.

47.     These false, misleading and defamatory statements were published on the internet and published and republished elsewhere in this circuit for the entire world to see and hear.

48.     These false and misleading statements were published with malice, as Defendant Stone knew that they were false and misleading, and/or at a minimum acted with a reckless disregard for the truth.

49.     These statements created the false and misleading implication that Plaintiff Klayman has been the subject of a sexual harassment complaint and committed criminal sexual offenses, among other false and misleading statements as pled in the preceding paragraphs.

50.     Plaintiff Klayman has been severely harmed and damaged by these false and misleading statements because they subject him to hatred, distrust, ridicule, contempt, and disgrace.

51.     Plaintiff Klayman has been damaged by these false and misleading statements because the statements severely harmed and damaged Plaintiff Klayman in his profession and business as a public advocate and personally, as pled herein.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Larry Klayman prays for judgment against Defendant Stone as follows:

a.     Awarding Plaintiff Klayman compensatory and actual including consequential and incidental damages in excess of $ 35,000,000 million U.S. Dollars.

b.     Awarding Plaintiff Klayman attorney's fees and costs.

c.     Granting any further relief as the Court deems appropriate including preliminary and

permanent injunctive relief, as well as leave to later amend to add a claim for punitive damages pursuant to Section 768.72 of the Florida Statutes. When amended, Plaintiff Klayman will plead for punitive damages in excess of $40, 000,000 U.S. Dollars. On information and belief Defendant Stone is wealthy and has various hidden bank accounts overseas, in addition to assets in this circuit and domestically.

Dated: February 5, 2019                                 Respectfully Submitted,

                                                          ___/s/ Larry Klayman___
                                                          Larry Klayman, Esq.
                                                          2020 Pennsylvania Ave NW #800
                                                          Washington, DC, 20006
                                                          Telephone:  (310)-595-0800
                                                          Email: leklayman@gmail.com
                                                          *Plaintiff Pro Se*

# [SUB]EXHIBIT 1
Intentionally Omitted. *See* Main Ex. 1

EXHIBIT 5

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF FLORIDA

LARRY KLAYMAN, Individually

        Plaintiff

    v.

THOMAS J. FITTON, Individually

        Defendant.

**Case Number:**

## COMPLAINT FOR DEFAMATION

Plaintiff, LARRY KLAYMAN ("Plaintiff" or "Klayman") hereby files this action against THOMAS J. FITTON ("Defendant Fitton") for Defamation, Defamation Per Se, and Defamation by Implication.

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 under diversity of citizenship. The parties are citizens of different states and the amount in controversy exceeds $75,000.

2.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) as this is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

## THE PARTIES

3.      Plaintiff, Larry Klayman, is an individual and a citizen of Florida. Plaintiff is a well-known private lawyer and conservative public interest advocate and litigator, as well as a syndicated national radio talk show host on Radio America, his weekly show appropriately titled "Special Prosecutor with Larry Klayman."  Plaintiff Klayman conceived of and founded both Judicial Watch, Inc. and Freedom Watch, Inc. He is a former federal prosecutor of the Antitrust

1

Division of the U.S. Department of Justice, where he was on the trial team that broke up the AT&T monopoly.

4.      Defendant, Thomas Fitton, is an individual and a citizen of the District of Columbia, whose address is 5245 42nd St NW, Washington, DC 20015. Defendant Fitton is the current President of Judicial Watch, which was conceived of and founded by Plaintiff Klayman.  He is not a lawyer and at the time that Klayman left Judicial Watch on September 19, 2003 to run for the U.S. Senate in Florida, Defendant Fitton had not graduated from college. When Plaintiff Klayman hired him years earlier as an assistant, he lied to Klayman that he had graduated from George Washington University. Since then Defendant Fitton has had a book written for him by "ghost writer," Ben Shapiro, effectively claiming credit for Plaintiff Klayman's accomplishments in conceiving of, founding and running Judicial Watch for almost ten (10) years. Plaintiff Klayman was thus conspicuously and maliciously written out of the history of Judicial Watch. The book is titled "Corruption Chronicles" and remains on sale on the internet and in book stores. Defendant Fitton has also falsely testified multiple times under oath that he does not know who founded Judicial Watch, as he continues to try to spread the false narrative and impression he or someone other than Klayman founded Judicial Watch, in order to boost his own standing in the conservative community and elsewhere, as the expense of Plaintiff Klayman. In short, and regrettably Defendant Fitton, as set forth below, is a 'serial liar" and dishonest.

## STANDING

5.      Plaintiff has standing to bring this action because he has been directly affected and victimized by the unlawful conduct complained herein. His injuries are proximately related to the conduct of Defendant Fitton, individually and working in concert with Roger Stone as set forth below.

## FACTS

6.     Defendant Fitton has engaged in a pattern and practice of defaming Plaintiff Klayman since Plaintiff's voluntary departure from Judicial Watch, Inc. to run for the U.S. Senate in Florida in 2003-2004.

7.     For instance, in 2013, a federal jury in the Southern District of Florida awarded Plaintiff Klayman judgment in the sum of $181,000, including punitive damages against Judicial Watch for having maliciously defamed Plaintiff.   See Exhibit 1 – Jury Verdict and Judgment. This jury verdict and judgment is final.

8.     Defendant Fitton is now conveniently and incredibly working with Roger Stone ("Stone") to again defame Plaintiff Klayman.

9.     Stone was recently indicted on seven (7) felony counts by Special Counsel Robert Mueller ("Mueller Indictment") as part of his "Russian Collusion" investigation for the alleged crimes of perjury, witness tampering and obstruction of justice.   See Exhibit 2 – Mueller Indictment.

10.     Specifically, the seven count Mueller Indictment against Defendant Stone involves alleged lying under oath - that is, perjury - witness tampering and obstruction of justice by threatening to kill a material witness, Randy Credico ("Credico") and his dog if Credico did not lie to government authorities concerning his involvement with Roger Stone. Credico is Person 2 in the Mueller Indictment of Defendant Stone. *Id.* Person 1 in this Mueller Indictment is Dr. Jerome Corsi, another material witness, who is Plaintiff Larry Klayman's client.

11.     Stone has since engaged in a public relations campaign to illegally smear, intimidate, coerce and threaten Dr. Jerome Corsi ("Dr. Corsi"), a witness in the "Russian Collusion" investigation, and who is being legally represented by Plaintiff Klayman.

12.     Stone knew that he was going to be indicted, and therefore began this illegal public relations campaign to smear and defame Dr. Corsi and his lawyer, Larry Klayman, even before his actual indictment on January 25, 2019, in order to try to influence public opinion and Special Counsel Robert Mueller – by illegally trying to attribute guilt to Dr. Corsi and not him - as well as to try to raise money for his legal defense. This pattern and practice of defaming Dr. Corsi and his lawyer Larry Klayman is ongoing, so Plaintiff reserves the right to amend this Complaint. Stone has recently been sued by Dr. Corsi for defamation, intentional infliction of emotional distress and assault.

13.     Dr. Corsi has been named as a material witness to Stone's upcoming prosecution, which has prompted Stone to try to intimidate, coerce and threaten Dr. Corsi by defaming him and his defense counsel, Plaintiff Klayman, which is ironically what he has been indicted for. And, the way to also "get to" Dr. Corsi is for Defendant Stone to also defame his lawyer, Plaintiff Larry Klayman

14.     By defaming Dr. Corsi and Plaintiff Klayman, Defendant Fitton and Stone are working in concert as joint tortfeasors hoping to not only intimidate Dr. Corsi and his counsel to severely harm and damage their reputations, but also to coerce and threaten Dr. Corsi to testify falsely if subpoenaed to be called as a material witness in Defendant Stone's ensuing criminal trial, as well as to impede and harm Dr. Corsi's criminal defense. They are also acting in concert to divert funds away from Dr. Corsi's legal defense fund, while boosting Stone's legal defense fund.

15.     Before Defendant was indicted, on or about January 18, 2019, he appeared on InfoWars, where he made several false, misleading and defamatory statements in this district,

nationally and internationally regarding Plaintiff Klayman (the "InfoWars Video").[1] The same video was published on Defendant Stone's YouTube channel, "*Stone Cold Truth*," on January 18, 2019.[2]

16.     At 1:30, Stone published, "He (Klayman) was ousted at Judicial Watch. Ask Tom Fitton [the current president of Judicial Watch] why he left. He left because of a sexual harassment complaint."

17.     Stone made this false, defamatory statement at the direction of Defendant Fitton, whom he attributes this false and defamatory statement to.

18.     Defendant Fitton knew that Plaintiff Klayman was not ousted at Judicial Watch as a result of a sexual harassment complaint, but, in actuality, Plaintiff Klayman left Judicial Watch on his own accord and voluntarily in order to run for U.S. Senate in Florida.

19.     Defendant Fitton with malice and/or a reckless disregard for the truth knew that Plaintiff Klayman did not leave Judicial Watch as a result of a sexual harassment complaint.

20.     Defendant Fitton knowingly published this false and defamatory statement to Stone, who in turn republished it during interviews which were broadcast by him and his surrogates in this district, nationally and internationally for the entire world to hear and see. On information and belief Fitton has also recently published, within the last two years up to the present, this and other false and misleading statements to others to severely harm and damage Plaintiff Klayman, such as to the Council for National Policy, the American Conservative Union, the Scaife Foundation, other conservative organizations, groups and donors, and media publications and television networks such as Fox News, to name just a few. As a non-lawyer who currently runs Judicial Watch, Defendant Fitton feels competitive with Klayman, and as

---

[1] https://www.infowars.com/watch/?video=5c3fbf24fe49383dcf6996e4
[2] https://www.youtube.com/watch?v=cJyfgdvtFx8

result of what in effect is an "inferiority complex" since he is a non-lawyer who tries to pass himself in the media off as a lawyer and legal expert as the current head of Judicial Watch, thus has engaged in a concerted campaign to severely damage and harm Klayman's reputation, professional and personal reputation, and family. By severely harming Plaintiff Klayman's reputation and standing in the legal, media and related communities, Defendant Stone's malicious intent is to boost his own reputation and standing at the expense of Klayman, who conceived of, founded and successfully ran Judicial Watch for nearly ten (10) years, making it the preeminent conservative public interest group fighting against corruption and for ethics and justice in government and the legal profession.

21.     Defendant Fitton, in concert with Stone, have therefore also engaged in illegal witness tampering of Dr. Corsi and his lawyer Plaintiff Klayman in violation of 18 U.S.C. § 1512 by virtue of the defamatory acts and practices as alleged herein.

## **FIRST CAUSE OF ACTION**
### *Defamation*

22.     Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

23.     Defendant Fitton published the malicious, false and defamatory statement that Plaintiff Klayman was ousted at Judicial Watch due to a sexual harassment complaint to Stone, who in turn, and in concert with Defendant Fitton, republished this false and defamatory statement on the internet domestically, internationally and elsewhere for the entire world to see and hear.

24.     This false and misleading statement was published with malice, as Defendant Fitton knew that it was false and misleading, or at a minimum acted with a reckless disregard for the truth.

25.     Plaintiff Klayman has been severely harmed and damaged by this and other false and misleading statements, more of which will be uncovered in discovery, because it subjected him to hatred, distrust, ridicule, contempt, and disgrace.

26.     Plaintiff Klayman has been severely damaged by this false and misleading statement because the malicious statement injured Plaintiff Klayman in his profession and business as a public interest and private lawyer and nationally syndicated radio talk show host who promotes ethics in government and the legal profession, as well as personally.

## SECOND CAUSE OF ACTION
### *Defamation Per Se*

27.     Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint.

28.     Defendant Fitton published to Stone the malicious false, misleading and defamatory statement that Plaintiff Klayman was ousted at Judicial Watch due to a sexual harassment complaint, who in turn, and in concert with Defendant Fitton, republished this malicious false and defamatory statement on the internet in this district, domestically and internationally and elsewhere for the entire world to see and hear.

29.     Under Florida Law, "it is established…that an oral communication is actionable per se - that is, without a showing of special damage - if it imputes to another (a) a criminal offense amounting to a felony, or (b) a presently existing venereal or other loathsome and communicable disease, or (c) conduct, characteristics or a condition incompatible with the proper exercise *of his lawful business*, trade, profession or office, or (d) the other being a woman, acts of unchastity." *Wolfson v. Kirk*, 273 So. 2d 774, 777 (Fla. Dist. Ct. App. 1973).

30.     This false and misleading statement was published with malice, as Defendant Fitton knew that it was false and misleading, or at a minimum acted with a reckless disregard for

the truth.

31.     This malicious false, misleading and defamatory statement was published on the internet in this district, domestically and internationally for the entire world to see and hear and specifically Defendant Fitton published these malicious false and misleading "facts," *inter alia*, that Plaintiff's conduct, characteristics or a condition is incompatible with the proper exercise of his lawful business, trade, profession or office

32.     This malicious false and misleading statement is *per se* defamatory because it falsely accuses Plaintiff Klayman of being ousted from Judicial Watch because of sexual harassment - thereby falsely imputing a criminal and sexually related offense upon Plaintiff Klayman – as well as being "ousted" as the chairman and general counsel of Judicial Watch because of an actual sexual harassment complaint, as well as the other false and misleading published statements alleged herein. To the contrary, on information and belief Fitton himself hypocritically had and may continue to have an "intimate personal relationship" with another director and member of the board of Judicial Watch, Paul Orfanedes, which on information and belief may constitute sexual harassment, as Defendant Fitton is Orfanedes' superior as a result of Fitton being the president of Judicial Watch. Defendant Fitton also sits on the board of directors along with Orfanedes, one of only three (3) directors, all of whom are also employed by Judicial Watch. By maliciously defaming Plaintiff Klayman, Defendant Fitton intended and intends to deflect attention away from his issues, vulnerabilities and conduct.

33.     This false, misleading, and defamatory statement concerning Plaintiff Klayman is defamatory *per se* and this false and misleading statement, and others which will be uncovered in discovery, severely harmed and damaged Plaintiff Klayman in his profession and business as a lawyer and advocate and as a nationally syndicated radio talk show host, as they concern conduct

and characteristics incompatible with being a lawyer and radio talk show host who promotes ethics in government and the legal profession. Damage is presumed by law when defamation *per se* is shown.

### THIRD CAUSE OF ACTION
#### *Defamation by Implication*

34. Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

35. Defendant Fitton published to Stone the false, misleading and defamatory statement that Plaintiff Klayman was ousted at Judicial Watch due to a sexual harassment complaint, who in turn, and in concert with Defendant Fitton, republished this false and defamatory statement on the internet in this district, domestically and internationally and elsewhere for the entire world to see and hear.

36. This false, misleading and defamatory statement was published with malice, as Defendant Fitton knew that it was false, or at a minimum acted with a reckless disregard for the truth.

37. This malicious statement created the false and misleading implication that Plaintiff Klayman has engaged been subject to a sexual harassment complaint and was ousted from Judicial Watch for this reason and committed criminal sexual offenses, as well as other matters of moral turpitude as set forth in this Complaint.

38. Plaintiff Klayman has been severely harmed damaged by this published statement because it subjected him to hatred, distrust, ridicule, contempt, and disgrace.

39. Plaintiff Klayman has been damaged by malicious this false and misleading statement, and others which will be disclosed during discovery, because the statements severely harmed and damaged Plaintiff Klayman in his profession and business as a public advocate and

as a syndicated radio talk show host who promotes ethics in government and the legal profession, and personally, as pled herein.

40.     On information and belief Defendant Fitton's defamatory conduct, in concert with Stone and individually, is on-going and as more defamatory conduct is uncovered through discovery and otherwise, this defamatory conduct will be subject to a motion to amend this Complaint.

41.     Defendant Fitton's malicious intent to severely harm and damage Plaintiff Klayman is largely based on an "inferiority complex" that he is not a lawyer and thus he feels competitive with Klayman. Indeed, at the time that Plaintiff left Judicial Watch on September 19, 2003, to run for the U.S. Senate in Florida Fitton had not graduated from college, his having lied to Klayman that he did have a bachelor's degree from George Washington University. This false statement fraudulently induced Klayman to offer him a job at the public interest organization. As a non-lawyer Fitton inappropriately does not have the background and expertise to now head Judicial Watch and make expert legal commentary on television, radio, the internet and in print, as Judicial Watch was conceived to in effect be and is a public interest law firm.

42.     Plaintiff Klayman has steadfastly demanded that Defendant Fitton refrain from making the malicious false and misleading statement as alleged herein, but he has refused and Fitton has also refused to correct this and other false and misleading statements in the past, regrettably necessitating the need for this and other legal complaints. The false and misleading statement published in concert with Stone has since been republished by others to severely harm and damage Plaintiff Klayman and his client Dr. Corsi. Defendant Fitton's campaign to severely harm and damage Plaintiff Klayman is maliciously intended to boost his own standing at the expense of Plaintiff Klayman in the conservative community, media and with donors and

elsewhere and it continues unabated.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Larry Klayman prays for judgment against Defendant Fitton as follows:

a.      Awarding Plaintiff Klayman compensatory including actual, consequential, incidental and punitive damages for malicious tortious conduct as alleged herein in an amount to be determined at trial and in excess of $35, 000,000 U.S. Dollars.

b.      Awarding Plaintiff Klayman attorney's fees and costs.

c.      Granting any such further relief as the Court deems appropriate including preliminary and permanent injunctive relief.

**PLAINTIFF KLAYMAN DEMANDS A JURY TRIAL ON ALL COUNTS SO TRIABLE.**

Dated: February 11, 2019                                    Respectfully Submitted,

                                                                             */s/ Larry Klayman*
                                                                    Larry Klayman, Esq.
                                                                    FL Bar No. 246220
                                                                    KLAYMAN LAW GROUP, P.A.
                                                                    c/o 2020 Pennsylvania Ave., N.W.
                                                                    Suite 800
                                                                    Washington, D.C. 20006
                                                                    Telephone:  (310) 595 - 0800
                                                                    Email: leklayman@gmail.com

Case 1:13-cv-20610-CMA   Document 157   Entered on FLSD Docket 06/11/2014   Page 1 of 1

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.: 13-20610-CIV-ALTONAGA

LARRY KLAYMAN,

    Plaintiff,

v.

JUDICIAL WATCH, INC.,

    Defendant.

_____/

### FINAL JUDGMENT

**THIS CAUSE** came for trial before the Court and a jury, United States District Judge, Cecilia M. Altonaga, presiding, and the issues having been duly tried and the jury having duly rendered its verdict on June 10, 2014, it is

**ORDERED AND ADJUDGED** that Judgment is entered in favor of Plaintiff, Larry Klayman, and against Defendant, Judicial Watch Inc., in the amount of **$156,000.00** for compensatory damages and **$25,000.00** for punitive damages, totaling **$181,000.00**, for which sum let execution issue. Requests for costs and attorneys' fees shall not be submitted until after any post-trial motions are decided or an appeal is concluded, whichever occurs later. This judgment shall bear interest at the rate as prescribed by 28 U.S.C. section 1961, and shall be enforceable as prescribed by 28 U.S.C. sections 2001–2007, 28 U.S.C. sections 3001–3308, and Federal Rule of Civil Procedure 69(a). The Clerk shall mark this case closed.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 11th day of June, 2014.

*Cecilia M. Altonaga*

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:    counsel of record

Certified to be a true and correct copy of the document on file
Steven M. Larimore, Clerk,
U.S. District Court
Southern District of Florida

By _Lisa I. Street_
    Deputy Clerk

Date _6-24-2016_

# [SUB]EXHIBIT 2
# Intentionally Omitted. *See* Main Ex. 1

EXHIBIT 6

# ABOUT LARRY KLAYMAN

Larry Klayman, founder of Judicial Watch and Freedom Watch, is known for his strong public interest advocacy in furtherance of ethics in government and individual freedoms and liberties. During his tenure at Judicial Watch, he obtained a court ruling that Bill Clinton committed a crime, the first lawyer ever to have done so against an American president. Larry became so famous for fighting corruption in the government and the legal profession that the NBC hit drama series "West Wing" created a character after him: Harry Klaypool of Freedom Watch. His character was played by actor John Diehl.

In 2004, Larry ran for the U.S. Senate as a Republican in Florida's primary. After the race ended, he founded Freedom Watch.

Larry graduated from Duke University with honors in political science and French literature. Later, he received a law degree from Emory University. During the administration of President Ronald Reagan, Larry was a Justice Department prosecutor and was on the trial team that succeeded in breaking up the telephone monopoly of AT&T, thereby creating competition in the telecommunications industry.

Between Duke and Emory, Larry worked for U.S. Senator Richard Schweiker (R-Pa.) during the Watergate era. He has also studied abroad and was a stagiaire for the Commission of the European Union in its Competition Directorate in Brussels, Belgium. During law school, Larry also worked for the U.S. International Trade Commission in Washington, D.C.

Larry speaks four languages—English, French, Italian, and Spanish—and is an international lawyer, among his many areas of legal expertise and practice.

The author of two books, *Fatal Neglect* and *Whores: Why and How I Came to Fight the Establishment,* Larry has a third book in the works dealing with the breakdown of our political and legal systems. His current book, *Whores,* is on now sale at WND.com, Amazon.com, BarnesandNoble.com, Borders.com, and all major stores and booksellers.

Larry is a frequent commentator on television and radio, as well as a weekly columnist, on Friday, for WND.com. He also writes a regular blog for Newsmax called "Klayman's Court."

Larry has been credited as being the inspiration for the Tea Party movement. (See "Larry Klayman - The One Man TEA Party," by Dr. Richard Swier, http://fwusa.org/KFA)



**Support the work of Freedom Watch at www.FreedomWatchUSA.org**

EXHIBIT 7

MINUTE ORDER as to ROGER J. STONE, JR. On February 19, 2019, the Court ordered the defendant to show cause at a hearing to be held on February 21, 2019 as to why the media communications order entered in this case 36 and/or defendant's conditions of release 21 should not be modified or revoked. A hearing was held on this date. For the reasons set forth on the record, and based upon the entire record, including the sealed exhibit to the hearing 42 , the testimony of the defendant, the arguments of counsel, and the submissions of the parties 28 29 filed in connection with the potential imposition of a media communications order, the Court entered the following order at the hearing: the conditions of defendant's pretrial release 21 are hereby modified to include the condition that, and the February 15, 2019 media communications order 36 is hereby modified to provide that, the defendant is prohibited from making statements to the media or in public settings about the Special Counsel's investigation or this case or any of the participants in the investigation or the case. The prohibition includes, but is not limited to, statements made about the case through the following means: radio broadcasts; interviews on television, on the radio, with print reporters, or on internet based media; press releases or press conferences; blogs or letters to the editor; and posts on Facebook, Twitter, Instagram, or any other form of social media. Furthermore, the defendant may not comment publicly about the case indirectly by having statements made publicly on his behalf by surrogates, family members, spokespersons, representatives, or volunteers. The order to show cause is hereby vacated. Signed by Judge Amy Berman Jackson on 2/21/19. (DMK) (Entered: 02/21/2019)

Stone deleted the only image in that multi-image post that included "Who framed Roger Stone" language shortly after CNBC emailed his lawyer to ask about it.



 rogerjstonejr  12m 



Stone's post was put online less than 48 hours after the judge, Amy Berman Jackson, ordered lawyers for the admitted Republican "dirty trickster" to explain why they did not tell her earlier about the planned publication of a book by Stone that could violate her gag order on him.



Constant Fatigue Is A Warning Sign – See The Simple Fix

Gundry MD

by Taboola

House Democrats unveil a sweeping 'Medicare-for-all' bill — here's what's in it

Michael Cohen's testimony gives both sides fodder in a possible impeachment fight

A 'shock and awe' rally


CNBC TV


MENU

Bloomberg aides interview staffers in New Hampshire, Iowa as the billionaire considers 2020 run

These are the cities where you can live comfortably on $50,000 a year

Michael Cohen says prosecutors are investigating previously undisclosed wrongdoing related to Trump

**TRENDING NOW**


1. Brett Kavanaugh: State laws blocking taxpayer-funded church repairs are 'pure discrimination'


2. Southwest Airlines starts selling its first Hawaii flights, from $49 one way


3. Tesla's onslaught of announcements is raising red flags about demand for its cars

Roger Stone suggests Robert

Stone announced on Instagram in January that he was coming out with the book, "The Myth of Russian Collusion: The Inside Story of How Trump Really Won."

In her gag order in U.S District Court in Washington, D.C., Jackson barred Stone from "making statements to the media or in public settings about the Special Counsel's investigation or this case or any of the participants in the investigation or the case."

The gag extends to "posts on Facebook, Twitter, Instagram or any other form of social media." If Stone violates the order, Jackson could order him jailed without bail until his trial.

Jackson had slapped that order on Stone on Feb. 21 after he posted on Instagram a photo showing the judge's face next to a rifle scope's



Mueller 'framed' him in Instagram post that could violate gag order



5. 'Beverly Hills, 90210' and 'Riverdale' star Luke Perry died at 52 after suffering a massive stroke

---

MARKETS    WATCHLIST    CNBC TV    MENU



**rogerjstonejr**

**Jon Swaine** @jonswaine

Roger Stone now directly attacking the federal judge presiding over his case and posting a pic of her head beside crosshairs

9,929   11:12 AM - Feb 18, 2019

10.2K people are talking about this

Stone's new post is comprised of a rotating series of images that ask for money to support Stone's defense to charges that he lied to Congress and tampered with a witness.

One says, "I am committed to proving my innocence. But I need your help." Another photo, which shows a young Stone standing



behind Trump years ago, says, "I've always had Trump's back. Will you have mine?" Two other images tout a "Roger Stone Did Nothing Wrong" t-shirt and "Stone Cold Truth" sweatshirt.

The post originally had an image showing Stone wearing eyeglasses under the words "Who Framed Roger Stone," a reference to the movie "Who Framed Roger Rabbit." The image has been on the Internet for some time.



rogerjstonejr   12m

**Shelby Holliday**
@shelbyholliday

New in Instagramland: Roger Stone, using Insta stories (which disappear after 24 hrs), suggests he's being framed.

2,224   10:40 AM - Mar 3, 2019

2,253 people are talking about this

A spokesman for Mueller declined to comment Sunday. Stone's lawyer did not immediately respond to a request for comment.

Stone, who remains free on a $250,000 signature bond, was arrested in Florida in late January and has pleaded not guilty to the seven counts against him, including making false statements to Congress, witness tampering and obstructing justice.

Mueller has said Stone lied to Congress about his alleged efforts to have WikiLeaks release material hacked by Russian agents from Democrats, including Hillary Clinton's campaign chairman, during the 2016 campaign that ended with Trump's victory.

An indictment alleges Stone was in contact with top-ranking Trump campaign officials about efforts to leak damaging information about Clinton right before Election Day.



**Dan Mangan**
Reporter

FROM THE WEB                                   Sponsored Links by Taboola

**Drivers who switch save an average of $668 on car insurance.**
Progressive

**Before you renew Amazon Prime, read this**
Wikibuy

**U.S. Cardiologist: It's Like a Pressure Wash for Your Insides**
Health Headlines

**Man Who Called DOW 20,000 Has Surprising New Prediction**
Investing Outlook

**These German hearing aids are going viral**
hear.com

**If Your Indoor Cat Vomits (Do This Every Day)**
Ultimate Pet Nutrition






MORE FROM CNBC                                   by Taboola

House Judiciary Committee chair Nadler says Trump obstructed justice, will request documents

Trump will be 'very tough to beat' in 2020 if he gets three things right: Scaramucci

Cohen brings Trump's net worth statements to hearing. Here's how to read them

Trump, from Vietnam, berates 'Da Nang Dick' Blumenthal for war record

Michael Cohen: 'I fear' Trump won't peacefully give up the White House if he loses the 2020 election

GOP Rep. tweets at Michael Cohen on eve of hearing: Does your wife 'know about your girlfriends?'